# EXHIBIT E

# VANDERBILT    LAW    REVIEW

VOLUME 29                JANUARY 1976                NUMBER 1

# The Commodity Futures Trading Commission Act: Preemption as Public Policy

*Philip F. Johnson**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | PRIOR EFFORTS AT REGULATORY CENTRALIZATION | 5 |
| III. | THE LEGISLATIVE HISTORY OF THE CFTC ACT | 7 |
|  | A.   The 1973-1974 Hearings | 7 |
|  | B.   The Conference | 17 |
|  | C.   The Appointments Delay | 19 |
| IV. | THE LEGISLATIVE AFTERMATH | 20 |
| V. | SUBSEQUENT LEGISLATIVE EFFORTS | 26 |
| VI. | THE JUDICIAL RESPONSE | 28 |
| VII. | THE REMAINING ISSUES | 31 |
|  | A.   Private Suits Under Other Statutes | 32 |
|  | B.   The Prevention of Fraud | 36 |
| VIII. | CONCLUSION | 42 |

## I.  INTRODUCTION

On October 23, 1974, President Ford signed into law P.L. 93-463, bearing the breathless title "Commodity Futures Trading Commission Act of 1974"[1] [hereinafter the CFTC Act]. The CFTC Act followed a series of hearings, beginning in the summer of 1973, held first by a subcommittee of the House Committee on Small Business[2] and followed rapidly by the more traditional oversight committees

---

*Member of the Illinois Bar; A.B., Indiana University, 1959; LL.B., Yale University, 1962.

1. Pub. L. No. 93-463, 88 Stat. 1389, *amending* 7 U.S.C. § 1 (1970) (codified at 7 U.S.C.A. § 1 (Supp. 1, 1975)).

2. *Hearings Before the Subcomm. on Special Small Business Problems of the House Permanent Select Comm. on Small Business*, 93d Cong., 1st Sess. (1973).

1

HeinOnline -- 29 Vand. L. Rev. 1 1976

of the Congress—the House Agriculture Committee[3] and the Senate Agriculture and Forestry Committee.[4] The result was a major overhaul of the Commodity Exchange Act,[5] which had governed the commodity futures markets since 1922. More significantly, however, the Act has become an experiment in centralizing regulatory power within a single federal agency—the Commodity Futures Trading Commission [hereinafter CFTC]—and has resulted in the preemption of all other would-be regulators at every level of government.

During the 1973-1974 period the rather obscure commodity futures industry was not merely alive and well; it was thriving. The twelve organized commodity exchanges[6] in the United States registered record trading volume in 1973: 51.6 million futures transactions having an estimated dollar value of $520 billion.[7] The year 1974 was even better: 55.4 million transactions worth $571 billion.[8] These growth figures reflect an amazing 400% increase in trading volume in the ten years since 1964.[9] These are hardly the typical circumstances that invite congressional attention toward an industry, nor was this the crisis-oriented environment in which Congress is most apt to respond. And yet, both the futures industry and Congress—for both complementary and differing reasons—were enthusiastic about legislative action. The industry wished to modernize the archaic Commodity Exchange Act, basically an agriculture bill, to facilitate the extension of futures trading into nonfood

---

3. *Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess. (1973); *Hearings on H.R. 11,955 Before the House Comm. on Agriculture*, 93d Cong., 2d Sess. (1974) [hereinafter cited as *Hearings on H.R. 11,955*].

4. *Hearings on S. 2485, S. 2578, S. 2837, & H.R. 13,113 Before the Senate Comm. on Agriculture & Forestry*, 93d Cong., 2d Sess. (1974) [hereinafter cited as *Hearings on H.R. 13,113*].

5. 7 U.S.C. § 1 (1970). The many substantive changes made in the Commodity Exchange Act by the 1974 CFTC Act have been reported elsewhere and will not be reviewed in this article. *See, e.g.*, Rainbolt, *What the New Commodity Futures Trading Commission Means to You*, COMMODITIES, Feb. 1975, at 23-26; Johnson, *Antitrust Under the CFTC Act: An Ounce of Prevention . . .* , 20 ANTITRUST BULL. 441 (1975); Johnson, *The Changing Face of Commodities Regulation*, 20 PRAC. LAW., Dec. 1974, at 27; Johnson, *The Commodity Futures Trading Commission: Newest Member of Each Exchange's Management Team*, 34 FED. B.J. 173 (1975); Schroeder & Pollack, *Commodities Regulation*, 8 REV. SEC. REG., no. 7, (Apr. 9, 1975); Note, *The Role of the Commodity Futures Trading Commission Under the CFTC Act of 1974*, 73 MICH. L. REV. 710 (1975).

6. Chicago Board of Trade; Chicago Mercantile Exchange; Mid-America Commodity Exchange (Chicago); Kansas City Board of Trade; Minneapolis Grain Exchange; New York Cocoa Exchange; New York Coffee and Sugar Exchange; Commodity Exchange, Inc. (New York); New York Cotton Exchange and Associates; New York Mercantile Exchange; Pacific Commodity Exchange (San Francisco); West Coast Commodity Exchange (Los Angeles).

7. Bulletin No. 1304 of the Ass'n of Commodity Exchange Firms, Inc., New York, N.Y.

8. These figures were supplied by the Futures Industry Ass'n, New York, N.Y.

9. H.R. REP. No. 93-975, 93d Cong., 2d Sess. 156 (1974).

HeinOnline -- 29 Vand. L. Rev. 2 1976

Case 1:07-cv-06682-DC    Document 5-8    Filed 08/16/2007    Page 4 of 20

areas. In addition, the industry had suffered from scandals in so-called "naked options," which although they occurred outside of the industry, routinely were identified in the media as part of the "commodities" business.[10] Congress, on the other hand, was under great public pressure to find a solution to the changing economics of food production, distribution, and marketing. If the futures markets with their *multi-billion* dollar volume[11] were responsible in any way for the rising cost of food, for example, or if those markets could provide some relief from that burden, legislative action would be in order. Thus, hearings in the Congress to modernize the Commodity Exchange Act generally were well received by all concerned.

Curiously, the legislative process began with Congress and the futures industry concerned about quite different things. Congress continued to envision the futures markets in their traditional role as part of the agricultural community; hence its interest centered upon food prices and food marketing. The futures industry realized, on the other hand, that its dependence upon an agricultural role had lessened in recent years because of the introduction of futures trading in many nonfood items. Even before Congress began to evolve the CFTC Act, futures markets were offering trading in the following other products:

| | |
|---|---|
| Cocoa | Iced Broilers |
| Coffee | Lumber |
| Copper | Mercury |
| Foreign currency: | Palladium |
|     British Pound | Platinum |
|     Canadian Dollar | Plywood |
|     Deutschmark | Propane Gas |
|     Dutch Guilders | Silver |
|     Japanese Yen | Silver Coins |
|     Mexican Peso | Sugar |
|     Swiss Franc | |
|     Canadian Silver Coins | |

---

10. *See, e.g.*, Long, *The Naked Commodity Option Contract as a Security*, 15 WM. & MARY L. REV. 211, 214-17 (1973); Wall Street J. (East. ed.) Mar. 6, 1973, at 4, Feb. 28, 1973, at 2, Feb. 23, 1973, at 25, Feb. 8, 1973, at 18, Feb. 7, 1973, at 36, Feb. 2, 1973, at 44, Nov. 3, 1972, at 6.

11. The "dollar volume" calculation is more hypothetical than real. It is the estimated total cost of each transaction if it were to result in delivery of the underlying commodity and payment of the full purchase price. Since few transactions result in delivery, but rather are "offset" in the market, the actual cost is usually only the difference between acquiring and liquidating the futures position in the market.

The focus of industry interest in legislation, therefore, was to update the Commodity Exchange Act in light of the rapidly expanding universe of the futures markets.

The problem with the Commodity Exchange Act was its applicability to only a specified number of identified agricultural products. The Act's coverage was limited to "commodities" as defined in section 2, which was a narrow listing of specific farm items:

> The word "commodity" shall mean wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, onions, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice.[12]

Since none of the products shown in the table above were listed in section 2, the Act did not apply to trading in them, and thus an additional potential risk existed for persons trading in those products. The federal watchdogs under the Act, the Commodity Exchange Commission and the Secretary of Agriculture, could not regulate trading in these items. Neither the markets nor the brokers engaged in the trading were subject to federal screening or approval. The antifraud provisions of the Act, and the important requirement that all customer money must be segregated from the broker's own funds, were inapplicable. It was simply a matter of time, the industry feared, before these promising new fields for futures trading would be tainted by scandal. As previously noted, scandals in "naked options" outside the industry already had emerged in the absence of strong federal oversight. The industry thus committed itself to a major modernization of the Commodity Exchange Act and to the elimination of the regulatory gap caused by the Act's outdated definition of "commodity."

Closing the regulatory gap could be accomplished in a variety of ways. One approach, similar to what had occurred under the Act in the past, was to extend the definition of "commodity" to include each of the nonfood products already traded and, thereafter, as new items were introduced, to add to the list. The obvious disadvantage of this approach was that repeated amendments by Congress would be necessary; the Act's definition of "commodity" already had been amended many times simply to keep abreast of new *food* items being traded. Also, it could be expected that each new item would trade for awhile free from the Act's coverage because of the lead time needed for amendatory relief, thus perpetuating the regulatory

---

12.  7 U.S.C. § 2 (1970).

gap. In balance, the better solution appeared to be to define the term "commodity" in the broadest possible way, so that each new futures contract—no matter what is traded—would automatically be covered by the Commodity Exchange Act.

Assuming that Congress could be persuaded to expand the Commodity Exchange Act to embrace all things that were or could be traded under futures contracts, it remained for Congress and the industry to determine how best to reach that objective. The Act as then worded covered most major agricultural products and gave regulatory jurisdiction to the logical federal official, the Secretary of Agriculture. A new definition, embracing all products that might underlie a futures contract, eventually would cover trading activity outside the Secretary's traditional jurisdiction and expertise and potentially within the jurisdiction of other federal, state, or local public regulatory bodies. For example, futures trading in propane would fall outside the traditional purview of the Secretary of Agriculture. Similarly, in the 1973-1974 period Congress was aware that futures markets were actively investigating new contracts in items ranging from mortgages to petroleum allocations.[13] Other federal, state, and local agencies might evince a regulatory interest in these items. The potential for a hodgepodge of regulatory requirements, acting in countervailing or conflicting fashion to one another, clearly was present—unless, of course, Congress centralized regulatory power in a single federal agency.

The balance of this article will discuss the legislative history of the 1974 amendments as it pertains to the jurisdiction of the CFTC, the centralization of regulatory power in the CFTC, and the preemption of other regulators. Later developments in the legislature will be discussed along with the emerging case law. This article will conclude with an examination of two key issues that must be resolved: the status of private litigation under other state and federal statutes and the antifraud provisions of the CFTC Act.

## II.  PRIOR EFFORTS AT REGULATORY CENTRALIZATION

The question of how to avoid regulatory congestion if futures trading in all products were brought under the Commodity Exchange Act had been addressed prior to 1973. In December 1970, the securities industry had obtained passage of the Securities Investor Protection Act,[14] which, among other things, insured securities cus-

---

13.  *See* H.R. REP. No. 93-975, *supra* note 9, at 41.
14.  Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa (1970).

tomers against loss, within limits, in the event of the financial collapse of the carrying brokerage firm. In addition to contributions from the securities industry, the insurance reserve was backed by a $1 billion call upon the Treasury of the United States. In early 1971 attorneys for the Department of Agriculture, at the request of the Commodity Exchange Authority [hereinafter CEA],[15] prepared similar legislation to insure commodity futures customers against loss due to broker insolvencies. The draft legislation was circulated to the various commodity exchanges for their comments. Thereafter, as the result of negotiations principally between the CEA and the Chicago Board of Trade, a mutually acceptable text was agreed upon and introduced in the Senate as S. 1921 on May 21, 1971, by Senator Everett Jordan. The bill was then entitled "The Federal Commodity Account Insurance Corporation Act."[16]

Nothing in S. 1921 sought to extend the jurisdiction of the Commodity Exchange Act over futures trading in nonfarm items. Instead, in recognition of the potential additional risk of customer loss if an unregulated broker became insolvent, mainly because the segregation requirements of the Act did not apply, the bill provided for variable assessment rates based upon this or other risk factors. In addition to assessments from the industry, the bill provided for a $50 million call upon the Treasury in emergencies.

Because of the involvement of Treasury funds in the proposed program, S. 1921 had to be reviewed by the Office of Management and Budget before it could receive Administration backing. In a series of conferences and communications between the Administration and the Chicago Board of Trade, it became evident that the Administration's backing could not be expected as long as futures trading in nonfood items remained outside the jurisdiction of the Commodity Exchange Act. Accordingly, in the hope of facilitating the progress of S. 1921, the Chicago Board of Trade prepared and tendered an additional bill[17] that redefined the term "commodity" in section 2 of the Act to be all-inclusive: "The word 'commodity' [includes] anything deliverable upon a contract of sale for future delivery. . . ."[18]

---

15.  The Commodity Exchange Authority was the bureau within the Department of Agriculture to which the Secretary had delegated his responsibilities under the Commodity Exchange Act.

16.  The bill is reprinted in full in *Hearings Before the Subcomm. on Special Small Business Problems of the House Permanent Select Comm. on Small Business*, 93d Cong., 1st Sess. 145-55 (1973).

17.  *Id.* at 143-45.

18.  *Id.* at 144.

The bill offered by the Chicago Board of Trade in 1971 also sought to deal with the regulatory aftermath of the proposed expansion of the term "commodity" by vesting exclusive jurisdiction in one agency.[19] The exact language proposed for this purpose by the Chicago Board of Trade was as follows:

> Sec. 11. The jurisdiction conferred by this Act upon the Secretary of Agriculture and the Commission to administer and enforce the act, and to establish requirements governing transactions and markets in contracts of sale of any commodity for future delivery, shall be exclusive; and no act of Congress shall be construed to empower any other department, agency, instrumentality or officer of the United States to adopt or impose regulatory requirements applicable to transactions or markets in any such contract.[20]

Neither this bill, nor the proposed "Federal Commodity Account Insurance Corporation Act," was ever acted upon by Congress.

### III.   THE LEGISLATIVE HISTORY OF THE CFTC ACT

#### A.   *The 1973-1974 Hearings*

When a subcommittee of the House Permanent Select Committee on Small Business held hearings over the summer of 1973 to consider possible new legislation for the futures industry, the Chicago Board of Trade seized upon the opportunity to reintroduce its 1971 bills. Its chairman presented both proposals to the subcommittee and gave testimony explaining the bills:

> Is additional legislation necessary to strengthen the regulation of futures markets?
> So far as the Board of Trade is concerned the answer is an unqualified "Yes." As a matter of fact, the board has long advocated additional legislation—legislation, for example, which would have prevented the commodity put-and-call scandals of the last year or so.
> Some time ago, we submitted to the House Agriculture Committee and the Department of Agriculture a bill to regulate all commodities. The bill is

---

19. An explanatory comment to this Bill stated that the legislature should:

   Add a new section 11 to the act . . . placing complete regulatory authority over futures trading under the Secretary of Agriculture and the Commodity Exchange Commission. Under the present act, jurisdiction resides with the Secretary and the Comission. However, the amendment to section 2(a) will extend their jurisdiction to include certain activities or articles which might also fall under another Department or agency as a technical matter, even though no other Department or agency has undertaken to regulate futures trading in those areas. For example, the metals traded for future delivery might be also within the purview of the Department of Commerce or of the Interior, although neither has ever involved itself in this activity. Section 11 would make clear that the Secretary of Agriculture and the Commodity Exchange Commission shall regulate futures trading, thus assuring uniform regulation and avoiding duplication of costs and functions by other Federal bodies.

*Id.*

20.  *Id.* at 145.

8            *VANDERBILT LAW REVIEW*            [Vol. 29:1

similar to bills introduced by Congressmen Foley and Findley, but has two significant additions.

. . .

Second, our proposal for legislation would place complete regulatory authority over all futures trading under the CEA. This would be an extension of jurisdiction, and it would prevent jurisdictional conflicts which might arise from the establishment of trading in commodities or instruments over which some other Federal agency might feel it had authority.

In 1971, the Chicago Board of Trade prepared a bill which was introduced in the Senate to create a Federal Commodity Account Insurance Corporation to provide commodity customers the same financial guarantees that the SIPC bill gives security customers. I'll not go further into details other than to indicate that copies of both of these proposals are being submitted to this subcommittee and to the House Agriculture Committee for consideration. We feel both should be enacted as promptly as possible.[21]

The House Committee on Agriculture began a series of hearings on October 16, 1973, to consider possible improvements in the Commodity Exchange Act. Witnesses were encouraged to discuss a series of twenty-five issues formulated by the Committee, including whether all futures trading should be regulated under the Act and whether a SIPC-type customer insurance plan should be developed. The chairman of the Chicago Board of Trade reasserted the exchange's support for both proposals, emphasizing once again the importance of vesting exclusive regulatory jurisdiction in a single agency:

7. *Regulation of All Commodities.* We favor this and have submitted a bill. We want to place particular emphasis on that provision in our bill which would give the commodity regulatory agency exclusive jurisdiction over futures trading. This would prevent any possible conflicts over jurisdiction over futures trading. This would prevent any possible conflicts over jurisdiction.[22]

At these initial hearings, the Chicago Board of Trade was the only witness directly to address the need for "exclusive" jurisdiction in a single agency, although the testimony of some other witnesses seemed to infer a comparable objective.[23]

On December 13, 1973, a draft bill, was finalized by a subcommittee of the House Committee on Agriculture and was introduced as H.R. 11,955. The bill included many major changes in the Commodity Exchange Act, including the creation of a new and independent Commodity Futures Trading Commission to replace the earlier CEA and Secretary of Agriculture, and greatly expanding enforcement powers under the Act. Moreover, H.R. 11,955 redefined the

---

21.   *Id.* at 141-42.

22.   *Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess. 128 (1973).

23.   See, e.g., the testimony for Cargill, Inc. that the agency "ought to be the focus of authority for regulating all commodity futures trading. . . ." *Id.* at 169.

term "commodity" by adding the following open-ended phrase after the previous listing of specific agricultural items:

> . . . and all [other] goods and articles and all services, rights and interests in which contracts for future delivery are presently or in the future dealt in . . . .[24]

In this fashion an initial attempt was made to extend the Commodity Exchange Act to cover both existing nonagricultural futures contracts and all new contracts that would be developed in future years. Equally significant was the expansion of the definition of "commodity" clearly to embrace intangibles ("services, rights and interests") as well as tangible products.

The redefinition of "commodity" in H.R. 11,955 left unresolved whether all other federal, state, and local agencies could regulate futures trading in items under their technical jurisdictions. Indeed, H.R. 11,955 seemed to confuse the issue. Although it said nothing about the scores of other agencies at all levels of government that might claim jurisdiction under certain circumstances, H.R. 11,955 singled out the Securities and Exchange Commission [hereinafter SEC] and declared that its jurisdiction was *not* to be affected:

> *Provided*, That nothing contained in this Act shall preclude the Securities and Exchange Commission from carrying out its duties and responsibilities in accordance with the laws of the United States under which it was established and currently functions.[25]

Did this mean that the SEC alone would be permitted to share the regulatory effort with the futures agency, or had the SEC merely forced a breach in H.R. 11,955 through which any other public regulator likewise could pass?

Whatever the explanation for singling out the SEC in a jurisdictional saving clause in H.R. 11,955, it appears likely that the SEC had been consulted on the subject. In fact there were several lengthy bills to amend the Commodity Exchange Act that were introduced in the House and Senate either prior to or immediately after H.R. 11,955, all of which contained similar special language for the SEC's benefit. For example, as early as September 26, 1973, Senator Humphrey introduced S. 2485, which, after expanding the definition of "commodity," contained this saving clause:

> *Provided*, that nothing in this definition shall be construed to derogate from the jurisdiction of the Securities and Exchange Commission.[26]

---

24.  *Hearings on H.R. 11,955, supra* note 3, at 348.

25.  *Id.*

26.  *See Hearings on H.R. 13,113, supra* note 4, pt. 1, at 3.

Other, later bills contained similar language: On October 12, 1973, Senator McGovern introduced S. 2578, which contained language identical to the Humphrey bill; and on October 30, 1973, Congressman Neal Smith introduced H.R. 11,195, which also contained identical language. Thus, the origin of the SEC saving clause appears to be the Humphrey bill. Neither Senator Humphrey's remarks when introducing S. 2485,[27] however, nor his testimony at the later hearings before the Senate Agriculture and Forestry Committee,[28] mention the reservation of SEC jurisdiction or reveal to what extent the SEC was involved in the original formulation of that clause.

The House Committee on Agriculture announced a new set of hearings beginning on January 23, 1974, that focused upon the specific text of H.R. 11,955. The Chicago Board of Trade reiterated its position that a single agency should have exclusive jurisdiction, and, it addressed specifically the proviso in H.R. 11,955 on the SEC's jurisdiction:

> Another area of concern—and the final area in which we are urging modification of the proposed act—involves the broadening of the definition of the term "commodity" (sec. 201). It appears that the definition would be sufficiently broad to include all presently foreseeable futures contracts.
>
> While we favor this broadened definition, we believe it would be highly imprudent to give jurisdiction to the Securities and Exchange Commission over futures trading in instruments that might fall within the expansive definition of "security." It would unavoidably result in major conflict of policy and regulation.
>
> The distinguished chairman of this committee was among the first to recognize the pitfall of placing the regulation of futures trading within the SEC.[29] As the chairman most wisely pointed out, "there is little correlation in theory or fact between the regulation of futures trading and the regulation of securities transactions."
>
> The inherent differences would quickly become evident if, for example, futures trading in mortgages were to be initiated. There is, at the present time, considerable pressure within the lending industry for a futures market in mortgages due to the extreme volatility of interest rates. Mortgages, however, have been defined as securities. Thus, any exchange contemplating a futures market in mortgages would find itself in a regulatory morass of conflicting legislation and rules.[30]

---

27. 119 CONG. REC. 17,727 (1973).

28. *Hearings on H.R. 13,113, supra* note 4, pt. 1, at 371-84. Indeed, the SEC did not testify at *any* of the hearings held on the CFTC Act or submit any materials for the record.

29. The comment referred to the introductory remarks of the Committee's chairman, W.R. Poage, on December 13, 1973, in the House of Representatives. 119 CONG. REC. 41,331-35 (1973).

30. On October 20, 1975, the Chicago Board of Trade opened trading in a form of mortgage futures contract, involving the participation certificates of the Government National Mortgage Association, after gaining approval ("designation") of the contract by the CFTC under § 5 of the Commodity Exchange Act.

HeinOnline -- 29 Vand. L. Rev. 10 1976

> It is therefore our recommendation that the SEC's jurisdiction remain confined to securities transaction[s] and securities markets other than futures contracts and futures markets. This, of course, would in no way rule out close liaison and consultation between the two agencies. Indeed, the Commission might choose to adopt certain SEC policies where it promotes the act. Such a relationship could be carried out informally or it could be specifically provided for in the act itself.[31]

Other witnesses likewise objected to the jurisdictional proviso, although some did not discuss the desirability of vesting exclusive jurisdiction in a single agency.[32] A number of commodity exchange and trade interests, on the other hand, joined the Chicago Board of Trade in urging that the SEC be ousted of any present or potential role in the regulation of futures trading.[33]

After the second round of hearings were concluded on January 31, 1974, the House Committee on Agriculture promptly began "mark up" sessions to finalize the text of its bill. On February 6, 1974, the Committee revised the jurisdictional provision in section 201 of H. R. 11,955 in a manner described as "clarifying Commodity Futures Commission and SEC jurisdiction."[34] Instead, the new language seemed only to confuse the issue. The new CFTC was given "exclusive jurisdiction" over futures trading but, curiously, the provision continued to carry the protective language for the SEC and *expanded* the language to benefit all other federal agencies as well:

> *Provided*, that the Commission [CFTC] shall have exclusive jurisdiction of transactions dealing in, resulting in, or relating to contracts of sale of a commodity for future delivery, traded or executed on a domestic board of trade or contract market or on any other board of trade, exchange, or market:
> *And provided further*, That nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities Exchange Commission [*sic*] or other regulatory authorities under the laws of the United States or restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with laws of the United States.[35]

What did this language mean? If the CFTC's jurisdiction were declared "exclusive," then there must be other public agencies that were excluded from exercising jurisdiction over futures trading. Yet, at least as to other federal agencies, the new provision seemed to

---

31.  *Hearings on H.R. 11,955, supra* note 3, at 168.
32.  *See, e.g.,* testimony on behalf of the National Grain Trade Council, *id.* at 51; testimony on behalf of the Minneapolis Grain Exchange, *id.* at 97.
33.  *Id.* at 105, 113-14 (Chicago Merchantile Exchange); *id.* at 249, 253 (New York Coffee & Sugar Exchange, Inc.; Commodity Exchange, Inc.; New York Cocoa Exchange, Inc.); *id.* at 322 (Continental Grain Co.).
34.  House Comm. on Agriculture, Memorandum for Members and Comm. Staff, Feb. 6, 1974, at 1 (copy available through *Vanderbilt Law Review*).
35.  *See Hearings on H.R. 13,113, supra* note 4, pt. 1, at 140-41.

*VANDERBILT LAW REVIEW*    [Vol. 29:1

guarantee to each of them a complete retention of their existing and potential jurisdiction.

The House Committee on Agriculture reintroduced its bill with the "mark up" changes as H.R. 13,113 and filed a Report on April 4, 1974.[36] In its Report, the Committee endeavored to reconcile the jurisdictional language of section 201 by stating that the retention of jurisdiction by other agencies was limited to those areas *other than futures trading on a contract market* (designated commodity exchange). Additionally the Report made clear in a somewhat backhanded fashion that the CFTC's exclusive jurisdiction would embrace securities, and would preempt the SEC, if the securities were the subject of futures trading on a contract market:

> Although the expanded definition of "commodity" contained in Section 201(B) may include rights and interests which are securities as defined in the federal securities laws, *except in the area of transactions involving a contract market*, the jurisdiction of the Commodity Futures Trading Commission ("CFTC") over any such rights and interest[s] is intended to exist concurrently with the jurisdiction vested in the Securities and Exchange Commission. Accordingly, the first proviso of the Section 201(B) indicates that the CFTC's jurisdiction shall be exclusive with respect to transactions involving contracts of sale of a commodity for future delivery which are traded or executed on a contract market that has been designated pursuant to Section 5 of the Commodity Exchange Act (the "CEA") (7 U.S.C. § 7) and which, in accordance with Section 4h of the CEA (7 U.S.C. § 6), may not lawfully be executed or consummated otherwise than through a member of a contract market, and the second proviso of Section 201(B) indicates that, *except as to transactions covered by the first proviso*, the expanded definition of commodity is not intended to [derogate] from the jurisdiction of the Securities and Exchange Commission (the "SEC").[37] [Emphasis added]

But for the explanatory statements in the Report, the text of section 201(B) of H.R. 13,113 as it related to the CFTC's "exclusive jurisdiction" would have been hopelessly muddled. The authors of H.R. 13,113 on the Committee, and its staff, were skilled draftsmen, and the murky language of section 201(B) does not reflect in any way upon their talents. Rather, the condition of the text itself and the somewhat cumbersome but effective clarification in the Report are best explained by the trepidation felt in the Congress, even in compelling circumstances, whenever it realigns power ("jurisdiction") between agencies within the federal establishment. Similar delicate language was used by the Committee's chairman in presenting the bill to the full House on April 11, 1974:

> Title II provides broad new authority to the new Commission over futures

---

36.  H.R. REP. No. 93-975, *supra* note 9.
37.  *Id.*, pt. 1 at 38.

HeinOnline -- 29 Vand. L. Rev. 12 1976

trading in a number of areas. All commodity trading in futures will be brought within federal regulation under the aegis of the new Commission, however, provision is made for the preservation of Securities Exchange Commission jurisdiction *in those areas traditionally regulated by it*.[38] [Emphasis added]

Since the SEC had never regulated futures trading or futures markets, it would seem that nothing over which the CFTC had exclusive jurisdiction—including possible futures trading in securities—would constitute "areas traditionally regulated by" the SEC.

Having concluded its work, the House Committee on Agriculture forwarded its final effort, H.R. 13,113, to the Senate Agriculture and Forestry Committee where that bill joined several others sponsored by Senators Humphrey (S. 2485), McGovern (S. 2578), and Hart (S. 2837).[39] The Senate Committee held hearings on the various bills from May 13 through May 22, 1974.[40] Although the Chicago Board of Trade and other industry witnesses favoring exclusive jurisdiction testified on unresolved issues at those hearings, the principal effort to remedy the ambivalent text in section 201(B) occurred in discussions at the staff level. It was pointed out, for example, that the Report of the House Committee on Agriculture disclosed the true intent of sponsors of H.R. 13,113 to foreclose other agencies from regulating futures trading on organized futures markets, regardless of their interest in the underlying "commodity." The Senate Committee thereafter revised section 201(B) of H.R. 13,113 to codify that intent. The solution was a relatively simple one: All that was needed to reconcile the first proviso of section 201(B) on the CFTC's "exclusive jurisdiction" over futures trading with the second proviso's preservation of other agencies' jurisdiction was to insert the phrase "except as hereinabove provided" between the two clauses. Thus, the Senate version of section 201(B) was made to read as follows:

Provided, That the Commission shall have exclusive jurisdiction with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act and which, in accordance with section 4h of this Act, may not lawfully be executed or consummated otherwise than through a member of a contract market: And provided further, That, *except as hereinabove provided*, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States

---

38.    120 CONG. REC., 42,925 (daily ed. Apr. 11, 1974). Indeed the Committee's chairman warned the House in the same remarks against assuming that futures trading is similar to the activities which the SEC regulates. *Id.* at H. 2924.

39.    The bills are reproduced in *Hearings on H.R. 13,113, supra* note 4, pt. 1, at 1-124.

40.    *Id.* pts. 1-3.

*VANDERBILT LAW REVIEW*                    [Vol. 29:1

or of any State, or (ii) restrict the Securities and Exchange Commission and
such other authorities from carrying out their duties and responsibilities in
accordance with such laws.[41] [Emphasis added]

Although the Senate Committee made other significant improve-
ments in section 201(B), discussed below, its principal contribution
on the matter of exclusive jurisdiction was to build the bridge ("ex-
cept as hereinabove provided")[42] between the first and second provi-
sos, which for the first time permitted the reader of section 201(B)
itself to discern the congressional objective.

The Report prepared by the Senate Agriculture and Forestry
Committee likewise was clearer on the issue of "exclusive jurisdic-
tion." Characterizing its contribution to section 201(B) as a "clarifi-
cation," the Committee offered a straightforward explanation in its
Report:

> The House bill provides for exclusive jurisdiction of the Commission over
> all futures transactions. However, it is provided that such exclusive jurisdic-
> tion would not supersede or limit the jurisdiction of the Securities and Ex-
> change Commission or other regulatory authorities.
> The [Senate] Committee amendment retains the provision of the House
> bill but adds three clarifying amendments. The clarifying amendments make
> clear that (a) the Commission's jurisdiction over futures contract markets or
> other exchanges is exclusive and includes the regulation of commodity ac-
> counts, commodity trading agreements, and commodity options; (b) the Com-
> mission's jurisdiction, where applicable, supersedes State as well as Federal
> agencies. . . .[43]

Thus, the Senate Agriculture and Forestry Committee under-
took to transform the House's professed intent into specific statu-
tory language vesting exclusive jurisdiction in the new CFTC over
futures trading on commodity markets, thereby preempting the
SEC and all other public agencies that, absent section 201(B),
might undertake to regulate that field. But the contribution of the
Senate Committee went much further. For example, it extended the
CFTC's exclusive jurisdiction to "accounts" and "agreements" as
well as "transactions" for future delivery on a contract market. This
important change extended the Act to the activities surrounding
trading, such as the regulation of so-called "discretionary accounts"
or "discretionary agreements" common in futures trading, which
had sometimes been treated as "securities" in the courts.[44] Simi-

---

41.  S. Rep. No. 93-1131, 93d Cong., 2d Sess. 54 (1974).

42.  The critical role of this phrase in the Senate Committee's solution is demonstrated
by its own special reference to the clause in its Report. *Id.* at 31.

43.  *Id.* at 6.

44.  Federal appellate courts have held that discretionary commodity accounts are not
securities subject to SEC regulation. *See* Milnarik v. M-S Commodities, Inc., 457 F.2d 274
(7th Cir. 1972), *cert. denied*, 409 U.S. 887 (1972); Wasnowic v. Chicago Bd. of Trade, 352 F.

larly, the CFTC's exclusive jurisdiction was extended to commodity options, and to "leverage contracts" in gold and silver bullion and bulk coins, which had also come under attack as "securities."[45] Additionally, the Senate Committee clarified the point that state agencies, such as the various "blue sky" commissions, were preempted to the same extent as the other federal agencies: "The Committee wished to make clear that where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies."[46]

The Senate Committee, on the other hand, modified the House version of H.R. 13,113 in several significant respects that narrowed somewhat the CFTC's new grant of exclusive jurisdiction. While the House text vested exclusive jurisdiction in the CFTC over futures trading on "a domestic board of trade or contract market or on any other board of trade, exchange, or market,"[47] the Senate Committee limited exclusive jurisdiction to futures trading on "a contract market designated pursuant to section 5 of this Act. . . ."[48] The practical effect of the Senate Committee's amendment was to eliminate the CFTC's exclusive jurisdiction over trading in futures contracts or commodity options on foreign markets, such as the trading that takes place in London. In addition, following a request from the Treasury Department after the hearings had ended,[49] the Senate Committee agreed to bar the CFTC from regulating certain financial dealings carried on directly between banks and other sophisticated investors, but the CFTC would retain purview over any such dealings on a commodity exchange:

---

Supp. 1066 (M.D. Pa. 1972), *aff'd mem.*, 491 F.2d 752 (3d Cir. 1973), *cert. denied*, 416 U.S. 994 (1974); *cf.* Stuckey v. duPont Glore Forgan, Inc., 59 F.R.D. 129 (N.D. Cal. 1973). Some lower courts, however, have adopted the contrary view. *See, e.g.,* Marshall v. Lamson Bros. & Co., 368 F. Supp. 486 (S.D. Iowa 1974); Berman v. Orimex Trading, Inc., 291 F. Supp. 701 (S.D.N.Y. 1968); *cf.,* SEC V. Continental Commodities Corp., 497 F.2d 516 (5th Cir. 1974).

45.  *See, e.g.,* SEC v. Continental Commodities Corp. 497 F.2d 516 (5th Cir. 1974). *See also,* Note, *Federal Legislation for Commodity Option Trading: A Proposal,* 47 S. CAL. L. REV. 1418 (1974).

The CFTC's exclusive jurisdiction, however, did not extend to *securities* options such as those traded on the Chicago Board Options Exchange or the American Stock Exchange, since such options, when exercised, do not result in the delivery of a futures contract. The Senate Committee so stated: "The Commission [CFTC] will have exclusive jurisdiction over options trading in commodities (but not in securities)." S. REP. No. 93-1131, *supra* note 41, at 31.

46.  *Id.* at 23.

47.  H.R. REP. No. 93-975, *supra* note 9, at 87.

48.  S. REP. No. 93-1131, *supra* note 41, at 54.

49.  *Id.* at 49-50.

*VANDERBILT LAW REVIEW*                [Vol. 29:1

> Nothing in this Act shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, *unless such transactions involve the sale thereof for future delivery conducted on a board of trade.*[50] [Emphasis added]

While the CFTC's right to regulate dealings between financial institutions was greatly circumscribed by this exclusion, the language served in another sense to reconfirm the CFTC's exclusive authority under section 201(B) over *all* futures transactions on a contract market, including trading in traditional securities such as "security warrants, security rights, . . . government securities, or mortgages . . ." whenever "such transactions involve the sale thereof for future delivery conducted on a board of trade." Finally, the Senate Committee inserted a proviso that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."[51]

The Senate Committee took its version of H.R. 13,113 to the floor of the Senate on September 6, 1974,[52] and debate was held on September 9.[53] Chairman Talmadge, in his prepared statement informed the Senate of the CFTC's proposed exclusive jurisdiction but, at the same time, seemed to confuse the effect of that grant upon other agencies:

> In establishing the Commission it is the committee's intent to give it exclusive jurisdiction over those areas delineated in the act. This will assure that the affected entities—exchanges, traders, customers, et cetera—will not be subject to conflicting agency rulings. However, it is not the intent of the committee to exempt persons in the futures trading industry from existing laws or regulations such as the antitrust laws, nor for the Commodity Futures Trading Commission to usurp powers of other regulatory bodies such as those of the Federal Reserve in the area of banking or the Securities and Exchange Commission in the field of securities.[54]

Read literally, the foregoing statement cannot be reconciled with the Senate's revised text of section 201(B) nor with the Senate Committee's own Report, which states quite clearly that the CFTC will preempt *all* federal and state agencies in the regulation of futures trading on contract markets. The better reading would be that the Chairman, like his counterpart in the House,[55] wished simply to

---

50. *Id.* at 54-55.
51. *Id.* at 54.
52. *See* 120 Cong. Rec. S 16,075 (daily ed. Sept. 6, 1974).
53. 120 Cong. Rec. S 16,127-37 (daily ed. Sept. 9, 1974).
54. *Id.* at S 16,128.
55. 120 Cong. Rec. H 2925 (daily ed. April 11, 1974). Indeed, the Committee's chairman warned the House in the same remarks against assuming that futures trading is similar to

assure his colleagues that the SEC and other agencies would retain their "traditional" roles, which had never included the regulation of futures trading on commodity markets.

## B.   The Conference

The House and Senate versions of H.R. 13,113 went to Conference Committee in September 1974. The House version of section 201(B) granted exclusive jurisdiction to the CFTC over "transactions" in futures contracts conducted on any domestic or foreign exchange. The Senate version extended that exclusive jurisdiction to "accounts" and "agreements" as well as to the futures transactions themselves, and added commodity options as well as "leverage" contracts in gold and silver bullion or bulk coins. On the other hand, the Senate limited the CFTC's exclusive jurisdiction to activities on a designated "contract market" rather than on any exchange, barred the CFTC from regulating certain institutional banking transactions, and declared that the jurisdiction of federal and state courts remained unaffected. Most importantly, the Senate version bridged the gap between the first proviso granting exclusive jurisdiction to the CFTC and the second proviso preserving other agencies' rights by inserting the keystone phrase "except as hereinabove provided."

In every respect except one, the Senate version prevailed in the Conference. The one exception was that the House's language bringing all domestic and foreign commodity markets under the CFTC's exclusive jurisdiction was accepted in lieu of the Senate's narrower provision limiting that exclusive authority to "contract markets." The Conference Report[56] explained the result as follows:

> The Conference substitute adopts the Senate amendment, including the provision in section 402(d) of the bill which strikes the last sentence of section 4c of the Commodity Exchange Act. The language being struck provides that "Nothing in this section [section 4c] or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections."[57]
>
> *Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned.* Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the

---

the activities that the SEC regulates. *Id.* at H 2924.

56.   H.R. REP. No. 93-1383, 93d Cong., 2d Sess. (1974).

57.   Senator Curtis, by motion on the Senate floor, had succeeded in having § 4c stricken "in order to assure that Federal preemption is complete." 120 CONG. REC. S 16,133 (daily ed. Sept. 9, 1974).

*VANDERBILT LAW REVIEW*          [Vol. 29:1

broad grant of authority to the Commission to regulate the futures trading
industry, the Conferees do not contemplate that there will be a need for any
supplementary regulation by the States.[58] [Emphasis added]

Although the foregoing language seems to confuse the objective of
total preemption with the lesser concept of federal supremacy when
state law is in conflict, it is clear that the conferees intended the
CFTC to be the sole regulatory authority for the futures industry.

The compromise version of H.R. 13,113 returned to the floor of
the House on October 9, 1974, and Chairman Poage spoke at some
length about the CFTC's new exclusive jurisdiction. He stated that
his remarks were prompted by "some concern" among unidentified
persons that "in effectuating the intent to fill regulatory gaps, the
Conference substitute appears to have an unintended impact on the
jurisdiction of the Securities and Exchange Commission."[59] With
respect to the specific jurisdiction to be retained by the SEC and
not to be preempted by the CFTC, Chairman Poage first assured
the SEC that it would continue to regulate the stock markets:

> This grant of exclusive jurisdiction is not to be construed as preempting the
> jurisdiction of the Securities and Exchange Comission over securities, includ-
> ing stock options, traded on any national securities exchange or any other U.S.
> securities market.[60]

He further explained that the SEC was not divested of jurisdiction
over "traditional" stocks, bonds and the like, but that futures trad-
ing on contract markets was a different matter:

> It was not intended, however, to apply to trading in interests and rights tradi-
> tionally known as securities, including, for example, stocks, corporate bonds,
> warrants, and debentures, nor was it intended to apply to trading in options
> to purchase any of the foregoing. *However, the last sentence of subsection (b)
> of section 201 of the bill helps to clarify that the intent of the conferees was to
> subject all trading in futures contracts on a "contract market" designated
> pursuant to section 5 of the act, to the jurisdiction of the CFTC.*[61] [Emphasis
> added]

Similarly, Chairman Poage sought to reassure the SEC that its
jurisdiction over "investment contracts" was preempted *only* when
they related to futures trading on a contract market:

> I further understand, however, that the Securities and Exchange Commission
> has jurisdiction over other types of securities, including investment contracts,
> and that the term investment contract includes a broad category of arrange-
> ments and contracts relating to investments. In this area, there may be some
> apparent overlap between the jurisdiction of the Securities and Exchange

---

58.  H.R. REP. No. 93-1383, *supra* note 56, at 35-36.
59.  120 CONG. REC. H 10,247 (daily ed. Oct. 9, 1974).
60.  *Id.* at H 10,248.
61.  *Id.*

> Commission and the intended jurisdiction of the Commodity Futures Trading
> Commission over trading in futures contracts relating, or purporting to relate,
> to tangible commodities. It was not intended that the jurisdiction of the Secur-
> ities and Exchange Commission with respect to investment contract be su-
> perseded, *except to the extent that jurisdiction is granted to the CFTC with*
> *respect to contracts for future delivery or options relating, or purporting to*
> *relate, to tangible commodities, or which are effected on a contract market*
> *designated pursuant to section 5 of the act.* As a result, the act is designed to
> supplement the present framework of regulation and to operate in conjunction
> with existing statutes; it is not intended to create any regulatory gaps.[62]
> [Emphasis added]

Finally, Chairman Poage stated that pending SEC investigations against abuses not previously under the CFTC's jurisdiction could continue to their completion, implying at the same time that new SEC actions of a similar nature would not be permissible after CFTC jurisdiction takes effect:

> This act is remedial legislation designed to correct certain abuses which Con-
> gress found to exist in areas that will now come within the jurisdiction of the
> CFTC. . . . Accordingly, section 412 was included in the bill to make clear
> that all pending proceedings, including ongoing investigations, as well as court
> proceedings, should continue unabated by any provision of the Act. . . . Dur-
> ing the course of our deliberations, we learned, for example, that the SEC has
> a number of such matters currently under investigation. We would expect that
> those investigations will continue and any proceedings resulting therefrom will
> not be affected by the passage of this act.[63]

The following day, October 10, the final text of H.R. 13,113 reached the floor of the Senate.[64] The prepared remarks accompanying the submission of H.R. 13,113 for final Senate passage were identical to the statements of Chairman Poage the day before in the House. Thereafter, on October 24, 1974, the President signed the bill into law (P.L. 93-463) with the observation that:

> This act will provide the first major overhaul of the existing Commodity
> Exchange Act since its inception by establishing a new regulatory structure to
> apply to all commodity futures trading. This is an objective which I fully
> support.[65]

## C.  *The Appointments Delay*

Under section 418 of H.R.13,113 as enacted, the many provisions of the Act were to take effect 180 days after the President's signature was affixed. Thus, the Act was to be operational by April 21, 1975. The President, however, did not promptly nominate candidates to serve as the five Commissioners of the CFTC, and it was

---

62. *Id.*
63. *Id.*
64. 120 Cong. Rec. S 18,864 (daily ed. Oct. 10, 1974).
65. 10 Wkly Comp. of Pres. Docs. 1366 (1974).