March 18, 1975, before names were transmitted by the President to Congress.[66] Both the House and the Senate realized that, because of that delay, it was unrealistic to expect the new Commissioners to meet an April 21 deadline.

Accordingly, a joint resolution, H.R.J. Res. 335,[67] was prepared in late March 1975 and was thereafter reviewed by the House Committee on Agriculture and by the Senate Agriculture and Forestry Committee. On April 7, 1975, the House Committee issued its Report,[68] explaining those provisions of the Act that would be deferred to a later date. H.R.J. Res. 335, however, did not delay the effective date of the CFTC's new "exclusive jurisdiction" or otherwise alter the jurisdictional results of section 201(B): "No provision in the resolution, as amended, alters existing law with respect to the jurisdiction of other Federal or State regulatory efforts."[69] The Senate Committee filed its Report on H.R.J. Res. 335 on April 10, 1975,[70] the same day that the first four Commissioners of the CFTC were confirmed by the Senate. Like the House Committee's report, the Senate also confirmed that "[e]xcept as specifically provided therein, the resolution is not intended in any way to make substantive changes in the 1974 Act and the Commodity Exchange Act, as amended."[71] The Senate Committee's report, however, indicated that the ouster of state jurisdiction did not foreclose the enforcement of a state's regular *criminal* fraud statutes: "The Committee wishes to make clear that the preemption of the regulation of commodity futures trading by the Commodity Futures Trading Commission Act of 1974 does not prevent the States from enforcing their criminal anti-fraud statutes."[72]

## IV. THE LEGISLATIVE AFTERMATH

In light of the zigzag course followed by Congress toward CFTC preemption of other agencies, several conclusions appear to be justified. First, Congress intended to centralize in a single agency the full regulatory authority over futures trading on commodity exchanges, regardless of the item or interest being traded, as well as over certain other activities (commodity options and "leverage" contracts in gold and silver bullion or bulk coins). Secondly, Congress recognized

---

66.  121 CONG. REC. H 2508 (daily ed. April 8, 1975).

67.  H.R.J. RES. 335, 94th Cong., 1st Sess. (1975).

68.  H.R. REP. No. 94-122, 94th Cong., 1st Sess. (1975).

69.  *Id.* at 7.

70.  S. REP. No. 94-73, 94th Cong., 1st Sess. (1975).

71.  *Id.* at 5.

72.  *Id.*

that successful centralization would affect the existing or projected jurisdiction of other agencies at the state and federal level. And, thirdly, the difficulty that Congress experienced in clearly articulating the effect of its action illustrates the tremendous stress imposed upon Congress whenever its decisions are perceived by established public agencies as affecting their real or hoped-for authority. As a tool for statutory interpretation, the Act itself ordinarily is the best source and, under section 201(B) [now section 2(a)], agencies other than the CFTC have been expressly excluded from regulating:

> accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option," "privilege," "idemnity," "bid," "offer," "put," "call," "advance guaranty," or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 217 of the Commodity Futures Trading Commission Act of 1974. . . .[73]

The next best source of congressional intent, at least in terms of the time and attention customarily given to their preparation, is the reports of the congressional committees that reviewed the bills.[74] These reports are typically prepared with full realization that they will be the first source, beyond the statutory language itself, consulted to ascertain congressional intent. Lastly, an additional source of somewhat more fragile reliability is the dialogue during congressional debates on the bill.[75] Time limitations, and sometimes a desire to minimize controversy, however, militate against a full and precise explanation of the bill in such an environment.

The legislative history of the CFTC's exclusive jurisdiction over futures trading on commodity markets and over commodity options and leverage contracts seems preoccupied with the Act's impact on one particular agency—the Securities and Exchange Commission. That is the only agency mentioned by name in the Act, and, as noted earlier, clauses attempting to protect the SEC appeared in even the earliest bills introduced to overhaul the Commodity Exchange Act. The preemptive effect of the final bill, however, reached *all* other agencies at every level of government and did not single out the SEC: "The Committee wished to make clear that where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies."[76] Only by

---

73. CFTC Act § 201(b), 7 U.S.C.A. § 2 (Supp. 1, 1975).

74. *See* 2A J. Sutherland, Statutes and Statutory Construction § 48.06 (3d ed. 1973).

75. *Id.* § 48.13.

76. S. Rep. No. 93-1131, *supra* note 41, at 23.

such comprehensive preemption could Congress reach its avowed objective:

> Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned.[77]

The decision of Congress to grant exclusive jurisdiction to the CFTC over futures trading on commodity markets and over commodity options and leverage contracts met little if any resistance from the many agencies other than the SEC that were affected by it.[78] The extension of the definition of "commodity" to include "all . . . goods and articles . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in,"[79] when coupled with the grant of exclusive jurisdiction to the CFTC, made it inevitable that future growth of the commodity industry would invade areas previously governed by other federal, state, or local agencies or other areas into which such agencies arguably could intervene.

The long-term effects of Congress's decision in favor of preemption can be illustrated as follows. The ouster of other agencies from regulating futures trading on commodity markets relieves the CFTC and the industry from the risk not only of incompatible regulation by the SEC but, at the same time, of the additional inefficiency and confusion of regulation by the "blue sky" commission of each state. Very early in the development of H.R. 13,113, the Chairman of the House Committee on Agriculture acknowledged that, despite some superficial similarities, the regulatory framework for futures is necessarily quite different from the traditional policies that govern securities regulation.

> There was also a proposal advanced briefly to place the regulation of futures trading within the present SEC. The advantages were the existence of the SEC as an independent regulatory structure. The disadvantages were legend.
>
> Often erroneously viewed as twins, there is little correlation in theory or in fact between the regulation of Futures Trading and the regulation of securities transactions. Futures trading regulation is essentially a regulation of a marketing device, that is, a contract right which is terminable at a time certain, for agricultural commodities while the SEC regulates the handling of certificates of tangible ownership which are permanent in nature.
>
> . . .

---

77. H.R. Rep. No. 93-1383, *supra* note 56, at 35.

78. The Treasury Department was the only other federal agency to endeavor to erode the CFTC's exclusive jurisdiction, and it readily conceded that the CFTC should not be ousted when the transactions of interest to it were available on a commodity exchange. *See* S. Rep. No. 93-1131, *supra* note 41, at 49-51.

79. CFTC Act § 201(b), 7 U.S.C.A. § 2 (Supp. 2, 1975).

Case 1:07-cv-06682-DC    Document 5-9    Filed 08/16/2007    Page 4 of 25

While securities markets attract the small speculator, with a limited exposure to loss, futures speculation is normally limited to the more venturesome and solvent speculator. . . . Additionally, the concept of margin—which is a guarantee of performance in the futures market as contrasted with an extension of credit by the broker in the securities industry—the actual delivery of commodities in certain limited situations—approximately 3 percent—of all contracts, and the handling of devices such as options are, and should remain, entirely different within the respective spheres of regulation.

The existence of another, more volatile regulatory function with the SEC could create difficulties that could probably never be overcome. No SEC Commissioner is appointed because of expertise in futures trading, and a merger of the staffs of the CEA within the respective organizations would do little more than precipitate a continuing conflict as to the priorities of the Commission with its jurisdiction so confused. The possibility seemed to terrify experts on futures trading who appeared before the full committee, and who met with the committee staff on numerous occasions. Neither is it a welcome prospect at the SEC.[80]

Those sentiments had been echoed in the past by SEC personnel as well. Appearing before the same House Committee in 1967, the General Counsel of the SEC (now Commissioner), Philip A. Loomis, testified that the SEC's knowledge and expertise do not extend to commodities regulation and that a different regulatory scheme might be required for futures trading:

The Securities and Exchange Commission has no jurisdiction or responsibility with respect to the Commodity Exchange Act or the commodities market and our understanding of those markets is limited.

. . .

We, of course, do not claim any particular experience or familiarity with the commodities market and we know that these markets operate in a way which is in many respects quite different from the securities market. For these and other reasons, regulation in the commodities markets may call for different provisions and for somewhat different objectives than those of securities regulation.[81]

When specific SEC policies are examined, the differences between commodities regulation and securities regulation become readily apparent, and the disparities can be critical. One major area of conflict, for example, relates to the availability of exchange memberships. In the commodity field a primary economic function of the markets is to provide a vehicle for commercial enterprises (such as farm cooperatives, grain merchandisers, and food processors) to "hedge" against fluctuations in their operating costs or in their selling prices. Accordingly, these entities are encouraged to become members of the commodity exchanges. In fact, the Commodity Exchange Act declares it unlawful for any contract market to discrimi-

---

80. 119 CONG. REC. 41,335 (1973).

81. *Hearings on H.R. 11,930 Before the House Comm. on Agriculture*, 90th Cong., 1st Sess. 156 (1967).

nate against farm cooperatives seeking membership.[82] By contrast, the SEC has adopted a policy, codified in Rule 19b-2,[83] that precludes any entity from membership on a stock exchange unless eighty percent of its business is conducted for public customers. Thus, an entity seeking membership principally to facilitate its own trading will be denied admittance under Rule 19b-2. If the policy of that Rule were superimposed on the futures markets, the principal users and beneficiaries of futures transactions would be excluded from membership since very few of them conduct a substantial public brokerage business. Similarly, the futures markets depend for their liquidity upon active floor trading by members, who perform the valuable function of absorbing the large orders frequently placed by commercial "hedgers."[84] Absent the participation of these floor traders, the markets' ability to perform efficiently might be severely impaired. By contrast again, the SEC has virtually eliminated floor trading from the national stock exchanges. Pursuant to section 11(a) of the Securities Exchange Act,[85] the SEC adopted Rule 11a-1[86] banning all stock exchange members from trading for their own account or any controlled account on the exchange floor unless they have qualified under certain limited exceptions. A witness with a securities background testified at the hearings on the predecessor bill of H.R. 13,113 before the House Committee on Agriculture that the imposition of this policy in the commodities field could have devastating effects:

> Mr. Chairman, there is one other consequence which worries us as we look down the road at the effects of this legislation. It worries us greatly, and I hope that it would worry this committee. It is this: As the number of brokers available to execute the public's orders is reduced, and as those remaining brokers with the greatest financial resources are prohibited from "taking the other side" of the public's orders through trading for their own accounts, it will inevitably mean that the trading on our markets will increasingly become commercial trading. With fewer speculators or investors, price swings will tend to be much more violent—the reason being that speculators are price responsive whereas commercials are not. We see this happening in our Nation's securities exchanges as participation by the "small investor" diminishes. I would ask this committee whether it really wants to see our commodity markets at some time in the future choking and gagging on commercial business in the same way that our securities exchanges are choking and gagging on institutional business. I should hope not.[87]

---

82.  7 U.S.C. §§ 7(e), 10(a) (1970).

83.  17 C.F.R. § 240.19b-2 (1975).

84.  A brief discussion of this function can be found in Johnson, *The Changing Face of Commodities Regulation.* 20 PRAC. LAW., Dec. 1974, at 27, 31-32.

85.  15 U.S.C. § 78k(a) (1970).

86.  17 C.F.R. § 240.11a-1 (1975).

87.  *Hearings on H.R. 11,955, supra* note 3, at 165 (testimony of Frederick G. Uhlmann,

Aside from the SEC's conflicting policies, Congress had to consider the real possibility that scores of other agencies at every level of government might attempt to regulate futures trading in the absence of preemption. Congress was well aware, for example, that a futures contract based upon mortgage interest rates was under development in 1973 and 1974.[88] In the final analysis, this contract took the form of futures involving mortgage-backed certificates guaranteed by the Government National Mortgage Association[89] (the "GNMA contract"). The CFTC entered an order on September 11, 1975, authorizing the Chicago Board of Trade to initiate trading in its GNMA contract.[90] In addition to the SEC[91] and state "blue sky" commissions, other public agencies might have laid claim to a regulatory role over that contract if Congress had not preempted them. For example, the mortgages underlying the GNMA contract are insured by either the Federal Housing Administration, the Veterans' Administration, or the Farmers Home Administration.[92] The principal users of the GNMA contract apparently are the banks and savings and loan associations of the United States. The banking entities currently are regulated by the Comptroller of the Currency or by state banking authorities, and the savings and loan associations are answerable to either the Federal Home Loan Bank Board or state regulatory agencies. In addition, the Federal Reserve Board has an active role in the regulation of money markets and interest rates. Any one or all of these federal and state agencies, including the Government National Mortgage Association itself, would have the opportunity—absent preemption—to promulgate regulations affecting the GNMA futures contract.[93]

Congress was likewise aware of research into a futures contract

---

Chairman of the Chicago Board of Trade and officer of Drexel Burnham & Co.).

88.  *See, e.g.,* H.R. REP. No. 93-975, *supra* note 9, at 41, 62; S. REP. No. 93-1131, *supra* note 41, at 19; *Hearings on H.R. 13,113, supra* note 4.

89.  The underlying certificates are authorized by § 306 of the National Housing Act, 12 U.S.C. § 1721 (1970).

90.  CCH COMMOD. FUT. L. REP. Newsletter No. 9, at 1 (Sept. 23, 1975).

91.  BNA SEC. REG. & L. REP. No. 329, at A-7 (Nov. 26, 1975).

92.  *See* 2 CCH FED. BANKING L. REP. ¶ 25,403.

93.  The problem of several agencies involved in the regulation of the same activities was sidestepped in the Securities Reform Act of 1975, P.L. 94-29, 89 Stat. 97, *amending* scattered sections of 15 U.S.C. (1970). Unlike the CFTC Act, which made the new Commission the exclusive regulator of the futures markets, commodity options, and leverage contracts, the Securities Reform Act simply states that some "appropriate regulatory agency" should administer the various provisions of that Act. *See* Securities Exchange Act of 1934, §§ 3(a)(34), 15B, 17, 19, 23, 25, 15 U.S.C.A. § 78c(a) (34), 78o-4, 78q, 78s, 78w, 78y (Supp. 4, 1975).

relating to ocean freight rates.[94] Interested agencies might range from the Federal Maritime Commission to local port authorities at the major export-import cities. The possibility of futures trading in petroleum also was known to Congress.[95] Potential regulators of that contract could range from the Federal Energy Administration to the state agencies controlling crude oil production. Thus, while attention in Congress seemed to focus primarily upon the SEC, the decision to vest exclusive jurisdiction in the CFTC was addressed to a far broader problem.

## V.  SUBSEQUENT LEGISLATIVE EFFORTS

On November 20, 1974, roughly a month after the CFTC Act was signed by the President, a letter was transmitted to the SEC by the chairman of the House Committee on Interstate and Foreign Commerce expressing the view that the CFTC had preempted the SEC in certain circumstances:

> I realize that the framers of the Commodity Futures Trading Commission Act were anxious to draft that Act sufficiently broadly to include numerous types of arrangements which at present may be entirely unregulated or inadequately regulated. The accomplishment of this purpose would appear to be in the public interest. These provisions, however, are so broad as to encompass many types of securities and securities transactions now regulated by the Securities and Exchange Commission, including not only unusual types of securities, but also securities and transactions which are clearly, and traditionally have been covered by the Federal securities laws. The resulting apparent overlap and preemption of Securities and Exchange Commission jurisdiction are a source of considerable concern to me and to the Subcommittee on Securities.
>
> I would appreciate receiving your views on the concerns stated above at your earliest convenience.[96]

In a response sent nearly three months later Chairman Ray Garrett, Jr. of the SEC preferred to characterize the CFTC Act as "ambiguous" on the question of preemption, but nevertheless he proposed to amend the Securities Exchange Act in a way that, as a practical matter, would have totally repealed the CFTC's *exclusive* jurisdiction vis-a-vis the SEC. The SEC's proposed amendment read as follows:

> No definition of "commodity" *or grant of exclusive jurisdiction* to the Commodity Futures Trading Commission contained in the Commodity Futures Trading Commission Act of 1974 shall supersede or limit the jurisdiction of the

---

94.  *See* S. REP. No. 93-1131, *supra* note 41, at 19.

95.  *See* H.R. REP. No. 93-975, *supra* note 9, at 41, 62.

96.  Letter from Chairman Harley O. Staggers, House Comm. on Interstate and Foreign Commerce, Subcomm. on Securities, to Chairman Ray Garrett, Jr., Securities and Exchange Commission, Nov. 20, 1974 (copy available through *Vanderbilt Law Review*).

Commission [SEC] or the courts of the United States or of any State with
respect to accounts, agreements and transactions involving a "security" within
the meaning of this Title, the Securities Act of 1933, as amended, the Public
Utility Holding Company Act of 1935, as amended, the Trust Indenture Act
of 1939, as amended, the Investment Company Act of 1940, as amended and
the Investment Advisers Act of 1940, as amended." [Emphasis added]

Neither the House Committee on Interstate and Foreign Commerce
nor either of Congress's agriculture committees adopted the SEC
proposal. In fact, when H.R.J. Res. 335 came before the Senate
Agriculture and Forestry Committee approximately two months
after Chairman Garrett's proposal first was made, the Report stated
pointedly that "[e]xcept as specifically provided therein, the reso-
lution is not intended in any way to make substantive changes in
the 1974 act. . . ."[88] The spokesman for the House Committee on
Agriculture made the same observation about H.R.J. Res. 335 on
the floor of the House:

. . . the extension of time we recommend here will in no way alter the basic
charter that was created by the creation of the Commodity Futures Trading
Commission Act of 1974.[89]

   These "concerns" of the SEC regarding its jurisdiction were
quiescent through the spring and summer of 1975. On September
11, 1975, however, the CFTC entered an order designating the Chi-
cago Board of Trade as a "contract market" for trading in futures
contracts involving the mortgage-backed certificates guaranteed by
the Government National Mortgage Association. At the same time,
the Chicago Mercantile Exchange had pending before the CFTC its
application for designation as a "contract market" for trading in
futures contracts involving Treasury Bills. Prompted by these de-
velopments, the SEC renewed its criticism of the CFTC's "exclusive
jurisdiction" and alluded once again to a possible legislative effort.
   Characteristic of the SEC's posture was a lengthy letter dated
November 13, 1975, from the new SEC chairman, Roderick M.
Hills, to the CFTC chairman, William T. Bagley.[100] Chairman Hills
first summarized the positions of both agencies:

   We [SEC] have previously advised you of our view that GNMA certifi-
cates and Treasury Bills are securities, as that term is defined in the federal
securities laws. We also believe it to be quite clear that contracts for future

---

97. Letter from Ray Garrett, Jr. to Harley O. Staggers, Feb. 14, 1975 (copy available
through *Vanderbilt Law Review*).

98. S. Rep. No. 94-73, *supra* note 70, at 5.

99. 121 Cong. Rec. H 2509 (daily ed. April 8, 1975) (Mr. Bob Bergland).

100. BNA Sec. Reg. & L. Rep., No. 329, at F-1, F-2 (Nov. 26, 1975). For a collection of
jurisdictional correspondence of the CFTC and the SEC, see CCH Fed. Sec. L. Rep. ¶ 80,336.

delivery of those securities are also "securities." You, in turn, argue that the Commodity Exchange Act, as amended, grants exclusive jurisdiction over trading in contracts for future delivery, including contracts for future delivery of securities, to the CFTC.[101]

The SEC letter, however, did not attempt to deal with the CFTC's view that its jurisdiction over the Chicago Board of Trade's GNMA contract and the Chicago Mercantile Exchange's T-Bill contract is exclusive. Instead, Chairman Hills proposed to bypass that question:

> Both the CFTC and this Commission should be concerned, not with the bare questions of jurisdiction, but with a number of important questions relating to the integrity and viability of our capital markets, and the effect futures trading will have on the securities markets and on public investors therein.[102]

The letter then propounded fourteen questions to the CFTC's chairman and, while Chairman Hills had side-stepped the question of jurisdiction, many of the questions involved traditional SEC requirements, as if the CFTC's jurisdiction were *not* exclusive. Chairman Hills, however, concluded his letter with the inference that the SEC might seek legislative relief—as his predecessor had sought unsuccessfully to do earlier in 1975:

> Until we have clarified the questions raised above, either through a monitoring program, or through hearings pursuant to our own statutory authority, or until the Congress has been given an opportunity to consider whether it wishes to draw different distinctions than the ones that presently exist in the organic acts of our two agencies, such trading [in new futures contracts on securities other than GNMA and T-Bills] would be premature.[103]

## VI. THE JUDICIAL RESPONSE

The CFTC Act took effect on April 21, 1975, except for those provisions relating to licensing, contract market approval, and rules review, which were postponed by H.R.J. Res. 335. Little time elapsed before the CFTC confronted the SEC in court on the question of jurisdiction. On July 11, 1975, the CFTC filed a brief as amicus curiae in *SEC v. American Commodity Exchange, Inc.*[104] The SEC sought to enjoin alleged violations of the federal securities laws by a dealer in commodity options. The SEC contended that commodity options were securities ("investment contracts") and that the defendant had violated the registration requirements, antifraud provisions, and broker-dealer registration requirements of

---

101. *Id.*
102. *Id.*
103. *Id.*
104. CCH COMMOD. FUT. L. REP. ¶ 20,063 (Civ. No. 15-0436-c) (W.D. Okla. 1975).

the federal securities laws. In its memorandum as amicus curiae, the CFTC stated that in its opinion the CFTC Act did not oust the SEC of jurisdiction in that action because the alleged securities violations occurred prior to April 21, 1975:

> To be sure, the Commodity Futures Trading Commission Act has carved out an area in which the Commodity Futures Trading Commission has been granted exclusive jurisdiction. . . . Without going into the question of the impact of this provision on fraudulent commodity or commodity-related option transactions which have occurred *since* April 21, 1975 (or which may occur in the future), the enactment of that provision should in no way be held to affect the jurisdiction of the Securities and Exchange Commission *prior to* April 21, 1975.[105] [CFTC's emphasis]

The CFTC's brief, however, implied that similar conduct occurring after April 21, 1975, would be within its own exclusive jurisdiction. Thus, for example, the CFTC said that "[o]f course, activities of the kind discussed in the Securities and Exchange Commission's complaint are now plainly within the jurisdiction of the Commodity Futures Trading Commission," and offered to intervene in the proceeding as an additional plaintiff to enjoin future violations of the CFTC's new antifraud rule [17 C.F.R. § 30.01] or the provisions of the Commodity Exchange Act.[106]

The CFTC's preemption of state regulation received its first reported test in the state courts of Texas. In *Texas v. Monex International, Ltd.*,[107] the state securities commission sought to enjoin the defendant from offering "leverage" contracts in that state on the ground that they are unregistered securities. The trial court dismissed the case. The Texas Court of Civil Appeals affirmed on August 29, 1975, holding that the CFTC has preempted the states in the regulation of those instruments, even if they are "securities":

> The State contends Pacific's "margin account" investment plan constitutes an "investment contract" and is thus a security. . . . We do not reach this point.
>
> . . . .
>
> We think it is clear that the newly established Commodity Futures Trading Commission now has exclusive jurisdiction to regulate Pacific's margin account sales. . . .[108]

Curiously, the suit was dismissed even though it had been initiated *before* the effective date of the CFTC Act. In fact, the CFTC Act did not become effective until the case had ended in the trial court

---

105. *Id.* at 20,681.
106. *Id.* at 20,682.
107. CCH COMMOD. FUT. L. REP. ¶ 20,083 (Tex. Civ. App., Aug. 29, 1975).
108. *Id.* at 20,738.

and was awaiting hearing on appeal. Nevertheless, the Texas appellate court rejected the State's argument that under section 412 of the CFTC Act the case could continue:

> The State argues that Section 412 of the Commodity Futures Trading Commission Act of 1974 expressly exempts from coverage under the Act all proceedings pending prior to enactment. We disagree.
>
> . . .
>
> We hold that Section 412 pertains to matters pending under the Commodity Exchange Act before the 1974 amendment. Here, the State seeks to enjoin future conduct on the part of Pacific under the Texas Securities Act. Section 412 is not applicable.[109]

While this result seems incompatible with the assurances expressed on the floor of the House and Senate that pending state and federal proceedings would be unabated by the CFTC Act,[110] the outcome appears to be entirely warranted because the relief sought by the State—a prospective injunction—would reach into the period after the CFTC Act took effect. The result might have been different if no prospective relief had been sought.

The question not answered in the preceding actions is whether the CFTC preempts all other *federal* agencies (like the SEC) from instituting enforcement actions after April 21, 1975. That question now has been faced and decided by a federal court—in the CFTC's favor. In *SEC v. Univest, Inc.*,[111] the United States District Court for the Northern District of Illinois dismissed a complaint by the SEC alleging certain violations of the federal securities laws by a dealer in commodity options. While the SEC had an investigation underway prior to April 21, 1975, the effective date of the CFTC Act, its suit was instituted after that date. The district court held that the SEC could not pursue this action:

> This new statute [CFTC Act], which went into effect on April 21, 1975, serves to strip the S.E.C. of standing to bring this suit. The text of the Commodity Act of 1974 and its legislative history indicates to me that under this particular factual pattern, the new Commodity Futures Trading Commission, and not the S.E.C., has exclusive jurisdiction over this conduct. [Quoting section 2(a)]. To me, that language plainly states that exclusive jurisdiction is vested in the Commodity Commission; that group, and not the S.E.C., is empowered to bring a suit in a situation like that presently before the court.[112]

The SEC countered with the argument (implicit in the Hills-Bagley correspondence discussed above) that the second proviso of section

---

109. *Id.*

110. *See* note 63 *supra* and accompanying text.

111. SEC v. Univest, Inc., CCH FED. SEC. L. REP. ¶ 95,369 (N.D. Ill., Nov. 18, 1975). The SEC has asked the court to reconsider its decision. CCH FED. SEC. L. REP., No. 620, at 2 (Dec. 17, 1975).

112. *Id.* at 98,843.

2(a) preserving its jurisdiction somehow modifies the CFTC's exclusive jurisdiction and allows the suit to proceed. Emphasizing the keystone phrase "except as hereinabove provided," the court rejected the SEC's position.

> The Plaintiff's argument that the second proviso within Section 2 somehow negates that grant of exclusive jurisdiction is simply invalid. . . . The key phrase in this proviso is the introductory one; I must assume that it means exactly what it says. The fact is that the statements "hereinabove provided" do limit the jurisdiction of the S.E.C. with regard to commodity futures trading. In effect, those statements transfer jurisdiction from the S.E.C. to the new Commodity Futures Trading Commission.[113]

Finally, the court ruled that, even though the activities alleged in the complaint occurred prior to April 21, 1975, the suit was not "pending" on that date within the meaning of section 412, and any information that the SEC had obtained from its investigation should have been turned over to the CFTC for prosecution:

> The S.E.C. was entitled to continue any investigation commenced prior to the effective date, but any information developed from those inquiries should have been turned over to the proper party for prosecution. In this instance, the proper party was the new Commodity Commission. The Congress, by enacting this legislation, created a body with special expertise in the commodities field and it is my belief that the wording of the statute removes standing from the S.E.C. and vests it in the "new" experts—the Commodity Futures Trading Commission. I must follow the dictates of the Congress in this matter and allow the proper party to prosecute any alleged violators.[114]

As in the opinion rendered in the *Monex* case, the language used here to preclude SEC prosecutions of activities occurring prior to April 21, 1975, seems unnecessarily broad. When, however, prospective relief is sought, for example an injunction controlling future conduct, a court cannot grant the desired relief without interfering with the CFTC's exclusive jurisdiction in the post-enactment period. Thus, a complete prohibition of injunctive actions by other regulatory agencies, even for pre-Act conduct, is consonant with the congressional intent.

## VII. THE REMAINING ISSUES

The preceding discussion is a chronicle of the CFTC's struggle to gain—and now to retain—"exclusive jurisdiction" over futures trading on the commodity exchanges. While the principal assault on the CFTC's new authority has come from the SEC, the attack could as easily have come from any other governmental agency whose existing of potential power has been similarly affected. Each, no

---

113. *Id.*
114. *Id.* at 98,844.

doubt, could formulate a series of "questions" about the CFTC's ability to replace the work done by that agency. The CFTC, in turn, must consider the reality that any accommodation made to one agency in derogation of its "exclusive jurisdiction" necessarily will be shared by all other agency claimants—a result that Congress plainly did not intend.

## A. *Private Suits Under Other Statutes*

A different question arises, however, when consideration is given to the effect of the CFTC's "exclusive jurisdiction" on the applicability of the substantive requirements of other regulatory statutes. Even if the agencies created to administer those statutes are preempted, do the statutes themselves remain applicable for such purposes as private actions? It has been suggested[115] that private suits under other regulatory statutes may continue to be permissible because of the language in section 201(B) [now section 2(a)] that—

> Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.[116]

The SEC itself raised that issue in the Hills-Bagley correspondence of November 13, 1975, although it indicated the possibility that "problems would arise from such anomalous situation."[117]

The legislative history of the "saving" clause for courts is quite sparse. The House version of H.R. 13,113 did not contain that clause, and, while it was added by the Senate Agriculture and Forestry Committee, the Report of that Committee offers no explanation of its purpose. The remarks made by Chairman Talmadge on the Senate floor, however, are instructive, and they tend to indicate only that the new administrative proceedings and remedies vested in the CFTC under H.R. 13,113 do not displace the right of parties to judicial review:

> The vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way. It is hoped that giving the Commission this authority will somewhat lighten the burden upon the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved.[118]

Presumably, concern over the continued right of judicial review was

---

115. *See, e.g.,* Schroeder & Pollack, *Commodities Regulation* 8 REV. SEC. REG., no. 7, at 938 (Apr. 9, 1975).

116. CFTC Act § 201(b), 7 U.S.C.A. § 2 (Supp. 1, 1975).

117. BNA SEC. REG. & L. REP., No. 329, at F-1 (Nov. 26, 1975).

118. 120 CONG. REC. S 16,128 (daily ed. Sept. 9, 1974).

prompted to some degree by certain new roles that the CFTC would perform under H.R. 13,113. For example, under section 106 of the bill (now section 14 of the CFTC Act), injured commodity customers may seek monetary "reparations" from their carrying brokerage firms or other registered persons in an administrative hearing conducted by the CFTC rather than by the courts. The "saving" clause relating to the courts' jurisdiction makes it clear that the customer can sue under the Act for damages instead, if he wishes.[119]

There also is evidence that Congress did not wish to nullify pending court proceedings brought under other statutes before the effective date of the new amendments. In his report to the House on the work of the Conference Committee, Chairman Poage indicated that the "saving" clause preserving courts' jurisdiction would allow pending litigation to continue to completion:

> In addition, the conferees wished to make clear that nothing in the act would supersede or limit the jurisdiction presently conferred on courts of the United States or any State. This act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the CFTC. Congress was aware that there have been ongoing efforts by various State and Federal regulators to prevent some of these abuses. . . . We would expect that those investigations will continue and any proceedings resulting therefrom will not be affected by the passage of this act.[120]

Additionally, the intent of Congress to permit courts to continue to adjudicate state criminal fraud cases can be found in the Report of the Senate Agriculture and Forestry Committee on H.R.J. Res. 335,[121] which extends the CFTC's deadlines to accomplish certain duties imposed by the 1974 amendments:

> The Committee wishes to make clear that the preemption of the regulation of commodity futures trading by the Commodity Futures Trading Commission Act of 1974 does not prevent the States from enforcing their criminal anti-fraud statutes. The Committee realizes that many fraudulent schemes are devised to prey on the unsuspecting and unsophisticated investor. In many cases, these schemes purport to deal in commodities trading. The States are encouraged to continue to utilize their criminal anti-fraud statutes to discourage such schemes.[122]

More specific insight into congressional intent to preempt the substantive provisions of other regulatory statutes, as well as the agencies themselves, can be found in the remarks of Senator Curtis on the Senate floor, where he successfully urged the repeal of a

---

119. A private right of action for damages exists by implication under the Commodity Exchange Act. Goodman v. H. Hentz & Co., 265 F. Supp. 440 (N.D. Ill. 1967).

120. 120 Cong. Rec. H 10,248 (daily ed. Oct. 9, 1974).

121. S. Rep. No. 94-73, *supra* note 70.

122. *Id.* at 5-6.

sentence in the pre-existing Commodity Exchange Act that had been designed to preserve "any State law applicable to any transaction enumerated or described" in certain parts of the Act. Senator Curtis explained that such a sentence was incompatible with the CFTC's new exclusive jurisdiction and the intended preemption of all state agencies. He indicated that only the substantive law contained in the Commodity Exchange Act would govern in the future:

> Mr. President, I understand that the intent of the bill is to grant exclusive jurisdiction over commodity futures trading to the new Commission, except to the extent the bill specifies that other Federal and State agencies and Federal and State courts are to retain jurisdiction. However, as I understand it, it is also the intent of the bill that, even in the cases where the State agencies and State courts retain jurisdiction, the Federal substantive law embodied in the Commodity Exchange Act as amended by the bill would pre-empt the field completely, so that if any substantive State law were contrary to or inconsistent with Federal law, the Federal law would govern.[123] [Emphasis added]

The genesis of the provision in section 201(B) retaining the jurisdiction of federal and state courts appears to be the testimony filed in the Senate Agriculture and Forestry Committee by Congressman Peter W. Rodino, Chairman of the House Committee on the Judiciary.[124] He indicated, first, that the CFTC's exclusive jurisdiction might oust the courts' jurisdiction to hear typical contract claims or other commercial disputes:

> Many of the millions of commodity futures contracts are presently enforceable in State courts under recognized commercial law and contract principles. This double proviso could, in effect, deprive State courts of their current jurisdiction.[125]

Also, Chairman Rodino expressed concern that without a "saving" clause federal courts would be barred from hearing antitrust suits and that, in fact, the CFTC's decisions might not be reviewable in the courts.

> In addition, this double proviso could possibly be read as an attempt to oust even the federal courts of jurisdiction. The first proviso confers "exclusive jurisdiction" on the Commission for commodity transactions. Exceptions to this exclusive jurisdiction are carved out in the second proviso without, however, referring to federal district courts. . . . [A]ntitrust laws are to apply to commodity transactions and, of course, federal courts play an instrumental role in promoting as well as protecting the national policies expressed already in the antitrust laws. Arguably, too, if jurisdiction of federal courts were to be withdrawn also, Commission decisions on commodity transactions would be non-reviewable by the judiciary raising, thereby, serious questions of administrative and constitutional law.[126]

---

123. 120 CONG. REC. S 16,133 (1974).
124. *Hearings on H.R. 13,113, supra* note 4, pt. 1, 257-62.
125. *Id.* at 260.
126. *Id.*

The effort of Congressman Rodino to modify section 201(B) in the Senate, therefore, appears to have had the limited objective of allowing courts to hear claims at common law or under statutes that do not compete with the regulatory functions of the CFTC under the Commodity Exchange Act. However difficult it might prove to be in particular cases to differentiate between permissible and barred claims, neither Congressman Rodino's proposal nor any other part of the legislative history warrants the conclusion, characterized as "anomalous" by the SEC,[127] that private parties should be allowed to invoke the standards of other regulatory acts for their private gain after the agency that administers those standards has been barred by the Congress from doing so.

Strong public policy considerations likewise militate against the idea that private remedies under other regulatory statutes should remain available even after the CFTC's "exclusive jurisdiction" has preempted those regulatory agencies. As a rule, regulatory statutes contain fairly broad and flexible concepts. The Securities Exchange Act, for example, requires stock exchanges to have rules designed to "prevent fraudulent and manipulative acts and practices" and to "promote just and equitable principles of trade."[128] Similarly, a commodity exchange cannot obtain designation as a "contract market" in a particular commodity unless the CFTC finds that the new futures contract "will not be contrary to the public interest."[129] These fluid concepts not only require the continual exercise of judgment and discretion, but, to provide effective regulation, they must be administered on a relatively consistent and uniform basis. It is reasonable to assume that Congress, having created a regulatory agency under the same statute, intends for that agency to exercise the requisite judgment and to provide the needed uniformity. Otherwise, the key decisions influencing the scope and direction of federal regulatory policy in that field would be left to a variety of different courts responding piecemeal to the advocacy of private interests. There would appear to be distinct public benefits in assuring that the overall character of regulatory policy is set by the agency charged by Congress with that function. Conversely, once Congress has directed the agency *not* to formulate regulatory policy with respect to a particular activity—perhaps that task has been assigned to another agency under a different statute—no public benefit can be discerned from allowing private actions for private gain, which may evolve new policies or standards at variance with

---

127. BNA Sec. Reg. & L. Rep., no. 329, at F-1 (Nov. 26, 1975).
128. 15 U.S.C.A. § 78f(b) (5) (Supp. 4, 1975).
129. CFTC Act § 103(g), 7 U.S.C.A. § 7(g) (Supp. 1, 1975).

the congressional intent, under the preempted agency's governing statute.

## B.  The Prevention of Fraud

Another major issue, as yet unresolved, is whether the new CFTC will have the tools to detect and prosecute fraudulent conduct in connection with futures trading, the sale of commodity options, or the offering of "leverage" contracts in gold and silver bullion or bulk coins. The most frequently cited "policy" rationale in criticism of the CFTC's exclusive jurisdiction is that other agencies may be better equipped to prevent fraudulent activities. For example, former SEC Chairman Ray Garrett Jr., opined to Chairman Staggers of the House Committee on Interstate and Foreign Commerce in February 1975 that "[w]e believe . . . that the disclosure and antifraud provisions of the federal securities laws do not have an adequate counterpart in the CFTC and the Commodity Exchange Act."[130]

There is superficial appeal to the contention that the Commodity Exchange Act and the CFTC's regulations presently do not call for the intense disclosure typical of securities regulation. In large part, however, this disclosure distinction exists because of the fundamentally different character of futures contracts. For instance, a futures contract is created by the sponsoring *commodity exchange*, not by a private issuer, and its terms are completely standardized. Futures contracts, unlike securities, are not created to raise capital for the promoters of a commercial enterprise. Disclosures concerning the quality of management, the financial condition of the enterprise, and the prospects for success are inapposite. Also, each of the basic terms and conditions of a futures contract must be submitted to, and affirmatively approved by, the CFTC before trading in it can be initiated by the sponsoring exchange. Indeed, the CFTC has authority[131] to *alter* those terms in the public interest. Once approved, the terms and conditions of each futures contract are published in the exchange's rulebook and are readily available to the trading public.

A somewhat different situation has existed, of course, with respect to commodity options and "leverage" contracts, which have been offered privately and without exchange sponsorship. These

---

130.  Garrett letter, *supra* note 97.

131.  Section 5a(10) of the CFTC Act, 7 U.S.C.A. § 7a(10) (Supp. 1, 1975), permits the CFTC to set the locations where deliveries must be permitted, and § 8a(7), 7 U.S.C.A. § 12a(7) (Supp. 1, 1975), allows the CFTC to "alter or supplement" any other rule or contract term.

instruments, like traditional securities, may vary widely in their terms and may depend to some degree upon the financial condition or management skills of a promoter. The CFTC promptly recognized that fact, however, and adopted antifraud rules in June 1975 with respect to these instruments.[132] Although the CFTC found that the adoption of a provision identical to SEC Rule 10b-5[133] was inappropriate when applied to commodity options because it "might invite an uncritical application of security law principles and practices" and might "misapply non-disclosure-of-information standards taken from securities laws decisions,"[134] the CFTC did adopt Rule 10b-5 criteria in regard to "leverage" contracts because "[t]hese are not transactions of a type commonly entered in the markets for commodity futures or cash commodities."[135]

Despite the CFTC's adoption of antifraud rules governing commodity options and "leverage" contracts, some concern has persisted that the Commodity Exchange Act does not protect the public against fraud as effectively as some other statutes, most notably the Securities Exchange Act. Former Chairman Garrett of the SEC expressed that view in February 1975,[136] and at least one court has held that the antifraud provisions of the federal securities laws are broader. In *McCurnin v. Kohlmeyer & Co.*,[137] the plaintiff urged the court to interpret the principal antifraud provision of the Commodity Exchange Act, section 4b,[138] as broadly as the case law under SEC Rule 10b-5. In pertinent part, section 4b prohibits "any member of a contract market" or "any person" in connection with any commodity transaction on a contract market for or on behalf of another person:

> (A) to cheat or defraud or attempt to cheat or defraud such other person;
> (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
> (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person. . . .[139]

The court, evidently ignoring subsection (A) in which "willfullness"

---

132.  Regs. §§ 30.01, 30.03, CCH Commod. Fut. L. Rep., ¶¶ 12,650, 12,652.

133.  17 C.F.R. § 240.10b-5 (1975).

134.  *See* 40 Fed. Reg. 26,505, n.1 (1975).

135.  *Id.* at 26,505.

136.  Garrett letter, *supra* note 97.

137.  347 F. Supp. 573 (E.D. La. 1972), *aff'd on other grounds*, 477 F.2d 113 (5th Cir. 1973).

138.  7 U.S.C. § 6b (1970).

139.  *Id.*

is not an element, held that section 4b "is clearly directed only toward willful misconduct" and stated that SEC Rule 10b-5 is much broader:

> The Securities Exchange Act of 1934, for example, employs much broader language, forbidding "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Section 10(b), 15 U.S.C.A. § 78j(b). The regulations, Rule 10 b 5 elaborate on what is forbidden. There is no counterpart of Section 10(b) in the C.E.A., nor any counterpart of Rule 10 b 5 in the Commodities Act regulations.[140]

The CFTC, on the other hand, has expressed its disagreement with the *McCurnin* decision and the position of the SEC that Commodity Exchange Act provisions proscribing fraud are inferior to those in the federal securities laws:

> The operative language of the anti-fraud provision contained in section 4b of the Commodity Exchange Act, as amended, 7 U.S.C. § 6b, is no less broad than Rule 10b-5 with respect to misrepresentations and deceptive acts and practices. . . .[141]

The CFTC has announced its intention to interpret section 4b broadly, notwithstanding the narrower *McCurnin* interpretation:

> The Commission does not believe these decisions should have continued vitality as applied to the Act as recently amended. It is appropriate—particularly in light of the Commodity Futures Trading Commission Act of 1974—that all provisions of the Commodity Exchange Act, as amended, be broadly construed to effectuate their remedial purposes. . . . The courts have frequently held in the context of remedial legislation that willfulness connotes no more than an awareness of an act or omission and not whether the act or omission is understood to be unlawful. . . .[142]

Despite the CFTC's efforts to treat the antifraud provisions of the Commodity Exchange Act as coextensive with those of the federal securities laws, it would appear that section 4b and other antifraud sections of the Act are not that broad. The principal deficiency of section 4b is that it applies only to those acting as agent or broker in commodity transactions, and not to the principals in the transactions. Section 4b proscribes fraudulent conduct by a member of a contract market or his correspondent, agent, or employee only if the activities involve transactions "for or on behalf of any other person." Similarly, the provision of section 4b applicable to "any person" applies only when his actions are "for or on behalf of any other person." The offense, therefore, exists when the *agent* cheats or defrauds "such other person," or makes false records to

---

140.   347 F. Supp. at 575-76.
141.   40 Fed. Reg., 26,505 (1975).
142.   *Id.* at 26,505 n.2.

deceive "such person." Aside from these agents or brokers, the only persons specifically covered by antifraud provisions of the Commodity Exchange Act are commodity pool operators and commodity trading advisers.[143] It would appear that a fraud committed by a principal to the transaction (a buyer or seller) or by a third party not acting as a principal's agent cannot be the basis of a private suit or disciplinary action under section 4b of the Commodity Exchange Act. All cases brought under section 4b, for example, have been by investors against their brokers.[144] When effort has been made to invoke section 4b in the absence of a broker-investor relationship, the complaint has been dismissed.[145]

By contrast, it is well established that a defrauded securities investor can proceed under section 10(b) of the Securities Exchange Act against a violator other than his own broker, such as the offeror or seller of securities.[146] It could be argued that for this reason section 10(b) provides substantially better protection for the investing public than section 4b of the Commodity Exchange Act. The capacity of direct parties to the transaction to defraud each other in futures trading, or the ability of third party non-brokers to do so, however, may be less in futures trading than in securities merchandising since futures contracts are standardized instruments, sponsored by the commodity exchanges, that have readily ascertainable terms and are valued basically in relation to the prevailing market price of the underlying commodity. In such circumstances, the opportunity and temptation of a seller, buyer, or third party to disclose falsehoods or to withhold material facts about the futures contract may be more limited than in securities transactions. The inference in section 4b itself seems to be that the greatest danger of fraud exists in the relationship of the trader with his broker, rather than in the other contacts that an investor in futures contracts may make. In any event, it would appear that non-brokers would be liable to investors even in section 4b cases if they are shown to have "aided and abetted" the broker's fraud.[147]

---

143. Section 4o, 7 U.S.C. § 6o (1970).

144. *See, e.g.,* Booth v. Peavy Co. Commodities Serv., 430 F.2d 132 (8th Cir. 1970); Gould v. Barnes Brokerage Co., 345 F. Supp. 294 (N.D. Tex. 1967); Johnson v. Arthur Espey, Shearson, Hammill & Co., 341 F. Supp. 764 (S.D.N.Y. 1972); McCurnin v. Kohlmeyer & Co., 340 F. Supp. 1338 (E.D. La. 1972); Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 337 F. Supp. 107 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972); Hecht v. Harris, Upham & Co., 283 F. Supp. 417 (N.D. Calif. 1968); Goodman v. H. Hentz & Co., 265 F. Supp. 440 (N.D. Ill. 1967).

145. *See* Rosee v. Board of Trade, 311 F.2d 524 (7th Cir. 1963) and the discussion thereof in Goodman v. H. Hentz & Co., 265 F. Supp. 440, 446-47 (N.D. Ill. 1967).

146. *See, e.g.,* Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).

147. *See, e.g.,* Wasnowic v. Board of Trade, Civil No. 69-328, at 5 (M.D. Pa., Dec. 31,

Criticism also has been leveled against the antifraud provisions of the Commodity Exchange Act on the ground that they do not afford the breadth of "remedies" available under other regulatory statutes such as the Securities Exchange Act. Former Chairman Garrett has stated that "the remedies available [under the Commodity Exchange Act] to victims of fraud are significantly narrower in scope than those available under the federal securities laws."[148] But the remedies for fraud under the Commodity Exchange Act compare quite favorably to the remedies under the federal securities laws and, in some respects, offer superior relief.

It is well established that an investor in the futures market can recover damages if he is injured by a violation of the Commodity Exchange Act.[149] Alternatively, the investor may file a complaint with the CFTC, which, under section 14,[150] can conduct an administrative proceeding and award "reparations" in favor of the complainant. The federal securities laws have no comparable administrative remedy for private parties. The CFTC itself has the right (as does the SEC under the federal securities acts)[151] to seek injunctions in its own name against violations of the Act.[152] In addition, the CFTC can seek writs of mandamus or similar relief whenever "necessary to remove the danger of violation of this Act or any such rule, regulation or order. . . ." Alternatively, in an administrative proceeding the CFTC can impose "civil penalties" up to $100,000 on any contract market or registered person for each violation of the Act, pursuant to section 6 of the Act.[153] The CFTC's right to assess civil penalties has no counterpart in the federal securities laws. Finally, the Act provides strict criminal sanctions for major offenses under the Act.[154]

The only significant remedy available to private parties under the federal securities laws that has no direct parallel in the Commodity Exchange Act is the express right of rescission enjoyed by

---

1970) (copy available through *Vanderbilt Law Review*); *cf.* Hochfelder v. Midwest Stock Exch., 350 F. Supp. 1122 (N.D. Ill. 1972); Brennan v. Midwestern United Life Ins. Co., 259 F. Supp. 673, 680 (N.D. Ill. 1966), *aff'd*, 417 F.2d 147, 153-54 (7th Cir. 1969).

148.  Garrett letter, *supra* note 97.

149.  Deaktor v. L.D. Schreiber & Co., 479 F.2d 52 (7th Cir. 1973) (against other traders and commodity exchange); Goodman v. H. Hentz & Co., 265 F. Supp. 440 (N.D. Ill. 1967) (against broker).

150.  CFTC Act § 106, 7 U.S.C.A. § 18 (Supp. 1, 1975).

151.  15 U.S.C. § 78u(e) (1970).

152.  CFTC Act § 211, 7 U.S.C.A. § 13a-1 (Supp. 1, 1975).

153.  CFTC Act § 212(a)(1), (3), 7 U.S.C.A. § 9, 9a (Supp. 1, 1975).

154.  CFTC Act §§ 212(d), 401, 7 U.S.C. § 13 (Supp. 1, 1975). The securities acts also provide criminal sanctions. *See* Securities Act of 1933, § 24, 15 U.S.C. § 77x (1970); Securities Exchange Act of 1934, § 32, 15 U.S.C. § 78ff (1970).

investors under section 12(1)[155] of the Securities Act of 1933 when, for example, securities have not been properly registered with the SEC, or the offering prospectus is untruthful. The context in which this remedy is available, however, has no relevance to futures trading since futures contracts are not "registered" with the CFTC in the SEC sense nor are they offered by means of a prospectus. Futures contracts, instead, are creatures of the commodity exchanges themselves and are reviewed exhaustively by the CFTC with respect to their economic justification and other public policy interests. The CFTC can require changes in the basic terms and conditions of futures contracts before trading is authorized. Affirmative approval is given by the CFTC in the form of a designation of the applicant exchange as a "contract market" for that particular contract. The SEC has no equivalent screening procedure with respect to the registration of securities or the review of prospectuses.

The Commodity Exchange Act, as amended in 1974, therefore, seems adequate in both its safeguards and its remedies to deal with fraudulent activity. The broad rulemaking power possessed by the CFTC under section 8a(5) of the Act[156] "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this Act" offers ample opportunity for the CFTC to fill in any remaining gaps. For example, the CFTC may wish to develop a "know your customer" rule or to set certain suitability standards for participating in the futures market or for entering transactions in commodity options or "leverage" contracts. In any event, there are certain unique safeguards already built into the Act that offer special protection to the investing public, such as the absolute prohibition under section 4d(2)[157] against a broker commingling customer money with his own funds.[158] Futhermore, public investors can benefit uniquely from the margin rules of the commodity markets, which require that additional funds must be put up by investors whenever their equity is impaired by adverse market price movements. These "margin calls" act as a practical inducement for investors to liquidate losing positions before massive losses are incurred. In securities trading, on the other hand, the tendency of many investors is to "ride out" adverse mar-

---

155.  15 U.S.C. § 77*l* (1970).

156.  7 U.S.C.A. § 12(a)(5) (Supp. 1, 1975).

157.  7 U.S.C. § 6d(2) (1970).

158.  Compare the far less rigid "segregation" requirement contained in SEC Rules 15c3-2 and 15c3-3, 17 C.F.R. §§ 240.15c3-2, .15c3-3 (1975).

ket movements since no additional expenditure is involved. As a result, securities investors may take greater risks of major losses than their counterparts in the commodity markets.

A final concern expressed about the CFTC's ability to protect the investing public has been that the CFTC might not initiate enforcement actions as aggressively as agencies like the SEC. Former Chairman Garrett noted, for example, that the SEC had filed a number of injunctive actions against promoters of commodity options and "leverage" contracts whom the SEC believed to be defrauding their investors.[159] Those SEC enforcement actions and Chairman Garrett's observations occurred before the CFTC began operations in late April of 1975. Whether the expressed concerns were warranted would depend, in the final analysis, upon whether the CFTC proved to be an aggressive enforcer when it became operational.

The CFTC's record to date suggests that the concerns over its determination to protect public investors were unwarranted. In addition to promulgating antifraud rules for commodity options and "leverage" contracts[160] during June of 1975, the CFTC has initiated a number of enforcement actions and has procured injunctions against persons operating investment programs in violation of the Act.[161] Also, the CFTC presently has under study by its staff and by a recently appointed Advisory Committee the form of regulations that should be adopted to protect the public against unscrupulous dealers in commodity options or "leverage" contracts.[162]

## VIII.  Conclusion

The amendments made by Congress in 1974 to the Commodity Exchange Act would have attracted little attention outside the commodity industry but for the extraordinary fact that Congress, in an era of proliferating public agencies and spiraling federal budgets to support them, chose in this Act to *centralize* regulation of the futures markets, commodity options, and "leverage" contracts in a single entity—the Commodity Futures Trading Commission. The Act has become, therefore, a bold experiment in whether the regulation of an American industry can be conducted more efficiently and

---

159.  Garrett letter, *supra* note 97.

160.  CFTC Reg. §§ 30.01, 30.03, CCH Commod. Fut. L. Rep. ¶¶ 2288, 2290.

161.  *See, e.g.*, CFTC v. American Options Corp., CCH Commod. Fut. L. Rep. ¶ 20,107 (C.D. Calif. 1975); CFTC v. American-Overseas Trading Corp., CCH Commod. Fut. L. Rep. Newsletter No. 10, at 5-6 (D. Ga. 1975).

162.  CCH Commod. Fut. L. Rep., Newsletter No. 11, at 4 (Oct. 31, 1975); BNA Sec. Reg. & L. Rep., No. 329, at A-8 (Nov. 26, 1975).

Case 1:07-cv-06682-DC     Document 5-9     Filed 08/16/2007     Page 24 of 25

more uniformly under a centralized leadership. It also will test whether other agencies, previously imbued with power or aspirations of power over some features of the industry, will give the experiment a chance to work. The CFTC, to its credit, has expressed its determination to resist all efforts to erode its exclusive jurisdiction.[163] The industry, for its part, can be expected to support the CFTC's position since fragmented and conflicting regulatory crosscurrents would, in the long run, be injurious to the industry and its orderly growth.

---

163. See brief of CFTC as amicus curiae in SEC v. American Commodity Exch., Inc., CCH COMMOD. FUT. L. REP. ¶ 20,063 (W.D. Okla. 1975).