# EXHIBIT F

114 FERC 61,047
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

18 CFR Part 1c

(Docket No. RM06-3-000; Order No. 670)

Prohibition of Energy Market Manipulation

(Issued January 19, 2006)

AGENCY:  Federal Energy Regulatory Commission.

ACTION:  Final Rule.

SUMMARY:  In this Final Rule, pursuant to Title III, Subtitle B, and Title XII, Subtitle

G of the Energy Policy Act of 2005, the Federal Energy Regulatory Commission

(Commission) is amending its regulations to implement new section 4A of the Natural

Gas Act and new section 222 of the Federal Power Act, prohibiting the employment of

manipulative or deceptive devices or contrivances.

EFFECTIVE DATE: This Final Rule will become effective [insert date of publication in

the **FEDERAL REGISTER**].

FOR FURTHER INFORMATION CONTACT:

Mark Higgins
Office of Market Oversight and Investigations
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426
(202) 502-8273
Mark.Higgins@ferc.gov

Docket No. RM06-3-000                                                    -2-

Frank Karabetsos
Office of General Counsel
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426
(202) 502-8133
Frank.Karabetsos@ferc.gov

SUPPLEMENTARY INFORMATION:

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Prohibition of Energy Market Manipulation                    Docket No. RM06-3-000

ORDER NO. 670

FINAL RULE

(Issued January 19, 2006)

I. INTRODUCTION.................................................................................................. 1.

II. BACKGROUND ................................................................................................. 6.

III. DISCUSSION.................................................................................................... 8.
  A. Scope of Application of Regulations........................................................ 9.
    1. Comments............................................................................................... 9.
    2. Commission Determination.................................................................... 16.
  B. General Applicability of Securities Law Concepts ................................. 26.
    1. Comments............................................................................................... 26.
    2. Commission Determination.................................................................... 30.
  C. Disclosure ................................................................................................ 33.
    1. Duty of Disclosure................................................................................. 34.
      a. Comments .......................................................................................... 34.
      b. Commission Determination............................................................... 35.
    2. Sections 1c.1(a)(2) and 1c.2(a)(2) and Omissions of Material Fact ..... 38.
      a. Comments .......................................................................................... 38.
      b. Commission Determination............................................................... 41.
  D. Sections 1c.1(a)(3) and 1c.2(a)(3) and Intent........................................ 43.
    1. Comments............................................................................................... 43.
    2. Commission Determination.................................................................... 45.
  E. Elements of a Manipulation Claim .......................................................... 46.
    1. Comments............................................................................................... 46.
    2. Commission Determination.................................................................... 48.
  F. Interplay with Market Behavior Rules ..................................................... 55.
    1. Comments ............................................................................................... 55.
    2. Commission Determination.................................................................... 58.
  G. Statute of Limitations .............................................................................. 61.

    1. Comments.............................................................................................. 61.
    2. Commission Determination.................................................................. 62.
  H. Safe Harbors and Affirmative Defenses.................................................. 64.
    1. Comments.............................................................................................. 64.
    2. Commission Determination.................................................................. 66.
  I. Procedures for Handling Manipulation Claims.......................................... 68.
    1. Comments.............................................................................................. 68.
    2. Commission Determination.................................................................. 70.
  J. Miscellaneous Issues................................................................................ 75.
    1. Use of "Entity" in place of "Person" in sections 1c.1(a)(3) and 1c.2(a)(3) ........ 75.
      a. Comments.......................................................................................... 75.
      b. Commission Determination.............................................................. 76.
    2. Impact of New Regulations on the Policy Statement on Natural Gas and Electric
    Price Indices ............................................................................................ 77.
      a. Comments .......................................................................................... 77.
      b. Commission Determination.............................................................. 78.
    3. Special Pleading ...................................................................................... 79.
      a. Comments.......................................................................................... 79.
      b. Commission Determination.............................................................. 80.

IV. REGULATORY FLEXIBILITY ACT CERTIFICATION ...................................... 81.

V. INFORMATION COLLECTION STATEMENT ...................................... 83.

VI. ENVIRONMENTAL STATEMENT ........................................................ 84.

VII. DOCUMENT AVAILABILITY .............................................................. 85.

VIII. EFFECTIVE DATE AND CONGRESSIONAL NOTIFICATION ...................... 88.

TABLE OF CONTENTS

REGULATORY TEXT

APPENDIX:  Parties Filing Initial and Reply Comments and Acronyms

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

Prohibition of Energy Market Manipulation                Docket No. RM06-3-000

ORDER NO. 670

FINAL RULE

(Issued January 19, 2006)

## I.  **Introduction**

1.     On October 20, 2005, the Commission issued a Notice of Proposed Rulemaking

(NOPR) to prohibit energy market manipulation.[1]  Pursuant to section 4A of the Natural

Gas Act (NGA)[2] and section 222 of the Federal Power Act (FPA),[3] as added to the

statutes by the Energy Policy Act of 2005 (EPAct 2005),[4] the Commission proposed to

add a Part 159 under Subchapter E and a Part 47 under Subchapter B to Title 18 of the

Code of Federal Regulations.  Under the proposed regulations, it would be unlawful for

---

[1] Prohibition of Energy Market Manipulation, 113 FERC ¶ 61,067 (2005).

[2] 15 U.S.C. 717 et al. (2000).

[3] 16 U.S.C. 791a et al. (2000).

[4] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005), 315 and
1283, respectively.

any entity, directly or indirectly, in connection with the purchase or sale of natural gas or

the purchase or sale of transportation services subject to the jurisdiction of the

Commission, or in connection with the purchase or sale of electric energy or the purchase

or sale of transmission services subject to the jurisdiction of the Commission, (1) to use

or employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business that operates or would operate as

a fraud or deceit upon any person.

2.      In the NOPR, the Commission stated that sections 315 and 1283 of EPAct 2005

"apply to the conduct of 'any entity,' not just jurisdictional market-based rate sellers,

natural gas pipelines, or holders of blanket certificate authority," and "includes not only

regulated utilities but also governmental utilities and other market participants."[5]

Furthermore, we stated in the NOPR that sections 1c.1(a)(1)-(3) and 1c.2(a)(1)-(3) of the

proposed regulations were patterned after the Securities and Exchange Commission's

(SEC) Rule 10b-5,[6] and were "intended to be interpreted consistent with analogous SEC

precedent that is appropriate under the circumstances."[7]  Sections 1c.1(b) and 1c.2(b) of

---

[5] NOPR at P 9.

[6] 17 CFR 240.10b-5 (2005).

[7] NOPR at P 10.  As explained in P 5, supra, the regulations proposed to be placed
(continued)

Docket No. RM06-3-000                                                        3

the proposed regulations stated that nothing in these provisions should be construed to

create a private right of action.  The Commission further noted, however, that sections

1c.1(b) and 1c.2(b) were not intended to take away any other right that may otherwise

exist.

3.      Thirty parties filed comments and nine parties filed reply comments.[8]  In response

to the comments, and as discussed more fully below, the Commission, among other

things: clarifies the scope of application of the Final Rule; addresses comments pertaining

to disclosure and sections 1c.1(a)(2)-(3) and 1c.2(a)(2)-(3) of the Final Rule; discusses

the elements of a violation of the Final Rule; notes the relationship of the Final Rule to

the Market Behavior Rules[9]; and deals with a number of implementation issues, such as

the applicable statute of limitations, affirmative defenses and safe harbor provisions, and

procedural matters.

---

in new sections 159.1 and 47.1 will be new sections 1c.1 and 1c.2, respectively.

    [8] Entities filing intervening and reply comments are listed in the Appendix to this
Final Rule.  The abbreviations for such commenters are noted in the Appendix.  The
Commission has accepted and considered all comments filed, including late-filed
comments.

    [9] Investigation of Terms and Conditions of Public Utility Market-Based Rate
Authorizations, 105 FERC ¶ 61,218 (2003), reh'g denied, 107 FERC ¶ 61,175 (2004);
Order No. 644, Amendment to Blanket Sales Certificates, 68 FR 66323 (2003), FERC
Stats. & Regs. ¶ 31,153 (2003), reh'g denied, 107 FERC ¶ 61,174 (2004).  The Market
Behavior Rules are currently on appeal.  Cinergy Marketing & Trading, L.P. v. FERC,
Nos. 04-1168 et al. (D.C. Cir., appeal filed April 28, 2004).

4.     For the most part, the Commission finds it unnecessary to change the wording of

the proposed regulatory text, except in one respect: substituting "entity" for "person" in

sections 1c.1(a)(3) and 1c.2(a)(3) of the Final Rule. However, we do provide certain

clarifications requested by several commenters. In addition, we find that some of the

recommendations made by commenters are more appropriately addressed in the

proceeding initiated in Docket No. RM06-5-000, proposing to repeal the codes of

conduct for unbundled sales service and for persons holding blanket marketing

certificates, and in Docket No. EL06-16-000, proposing to repeal the Market Behavior

Rules, which are currently included in all public utility sellers' market-based rate tariffs

and authorizations.[10]

5.     Without a rule prohibiting manipulative or deceptive conduct, the language of

EPAct 2005 sections 315 and 1283 does not, by itself, make any particular act unlawful.

As a result, this Final Rule serves as the implementing provision designed to prohibit

manipulation and fraud in the markets the Commission is charged with regulating. The

Final Rule is not intended to regulate negligent practices or corporate mismanagement,

but rather to deter or punish fraud in wholesale energy markets. In addition, to ease

references to the Final Rule, we have determined to place the new regulations in a new

---

[10] Amendments to Codes of Conduct for Unbundled Sales Service and for Persons
Holding Blanket Marketing Certificates, 70 FR 72090 (2005), 113 FERC ¶ 61,189
(2005); Investigation of Terms and Conditions of Public Utility Market-Based Rate
Authorizations, 70 FR 71484 (2005), 113 FERC ¶ 61,190 (2005).

Part 1c of the Commission's general regulations, rather than separately in new Parts 159

and 47 as proposed in the NOPR. The regulatory text of proposed sections 159.1 and

47.1 as identified herein will be new sections 1c.1 and 1c.2, respectively.

## II. **Background**

6.      On August 8, 2005, EPAct 2005 became law. Sections 315 and 1283 of EPAct

2005, amending the NGA and the FPA, respectively, are virtually identical, and prohibit

the use or employment of manipulative or deceptive devices or contrivances in

connection with the purchase or sale of natural gas, electric energy, or transportation or

transmission services subject to the jurisdiction of the Commission. These anti-

manipulation sections of EPAct 2005 closely track the prohibited conduct language in

section 10(b) of the Securities Exchange Act of 1934,[11] and specifically dictate that the

terms "manipulative or deceptive device or contrivance" are to be used "as those terms

are used in section 10(b) of the Securities Exchange Act of 1934."

7.      The SEC adopted Rule 10b-5,[12] which implemented section 10(b) of the Exchange

Act. Since their promulgation, a significant body of legal precedent concerning section

10(b) of the Exchange Act and Rule 10b-5 has developed. Consistent with the mandate

that certain aspects of the Commission's new authority be exercised in a manner

consistent with section 10(b) of the Exchange Act, consistent with Congress' modeling

---

[11] Securities Exchange Act of 1934, 15 U.S.C. 78j(b) (2000) (Exchange Act).

[12] 17 CFR 240.10b-5 (2005).

sections 315 and 1283 of EPAct 2005 on section 10(b) of the Exchange Act, and as

proposed in the NOPR, the Commission has modeled the Final Rule on Rule 10b-5. This

approach will benefit entities subject to the new rule because there is a substantial body

of precedent applying the comparable language of Rule 10b-5. In the course of

responding to various comments, we will discuss the appropriate application of analogous

securities law precedent that will inform the interpretation of the Final Rule in the context

of the NGA and FPA.

## III.    **Discussion**

8.      The 30 initial comments and nine reply comments on the NOPR are from a diverse

group of industry stakeholders. Overwhelmingly, commenters are supportive of our

efforts to implement well-developed, clear and fair rules aimed at eliminating the

potential for fraud in wholesale energy transactions. The comments identify a number of

issues: (1) the scope of application of the Final Rule; (2) the usefulness of securities law

precedents to the energy industry; (3) the disclosure implications of the Final Rule; (4)

the elements that comprise a violation of the Final Rule; (5) how the Final Rule will

interact with the Market Behavior Rules; and (6) a variety of procedural matters,

including the appropriate statute of limitations to apply to the Final Rule. These issues

and others that were raised in comments are addressed in the sections that follow.

### A. **Scope of Application of Regulations**

#### 1. **Comments**

9.      Several commenters express views on the appropriate scope of the proposed anti-

manipulation regulations.[13]  Commenters ask the Commission to clarify the meaning of

"any entity" and "subject to the jurisdiction of the Commission" as these statutory terms

apply to the proposed regulations.  For example, the Midwest ISO supports broad

application of the proposed regulations to any entity as opposed to "limiting the

application of the regulations to FERC jurisdictional parties."[14]  Likewise, NASUCA

reads the proposed regulations as applying to all entities, "not just jurisdictional market-

based rate sellers, natural gas pipelines, or holders of blanket certificate authority."[15]

AGA asks the Commission to clarify that "any entity" means that the proposed

regulations extend beyond Order No. 644 regulation of jurisdictional market-based rate

sellers, natural gas pipelines, or holders of blanket certificate authority.  This is

necessary, AGA asserts, to ensure the rules will have the "intended effective impact on

the market place for natural gas sales."[16]

10.    Two commenters specifically address whether the proposed regulations apply to

"first sales"[17] of natural gas.  APGA, noting that first sales represent a substantial part of

---

[13] See, e.g., AGA at 4-5; APGA at 10; APPA at 3-4; AOPL at 2; BP at 1-2;
Cinergy at 8; EEI at 25-26; Indicated Market Participants at 8; Midwest ISO at 4;
NARUC Reply at 3-5; SCANA at 3; SUEZ at 6-11.

[14] Midwest ISO at 4.

[15] NASUCA at 3.

[16] AGA at 4.

[17] "First sales" are certain wholesale sales of natural gas removed from the
Commission's jurisdiction by the Natural Gas Policy Act of 1978 (NGPA) and the
(continued)

the wholesale natural gas market, argues that the phrase "subject to the jurisdiction of the Commission" in NGA section 4A must be read to apply only to "the purchase or sale of transportation services" and not to the preceding clause "purchase or sale of natural gas."[18]  SUEZ, however, argues that "subject to the jurisdiction of the Commission" applies to purchases and sales as well as to transportation services.  SUEZ maintains that "any entity" does not include entities engaged in non-jurisdictional transactions such as first sales, sales of LNG, or retail sales, but is intended only to bring certain governmental entities otherwise excluded from FPA jurisdiction under the umbrella of the proposed regulations.[19]

11.    APPA and NARUC also urge the Commission to construe the phrase "subject to the Commission's jurisdiction" to modify both the purchase or sale of electric energy and the purchase or sale of transmission services.  By doing so, APPA and NARUC argue, the Commission will make clear the regulation does not apply to retail sales or purchases

---

Wellhead Decontrol Act of 1989.  Accordingly, the only sales of natural gas that the Commission currently has jurisdiction to regulate are sales for resale of domestic gas by pipelines, local distribution companies (LDCs), or their affiliates so long as they do not produce the gas that they sell, and sales for resale of natural gas previously purchased and sold by an interstate pipeline, LDC or retail customer.  See San Diego Gas and Electric Company, 101 FERC ¶ 61,161 at P 10 (2002); Reporting of Natural Gas Sales to the California Market, 96 FERC ⬜ 61,119 at 61,463, reh'g denied, 97 FERC ¶ 61,029 (2001).

[18] APGA at 3-10.

[19] SUEZ at 10, referring to FPA section 201(f) entities.

and thus will avoid overlap with state and local jurisdiction.[20] In reply comments,

Cinergy argues that regardless of the parsing of the statutory language, the manipulation

authority falls within the existing scope of the FPA and NGA, and that nothing in the

scope of these statutes suggests that retail sales are in any way subject to the

Commission's authority.[21] Likewise, EEI argues that the FPA is limited to wholesale

markets, and that matters subject to state regulation are excluded from the reach of the

Commission.[22]

12.    NGSA asserts that EPAct 2005 does not open the door to regulation of non-

jurisdictional sales even if they are subject to the anti-manipulation rules. NGSA

acknowledges that the statutory provisions expand the Commission's authority to prevent

market manipulation, but cautions that nothing in the statute grants the Commission any

rate or certificate jurisdiction over deregulated first sales of natural gas.[23]

13.    Other commenters address the meaning of "any entity" in the context of FPA

sections 201(f) and 211A. PG&E argues that it is crucial that the Commission's authority

to prohibit manipulation extend to all entities involved in the market. Noting the specific

reference to entities described in FPA section 201(f), PG&E states that the proposed

---

[20] APPA at 4; NARUC Reply at 3-5.

[21] Cinergy Reply at 2-4.

[22] EEI Reply at 6.

[23] NGSA at 3.

regulations should apply to all municipalities and other governmental agencies.[24]  EEI

also states that the proposed regulations must reach entities described in FPA section

201(f), including unregulated transmitting utilities under FPA section 211A. This is so,

EEI argues, because the authority to require comparable open access transmission under

FPA section 211A makes all transmission service provided by FPA section 201(f) entities

subject to the jurisdiction of the Commission and thus subject to the proposed anti-

manipulation rules.[25]  APPA responds that under section 211A(c) certain entities are not

subject to the transmission service requirements (those selling less than 4,000,000 MWhs

per year, or that do not own facilities necessary to operate an interconnected transmission

system, or that meet other criteria that the Commission may adopt in the future). These

entities, APPA argues, are not subject to the jurisdiction of the Commission and thus not

subject to the proposed regulations.[26]  NRECA goes further, asserting that while FPA

section 201(f) governmental entities are "potentially" subject to the proposed anti-

manipulation regulations, the regulations can only apply to transactions that are otherwise

subject to the Commission's jurisdiction. Thus, NRECA argues that neither party to a

retail sale, to transmission service in intrastate commerce, or to a sale of electricity or

---

[24] PG&E at 6.

[25] EEI at 25.

[26] APPA Reply at 5-6.

11

transmission service by a FPA section 201(f) entity are subject to the proposed

regulations.[27]

14.    AOPL seeks clarification that "subject to the jurisdiction of the Commission" does

not mean the Commission would subject oil pipelines to claims of market manipulation

in connection with transportation and transmission services subject to the Commission's

jurisdiction under the Interstate Commerce Act (ICA).[28]

15.    Finally, Cinergy asks that the text of the proposed regulations be modified to make

explicit that the regulations pertain only to market manipulation, noting that SEC Rule

10b-5 applies to a wide range of activities beyond market manipulation.[29]

### 2.  **Commission Determination**

16.    As an initial matter, this Final Rule does not, and is not intended to, expand the

types of transactions subject to the Commission's jurisdiction under the FPA, NGA,

NGPA, or ICA.  As now explained, however, the new regulations do apply to "any

entity" as that is the scope of the Final Rule as directed by sections 315 and 1283 of

EPAct 2005.  If any entity engages in manipulation and the conduct is found to be "in

connection with" a jurisdictional transaction, the entity is subject to the Commission's

anti-manipulation authority.  Absent such nexus to a jurisdictional transaction, however,

---

[27] NRECA Reply at 2-5.

[28] AOPL at 1-3.

[29] Cinergy at 8.

fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is

not subject to the new regulations.

17.     NGA section 4A and FPA section 222 make it unlawful for "any entity" to use a

manipulative or deceptive device or contrivance "in connection with" the purchase or sale

of natural gas or electric energy or the purchase or sale of transportation or transmission

services "subject to the jurisdiction of the Commission."[30]  The answer to the scope of

---

[30] The text of EPAct 2005 section 315, adding section 4A to the NGA, is:

It shall be unlawful for any entity, directly or indirectly, to use or employ, in
connection with the purchase or sale of natural gas or the purchase or sale of
transportation services subject to the jurisdiction of the Commission, any manipulative or
deceptive device or contrivance (as those terms are used in section 10(b) of the Securities
Exchange Act of 1934 (15 U.S.C. 78j(b))) in contravention of such rules and regulations
as the Commission may prescribe as necessary in the public interest or for the protection
of natural gas ratepayers. Nothing in this section shall be construed to create a private
right of action.

The corresponding text of EPAct 2005 section 1283, adding section 222 to the
FPA, is:

(a) IN GENERAL.—It shall be unlawful for any entity (including an entity described
in section 201(f)), directly or indirectly, to use or employ, in connection with the
purchase or sale of electric energy or the purchase or sale of transmission services subject
to the jurisdiction of the Commission, any manipulative or deceptive device or
contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of
1934 (15 U.S.C. 78j(b))), in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public interest or for the
protection of electric ratepayers.

(b)  NO PRIVATE RIGHT OF ACTION.—Nothing in this section shall be construed to
create a private right of action.

application of the Final Rule lies in a reasonable reading of these terms in relation to each other.

18.    "Any entity" is a deliberately inclusive term.  Congress could have used the existing defined terms in the NGA and FPA of "person," "natural-gas company," or "electric utility," but instead chose to use a broader term without providing a specific definition. [31]  Thus, the Commission interprets "any entity" to include any person or form of organization, regardless of its legal status, function or activities. [32]

19.    The second aspect of the analysis focuses on the transaction involved.  A transaction under NGA section 4A is "the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission."  A transaction under FPA section 222 is "the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission." The critical issue is whether the limiting phrase of "subject to the jurisdiction of the Commission" applies to both preceding phrases, that is, (1) the purchase or sale of the energy commodity and (2) transportation services or transmission services, or just to the

_____

[31] See NGA sections 2(1) and 2(6); FPA sections 3(4) and 3(22).  Congress did note that entities described in FPA section 201(f) are included in the meaning of entity. See FPA section 222(a).

[32] Because many entities that are engaged in wholesale natural gas or electricity transactions or in interstate transportation or transmission services, engage in both jurisdictional and non-jurisdictional transactions, it is not enough to say, as SUEZ suggests, that entities engaging in non-jurisdictional transactions are not covered.

transportation or transmission services.  APGA argues that the "rule of the last

antecedent" means that it should only modify the last phrase, that is, transportation

services or transmission services.  But in the absence of definitive punctuation or other

clearer expression of intent to limit the jurisdiction requirement only to transportation or

transmission, the Commission must look for the meaning which is the most reasonable

under the circumstances.[33]

20.     The Commission concludes that the phrase "subject to the jurisdiction of the

Commission" should be read as modifying both preceding phrases, that is, "the purchase

or sale" as well as "transportation services" (NGA) and "transmission services" (FPA).

Had Congress intended to expand the Commission's jurisdiction so significantly as to

give it anti-manipulation authority over such transactions as first sales of imported natural

gas, intrastate sales of electric energy, retail sales of electric energy or energy sales by

governmental entities, we believe it would have done so explicitly. [34]  Further, in light of

_____

[33] APGA at 4 (citing 2a N. Singer, Sutherland on Statutory Construction § 47:33 at
369 (6th rev. ed. 2000) and Barnhart v. Thomas, 540 U.S. 20, 26 (1993)).  The general
rule is that a qualifying phrase will normally apply to the provision or clause immediately
preceding it.  However, "where the sense of the entire act requires that a qualifying word
or phrase apply to several preceding . . . sections, the word or phrase will not be restricted
to its immediate antecedent."  Sutherland § 47:33 at 372.  The case referred to by APGA
also notes that the rule is "not an absolute" and "can assuredly be overcome by other
indicia of meaning."  Barnhart v. Thomas, 540 U.S. at 26.

[34] Transactions not subject to the Commission's jurisdiction include first sales,
sales of imported natural gas, sales of imported LNG, sales and transportation by NGA
section 1(b)-(d) entities (i.e., activities including production and gathering, local
distribution, "Hinshaw" pipelines, and vehicular natural gas), or by NGA section 7(f)
(continued)

the close link between transportation or transmission services and natural gas and electric

commodity sales, we do not believe that Congress would have expanded the

Commission's authority to cover all natural gas and electric commodity sales but not all

gas transportation and electric transmission. Accordingly, we conclude that the most

reasonable interpretation is that Congress did not expand the Commission's traditional

NGA and FPA subject matter jurisdiction in sections 315 or 1283 of EPAct, but rather

gave the Commission broad jurisdiction over the entities that engage in certain conduct

affecting our subject matter jurisdiction.

21.     Third, the phrase "in connection with" must be given meaning. APGA says that

interpreting "subject to the jurisdiction of the Commission" as applying to sales

effectively would exclude producers and marketers from the reach of the Final Rule as

these are the dominant sellers of natural gas in wholesale markets. APGA argues this

interpretation implies that enactment of NGA section 4A serves no purpose, as it does not

increase the Commission's reach beyond the rules already promulgated by Order No.

644.[35] This is not the case, however. As discussed below, any entity may be subject to

---

companies, retail sales of electric energy, sales of electric energy in intrastate commerce,
sales of electric energy by governmental entities and certain electric power cooperatives,
and certain interstate transmission by governmental entities.

[35] APGA at 6-8. APGA also points to EPAct 2005 section 318, which adds a new
section (d) to NGA section 20. Section 20(d) authorizes the Commission to seek a court
order barring an individual found to have engaged in manipulation from future energy
transactions; there is a similar new provision in FPA section 314(d). Here, APGA
argues, Congress used subparts to separate sales from transportation service, and applied
(continued)

the Final Rule if its fraudulent or manipulative conduct is "in connection with" a

purchase or sale of natural gas, electric energy, transportation service, or transmission

service that is subject to the Commission's jurisdiction. [36] Thus, the third aspect of the

analysis is to consider whether the fraud is "in connection with" a jurisdictional

transaction.

22.    Section 10(b)'s "in connection with" requirement has been construed broadly by

the Supreme Court to encompass many circumstances where securities transactions

"coincide" with the overall scheme to defraud.[37]  However, the Supreme Court was

---

the "subject to the jurisdiction of the Commission" only to the latter. This is not
dispositive. First, this is a separate section of the statute. Second, the use of subparts
does not conclusively mean that "subject to the jurisdiction of the Commission" cannot
also modify the first subpart. Third, the reading APGA urges still presents the
troublesome prospect that parties could assert that the anti-manipulation authority now
applies to retail sales or other transactions otherwise expressly excluded from the
Commission's jurisdiction.

[36] AEP urges that the Final Rule identify the modalities through which an entity is
prohibited from manipulating a market, noting that SEC Rule 10b-5 specifies that fraud
or manipulation must involve the "use of any means or instrumentality of interstate
commerce or of the mails, of any facility of any national securities exchange." AEP at 2.
This is not necessary, as manipulation must be in connection with jurisdictional
transactions which, by definitions in NGA section 1(b) and FPA section 201(b), are in
interstate commerce.

[37] SEC v. Zandford, 535 U.S. 813, 825 (2002) ("[T]he SEC complaint describes a
fraudulent scheme in which the securities transaction and breaches of fiduciary duty
coincide. Those breaches were therefore 'in connection with' securities sales within the
meaning of [section] 10(b)."). See also Superintendent of Insurance v. Bankers Life &
Casualty Co., 404 U.S. 6, 12-13 (1971) (previously the Supreme Court had stated that the
requirement was met when there was an "injury as a result of deceptive practices
touching [the] sale of securities"); Head v. Head, 759 F.2d 1172, 1175 (4th Cir. 1985)
(continued)

careful to state that section 10(b) "must not be construed so broadly as to convert every

common law fraud that happens to involve securities into a violation" of section 10(b)

and Rule 10b-5.[38] Guided by this precedent, the Commission views the "in connection

with" element in the energy context as encompassing situations in which there is a nexus

between the fraudulent conduct of an entity and a jurisdictional transaction. We note

that, unlike the SEC, which has broad jurisdiction over securities transactions, our

jurisdiction is limited to certain wholesale transactions that remain within the ambit of the

NGA, NGPA, and FPA. At the same time, energy markets are made up of both

jurisdictional and non-jurisdictional transactions. We do not intend to construe the Final

Rule so broadly as to convert every common-law fraud that happens to touch a

jurisdictional transaction into a violation of the Final Rule. Rather, in committing fraud,

the entity must have intended to affect, or have acted recklessly to affect, a jurisdictional

transaction.[39] For example, any entity engaging in a non-jurisdictional transaction

through a Commission-regulated RTO/ISO market, that acts with intent or with

recklessness to affect the single price auction clearing price (which sets the price of both

non-jurisdictional and jurisdictional transactions), would be engaging in fraudulent

---

(the nexus must be more than a <u>de minimis</u> "touch," yet is applied flexibly where there is
fraud affecting securities transactions).

[38] <u>SEC v. Zandford</u>, 535 U.S. at 820.

[39] See PP 52-53 <u>infra</u> for a discussion of the intent required for a violation of the
Final Rule.

conduct in connection with a jurisdictional transaction and, therefore, would be in violation of the Final Rule.

23.     Turning to the comments that address the applicability of the proposed regulations to FPA sections 201(f) and 211A,[40] here too the focus must be on the transaction and the entity's conduct to determine whether a violation of the Final Rule occurred.  Again, the Commission emphasizes that if <u>any</u> entity engages in fraudulent conduct and that conduct is in connection with a jurisdictional transaction, then the Final Rule is applicable to that entity.  It is, therefore, not necessary for the Commission to determine in this context how sections 201(f) and 211A are to be applied generally.[41]

24.     With respect to the request by AOPL for clarification on whether "subject to the jurisdiction of the Commission" would cause oil pipelines to be subject to claims of market manipulation in connection with transportation services subject to the Commission's jurisdiction under the ICA, the Commission points out that EPAct 2005 did not amend the ICA to include anti-manipulation provisions, and therefore we do not

---

[40] <u>See, e.g.</u>, APPA Reply at 5-6; EEI at 25; PG&E at 6; NRECA Reply at 2-5.

[41] Section 211A permits the Commission to issue regulations to implement the provisions of FPA section 211A.  At this time, the Commission has not proposed such regulations, but has included this issue in the Notice of Inquiry issued in <u>Preventing Undue Discrimination and Preference in Transmission Service</u>, 70 FR 55796 (2005), FERC Stats. & Regs. ¶ 35,553 (2005).  Full delineation of the scope of FPA section 211A should be developed through that proceeding, not in the context of the anti-manipulation regulations.

read the authority granted under the NGA and FPA to proscribe and penalize fraud or

deceit as applying to oil pipeline transportation under the ICA.

25.     As to Cinergy's request that the text of the Final Rule be modified to make explicit

that the regulations apply only to market manipulation, we decline to do so. Cinergy's

request would unduly narrow the broad authority Congress granted in EPAct 2005. The

language of EPAct 2005 sections 315 and 1283 is modeled after section 10(b) of the

Exchange Act, which has been interpreted as a broad anti-fraud "catch-all clause."[42]  SEC

Rule 10b-5, on which the Final Rule is patterned, does not expressly limit itself to

manipulation, but uses terms such as "device, scheme, or artifice to defraud" and "fraud

or deceit."[43]  We will retain similar language in our Final Rule, which will permit the

Commission to police all forms of fraud and manipulation that affect natural gas and

electric energy transactions and activities the Commission is charged with protecting.

### B. General Applicability of Securities Law Concepts

#### 1. Comments

26.     Commenters are divided as to whether we should model the proposed anti-

---

[42] See Aaron v. SEC, 446 U.S. 680, 690 (1980); see also Schreiber v. Burlington
Northern, Inc., 472 U.S. 1, 6-7 (1985) (describing section 10(b) as a "general prohibition
of practices . . . artificially affecting market activity in order to mislead investors . . . .");
Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151-53 (1972) (noting that
the repeated use of the word "any" in section 10(b) and SEC Rule 10b-5 denotes a
congressional intent to have the provisions apply to a wide range of practices).

[43] 17 CFR 240.10b-5 (2005).  SEC Rule 10b-5 is titled "Employment of
manipulative and deceptive devices."

manipulation regulations after SEC Rule 10b-5. Ameren, Cinergy, EPSA, Indicated

Market Participants, EEI, LG&E, NGSA, PNM and Xcel argue that adoption of a rule

patterned on SEC Rule 10b-5 is problematic because the securities model is one of

disclosure, designed in large part to protect novice investors by eliminating disparities in

access to information, whereas the purpose of the FPA and NGA is to ensure "just and

reasonable" rates in wholesale energy markets. Many of the commenters also argue that

the participants in energy markets are largely sophisticated, and unlike less-sophisticated

participants in the securities markets, do not need the protections of a disclosure regime.[44]

27.    AGA comments that it is unclear how the SEC's model of disclosure will apply to

natural gas market transactions, and ISDA and PNM argue that the Commission should

refrain from a wholesale adoption of SEC case law as such an action would create

uncertainty as to the duties, standards and obligations owed by market participants

because of the different regulatory frameworks for energy and securities markets.[45]

EPSA, PG&E and SUEZ call for further study and tailoring of Rule 10b-5 to the energy

industry because of the differences between the operations of the securities markets and

---

[44] Ameren at 3-4; Cinergy at 6-7; EPSA at 5-8; Indicated Market Participants at 10-13; EEI at 6-8; LG&E at 3-7; NGSA at 4-5; PNM Reply at 4-5; Xcel at 3-6.

[45] AGA at 4; ISDA at 3-5; PNM Reply at 4-6. But not everyone dismisses the importance of the regulations to sophisticated parties. APPA shares SCE's observation that the degree of "protection" implied by relative levels of counterparty sophistication must not be overstated, noting that even sophisticated market participants may need protection against market manipulations. APPA Reply at 3-4; SCE at 3-4.

the energy markets.[46] FirstEnergy argues that the rules proposed in the NOPR are vague

and overly broad.[47]

28.    On the other hand, APGA, NARUC, NASCUA, NJBPU, and the States support

the Commission's decision to model the proposed regulations on SEC Rule 10b-5.[48]

APPA, NARUC and NJBPU argue that Rule 10b-5 case law will provide useful guidance

as the Commission develops its own body of precedent to follow.[49]    TDUS argues that

the Commission's proposed rule prohibiting market manipulation plainly implements, in

a straightforward manner, the express intent of EPAct 2005.[50]    TDUS finds the arguments

of Ameren and Xcel unpersuasive because parties as sophisticated as they purport to be

ought to have no problem complying with a straightforward prohibition against making

fraudulent representations in their transactions.[51]    TDUS also argues that the level of

sophistication of the parties to a bilateral negotiation is irrelevant because the

---

[46] EPSA at 11; PG&E at 12; SUEZ at 14.

[47] FirstEnergy at 4-6.

[48] APGA at 4-5; NARUC at 4-5; NASCUA at 2-3; NJBPU at 2-3; States at 2.
APGA, NARUC, and the States argue that modeling the Final Rule on SEC Rule 10b-5 is
consistent with the express congressional dictates of EPAct 2005.

[49] APPA Reply at 1-2; NARUC at 5; NJPBU at 3.

[50] TDUS at 2-3.

[51] Id. at 3.

Commission's anti-manipulation rules are not to protect the contracting parties from each other, but to protect the consumers who rely on the market for their energy supplies.[52]

29.    APPA and INGAA support the Commission's reliance on section 10(b) of the Exchange Act and SEC Rule 10b-5, and the case law interpreting the statute and rule, as providing guidance to the Commission in administering its new EPAct 2005 anti-manipulation authority.[53]    APPA and INGAA also recommend that the Commission take into account pertinent differences between the regulatory regimes of the Exchange Act and the NGA and NGPA, and depart from securities law precedent when industry structure and common sense so dictate.[54]

### 2.  **Commission Determination**

30.    As a general matter, the Commission does not believe that modeling the Final Rule on SEC Rule 10b-5 is problematic or will create uncertainty.  This is not to say that commenters did not raise valid concerns about how securities precedent will be applied in the energy industry context.  We intend to adapt analogous securities precedents as appropriate to specific facts, circumstances, and situations that arise in the energy industry.  This is consistent with Congress' modeling of EPAct 2005 sections 315 and 1283 on section 10(b) of the Exchange Act and explicit references to section 10(b) in

---

[52] Id. at 3-4.

[53] APPA Reply at 1-3; INGAA at 7.

[54] APPA Reply at 1; INGAA at 5.

EPAct 2005 sections 315 and 1283, and will provide a level of substantial certainty with

respect to how the regulations will operate that the Commission is not typically able to

provide where a preexisting body of law and precedent is not readily available. The

Commission likewise finds that modeling the Final Rule on SEC Rule 10b-5 provides

clarity to affected parties similar to the clarity provided by Congress. Thus, the

Commission rejects FirstEnergy's argument that the proposed regulations are vague and

overly broad. As previously stated, the Final Rule is modeled on SEC Rule 10b-5, which

is not vague or overly broad.[55]

31.     The Commission rejects EPSA's, PG&E's and SUEZ's calls for further study and

tailoring of Rule 10b-5 to the industry the Commission regulates. Further study and

tailoring would not improve the Final Rule or industry understanding of its scope and

applicability. While the Commission generally agrees with commenters that a wholesale

overlay of the securities laws onto energy markets is overly simplistic, we also believe it

would be illogical to simply ignore decades of useful guidance that securities law

precedent can offer, especially considering that Congress deliberately modeled EPAct

2005 sections 315 and 1283 on section 10(b) of the Exchange Act. Therefore, the

Commission intends to recognize, on a case-by-case basis, that the roles of the

Commission and the SEC are not identical in determining whether it is appropriate to

---

[55] See, e.g., United States v. Persky, 520 F.2d 283 (2d Cir. 1975); accord Todd & Co. v. SEC, 557 F.2d 1008, 1013 (3d Cir. 1977).

adopt securities precedents to specific energy industry facts, circumstances, or situations.[56]

32.     The Commission recognizes that the SEC does not have a duty to assure that the price of a security is just and reasonable, and that our duty is not to protect purchasers through a regime of disclosure. Despite these differences in mission, however, wholesale natural gas and power markets, like securities markets, are susceptible to fraud and market manipulation, regardless of the level of sophistication of the market participants. Therefore, it is appropriate to model the Final Rule on SEC Rule 10b-5 in an effort to prevent (and where appropriate remedy) fraud and manipulation affecting the markets the Commission is entrusted to protect, while providing a level of certainty to market participants that is beyond that which the Commission would be otherwise required to provide. However, as discussed below, we provide several of the clarifications requested by the commenters to address the differences between the SEC's regulation of securities markets and our regulation of markets for natural gas and electricity.

## C. Disclosure

33.     Several commenters expressed concern over what they consider to be disclosure implications of the proposed regulations.[57] In particular, commenters focused on two

---

[56] For example, as explained in paragraph 36 supra, the Commission is not adopting the disclosure regime of the SEC, and as explained in paragraphs 52-53 infra, the element of scienter will apply in the Final Rule just as it applies to SEC Rule 10b-5.

[57] See, e.g., Ameren at 4-6; AGA at 4; AEP at 2; Cinergy at 8-9; Indicated Market (continued)

Docket No. RM06-3-000                                                                        25

disclosure-related areas: whether the proposed anti-manipulation regulations create a new

duty of disclosure; and whether sections 1c.1(a)(2) and 1c.2(a)(2), and particularly the

references to "omissions of material fact," impose an undue burden on bilateral, arm's-

length negotiations.

### 1. **Duty of Disclosure**

#### a. **Comments**

34.    Commenters' view is that the proposed regulations should not create an

affirmative duty to disclose strategic or proprietary information not otherwise required

under the FPA, NGA, or Commission orders, rules, or regulations.[58] Ameren argues that

there is no evidence in EPAct 2005 that Congress intended to impose a general obligation

of disclosure in the energy markets.[59] Ameren and LG&E provide examples of a

company purchasing power as a result of a forced outage, and question whether, under

the regulations, a party would have to disclose information detrimental to its bargaining

position.[60] AEP expresses similar concern that the regulations should not require

companies to disclose trade secrets, sensitive information, or forward looking information

---

Participants at 10-13, 23-28; EEI at 14-16; EPSA at 5-11; FirstEnergy at 10-13; ISDA at 3-8; INGAA at 5-7, 10; LG&E at 9; NGSA at 2, 5-6; PG&E at 7; Progress at 2-4; SCE at 3-4; SUEZ at 12-14; Xcel at 2, 4-6.

[58] See, e.g., Ameren at 4; EEI at 16; Indicated Market Participants at 27.

[59] Ameren at 4.

[60] Id. at 5; LG&E at 8.

developed by the company.[61]  AEP argues that the proposed rules be clarified to encompass only those instances where there is an affirmative duty to disclose, such as a Commission-imposed disclosure or reporting requirement.[62]  EPSA and Progress argue that the regulations should be clarified so as not to result in broad disclosure obligations that would be incompatible with the arm's-length transactions that the Commission oversees.[63]  Similarly, INGAA and EEI argue that the regulations should be revised to delete or limit any affirmative obligation to disclose information to a counterparty, or to educate another party in bilateral negotiations.[64]  In support of its argument, INGAA cites SEC Regulation D, which exempts certain securities offerings from the registration and disclosure requirements of the securities laws because the investors in such offerings are sophisticated.[65]  NGSA also states that the Commission should clarify that it does not intend to incorporate by reference the disclosure obligations applicable to issuers of securities.[66]

---

[61] AEP at 2.

[62] Id. at 3.

[63] EPSA at 1; Progress at 2-4.

[64] INGAA at 7; EEI at 16.  See also ISDA Supplemental Reply at 2.

[65] INGAA at 5.

[66] NGSA at 2, 5-6.

### b. Commission Determination

35.    The Commission declines to modify the proposed regulations in this Final Rule.

To avoid uncertainty, however, we clarify that the Final Rule creates no new affirmative

duty of disclosure. Commenters are mistaken to the extent they believe section 10(b) of

the Exchange Act or SEC Rule 10b-5 imposes an independent affirmative obligation to

disclose. Well-settled case law interpreting section 10(b) and Rule 10b-5 makes clear

that section 10(b) and Rule 10b-5 do not, by themselves, create an affirmative duty to

disclose absent a relationship of trust and confidence (i.e., a fiduciary relationship) or

some other duty imposed elsewhere in the securities laws.[67] Therefore, in the arm's-

length, bilateral negotiations that are typical in wholesale energy markets, absent some

tariff requirement or Commission directive mandating disclosure, the Final Rule imposes

no new affirmative duty of disclosure.

36.    As there is no new affirmative duty of disclosure under the Final Rule,

commenters' concern over the disclosure implications of the proposed regulations is

---

[67] See Basic Inc. v. Levinson, 485 U.S. 224, 239, n.17 (1988) ("Silence, absent a
duty to disclose, is not misleading under Rule 10b-5.") citing Chiarella v. United States,
445 U.S. 222, 234 (1980) (". . . a duty to disclose under [section] 10 (b) does not arise
from the mere possession of nonpublic market information. [T]he duty to disclose arises
when [there exists] a relationship of trust and confidence. . . ."); see also Gross v. Summa
Four, 93 F.3d 987, 992 (1st Cir. 1996) (citing Chiarella, the court holds that "[b]y itself. .
. Rule 10b-5[] does not create an affirmative duty of disclosure. Indeed, a corporation
does not commit securities fraud merely by failing to disclose all nonpublic material
information in its possession."); accord Castellano v. Young & Rubicam, Inc., 257 F.3d
171, 179 (2d Cir. 2002); Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir. 1991).

misplaced. The Final Rule operates within the regulatory framework of the FPA and

NGA; the Commission is not adopting the disclosure provisions of the securities laws[68]

or the purpose of the securities laws, which is "to protect investors by promoting full

disclosure of information thought necessary to informed investment decisions."[69]  Rather,

the Final Rule, like section 10(b) of the Exchange Act and SEC Rule 10b-5, is an anti-

fraud provision, not a disclosure provision.[70]  Nothing in the Final Rule requires

disclosure of sensitive information that would only function to weaken an entity's

bargaining position in arm's-length, bilateral negotiations.   Absent a tariff requirement or

Commission directive mandating disclosure, there is no violation of the Final Rule

simply because an entity chooses not to disclose all non-public information in its

possession.[71]

37.    Similarly, the Commission clarifies that nothing in the Final Rule changes the

Commission's precedent on contract law.  Private contracts are fundamental to the

---

[68] See, e.g., 15 U.S.C. 78m (2000).

[69] SEC v. Ralston Purina Co., 346 U.S. 119, 123-5 (1953).

[70] See, e.g., International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 565
n.18 (1979) (distinguishing between the disclosure and antifraud provisions of the
securities laws, the court states that a waiver from disclosure requirements because an
investor is sophisticated does "not provide shelter from the criminal anti-fraud protection
of Rule 10b-5 or other civil anti-fraud provisions); Sonnenfeld v. City of Denver, 100
F.3d 744, 746 n.1 (10th Cir. 1996) (noting that securities exempted from regulatory
burdens are still subject to civil fraud causes of action).

[71] See supra note 67.

functioning of the energy industry, and the Commission expects parties to continue to rely on the contracts they enter into. The Commission expects parties to continue to resolve most contract disputes, including those based on claims of fraud in the inducement, without the involvement of the Commission, relying on state and federal courts to apply contract law as appropriate.

## 2. **Sections 1c.1(a)(2) and 1c.2(a)(2) and Omissions of Material Fact**

### a. **Comments**

38.    Commenters are divided as to whether the Commission should modify or delete sections 1c.1(a)(2) and 1c.2(a)(2) of the Final Rule, particularly with regard to sections 1c.1(a)(2) and 1c.2(a)(2)'s references to omissions.[72] Ameren, Cinergy, and Indicated Market Participants argue that sections 1c.1(a)(2) and 1c.2(a)(2) should not be adopted because the definition of market manipulation should not include any general duty to disclose.[73] More specifically, EEI and EPSA argue that reference in sections 1c.1(a)(2) and 1c.2(a)(2) to "omissions of material fact" should be deleted as it would require market participants to disclose sensitive information that would not otherwise be exchanged among wholesale energy market participants engaged in bilateral negotiations,

---

[72] Sections 1c.1(a)(2) and 1c.2(a)(2) read: "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

[73] Ameren at 6; Cinergy at 8; Indicated Market Participants at 28.

which could result in harm to the market participant's bargaining position.[74] EEI also argues that sections 1c.1(a)(2) and 1c.2(a)(2) should be modified to incorporate a knowledge and intent standard.[75]

39.     FirstEnergy argues that sections 1c.1(a)(2) and 1c.2(a)(2) are overly broad, and unnecessary to protect electric ratepayers because participants in wholesale power sales transactions are sophisticated and have the ability to evaluate the veracity of any information that may be conveyed by other participants.[76] Indicated Market Participants argue that since the disclosure concepts of the securities laws are not generally applicable to electric and gas markets, sections 1c.1(a)(2) and 1c.2(a)(2) should be deleted.[77] Likewise, Xcel argues that there is no need to require SEC-like disclosure in wholesale energy markets, and it argues that the Commission should modify or delete sections 1c.1(a)(2) and 1c.2(a)(2).[78] While not asking for a change in the regulations, INGAA requests that we clarify that "mere puffery" is not actionable under the regulations.[79]

40.     On the other hand, APGA, PNM and TDUS support the inclusion of sections

---

[74] EEI at 16; EPSA at 8.

[75] EEI at 16.

[76] FirstEnergy at 11.

[77] Indicated Market Participants at 27-28.

[78] Xcel at 2, 4-6.

[79] INGAA at 9.