1c.1(a)(2) and 1c.2(a)(2) without modification.[80] APGA urges the Commission to reject

calls for the deletion or modification of sections 1c.1(a)(2) and 1c.2(a)(2) because the

vast bulk of natural gas sales are not negotiated by sophisticated market participants, but

are determined by price indices that rely on full and accurate reporting.[81] PNM supports

the inclusion of sections 1c.1(a)(2) and 1c.2(a)(2) noting that there may be rare instances

where an omission of material fact amounts to market manipulation, but also notes that

the Commission should make clear that the sections create no new duty of disclosure.[82]

### b. **Commission Determination**

41.    The Commission rejects proposals to modify or delete sections 1c.1(a)(2) and

1c.2(a)(2) of the regulations.  As just discussed, the Final Rule does not create an

affirmative duty to disclose beyond any existing requirements.  It is important to note,

however, that where an entity voluntarily provides information or where the entity is

required by a tariff or a Commission statute, order, rule or regulation to provide

information, and the entity then misrepresents or omits a material fact such that the

information provided is materially misleading, there can be a violation of the Final Rule

---

[80] APGA at 5; PNM at 9; TDUS at 3-4.

[81] APGA at 5.

[82] PNM at 9.  As discussed above in paragraph 28, TDUS argues that no dilution
or alteration of the proposed rules is warranted, regardless of the sophistication of the
parties to a transaction.  TDUS at 3-4.

if all of the other elements of a violation are present.[83]  This does not mean, however, that a material misrepresentation or omission that affects only negotiations between two sophisticated parties will necessarily result in an enforcement action by the Commission. Instead, the Commission will decide whether to pursue enforcement action in such a situation on a case-by-case basis, with due consideration of whether such material misrepresentations or omissions occur in or have an effect on jurisdictional transactions. Absent such an effect, as we noted earlier, we generally will not apply the Final Rule to bilateral contract negotiations.

42.      With respect to other comments related to the application of specific securities law precedent, as discussed earlier, the Commission intends, on a case-by-case basis, to be guided by analogous securities law precedent that is appropriate under the specific facts, circumstances, and situations in the energy industry.  For example, even if some duty to provide information exists, the Commission agrees with INGAA that "mere puffery" is not violation of sections 1c.1(a)(2) and 1c.2(a)(2).[84]

---

[83] These include the requisite scienter, discussed infra, and the conduct being in connection with a jurisdictional purchase or sale or jurisdictional transportation or transmission, discussed supra.

[84] See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3rd Cir. 1999) (noting that general expressions of optimism for the future are immaterial and not actionable); Eisenstadt v. Centel Corp., 113 F.3d 738, 745 (7th Cir. 1997) ("Everybody knows that someone trying to sell something is going to look and talk on the bright side. You don't sell a product by bad-mouthing it.  And everybody knows that auctions can be disappointing.") (emphasis in original); Raab v. General Physics Corp., 4 F.3d 286, 287 (4th Cir. 1996) (holding that predictions of future business prospects were not specific

(continued)

Docket No. RM06-3-000                                                                33

### D.  **Sections 1c.1(a)(3) and 1c.2(a)(3) and Intent**

####    1.  **Comments**

43.     Some commenters suggested the Commission delete sections 1c.1(a)(3) and

1c.2(a)(3) of the proposed regulations or revise them explicitly to include the element of

intent.  For example, Ameren argues that sections 1c.1(a)(3) and 1c.2(a)(3) are

unnecessary in light of sections 1c.1(a)(1) and 1c.2(a)(1).[85]  EEI argues that sections

1c.1(a)(3) and 1c.2(a)(3) should be deleted because the "operates as a fraud" language

could prohibit any deceptive act regardless of whether scienter is present.[86]

Alternatively, EEI and FirstEnergy suggest that sections 1c.1(a)(3) and 1c.2(a)(3) be

revised.  EEI urges that sections 1c.1(a)(3) and 1c.2(a)(3) include elements of knowledge

and intent; FirstEnergy also asks that the phrase "or would operate" be removed so it

would be clear that actions not intended to defraud from being subject to the

regulations.[87]

---

guarantees necessary to make them material within the meaning of section 10b); see also
In re Northern Telecom Ltd. Securities Litig., 116 F. Supp. 2d 446, 466 (S.D.N.Y 2000)
(stating that under section 10b and Rule 10b-5, actionable statements must be sufficiently
"concrete" or "specific" to be material, as opposed to "single, vague statement[s] that are
essentially mere puffery").

   [85] Ameren at 6-7.

   [86] EEI at 13-14.

   [87] Id. 14; FirstEnergy at 15.

44.    In contrast, TDUS argues that the Commission should reject attempts to modify or

delete sections 1c.1(a)(3) and 1c.2(a)(3) noting that SEC Rule 10b-5 has remained intact

since 1951, and no court or SEC action has resulted in any change to Rule 10b-5.[88]

APGA also opposes modification or deletion of sections 1c.1(a)(3) and 1c.2(a)(3),

arguing that intent is already an element of a violation of the proposed regulations, and

any elimination of sections 1c.1(a)(3) and 1c.2(a)(3) could create uncertainty by

distinguishing the Final Rule from SEC Rule 10b-5 so as to render analogous securities

law precedent inapplicable.[89]

## 2. **Commission Determination**

45.    The Commission rejects proposals to modify or delete sections 1c.1(a)(3) and

1c.2(a)(3) beyond the substitution of "entity" in place of "person" as discussed below in

paragraph 76. Sections 1c.1(a)(3) and 1c.2(a)(3) are necessary; and as discussed below,

there can be no violation of the Final Rule, or any of its sections, absent a showing of the

requisite scienter. SEC Rule 10b-5 has an analogous section that has remained

unchanged since it was adopted in 1942, and there is abundant securities law precedent

that highlights the ongoing relevance of that section.[90]  Therefore, as the Final Rule is

---

[88] TDUS Reply at 8-9.

[89] APGA Reply at 5.

[90] One measure of the paragraph's importance is the frequency of use.  There are
numerous cases citing the "operate as a fraud" language of SEC Rule 10b-5, which
suggest that it is not nugatory as EEI argues in its comments.  See, e.g., SEC v. Zandford,
(continued)

modeled on SEC Rule 10b-5 and the Commission intends to be guided, on a case-by-case

basis, by analogous securities law precedent that is appropriate under the facts,

circumstances, and situations presented in the energy industry, it is prudent to retain

sections 1c.1(a)(3) and 1c.2(a)(3) without modification.

### E. **Elements of a Manipulation Claim**

#### 1. **Comments**

46.    Several commenters asked the Commission to clarify the elements of manipulation

under the Final Rule.[91] INGAA recommends that the Commission explicitly reference

the essential elements of the SEC's Rule 10b-5 cause of action that have been developed

in the case law and provide greater guidance as to their application in the context of the

natural gas markets.[92] Specifically, INGAA argues the Commission should clarify the

definition of materiality, the requirement of scienter, the requirement of deception, the

existence of a pre-existing duty to speak in a nondisclosure case, the absence of liability

for mere puffery and other limitations.[93] Indicated Market Participants and NGSA state

that the Commission should set forth the following as elements of a manipulation claim:

---

535 U.S. at 819; SEC v. George, 426 F.3d 786, 792 (2005).

[91] See, e.g., Ameren at 6-7; AEP at 3; Cinergy at 7-8; Indicated Market
Participants at 9-10, 18; EEI at 12-14; FirstEnergy at 7-10; INGAA at 7-11; LG&E at 3;
NGSA at 2, 5-8; NiSource at 3, 5-8; Progress at 2-3; SCE at 4.

[92] INGAA at 7-8.

[93] Id. at 11.

misrepresentation or omission of a material fact; scienter, causation, reliance, and damages.[94]

47.    EEI seeks clarification that fraud is a required element of the Final Rule and its sections.[95] AEP and EEI suggest that the Commission should explicitly identify the intent standard based on the scienter standard used in section 10(b), which is satisfied by a showing of recklessness.[96] EEI seeks clarification that liability under the market manipulation rule requires a showing of "extreme recklessness" or "egregious disregard."[97]    Progress believes that the Final Rule should be revised to exclude "indirectly" from sections 1c.1(a) and 1c.2(a), and if the Commission is unwilling to do so, it should explicitly incorporate an intent standard.[98] In contrast, TDUS argues that the Commission should not modify the regulations to incorporate a specific standard of intent into the Final Rule.[99]

### 2.  **Commission Determination**

48.    The Commission generally agrees that clarification of the elements of a violation

---

[94] Indicated Market Participants at 18; NGSA at 2, 5-7.

[95] EEI at 4.

[96] Id. at 12; AEP at 3.

[97] EEI at 12.

[98] Progress at 2-3.

[99] TDUS at 5.

under the Final Rule would reduce regulatory uncertainty and thereby assure greater

compliance. It is unnecessary, however, to modify the text of the Final Rule. Rather, we

will clarify the general requirements of a violation, guided by applicable securities law

precedent, specifically the precedent setting out the elements the SEC must prove when it

brings an enforcement action, as INGAA noted in its comments.[100] In enforcement

actions under Rule 10b-5, the SEC must show that the defendant: (1) made a material

misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; and (3) in connection with the purchase or sale of

securities.[101] The SEC does not need to show reliance, loss causation or damages

because "the Commission's duty is to enforce the remedial and preventive terms of the

statute in the public interest, and not merely to police those whose plain violations have

already caused demonstrable loss or injury."[102]

---

[100] INGAA at 10-11. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (setting out the elements of an enforcement action under SEC Rule 10b-5). We reject the comments of Indicated Market Participants and NGSA, which set forth the elements of a private right of action under section 10(b) and Rule 10b-5. While cases arising in the context of private litigation may be instructive on certain points, the elements needed for a private right of action are not the same as those required for administrative enforcement applicable here.

[101] SEC v. Monarch Funding Corp., 192 F.3d at 308.

[102] See, e.g., SEC v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002) quoting Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963) citing SEC v. North American Research & Dev. Corp., 424 F.2d 63, 84 (2d Cir. 1970) (reliance not an element of a Rule 10b-5 claim in the context of an SEC proceeding). Similarly, in a criminal prosecution for securities fraud, the government need not demonstrate specific
(continued)

Docket No. RM06-3-000                                              38

49.     These elements offer useful guidance as to how the Commission will apply the

Final Rule.  The Commission will act in cases where an entity: (1) uses a fraudulent

device, scheme or artifice, or makes a material misrepresentation or a material omission

as to which there is a duty to speak under a Commission-filed tariff, Commission order,

rule or regulation, or engages in any act, practice, or course of business that operates or

would operate as a  fraud or deceit upon any entity; (2) with the requisite scienter; (3) in

connection with the purchase or sale of natural gas or electric energy or transportation of

natural gas or transmission of electric energy subject to the jurisdiction of the

Commission.  In the paragraphs that follow, the Commission offers clarification on each

element.

50.     The Final Rule prohibits the use or employment of any device, scheme, or artifice

to defraud.  The Commission defines fraud generally, that is, to include any action,

transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-

---

reliance by the investor in a securities fraud prosecution. See United States v. Ashdown,
509 F.2d 793, 799 (5th Cir. 1975).  However, the government must show "impact of the
scheme on the investor." See United States v. Schaefer, 299 F.2d 625, 629 (7th Cir.
1962).  While reliance, loss causation and damages are not necessary for a violation of
the Final Rule, these elements will inform the Commission's assessment of any
disgorgement or civil penalties that may be appropriate under the circumstances.

functioning market.[103]  Fraud is a question of fact that is to be determined by all the

circumstances of a case.

51.     If there is a duty to disclose under a Commission-filed tariff or Commission

directive, material misrepresentations and, under certain conditions, material omissions,

may violate the Final Rule.  Guided by securities law precedent, the Commission finds

that a fact is material if there is a substantial likelihood that a reasonable market

participant would consider it in making its decision to transact because the material fact

significantly altered the total mix of information available.[104]  Of course, not every fact

about a transaction is material and, therefore, the materiality of a misrepresented or

omitted fact will be determined on a case-by-case basis.[105]

52.     The Commission rejects as unnecessary commenters' requests to incorporate a

specific intent standard into the Final Rule.  Congress directed that the terms

"manipulative or deceptive device or contrivance" as they appear in sections 1283 and

---

[103] See e.g., Dennis v. United States, 384 U.S. 855, 861 (1966) (noting that fraud within the meaning of a statute need not be confined to the common law definition of fraud: any false statement, misrepresentation or deceit).

[104] TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) sets forth the "total mix" or "substantial likelihood" test of materiality: a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.  Accord Basic, Inc. v. Levinson, 485 U.S. 224, 231-2 (1988).

[105] Based on securities law precedent, the relevant time period for determining materiality is at the time of the statement or omission, and not in hindsight.  See Ganino v. Citizens Utils. Co., 228 F.3d 154, 165 (2d Cir. 2000).

315 of EPAct 2005 be interpreted in accordance with section 10(b) of the Exchange Act.

According to the Supreme Court, "[t]he words 'manipulative or deceptive' used in

conjunction with 'device or contrivance' strongly suggest that § 10 (b) was intended to

proscribe knowing or intentional misconduct . . . conduct designed to deceive or defraud

investors by controlling or artificially affecting the price of securities."[106]  Based on the

foregoing, any violation of the Final Rule requires a showing of scienter.[107]

53.    Commenters sought clarification on whether recklessness satisfies the scienter

element.  The Supreme Court has not addressed whether recklessness satisfies the

scienter requirement it read into section 10(b),[108] but the Courts of Appeals that have

---

[106] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976) (Hochfelder); accord
Aaron v. SEC, 446 U.S. 680, 690 (1980) (Aaron).

[107] See Aaron, 446 U.S. at 690, 705 (stating that the words "manipulative,"
"device," and "contrivance" whether given "their commonly accepted meaning or read as
terms of art" clearly refers to "knowing or intentional misconduct." In addition, the Court
said that "Section 10(b) is described as a catchall provision, but what it catches must be
fraud."); Hochfelder, 425 U.S. at 199 (noting that the words "manipulative," "device,"
and "contrivance" are "terms that make unmistakable a congressional intent to proscribe
a type of conduct quite different from negligence").  Despite section 10(b)'s use of the
disjunctive "or" in "manipulative or deceptive device or contrivance," the Supreme Court
has concluded that both require "misrepresentation."

[108] Hochfelder, 425 U.S. at 194 n.12 ("In certain areas of the law recklessness is
considered to be a form of intentional conduct for purposes of imposing liability for some
act. We need not address here the question whether, in some circumstances, reckless
behavior is sufficient for civil liability under [section] 10(b) and Rule 10b-5.").  Although
the scienter requirement was first read into section 10(b) in the context of a private right
of action, in Aaron the Supreme Court decided that a showing of scienter is also required
in SEC civil enforcement actions arising under section 10(b).  Aaron, 446 U.S. at 695.

addressed the issue agree that recklessness satisfies the section 10(b) scienter

requirement.[109]  Similarly, the Commission concludes that recklessness satisfies the

scienter element of the Final Rule.

54.    For our discussion of the "in connection with" requirement, see paragraphs 21 and

22, supra.

### F.  Interplay with Market Behavior Rules

####    1.  Comments

55.    Several commenters raise concerns over the interplay between the proposed

regulations and the Market Behavior Rules.[110]  Some commenters advocate that the

---

[109] Courts of appeal are in general agreement that that recklessness in some form
satisfies the scienter requirement of SEC Rule 10b-5.  For example, motive and
opportunity to commit fraud or conscious behavior sufficient to raise a strong inference
of recklessness is sufficient in the Second, Third, and Eighth Circuits.  See, e.g., Florida
State Board of Administration v. Green Tree Fin. Corp., 270 F.3d 645 (8th Cir. 2001);
Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000); In re Advanta Corp. Securities Litig., 180
F.3d 525 (3d Cir. 1999).  The First, Fifth, Sixth, Tenth and Eleventh Circuits apply a
"severely reckless" or action with "conscious disregard" of the problem or risk standard.
See, e.g., Nathenson v. Zonagen, Inc., 267 F.3d 400 (5th Cir. 2001); City of Philadelphia
v. Fleming Companies, Inc., 264 F.3d 1245 (10th Cir. 2001); Grebel v. FTP Software,
Inc., 194 F.3d 185 (1st Cir. 1999); In re Comshare, Inc. Securities Litig., 183 F.3d 543
(6th Cir. 1999); Bryant v. Avardo Brands, Inc., 187 F.3d 1271 (11th Cir. 1999).  In the
Ninth Circuit, a plaintiff must plead "in great detail facts that constitute strong
circumstantial evidence of deliberately reckless or conscious misconduct." See, e.g., In re
Silicon Graphics Securities Litig., 183 F.3d 970 (9th Cir. 1999) (adopting the definition of
recklessness as it appears in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th
Cir. 1977), cert. denied, 434 U.S. 875 (1977)).

[110] See, e.g., Ameren at 8-9; AGA at 5; Cinergy at 5, 9; EEI at 17-19; LG&E at 9;
NARUC at 6; NASUCA at 4-5 (arguing for an expansion of the Market Behavior Rules
to reach all market participants); PG&E at 4, 12-13; APPA Reply at 5; PNM Reply at 7-
(continued)

Commission retain Market Behavior Rules, either as they are currently written or with modification.[111]  Several industry commenters request deletion of the foreseeability standard and "legitimate business purpose" criteria of Market Behavior Rule 2, and incorporation of the scienter standard of the proposed regulations.  Certain commenters also find the specific prohibitions of Market Behavior Rules 2(a) (wash trades), 2(b) (false information), 2(c) (artificial congestion/relief), and 2(d) (collusion) useful because those rules offer guidance and specificity about the prohibition of certain defined transactions.

56.    APPA argues that the Commission should deal with the future of the Market Behavior Rules in the Commission's separate FPA 206 proceeding and not as part of this proceeding.[112]  PNM, in contrast, contends that adopting rules based on SEC Rule 10b-5 will be confusing, and instead urges the Commission to amend the existing Market

---

8; EEI Reply at 4-6.

[111] We note that, as a result of the timing of the comment due date in this proceeding, these comments were filed the same day as the Commission issued its orders proposing repeal of the Market Behavior Rules.  See Amendments to Codes of Conduct for Unbundled Sales Service and for Persons Holding Blanket Marketing Certificates, 113 FERC ¶ 61,189 (2005); Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations, 113 FERC ¶ 61,190 (2005).

[112] APPA Reply at 5.

Behavior Rules to incorporate the terms of EPAct 2005 sections 315 and 1283, and not adopt the proposed regulations.[113]

57.    EEI urges the Commission to retain the time limits and specific acts set forth in the Market Behavior Rules, and to state that compliance with the behavior rules guidelines constitutes compliance with the new rules.[114]  Similarly, EEI argues that whatever the interaction between the Market Behavior Rules and the Final Rule, the Commission should clarify that there will be no "double jeopardy."[115]

### 2.  Commission Determination

58.    Both Market Behavior Rules 2 and 3[116] and this Final Rule prohibit fraud and manipulative conduct.  The Market Behavior Rules are still in effect, although the Commission has indicated in the Market Behavior Rules proceeding (Docket Nos. EL06-16-000 and RM06-5-000) that the Market Behavior Rules may be revised or repealed after the anti-manipulation regulations are made effective.[117]  If they are repealed, the

---

[113] PNM Reply at 7-8.

[114] EEI Reply at 4-6.

[115] EEI at 21.

[116] The following analysis with regard to the Market Behavior Rules also applies to sections 284.288(a) and 284.403(a) of the Commission's codes of conduct with respect to certain sales of natural gas.  18 CFR 284.288(a) and 284.403(a) (2005).

[117] See Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations, 70 FR 71484 (2005), 113 FERC ¶ 61,190 at P 13 (2005); Amendments to Codes of Conduct for Unbundled Sales Service and for Persons Holding Blanket Marketing Certificates, 70 FR 72090 (2005), 113 FERC ¶ 61,189 at P 11 (2005).

Commission intends to have a smooth transition from the Market Behavior Rules to the Final Rule on manipulation, and there will be no gap in our prohibition of manipulation as we complete the transition.

59.    As stated in the NOPR, the Commission will not seek duplicative sanctions for the same conduct in the event that conduct violates both the Market Behavior Rules and this Final Rule.[118]  With respect to the specific prohibitions of Market Behavior Rule 2 (wash trades, transactions predicated on submitting false information, transactions creating and relieving artificial congestion, and collusion for the purpose of market manipulation), these are examples of prohibited manipulation, all of which are manipulative or deceptive devices or contrivances, and are therefore prohibited activities under this Final Rule, subject to punitive and remedial action.[119]  Further, as discussed further below, the specific provision set forth in the Market Behavior Rules for actions taken in conformity with the Commission-approved market rules adopted by an ISO or RTO identify behaviors that are presumptively not fraudulent and hence would not be violations of this Final Rule.

60.    The issue of applying the time limits set forth in the Market Behavior Rules to this Final Rule will be dealt with below.

---

[118] See Prohibition of Energy Market Manipulation, 113 FERC ¶ 61,067 at P 15 (2005).

[119] See 113 FERC ¶ 61,190 at P 18 (2005); 113 FERC ¶ 61,189 at P 15 (2005).

## G. Statute of Limitations

### 1. Comments

61.    Some commenters urged the Commission to adopt an explicit statute of limitations

period for the proposed rules.[120]  For example, NiSource cites the Sarbanes-Oxley Act in

support of its argument that the Commission require actions under the Final Rule be

commenced within two years of discovery of a violation, but in no event more than five

years after occurrence of a violation.[121]    AEP cites a private rights of action under SEC

Rule 10b-5 in support of its argument for three year limitations period, and EEI argues

the Commission should follow the five-year statute of limitations contained in 28 U.S.C.

2462 and adopt the 90-day provision of the Market Behavior Rules to require that an

action must be filed within 90 days after the end of the calendar quarter in which the

alleged violation of the Final Rule occurred or, if later, 90 days after the complainant

knew or should have known that the alleged violation of the Final Rule occurred.[122]

### 2. Commission Determination

62.    There is no explicit statute of limitations set forth in NGA section 4A or in FPA

section 222, and no statute of limitations of general applicability appears in the NGA or

FPA.  The Commission declines to designate a statute of limitations or otherwise adopt

---

[120] See, e.g., AEP at 3; EEI at 19-21; NGSA at 2, 5, 8; NiSource at 9.

[121] NiSource at 3.

[122] AEP at 3; EEI at 19-20.

an arbitrary time limitation on complaints or enforcement actions that may arise under

NGA section 4A and FPA section 222. We note, however, that when a statutory

provision under which civil penalties may be imposed lacks its own statute of limitations,

the general statute of limitations for collection of civil penalties, 28 U.S.C. 2462,

applies.[123] Section 2462 in 28 U.S.C. imposes a five-year limitations period on any

"action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture,

pecuniary or otherwise."[124]

63.     The Commission, therefore, rejects AEP's call for a three-year limitations period

because that period applies only in the context of private rights of action under the

securities laws, not to SEC enforcement actions. For the same reason, we reject

NiSource's argument that a limitations period under the Sarbanes-Oxley Act should

apply to actions we may bring under our enforcement authority, and EEI's request that

the Commission apply to the Final Rule the 90-day action limitation of the existing

Market Behavior Rules. We will exercise prosecutorial discretion in determining

whether to pursue an alleged violation based on all the facts presented, including the time

elapsed since the violation is alleged to have occurred, and will adhere to the five-year

statute of limitations where we seek civil penalties.

---

[123] See, e.g., United States v. Godbout-Bandal, 232 F.3d 637, 639 (8th Cir. 2000).

[124] 28 U.S.C. 2462 (2000). The five-year limitation runs "from the date the claim first accrued." Id. We intend that any administrative action for violation of the Final Rule be commenced within five years of the date of the fraudulent or deceptive conduct.

## H. Safe Harbors and Affirmative Defenses

### 1. Comments

64.     Several commenters suggest that the Commission make explicit in the language of proposed regulations certain safe harbors.  For example, they argue that the following should be deemed acceptable behavior: actions or transactions taken at the direction of an RTO or ISO (similar to the affirmative defense in Market Behavior Rule 2), compliance with Midwest ISO's market monitoring program, actions or transactions with a "legitimate business purpose," and legitimate hedging activity.[125]

65.     Some commenters urge the Commission to provide specific examples of what would or would not constitute market manipulation.[126]  NiSource argues that aiding and abetting, as opposed to primary violations, and actions taken pursuant to Commission-approved tariffs, state law, and Supreme Court precedent, as well as minor errors, would not violate the proposed rules.[127]  Furthermore, some commenters request a mechanism

---

[125] See, e.g., AEP at 2; AGA at 5-6 (advocating a safe harbor for "inadvertent" errors); Ameren at 7; DTE at 2-4; INGAA at 11; LG&E at 3; NGSA at 2, 5, 8-9 (seeking clarification that the proposed regulations do not modify or supersede the Commission's policy statement on price reporting or the related safe harbor provisions of that policy); NiSource at 7; and SCANA at 3-4.

[126] See, e.g., SCANA at 3-5 (arguing for an explicit safe harbor for hedging transactions, and that any violation of the "shipper must have title" rule is a per se violation); NiSource at 7; and Indicated Market Participants at 20-22 (requesting specific guidance, including a non-exclusive list, of what would and would not be considered manipulative conduct, to aid in internal training and compliance programs).

[127] NiSource at 6-9.

for obtaining guidance on whether proposed conduct violates the anti-manipulation rules

through a procedure similar to the SEC's No-Action Letter process.[128]

## 2. **Commission Determination**

66.    The Commission will address issues relating to the Market Behavior Rules, and

the affirmative defenses or safe harbors therein, in the FPA section 206 proceeding and

NGA NOPR related to the Market Behavior Rules in Docket Nos. EL06-16-000 and

RM06-5-000.  As noted in that proceeding, it is the Commission's intent to have a

smooth transition to the new anti-manipulation regulations but not to leave gaps between

the adoption of the Final Rule and any repeal or revision of the Market Behavior Rules.

67.    In all events, however, it is not necessary to change the wording of the Final Rule.

The availability of safe harbor presumptions of compliance and affirmative defenses will

be the same as is currently the case under the Market Behavior Rules.  Thus, if a market

participant undertakes an action or transaction that is explicitly contemplated in

Commission-approved rules and regulations, we will presume that the market participant

is not in violation of the Final Rule.  If a market participant undertakes an action or

transaction at the direction of an ISO or RTO that is not approved by the Commission,

the market participant can assert this as a defense for the action taken.

---

[128] See, e.g., First Energy at 15-16; INGAA at 11.

## I. **Procedures for Handling Manipulation Claims**

### 1. **Comments**

68.     Some commenters seek clarification on how claims of market manipulation will

be processed by the Commission. PG&E asks for procedures that will permit

involvement of affected market participants in manipulation complaints, including

intervention and full participation by affected parties, and availability of all remedies,

including disgorgement or returning consumers to the condition they would have been in,

absent manipulation. Doing so, PG&E asserts, would provide due process for those

damaged by manipulation and would assure that the Commission considers all relevant

factors in resolving the complaint.[129] Cinergy, on the other hand, states that it expects

that complaints would be filed pursuant to NGA section 5 or FPA section 206, and that

the Commission should incorporate in the Final Rule procedural requirements for filing

complaints. Cinergy also seeks clarification on whether the Commission intends to apply

the proposed regulations retroactively in any manner.[130] At the same time, however,

Cinergy also argues that the Commission should explicitly urge parties first to take

concerns and potential complaints to the Office of Market Oversight and Investigations

Enforcement Hotline (Hotline). This, Cinergy explains, would permit entities accused of

manipulation to present facts and evidence without suffering the potential harm within

---

[129] PG&E at 14-15.

[130] Cinergy at 10.

industry and the investment community that could result from an accusation of

manipulation, and could lead to faster settlement resolutions of manipulation claims.[131]

69.    EEI and INGAA also urge the Commission to address the formal process and

procedures to be used in resolving manipulation complaints, including the burden of

proof.[132]  INGAA and ISDA suggest the Commission adopt a "Wells submission"[133]

process like that of the SEC in which an entity is given, at the end of an investigation,

notice of the proposed charges and enforcement action that staff intends to recommend to

the SEC, and an opportunity to submit a written statement and materials to refute staff's

recommendation.[134]

### 2.  **Commission Determination**

70.    Congress enacted the statutory prohibitions on market manipulation as separate

sections of the NGA and FPA, giving the Commission anti-manipulation authority that is

independent of other provisions of the NGA and FPA, including NGA section 5 and FPA

section 206.  Accordingly, the Commission rejects Cinergy's suggestion that complaints

alleging manipulation necessarily would rely on NGA section 5 or FPA section 206.[135]

---

[131] Id. at 10-12.

[132] EEI at 19-21; INGAA at 13.

[133] The "Wells submission" process is set forth in SEC regulations, 17 CFR 202.5(c) (2005).

[134] INGAA at 12; ISDA Reply at 5.

[135] Even if a complaint were to involve NGA section 5 or FPA section 206 in some
                                                                        (continued)

As to the procedures to be followed when a complaint alleging manipulation is filed, the

Commission will process the filing under the procedures currently set forth in Rule 206

of the Rules of Practice and Procedure.[136]  The Commission rejects as unnecessary EEI's,

INGAA's, and Cinergy's suggestions that we incorporate procedures into the Final Rule.

The requirements for filing complaints are set out in Rule 206, and the process for

handling complaints, including the allocation of the burden of proof, is well-defined

through Commission case law.  There is no need for a special or separate set of

procedures for complaints arising from our new anti-manipulation authority.

71.    Cinergy states that the industry needs to understand if there is to be any retroactive

application of the Final Rule.  The regulations adopted herein will become effective upon

publication in the Federal Register.  There can be no violation of the Final Rule until it is

effective.  The Market Behavior Rules, however, have been in effect since December

2003, and will remain in effect pending the outcome of the separate Docket Nos. EL06-

16-000 and RM06-5-000 proceedings.

72.    To the extent Cinergy suggests that no retroactive remedies should be used, the

Commission reiterates that a complaint that alleges market manipulation will proceed

---

manner, that does not mean that the Commission would be limited only to prospective
remedies, as Cinergy seems to suggest.  Certain violations are susceptible of remedies
from the time the violation occurred.  See, e.g., Consolidated Gas Transmission Corp.,
771 F.2d 1536 (D.C. Cir. 1985) (retroactive remedy available under NGA section 16).

[136] 18 CFR 385.206 (2005).

under NGA section 4A or FPA section 222, utilizing the procedural rules and

mechanisms generally applicable to NGA and FPA proceedings.  We reject any

suggestion that the Commission cannot remedy manipulative conduct after it has

occurred, such as by ordering the disgorgement of profits and/or imposing a civil penalty.

Congress did not limit the Commission's jurisdiction under NGA section 4A or FPA

section 222 to prospective conduct and associated remedies only.  How the Commission

addresses market manipulation will depend on the facts presented, but we have

significant discretion to shape equitable remedies that achieve the purpose of Congress'

enactment of anti-manipulation provisions.[137]  In devising a remedy, the Commission will

exercise discretion to arrive at an appropriate remedy[138] and will explore all equitable

considerations and practical consequences of our action pursuant to our statutory

delegation.[139]

---

[137] "[T]he Commission has broad authority to fashion equitable remedies in a variety of settings."  Columbia Gas Transmission Corp. v. FERC, 750 F.2d 105, 109 (D.C. Cir. 1984) and cases cited therein.  The courts have noted that "the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies, and sanctions . . . to arrive at maximum effectuation of Congressional objectives."  Niagara Mohawk Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967).

[138] Gulf Oil Corp. v. FPC, 536 F.2d 588 (3rd Cir. 1977), cert. denied, 434 U.S. 1062 (1978), reh'g denied, 435 U.S. 981 (1978).

[139] FPC v. Tennessee Gas Transmission Co., 371 U.S. 145 (1962); Continental Oil Co. v. FPC, 378 F.2d 510 (5th Cir. 1967).

73.    The Commission also declines to accept Cinergy's suggestion that we explicitly

urge parties first to bring concerns and potential complaints to the Hotline.[140]  Aggrieved

entities should be free to choose the approach best suited to their circumstances, and if an

entity so chooses, the Hotline (or other informal contact with the Commission's staff) is

available for such matters.

74.    Turning to INGAA's suggestion that the Commission adopt what is referred to as

a "Wells submission" to permit entities under investigation to submit material to refute

staff findings and recommendations prior to Commission action, we find that no new

process need be adopted here.  The Commission already has a regulation in place that

provides a company under investigation with an opportunity to present its views,[141] and

staff's existing practice is to present the company's views to the Commission as part of

any report or recommendation made by staff following an investigation.

### J.  Miscellaneous Issues

#### 1.  Use of "Entity" in place of "Person" in sections 1c.1(a)(3) and 1c.2(a)(3)

##### a.  Comments

75.    Two commenters express concern with the use of "person" in proposed sections

47.1(a)(3) and 159.1(a)(3) and urge the Commission to substitute "entity" for "person."[142]

---

[140] See 18 CFR 1b.21 (2005)

[141] See 18 CFR 1b.18 (2005).

[142] See APGA at 10-11; APPA at 2-4.

Specifically, APPA points out that under proposed section 47.1(a)(3), it is unlawful "to

engage in any act, practice, or course of business that operates or would operate as a

fraud or deceit upon any <u>person</u>" (emphasis added) and that the definition of "person"

under the FPA excludes municipalities.  Thus, according to APPA, an entity that

practices a "fraud or deceit" on a municipality could argue that proposed section

47.1(a)(3) does not apply because the victim is not a "person" under the FPA.[143]  APGA

makes a similar argument with respect to proposed section 159.1(a)(3).[144]

### b.  Commission Determination

76.     The Commission agrees with these commenters.  It would be unfair and

unintended to prohibit fraudulent or manipulative behavior by any entity, including

municipalities, but then not cover fraud or deceit when it is perpetrated against a

municipality.  Accordingly, the Commission will substitute the word "entity" for

"person" in sections 1c.1(a)(3) and 1c.2(a)(3) of the Final Rule.[145]

### 2.  Impact of New Regulations on the Policy Statement on Natural Gas and Electric Price Indices

### a.  Comments

77.     NGSA requests that the Commission clarify that the new regulations do not

---

[143] APPA at 2-3.

[144] APGA at 10.

[145] As noted, the Final Rule will appear in 18 CFR 1c.1 and 1c.2 of the
Commission's Rules of General Applicability, and the language change will be in 18
CFR 1c.1(a)(3) and 1c.2(a)(3).

Docket No. RM06-3-000                                                        55

modify or supersede the Commission's Policy Statement on Natural Gas and Electric

Price Indices.[146]

### b. **Commission Determination**

78.    The Commission clarifies that the new regulations are not intended to modify or

supersede the Commission's Policy Statement on Natural Gas and Electric Price Indices.

That Policy Statement provided guidance on how market participants should report price

transaction information to price index developers, and stated that if the Policy Statement

guidelines are followed, participants would not be penalized for inadvertent errors.  We

continue to encourage market participants to contribute to price formation and to utilize

the guidelines of the Policy Statement when reporting pricing information.  We also note

that if an inadvertent error occurs, it would not involve the scienter needed for application

of the Final Rule.

### 3. **Special Pleading**

### a. **Comments**

79.    AEP argues that the Commission should discourage general allegations of fraud

by requiring parties that bring an action under the proposed rule to plead with "sufficient

particularity" by addressing eight items.[147]  Other commenters, however, argue that the

---

[146] NGSA at 8-9.  See Policy Statement on Natural Gas and Electric Price Indices,
104 FERC ¶ 61,121 (2003) (explaining the conditions under which the Commission will
give industry participants safe harbor protection for good faith reporting of transactions
data to entities that develop price indices).

[147] AEP at 3-4.  The eight items are: (1) what identifiable acts or omissions
(continued)

Docket No. RM06-3-000                                                              56

Commission should not adopt special pleading requirements beyond its notice provisions

and existing complaint procedures.[148]

### b. **Commission Determination**

80.    Commenters' concerns regarding special pleading requirements are clearly

covered by Rule 206 of the Commission's Rules of Practice and Procedure, which

contains detailed requirements as to the specificity required by parties filing complaints

with the Commission.  For instance, under Rule 206(b)(1)-(2), a complaint must "clearly

identify the action or inaction which is alleged to violate applicable statutory or

regulatory requirements," and must "explain how the action violates statutory or

regulatory requirements."[149]  Similarly, in Order No. 663, the Commission sets forth the

---

occurred, what representations were made and why they were not accurate but constituted
a scheme or device to defraud; (2) when and where each act occurred; (3) who
participated, that is, how each entity is related to the case; (4) what specific documents
contained what specific misrepresentations or material omissions; (5) how a party relied
on the other party's actions; (6) whether the necessary element of scienter was present;
(7) when the purchase, sale, or transmission of electric energy or natural gas occurred;
and (8) what the offending party gained as a result of the fraud.

[148] See, e.g., TDUS Reply at 9.

[149] See Wisconsin Department of Natural Resources v. Wisconsin River Power
Company, 101 FERC ¶ 61,108 at P 5 (2002) (rejecting complaint).  See also Union
Electric Company, d/b/a AmerenUE, 93 FERC ¶ 61,158 at 61,529 (2000) (denying a
request for a hearing, citing Rule 206(b)(1), (2), and (8), and stating that "[t]he
Commission's rules require a complaint not only to identify clearly the action that is
alleged to violate applicable statutory standards or regulatory requirements, but to explain
how the action violates those standards or requirements, and to include all documents in
the complainant's possession that support the facts in the complaint").

requirement that issues must be listed with specificity in a separate section entitled "Statement of Issues."[150]

## IV.    **Regulatory Flexibility Act Certification**

81.    The Regulatory Flexibility Act of 1980[151] generally requires a description and analysis of Final Rule that will have significant economic impact on a substantial number of small entities.[152]  The Commission is not required to make such analyses if a rule would not have such an effect.

82.    The Commission concludes that this Final Rule would not have such an impact on small entities.  This Final Rule prohibits all entities, including small entities, from employing manipulative or deceptive devices or contrivances in connection with energy markets subject to the Commission's jurisdiction, and therefore may cause entities, including potentially small entities, to increase costs in order to comply.  This

---

[150] See Revision of Rules of Practice and Procedure Regarding Issue Identification, 70 FR 55723 (2005), FERC Stats. & Regs. ¶ 31,193 (2005).

[151] 5 U.S.C. 601-612 (2000).

[152] The RFA definition of "small entity" refers to the definition provided in the Small Business Act, which defines a "small business concern" as a business which is independently owned and operated and which is not dominant in its field of operation. 15 U.S.C. 632 (2000).  The Small Business Size Standards component of the North American Industry Classification System defines a small electric utility as one that, including its affiliates, is primarily engaged in the generation, transmission, and/or distribution of electric energy for sale and whose total electric output for the preceding fiscal years did not exceed 4 million MWh.  13 CFR 121.201 (Section 22, Utilities, North American Industry Classification System, NAICS) (2004).

prohibition, however, will improve market transparency to the economic benefit of all entities, including small entities. Therefore, the Commission certifies that this Final Rule will not have a significant economic impact on a substantial number of small entities. Therefore, no regulatory flexibility analysis is required.

## V.     **Information Collection Statement**

83.     This Final Rule implements the existing requirements as set forth in sections 315 and 1283 of EPAct 2005 and does not include new information requirements under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

## VI.     **Environmental Statement**

84.     The Commission is required to prepare an Environmental Assessment or an Environmental Impact Statement for any action that may have a significant adverse effect on the human environment.[153] The Commission has categorically excluded certain actions from this requirement as not having a significant effect on the human environment. Included in the exclusion are rules that are clarifying, corrective, or procedural or that do not substantially change the effect of the regulations being amended.[154] Thus, we affirm the finding we made in the NOPR that this Final Rule is procedural in nature and therefore falls under this exception; consequently, no environmental consideration would be necessary.

---

[153] Regulations Implementing the National Environmental Policy Act, Order No. 486, 52 FR 47897 (1987), FERC Stats. & Regs. ¶ 30,783 (1987).

[154] 18 CFR 380.4(a)(2)(ii) (2005).

## VII.    Document Availability

85.     In addition to publishing the full text of this document in the Federal Register, the

Commission provides all interested persons an opportunity to view and/or print the

contents of this document via the Internet through the Commission's Home Page

(http://www.ferc.gov) and in the Commission's Public Reference Room during normal

business hours (8:30 a.m. to 5:00 p.m. Eastern time) at 888 First Street, N.E., Room 2A,

Washington, D.C. 20426.

86.     From the Commission's Home Page on the Internet, this information is available

in the eLibrary.  The full text of this document is available on eLibrary both in PDF and

Microsoft Word format for viewing, printing, and/or downloading.  To access this

document in eLibrary, type the docket number excluding the last three digits of this

document in the docket number field.

87.     User assistance is available for eLibrary and the Commission's website during

normal business hours.  For assistance, please contact Online Support at 1-866-208-3676

(toll free) or 202-502-6652 (e-mail at FERCOnlineSupport@FERC.gov), or the Public

Reference Room at 202-502-8371, TTY 202-502-8659 (e-mail at

public.referenceroom@ferc.gov).

## VIII.    Effective Date and Congressional Notification

88.     This Final Rule will take effect upon publication in the Federal Register.  The

Commission has determined, with the concurrence of the Administrator of the Office of

Information and Regulatory Affairs of the Office of Management and Budget, that this

rule is not a major rule within the meaning of section 251 of the Small Business

Regulatory Enforcement Fairness Act of 1996.[155]  The Commission will submit the Final

Rule to both houses of Congress and the Government Accountability Office.[156]

89.     A non-major rule goes into effect "as otherwise provided by law after submission

to Congress."[157]  The effective date may be sooner if the agency "for good cause" finds

that "notice and public procedure thereon are impracticable, unnecessary, or contrary to

the public interest."[158]  The Administrative Procedure Act (APA)[159] requires rulemakings

to be published in the Federal Register.  The APA generally mandates that publication or

service of a substantive rule not be made less than 30 days before its effective date.  This

waiting period is not required, however, if the agency finds "good cause" for waiving the

30 day waiting period.[160]

90.     The Commission finds that "good cause" exists that makes further notice and

public procedure impracticable, unnecessary, or contrary to the public interest.  The

Commission has balanced the necessity for immediate implementation of this Final Rule

---

[155] 5 U.S.C. 804(2) (2000).

[156] 5 U.S.C. 801(a)(1)(A) (2000).

[157] 5 U.S.C. 801(a)(4) (2000).

[158] 5 U.S.C. 808(2) (2000).

[159] 5 U.S.C. 551, et seq. (2000).

[160] 5 U.S.C. 553(d)(3) (2000).

against the principles of fundamental fairness which require that all affected persons be

afforded reasonable time to prepare for the effective date of this ruling. The Commission

is of the view that the persistent high energy prices in the wake of severe damage to the

United States energy infrastructure from the hurricanes of 2005, together with the

potential for severe price events in the event of cold winter weather during the winter

months of 2006, may present opportunities for energy price manipulation. It would be

contrary to the public interest to delay regulations that implement Congressional intent to

prohibit manipulation in energy markets. Immediate adoption of the Final Rule will

protect natural gas and electricity markets from manipulative conduct. Moreover, the

public has had an opportunity to comment on the proposed rules, and the Final Rule

being adopted is substantively the same as the rule that was proposed. Finally, the

conduct proscribed by the Final Rule is similar to the conduct already proscribed by the

Market Behavior Rules. Market participants should not have difficulty preparing to

comply with a rule that bars manipulation in energy markets, particularly since many

such participants are currently subject to the existing Market Behavior Rule provisions

prohibiting manipulation. This Final Rule, therefore, will be made effective upon

publication in the Federal Register.

Docket No. RM06-3-000                                                                62

<u>List of subjects in 18 CFR Part 1c</u>

Electric utilities

Natural gas

By the Commission.

( S E A L )


                              Magalie R. Salas,
                                 Secretary.

In consideration of the foregoing, under the authority of EPAct 2005, the

Commission amends Chapter I, Title 18, Code of Federal Regulations, as follows:

1.      Part 1c is added to read as follows:

## PART 1c - - PROHIBITION OF ENERGY MARKET MANIPULATION

**Sec.**
**1c.1  Prohibition of natural gas market manipulation.**
**1c.2  Prohibition of electric energy market manipulation.**

Authority: 15 U.S.C. 717-717z; 16 U.S.C. 791-825r, 2601-2645; 42 U.S.C. 7101-7352; .

### § 1c.1  Prohibition of natural gas market manipulation.

(a) It shall be unlawful for any entity, directly or indirectly, in connection with the

purchase or sale of natural gas or the purchase or sale of transportation services subject to

the jurisdiction of the Commission,

(1) To use or employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business that operates or would

operate as a fraud or deceit upon any entity.

(b) Nothing in this section shall be construed to create a private right of action.

### § 1c.2  Prohibition of electric energy market manipulation.

(a) It shall be unlawful for any entity, directly or indirectly, in connection with the

purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,

(1) To use or employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

(b) Nothing in this section shall be construed to create a private right of action.

Note: The following Appendix will not be published in the Code of Federal Regulations.

## APPENDIX

### List of Parties Filing Comments and Reply Comments and Acronyms

Ameren Services Co. (Ameren)

American Electric Power Service Corporation (AEP)

American Gas Association (AGA)

American Public Gas Association (APGA) * *

American Public Power Association (APPA) * *

Association of Oil Pipelines (AOPL)

BP Energy Co. (BP)

Cinergy Services, Inc. (Cinergy) * *

Constellation Energy Group, Inc., DTE Energy Company and Sempra Energy (Indicated Market Participants)

DTE Energy Company (DTE)

Edison Electric Institute (EEI) * *

Electric Power Supply Association (EPSA)

FirstEnergy Service Co. (FirstEnergy)

International Swaps and Derivatives Association, Inc. (ISDA) * *

Interstate Natural Gas Association of America (INGAA)

LG&E Energy LLC (LG&E)

Midwest Independent Transmission System Operator, Inc. (Midwest ISO)

Missouri Public Service Commission

National Association of Regulatory Utility Commissioners (NARUC) * *

Docket No. RM06-3-000                                                                              2

National Association of State Utility Consumer Advocates (NASUCA)

National Rural Electric Cooperative Association (NRECA)*

Natural Gas Supply Association (NGSA)

New Jersey Board of Public Utilities (NJBPU)

NiSource, Inc. (NiSource)

Pacific Gas and Electric Co. (PG&E)

PNM Resources, Inc. (PNM) *

Progress Energy Inc. (Progress)

SCANA Energy Marketing, Inc. (SCANA)

Southern California Edison Company (SCE)

States of Illinois, Iowa, Minnesota, Missouri and Wisconsin (States)

SUEZ Energy North America, Inc. (SUEZ)

Transmission Dependent Utility Systems (TDUS)*

Xcel Energy Services Inc. (Xcel)


*          Entities filing reply comments only

* *        Entities filing reply comments in addition to initial comments