**EXHIBIT D**

1          UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

3

4    BRIAN HUNTER,        :  Docket No. CV07-1307 (RJL)

                :  July 24, 2007

5        Plaintiff,   :

                :  4:15 p.m.

6                :

    v.         :

7                :

    FEDERAL ENERGY REGULATORY   :

8    COMMISSION,        :

                :

9        Defendant.   :

    . . . . . . . . . . . . . . . :

10

11

       TRANSCRIPT OF TEMPORARY RESTRAINING ORDER

12       BEFORE THE HONORABLE RICHARD J. LEON

          UNITED STATES DISTRICT JUDGE

13

14

    APPEARANCES:

15

16    For the Plaintiff:    MICHAEL KIM, ESQ.

                   JUSTIN VAUN SHUR, ESQ.

17               Kobe & Kim, LLP

               1050 Connecticut Avenue, N.W.

18               Washington, D.C. 20036

19

    For the Defendant:    MEGAN ROSE

20               U.S. Attorney's Office

               555 4th Street, N.W.

21               Washington, D.C. 20530

22               JUSTIN M. SHELLAWAY, ESQ.

               Federal Energy Regulatory

23                Commission

24               888 First Street, N.E.

25               Washington, D.C. 20426

1

2

3

4

5

6     Court Reporter:          PATTY ARTRIP GELS, RMR

7                              Official Court Reporter

8                              Room 4800-C, U.S. Courthouse

9                              Washington, D.C.  20001

10                             (202) 962-0200

11

12

13

14    Proceedings reported by machine shorthand, transcript produced

15    by computer-aided transcription

Amaranth 365

1          PROCEEDINGS

2          COURTROOM DEPUTY: Your Honor, this is the matter of

3     Brian Hunter versus Federal Energy Regulatory Commission, Civil

4     Action 07-1307. This matter is scheduled for a TRO.

5          Parties, come forward and state your appearances for

6     the record.

7          MR. KIM: Good afternoon, your Honor. Michael Kim and

8     Justin Shur for Plaintiff Brian Hunter.

9          THE COURT: Welcome.

10         MS. ROSE: Good afternoon, your Honor. Assistant

11    United States Attorney Megan Rose representing FERC. Also

12    seated with me at counsel table is Ms. Leanne Watson and -- I am

13    sorry -- Justin Shellaway from FERC as well.

14         THE COURT: Thank you, Ms. Rose.

15         Mr. Kim, as far as yours, what you want is

16    extraordinary, so I will give you a little time here to explain

17    why it is it's appropriate for this Court to do it and how you

18    qualify for the -- meeting the requirements of the TRO.

19         MR. KIM: Yes, your Honor. Your Honor, as a threshold

20    matter, I am not admitted to the bar of this court, and I

21    believe my colleague, Justin Shur, who is, has made a Motion to

22    admit me pro hac vice. So before I address your Honor, I wanted

23    to request that your Honor grant that Motion.

24         THE COURT: That's fine. I will grant that Motion.

25         MR. KIM: Thank you, your Honor. Your Honor, I believe

1    the relief we request is certainly unusual, but has a basis in

2    the case law because what we are requesting, your Honor, is

3    essentially the following. We are requesting that your Honor

4    issue a Temporary Restraining Order to prevent a Federal agency

5    from doing something that is completely outside the scope of its

6    statutory authority. In other words, we are not --

7        THE COURT: How do you know they are going to do it?

8        MR. KIM: Because they --

9        THE COURT: You don't have a crystal ball.

10       MR. KIM: Your Honor, they have informed us that they

11   will do it. We do have correspondence from them, as well as

12   they have informed us that they will issue this order, and once

13   the order is issued, that is the very harm we are trying to

14   prevent. So it is not a matter of speculation or our theory

15   that we will issue it; they have told us explicitly they will

16   issue it and also named the date on which they will issue it,

17   although the exact date is ambiguous. And they have also given

18   us attachments of documents that they intend to use in

19   connection with this action.

20       So it is not a speculative or threatened action. It is

21   imminent.

22       THE COURT: Um-hum.

23       MR. KIM: In addition, your Honor, we are not, for

24   purposes of this argument, requesting relief under the

25   Administrative Procedure Act. I want to be absolutely clear

1    about that.  For purposes of this application, your Honor, we

2    are relying on the Court's inherent equitable jurisdiction,

3    which has been recognized on a number of cases, to enjoin a

4    Government agency that is acting outside the statutory authority

5    granted to it by Congress.

6         So in other words, we are not here complaining to your

7    Honor that there is a matter within the FERC's jurisdiction but

8    that we are unhappy with the manner in which the FERC is

9    carrying out its responsibilities.  I won't concede that.  We

10   might complain about that to your Honor at some point, but for

11   purposes of this application, the issue that we are bringing

12   before your Honor is that the FERC is doing something that is

13   clearly outside the statutory authority granted to it by

14   Congress, which is a pure issue of law that is within the unique

15   province of the Article III court to resolve; in other words,

16   the issue of Congressional intent and the issue of whether the

17   statute unambiguously excludes FERC from having jurisdiction in

18   this are.

19         THE COURT:  Why is it outside of their domain of

20   authority?

21         MR. KIM:  Your Honor, there are a number of sources

22   cited in our brief, and I do have to tell your Honor that we

23   received the FERC's letter on Friday.  It is dated the 19th, but

24   it was received by us on Friday.  I believe it was also sent on

25   Friday.

1         And we have done the best we can in the one business

2    day we have had to bring before your Honor everything that we

3    are aware of now -- I believe there are probably more out

4    there -- as to why natural gas futures is an area that is

5    clearly outside the province of jurisdiction of the FERC, and

6    not just outside their jurisdiction, but in the exclusive

7    jurisdiction of the CFTC. We have cited in our brief various

8    sources, and basically the sources fall within the categories of

9    either explicit language in all the relevant statutes, both

10   enabling the CFTC as well as statutes that go to the FERC

11   itself -- in fact, the very statute, the Energy Policy Act of

12   2005, which the FERC purports to move under for this enforcement

13   action explicitly recognized the CFTC's exclusive jurisdiction.

14        I believe the second category of materials that we were

15   able to find in the short term -- and, you know, I believe that

16   there's probably more out there, and we have previously brought

17   these materials to the FERC's attention, although obviously the

18   focus so far has been my trying to convince the FERC that their

19   theory is incorrect -- but another source of materials, your

20   Honor, are the FERC's own pronouncements, both in the materials

21   that been released in the Federal Register as well as statements

22   they have made as well as agreements they have entered into

23   where they explicitly recognized that futures, natural gas

24   futures, are in the exclusive province of the CFTC.

25        And obviously the only rational meaning of the word

1    "exclusive" is there should be no other entity regulating

2    that space.

3        THE COURT:  Did you talk to the CFTC about this?

4        MR. KIM:  Your Honor, I don't want to speculate as to

5    what they might do.  Obviously --

6        THE COURT:  No, but did you bring it to their attention

7    that FERC was grabbing their authority away from them?  Did you

8    run it by them?

9        MR. KIM:  Yes, your Honor.

10       THE COURT:  What did they say?

11       MR. KIM:  Well, I have not personally spoke to the CFTC

12   other than -- but I work as part of a large group of lawyers

13   representing different parties, so I am reporting to your Honor

14   what I know secondhand.  We all have sort of divided up

15   different responsibilities because there's too much work to do

16   in the aggregate.

17       But, your Honor, my belief -- or my information is that

18   the CFTC believes that the FERC is wrong in asserting

19   jurisdiction in this area.  And I believe it is possible that

20   the CFTC itself might come either before your Honor or another

21   Court.

22       And -- but these are large Government agencies.  I

23   believe it takes time to make those types of decisions.

24   Obviously, until Friday, I was not aware that the FERC had a

25   date certain and a specific action they were going to bring

1    although, obviously, as your Honor points out, before then I was

2    in the realm of maybe they will bring the action, maybe they

3    won't, and it was not yet ripe.

4         THE COURT: So let's say they do what they have said in

5    some letter that they are going to do.

6         MR. KIM: Yes, your Honor.

7         THE COURT: The decision to execute that letter is

8    either within the scope of their authority or not within the

9    scope of their authority, and it can be evaluated in a

10   Preliminary Injunction hearing at a later time. Where is the

11   extraordinary irreparable harm that's going to befall your

12   client between the date they issue the letter and the date of

13   any future ruling that the -- that they didn't have authority to

14   issue such an order?

15        MR. KIM: Yes, your Honor. I believe the reason in

16   this case that the irreparable harm is the issuance of the order

17   itself is because we are talking about a Plaintiff who has a

18   fairly large investment in a company that is a regulated

19   company, Solengo Capital ULC, which is a hedge fund, or I should

20   say an investment company that has just started. And Mr. Brian

21   Hunter's declaration to your Honor sets forth a number of

22   grounds on which the mere issuance of the order that they

23   contemplate will cause Solengo to lose the ability to gain

24   various types of regulatory approvals as well as lose all of its

25   indications of interest from investors as well as the unique

1    group of professionals it has gathered.

2        So this is not a case, for example, your Honor, where I

3    represent a Plaintiff who is vaguely complaining that if the

4    FERC engages in an enforcement action and he loses, somehow he

5    will be harmed. I believe in that type of case your Honor very

6    well might say perhaps I have jurisdiction over this; I will

7    appear at a Preliminary Injunction hearing, say, several weeks

8    from now, and until then, everybody just does whatever they were

9    going to do. I think here, your Honor, the very issuance of the

10   order itself is the harm and will destroy my client's business.

11       And I believe your Honor recently held in another

12   case -- I believe it's Capital Paving of D.C. --

13       THE COURT: How do you know that, though?

14       MR. KIM: I saw it published, your Honor, in Westlaw,

15   and your Honor's name was attached to it.

16       THE COURT: No, no, no. How do you know it's going to

17   ruin the business?

18       MR. KIM: Your Honor, I believe that --

19       THE COURT: How do you know that? I mean, that's

20   speculative at best.

21       MR. KIM: Your Honor, the part that is not speculative

22   is that, as Mr. Hunter's declaration explains, there are various

23   types of permits that they are supposed to get, and the issuance

24   of the order itself, he has been advised by various

25   professionals, will essentially devastate the ability of Solengo

1    to qualify for various permits as well as potentially have

2    people flee.

3        THE COURT: Until such time as that order is held

4    illegal. You know, if you are right that this would be an

5    illegal order --

6        MR. KIM: Yes, your Honor.

7        THE COURT: -- on the part of the agency, and this

8    Court were to agree with you, ultimately, from the point of a

9    ruling that it was an illegal order, then your client would be

10   able to get whatever permits he was otherwise qualified to get,

11   you know, prior to than, and then I guess we would have a

12   hearing as to any damages that your client was entitled to

13   during that period between the filing of the order and the

14   Court's ruling that the order was illegal. Right?

15       MR. KIM: I have a few different ideas to offer to your

16   Honor for that. First of all, if the business were to collapse

17   now and had to be restarted at some point in the future, all the

18   investors who have indicated an interest in investing -- and

19   when it formally launches, it would accept investments from

20   these investors -- would obviously invest elsewhere. That is

21   just the nature of money.

22       Now, as to whether Solengo would be able to win those

23   investors back is unclear, but what Mr. Hunter's declaration

24   explains is that there are indications of investment interest

25   and have been collected so far. That's not the exact quote from

1   his affidavit, but that's essentially one concept.

2       I believe, second, your Honor -- and I think that's

3   similar to a concept of if you have a business -- and I believe

4   your Honor recently held in this case that threatening the very

5   existence of a business equals irreparable harm.  If you have a

6   business, and that business itself collapses, substantially

7   collapses or ceases to exist, it's always true, for example,

8   that somebody could go and start another business in the future.

9   But the point is the harm to this business that he started where

10  he has invested a substantial amount of money and time to gather

11  various professionals that, once recruited, there were

12  recruiting costs, et cetera -- if they leave, it's unclear

13  whether he will be able to bring those people back together

14  again, and that is really at the essence of the value of this

15  business.

16      And, your Honor, I believe the third point is that in

17  order for the Court to conclude that Mr. Hunter is not

18  irreparably injured because Mr. Hunter could just claim for

19  damages for the damages in the interim -- I believe there are

20  two assumptions in that statement that may not be true.  I

21  believe, first of all, there is the assumption that Mr. Hunter

22  could recover money from the FERC, which itself is a highly

23  complex question because of the fact that they are a Government

24  agency and this is not another private party who is coming in

25  and interfering with his business.  And so he may never be able

1    to recover money, even if such money could be calculated.

2         And, second, your Honor, where you are talking about a

3    start-up business, there is immense difficulty in quantifying,

4    in terms of dollar amounts, the amount of money that is being

5    lost although, clearly, there is harm in terms of him losing his

6    new business.

7         So where the amount of damages is hard to quantify, I

8    believe it is proper for the Court to issue equitable relief, to

9    hold things still so that if it turns out that Mr. Hunter is

10   wrong and your Honor rules and the Courts rule that the FERC can

11   proceed, if he loses his business, that's just a consequence of

12   life.

13        If it turns out that Mr. Hunter is right, however, your

14   Honor, if we are in a situation where his new business is gone,

15   it is difficult if not impossible for him to prove damages and

16   difficult if not impossible for him to get anyone to pay -- that

17   is irreparable harm.

18        THE COURT:  A TRO lasts in ten days.  What's going to

19   happen in ten days?

20        MR. KIM:  Your Honor -- hopefully, your Honor will

21   entertain a Preliminary Injunction and we will be able to do

22   that and we will be able to proceed to a judgment on the merits.

23        THE COURT:  Yes, but you are not going to get a ruling

24   on that within ten days.

25        MR. KIM:  Well, your Honor --

1    THE COURT: What's going to happen between the issuance

2    of a TRO and the lapsing of the TRO? What's going to happen in

3    ten days?

4    MR. KIM: Your Honor, hopefully before the TRO lapses

5    and the FERC feels free to issue this order, we would have

6    secured equitable relief from the Court to prevent the FERC from

7    issuing the order pending resolution of these issues.

8    THE COURT: That's not how it works.

9    MR. KIM: Your Honor, but --

10    THE COURT: You are not going to get it. You are going

11    to get a PI hearing, if you are lucky, within two weeks.

12    MR. KIM: Well --

13    THE COURT: You are not going to -- you know, the TRO

14    will have lapsed before you are going to get a ruling on the PI.

15    MR. KIM: Well, perhaps, your Honor, the only practical

16    thing to do is to schedule the PI at a time when it would be

17    within the time frame where they would not be issuing the order.

18    THE COURT: There is no way you are going to get a

19    ruling on a PI and an opinion on the PI within ten days. It is

20    not possible. It is not possible. So what's going to happen in

21    ten days?

22    MR. KIM: Well, if they issue the order, your Honor, my

23    client's business will be destroyed.

24    THE COURT: All right.

25    MR. KIM: And if they issue the order, they will likely

1    take the position that your Honor will not be able to pass on

2    the merits of this dispute.

3        THE COURT: Well, but what's the reason to believe it

4    will be destroyed?

5        MR. KIM: Your Honor --

6        THE COURT: Why can't it be resuscitated if it turns

7    out that it's an illegal order later?

8        MR. KIM: Because, your Honor, by the time that --

9    well, first of all, the issuance of the order itself is a

10   legally significant event for a company such as Solengo.

11       THE COURT: Why?

12       MR. KIM: Because, your Honor, as Mr. Hunter's

13   declaration explains, there are various permits and licenses

14   that they must secure, and the issuance of an enforcement action

15   against the --

16       THE COURT: You don't know if you are going to get

17   those permits and certificates. You are standing there right

18   now without any knowledge whether those will ever be granted.

19       MR. KIM: Your Honor, I believe the statements in the

20   factual record, which are the only factual material before your

21   Honor, because none of the lawyers here have any personal

22   knowledge, obviously, and I am not appearing before your Honor

23   as a fact witness -- but a fact witness has submitted a

24   declaration to your Honor, which is Brian Hunter. And what

25   his --

1      THE COURT: But he doesn't know for sure whether he

2  will ever get those permits.

3      MR. KIM: Your Honor, I think --

4      THE COURT: How does he know? He doesn't have a

5  crystal ball.

6      MR. KIM: What we do know, your Honor, and I believe

7  this really goes to the heart of the issue, is that if there is

8  an enforcement action against the principal of Solengo, the

9  majority owner and the person who is supposed to do the trading,

10  then he will never get those permits. And I believe that's the

11  critical fact, your Honor.

12      THE COURT: How does he know that?

13      MR. KIM: That's -- well, he has been advised, your

14  Honor. And I think the important thing is --

15      THE COURT: Advised by who?

16      MR. KIM: Well --

17      THE COURT: I don't have it in front of me. I don't

18  have the declaration.

19      MR. KIM: Yes, your Honor.

20      THE COURT: You tell me.

21      MR. KIM: Yes, your Honor.

22      THE COURT: Who is advising him?

23      MR. KIM: The professionals who are handling these

24  permits and licenses --

25      THE COURT: Do they have crystal balls?

1        MR. KIM: No, your Honor. And I believe that the

2    standard that we are supposed to meet in terms of proving

3    irreparable injury is not a 100 percent certainty as to what

4    would happen in the future, but I think the concept is that if

5    what they are purporting to do is allowed to happen and it turns

6    out that we were right, I think what we are entitled to prove is

7    that based on the evidence before the Court -- the only factual

8    record is Mr. Hunter's statements. They have not put in any

9    evidence that suggests that the license would be granted or that

10   the relief of Mr. Hunter is unreasonable in some way.

11       Obviously, nobody has a crystal ball, your Honor. It's

12   the very nature of provisional relief that we are asking for

13   something that would happen in the future --

14       THE COURT: You came before this Court wanting to

15   proceed ex parte.

16       MR. KIM: Yes, your Honor.

17       THE COURT: This Court refused that request.

18       MR. KIM: Yes, your Honor.

19       THE COURT: You wanted me to rule in your favor without

20   the Government even having a chance to be heard.

21       MR. KIM: Actually, your Honor --

22       THE COURT: Now, you are willing to have the Government

23   be heard, but you are not giving the Government any opportunity

24   to set forth in writing even -- we haven't even had enough time

25   for that -- as to why it believes your position is totally not

1    supportable by law.

2        So, I mean, you are the ones trying to rush this Court

3    into a ruling in your favor before the agency even makes a

4    decision. The agency hasn't made a decision yet. You are

5    expecting a decision will occur. Maybe the decision won't

6    occur; maybe it will occur. We don't know.

7        MR. KIM: Your Honor, we have been informed that the

8    Commission has actually voted in favor of this, and it's just a

9    formal issuance of the order that has not happened yet. So the

10   agency has made a decision, and there is a certainty of harm at

11   a date certain in the future.

12       Yesterday, if I were to come before your Honor -- the

13   reason we applied ex parte is -- obviously, the history of our

14   dialogue with the FERC has not been -- has not led to amicable

15   resolution of these issues. That's why we are here taking

16   care -- taking your Honor's time.

17       Now, the fact is we were concerned that if the FERC

18   issued the order in response to our invitation to them to come

19   before your Honor, that would be the very harm, and there is

20   nothing anybody could do about the consequences that flow from

21   it.

22       What I was going to ask your Honor yesterday was not to

23   issue the relief permanently, but rather -- or even ten days,

24   but to ask your Honor to enjoin the FERC from issuing it the

25   very next day, which is what their letter had stated they would

1    do, and to ask the FERC to come here for argument. I wasn't

2    suggesting, and I still -- obviously, I believe it's

3    unreasonable to ask the Court to issue the actual relief

4    requested without giving the other side an opportunity to

5    respond. And, your Honor, coming before you today --

6        THE COURT: You are the one who wanted an ex parte

7    TRO --

8        MR. KIM: Yes, your Honor, but --

9        THE COURT: Not me.

10       MR. KIM: Yes. The ex parte conference that we

11   requested, your Honor, would have been to have an order issued

12   to prevent the FERC from issuing its enforcement order.

13       THE COURT: That's a TRO.

14       MR. KIM: Yes, your Honor. But the very fact is that

15   if the FERC issues this enforcement order -- this is a unique

16   situation where the very harm we are seeking to prevent would

17   have happened instantly. It's different, for example, where the

18   harm we're requesting your Honor stop takes some time or that we

19   would have notice that it's taking place at the time, such as

20   somebody coming and literally destroying our business physically

21   or some act of that sort.

22       This would be something that the FERC could just do at

23   the stroke of a pen, since the Commission has apparently already

24   voted to do this, which is what we have been informed. And if

25   it had happened, two consequences would have flown from it.

1     First of all, Solengo itself -- the very harm we are

2     trying to prevent -- would have been destroyed, and secondly,

3     they would be sitting here arguing your Honor doesn't have

4     jurisdiction because they have already issued the order.  And

5     there is really nothing more in dispute.  And what we were --

6     simply what we are trying to do is to get them here, your Honor.

7     And today what I am asking, your Honor -- I believe

8     that, you know, we have had a lot of law we have put before your

9     Honor.  I believe there is more work I can do.  These are

10    difficult questions of law that -- I say difficult in the sense

11    that it requires the study of various materials.

12    I am asking your Honor to prevent the FERC from issuing

13    the order until the parties have had a chance to fully brief

14    your Honor and your Honor can decide this case on the merits.

15    There is -- your Honor is correct to point out that

16    nobody has a crystal ball, nobody knows what definitely will

17    happen in the future, but that is true in every case of

18    provisional relief.  What is true here, your Honor, is that the

19    factual statements put before you by the principal of the

20    company, by the very person actually whose interests would be

21    harmed, provides --

22    THE COURT:  I thought this company couldn't get up and

23    running until it gets these permits; isn't that right?

24    MR. KIM:  Well, if the permits of the prime brokerage

25    relationships, et cetera, are prevented from materializing, it

1   could not actually trade. In other words, it could not actually

2   function as a commodities broker or as a trading vehicle.

3         THE COURT: Yes, but whether or not the permits issue

4   is not a decision that FERC makes, right?

5         MR. KIM: But the FERC's decision to start an illegal

6   enforcement action would prevent those events from occurring.

7   It would stop Solengo from being able to launch in the first

8   place and would effectively destroy Solengo because all the

9   investors that have indicated interest and the employees would

10  disappear.

11        THE COURT: How many investors?

12        MR. KIM: I don't know the exact number, your Honor.

13        THE COURT: Give me a rough idea. 20? 100?

14        MR. KIM: I believe that there are --

15        THE COURT: A thousand?

16        MR. KIM: I believe that there are indications of

17  interest from numerous investors representing large amounts of

18  money.

19        THE COURT: Time out.

20        MR. KIM: Yes, your Honor.

21        THE COURT: Indication of interest is valueless. I

22  want to know who has put money down. How many?

23        MR. KIM: Your Honor, nobody can actually put money

24  down right now because of SEC regulations that require a certain

25  waiting period before investors can consummate their investment

1    interest.

2        THE COURT: So other than your client, no one has put

3    money down?

4        MR. KIM: Well, if by putting money down, your Honor

5    means that there is an actual investor who has --

6        THE COURT: Who has committed.

7        MR. KIM: -- consummated -- well, your Honor --

8        THE COURT: Who has committed.

9        MR. KIM: I believe by definition this vehicle has

10   not -- does not have an investor who has put money down in that

11   sense.

12       THE COURT: So basically, at this point, your client

13   has no investors who have committed any money to his custody and

14   control yet?

15       MR. KIM: Well, I believe in a lay sense and not sort

16   of strictly as a contractual sense it is accurate to say that

17   people have committed money because I think the very nature of

18   this type of industry is that the process for getting money from

19   investors is that investors basically indicate an interest to

20   invest and then, when various intermediate steps are completed,

21   they consummate that indication of interest by an actual

22   investment. But, your Honor --

23       THE COURT: If the business starts now or starts next

24   month, starts the month after, what's the harm to your client?

25   The business hasn't even started yet. The company hasn't even

1   come into existence yet.

2        MR. KIM: Well, the company does exist, your Honor, and

3   Mr. Hunter has spent a substantial amount of money gathering not

4   just the indications of interest from investors, but also a

5   trading team of people who will leave if Mr. Hunter has an

6   enforcement action against him and is unable to operate and is

7   unable to actually launch Solengo.

8        THE COURT: Is he paying salaries of those people on

9   the trading team?

10       MR. KIM: Yes, your Honor.

11       THE COURT: Okay. When did he start paying salaries?

12       MR. KIM: I don't know the precise date, but it has

13   been several months.

14       THE COURT: Several months?

15       MR. KIM: Yes.

16       THE COURT: Okay. Has he rented space?

17       MR. KIM: Yes, your Honor.

18       THE COURT: He has. And where is that located?

19       MR. KIM: In Canada, as well as I believe several other

20   places.

21       THE COURT: In Canada?

22       MR. KIM: Yes, your Honor. Mr. Hunter is Canadian.

23       THE COURT: He is Canadian?

24       MR. KIM: Yes, your Honor. He resides in Alberta,

25   Canada. So Solengo is an operating company. It has employees.

1    It has a substantial amount of --

2    THE COURT: In the United States?

3    MR. KIM: I believe they --

4    THE COURT: Anywhere in the United States?

5    MR. KIM: I believe there is a New York and Connecticut

6    offices that either exist or are in the stage of actually being

7    put together. And a lot of money has been spent on that

8    already, I believe.

9    So -- and, your Honor, I think the fact is that when

10   you look at the other side of the equation, the potential harm

11   to the FERC from just having FERC enjoined from issuing this

12   order at least until your Honor can get adequate briefing and

13   decide this legal issue -- I would submit that there is no

14   legally recognizable harm.

15   The subject of the purported enforcement action is

16   purely past conduct. It's conduct that is from 2006. So we are

17   not talking about some ongoing activity by Mr. Hunter that FERC

18   is trying to stop or affect legally in some way.

19   All of the evidence involved has already been gathered

20   by the FERC, and supposedly the -- at least according to the

21   FERC, the Commission has already voted to initiate an

22   enforcement action. So, your Honor, I believe -- if we are

23   talking about giving the Court an adequate amount of time for

24   both parties to fully brief the Court, which is the only issue

25   before your Honor today because, obviously, we are not asking

1    you to decide all the issues and all the merits at this point --

2    I believe the equities weigh heavily in favor of Mr. Hunter.

3         And I want to be clear that the damage is not just to

4    these potential investors.  The damage is to all the rest of

5    them.  Mr. Hunter does have a real business with employees, with

6    furniture, with money put in it, professionals, trading

7    systems --

8         THE COURT:  He doesn't have a real business if it's not

9    trading, if it's not doing anything.

10        MR. KIM:  Well, your Honor --

11        THE COURT:  You just told me a few minutes ago that he

12   needs to have these investors actually do some investing before

13   he can start running.  You used the word "launch," right?

14   That's your word.

15        MR. KIM:  Yes, your Honor.

16        THE COURT:  Not my word.  You used the word "launch."

17   You are going to launch his business.  Well, you know, it

18   doesn't sound to me like he is even prepared to launch his

19   business yet because he is in the early stages of putting his

20   business together.  He needs to get certain permits in order to

21   put his business together.

22        MR. KIM:  Your Honor, I believe he has been investing

23   money and devoting full time to this business for almost the

24   last year, he and various other people that work with him.  It's

25   not a simple matter, obviously.  You can't just open up an

1    investment company such as this and start trading the next day.

2    You have to -- he has spent a substantial amount of money

3    putting together a proprietary trading system that is unique,

4    that exists nowhere else. And the people who can put those

5    trading systems together -- and this is part of this declaration

6    as well -- will no longer work with him, obviously, if there's

7    an enforcement order against the actual principal.

8        So, your Honor, I believe that -- I take your Honor's

9    point that I cannot sit here and say I know with 100 percent

10   certainty that X number of dollars will come into the fund, or I

11   know with 100 percent certainty that the fund will be X as of a

12   certain point. But what I do believe, your Honor, is that the

13   record of irreparable injury is there because if it turns out

14   that we are right, all of these things are not quantifiable in

15   terms of money. Mr. Hunter will have no, relief your Honor.

16       THE COURT: Mr. Hunter -- if Mr. Hunter opens a

17   business and starts trading in the market, he may lose in every

18   single trade he makes.

19       MR. KIM: Yes, your Honor, or he --

20       THE COURT: You don't know if he will win or lose on

21   every trade he makes. No one knows. It may be, if he started

22   his business next week, he would have six straight weeks of

23   losses, and at the end of six weeks he would be bankrupt.

24       MR. KIM: Yes, your Honor.

25       THE COURT: We don't know that. It's all very -- it's

1    all speculative.

2        MR. KIM: Your Honor, and I believe that amount of

3    uncertainty about the future is not inconsistent with

4    provisional relief because certainly if --

5        THE COURT: Have you got a case in our District that

6    says that? Have you got a Circuit -- in this Circuit, have you

7    got a case that says that?

8        MR. KIM: Well, certainly, your Honor, the concept that

9    harm to trading operations is economic harm is litigated every

10   day in the courts of New York and other financial centers.

11   Certainly -- obviously, for example, in any sort of fund or

12   investment company --

13       THE COURT: Have you ever seen a case in this Circuit

14   where a District Judge issued a Preliminary Injunction or TRO to

15   prohibit a Government agency from initiating an enforcement

16   action on the theory that doing so would harm a Plaintiff's

17   ability to make money in a business that didn't exist yet?

18       MR. KIM: Your Honor, the business does exist.

19       THE COURT: Well, I be -- I don't want to quibble with

20   you. That isn't up and running yet.

21       MR. KIM: Well, the business -- there are various

22   aspects to an investment company such as this. Obviously, the

23   trading operations is the ultimate goal.

24       THE COURT: Right.

25       MR. KIM: But it's not that there is a -- the traders

1    just walk into a room and just start trading.

2         THE COURT:  So -- let's not quibble.  Have you ever

3    seen such a case?  Does it exist?

4         MR. KIM:  Your Honor, I believe that the -- first of

5    all, in answer to your Honor's precise question, I am not aware

6    of a D.C. Circuit case with that fact pattern.  However --

7         THE COURT:  Let's go to the Second Circuit.  That's

8    where you practice law.

9         MR. KIM:  Yes, your Honor.

10        THE COURT:  Have you ever seen a Southern District of

11   New York case where a District Judge there issued a PI to

12   prohibit a Government agency from launching an enforcement

13   action in order to provide the kind of relief you are seeking on

14   behalf of a company that wasn't trading yet but was hoping to be

15   trading in the near future?

16        MR. KIM:  Your Honor, I am not aware such a case, but

17   only because I believe the SEC's ability to regulate the

18   securities markets is unquestioned, and I don't think anybody

19   would seriously question the SEC's ability to do that.

20        I believe this is really the first time that I am aware

21   of where an agency that regulates the physical markets, such as

22   the Federal Energy Regulatory Commission, is arguing that it can

23   now regulate an area that Congress has clearly delineated to the

24   CFTC.

25        Now, your Honor, I would, in response to the essence of

1   your Honor's question, I would point your Honor to various cases

2   in our brief as well as other cases I believe, with an

3   opportunity, I would be to submit to your Honor that does hold

4   that Courts, when examining an agency that is acting ultra vires

5   and outside of its jurisdiction, whether the harm that they are

6   about to commit is economic or otherwise, the Courts do have the

7   power to issue an injunction, to exercise its equitable power.

8        And I believe it's only logical that if the Court -- if

9   an Article III judge has that power, within the realm of his

10  discretion, he can choose to exercise that power in the context

11  of a preliminary proceeding or a permanent proceeding.

12       THE COURT:  Did you read my opinion in Brendsel versus

13  OFHEO?

14       MR. KIM:  I am not familiar with that opinion, your

15  Honor.

16       THE COURT:  You ought to check it out.

17       MR. KIM:  Yes, your Honor.

18       THE COURT:  I will hear from the Government.

19       MS. ROSE:  Good afternoon, your Honor.

20       THE COURT:  Good afternoon.

21       MS. ROSE:  The instant Motion should be denied quite

22  simply because Mr. Hunter cannot meet the criteria necessary for

23  the extraordinary relief of the issuance of an injunction.  Your

24  Honor hit the nail on the head.  The key here is that this is,

25  in fact, extraordinary relief to ask that a regulatory agency be

Amaranth 365

1    enjoined from performing their inherent function.

2         And the key here is that this -- when we keep referring

3    to the order at issue, it is simply a preliminary order.  It is

4    an order to show cause.  Once that issues, Mr. Hunter will have

5    all of the rights that attach with that, and it will proceed

6    through the administrative process, as cases normally would.  So

7    he is not being denied any rights with the issuance of the order

8    at issue.

9         THE COURT:  He indicated that his sources tell him that

10   the board at FERC has already voted on this, the issuance of

11   this order to show cause.  Is that consistent with your

12   understanding as well, or is your understanding different from

13   that?

14        MS. ROSE:  I am not certain what the board has and has

15   not done, but I do believe that they do intend to issue the

16   order to show cause.

17        THE COURT:  You can just check with your client.  That

18   will be fine.  We try to keep it to one speaker at a time.

19        (Pause.)

20        THE COURT:  Ms. Rose.

21        MS. ROSE:  Your Honor, I apologize for that

22   interruption.  I do believe that the letter issues prior to the

23   order, so that the order will, in fact, issue.

24        But that aspect of it goes to the first criteria for

25   injunctive relief, which is a strong likelihood of prevailing on

1    the merits and simply, you know, having an order to show cause

2    doesn't -- there is no likelihood of prevailing on the merits

3    here. And also it's notable that 7 USC Section 2(a)(1)(A) --

4    Mr. Hunter failed to continue his excerpt from the necessary

5    statute. And under that statute, FERC does, in fact, have the

6    authority to issue such an order.

7        And also, along with that, as far -- I will be brief,

8    your Honor. As far as the irreparable harm goes, I have been

9    told that the CFTC, which is the other agency that I believe

10   Mr. Hunter is arguing that they have exclusive jurisdiction -- I

11   have been informed and actually given authority to represent to

12   you today that they will be filing in the Southern District of

13   New York tomorrow morning their investigation of Mr. Hunter.

14       So there really is no irreparable harm to our order

15   possibly issuing on Thursday, considering that, you know, there

16   is already this information out there. This --

17       THE COURT: So he is facing, apparently, multi-front

18   investigations or whatever from various U.S. Government agencies

19   in the near future?

20       MS. ROSE: Yes, your Honor. And also -- it's also

21   worth noting that the instant Motion and Complaint were, in

22   fact, publicly filed, and so this information is already

23   publicly -- it's available. It's out there now. And there have

24   been numerous Wall Street Journal articles written on Mr. Hunter

25   and on this -- the matter at issue here.

1       So as far as keeping any of this quiet on the order to

2   show cause, there just simply is no irreparable harm here.

3       THE COURT: Yes. So if the Court were to deny the TRO,

4   when would the Government be in a position to file its brief in

5   opposition to the memorandum that's been filed already in this

6   particular Motion?

7       MS. ROSE: I have been told that we would be able to

8   oppose -- to file papers in this case as early as tomorrow.

9   The -- however, you know, the agency feels that they should be

10  able to proceed as they normally would with their regulatory

11  functions and not have to wait for briefing on any injunctive

12  relief that Mr. Hunter may seek here.

13      THE COURT: All right.

14      MS. ROSE: I would also point out that, as your Honor

15  stated a few moments ago, that if, in fact, this order to show

16  cause were found to be somehow illegal at any point in the

17  future, that, as you pointed out, Mr. Hunter would be entitled

18  to any damages at that time. So that, again, cuts against any

19  injunctive relief here.

20      THE COURT: It's not even really -- it's not really a

21  final order by the agency. It's basically -- it's the

22  initiation of an investigation that's accompanied by a demand

23  that he show cause why they shouldn't do something in the

24  future.

25      MS. ROSE: Yes, your Honor. In fact, it is just that.

1    Then he is given his opportunity to be heard and all of, you

2    know, the administrative rights that go along with those

3    procedures which I am not personally familiar with at this time,

4    but --

5        THE COURT: All right. Very good. Thank you,

6    Ms. Rose.

7        MS. ROSE: Thank you, your Honor.

8        MR. KIM: Your Honor, may I be heard?

9        THE COURT: Sure. Are you going to file a TRO up in

10    the Southern District of New York to stop the CFTC from filing

11    their --

12        MR. KIM: Your Honor, that was going to be one of the

13    points that I --

14        THE COURT: -- order to show cause?

15        MR. KIM: I am not suggesting that Ms. Watson [sic] is

16    deliberately misrepresenting anything to your Honor. I believe

17    she is obviously stating her understanding of what others might

18    have told her. But I believe a number of factual statements she

19    made to you are absolutely incorrect.

20        First of all, this notion that the CFTC, quote/unquote,

21    is going to file some type of -- I think she said they are going

22    to file their investigation in the Southern District of New

23    York. The CFTC, your Honor, has a process called the Wells

24    process where, if they are contemplating filing an enforcement

25    action against a person, they notify that person and then take

1    submissions from them.  That has not happened with Mr. Hunter.

2    We have had no indication from the CFTC whatsoever that they are

3    going to file any action -- any enforcement action against

4    Mr. Hunter.

5         In addition, your Honor, I believe others on the -- in

6    this group of lawyers I told you spoke with the CFTC and the

7    CFTC indicated that they may have an interest in basically

8    appearing in this action or otherwise getting involved in some

9    way -- and I don't know the exact words spoken, but in terms of

10   indicating that the FERC should not proceed, and in addition,

11   your Honor, recently there were Senate hearings not on whether

12   laws were violated, but essentially on the regulation of markets

13   where the CFTC testified and indicated that it had conducted an

14   expert study of Amaranth, Mr. Hunter's prior employer's

15   trading -- the trading that Mr. Hunter had done in 2006, and had

16   not found any of the types of violations that were being

17   discussed at the Senate.

18        So the notion that they are going to file,

19   quote/unquote, some investigation, I believe that sentence

20   itself makes no sense.  I believe it's something that is, I

21   believe, just completely incorrect.

22        If whatever they are referring to happens, then

23   obviously that can be a relevant consideration for your Honor.

24   But it is absolutely incorrect, I believe, to suggest that

25   Mr. Hunter is facing any other regulatory action.  If so, then

1    the CFTC will have completely violated its own procedures, and I

2    don't believe there is any basis to think they have done that.

3         Second, your Honor, they have indicated that they have

4    the authority -- they have just asserted in a conclusory manner

5    that they have the authority to issue this order and that we

6    have to wait until the order is final and so forth.

7         Your Honor, the cases that we have cited -- and I

8    believe there are others -- clearly indicate that those types of

9    concepts, Administrative Procedure Act finality concepts,

10   exhaustion concepts do not apply where the agency is acting

11   wholly outside of its statutory authority because the very act

12   of issuing the order or initiating the proceeding is something

13   that this Court can review as a matter of law before they are

14   allowed to do it.

15        And, further, your Honor, I believe Ms. Watson referred

16   to a Motion and Complaint that was apparently publicly filed.  I

17   am not sure what she is --

18        THE COURT:  Her name is Rose.

19        MR. KIM:  I'm sorry.

20        THE COURT:  Megan Rose.

21        MR. KIM:  Yes, your Honor.  I believe that -- I thought

22   I heard Ms. Watson out in the hallway.

23        But what Ms. Rose is referring to -- your Honor, couple

24   of points about that.  First of all, we are not here to ask your

25   Honor for an injunction to stop the Federal Energy Regulatory

1    Commission from telling people that it intends to issue the

2    order. So this is not an action to keep them quiet. This is an

3    action to stop the issuance of the order itself. So --

4        THE COURT: It's an order to show cause.

5        MR. KIM: Your Honor --

6        THE COURT: That's all it is. They are ordering your

7    client to show cause.

8        MR. KIM: Your Honor, I believe the way that the

9    communication from FERC to us was described is inaccurate. I

10    think Ms. Rose described it as an order initiating an

11    investigation. Your Honor, that is not the order we are

12    complaining about. There is an order initiating an

13    . investigation, but this is a totally different order altogether.

14        And I believe part of the confusion is arising from the

15    fact that -- that the FERC has basically voted to start an

16    enforcement action. The order to show cause they are referring

17    to is their complaint in the process that they have set up, your

18    Honor.

19        THE COURT: I have heard enough. I am going to deny

20    the TRO. The agency has until Monday, the 30th, to file its

21    brief opposing the memorandum of law in support of the TRO, PI.

22    You have until Friday the 3rd to file any reply that you are

23    going to file. We will set a hearing for the afternoon of

24    August 7th at 3:00 for oral arguments on the PI. And that's the

25    Court's ruling.

1      See you on the 7th, Counsel.

2

3           (Whereupon, at 4:59 p.m., the proceedings were

4      concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2

3

4              I, Patty A. Gels, certify that the foregoing is a

5     correct transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10              _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

maranth 365