**EXHIBIT F**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Amaranth Advisors L.L.C. | ) | Docket No. IN07-26-000 |
| Amaranth LLC | ) | |
| Amaranth Management Limited Partnership | ) | |
| Amaranth International Limited | ) | |
| Amaranth Partners LLC | ) | |
| Amaranth Capital Partners LLC | ) | |
| Amaranth Group Inc. | ) | |
| Amaranth Advisors (Calgary) ULC | ) | |
| Brian Hunter | ) | |
| Matthew Donohoe | ) | |

**REQUEST OF AMARANTH ADVISORS L.L.C.,**
**AMARANTH ADVISORS (CALGARY) ULC,**
**AMARANTH MANAGEMENT LIMITED PARTNERSHIP**
**AND AMARANTH GROUP INC.**
**FOR EXPEDITED REHEARING**
**TO TERMINATE SHOW CAUSE ORDER**
**FOR LACK OF SUBJECT MATTER JURISDICTION**

Pursuant to Rule 713 of the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of Practice and Procedure, 18 C.F.R. § 385.713 (2007), and Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a) (2005) ("NGA"), Amaranth Advisors L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Management Limited Partnership, and Amaranth Group Inc. (together, "Amaranth Advisors") hereby respectfully request expedited rehearing of the Commission's determination articulated among other places in the Order to Show Cause and Notice of Proposed Penalties ("Show Cause Order") dated July 26, 2007,[1] in the captioned proceeding that it has jurisdiction to assess civil penalties and require the disgorgement of profits for Amaranth Advisors' trading solely in non-jurisdictional futures markets.

---

[1] *Amaranth Advisors L.L.C.*, 120 FERC ¶ 61,085 (2007). By filing this request for rehearing, Amaranth Advisors do not in any way concede that such a request is a prerequisite for review of the Commission's jurisdictional ruling in Federal court.

## I.    PRELIMINARY STATEMENT

The Commission proposes to order respondents that have never been, and are not, subject to its jurisdiction to pay hundreds of millions of dollars in penalties for transactions conducted solely in contracts for future delivery transacted on or subject to the rules of designated contract markets ("futures" or "futures transactions").  The Commission does not regulate futures transactions, and in fact readily admits that such markets are subject to the *exclusive* jurisdiction of the Commodity Futures Trading Commission ("CFTC"), which has initiated its own proceeding in the United States District Court for the Southern District of New York involving the same conduct that is at issue in the Show Cause Order.  The Commission's claim that it has the implicit power to assess civil penalties for transactions conducted entirely beyond its purview cannot be reconciled with its admission that those transactions lie solely within the province of the CFTC.  The Commission points to no express delegation of power by Congress in the NGA authorizing it to regulate such transactions, and the Commission's attempt to bootstrap jurisdiction through an interpretation of the "in connection with" language in the statute and its regulations has been expressly rejected by the courts.

The Commission's *ultra vires* exercise of jurisdiction over futures transactions "is plainly contrary to law and cannot stand."[2]   Accordingly, Amaranth Advisors respectfully request the Commission expeditiously to reassess its jurisdictional ruling to avoid an expensive waste of Commission and taxpayer resources, and the unjustified burden and cost this proceeding is imposing on Amaranth Advisors.

---

[2]    *Atlantic City Electric Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002).

## II.    **BACKGROUND**

A.    **Overview of the Commission's Regulatory Powers to Sanction Market Manipulation.**

The Commission's subject matter jurisdiction over market manipulation was historically limited to the power to seek refunds or revoke tariff authority under Section 5 of the NGA or Section 206 of the Federal Power Act ("FPA"), or to seek disgorgement of profits of jurisdictional entities for unjust enrichment under Sections 16 and 309 of the NGA and FPA, respectively.[3]   In the wake of allegations that the 2000-2001 energy crisis in Western U.S. gas and electric markets was caused in part by manipulation of Commission-jurisdictional markets by participants in them, the Commission asked Congress for explicit power to assess civil penalties in manipulation cases.[4]

Congress granted the Commission the new power it sought on August 8, 2005, when it passed the Energy Policy Act of 2005 ("EPAct 2005").[5]   Section 315 of that statute added new Section 4A to the NGA, which makes it unlawful for "any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the

---

[3]    15 U.S.C. §§ 717d and 717o (2005); 16 U.S.C. §§ 824e and 825h (2005); *see generally*, *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, 105 FERC ¶ 61,218 (2003), *reh'g denied*, 107 FERC ¶ 61,175 (2004), *aff'd sub nom. Colo. Office of Consumer Counsel v. FERC*, 2007 U.S. App. LEXIS 14825 (D.C. Cir. June 22, 2007).

[4]    Hon. J. Kelliher, *Market Manipulation, Market Power, and the Authority of the Federal Power Commission*, 26 Energy L.J. 1, 30-33 (2005).   The alleged manipulative schemes were first chronicled in a lengthy Commission staff report, but not a single one involved manipulation of futures markets by either a jurisdictional or a non-jurisdictional entity.   *Final Report on Price Manipulation in Western Energy Markets:  Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, Docket No. PA02-2-000 (Mar. 2003).

[5]    Energy Policy Act of 2005, §§ 315 and 1283, Pub. L. No. 109-58, 119 Stat. 594 (2005).

Securities Exchange Act of 1934 . . .).”[6]  This statutory prohibition was not self-implementing,

however, and required Commission action through a rulemaking before it could take effect.[7]

On January 19, 2006, the Commission issued Order 670 to implement the new

anti-manipulation statute.[8]  The Commission patterned the rule after Securities and Exchange

Commission (“SEC”) Rule 10b-5, which is a securities anti-fraud rule, and said it would interpret

the rule “consistent with analogous SEC precedent that is appropriate under the circumstances.”[9]

In pertinent part, Order 670 followed Rule 10b-5 to require a showing that an entity “(1) uses a

fraudulent device, scheme or artifice, or makes a material misrepresentation or a material

omission as to which there is a duty to speak under a Commission-filed tariff, Commission order,

rule or regulation, or engages in any act, practice, or course of business that operates or would

operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with

the purchase or sale of natural gas or electric energy or transportation of natural gas or

transmission of electric energy subject to the jurisdiction of the Commission.”[10]

Order 670 recognized that none of these elements come into play, however, unless

the Commission has subject matter jurisdiction over the underlying transaction in the first place.

Thus, the Commission pointed out that “[a]s an initial matter, this Final Rule does not, and is not

intended to, expand **the types of transactions subject to the Commission’s jurisdiction** under the

---

[6]      15 U.S.C. § 717c-1.

[7]      *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at P 5 (“Order 670”), *reh’g denied*, 114 FERC ¶ 61,300 (2006).

[8]      The new rules took effect on January 26, 2006, upon publication in the Federal Register after the Commission found good cause to waive the usual requirement that new regulations take effect 30 days after publication.  Order 670 at P 90; 71 Fed. Reg. 4244 (Jan. 26, 2006).

[9]      Order 670 at P 2; *see also id.* at PP 7 and 48.

[10]     *Id.* at P 49 [codified at 18 C.F.R. Part 1c].

NGA, [Natural Gas Policy Act,] or FPA."[11]  Although EPAct 2005 expanded the Commission's personal jurisdiction in manipulation cases to cover "any entity," as opposed to "natural-gas companies" as defined in the NGA and "public utilities" as defined in the FPA, the Commission confirmed that "fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is not subject to the new regulations."[12]

**B.     The Commission's Show Cause Order Alleges that Amaranth Advisors Engaged in "Manipulation in a Non-Jurisdictional Transaction."**

The Show Cause Order recounts how soon after Order 670 took effect Commission enforcement staff began monitoring futures transactions on the New York Mercantile Exchange ("NYMEX").[13]  The Commission's enforcement staff was first alerted to Amaranth Advisors' trading on April 26, 2006, when it noticed a 10¢ increase in the settlement price for the May 2006 NYMEX futures contract.[14]  Commission staff then requested information from the CFTC pursuant to the memorandum of understanding between the two agencies and learned that Amaranth Advisors was the largest seller of the May natural gas futures contracts.[15]  The Commission states that its investigation "was heavily coordinated with an investigation opened subsequently by the CFTC, the exclusive direct regulator of the NYMEX."[16]  The two agencies "regularly coordinated their discovery efforts including participating jointly in depositions, sharing documentary evidence and conferring jointly with

---

[11]     *Id*. at P 22 (emphasis added).

[12]     *Id*.

[13]     Show Cause Order at P 52.

[14]     *Id*.

[15]     *Memorandum of Understanding Between FERC and CFTC Regarding Information Sharing And Treatment Of Proprietary Trading And Other Information* (Oct. 12, 2005) ("MOU").  A copy is attached as Attachment 1.

[16]     Show Cause Order at P 55.

both inside and outside experts."[17]  Although the Commission does not mention it, Amaranth Advisors cooperated with these dual investigations from the time the agencies first contacted it, producing over a million pages of documents, making its current and former employees available for questioning by the regulatory agencies, and having its counsel attend numerous meetings with them over the past year.

On April 12, 2007, the CFTC issued a "Wells Notice" to Amaranth Advisors regarding a possible enforcement action for alleged manipulation of the price of the NYMEX May 2006 natural gas futures contracts during the last half-hour of the last trading day in the May contract, April 26, 2006.[18]  The CFTC followed-up on July 25, 2007, by filing a complaint with the United States District Court for the Southern District of New York alleging that Amaranth Advisors *attempted* artificially to depress the settlement price of natural gas futures traded on the NYMEX.[19]  The CFTC did not allege any *actual* market manipulation.  In a press release announcing the action, the CFTC noted its "unwavering determination to ensure that the futures markets operate in an open and competitive manner" and stated that "[t]he CFTC stands ready to enforce the provisions of the Commodity Exchange Act ["CEA"] against those who attempt to manipulate U.S. futures and commodity prices."[20]

---

[17]    *Id.*

[18]    Under CFTC regulations, the Division of Enforcement "in its discretion, may inform persons who may be named in a proposed enforcement proceeding of the nature of the allegations pertaining to them," and may also, "in its discretion, advise such persons that they may submit a written statement prior to the consideration by the Commission of any staff recommendation for the commencement of such proceeding."  Appendix A, 17 C.F.R. Part 11.  This process is commonly referred to as a "Wells Notice."

[19]    A copy of the complaint filed by the CFTC is attached as Attachment 2.

[20]    A copy of the CFTC press release dated July 25, 2007, is attached as Attachment 3.

The Commission initiated its own action against Amaranth Advisors the very next day based on the same facts, conduct and evidence as the CFTC action.[21]  The Show Cause Order is particularly significant in that it is the first time the Commission has ever invoked its new powers to sanction market manipulation.  The Commission's Show Cause Order differed from the CFTC's complaint in that it preliminarily concluded that Amaranth Advisors manipulated jurisdictional natural gas markets by actually causing artificially low prices for natural gas futures contracts on the NYMEX.

Moreover, and of critical importance to this request for rehearing, the Show Cause Order alleges that the supposedly manipulative trading took place entirely in the NYMEX futures market, a market which the Commission concedes to be subject to the CFTC's "exclusive jurisdiction."[22]  Not one single physical natural gas transaction involving Amaranth Advisors — or anyone else — is even mentioned by the Commission in its Show Cause Order.  In fact, Amaranth Advisors never bought or sold physical natural gas in the wholesale natural gas market and the Show Cause Order does not claim otherwise.  Thus, Amaranth Advisors have never engaged in a single natural gas transaction subject to FERC jurisdiction.

---

[21]   Prior to this, the FERC staff determined the Commission has jurisdiction over natural gas futures contracts, and informed Amaranth Advisors of its determination by e-mail dated June 7, 2007, and letter dated June 13, 2007, that a "recommendation *may* be made" to bring an enforcement proceeding regarding manipulation of the NYMEX natural gas futures markets.  A copy of Staff's June 7, 2007, letter is attached at Attachment 4.  Amaranth Advisors responded to Staff's letter on June 26, 2007, with a statement pursuant to Section 1b.18 of the Commission's regulations which, among other things, demonstrated that the Commission lacks jurisdiction over Amaranth Advisors' transactions.  The Show Cause Order references this submission (Show Cause Order at P 4), but disregarded those jurisdictional arguments by finding that the Commission has jurisdiction to pursue its claims against Amaranth Advisors, and the Commission confirmed its jurisdictional views through contemporaneous press releases.  Copies of these are included at Attachment 5.  The Commission's various findings that it has jurisdiction over Amaranth Advisors' natural gas futures trades are referred to collectively herein as the Commission's "Final Jurisdictional Ruling."

[22]   Show Cause Order at P 55.

Notwithstanding its recognition that the CFTC is the sole regulator of futures transactions on the NYMEX, the Commission has determined that "both agencies have jurisdiction where, as here, the manipulations are **connected** to both markets."[23]    The Commission rests its jurisdictional claim on two sections of EPAct 2005:  the anti-manipulation rule itself in Section 4A of the NGA, and the price transparency provisions adopted in Section 316 of EPAct 2005, which added new Section 23 to the NGA.[24]    The Commission cites to the MOU with the CTFC as the source for an implied delegation of regulatory power by Congress to FERC over natural gas futures transactions that "overlap" with physical natural gas markets.[25]    The Commission asserts that Order 670 "prohibits manipulation of the physical and financial natural gas markets" if the trading intentionally or recklessly affects Commission-jurisdictional transactions.[26]    Thus, the Commission claims to have subject matter jurisdiction under Section 4A "in connection with" natural gas futures trading so long as those trades arguably "affected" jurisdictional wholesale natural gas transactions.    The Commission has determined that a "generalized" effect that is not "overwhelmingly direct" is enough to give it jurisdiction.[27]

The Commission does not allege that Amaranth Advisors' traders manipulated the NYMEX natural gas futures price to manipulate the physical natural gas market.    To the contrary, the Commission claims that Amaranth Advisors intended to profit from its financially-

---

[23]     *Id*. (emphasis added).

[24]     The Commission offers its main jurisdictional analysis at paragraphs 44 through 51 of the 75-page Show Cause Order, and elaborates on the "in connection with" element of Order 670 at paragraphs 108 through 110.

[25]     Show Cause Order at P 48.

[26]     *Id*. at P 49.

[27]     *Id*. at P 110.

settled swap positions on unregulated over-the-counter exchanges.[28]    The Commission's jurisdictional theory, therefore, hinges entirely upon the tangential and indirect effect that the price of natural gas futures may have had on the price of unrelated physical natural gas sales by unidentified third parties.

In particular, the Commission's view is that its "affects" test is satisfied in this case because (a) Amaranth Advisors' traders allegedly manipulated the NYMEX month-end natural futures gas contract settlement price which (b) "recklessly" affected wholesale natural gas markets because (c) the NYMEX monthly closing futures price also "determines" the price in certain "physical basis" transactions potentially entered into by third parties that **are** subject to the Commission's jurisdiction, and because (d) the NYMEX month-end futures settlements might be inputs into certain natural gas price indices that are sometimes used by others in setting the price for their jurisdictional trades.[29]    The Commission, however, admits that "we cannot, nor need we, determine at this time the precise volume or proportion of total 'jurisdictional' gas transactions that are priced using physical basis or that are sold at index prices determined, in whole or in part, by physical basis trades."[30]    Indeed, elsewhere the Commission laments that "there is **no way to determine** important volumetric relationships between the fixed-price day- or month-ahead transactions that form price indices or to determine the use of price indices

---

[28]    *Id*. at PP 5, 62.  The Commission states that such swap positions entail no physical delivery risk at all, making it impossible for swap transactions ever to become FERC-jurisdictional transactions.  *Id*. at P 18. Nevertheless, Commission staff has advised Amaranth Advisors' counsel that under the current jurisdictional theory, the Commission can assert jurisdiction over swap transactions that indirectly "affect" unrelated physical natural gas transactions.

[29]    *Id*. at PP 20-21.

[30]    *Id*. at P 25.

themselves."[31]    Thus, under the Commission's theory, it has jurisdiction over every NYMEX natural gas futures trade that "may effect" the monthly natural gas futures contract settlement price which, in turn, "may effect" the price of physical natural gas sales, but the Commission need not ever actually show any such effects.

Despite claiming a generalized indirect effect of Amaranth Advisors' NYMEX natural gas futures trading on Commission-jurisdictional wholesale natural gas markets, the Commission does not actually propose any penalties at all based upon the purported effect the non-jurisdictional futures trades allegedly had on jurisdictional natural gas markets.  Instead, the Commission proposes to impose a $200 million civil penalty and disgorgement of at least $59 million of purported profits based *solely* on non-jurisdictional natural gas futures trades.  Thus, the Commission seeks to penalize the identical conduct that is currently the subject of the CFTC's civil complaint proceeding in the United States District Court for the Southern District of New York.

### III.    RULE 713(c) SPECIFICATION OF ERRORS

Pursuant to Rule 713(c), 18 C.F.R. § 385.713(c) (2007), Amaranth Advisors provide the following statement of jurisdictional errors in the Commission's Show Cause Order, and representative court precedents on which Amaranth Advisors relies:

1.    The Final Jurisdictional Ruling reflected in the Show Cause Order is an unlawful exercise of the Commission's regulatory powers because it concedes that Congress has not delegated to the Commission subject matter jurisdiction over futures transactions through Section 4A of the NGA and that those transactions are within the exclusive jurisdiction of the CFTC.

Representative Cases:  *Brown v. Gardner*, 513 U.S. 115 (1994); *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675 (1951); *FPC v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498 (1949); *California Indep. Sys. Operator Corp. v.*

---

[31]    *Transparency Provisions of Section 23 of the Natural Gas Act; Transparency Provisions of the Energy Policy Act*, Notice of Proposed Rulemaking, 119 FERC ¶ 61,068, at P 50 (Apr. 19, 2007) (emphasis added) (hereinafter "Price Transparency NOPR").

*FERC*, 372 F.3d 395 (D.C. Cir. 2004); *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071 (D.C. Cir. 2002); *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002); *FTC v. Roberts*, 276 F.3d 583 (D.C. Cir. 2001); *Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001); *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365 (5th Cir. 1997); *Chicago Mercantile Exch. v. SEC,* 883 F.2d 537 (7th Cir. 1989); *SEC v. American Commodity Exch., Inc.*, 546 F.2d 1361 (10th Cir. 1976).

2.    The Final Jurisdictional Ruling reflected in the Show Cause Order is unlawful because the "in connection with" language on which the Commission relies does not support its exercise of jurisdiction when, as here, the respondents are not FERC-jurisdictional entities, have not engaged in any FERC-jurisdictional activities, and the activity at issue involved trading natural gas futures contracts solely on a CFTC-regulated exchange.  The courts have uniformly held that the "in connection with" language of the NGA and Section 10(b) of the Securities Exchange Act does not allow an agency to bootstrap subject matter jurisdiction simply by claiming that an otherwise non-jurisdictional transaction or activity has some effect on matters within the agency's jurisdiction.  Numerous cases similarly reject FERC's attempts to expand its subject matter jurisdiction to encompass matters not delegated to it by Congress.

Representative Cases:  *Environmental Defense v. Duke Energy Corp.*, 127 S. Ct. 1423 (2007); *SEC v. Zandford*, 535 U.S. 813 (2002); *FPC v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498 (1949); *Transmission Agency of Northern California v. FERC*, 2007 U.S. App. LEXIS 17303 (D.C. Cir. 2007); *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005); *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); *Altamont Gas Transmission Co. v. FERC,* 92 F.3d 1239 (D.C. Cir. 1996); *Conoco, Inc. v. FERC*, 90 F.3d 536 (D.C. Cir. 1996); *Chicago Mercantile Exch. v. SEC*, 883 F.3d 537 (7th Cir. 1989); *Chicago Bd. of Trade v. SEC*, 677 F.2d 1137 (7th Cir. 1982).

3.    The Final Jurisdictional Ruling reflected in the Show Cause Order is arbitrary, capricious, an abuse of discretion, not the product of reasoned decision-making and otherwise unlawful because it departs without explanation from the finding in Order 670 that "fraud and manipulation in a non-jurisdictional transaction . . . is not subject to the new regulations."

Representative Cases:  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335 (D.C. Cir. 2004); *ANR Pipeline Co. v. FERC*, 71 F.3d 897 (D.C. Cir. 1995); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970); *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, *reh'g denied*, 114 FERC ¶ 61,300 (2006).

## IV.    <u>REQUEST FOR REHEARING</u>

The Commission has conceded that the CFTC's jurisdiction over futures transactions is exclusive, but nevertheless claims in this instance that its jurisdiction "overlaps" with that of the CFTC when futures transactions have some effect on wholesale natural gas commodity sales.  No such regulatory overlap exists here.  As discussed below, the courts have specifically rejected the Commission's interpretation that the "in connection with" language at issue here reaches non-jurisdictional conduct that incidentally affects jurisdictional markets.  The courts have also consistently and uniformly rejected attempts by regulatory agencies — both in the securities context and in numerous cases involving this Commission — to bootstrap regulatory authority in areas where Congress has withheld subject matter jurisdiction.

**A.    The Show Cause Order Is an Unlawful Exercise of the Commission's Regulatory Powers Because it Concedes that Congress Has Not Delegated to the Commission Subject Matter Jurisdiction Over Futures Transactions Through Section 4A of the NGA and That Those Transactions Are Within the Exclusive Jurisdiction of the CFTC.**

It is well-settled that the Commission is "a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'" *Atlantic City Electric Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("*Atlantic City*") (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)) (emphasis added by the court in *Atlantic City*).  Federal agencies cannot confer jurisdiction on themselves.  *NLRB v. Denver Bldg. & Const. Trades Council,* 341 U.S. 675 (1951).  Moreover, the perceived "need for regulation cannot alone create authority to regulate."  *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1088 (D.C. Cir. 2002) ("*ExxonMobil*") (citing *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 371 (5th Cir. 1997)).  Accordingly, "[i]n the absence of statutory authorization for

its act, an agency's 'action is plainly contrary to law and cannot stand.'" *Atlantic City*, 295 F.3d at 8 (quoting *Michigan*, 268 F.3d at 1081).

Although the Commission claims that Congress gave it "a clear mandate" in EPAct 2005 to punish manipulation of the NYMEX futures markets,[32] the Commission cannot identify an express congressional delegation of power to regulate transactions on the NYMEX. In fact, the Commission concedes that it "is not authorized to regulate all commodities trading behavior by any person or company," and that the "CFTC has **exclusive** jurisdiction over the operation of exchanges such as NYMEX."[33]   Thus, there is no "clear mandate" as the Commission claims.   Instead, the Commission has inferred that Congress intended for the Commission to regulate natural gas futures transactions because it believes the regulatory regimes of the CFTC and the Commission "overlap" based simply on the assertion that futures settlement prices affect the pricing of physical trades.[34]   This belief, however, is irrelevant because there can be no jurisdictional overlap for activity solely involving futures trading on a CFTC-regulated exchange based on an "affects" test when Congress has specifically excluded the Commission from any regulatory oversight responsibility for NYMEX futures trading in the first instance.

> **1.     Congress did not expand the Commission's subject matter jurisdiction to include trading solely in natural gas futures, but instead confirmed that the CFTC has exclusive regulatory responsibility for futures trading.**

To determine whether an agency's action exceeds its delegated authority and, therefore, "cannot stand," the courts first look to see whether Congress has expressly delegated

---

[32]     Show Cause Order at P 8.

[33]     *Id*. at PP 49, 55 (emphasis added).

[34]     *Id*. at P 48.

to the agency the authority to act. *Atlantic City*, 295 F.3d at 8.  As noted, the Commission concedes that Congress has not done so,[35] and a review of EPAct 2005 and Order 670 confirms it.

Even after the enactment of EPAct 2005, the Commission's NGA jurisdiction extends only to "the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption . . . , and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas . . . ."[36]  The Commission recognized in Order 670 that Congress did not expand the Commission's subject matter jurisdiction in EPAct 2005, and that if it intended to "it would have done so explicitly."[37]  Accordingly, the Commission confirmed that "this Final Rule does not, and is not intended to, expand the types of transactions subject to the Commission's jurisdiction under the NGA, NGPA, or FPA."[38]

While expressly withholding any new subject matter jurisdiction from the Commission, Congress at the same time specifically confirmed the CFTC's exclusive jurisdiction over trading in natural gas futures contracts:  "***Nothing in this section may be construed to limit or affect the exclusive jurisdiction of the [CFTC] under the [CEA]***."[39]  Thus, through EPAct 2005 Congress clarified that the Commission has ***no*** jurisdiction over ***any*** futures transactions and that its new powers in Section 4A of the NGA are limited to sanctioning manipulation of the ***physical*** natural gas markets.  In short, Congress issued a clear mandate

---

[35]     Order 670 at P 55.

[36]     15 U.S.C. § 717(b).

[37]     Order 670 at P 20.

[38]     *Id*. at PP 16, 22.

[39]     15 U.S.C. § 717t-2(c)(2) (emphasis added).

forbidding the Commission from intruding upon the CFTC's exclusive jurisdiction over futures transactions. The Commission seeks to undermine this congressional mandate by imposing sanctions for futures transactions that are subject to the CFTC's exclusive jurisdiction.

The Commission places great weight upon the second sentence of Section 2(a)(1)(A) of the CEA to argue that the CFTC's exclusive jurisdiction over futures transactions is not meant to preclude other federal agencies from exercising their jurisdictional responsibilities.[40] Contrary to the Commission's interpretation, however, the purpose of the "regulatory savings clause" in the second sentence of Section 2(a)(1)(A) "was to '*avoid unnecessary, overlapping and duplicative regulation*.'" *FTC v. Roberts*, 276 F.3d 583, 591 (D.C. Cir. 2001) (citing 120 Cong. Rec. H34,736 (Oct. 9, 1974)) (emphasis added). Indeed, the legislative history stresses "the exclusive jurisdiction of the Commodity Futures Trading Commission within its sphere of activity so that on a permanent basis *there would not be overlapping*." *SEC v. American Commodity Exchange, Inc.*, 546 F.2d 1361, 1368 (10th Cir. 1976) (emphasis added). Although an earlier version of the legislation would have allowed limited joint jurisdiction with other agencies, that language was rejected in the final legislation "in an attempt *to avoid unnecessary overlapping and duplicative regulation*.'" *Id.* (emphasis added.)

Therefore, contrary to the Commission's Final Jurisdictional Ruling, the savings clause in Section 2(a)(1)(A) enables agencies such as FERC to retain their jurisdiction *only* over "matters *beyond* the confines of 'accounts, agreements . . . , and transactions involving contracts

---

[40]     Show Cause Order at P 48 & n.73 (citing CEA, 7 U.S.C. § 2(a)(1)(A) (2000)). This second sentence reads: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws."

of sale of a commodity for future delivery.'" *FTC v. Roberts*, 276 F.3d at 591 (emphasis added) (citing *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 550 (7th Cir. 1989) ("*Chicago Mercantile*")). The Commission seeks to impose penalties for trades solely in "contracts of sale of a commodity for future delivery" on the NYMEX, that fall squarely within the CFTC's exclusive jurisdiction. Thus, the regulatory enforcement power the Commission seeks to assert is foreclosed by the CFTC's exclusive jurisdiction over commodity futures trading, and not covered by the savings clause.

> ### 2.   Congress has not implicitly delegated subject matter jurisdiction to the Commission to regulate NYMEX futures trades.

To support its inference that Congress implicitly delegated to FERC the power to regulate futures markets, the Commission leans heavily upon new Section 23 of the NGA, which granted it the authority to collect information to promote market price transparency, rather than Section 4A, which added the new market manipulation rule to the NGA. Thus, while conceding the CFTC's exclusive jurisdiction to regulate futures transactions, the Commission nevertheless implies that Section 23 creates a dual system that gives it the power to regulate futures transactions "[w]here the two regulatory regimes overlap . . . ."[41] The Commission's inference that Section 23 contains an implicit delegation of regulatory power over futures transactions fails for numerous reasons.

> #### (a)   FERC's claim that Section 23 implicitly delegates jurisdiction over futures transactions is a "poor fit" with the text of the statute and, therefore, unreasonable as a matter of law.

When the intent of Congress to withhold subject matter jurisdiction is clear — and the Commission acknowledges that futures transactions are within the CFTC's exclusive jurisdiction — there is no need to consider whether there has been an implicit delegation to the

---

[41]     *Id*. at P 48.

agency. *Brown v. Gardner*, 513 U.S. 115, 120 (1994) (when "the text and reasonable inferences from it give a clear answer against the government . . . that . . . is '*the end of the matter*'") (quoting *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 409 (1993)) (emphasis added). This is particularly true when, as here, the text of the statute that the agency relies upon is a "poor fit" with the agency's interpretation. *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401-02 (D.C. Cir. 2004) (rejecting FERC's attempt to regulate the composition of a public utility's board of directors through a broad reading of the word "practice" that was a "poor fit" with the FPA) ("*Cal ISO*").

The Commission claims Section 23(c) directed it to enter into an MOU with the CFTC "to establish, among other things, provisions ensuring that investigations pertaining to markets within the respective jurisdiction of each agency are properly coordinated . . . ."[42]  From this the Commission infers that it has overlapping jurisdiction with the CFTC, which the Commission believes gives it jurisdiction to regulate futures transactions that have some effect on physical natural gas markets.  But, Section 23 does not authorize the Commission to conduct "investigations," instruct the Commission to "coordinate" investigations with the CFTC, nor authorize the Commission to assess civil penalties under NGA Section 4A for manipulating futures markets.  In fact, it does not even apply to futures markets.

   **(i)  Section 23 expressly limits the Commission's information gathering to physical natural gas markets.**

Section 23 does not give the Commission the power to conduct investigations in natural gas futures markets.  Rather, it directs FERC "to facilitate price transparency in markets for the sale or transportation of *physical natural gas* in interstate commerce . . . ."[43]  To promote

---

[42]  *Id*. at P 48.

[43]  15 U.S.C. § 717t-2(a)(1) (emphasis added).

this price transparency function, the statute authorizes the Commission to adopt rules to provide for the timely dissemination of information about the availability and prices of natural gas sold at wholesale in interstate commerce, and to collect the information that it needs from any "market participant."[44]  The Commission has initiated the rulemaking that Congress authorized, in which it recognizes that the purpose of Section 23 is "to facilitate price transparency in *physical*, interstate gas markets . . . ."[45]  Consistent with the statutory directive, the Price Transparency NOPR proposes to exempt from price reporting all financially-settled transactions or physically-settled futures transactions that do not go to delivery *because futures markets are regulated by the CFTC*.[46]  Thus, the statutory basis the Commission points to for its investigation of Amaranth Advisors is entirely missing because Section 23 does not apply to futures transactions at all.

> (ii)    **Section 23 does not instruct FERC to enter into an MOU with the CFTC to coordinate "investigations" and, in fact, confirms the CFTC's exclusive jurisdiction over futures transactions.**

Section 23(c)(1) instructed FERC and the CFTC to enter into an MOU to "ensur[e] that information requests to markets *within the respective jurisdiction of each agency* are properly coordinated to minimize duplicative information requests . . . ," and to provide for "the treatment of proprietary trading information."[47]  This is a perfectly logical directive to these agencies to further administrative efficiency and avoid over-burdening market participants that

---

[44]    *Id*. at §§ 717t-2(a)(2)-(3).

[45]    Price Transparency NOPR at P 37 (emphasis added).  The Commission has yet to adopt a final rule to implement the price transparency goals of Section 23.

[46]    *Id*. at P 60 ("The Commission also does not propose that market participants report information regarding their financially-settled transactions nor regarding their physically-settled futures contracts that do not go to delivery.").

[47]    15 U.S.C. § 717t-2(c)(1) (emphasis added).

may transact in both physical and financial natural gas markets. Significantly, however, the specific direction to negotiate the MOU says not one word about investigations generally, nor does it authorize FERC to conduct any investigations in the futures markets. In short, Section 23(c)(1) provides no support for the Commission's claim to have jurisdiction over Amaranth Advisors' futures transactions.

Moreover, even if Section 23 could be read to authorize investigations into futures trading, it is simply not reasonable to interpret it as a delegation of any *regulatory* power to FERC. It is well-settled that the mere power to investigate under the NGA does not carry with it the power to regulate activities that otherwise fall outside of the Commission's subject matter jurisdiction. *FPC v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 505-06 (1949) (the provisions of the NGA authorizing the Commission to conduct investigations "do not even by implication suggest to us an extension of the regulatory provisions of the Act") ("*Panhandle*"). To the contrary, Section 23 explicitly *withholds* regulatory power from the Commission because, as noted above, immediately after instructing the two agencies to enter into the MOU, Section 23(c)(2) makes clear that "*[n]othing in this section may be construed to limit or affect the exclusive jurisdiction of the [CFTC] under the [CEA]*."[48]  Thus, the very statute the Commission points to as its source for the implied power to regulate trading in natural gas futures markets states that FERC has no such power. The Commission's interpretation to the contrary is, therefore, a "poor fit" with the text of the statute itself. *Cal ISO*, 372 F.3d at 401-02.

This "poor fit" is further underscored by the MOU, which also confirms that the CFTC's regulation of futures markets is supreme, and not shared with FERC as the Show Cause Order implies:

---

[48]      *Id*. at § 717t-2(c)(2).

> . . . the CFTC has ***exclusive jurisdiction*** with respect to accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery, ***including, but not limited to, natural gas,*** electricity, or any other energy product, ***traded or executed on or subject to the rules of a designated contract market,*** registered derivatives transaction execution facility, or any other board of trade, exchange, or market as described in section 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A).[49]

Accordingly, the MOU confers no jurisdiction on FERC, and does nothing more than provide for the sharing of information collected from market participants to avoid unnecessary duplication, as the statute directs.

### (iii) Section 23 makes clear that FERC's civil penalty authority applies only to price reporting violations involving contracts for the physical sale of natural gas to which the seller is a party.

Section 23 also does not confer any power on the Commission to assess civil penalties for manipulation in the futures markets. Instead, Section 23(e) confirms that the Commission's civil penalty authority for violations of the section applies to "any case in which the Commission finds that a ***seller that has entered into a contract for the transportation or sale of natural gas subject to the jurisdiction of the Commission*** has engaged in fraudulent market manipulation activities materially ***affecting the contract*** in violation of section 4A."[50]  Had Congress intended to give the Commission the authority to sanction futures trading that somehow "affects" wholesale natural gas markets, it would have been logical for it to do so expressly in this provision if, as the Commission argues, Section 23 contains a delegation of congressional power to investigate futures trading. That Congress did not do so — and instead specifically tied penalties to manipulations of physical natural gas contracts — contradicts the Commission's claim. Thus, to the extent the Commission believes it derives any regulatory

---

[49]    MOU at 2 (emphasis added).

[50]    15 U.S.C. § 717t-2(e)(2) (emphasis added).

powers from Section 23, subsection 23(e) makes clear that the penalties for the manipulations it finds are limited to "sellers" who have "entered into a contract for the transportation or sale of natural gas subject to the jurisdiction of the Commission" and who engage in improper activities "affecting the contract." Amaranth Advisors was not such a "seller."

> **(b)     There is no "gap" in the CFTC's exclusive jurisdiction over futures trading that FERC may seek to fill.**

As shown above, Congress has neither expressly, nor implicitly, delegated any regulatory power to FERC over natural gas futures transactions. Thus, the Commission simply presumes that it has the power to act because Congress has not said otherwise (although in fact Congress has withheld jurisdiction here because it has given jurisdiction exclusively to the CFTC. But, appellate courts have been consistent and clear in holding that the jurisdiction of federal agencies "may not be *presumed* based solely on the fact that there is not an express withholding of jurisdiction."[51] Moreover, "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron*[, *Mead*,] and quite likely the Constitution as well."[52] In the narrow circumstances when "Congress has expressly or impliedly left a gap for an agency to fill, there is a delegation of authority to the agency to give meaning to a specific provision of the statute by regulation . . . ."[53]

Here, there is no express or implied gap in regulation for the Commission to fill because the CFTC already exercises exclusive oversight of the area that this Commission now

---

[51]     *ExxonMobil*, 297 F.3d at 1088 (emphasis in original).

[52]     *Atlantic City*, 353 F.3d at 9 (quoting *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001)) (emphasis in original) (internal citation omitted) (citing *Chevron U.S.A., Inc. v. Natural Resource Defense Council*, 467 U.S. 837 (1984), and *United States v. Mead Corp.*, 533 U.S. 218 (2000)).

[53]     *Atlantic City*, 353 F.3d at 9.

presumes to regulate. When it enacted the CEA, Congress specifically directed that the CFTC

has "**exclusive** jurisdiction . . . with respect to accounts, agreements and transactions involving

contracts for the sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A) (emphasis

added); *see Chicago Mercantile,* 883 F.2d at 550 (dismissing the SEC's petition for review for

lack of jurisdiction because the CFTC had exclusive jurisdiction over futures contracts).

As shown above, one of the purpose of the CEA was to avoid duplicative, over-

lapping jurisdiction between Federal agencies. Congress's broad delegation of powers to the

CFTC — which necessarily precludes FERC from asserting any jurisdiction here — is made

explicit over and over again in the legislative history of the CEA.[54]

In providing the CFTC with exclusive jurisdiction, Congress charged a single

agency with responsibility for the buying and selling of all futures contracts: "(a) the

Commission's jurisdiction over futures contract markets or other exchanges is **exclusive** and

includes the regulation of commodity accounts, commodity trading agreements, and commodity

options; (b) the Commission's jurisdiction, where applicable, **supersedes State as well as**

**Federal agencies** . . . ." Sen. Rep. No. 93-1131, *reprinted in* 1974 U.S.C.C.A.N. 5848 (emphasis

added). Stated alternatively, "[u]nder the **exclusive** grant of jurisdiction to the [CFTC], the

authority in the Commodity Exchange Act . . . would **preempt the field insofar as futures**

**regulation is concerned**." H.R. Conf. Rep. No. 93-1383, *reprinted in* 1974 U.S.C.C.A.N. 5897

(emphasis added); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2002) ("[A]ll

of the categories delineated . . . describe business deals that involve the buying and selling of

---

[54]    *See* Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public
Policy,* 29 Vand. L. Rev. 1, 18 (1976) (describing legislative history of the Commodity Futures
Trading Act of 1974 ("CFTC Act"), which amended the CEA, and noting that "it is clear that the
conferees intended the CFTC to be the sole regulatory authority for the futures industry"). An
excerpt of this article discussing the legislative history of the CFTC Act is annexed hereto as
Attachment 6.

futures, which comports with Congress's goal of conferring the CFTC with sole regulatory authority over 'futures contracts, markets or other exchanges.'") (citation omitted).   As the Seventh Circuit noted, the goal of the CEA was to bring the futures markets "under a uniform set of regulations."   *American Agric. Movement, Inc. v. Chicago Bd. of Trade,* 977 F.2d 1147, 1155-57 (7th Cir. 1992).   As another court recently stated, even after the enactment of EPAct 2005, "the CEA is recognized as establishing a 'comprehensive system for regulating futures contracts and options.'"   *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194 (D. Colo. 2007) (citation omitted).   Thus, pursuant to the CEA, "the CFTC has exclusive jurisdiction over what are referred to as 'futures contracts.'"   *Id.* at 1195 (citing *CFTC v. Zelener*, 373 F. 3d 861, 865 (7th Cir. 2004)).

The absence of a gap in the CFTC's pervasive regulation of the futures markets is further confirmation that FERC's interpretation of its regulatory powers is a "poor fit" with the statute itself.   More fundamentally, the Commission's interpretation that it shares jurisdiction with the CFTC effectively reads the words "exclusive jurisdiction" out of CEA Section 2(a)(1)(A), which is contrary to basic rules of statutory construction that all words of a statute are to be given effect,[55] and repeals by implication are disfavored.[56]   This result is especially egregious when, as shown above, Congress expressly ***reaffirmed*** the CFTC's exclusive jurisdiction in the same statute the Commission claims gave it "overlapping" jurisdiction.

---

[55]   *E.g.*, *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect.").

[56]   *E.g.*, *Kaiser Steel v. Mullins*, 455 U.S. 72, 88 (1982) (the courts disfavor statutory interpretations that imply the repeal of other statutes because "the intention of the legislature to repeal must be clear and manifest") (quoting *TVA v. Hill*, 437 U.S. 153, 189 (1978)).

> **(c)** ***Court decisions permitting agencies to conduct separate investigations when their jurisdictions overlap are inapplicable here.***

The Show Cause Order also relies upon two decisions by United States District Courts to argue that it is not preempted by the CFTC because the jurisdiction of the two agencies "overlaps."[57]    Neither of those cases provides any support for the Commission's jurisdictional arguments.

In the first, *United States v. Reliant Energy Services, Inc.*,[58] the Government filed criminal charges claiming manipulation of electricity under Section 9(a)(2) of the CEA, among other things.    The facts showed that Reliant was a public utility participating in Commission-jurisdictional wholesale power markets.[59]    The Government claimed that Reliant manipulated the price of electricity (a commodity under the CEA) by withholding it from the spot market.    This case does not support the Commission's "regulatory overlap" theory because in *Reliant*, unlike here, Congress expressly made manipulation of electric ***commodity*** transactions a crime under Section 9(a)(2) of the CEA.[60]    Thus, the court found FERC's jurisdiction over the electric ***commodity*** is not exclusive, and nothing in the Federal Power Act evidenced a congressional intent to insulate a manipulative practice "that independently qualifies as a violation of a criminal statute."[61]

Unlike the situation in *Reliant*, the CFTC's jurisdiction over natural gas ***futures*** contracts ***is*** exclusive.    There is no independent grant of regulatory power to FERC over ***futures***

---

[57]    Show Cause Order at P 48 & n.74.

[58]    420 F. Supp. 2d 1043 (N.D. Cal. 2006).

[59]    *Id.* at 1046.

[60]    *Id.* at 1062.

[61]    *Id.* at 1064.

contracts. Thus, the Commission's reliance on *Reliant* for the proposition that it exercises dual jurisdiction with the CFTC is misplaced.

The Commission's reliance upon *SEC v. Hopper* fares no better.[62] In that case, the SEC brought a civil enforcement action claiming the defendants' round-trip trading scheme involving natural gas and electric commodities caused fraudulent financial representations within the meaning of Rule 10b-5.[63] One of the defendants argued that the SEC's complaint interfered with the CFTC's jurisdiction to regulate commodities, and FERC's jurisdiction over wholesale electric energy sales, because the complaint sought to prohibit round-trip trades.[64] The court said this argument simply misconstrued the SEC's claim, which was founded upon a misrepresentation of the company's financial condition to investors through its SEC filings.[65] Since the CFTC's jurisdiction over the electric commodity was not exclusive — unlike its jurisdiction over futures contracts, which is exclusive — the court had no difficulty finding that the SEC's action was not preempted.

Thus, unlike the Commission here, the SEC was able to show direct subject matter jurisdiction over the alleged violation (*i.e.*, manipulation of financial information required to be filed with that agency), and was not attempting to bring an enforcement action based on any transactions in futures contracts themselves. In contrast, the Commission has no subject matter jurisdiction here, where it has brought an enforcement action for natural gas futures trading that is within the CFTC's exclusive jurisdiction. Indeed, the Commission asserts that the "violations" are precisely Amaranth Advisors' NYMEX natural gas futures trades.

---

[62] 2006 U.S. Dist. LEXIS 17772, Fed. Sec. L. Rep. (CCH) ¶ 93,878 (S.D. Tex. 2006).

[63] *Id.* at *36.

[64] *Id.*

[65] *Id.*

**B.     The Commission Cannot Use the "In Connection With" Element of a Manipulation Claim to Bootstrap Subject Matter Jurisdiction When Congress Has Withheld From the Commission Any Responsibility for the Underlying Futures Transactions.**

As the foregoing demonstrates, Congress has not delegated any jurisdictional responsibility to the Commission for natural gas futures trades.  The Commission contends, however, that its statutory power under Section 4A of the NGA to pursue market manipulation covers futures trades that are completely separate from Commission jurisdictional natural gas markets because the statute's "in connection with" provision does not require that an "entity" must actually be "engaged in" or "a party to" a wholesale natural gas transaction.[66]   The Commission reasons that in the securities context the courts have upheld a generalized "in connection with" standard that does not require that "the connection be overwhelmingly direct."[67]  From this proposition, the Commission leaps to the assertion that as long as Amaranth Advisors' natural gas futures trades "affected" jurisdictional physical natural gas markets, those futures trades became jurisdictional as well.[68]   This analysis is flawed, as shown below.

**1.     The Commission's interpretation that the "in connection with" language of Section 4A establishes a jurisdictional "affects" test is an attempt to claim an open-ended grant of regulatory power that is inconsistent with the plain words of the statute, and which the courts have consistently rejected.**

It is a fundamental principle of statutory construction that the words are to be interpreted consistent with their natural and clear meaning given the context of the statute.  *SEC v. National Securities, Inc.*, 393 U.S. 453, 466 (1968); *see Panhandle*, 337 U.S. at 505 ("We now adhere to this natural and clear meaning of the words [in the NGA] and their obvious expression

---

[66]     Show Cause Order at P 110 & n.171.

[67]     *Id*. at PP 108-110.

[68]     *Id*. at P 110 & n.171.

of congressional intent."). Section 4A states that "[i]t shall be unlawful for any entity, directly or indirectly, to use or employ, *in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission*, any manipulative or deceptive device or contrivance . . . ."[69] This language closely tracks the ratemaking provision in Section 4, which provides that "[a]ll rates and charges made, demanded, or received by any natural-gas company for or *in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission* . . . shall be just and reasonable . . . ."[70] Section 4, like new Section 4A, does not specifically limit the just and reasonable condition to the rates charged by interstate pipelines for services that they are "engaged in," nor does it expressly state that the pipeline must actually be a "party to" the transaction, but that is the "natural and clear meaning" of the words in the statute.

The courts have held that the "in connection with" clause of Section 4 does not give FERC jurisdiction to regulate a non-jurisdictional activity or entity just because its actions arguably affected wholesale natural gas markets. For example, in *Conoco, Inc. v. FERC*, 90 F.3d 536, 552-53 (D.C. Cir. 1996) ("*Conoco*"), the D.C. Circuit rejected the Commission's attempt to interpret the words "in connection with" to give it ratemaking powers over the non-jurisdictional gathering service provided by a non-jurisdictional pipeline affiliate. In that case, an interstate natural gas pipeline company proposed to transfer its gathering facilities to an affiliate. The Commission found that upon completion of the transfer, those facilities would become completely exempt from its jurisdiction under Section 1(b) of the NGA, thereby depriving the Commission of the ratemaking authority that it exercised while the pipeline used the facilities as

---

[69]     15 U.S.C. § 717c-1 (emphasis added).

[70]     15 U.S.C. § 717c (emphasis added).

part and parcel of its interstate transportation service.  Nevertheless, the Commission believed

that it had jurisdiction because the gathering affiliate's activities could have affected

jurisdictional services.  The Commission, therefore, argued "that its jurisdiction over interstate

transportation obligate[d] it to ensure that there [was] no collusion between the interstate pipeline

and the gatherers to manipulate the interstate market . . . ."  90 F.3d at 549.  Thus, when the

pipeline proposed to terminate its gathering service agreements with its customers upon transfer

of the facilities, the Commission stepped in to claim that Section 7 of the NGA allowed it to

condition the service termination, and that the "in connection with" clause of Section 4

empowered it to set the rates, terms and conditions of default contracts that it proposed to require

the gathering affiliate to offer to the pipeline's former gathering customers.  *Id.*

      The D.C. Circuit rejected the Commission's contention that the "in connection

with" clause expanded the Commission's ratemaking jurisdiction to cover entities and facilities

that were otherwise exempt under the statute based on an affects test.  In a holding that is directly

applicable to the Commission's expansive reading of the "in connection with" language in the

Show Cause Order, the court ruled that:

> the statute forecloses what appears to be the principal justification offered
> by the Commission:  that the phrase 'in connection with' in § 4 permits it
> to regulate facilities that it has expressly found are not within its § 1(b)
> jurisdiction.   Where an activity or entity falls within NGA § 1(b)'s
> exemption for gathering, the provisions of NGA §§ 4, 5 and 7, *__including
> the 'in connection with' language of §§ 4 and 5, neither expand the
> Commission's jurisdiction nor override § 1(b)'s gathering exemption__*.

*Id.* at 552 (emphasis added).[71]   To underscore the point, the D.C. Circuit stated that "the

Commission cannot simply assert authority over the facilities and the affiliate by invoking other

sections of the Act."  *Id.* at 553.[72]

---

[71]      *See also Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1342 (D.C. Cir.
2004) (reversing and remanding FERC order using the "in connection with" language of § 4 of

The D.C. Circuit found the result in *Conoco* to be mandated by the United States Supreme Court's holding in *Panhandle*, a case in which the Commission similarly argued that it possessed implied powers both to investigate and to regulate the transfer of certain non-jurisdictional natural gas leases from one company to another because of the affect the transfer might have on the pipeline's ability to serve jurisdictional markets.   The Court found that, although the investigation was within the Commission's power, regulating the transfer of the non-jurisdictional natural gas properties was not.   In giving effect to the "natural and clear meaning" of the words in the NGA, the Court held that:

> sections 4, 5 and 7 do not concern the producing or gathering of natural gas; rather, they have reference to the interstate sale and transportation of gas and *are so limited by their express terms*.  Thus §§ 4(a), (b), (c), 5(a) and 7(c) speak of "transportation or sale of natural gas subject to the jurisdiction of the Commission" while § 7(a) and (b) refer respectively to "transportation facilities" and "facilities subject to the jurisdiction of the Commission."  Nothing in the sections indicates the power given to the Commission over natural-gas companies by § 1(b) could have been intended to swallow all the exceptions of the same section and thus extend the power of the Commission to the constitutional limit of congressional authority over commerce.  The *repetition of the words "subject to the jurisdiction"* makes clear to us the intent to keep the Commission's hands out of the excepted local matters.

337 U.S. at 508-09.  The Court was unmoved by the Commission's argument that the pipeline had included the natural gas leases as part of its reserves in applications for certificates of public convenience and necessity under Section 7 of the NGA, or its argument that these leases and the natural gas they contained were the "life blood" of the pipeline.  Accepting these arguments, the

---

the NGA to regulate gathering rates of a pipeline affiliate that did not directly participate in jurisdictional gas markets because the affiliate relationship was "utterly irrelevant to its ability to charge high rates" for non-jurisdictional service).

72    Amaranth Advisors are even further removed from the Commission's jurisdiction than the pipeline's gathering affiliate in *Conoco* because they have *no* affiliates that participate in Commission-jurisdictional natural gas markets.

Court held, "would be an assumption of powers specifically denied the Commission by the words of the Act . . . ." *Id*. at 509.

Here, as in *Panhandle* and *Conoco*, the context of Section 4A — which links the words "in connection with" to matters "subject to the jurisdiction of the Commission" in the same clause — together with the "natural and clear meaning" of those words imposes an express limitation on the Commission's authority that forecloses any jurisdictional claim based solely on the manner in which a non-jurisdictional activity effects wholesale natural gas markets.  FERC concedes as much in Order 670 when it acknowledges that, "[h]ad Congress intended to expand the Commission's jurisdiction . . . it would have done so explicitly."[73]  Conversely, nothing in Section 4A's jurisdictional clause indicates a congressional intent for the words "in connection with" to swallow the limitations on the Commission's regulatory powers by extending them to matters the Commission itself concedes to be beyond its jurisdiction.

The courts have recognized the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning."  *Environmental Defense v. Duke Energy Corp.*, 127 S. Ct. 1423, 1432 (2007) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 346 (1956) (stating that to the extent the Court's earlier decision "rested upon an original interpretation of similar statutory language it affords strong support for our interpretation of the Natural Gas Act.").  Although this presumption yields whenever the context indicates the words serve a different purpose, *Environmental Defense*, 127 S. Ct. at 1432, that is not the case here where Congress has given no indication that it intended to expand the Commission's subject matter jurisdiction.

---

[73]    Order No. 670 at P 20.

Given 80 years of experience under the NGA consistently limiting the scope of the Commission's jurisdiction to matters expressly delegated by Congress, it is simply inconceivable that Congress would have extended the Commission's jurisdiction to an entirely new subject matter (*i.e.*, futures markets) without so much as a word in EPAct 2005.[74] Moreover, since the courts have rejected an effects test basis for Commission jurisdiction under the NGA, and since "Congress is presumed to know how the courts have interpreted extant law when it enacts a new law,"[75] it is unreasonable to infer that Congress intended to incorporate an effects test into Section 4A without saying so explicitly. The Commission's attempt to graft a far-reaching effects test onto Section 4A through an expansive reading of the words "in connection with" in the Show Cause Order is a poor fit with the "natural and clear meaning" of these words as interpreted by the courts, and is contradicted by Congress's explicit reaffirmation of the CFTC's exclusive jurisdiction over futures trades in EPAct 2005.

2. **The courts have uniformly held that the "in connection with" language of Section 10(b) of the Securities Exchange Act does not allow an agency to bootstrap subject matter jurisdiction simply by claiming that an otherwise non-jurisdictional transaction or activity has some effect on matters within the agency's jurisdiction.**

Notwithstanding that Section 4A is in the NGA, the Commission implies that Section 10(b) of the Securities Exchange Act actually guides the jurisdictional analysis.[76] Congress, however, did not give the Commission any enforcement powers under Section 10(b), but merely pointed to it for certain definitions of the terms "manipulative or deceptive device or

---

[74]    As the Court stated in *Panhandle*: "We cannot attribute to Congress the intent to grant such far-reaching powers as implicit in the Act when that body has endeavored to be precise and explicit in defining the limits to the exercise of federal power." 337 U.S. at 514.

[75]    *Louisiana Public Service Commission v. FERC*, 482 F.3d 510, 519 n.***** (D.C. Cir. 2007) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)).

[76]    Show Cause Order at P 110.

contrivance."[77]  Further, precedent interpreting the SEC's jurisdiction under Section 10(b) has at best limited relevance to the scope of FERC's jurisdiction under NGA Section 4A because, as FERC itself has said:  "unlike the SEC, which has broad jurisdiction over securities transactions, our jurisdiction *is limited to certain wholesale transactions that remain within the ambit* of the NGA, NGPA, and FPA."[78]  Nevertheless, even assuming for the sake of argument that interpretations of the "in connection with" clause under Section 10(b) have some bearing on the Commission's jurisdiction under Section 4A of the NGA, those precedents also reject the effects test and, therefore, do not support the Commission's exercise of jurisdiction here.

As the Commission itself has recognized,[79] to be deemed "in connection with" a jurisdictional transaction, the alleged fraud must have "*coincided with the sales themselves*." *SEC v. Zandford*, 535 U.S 813, 820 (2002) (emphasis added).  Indeed, fraud that is merely incidental and unattached to any particular purchase or sale of securities would not satisfy the "in connection with" element.  *Id.* at 825.  Critically, the Supreme Court requires that securities transactions (*i.e.*, the SEC's "jurisdictional" turf) have been undertaken or induced as part and parcel *and in furtherance* of the fraudulent scheme.  *Id.* at 820 (emphasis added).  Specifically, in Section 10(b) manipulation cases, the alleged manipulators are always direct participants in the markets they were accused of manipulating.[80]  By contrast, Amaranth Advisors are not alleged to, and could not, engage in transactions in the physical wholesale natural gas market.

---

[77]    Order 670 at P 6 (noting that the anti-manipulation sections of EPAct 2005 "specifically dictate that the terms 'manipulative or deceptive device or contrivance' are to be used 'as those terms are used in section 10(b) of the Securities Exchange Act of 1934'").

[78]    *Id.* at P 22 (emphasis added).

[79]    *Id.*

[80]    *See, e.g., Wharf Holdings Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 597 (2001) (finding that the fraud coincided with a securities transaction where the defendant sold a security option while intending not to honor the option); *U.S. v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981) (the

Contrary to this precedent, the Commission claims in the Show Cause Order that the "in connection with" standard under Section 10(b) allows a plaintiff to sue even when it is not a purchaser or seller of securities.[81]  But, a number of cases specifically reject this argument, and none of the cases the Commission points to have adopted it.  For example, in *Ontario Public Service Employees v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), the U.S. Court of Appeals for the Second Circuit dismissed a complaint under Section 10(b) and SEC Rule 10b-5 because the plaintiffs, who were not purchasers or sellers of the alleged manipulator's stock, lacked standing to sue.  The court rejected the arguments that the anti-manipulation provisions of Section 10(b) cover purchases and sales of "any" securities and, much like the Commission's argument,[82] that the statute was intended to be construed "flexibly" to achieve this result.  *Id*. at 32.  Instead, the court held that the alleged misrepresentation by one company that merely "affected" the price of another company's securities was insufficient to give the plaintiffs standing to sue under Section 10(b) or Rule 10b-5.

Similarly, in *Rand v. Anaconda-Ericson, Inc.*, 794 F.2d 843 (2d Cir. 1986), the Second Circuit held that a false press release, which had a catastrophic effect on the price of a security, was not "in connection with" a jurisdictional transaction and, therefore, did not constitute securities fraud under Rule 10b-5.  *Id*. at 848; *see also Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 944 n.24 (2d Cir. 1984) (where a corporation misrepresented its

---

scheme engineered by the defendant to manipulate the market price of shares of a small electronics company involved an elaborate series of wash sales and matched orders of those shares); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007) ("Not all conduct that negatively affects a company's stock price is actionable as a federal securities fraud.  The scheme to defraud must coincide with the sale of securities.") (citation omitted).

[81]    Show Cause Order at P 110 & n.171.

[82]    *Id*. at P 110 n.172.

financial status to a commercial lender when it pledged the securities of a subsidiary as collateral for a loan, and the bank would not have otherwise made the loan, such "but for" causation was insufficient to confer jurisdiction on the SEC because the misrepresentations were "merely an incident in a transaction not otherwise involving the purchase or sale of securities").

None of the four cases the Commission points to support its theory that the "in connection with" clause establishes an effects test that can be met without a purchase or sale of securities.[83]  In , *SEC v. Zandford*, 535 U.S. 813 (2002), the Supreme Court explicitly required that the fraud must have "***coincided with the sales themselves.***"  *Id*. at 820 (emphasis added). The Commission does not identify any wholesale natural gas purchases or sales that "coincided" with the alleged manipulation of the futures market.  Indeed, the Commission does not identify ***any*** particular wholesale purchase or sale of natural gas, much less one that "coincided" with Amaranth Advisors' transactions in the futures markets.

In *United States v. O'Hagan*, 521 U.S. 642 (1997), the court said the "in connection with" standard is met when the defendant "uses the information ***to purchase or sell securities***" because the misappropriation theory "catches fraudulent means of capitalizing on such information ***through securities transactions***."  *Id*. at 656 (emphasis added).  This directly refutes the Commission's statement at footnote 171 of the Show Cause Order that "one can violate Rule 10b-5 . . . without being a purchaser or seller" while also being entirely consistent with *Zandford*'s coincident sale requirement.

The Commission's own description of *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), distinguishes that case as well because, as the Commission says, it was one "where [the]

---

[83]      *Id*. at P 110, nn.171 & 172.

company made misleading statements that *affected its own stock*."[84]   The scope of the "in connection with" standard never came up.

Finally, *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971), involved a private action seeking damages for a fraudulent scheme that deprived a company of the proceeds from the sale of its stock.  The scope of the "in connection with" element was not at issue.

Even if it were true, as the Commission claims, that the *Zandford* coincident sale requirement can be met absent an actual purchase or sale of securities, the CEA's exclusivity clause would foreclose such an indirect effects test here where the Commission concedes its jurisdiction is much more limited than that of the SEC.  In a case that is closely analogous to the facts alleged in the Show Cause Order, the United States Court of Appeals for the Seventh Circuit squarely rejected the SEC's attempt to bootstrap jurisdiction over stock index futures contracts, called index participation agreements or "IPs" (over which it otherwise has no jurisdiction), based on the perceived impact that those futures contracts had on stock prices (over which it does have jurisdiction).  *Chicago Mercantile Exch. v. SEC,* 883 F.3d 537 (7th Cir. 1989).  Emphasizing that the CEA's exclusivity clause created a "zero-sum game," the court analyzed whether IPs are more akin to stock or futures contracts because, if they were futures contracts, then "*the CFTC's jurisdiction is exclusive*." *Id.* at 545-47 (emphasis added).  The court ultimately concluded that IPs are futures contracts over which the CFTC has exclusive jurisdiction, which therefore meant that the SEC had no jurisdiction.  *Id.*; *see Chicago Board of Trade v. SEC,* 677 F.2d 1137 (7th Cir. 1982), *vacated as moot on other grounds,* 459 U.S. 1026 (1982) (concluding that although Government National Mortgage Association mortgage-backed-

---

[84]     *Id.* at P 110 n.171 (emphasis added).

pass-through certificates ("GNMAs") are *both securities and futures*, the CFTC had exclusive authority to regulate GNMAs and the SEC had no authority to regulate such instruments).

In sum, extensive precedent interpreting Section 10(b) of the Securities Exchange Act, and SEC Rule 10b-5, consistently rejects the Commission's determination that the "in connection with" clause can be satisfied through an indirect effects test, and that liability can be established absent an actual purchase or sale of wholesale natural gas. These precedents conclusively show that the Commission lacks jurisdiction to bring an enforcement action against Amaranth Advisors for futures transactions conducted solely on CFTC-regulated markets that were not coincident with a FERC-jurisdictional transaction.

>    **3.    Numerous cases reject FERC's attempts to expand its subject matter jurisdiction by indirectly regulating matters that Congress has not authorized it to regulate directly.**

Courts have consistently rebuffed the Commission's efforts to bootstrap jurisdiction over subject matter that Congress has withheld from it by claiming that those matters somehow affect the Commission's statutory authority. The Commission plainly exceeds its statutory powers when it attempts to regulate an entity that Congress has exempted, or a subject matter that Congress has delegated to another agency.[85]

For example, in *Altamont*, the California Public Utilities Commission ("CPUC"), Pacific Gas Transmission Company ("PGT"), a natural gas pipeline developer, and PGT's parent

---

[85] *E.g., Transmission Agency of Northern California v. FERC*, 2007 U.S. App. LEXIS 17303, *25 (D.C. Cir. 2007) (vacating and remanding FERC order purporting to impose a refund obligation on a non-jurisdictional entity that participated in Commission-jurisdictional markets); *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) (vacating and remanding the Commission's attempt to order a public utility subject to its jurisdiction to replace its board of directors when the composition of the board was a matter of state corporate law); *Conoco,* 90 F.3d at 552 (rejecting the Commission's claim that the "in connection with" clause of NGA Section 4 gave it subject matter jurisdiction to regulate state-jurisdictional gathering service); *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1247 (D.C. 1995) ("*Altamont*") (rejecting the Commission's attempt to use its conditioning powers under Section 7 of the NGA indirectly to claim subject matter jurisdiction to regulate state jurisdictional services).

company, Pacific Gas and Electric Company ("PG&E") asked the court to conclude the FERC

had exceeded its jurisdictional authority by conditioning its order permitting PGT to expand its

natural gas pipeline on PG&E's acceptance of a rate of return adjustment.  *Id.* at 1242-43.

Specifically, the petitioners asserted that the FERC used its jurisdictional authority to approve

pipeline expansions to infringe upon the CPUC's exclusive authority to set PG&E's intrastate

rates.  *Id.* at 1246-48.  The FERC admitted that it could not lawfully regulate PG&E's intrastate

rates, but argued that it nevertheless could move indirectly to "induc[e] a change to a policy

beyond [its] jurisdictional purview by attaching a rate-of-return condition to PGT's certificate."

The court rejected FERC's attempt to expand its jurisdiction.

　　　　The D.C. Circuit stated that the main question was whether the FERC could

"exercise its power over an interstate pipeline in a manner intended to influence a state agency's

regulation of" intrastate rates.  *Id.* at 1247.  The court concluded that FERC could not abuse its

jurisdictional right to approve pipeline expansions to encroach upon the CPUC's exclusive

authority to set intrastate rates:

> The Commission lowered PGT's return on equity specifically and only
> 'to induce a change to a policy beyond [its] jurisdictional purview,' *i.e.* to
> pressure the CPUC to regulate PG&E as the Commission desired but
> could not itself require.  Under the circumstances, ***the Commission was
> indeed attempting to do indirectly what it could not do directly, that is,
> intercede in a matter that the Congress reserved to the State***.

*Id.* at 1248 (emphasis added).  Ultimately, the D.C. Circuit held that the "the Commission did

indeed overstep its jurisdictional bounds, interfering in an area that the Congress has expressly

reserved to the states."  *Id.* at 1242; *see also Bonneville Power Admin. v. FERC*, 422 F.3d 908,

926 (9th Cir. 2005) (concluding that the FERC had acted beyond its statutory authority when it

ordered non-public utility sellers to issue refunds because Congress specifically limited its

jurisdiction to public utilities and rejecting this as an impermissible effort to "restructure the

scope of FERC's statutory authority"); *Northern States Power Co. v. FERC,* 176 F.3d 1090, 1096 (8th Cir. 1999) (concluding that the FERC "transgressed its Congressional authority" by using its jurisdiction to regulate the wholesale electricity market to regulate indirectly the retail market which Congress expressly delegated to the states).

The D.C. Circuit Court of Appeals similarly rejected the Commission's over-reaching in *Cal ISO*, vacating and remanding a Commission order purporting to regulate the composition of a public utility's board of directors based on the claim that the board structure was a "practice . . . affecting a rate" within the meaning of Section 206 of the FPA. Finding the implications of the Commission's power grab to be "staggering," the court said it was "not biting" because the Commission's interpretation would impermissibly "give it the authority to regulate anything done by or connected with a regulated utility . . . ." *Id.* at 401, 403. So too here, the implications of FERC regulating futures transactions whenever the Commission believes it can trace some "generalized"[86] effect on wholesale natural gas markets would be no less staggering than the situation in *Cal ISO* because it would overturn Congress's well-settled regulatory plan conferring exclusive regulatory authority over futures markets on the CFTC, and conceivably could expand the Commission's jurisdiction to reach a variety of matters within the otherwise exclusive jurisdiction of the states.

In all of these cases, courts have rejected the Commission's attempts to use its authority to regulate wholesale natural gas and electric markets as a springboard to regulate matters that Congress has assigned to another agency. Thus, like the Commission's attempt to use its authority over pipeline expansions to encroach on the CPUC's exclusive authority to set intrastate natural gas rates in *Altamont*, its attempt to use the "in connection with" language of

---

[86]    Show Cause Order at P 110.

the NGA to justify regulation of non-jurisdictional activity in *Conoco*, and its argument that the word "practice" in the FPA allowed it to regulate corporate governance in the *Cal ISO* case, here, the Commission is also overreaching with its overly-broad reading of the words "in connection with" in NGA Section 4A to regulate subject matter that Congress has expressly placed within the CFTC's exclusive jurisdiction.

C.   **FERC's Assertion of Jurisdiction in the Show Cause Order is Arbitrary, Capricious, an Abuse of Discretion, Not the Product of Reasoned Decision-Making and Otherwise Unlawful Because It Departs Without Explanation From the Finding in Order 670 that "Fraud and Manipulation in a Non-Jurisdictional Transaction . . . Is Not Subject to the New Regulations."**

It is elemental that the Commission is obligated to follow its precedents. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983); *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1341 (D.C. Cir. 2004). Within the limits of established law the Commission may change its policies, but must provide a reasoned explanation for doing so. *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981); *Idaho Power Co. v. FERC*, 312 F.3d 454 (D.C. Cir. 2002); *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 815-16 (D.C. Cir. 1998). Thus, when it departs from precedent, the Commission must provide "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *see also ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901-04 (D.C. Cir. 1995) (reversing FERC order that departed from the requirements established in a rulemaking without a reasoned explanation).

In addition to the flaws shown above, the Show Cause Order offers no reasoned explanation for its departure from the Commission's determination in Order 670 that "fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is not subject to the

new regulations."[87]   In Order 670, the Commission found that EPAct 2005 expands its NGA personal jurisdiction to cover "entities" in addition to "natural gas companies" (*i.e.*, interstate natural gas pipelines), but conceded that its subject matter jurisdiction remains "limited to certain wholesale transactions that remain within the ambit of the NGA, NGPA, and FPA."   Order 670 at P 22.   Thus, Order 670 makes clear that "this Final Rule does not, and is not intended to, expand the types of transactions subject to the Commission's jurisdiction."   *Id.* at P 16.   In fact, the sole example the Commission provided in Order 670 to illustrate how the new rule would apply involved a non-jurisdictional "entity" that participates in and manipulates a wholesale power market that is within the Commission's subject matter jurisdiction.[88]

Here, however, the Commission departs from the clear findings in Order 670 that the new rule did not expand the Commission's subject matter jurisdiction.   Rather than acknowledge a shift in its legal analysis and explain the change if it can, the Commission claims that its exercise of jurisdiction is consistent with Order 670 because it interpreted the phrase "any entity" broadly.   The Commission, however, fails to explain how expanding jurisdiction over non-jurisdictional "***entities***" translates into subject matter jurisdiction over otherwise non-jurisdictional futures ***transactions***.[89]   The Commission's contention is irreconcilable with its recognition in Order 670 that Congress did not expand its subject matter jurisdiction and that "fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is not

---

[87]     Order 670 at P 16.

[88]     *Id*. at P 22.

[89]     Show Cause Order at P 49.

subject to the new regulations."[90]  Thus, the Commission's Show Cause Order is an unexplained and unreasonable departure from Order 670.

**D.     The Commission Should Quickly Terminate This Show Cause Proceeding to Avoid Pursuing a Matter that is Clearly Beyond Its Jurisdiction.**

The Commission should quickly terminate this proceeding because it plainly lacks any jurisdiction to regulate Amaranth Advisors' transactions conducted solely on futures markets that are subject to the CFTC's exclusive jurisdiction.

The Commission's Final Jurisdictional Ruling is a final agency determination that it has jurisdiction to pursue this case — a purely legal issue of statutory construction that is not dependent upon any further factual record.  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967); *State of California ex rel. Water Resources Control Bd. v. FERC*, 966 F.2d 1541, 1562 (9th Cir. 1992) ("It is difficult to postulate an issue more proper for judicial review than that of the statutory authority of an administrative agency."); *see also Pepsico, Inc. v. FTC*, 472 F.2d 179, 187 (2d Cir. 1972) (an agency's refusal to dismiss a proceeding that is plainly beyond its jurisdiction constitutes a final order that is reviewable in court), *cert. denied*, 414 U.S. 876 (1973).  Given the narrow jurisdictional question presented here, which is entirely dispositive of this case, Amaranth Advisors respectfully request expeditious Commission action on their request for rehearing on or before September 27, 2007, the day before their answer to the Show Cause Order is due.

---

[90]     Order 670 at P 16.  Indeed, the Commission makes no attempt to explain how it can claim jurisdiction over futures transactions under Section 4A when it has no jurisdiction over certain physical sales of natural gas.

## V.    CONCLUSION

For the foregoing reasons, the Commission should expeditiously rule on this request for rehearing and promptly terminate this proceeding that rests entirely upon Amaranth Advisors' futures transactions which the Commission concedes lie within the exclusive jurisdiction of the CFTC.

Respectfully submitted,

Of Counsel:

Stephen Senderowitz
David E. Mollón

Donald N. Dankner
Raymond B. Wuslich
Charles B. Klein
Margaret H. Claybour
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006-3817
phone:  (202) 282-5000
fax:     (202) 282-5100
e-mail:  ddankner@winston.com
         rwuslich@winston.com
         cklein@winston.com
         mclaybour@winston.com

ATTORNEYS FOR AMARANTH ADVISORS

Dated:  August 27, 2007