P. Todd Mullins
Leslie B. Bellas
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC  20426
(202) 502-8594

Attorneys for the Federal Energy Regulatory Commission

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

|  |  |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **07 Civ. 6682 (DC)** |
| | : |
| **AMARANTH ADVISORS L.L.C.,** | : **ECF Case** |
| **AMARANTH ADVISORS (CALGARY) ULC,** | : |
| **and BRIAN HUNTER,** | : |
| | : |
| **Defendants.** | : |
| | : |

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

**THE FEDERAL ENERGY REGULATORY COMMISSION'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ........................................................................1

II.  BACKGROUND ........................................................................................4

    A.   Parties Relevant to This Action ...........................................................4

        1.   The Federal Energy Regulatory Commission ...................................4

        2.   Commodity Futures Trading Commission ........................................5

        3.   Defendants .................................................................................5

    B.   The Relevant Markets .........................................................................5

        1.   The Financial Markets ..................................................................6

        2.   The Physical Markets ...................................................................7

    C.   Recent Legislative and Regulatory Developments ...................................9

        1.   Energy Policy Act of 2005 ...........................................................9

        2.   FERC's Anti-Manipulation Rule ..................................................10

    D.   Agency Investigations .......................................................................11

        1.   FERC's Administrative Investigation and the OSC's Preliminary
            Findings ...................................................................................11

        2.   CFTC's Investigation and Litigation .............................................15

    E.   Related Litigation and Agency Action ..................................................17

        1.   Related Litigation Against Amaranth ..............................................17

        2.   Litigation Related to FERC's Order to Show Cause: *Hunter v. FERC* ........17

III. ARGUMENT ..........................................................................................18

    A.   Jurisdiction to Review FERC's Order Lies Exclusively With the Court of
        Appeals ...........................................................................................19

    B.   FERC's Enforcement Action Will Not Irreparably Harm Amaranth,
        but a Stay Will Harm FERC and the Public Interest ..............................23

        1.   Litigation Costs From Dual Actions are Not Irreparable Harm ...........24

**Page**

2.      Claim or Issue Preclusion is Not Harmful ...........................................25

3.      FERC and the Public Will be Harmed by a Stay ...............................28

C.   Amaranth is Unlikely to Prevail on the Merits .........................................29

1.      FERC Has Statutory Authority to Prohibit Market Manipulation
        that Affects Its Jurisdictional Energy Markets .................................29

2.      Manipulation of Natural Gas Markets Is Not Within the CFTC's
        "Exclusive" Jurisdiction .................................................................34

3.      The CEA Preserves FERC's Authority ..............................................36

4.      The Doctrine of Primary Jurisdiction Does Not Apply .....................37

IV.   CONCLUSION ...................................................................................38

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1980). ..................................................................................... 10, 31

*Altamont Gas Transmission Co v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996). ........................... 30

*Am. Elec. Power,* 103 F.E.R.C. ¶ 61,089 (2003). ................................................................ 27

*Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13 (2d Cir. 1987) .................................... 23

*Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005). ....................................... 30

*Borey v. National Union Fire Ins. Co.*, 934 F.2d 30 (2d Cir. 1991). ..................................... 23

*Bristol-Meyers Co. v. FTC*, 738 F.2d 554 (2d Cir. 1984). ..................................................... 27

*Burrows v. U.S.*, No. 93-1795, 1993 US. Dist. LEXIS 8229 (S.D.N.Y. June 16, 1993). ..................... 22

*CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) .................................................. 34

*CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006). ........................................................ 35

*CFTC v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1485 (10th Cir. 1983) .................... 28

*CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Colo. 2007). ......................................................... 35

*Cherokee Nation of Oklahoma v. U.S.*, 124 F.3d 1413 (Fed. Cir. 1997) ............................... 29

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) .................................... 36, 37

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958). ............................................ 19

*Conoco, Inc. v. FERC*, 90 F.3d 536 (D.C Cir. 1996), cert. denied, 519 U.S. 1142 (1997) .................. 30

*Consolidated Natural Gas Corp. v. FERC*, 611 F.2d 951 (4th Cir. 1979) .............................. 20

*Ellis v. Tribune Television Co.*, 443 F.3d 71 (2d Cir. 2006). ................................................. 38

*Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93 (2d Cir. 1986). ........................... 24

*Energy Dev. Corp. v. St. Martin*, No. 98-3395, 2005 U.S. Dist. LEXIS 994

   (E.D. La. Jan. 24, 2005) ................................................................................................... 25

*FTC v. Cement Inst.*, 333 U.S. 683 (1948) ........................................................................... 27

*FTC v. Roberts*, 276 F.3d 583 (D.D.C. 2001). ........................................................... 34, 35, 36

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) .................................................................... 24

*FTC v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977) (en banc). .............................................. 3

*Fulton Cogeneration Ass'n. v. Niagara Mohawk Power Corp.*, 84 F.3d 91 (2d Cir. 1996). ................ 38

**Page**

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) ...................................................... 23, 29

*Haustechnik v. U.S.*, 34 Fed. Cl. 740 (1996). ..................................................................................... 38

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005) .......................... 26

*Hydrocarbon Trading and Transp. Co. v. Exxon Corp.*, 89 F.R.D. 650 (S.D.N.Y. 1981) .................... 38

*In re Coral Energy Res., L.P.*, 110 F.E.R.C. ¶ 61,205 (2005) ................................................................ 27

*In re Coral Energy Res., L.P.*, Comm. Fut. L. Rep. (CCH) ¶ 29,815 (CFTC July 28, 2004) .............. 27

*In re FCC*, 217 F.3d 125 (2d Cir. 2000). ............................................................................................ 20

*Landis v. North Am. Co.*, 299 U.S. 248 (1936)............................................................................. 21, 23

*Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir. 1983)............................................................ 23

*M.G. Davis & Co. v. Cohen*, 369 F.2d 360, 363 (2d Cir. 1966) ........................................................ 21

*Myers v. Bethlehem Corp.*, 303 U.S. 41 (1938) ................................................................................ 21

*New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346 (3d Cir. 1964) ....... 26

*Northern States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir. 1999) ................................................ 30

*Northrop Corp. v. U.S.*, 27 Fed. Cl. 795 (1993) .............................................................................. 38

*Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322 (1979)............................................................... 25

*Peck v. U.S.*, 522 F. Supp. 245 (S.D.N.Y. 1981) ............................................................................ 26

*Perkins v. Endicott Johnson Corp.*, 128 F.2d 208, 213 (2d Cir. 1942) ............................................. 21

*Pub. Util. Comm'n of Ohio  v. United Fuel Gas Co.*, 317 U.S. 456 (1943). ........................................ 22

*Renegotiation Bd. v. Bannercraft Co.*, 415 U.S. 1 (1973) ................................................................ 24

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975). .................................................................. 23

*Southern Natural Gas Co. v. FERC*, 877 F.2d 1066 (D.C. Cir. 1989). ............................................. 21

*SEC v. Hopper*, No. 04-1054, 2006 U.S. Dist LEXIS 17772 (S.D. Tex. Mar. 24, 2006) ................... 35

*SEC v. Zandford*, 535 U.S. 813 (2002) ............................................................................................ 31

*Shepard Indus., Inc. v. 135 E. 57th St., L.L.C.*, No. 97-8447, 1999 U.S. Dist. LEXIS 14431

   (S.D.N.Y. Sept. 17, 1999)................................................................................................................ 23

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971) ................................................ 31

*Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, (D.C. Cir.1984). ....................................... 20

*The Times Mirror Co. v. FTC*, No.78-3422, 1979 U.S. Dist. LEXIS 11738

   (C.D. Cal. June 13, 1979) ................................................................................................... 20, 23, 33

**Page**

*Touche, Ross & Co. v. SEC*, 76 Civ. 4489, 1978 U.S. Dist. LEXIS 17974
(S.D.N.Y. May 3, 1978)............................................................................................ 33

*U.S. Commodity Futures Trading Comm'n v. Am. Elec. Power Co., Inc.*,
No. C2-03-891 (Sept. 30, 2003)................................................................................ 27

*U.S. v. RCA*, 358 U.S. 334 (1959)............................................................................ 26, 28

*U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043 (N.D. Cal. 2006) ........................... 27, 35

*U.S. v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429 (7th Cir. 1991)......................... 25

*U.S. v. Valencia*, No. 03-204, 2003 U.S. Dist. LEXIS 15264 (S.D. Tex. Aug. 25, 2003) ................... 35

*U.S. v. Western Pac. R.R.*, 352 U.S. 59 (1956) ...................................................... 37

*Warner-Lambert Co. v. FTC*, 361 F. Supp. 948 (D.D.C. 1973). ....................................... 27

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d 1996)................................... 23

*Williams Natural Gas Co. v. The City of Oklahoma*, 890 F.2d 255 (10th Cir. 1989) ................... 19, 20

*Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330 (D.C. Cir. 2006) ................... 19, 21

*Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981) ................................................ 22


**Statutes**

Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2000)............................................ *passim*

Energy Policy Act of 2005, P.L. No. 109-58, 119 Stat. 594 (2005)................................... *passim*

Federal Power Act, 16 U.S.C. § 824 *et seq.* (2000), as amended by
Energy Policy Act of 2005, P.L. No. 109-58, 119 Stat. 594, § 1283 (2005)............................ 30, 35

Natural Gas Act, 15 U.S.C. § 717 (2000). ......................................................... *passim*

Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 (2000)............................................ 4, 10

Securities Exchange Act, 15 U.S.C. 78j(b) (2000), ................................................. 10, 31

Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989) .......................... 4

**Page**

**Regulations**

17 C.F.R. § 240.10b-5 (2005). ........................................................................ 10, 30, 31, 35

18 C.F.R. § 1b.19 (2007) ................................................................................................. 13

18 C.F.R. § 1c.1 (2007)......................................................................................... 10, 13, 32


**Other Authorities**

A. Horwich, *Warnings to the Unwary: Multi-Jurisdictional Federal Enforcement*

    *of Manipulation and Deception in the Energy Markets After the Energy Policy Act of 2005*,

    27 ENERGY LAW J. No.2, 363, 364 (2006) ..................................................................... 32

Black's Law Dictionary (7th Ed. 1999)............................................................................ 35

C. Wright & A. Miller, Federal Practice and Procedure § 2948, (1973). .............................. 23

Natural Gas Futures Contract, NYMEX EXCHANGE RULEBOOK,

    http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007). ..................... 6

*Policy Statement on Enforcement*, 113 FERC ¶ 61,068 (2005)............................................ 14

*Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003),

    clarification granted, 105 FERC ¶ 61,282 (2003) ............................................................ 7

*Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006)........................ *passim*

STAFF REPORT OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, COMM.ON

    HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, 110th Cong., *Excessive Speculation in the*

    *Natural Gas Market* (2007). ....................................................................................... 6

U.S. GOV'T ACCOUNTING OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN

    OVERSEEING PRICES  (2006)....................................................................................... 9, 32

## I.    PRELIMINARY STATEMENT

The thrust of Amaranth's Motion for Preliminary Injunction is the assertion that the Federal Energy Regulatory Commission ("FERC") is exceeding its jurisdiction and, therefore, FERC should be enjoined from proceeding with its enforcement action.  However, judicial review of a FERC order such as the Order to Show Cause ("OSC") at issue here is committed, by statute, to the exclusive jurisdiction of the Courts of Appeals.  On that basis alone the Motion can, and must, be denied.  Notably, that very jurisdictional question is already pending and ripe for decision before the United States District Court for the District of Columbia (Leon, J.) in a related effort by Defendant Hunter to stop the OSC.  This Court ought in comity to defer its ruling to that court and *both* courts must recognize that this issue cannot be adjudicated in the district courts.

Amaranth also cannot demonstrate it will suffer irreparable harm or that it is likely to succeed on the merits.  Amaranth's claim of harm amounts to legal fees, which alone are not cognizable as "irreparable harm."  Moreover, from a practical standpoint, there is no judicial or administrative economy to be gained by staying FERC's administrative action pending the litigation of the Commodity Futures Trading Commission's ("CFTC") claims here.  Actually, staying FERC's OSC presents the prospect of greater expenditure of party, agency and judicial resources.  Moreover, FERC's action will not "interfere" with this Court's adjudication of the claims by the CFTC.  The staying of a federal agency's important enforcement proceeding by a federal court, merely because of the presence of related claims and parties before the court, would be an extraordinary act.  And it would be unprecedented, for Amaranth has cited not a *single case* where a federal court has done so.

During the court conference on August 16, 2007, the Court asked why two government agencies are pursuing enforcement action against some of the same parties for related conduct for seemingly similar relief.  FERC responds in detail below to this question and summarizes that response here.

1

First, this case does not involve the same parties, the same legal standards, or the same remedies that are at issue in FERC's OSC.  This action concerns only three parties, whereas FERC's OSC concerns those three parties as well as six other entities relevant to the allegedly manipulative conduct.  This action concerns only an allegation of *attempted* manipulation under the Commodity Exchange Act ("CEA"), whereas the OSC concerns an allegation of *actual* manipulation under the Natural Gas Act ("NGA").  This action charges alleged misrepresentations to the New York Mercantile Exchange ("NYMEX") as a violation, whereas the OSC contains no such allegation.  This action seeks primarily injunctive relief, whereas the OSC seeks primarily monetary relief.  This action does not seek the disgorgement of profits, whereas the OSC seeks disgorgement of $59 million in unjust profits to be disbursed to market participants who were harmed.

Second, the two cases concern impacts on two different markets.  This action concerns financial markets regulated by the CFTC.  FERC's OSC concerns the manipulation of financial markets only to the extent that such action directly harmed FERC-jurisdictional physical markets.  As Amaranth itself conceded, the "public relies on the [NYMEX] settlement price" as a "key price benchmark for physical . . . contracts involving natural gas."[1]  Amaranth's alleged manipulation of financial markets skewed the price of FERC-jurisdictional transactions, affecting millions of consumers across the United States.  That is why trade organizations representing millions of natural gas and electric consumers filed briefs *amicus curiae* in this action.  FERC has the expertise and jurisdictional mandate to protect these consumers.  Amaranth's claim, if accepted, would remove that protection.

Third, Amaranth complains that the CFTC and FERC investigated the same conduct, but there is nothing surprising nor unlawful in two federal agencies pursuing enforcement actions under

---

[1] Letter from Michael Carrieri, Compliance Director of Amaranth, to Anthony Densieski, Senior Director, Market Surveillance, NYMEX (Aug. 30, 2006) (attached as Exhibit 1).

two different statutory schemes where the same underlying conduct violates both statutes. *See* discussion *infra* fns 64-67.[2]  In these cases, the courts routinely held such actions permissible because a defendant that violated two statutory schemes cannot reasonably argue that violating one insulates it from liability for violating the other.  If the law were otherwise, it would reward unlawful behavior, rather than discouraging it, and encourage contests between federal agencies to file their actions first, rather than encouraging agency cooperation.

Fourth, in addition to the fact that overlapping enforcement actions are commonplace, they were specifically contemplated by Congress when it enacted the Energy Policy Act of 2005 ("EPAct 2005").  EPAct 2005 granted FERC broad new authority to police market manipulation and impose civil penalties for the manipulation of natural gas and electric markets.  This new authority was granted in the wake of the scandals involving Enron and the crisis that engulfed western energy markets in 2000-2001.  Relevant here, EPAct 2005 did not limit FERC's jurisdiction to manipulation by entities traditionally regulated by FERC, nor did it limit FERC's jurisdiction to manipulative conduct solely concerning physical markets.  Rather, Congress granted FERC broad authority to police market manipulation by "any entity" who engages in conduct that is in "in connection with" any jurisdictional transaction.  This grant of authority was modeled on similar authority given to the SEC, which authority has been interpreted very broadly.  Finally, if this were not enough, Congress recognized that this new grant of authority would require extensive cooperation between the CFTC and FERC, precisely because of the close interplay between financial and physical markets for natural gas and electricity.  Congress therefore mandated that the two agencies enter into a Memorandum of Understanding ("MOU") to facilitate coordination of their enforcement actions.

---

[2] *See FTC v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C. Cir. 1977) (en banc) (noting "an era of overlapping agency jurisdiction under different statutory mandates.")  For example, the FDA and the FTC simultaneously pursue cases for wrongful medical product claims.  The SEC and the FCC simultaneously pursue cases of improper conduct by communications companies. *See* discussion *infra* at pp. 26-28.

The CFTC and FERC did so promptly.  The fruits of that cooperation are evident in the enforcement actions that give rise to both this action and the OSC.  Those actions were closely coordinated for more than one year and announced the same week, with both agencies supporting each other's actions in public statements accompanying the announcements.

Far from a case of an agency veering off its congressionally-mandated course, which Amaranth would casually invite the Court to stay, the Amaranth OSC is the first time that FERC is implementing an important regulatory program that should go forward.  For all these reasons, as well as those discussed *infra*, the motion is without merit and should be denied.

## II.     BACKGROUND

### A.     Parties Relevant to This Action

#### 1.     The Federal Energy Regulatory Commission

FERC is an independent agency that regulates the rates, terms, and conditions of interstate transmission of natural gas, oil, and electricity by certain entities.  In 1938, Congress recognized that regulation of the transportation and sale of natural gas in interstate commerce is necessary in the public interest.[3]  Section 1(b) of the NGA grants FERC jurisdiction over "the sale of natural gas for re-sale" to ensure that rates and charges pertaining to the transportation or sale of natural gas subject to the jurisdiction of the Commission shall be "just and reasonable."[4]  The Commission was given broad power "to prescribe, issue, make, amend, and rescind such orders, rules, and regulations" as

---

[3] 15 U.S.C. § 717 (2000).

[4] 15 U.S.C. §§ 717(b) and 717c(a) (2000).  The Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301(21)(A) (2000), and the Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989), exclude from FERC's jurisdiction all "first sales," which are sales from the producer to the consumer, unless the gas is purchased by an interstate or intrastate pipeline, or local distribution company, or an affiliate thereof.

necessary to carry out its statutory obligations.[5]  Prior to 2005, however, FERC's reach was limited to actual sellers of natural gas and conduct that formed a part of the actual sales transaction.

In 2005, Congress expanded FERC's jurisdiction to reach *any* entity that, directly or indirectly, engages in manipulative practices *in connection with* those natural gas transportations and sales that have been historically within FERC's jurisdiction.  *See* discussion *infra* at pp 30-34.

### 2.    The Commodity Futures Trading Commission

Plaintiff CFTC is an independent federal regulatory agency that is responsible for administering and enforcing the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, and implementing regulations.  The CEA provides that the CFTC has exclusive jurisdiction to regulate accounts, agreements, and transactions involving futures contracts traded on designated contract markets and other registered entities.  *See* discussion *infra* at 35-37.

### 3.    Defendants

Defendant Amaranth Advisors L.L.C., and its subsidiary Amaranth Advisors ("Calgary") ULC, are investment advisors in what is commonly referred to as a "hedge fund" (known in the market as "Amaranth").  Prior to its cessation of trading in September 2006, Amaranth traded significantly in energy products.  Defendant Brian Hunter was a natural gas trader and portfolio manager at Amaranth from June 2004 until Amaranth's collapse in September 2006.

### B.    The Relevant Markets

Natural gas is among the most important energy sources in the United States.  It is used to heat homes, generate electricity, and power manufacturing operations.  As a recent Congressional report observed, "[n]atural gas prices are determined through the interaction of the two major types of markets for natural gas:  the cash, or physical, market, which involves the purchase and sale of physical quantities of natural gas; and the financial markets, which involve the purchase and sale of

---

[5] 15 U.S.C. § 717o.

financial instruments whose prices are linked to the price of natural gas in the physical market."[6]

The OSC alleges that Amaranth and others gamed the financial natural gas markets that directly set

prices in physical markets to the detriment of all market participants.

### 1.    The Financial Markets

Natural gas financial markets focus on the purchase and sale of financial instruments whose

price is linked to the price of natural gas on the physical market.  There are several financial markets

for energy commodities including "futures exchanges" (or a commodity exchange) such as the

NYMEX.

Amaranth traded in Natural Gas Futures Contracts ("NG Futures Contracts") on the

NYMEX.  NG Futures Contracts are standardized contracts that specify the terms under which a

buyer will accept and a seller will deliver a specified quantity of natural gas at a specified place and

over a specified month up to seventy-two months into the future.[7]  "Speculators" buy and sell NG

Futures Contracts to profit from the change in price over time, while "hedgers" use the futures

market to lock in the price of a future purchase or sale.  All participants look to the futures market

for information about trends in supply, demand, and price of natural gas.  The NG Futures Contract

is not purely a financial instrument, however.  Some futures contract traders take their contracts "to

delivery," meaning they hold the contracts into the contract month during which the contract

becomes a contract for actual delivery and purchase of 10,000 MMbtus of natural gas over the

contract month at the Henry Hub delivery point in Erath, Louisiana.  The price of that *physical* gas

---

[6] STAFF REPORT OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, COMM. ON HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, 110TH CONG., EXCESSIVE SPECULATION IN THE NATURAL GAS MARKET at 23 (2007) (attached as Exhibit 2).

[7] Specifically, a NG Futures Contract is a contract for the future delivery of 10,000 MMBtus of natural gas over the course of the contract month to the buyer's interconnection on the Henry Hub in Louisiana.  *See* Natural Gas Futures Contract, NYMEX EXCHANGE RULEBOOK §§ 220.05, 220.10-12, http://www.nymex.com/rule_main.aspx?pg=33#220.05 (last visited Sept. 14, 2007).

transaction is the "settlement price" of the NG Futures Contract.[8]  There are also a variety of "derivative" financial products, most of which are termed "swaps," that derive their value based on the settlement price of the NG Futures Contract for a given month.  In addition, the NG Futures Contract settlement price determines, in whole or in part, the price of a substantial volume of additional physical natural gas sales.

> 2.     **The Physical Markets**

The wholesale physical natural gas markets include a variety of types of contracts and selling arrangements.  One major monthly sales tool is a product called a "physical basis" contract. Physical basis contracts use the NG Futures Contract settlement price for a given month as the base price, plus or minus a fixed amount representing the expected price differential for delivery at the delivery location versus the Henry Hub in Louisiana (where the NYMEX NG Futures Contract calls for delivery).  Particularly in the Northeast, Midwest and Gulf of Mexico producing regions, trillions of cubic feet of natural gas were priced during 2006 using this method, which is mathematically tied to the NG Futures Contract settlement price.[9]

To determine the prevailing price for natural gas at a given location, physical buyers and sellers often look to benchmarks, such as a published price "index" at a similar location, or a specified differential to a published price index in the event the gas is to be delivered at a different location.[10]  To compile monthly "indices" at various physical natural gas trading locations,

---

[8] The "settlement price" is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the next calendar month contract.

[9] Order to Show Cause, 120 FERC ¶ 61,085 at ¶ 25 (July 26, 2007) (citing data available from the IntercontinentalExchange ("ICE")) (attached as Exhibit 3).

[10] *See generally Policy Statement on Natural Gas and Electric Price Indices*, 104 FERC ¶ 61,121 (2003), *clarification granted*, 105 FERC ¶ 61,282 (2003) (attached as Exhibit 4 and Exhibit 4a).

publishers of natural gas industry newsletters (*e.g.,* Platts or NGI) conduct price surveys of market participants. Those surveys capture a significant amount of the physical basis transactions. Figure 1 shows the high percentages of physical basis transactions that make up index prices.

**Figure 1: Use of Physical Basis Contracts in Natural Gas Price Indices at Major Trading Points, 2006**[11]



Consequently, if the NG Futures Contract settlement price is affected due to manipulation, this effect will be directly and substantially transmitted into index prices. In turn, this index pricing "dominates the market for long- and mid-term supply agreements" by such purchasers as Local Distribution Companies who sell natural gas to consumers to heat homes and fuel kitchens or electric utility companies who use natural gas to generate electricity for the Nation's grid.[12]

In sum, manipulation of the NG Futures Contract settlement price has a direct and substantial effect on the prices used for huge quantities of physical natural gas – the type of "connection with"

---

[11] FERC, 2006 STATE OF THE MARKETS REPORT 50 (2007), http://www.ferc.gov/market-oversight/st-mkt-ovr/st-mkt-ovr.asp (last visited Sept. 14, 2007).

[12] OSC at ¶ 23 (Exhibit 3) (citing FERC *State of the Market Report* and survey prepared by American Gas Association).

the physical natural gas markets that the new anti-manipulation provisions from EPAct 2005 were designed to redress.

### C.    Recent Legislative and Regulatory Developments

#### 1.    Energy Policy Act of 2005

EPAct 2005 empowered FERC to prohibit manipulation, not only by direct participants in the physical natural gas (or wholesale electric) markets, but also where, as here, "any entity" commits manipulation directly *or indirectly*, in *connection with* jurisdictional transactions.[13] Congress expanded FERC's authority under the NGA over natural gas markets to "police natural gas markets, punish manipulation, and impose greater penalties for other types of violations."[14] Congress also substantially increased through EPAct 2005 the remedies available to FERC to punish and deter such violations, including increased civil penalties of up to $1,000,000 per violation, per day.[15] This is the highest available penalty amount in the federal government and many times larger than penalties that can be sought by the CFTC.

As a consequence of expanding FERC's authority over energy markets, Congress recognized FERC would need to work with the CFTC because of areas of mutual jurisdictional interest. Thus, EPAct 2005 required FERC and the CFTC to enter into a MOU[16] because "the CFTC and the FERC

---

[13] Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 549 § 315 (2005) (codified at 15 U.S.C. 717c-1). Thus, the conduct need not be "in" a jurisdictional transaction. Rather, transactions in financial markets that intentionally or recklessly affect Commission-jurisdictional markets are within FERC's mandate under EPAct 2005. *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006).

[14] U.S. GOV'T ACCOUNTING OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES 2 (2006) (citing EPAct 2005) (attached as Exhibit 5).

[15] EPAct 2005 § 314(b) (codified at 15 U.S.C. § 717t-1).

[16] *Id.* § 316(c)(1).

may from time to time engage in oversight or investigations of activity affecting both CFTC-jurisdictional and FERC jurisdictional markets."[17]

## 2. FERC's Anti-Manipulation Rule

FERC adopted Rule 1c.1, "The Anti-Manipulation Rule," to implement its anti-manipulation authority.[18] This new rule was adopted through "Order No. 670." *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4,244 (Jan. 26, 2006) (herein "Order No. 670"). The Anti-Manipulation Rule is based largely on the Securities and Exchange Commission's 10b-5 regulation and prohibits all kinds of deception, manipulation, deceit, and fraud.[19] Tracking the breadth of EPAct 2005, the reach of Order No. 670 and Rule 1c.1 are likewise broad because they prohibit *any* entity from engaging in manipulation that is "in connection with" a jurisdictional transaction.[20]

---

[17] MOU at 2-3 (attached as Exhibit 6). The MOU notes that FERC has exclusive jurisdiction over the transportation and certain sales in interstate commerce of natural gas, while the CFTC has exclusive jurisdiction over the accounts, agreements, and transactions involving contracts for sale of a commodity for future delivery. *Id.* at 2. Yet, the MOU acknowledges that the oversight and investigations of these two Commissions may affect both CFTC-jurisdictional and FERC-jurisdictional markets.

[18] 18 C.F.R. § 1c.1 (2007).

[19] Order No. 670, 71 Fed. Reg. 4,244, 4,249 at ¶¶ 25 (quoting *Aaron v. SEC*, 446 U.S. 680, 690 (1980)), 49-50 (Jan. 26, 2006). *See also* 18 C.F.R. § 1c.1. Consistent with the mandate that certain aspects of the FERC's new authority be exercised in a manner consistent with section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and consistent with Congress' modeling of EPAct 2005 section 315 (new NGA section 4A) and 1283 (new FPA section 222) on section 10(b) of the Securities Exchange Act, FERC modeled the Anti-Manipulation Rule on SEC Rule 10b-5. Order No. 670, 71 Fed. Reg. 4,244, 4,246 at ¶ 7; *see also Exchange Act*, 15 U.S.C. § 78j(b) (2000); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2005).

[20] Order No. 670, 71 Fed. Reg. 4,244, 4246-9 at ¶¶ 2, 16, 18, 22. Commission-jurisdictional sales are wholesale natural gas sales in interstate commerce that are not sales from the producer to the consumer, unless and until gas is purchased by an interstate or intrastate pipeline, or local distribution company within the meaning of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3431(a)(1)(A) (2000).

**D.     Agency Investigations**

   **1.     FERC's Administrative Investigation and the OSC's Preliminary Findings**

   In April 2006, FERC's market oversight staff observed, in real-time, anomalies in the price on the NYMEX of NG Futures Contracts for May 2006 Delivery during the 30 minute settlement period for that contract.[21]  After review of comparative data on prior settlements, the matter was referred to FERC investigators.[22]  On May 2, 2006, FERC informed the CFTC of FERC's observations and requested and received trade data from the NYMEX pursuant to the MOU.[23]  In June 2006, FERC instituted a non-public investigation of Amaranth, subsequently working throughout in close cooperation with the CFTC.[24]  Following a year-long investigation, FERC staff concluded there was a substantial basis to believe that Amaranth and others manipulated the NYMEX NG Futures Contract price on February 24, March 29, and April 26, 2006 that had corresponding direct and substantial effects on the physical markets.[25]

   In the meantime, Congress followed up its enactment of EPAct 2005 with related oversight. For example, while FERC's non-public investigation of the Amaranth entities proceeded, Senator Jeff Bingaman, Chairman of the Senate Committee on Energy and Natural Resources, sent FERC Chairman Kelliher a letter: (a) noting "the evolution of complex and inter-related markets for financial and physical energy commodities has elevated the importance of the Federal Energy Regulatory Commission's . . . role," (b) inquiring about FERC's efforts "to police the [natural gas]

---

[21] OSC (Exhibit 3) at ¶¶ 55, 61.

[22] *Id*. at ¶ 53.

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶ 57.

market," in particular "efforts [by FERC] to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading" and, (c) querying how FERC was working with the CFTC.[26]  FERC's February 21, 2007 response explained that where matters relate to both futures markets and interstate natural gas transportation and certain sales, both the CFTC and FERC have jurisdiction.[27]  FERC described its routine monitoring of NG Futures Contract trading, but, because FERC's investigations are non-public, FERC could not disclose at that time the Amaranth investigation or other investigations.[28]  Senator Bingaman likewise sent a letter to the CFTC asking the same sorts of questions to which the CFTC replied in part, that indeed in recent years NG futures Contract "settlement prices have taken on a new role, as other entities independently have determined to rely on these prices to price various cash market transactions . . ."[29]  The CFTC also noted that the MOU was facilitating regular contacts between the enforcement staffs of the CFTC and FERC on "matters of mutual interest."[30]

---

[26] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Joseph Kelliher, Chairman, FERC (Feb. 6, 2007) (attached as Exhibit 7).

[27] Letter from Joseph Kelliher, Chairman, FERC, to Senator Bingaman, Chairman, Committee on Energy and Natural Resources (Feb. 21, 2007) (attached as Exhibit 8).

[28] *Id.* at 11-12.

[29] *See* Letter from Senator Bingaman, Chairman, Committee on Energy and Natural Resources, to Reuben Jeffrey III, Chairman, CFTC at 1-2 (Feb. 6, 2007) (attached as Exhibit 9).  In response, the CFTC explained that the MOU between the CFTC and the FERC is "a formal agreement by the [CFTC] and FERC to coordinate, on a regular basis, with respect to activities of mutual interest."  *See* Letter from Reuben Jeffrey III, Chairman, CFTC to Senator Bingaman, Chairman, Committee on Energy and Natural Resources at 5 (Feb. 22, 2007) (attached as Exhibit 10).  Thus, FERC and CFTC staff remain in regular contact to share information on oversight and ongoing investigations of mutual interest.  MOU (Exhibit 6) at 9.

[30] Letter of Jeffrey to Senator Bingaman at 7 (Feb. 22, 2007) (Exhibit 10).

Following its year-long investigation, and after providing Amaranth an opportunity to explain why an enforcement proceeding should not commence,[31] on July 19, 2007, FERC Commissioners voted unanimously to issue the OSC.  In coordination with the CFTC, and to maximize the efficacy of both enforcement efforts, FERC issued to Amaranth the OSC on July 26, 2007, one day following the CFTC's complaint in this action.  The OSC preliminarily concluded that the Amaranth Entities and former Amaranth employees Brian Hunter and Matthew Donahoe violated FERC's Anti-Manipulation Rule 1c.1 by *manipulating the price of Commission jurisdictional transactions* on three specific dates by trading on February 24, March 29 and April 26, 2006.  By selling an extraordinary amount of NG Futures Contracts during the last 30 minutes of trading before the contracts expired, the Amaranth traders appear to have manipulated (in this case driving down) the settlement price of NG Futures Contracts.  As Amaranth had taken positions several times larger in various financial "swaps" and other derivatives whose value increased as a direct result of the decrease in the settlement price of the NG Futures Contracts, Amaranth would have gained on its financial positions.

If Amaranth's conduct drove down the NG Futures settlement price, it had a significant impact on physical markets given the role of the NG Futures settlement price in physical market price formation and affected a substantial volume of FERC jurisdictional natural gas transactions.  As Amaranth itself stated to the NYMEX, the "public relies on the settlement price" as a "key price benchmark for physical and financial contracts involving natural gas."[32]  The CEO of the NYMEX,

---

[31] Pursuant to 18 C.F.R. § 1b.19, staff informed Amaranth that a recommendation may be made about whether to commence an enforcement action and invited Amaranth to submit a statement explaining Amaranth's position regarding FERC's investigation and basis for bringing an enforcement action.  In response, Amaranth and others filed with staff lengthy submissions to the Commission arguing issues of fact, law, and policy.

[32] Letter from Carrieri to Densieski (Exhibit 1) at 1.  For example, during the three months of interest in FERC's action, blanket certificate holders who sell natural gas subject to FERC's jurisdiction, such as BP, Louis Dreyfus, UBS, Merrill Lynch, and ConocoPhillips sold natural gas by

himself a former CFTC Commissioner, Dr. James Newsome, also observed that the NG Futures settlement price is "widely used as a national benchmark price."[33] As a result, producers and other natural gas market participants may have been paid an artificially lower price for their natural gas.[34] In addition, the pecuniary interests of state and federal governments may have been harmed when natural gas from public lands was sold for royalties that are also tied to the NYMEX settlement price.

The OSC does not, as Amaranth contends, seek "damages" or injunctive relief. Instead, FERC seeks more than $200 million in civil penalties to redress harm to the *physical* gas markets, not the NG Futures market. Thus, the civil penalties will punish the Amaranth Entities and the traders for the impact of their manipulative conduct on Commission-jurisdictional transactions and for preventing sellers from obtaining a price for their product that is fair and based on a well-functioning market. In addition, FERC proposed recovery, through disgorgement, at least $59 million in unjust profits and, to the extent possible, will distribute those disgorged funds to those who were harmed as a result of Amaranth's conduct.[35]

---

taking 2,000 NG Futures Contracts through expiration in one or more of the months for approximately 20 billion cubic feet ("Bcf") of physical gas that went to delivery. OSC (Exhibit 3) at ¶ 26. These are the prices Amaranth is accused of manipulating. *Id.* It is therefore somewhat puzzling that, citing the entire OSC, Amaranth claims no physical transactions were "mentioned by FERC." Memorandum of Law in Support of the Motion of Amaranth for Preliminary Injunction (hereinafter "Amaranth Memo.") (Docket Entry #5) at 5.

[33] Dr. James Newsome, "Testimony before the Senate Committee on Homeland Security and Governmental Affairs, Permanent Subcommittee on Investigations, Excessive Gas Speculation on Natural Gas Market" (July 9, 2007) (attached as Exhibit 11).

[34] OSC (Exhibit 3) at ¶¶ 20-27, 108-110.

[35] *Policy Statement on Enforcement,* 113 FERC ¶ 61,068, at ¶¶ 19, 23, 25 (2005) (attached as Exhibit 12) ("[A]t a minimum a company involved in wrongdoing must disgorge any unjust profits resulting from the wrongdoing.")

Amaranth has been granted nearly three months to respond to the OSC.[36]  After any such response, FERC may request further briefing, set issues for a trial-type proceeding, with full discovery before an administrative law judge ("ALJ"), request a recommendation or report from an ALJ, issue an order on the merits, or provide any other process that would justly and efficiently resolve the matter.[37]  Only at the culmination of such processes will FERC issue a final order that is appealable directly to the Court of Appeals.

### 2. CFTC's Investigation and Litigation

As discussed above, FERC contacted the CFTC on May 2, 2006, requesting trade data for the May NG Futures Contract.  The CFTC opened its investigation after being notified by FERC of the anomaly in the May settlement period and after FERC's investigation began.  Subsequently, pursuant to the MOU, FERC and the CFTC coordinated their investigations of Amaranth's conduct.

On July 25, 2007, the CFTC filed the instant action alleging that Amaranth and others attempted to manipulate NG Futures Contracts settlement prices on two specific dates (as opposed to three dates alleged in the OSC) in violation of the Commodity Exchange Act.[38]  In announcing their respective enforcement actions, the Chairmen of the two agencies praised each agency's cooperative investigative efforts.[39]  Unlike FERC's OSC, which made a preliminary finding of *actual* manipulation that impacted the natural gas markets, the CFTC complaint is narrower, in that it alleges only that Amaranth *attempted* to manipulate the price of NG Futures Contracts (Count 1).

---

[36] Amaranth sought, and was granted, extensions of time to respond to the OSC.  As of this writing, responses are due to be filed on October 19, 2007.

[37] OSC (Exhibit 3) at ¶ 2-3 n.7.

[38] *CFTC v. Amaranth Advisors, LLC*, No. 07 Civ. 6682, at 16-17 (S.D.N.Y. July 25, 2007) (Docket Entry No. 1).

[39] *See* http://www.cftc.gov/newsroom/enforcementpressreleases/2007/pr5359-07.html (CFTC statement), and http://www.ferc.gov/news/statements-speeches/kelliher/2007/07-26-07-kelliher.asp (Statement by FERC Chairman Kelliher).

The CFTC makes a claim for making misrepresentations to the NYMEX (Count 2), whereas FERC does not allege such a violation.  The CFTC did not sue all parties against whom the OSC issued. And, unlike the FERC OSC, which does not seek to bar the defendants from futures trading, the majority of relief sought by the CFTC is injunctive in nature.  The CFTC also seeks civil penalties, but in an amount not to exceed $130,000 or triple the monetary gain for each violation of the CEA.[40] Table 1 summarizes the differences between these two enforcement actions.

### Table 1:  Comparison of FERC OSC and CFTC Complaint

| ELEMENT OF THE ACTION | FERC OSC | CFTC COMPLAINT |
|---|---|---|
| **Plaintiffs:** | None | CFTC |
| **Defendants/Respondents:** | Amaranth Advisors L.L.C. Amaranth LLC Amaranth Management Limited Partnership Amaranth International Limited Amaranth Partners LLC Amaranth Capital Partners LLC Amaranth Group Inc. Amaranth Advisors (Calgary) ULC Brian Hunter Matthew Donohoe | Amaranth Advisors L.L.C. Amaranth Advisors (Calgary) ULC Brian Hunter |
| **Basis for Jurisdiction:** | NGA (as amended by EPAct) Section 4A, 15 U.S.C. § 717c-1 | Sections 6c and 9(a) of the CEA |
| **Claims Alleged:** | Manipulation of Commission-jurisdictional transactions by trading in the NG Futures Contracts on three days.  OSC at ¶ 5. | Count I:  *attempted* manipulation of the price of NG Futures on two days in violation of Section 6c, 6d, and 9(a)(2) of the CEA; Count II:  misrepresentations to the NYMEX in violation of Section 9(a)(4) of the CEA. |

---

[40] *Id.* at 20.

| Relief Sought: | **Disgorgement** of at least $59 Million in unjust profits<br><br>**Civil penalties** of over $230 million | **Injunctive relief** enjoining defendants from, inter alia:  violating the CEA, . . . trading on any registered entity or trading for any commodity interest account; or engaging in business activities related to commodity interest trading.<br><br>**Civil Penalties**  of up to $130,000 per violation<br><br>**Costs and fees** |
|---|---|---|

Given these differences, FERC will need to proceed administratively irrespective of the outcome of the CFTC case (*see* further discussion at pp. 29-30).

### E.       Related Litigation and Agency Action

#### 1.       Related Litigation Against Amaranth

Within the last several months, the Amaranth entities were named as defendants in three separate lawsuits filed by an Amaranth investor and putative class members representing market participants claiming investor fraud and market manipulation.[41]  In addition, the United States Securities and Exchange Commission, as well as other agencies, also opened inquiries into Amaranth's activities.[42]

#### 2.       Litigation Related to FERC's Order to Show Cause: *Hunter v. FERC*

On July 23, 2007, Brian Hunter, who is also a defendant in this action, filed in the United States District Court for the District of Columbia an *ex parte* application for a temporary restraining order ("TRO") and preliminary injunction to prohibit FERC from initiating the OSC action against

---

[41] *See San Diego County Employees Ret. Ass'n. v. Maounis et al.*, No. 07 Civ. 2618 (S.D.N.Y. Mar. 29, 2007) (attached as Exhibit 13); *Gracey v. Amaranth Advisors, LLC*, No. 07 Civ. 6377 (S.D.N.Y. July 12, 2007) (attached as Exhibit 14); *Special v. Amaranth Advisors, L.L.C.*, No. 07 Civ. 7181 (S.D.N.Y. Aug. 10, 2007) (attached as Exhibit 15).

[42] *See, e.g.,* OSC (Exhibit 3) at ¶ 55.

Hunter.[43]  The bases for Hunter's motion are virtually identical to the arguments raised in

Amaranth's *ex parte* motion here, namely that the CFTC, not FERC, has exclusive jurisdiction

because Amaranth traded only in the NYMEX futures market, and that FERC's enforcement action

would irreparably harm Hunter.  Hunter's motion for a TRO was immediately denied, but the parties

await the court's ruling on Hunter's motion for a preliminary injunction.[44]

## III.    ARGUMENT

As Hunter argued in *Hunter v. FERC*, Amaranth argues here that the CFTC has exclusive

jurisdiction over anything relating to futures markets and, therefore, FERC lacks jurisdiction to

pursue its enforcement action.  Like Hunter, Amaranth also asks this Court to: (1) review FERC's

Order to Show Cause, (2) determine that FERC's preliminary findings pertain exclusively to NG

Futures Contracts traded exclusively on the NYMEX; (3) ignore express statutory authority and

conclude that the CFTC is the *only* agency authorized to prevent and punish manipulation of natural

gas markets; and (4) prevent FERC from carrying out its express statutory mandate to protect energy

markets.

To resolve the motion, this Court must review FERC's OSC.  Thus, like Hunter, Amaranth is

trying an end-run around the statutory requirement that judicial review of a FERC order be had *only*

in the Court of Appeals and only upon final agency action.  As did Hunter, Amaranth raises its

unfounded legal argument at the wrong time and in the wrong court.

---

[43] A copy of Hunter's Motion and Memorandum in Support is attached as Exhibit 16.

[44] Judge Leon heard oral argument on Hunter's Motion on August 7, 2007.  *See Hunter v. FERC*, No. 1:07 Civ. 01307 (D.C. Cir. 2007), Excerpts of Transcript of Preliminary Injunction Hearing Before Judge Richard J. Leon, August 7, 2007 at 43:25-44:3 (attached as Exhibit 18).  On September 7, 2007, as here, the parties jointly sought, and were granted, a temporary cessation of the proceedings in *Hunter v. FERC*.  However, during a September 24, 2007 status conference, the parties requested that Judge Leon proceed with his ruling and Judge Leon advised the parties he expects to rule in October 2007.

### A.      Jurisdiction to Review FERC's Order Lies Exclusively With the Court of Appeals

Amaranth's motion must fail because this Court lacks jurisdiction to review FERC's OSC. 15 U.S.C. § 717r(b) (2005); *Williams Natural Gas Co. v. The City of Oklahoma*, 890 F.2d 255, 262-63, and 262 n. 8 (10th Cir. 1989) (under 19(b) of the NGA, judicial review of a FERC order is exclusive within the court of appeals and a collateral trial court challenge to a FERC order could not be entertained); *see also Williston Basin Interstate Pipeline Co. v. FERC,* 475 F.3d 330, 334 (D.C. Cir. 2006) (Section 19(b) of the NGA provides that a party aggrieved by a FERC order and seeking review must first apply for a rehearing of a FERC order, then upon application of rehearing, must file for any review in the appropriate court of appeals).  While Amaranth styles its motion as a motion for preliminary injunction that seeks merely to "stay" FERC's enforcement action, to grant Amaranth's Motion, this Court must find that Amaranth is irreparably harmed by FERC's OSC and ensuing administrative action *and* that there is a substantial likelihood that Amaranth will prevail in its claim that FERC's OSC and administrative action exceed FERC's jurisdiction.  Resolution of these arguments self-evidently requires review of FERC's Order.[45]  But, that review is committed exclusively to the Court of Appeals.

"It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the court in which, judicial review of administrative orders may be had."[46]  In Section 19(b) of the NGA, Congress provides that the

---

[45] Amaranth's claim that it "is not asking the court to determine whether FERC has jurisdiction to proceed with its enforcement action" (Amaranth's Memo. at 4 n. 6) is, to say the least, confusing given its prayer (on the same page of the brief) that the court "stay FERC's proceeding . . . [because] the FERC is acting beyond the scope of its statutory authority" and the seventeen out of thirty pages of Amaranth's Memo. which argue against FERC's jurisdiction.  *Id.*

[46] *City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 336 (1958).

exclusive avenue for judicial review of FERC orders (which the OSC unquestionably is) is in the

Court of Appeals.  The statute provides in pertinent part:

> Any party to a proceeding under this Act [15 USCS §§ 717 et seq.]
> aggrieved by an order issued by the Commission in such proceeding may
> obtain a review of such order in the [circuit] court of appeals of the United
> States for any circuit wherein the natural-gas company to which the order
> relates is located or has its principal place of business, or in the United
> States Court of Appeals for the District of Columbia, by filing in such court,
> within sixty days after the order of the Commission upon the application for
> rehearing, a written petition praying that the order of the Commission be
> modified or set aside in whole or in part.[47]

While the request before this Court involves a FERC order initiating an administrative

proceeding rather than concluding one after consideration of rehearing petitions, it nevertheless

involves review of a FERC order that in turn can be had only in a court of appeals.  "Where statute

commits review of agency action to the Court of Appeals, any suit seeking relief that might affect

the Circuit Court's *future* jurisdiction is subject to the exclusive review of the Court of Appeals."

(emphasis added).[48]  Importantly, in *Williams*, the Court observed that the prohibited collateral

attack, as here, "ultimately challenges FERC's determination of its own jurisdiction" but those

arguments must be raised on appeal from the FERC order.   890 F.2d at 269.  A very similar case

was presented in *Consolidated Natural Gas Corp. v. FERC*, 611 F.2d 951 (4th Cir. 1979).  In

*Consolidated*, the natural gas company filed a district court action seeking to restrain a FERC Order

to Show Cause proceeding.  In vacating the district court judge's grant of the injunction, the Court of

---

[47] 15 U.S.C. § 717r(b) (2005).

[48] *In re FCC*, 217 F.3d 125, 141 n. 10 (2d Cir. 2000) (quoting *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 78-9 (D.C. Cir.1984)).  *See also The Times Mirror Co. v. FTC,* No.78-3422, 1979 U.S. Dist. LEXIS 11738 (C.D. Cal. June 13, 1979) (attached as Exhibit 17) (court denied The Times Mirror's motion for preliminary injunction to enjoin the FTC's administrative action on the ground that the FTC lacked subject matter jurisdiction because the FTC administrative proceedings should be exhausted, The Times Mirror would have ample opportunity to present its position to the agency, and any final decision by the FTC would be subject to review by the Court of Appeals).

Appeals held that Section 19(b) of the Natural Gas Act "vests *exclusive* jurisdiction to review all decisions of the Commission in the circuit court of appeals." *Id.* at 957 (emphasis added) (citations omitted). Thus, the "district court was without jurisdiction to interfere with the Commission's proceedings through the issuance of an injunction." *Id.* at 958. Moreover, the court noted that *even the Court of Appeals* could not ordinarily review procedural or preliminary FERC Orders before administrative remedies had been exhausted and "even more so the district court may not review such orders." *Id.* at 957.[49]

Importantly, the above-referenced NGA provision also makes clear, and the cases state, that as a prerequisite to Court of Appeals review, an aggrieved party should first seek a rehearing by the Commission.[50]  Notwithstanding its attempt to stay the FERC proceeding through an order in this Court, Amaranth recently requested rehearing at the Commission of the OSC.[51]  Clearly, Defendants know that the appropriate course is to seek review of FERC's Order in the Court of Appeals and they are laying the groundwork at FERC to pursue that course. Defendants should not be permitted to shop in this forum for the relief they seek – and can only seek -- elsewhere.[52]

---

[49] *See also Perkins v. Endicott Johnson Corp.*, 128 F.2d 208, 213 (2d Cir. 1942) ("federal courts will not entertain a suit by a respondent in an administrative proceeding to enjoin the proceeding on allegations that the administrative agency is without 'jurisdiction' and that to allow the proceeding to continue in such circumstances will put the respondent to needless expense." (citing *Myers v. Bethlehem Corp.*, 303 U.S. 41 (1938)). *Accord M.G. Davis & Co. v. Cohen*, 369 F.2d 360, 363 (2d Cir. 1966) (injunction denied where plaintiff had not shown that the SEC "so grossly exceeded its power as to have, in effect, flouted the will of Congress.").

[50] *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330, 334 (D.C. Cir. 2006); *Southern Natural Gas Co. v. FERC*, 877 F.2d 1066, 1072 (D.C. Cir. 1989) (Section 19(b) of the NGA requires a person aggrieved by a FERC order to first petition the Commission for rehearing before petitioning the Court of Appeals for review).

[51] Request of Amaranth Advisors L.L.C. *et al.* for Expedited Rehearing to Terminate Show Cause Order for Lack of Subject Matter Jurisdiction, Docket No. IN07-26-000 (Aug. 27, 2007).

[52] Amaranth's reliance on *Landis v. North Am. Co.*, 299 U.S. 248 (1936) to support its claim that this Court has inherent authority to stay FERC's administrative proceeding is inapposite. Amaranth Memo. at 28. *Landis* involved 47 cases in 13 judicial districts, each making the same

In a related vein, Amaranth's co-defendant Hunter, sought in *Hunter v. FERC* a review of

FERC's administrative action arguing to Judge Leon that the CFTC, not FERC, has jurisdiction.[53]

As here, FERC argued in *Hunter v. FERC* that under § 19(b) of the NGA, the district court lacked

jurisdiction to review FERC's OSC. Hunter's motion in *Hunter v. FERC* is fully briefed and argued

and the parties await a decision by that court. Setting aside whether *Hunter v. FERC* represents yet

additional peddling of these arguments by Amaranth's co-defendant (who is also represented by

Amaranth's counsel in the case at bar),[54] the doctrine of comity urges this Court to defer its ruling

until the United States District Court for the District of Columbia, under its prevailing practice,

issues a decision in *Hunter v. FERC* that may inform this Court of the legal and factual bases for any

ruling on an injunction.[55]

---

challenge to a single statute and the resolution of a single test case would settle the rule of law with respect to the other cases. The instant case will not settle the rule of law because, as discussed above, the CFTC is proceeding under the CEA and FERC is proceeding under the NGA. Amaranth's reliance on *Pub. Util. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 468 (1943), is also misplaced. Amaranth Memo. at 28. In *Public Utility Comm'n*, the Supreme Court upheld an injunction against the state public utilities commission because the statute conferred to the Federal Power Commission (the predecessor of FERC) the exclusive authority to set natural gas rates. In this case, Amaranth is trying to *prevent* FERC from exercising the anti-manipulation authority conferred by the EPAct. Therefore, a stay in this case would clearly frustrate the will of Congress.

[53] *See* fn 44 *supra*.

[54] Though not appearing here as "counsel of record" for Hunter, Amaranth's counsel Winston & Strawn represents Hunter in his "corporate capacity" with respect to the FERC matter. In vociferously opposing an extension of the briefing schedule here (an extension to which it subsequently agreed), Winston & Strawn proclaimed in its September 5, 2007 letter to the Court that FERC was "clearly forum shopping." Though it is an intriguing notion that FERC, which neither initiated the *Hunter v. FERC* case nor involved itself in *this* case, is a "forum shopper," FERC will leave to the Court's own conclusions the matter of whether and which litigants are shopping, where, and for what.

[55] *See Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir. 1981) (relying on principles of comity and judicial economy, the court affirmed dismissal of action where plaintiffs had a remedy in another court with jurisdiction over the claims); *Burrows v. U.S.*, No. 93-1795, 1993 U.S. Dist. LEXIS 8229, at *8-9 (S.D.N.Y. June 16, 1993) (attached as Exhibit 19) (principles of comity required court to defer to Eastern District of New York to resolve identical claims.)

**B.** **FERC's Enforcement Action Will Not Irreparably Harm Amaranth, But a Stay Will Harm FERC and the Public Interest**

Amaranth is not entitled to a preliminary injunction without a showing of irreparable injury.[56] Amaranth "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which [it] prays will work damage to someone else."[57] Amaranth's claimed "harm" (aside from contradictory assertions about "collateral" effects discussed below) really boils down to speculative assertions by Amaranth's CEO that Amaranth will incur greater legal fees and costs from coordinated, simultaneous proceedings than it would incur if the CFTC case and OSC were adjudicated *seriatim*. Such speculative claims are insufficient to sustain its burden here.[58]

---

[56] *See*, *e.g.*, *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) (to obtain a preliminary injunction, the moving party must demonstrate "(a) irreparable harm *and* (b) either (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.") (internal quotations omitted); s*ee also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 56 (1975); *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996); *Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.") (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973) (footnote omitted)).

[57] *Landis*, 299 U.S. at 255.

[58] *See Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991) (a motion for preliminary injunction should be denied if the harm alleged is remote, speculative, or merely possible); *Baker's Aid v. Hussman Foodserv. Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (court affirmed denial of preliminary injunction because, in part, plaintiff produced only conclusory evidence of its president); *Shepard Indus., Inc. v. 135 E. 57th St., LLC*, No. 97-8447, 1999 U.S. Dist. LEXIS 14431, at *24 (S.D.N.Y. Sept. 17, 1999) (attached as Exhibit 20) (conclusory allegations of damage to goodwill and reputation are insufficient bases to find irreparable harm); *The Times Mirror Co. v. FTC*, No. 78-3422, 1979 U.S. Dist. LEXIS 11738, at *6 (C.D. Cal. June 13, 1979) (Exhibit 17) (neither litigation expenses nor waste of government resources amount to irreparable harm).

### 1.    Litigation Costs From Dual Actions Are Not Irreparable Harm

Amaranth's main contention -- that a stay is necessary to avoid defense effort and litigation costs[59] -- does not meet the standard of "irreparable harm" that warrants the extraordinary relief of delaying FERC's administrative action.  *See FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (noting that the burden, expense, and disruption of defending an enforcement action are part of the social burden of living under government and, therefore, are not considered irreparable harm).[60]  In fact, allowing FERC's action to proceed is more likely to result in *more* judicial economy – not less.  The CFTC and FERC can continue their joint efforts by coordinating requests for documents and conducting joint depositions, thereby reducing the discovery and resource burdens on Amaranth.  If Amaranth pursues third party discovery, there is no reason that such discovery cannot proceed in both this court and at FERC, as appropriate.  Moreover, given the complexity of the issues and the technical expertise needed, the parties would benefit by simultaneously developing expert analysis and testimony that encompasses all relevant issues, not just those in a single case.  Finally, Amaranth is currently facing litigation and investigation from many quarters such as multiple individual and class cases, as well as the attentions of yet additional regulators.  Stopping FERC's OSC will not stop these other activities and Amaranth does not and cannot specify what the additional marginal expense is of defending the FERC action.  So, it is speculative at best how a stay will result in cost savings.

---

[59] Declaration of Nicholas Maounis (Docket Entry # 4) at ¶¶ 9-10 (attached to Amaranth Memo.).

[60] *See also Renegotiation Bd. v. Bannercraft Co.*, 415 U.S. 1, 24 (1973) ("mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury); *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93, 100 (2d Cir. 1986) (monetary cost of arbitration is not irreparable harm, nor is the pendency of the same issues before the NLRB a basis for staying the arbitration) (citations omitted).

### 2.    Claim or Issue Preclusion is Not Harmful

Amaranth vaguely claims that it (or this Court's jurisdiction) could be "harmed" because of the potential "collateral" effects on the CFTC case at bar from rulings by FERC on the OSC.  These claims are unwarranted.  First, Amaranth conflates the concepts of "res judicata" and "collateral estoppel" -- the former is inapplicable here and the latter is of minimal relevance.  Second, Amaranth's argument is internally inconsistent.  On the one hand, Amaranth contends that allowing both cases to proceed could result in *inconsistent* decisions because of the "two agencies diametrically opposed conclusions," yet on the other hand (and in the same sentence) Amaranth claims it will be harmed if FERC's action has a collateral effect that would result in *consistent* decisions because the "agencies seek to punish Amaranth Advisors for the exact same conduct." Amaranth Memo. (Docket Entry # 5) at 8, 9.  Neither predicate is accurate and Amaranth's "either/or" argument is unsustainable as a matter of logic.  The doctrine of collateral estoppel is intended to ensure consistency of judicial decisions and there is nothing inherently harmful or problematic if resolution of one claim would have some effect on the second action.[61]  The cases cited by Amaranth to support its contention that the potential for inconsistent decisions constitutes irreparable harm either support FERC's position or are not on point.[62]  If the time comes for a determination by this Court on the merits, a preclusive ruling either will exist (which will spare the Court the need to re-litigate the matter) or it will not exist (and will therefore present no prospect of

---

[61] *See Parklane Hosiery Co., Inc., v. Shore*, 439 U.S. 322, 326 (1979) (offensive collateral estoppel protects litigants from the burden of relitigating an identical issue and promoting judicial economy by preventing needless litigation, and district courts are given discretion to determine when it should be applied).

[62] In *U.S. v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 438 (7th Cir. 1991), the court *agreed* "that the prospect of inconsistent state and federal court judgments did not constitute irreparable harm to the REA," and, therefore did not grant a preliminary injunction.  The irreparable harm found in *Energy Dev. Corp. v. St. Martin*, No. 98-3395, 2005 U.S. Dist. LEXIS 994 (E.D. La. Jan. 24, 2005) (attached as Exhibit 21), rested on the fact that conflicting state and federal judgments would cloud title to mineral rights.

double effort). Application of well-developed preclusive doctrines that are applied in related cases by courts on a regular basis is not "harmful." Amaranth may not like the results of such future (and as yet unknown) "collateral" effects but that does not make them "harmful."

Moreover, Amaranth's posited collateral effects are largely illusory.[63] FERC has no authority to enforce the provisions of the CEA, and the CFTC cannot adjudicate in this Court issues arising under the NGA. There are some similarities in the cases but also several substantial differences. The statutes (CEA v. NGA), causes of action (attempted v. actual manipulation), burden of proof (specific intent to create an artificial price v. reckless disregard), and remedies sought (injunctive relief and some civil penalties v. disgorgement of unjust profits and civil penalties) differ.[64] There is no "unforgiving" prospect of *res judicata* (Amaranth Memo. at 25) because the cases are not the same. Neither the CFTC nor FERC could be precluded in either case, because the agencies are not parties in the other's cases. In sum, Amaranth has not articulated how or to what extent either action would have a preclusive effect on the other, even if such effects were somehow deemed "harmful."

_____

[63] The most egregious claim by Amaranth is that the CFTC "found . . . that the evidence does not support a claim that prices of natural gas futures were artificial." Amaranth Memo. at 2. The CFTC made no such allegations, let alone a "finding." The most that can be said is that the CFTC has made (for now) a prosecutorial decision to charge a lesser offense of "attempted manipulation" as opposed to manipulation.

[64] *See U.S. v. RCA*, 358 U.S. 334, 346 (1959) (there can be no collateral estoppel or *res judicata* arising out of the separate district court and administrative proceedings, pursuant to the Sherman Act and Federal Communications Act, respectively, because the court had no power to decide the Federal Communications Act issues and the FCC had no power to decide antitrust questions); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 377 (3d Cir. 2005) (no risk of inconsistent judgments where cases are based on different facts or law); *Peck v. U.S.*, 522 F. Supp. 245, 247 (S.D.N.Y. 1981) (motion for stay *denied* because resolution of the instant action will have "very little, if any, impact on the outcome" of the other court's proceeding); *see also New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346, 353 (3d Cir. 1964) (the Department of Justice could not be estopped by any determination made in the FCC proceeding because the FCC did not have authority to decide the antitrust issue there presented).

Amaranth's overarching suggestion that there is something inherently wrong with two enforcement actions ignores modern regulatory norms.  There is ample judicial precedent to support dual enforcement actions by separate government agencies such as FERC and the CFTC.[65]  In fact, FERC and the CFTC previously acted under their respective statutory authorities to simultaneously address misconduct in the energy markets.[66]  The related CFTC and FERC actions do not require Amaranth to pay two civil penalties for the same violation.  The CFTC seeks civil penalties for violating the CEA, while FERC's civil penalty claim rests on violations of the NGA.  Because the CEA and the NGA authorize civil penalties for *each* violation, Amaranth is subject to civil penalties for violations under *both* laws.[67]  Moreover, FERC seeks disgorgement of profits – a remedy the CFTC does not seek – and a means by which those who were harmed by the misconduct can obtain at least some redress.

---

[65] *FTC v. Cement Inst.*, 333 U.S. 683 (1948) (two or more agencies may proceed simultaneously against the same parties and the same conduct); *Bristol-Meyers Co. v. FTC*, 738 F.2d 554, 559-60 (2d Cir. 1984) (concurrent Federal Trade Commission/Food and Drug Administration jurisdiction approved); *Warner-Lambert Co. v. FTC*, 361 F. Supp. 948, 952-53 D.D.C. 1973) (court upheld concurrent enforcement action by the FDA and FTC, even though they involved the same parties or issues, because the statutory remedies of the two agencies are cumulative and not mutually exclusive).

[66] As part of its investigation of the western energy markets, FERC initiated an enforcement action against American Electric Power ("AEP") for providing false data to trade press entities that published natural gas price indexes.  *Am. Elec. Power Co.*, 103 F.E.R.C. ¶ 61,089 (2003).  The CFTC also filed suit against AEP for the same conduct, alleging deliberate reporting of false natural gas trading information to firms that compile natural gas price indexes.  *U.S. Commodity Futures Trading Comm'n v. Am. Elec. Power Co.*, No. C2-03-891 (Sept. 30, 2003) (attached as Exhibit 22).  AEP entered into a settlement agreement with the U.S. Department of Justice, under which AEP agreed to pay an additional $30 million criminal penalty to resolve an investigation into the entity's false reporting of natural gas trades.  Similarly, both FERC and the CFTC addressed misconduct by Coral Energy Res., L.P.  Both actions involved allegations that Coral provided false data concerning natural gas transactions.  *See In re Coral Energy Res., L.P.*, 110 F.E.R.C. ¶ 61,205 at 12-14 (2005); *In re Coral Energy Res., L.P.*, Comm. Fut. L. Rep. (CCH) ¶ 29,815 (CFTC July 28, 2004).

[67] *See U.S. v. Reliant Energy Serv.*, 420 F. Supp. 2d 1043, 1064 (N.D. Cal. 2006) (where two federal laws cover the same conduct, both may be applied because "congressional intent behind one federal statute should not be thwarted by the application of another federal statute").

### 3.     FERC and the Public Will Be Harmed by a Stay

Staying FERC's proceeding will be harmful to FERC's enforcement program and the public. First, FERC is the federal agency responsible for regulating the wholesale, interstate physical natural gas market.  Unlike the CFTC, which overseas trading on products such as pork bellies, metals and lumber, FERC's sole focus is energy.  FERC has exclusive jurisdiction over, among other things, "the transportation of natural gas in interstate commerce, to the sale in interstate commerce, or to the sale in interstate commerce for resale."[68]  FERC, not the CFTC, has the enforcement focus to ensure that natural gas prices in those jurisdictional markets are competitive and fair.[69]  A stay that prevents FERC from pursuing its action will frustrate those efforts.

Second, staying FERC's enforcement action will have little practical benefit to the parties, this Court or the public.  Because FERC's OSC is different and broader than the CFTC complaint, the FERC action will need to go forward regardless of how the CFTC claims are resolved.[70]  Thus, staying the OSC is a pointless act that merely delays the vindication of the public's interests. Moreover, delaying FERC's administrative action until the instant litigation is resolved could result in a delay of several years.  During that time, Amaranth's assets and evidence could disappear. Amaranth's papers admit that it is disbursing its assets to investors, thereby reducing the assets

---

[68] 15 U.S.C. § 717.

[69] *See RCA*, 358 U.S. at 346 (agency that performs ratemaking activities has strong interest in maintaining its enforcement actions).

[70] If the CFTC proceeds first with its action and prevails, the FERC will still need to pursue its administrative action with the potential for discovery and a trial-type proceeding to resolve the NGA claims against all respondents because those issues and many respondents are not before this Court.  If the CFTC loses, for example, for failure to meet the intent requirement under its law, the FERC action will nonetheless proceed because the standard of proof for manipulation under NGA is "reckless disregard."  *See CFTC v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1485 (10th Cir. 1983) (court denied stay of investor lawsuits because the receiver and the individual investors were asserting different claims and, therefore a stay would delay, but not obviate the need for the investor lawsuits, and resolution of the receiver's claims will not narrow the issues in and promote settlement of the investors' lawsuits).

available to pay any disgorgement of unjust profits – a remedy the CFTC does not seek.[71]  FERC also faces the well known risks of loss of evidence and fading memories.[72]  As contrasted with the illusory and unspecified harms Amaranth claims, the harm to FERC and the public from a stay is substantial and indisputable.

**C.     Amaranth is Unlikely to Prevail on the Merits**

In addition to establishing irreparable harm, Amaranth must also demonstrate that it is likely to prevail on the merits or that it raises sufficiently serious questions going to the merits to make them a fair ground for litigation "and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[73]  Amaranth's assertions about the relative jurisdictions of FERC and the CFTC do not sustain this weighty burden.

**1.     FERC Has Statutory Authority to Prohibit Market Manipulation that Affects Its Jurisdictional Energy Markets**

Amaranth's argument that it is not subject to FERC's jurisdiction because it never traded in "physical gas" is off the mark.  FERC is pursuing enforcement against Amaranth because evidence uncovered during FERC's investigation suggests that Amaranth's alleged manipulation of the NG Futures Contract settlement price was "in connection with" *Commission-jurisdictional transactions*.  This is precisely the type of manipulation Congress decreed FERC should police under EPAct 2005.

---

[71] *See* Amaranth Memo. at 27 and the attached Declaration of Nicholas Maounis (Docket Entry # 4) at ¶ 10.  Amaranth claims that FERC's action will "harm" Amaranth because monies that could otherwise be used to re-pay investors would instead be used to cover expenses to defend FERC's enforcement action.  This is beside the point.  Every time a corporate actor is fined or must defend itself against regulatory action, its investors or shareholders theoretically pay the cost of litigation and judgment.

[72] *See Cherokee Nation of Oklahoma v. U.S.*, 124 F.3d 1413, 1418 (Fed. Cir. 1997) (trial court decision to stay resolution of claims impaired plaintiffs ability to litigate their case because, "with the passage of time, memories will fade, litigation costs will balloon, and resolve will dwindle.").

[73] *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) (internal quotations omitted).

Amaranth does not dispute FERC's authority to make all rules necessary to ensure that the markets for natural gas are competitive and free of manipulation. Nor does Amaranth dispute that in response to the western energy crisis, Congress gave FERC broad authority to prevent any entity from engaging in market manipulation in connection with jurisdictional sales (as defined by the NGA and NGPA) and transportation of natural gas in interstate commerce.[74] Amaranth simply argues that its conduct should not be covered by these provisions.

The language of the statute, however, particularly the use of the terms "any entity," "directly or indirectly" and "in connection with [jurisdictional transactions]," shows that Congress intended to cover the very type of conduct at issue here. By using the term "any entity," Congress intentionally added to the types of companies and individuals FERC could reach, including those not otherwise jurisdictional to FERC. Use of the phrase "directly or indirectly" shows Congress intended this provision to apply to more than the conduct of the physical sale itself and more than just the direct seller of the physical commodity. Similarly, use of the phrase "in connection with" supports the interpretation that Congress intended to cover a broad range of conduct that could significantly affect FERC-jurisdictional rates and services; in particular, the phrase "in connection with" is modeled after the "in connection with" language of section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b) (2000), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2006). Those provisions have been construed as broad anti-fraud "catch-all clauses" to cover a wide range of fraudulent, deceptive

---

[74] *See* EPAct 2005, 15 U.S.C. § 717c-1. A parallel provision was added to the Federal Power Act. Federal Power Act, 16 U.S.C. § 824v(a) (2000) (as amended by EPAct 2005 § 1283). Thus, Amaranth's reliance on *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996), *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 914-23 (9th Cir. 2005), *Northern States Power Co. v. FERC*, 176 F.3d 1090, 1096 (8th Cir. 1999) and *Conoco, Inc. v. FERC,* 90 F.3d 536, 552-53 (D.C Cir. 1996), are inapposite. Not only were all three cases brought in the Court of Appeals – the appropriate forum for deciding questions of the Commission's jurisdiction – but none of the three cases addressed the Commission's exercise of an authority expressly granted by Congress or EPAct 2005.

and manipulative practices.[75]  The "in connection with" language, in particular, has been construed "broadly and flexibly, not technically and restrictively," in order to accomplish its remedial purposes.[76]  Taken as a whole, the use of the "any entity" language coupled with the "directly or indirectly" and "in connection with" language, reflects congressional intent to expand FERC's jurisdiction to punish manipulative conduct by those who do not trade in physical gas but whose manipulation (as here) has a direct, substantial, and harmful connection to FERC-jurisdictional markets.

Other provisions of EPAct 2005, *in pari materia*, also show that Congress intended to expand FERC's authority over financial energy markets.  For example, EPAct 2005 directed the CFTC and FERC to execute the MOU to establish, among other things, provisions ensuring that investigations pertaining to markets within the respective jurisdiction of each agency are properly coordinated.[77]  There would be no need for such coordination if there existed between the two agencies the solid jurisdictional wall as Amaranth posits.

---

[75] Order No. 670, 71 Fed. Reg. 4244, 4249 at ¶ 25 (quoting *Aaron v. SEC,* 446 U.S. 680, 690 (1980)).  Consistent with the mandate that certain aspects of FERC's new authority be exercised in a manner consistent with Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and consistent with Congress's modeling of EPAct 2005 Sections 315 (new NGA Section 4A) and 1283 (new FPA Section 222) on Section 10(b) of the Exchange Act, FERC modeled the Anti-Manipulation Rule on SEC Rule 10b-5.  Order No. 670, 71 Fed. Reg. 4244, 4246 at ¶ 7; *see also* Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

[76] *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citations omitted); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971).  As Amaranth observes, *Zandford* held that a conduct may be shown to be "in connection with" a securities transaction when it "coincides" with a securities transaction, but then Amaranth asserts that FERC has not identified any purchase or sale of physical natural gas that "coincides with any transaction engaged in by Amaranth."  Amaranth Memo. at 17.  Amaranth can only reach this conclusion by ignoring the data in the OSC that shows Amaranth's alleged manipulation did not merely "coincide" with physical sales but set directly, immediately, and knowingly the sales price of physical transactions that are specifically identified by seller, date, volume, and price.  OSC (Exhibit 3 at ¶ 23).

[77] EPAct 2005 § 316, 15 U.S.C. 717t-2(c)(1).

FERC's construction of EPAct 2005, issuance of Order No. 670, and application of Rule 1c.1 are, in addition, consistent with congressional understanding. FERC promulgated Order No. 670 under the watchful eye of Congress. Following EPAct 2005, Congress closely monitored what *FERC was doing* to police the energy markets. Because EPAct 2005 broadened FERC's authority to "review transactions in the financial market related to natural gas," Senator Bingaman wanted to know how FERC was monitoring trading of NYMEX natural gas futures contracts, especially as relates to "end-of-month natural gas trading," which forms the basis of monthly index prices.[78]  In commenting on FERC's post-EPAct 2005 efforts, Congress' Government Accountability Office ("GAO") noted that EPAct 2005 gave FERC authority to "examine whether financial market transactions, which are not generally under FERC jurisdiction, affect the physical natural gas markets over which FERC has authority" and enforce against *any* entity, if the manipulative trading, whether intentionally or recklessly, affects physical natural gas markets, which are unquestionably within FERC's jurisdiction.[79]  Thus, FERC's overseers in Congress certainly view FERC's new anti-market manipulation regulations as properly applying to "producers, financial companies, local utilities, and natural gas traders, most of which were not previously regulated by FERC."[80]  Legal commentary likewise supports FERC's view.  A. Horwich, *Warnings to the Unwary: Multi-Jurisdictional Federal Enforcement of Manipulation and Deception in the Energy Markets After the Energy Policy Act of 2005,* 27 ENERGY LAW J. 363, 364, 395-97 (2006) (stating that EPAct 2005 "subjects transactions and actors which were not previously exposed to FERC jurisdiction to the enforcement powers of the agency.")

---

[78] *See* Letter from Senator Bingaman to Chairman  Kelliher (Exhibit 7) at 2.

[79] U.S. GOV'T. ACCOUNTABILITY OFFICE, ROLES OF FEDERAL AND STATE REGULATORS IN OVERSEEING PRICES (Exhibit 5) at 16.

[80] *Id.* at 15; s*ee also* Order No. 670 at ¶¶ 2, 18, 22.

Because FERC's jurisdictional approach is supported by law, judicial intervention in the Commission's administrative proceeding is not warranted.[81]  Amaranth grossly mischaracterizes FERC's statements in Order No. 670, ¶¶ 16, 20, 22 when it states that FERC there concedes that EPAct 2005 "did not expand" FERC's jurisdiction."[82]  As the foregoing demonstrates, and as Order No. 670 elsewhere makes clear,[83] EPAct 2005 clearly expanded FERC's overall jurisdiction.  EPAct 2005 did not increase the transactions under the Commission's *ratemaking* jurisdiction under pre-existing provisions of the *NGA*.  However, EPAct 2005 dramatically broadened FERC's authority to regulate and punish manipulative or deceptive conduct that, either *directly or indirectly*, is *in connection with* the purchase or sale of natural gas within FERC's jurisdiction.

Ironically, the targets of these enforcement actions have urged in press statements that FERC's OSC is just a response to political pressure from Congress.[84]  As noted above, FERC began its investigation of Amaranth *before* the above-referenced Congressional oversight activities, but it is a strange argument indeed that FERC is responding to pressure from Congress to exercise authority that Congress never intended for FERC to have.

---

[81] *Touche, Ross & Co. v. SEC*, 76 Civ. 4489, 1978 U.S. Dist. LEXIS 17974, at *11-*12 (S.D.N.Y. May 3, 1978) (attached as Exhibit 23) (to enjoin the SEC's administrative proceeding, plaintiff must show that the SEC acted in "flagrant violation of statutory authority.");  *see also The Times Mirror Co. v. FTC*, No.78-3422, 1979 U.S. Dist. LEXIS 11738, at *15-*16 (C.D. Cal. June 13, 1979) (Exhibit 17) (because the jurisdictional question is not free from doubt, the court will deny the motion for preliminary injunction and dismiss plaintiff's action so that the FTC may complete its administrative proceeding).

[82] Amaranth Memo. at 13.

[83] Order No. 670, 71 Fed. Reg. 4,244, 4248-50 at ¶¶ 18, 25, 22, 29.

[84] *See* Bloomberg.com, *U.S. Seeks $458 Million as Gas Market Cases Expand*, July 26, 2007 (attached as Exhibit 24) (Mr. Kim, Hunter's attorney, claimed allegations by FERC and CFTC the result of political pressure); Forbes.com, *FERC Lacks Authority to Regulate Futures Markets, Says Brian Hunter's Attorneys*, July 26, 2007 (attached as Exhibit 25) (Kim called the FERC and CFTC enforcement actions "baseless political stunts").

2.    **Manipulation of Natural Gas Markets Is Not Within the CFTC's "Exclusive" Jurisdiction**

Amaranth wrongly contends that a stay is warranted because the CFTC has "exclusive jurisdiction" over manipulation related to natural gas sales if it involves NG Futures Contracts and, therefore, FERC's action will infringe on this Court's jurisdiction over the CFTC claims.  The CFTC does *not* have "exclusive" jurisdiction over manipulation of physical sales of natural gas involving NG Futures.  Therefore, FERC is not precluded from proceeding and the resolution of FERC's OSC will not interfere with this Court's resolution of the CFTC complaint or lead to "inconsistent judgments."

The central fallacy in Amaranth's argument is the mischaracterization of the scope of the CFTC's exclusive jurisdiction:  in a nutshell, it presumes that if the CFTC regulates a given activity or subject matter, it does so exclusively.  Such is a "specious contention."  *See FTC v. Roberts,* 276 F.3d 583, 591 (D.D.C. 2001) ("[defendant] appears to assume that, at a minimum, whatever the Commission [CFTC] may regulate, it regulates exclusively.  This is a specious contention.")

The CFTC has both *exclusive* and *non-exclusive* jurisdiction provisions, but natural gas market-related manipulation does not come within the scope of its exclusive jurisdiction.  Section 2(a)(1)(A) of the CEA provides that the CFTC has exclusive jurisdiction over "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery."[85] However, market manipulation and similar practices such as false statements do not come within the scope of the CFTC's *exclusive* jurisdiction because they are not "accounts, agreements … and transactions" within the meaning of the CEA.  *See CFTC v.  Bradley*, 408 F. Supp. 2d 1214, 1219 (N.D. Okla. 2005) ("a 'contract, agreement, or transaction', as commonly understood, denotes a mutual understanding between the parties creating rights or obligations that are enforceable or

---

[85] 7 U.S.C. § 2(a)(1)(A) (2000).

recognized by law." (quoting Black's Law Dictionary 318 (7th Ed. 1999)).  Indeed, the CFTC itself

has successfully argued that false reporting and manipulation are fraudulent and deceptive conduct,

which, by their very nature, do not involve a "mutual understanding" creating enforceable rights or

obligations with counterparties.  Manipulation and false reporting are merely conduct *related to* a

"contract, agreement or transaction" in a commodity, but are not themselves a "contract, agreement

or transaction." [86]  "Thus, while the CFTC has the clear statutory authority to regulate a [trader's]

deceitful 'practices',  . . . .  there is no reason to think the authority is exclusive.  A 'practice' or

'course of business' is quite plainly not a 'transaction' – either in life or in this statutory provision.

(Nor for that matter is it an 'account' or 'agreement.')." [87]  Accordingly, the exclusive jurisdiction

provision cited by Amaranth does not apply [88] and "other agencies . . . retain their jurisdiction beyond

the confines of 'accounts, agreements, and transaction'" for futures contracts. [89]

　　　　This interpretation is consistent with FERC's overall approach, which does not seek to

regulate the day-to-day aspects of futures trading, such as the terms or conditions of sale of NG

Futures Contracts, the operating rules of the NYMEX exchange, or traders' commodity accounts.

FERC's OSC has nothing to do with such regulation.  As Amaranth notes, FERC consistently

---

[86] *See also CFTC v. Reed*, 481 F. Supp. 2d 1190, 1199 (D. Colo. 2007); *U.S. v. Valencia*, No.
03-024, 2003 U.S. Dist. LEXIS 15264, at *36 (S.D. Tex. Aug. 25, 2003) (attached as Exhibit 26);
*CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. GA. 2006).  These cases involved interpretation of a
parallel provision of the CEA that uses the terms "contract, agreement or transaction."  Given the
parallel language, the interpretation should be the same.

[87] *FTC v. Roberts*, 276 F.3d 583, 591 (D.D.C. 2001).

[88] *See also SEC v. Hopper*, No, 04-1054, 2006 U.S. Dist LEXIS 17772 (S.D. Tex. Mar. 24,
2006) (attached as Exhibit 27) (because energy trading transactions were fraudulent and deceptive
within the meaning of Rule 10b-5, the SEC could proceed at the same time as FERC and the CFTC);
*U.S. v. Reliant Energy Serv*., 420 F. Supp. 2d 1043, 1045 (N.D. Cal. 2006) (FERC's exclusive
jurisdiction under the Federal Power Act to regulate the transmission and sale at wholesale of
electricity in interstate commerce did not preempt the anti-manipulation jurisdiction under the CEA
pertaining to electricity prices during California's energy crisis in Summer 2000).

[89] *Id.*

recognized the CFTC's exclusive jurisdiction, Amaranth Memo. at 3, and the differing allegations in these very different enforcement actions demonstrates that FERC respects these jurisdictional lines. FERC's OSC does not seek to police Amaranth's statements to the NYMEX as the CFTC does, nor does FERC seek to bar Hunter from trading as the CFTC does. FERC's OSC is enforcement against manipulation pertaining to its jurisdictional markets, not regulation of NYMEX accounts.

### 3. The CEA Preserves FERC's Authority

Even if FERC's claims could somehow be read to fall within the CEA's "exclusive" jurisdiction provisions, the very next sentence, Section 2(a)(1)(A), expressly states that the CEA does not divest other federal regulators of their authority to pursue their own regulatory functions. Amaranth's Memo. omits this CEA "savings clause," which states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any state, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.[90]

Although the CFTC has exclusive jurisdiction over certain activities specified in section 2(a)(1)(A),

> [I]t does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms. . . .

> Indeed, the inclusion of the so-called "regulatory savings clauses," § 2(a)(1)(A)(I)-(II), makes clear that other agencies … retain their jurisdiction beyond the confines of 'accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery.'"[91]

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) ("*CME*"), cited by Amaranth, does not support its argument that the CFTC has exclusive jurisdiction over trading in futures contracts. *CME* involved a dispute over whether a certain financial product was a futures

---

[90] 7 U.S.C. § 2(a)(1)(A).

[91] *Roberts*, 276 F.3d at 591.

contract or a security (or an option on a futures contract or an option on a security), and thus whether

it was subject to CFTC or SEC regulation.  The SEC and the CFTC tried to reach an agreement to

delineate that the SEC had exclusive jurisdiction over securities options and that the CFTC had

exclusive jurisdiction over futures contracts and any futures options.  The court refused to enforce

this accord, holding that agencies cannot alter the scope of their jurisdiction by agreement.[92]

Congress subsequently enacted this accord into law with the purpose of preventing regulatory

overlap.  If anything, *CME* supports FERC's reasoning here.  EPAct 2005 was intended to expand

FERC's jurisdiction while the CFTC's day-to-day market oversight program was already *well

known*.  There is no evidence that Congress intended to prevent any regulatory overlap between the

CFTC and FERC over manipulation of natural gas, especially in light of the statutory requirement

that the two Commissions enter into a MOU to share information about their respective markets.[93]

As CFTC Commissioner Michael V. Dunn recently observed in a speech before the American Public

Gas Association, "[e]ssentially, the FERC and CFTC have joint jurisdiction over large parts of the

energy markets."[94]

### 4.        The Doctrine of Primary Jurisdiction Does Not Apply

Amaranth's motion makes much of the doctrine of "primary jurisdiction," but Amaranth's

arguments turn the doctrine on its head.  Rather than allocating jurisdiction among competing federal

agencies, as Amaranth contends, the doctrine of primary jurisdiction allocates jurisdiction for

identical claims among an agency *and a court*, with deference to be given to the agency.[95]  The

---

[92] *Chicago Mercantile Exch.*, 883 F.2d at 545.

[93] *See* EPAct 2005 § 316(c)(1).

[94] Michael V. Dunn, Commissioner, CFTC, Speech at APGA Annual Meeting at 7 (Aug. 7, 2007) (attached as Exhibit 28).

[95] *See U.S. v. Western Pac. R.R.*, 352 U.S. 59, 64 (1956) (primary jurisdiction applies where a claim originally brought in the courts is suspended because enforcement of the claim requires the

doctrine has no application here where Amaranth seeks to stop one agency (not proceeding in a court) in favor of another (proceeding in a court). If anything, the spirit of the doctrine would urge this court to defer to FERC, not the other way around.[96]

## IV.    CONCLUSION

This Court should deny Amaranth's motion. Only the Court of Appeals has jurisdiction to review FERC's OSC. That is the only question that any district court needs to reach in these various collateral attacks on FERC's OSC.

This Court could also deny Amaranth's motion on the merits. Allowing FERC to proceed with its enforcement action will not irreparably harm Amaranth. Indeed, simultaneous resolution of claims will be more efficient for the regulators, Amaranth, and the public. The FERC action will not infringe on the jurisdiction of this Court because the claims alleged and the relief sought by FERC are separate and distinct from the allegations made and relief sought by the CFTC. Because Congress expanded FERC's jurisdiction, FERC has authority to prohibit Amaranth from using a manipulative device in the financial markets, directly or indirectly in connection with the sale of

---

resolution of issues that are within the special competence of an administrative body); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) ("The doctrine's central aim is to allocate initial decision-making responsibility between courts and agencies and to ensure that they 'do not work at cross purposes.'" (citing *Fulton Cogeneration Ass'n. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996)). None of the seven cases cited by Amaranth are factually analogous to this case because they do not involve a court deferring the administrative proceedings of one administrative agency acting within the scope of its authority in favor of another. Amaranth Memo. at 19-20 and n.15. Instead, the cases cited by Amaranth address situations in which courts deferred their proceedings in favor of an administrative agency.

[96] In fact, the two Court of Claims cases cited by Amaranth, *Northrop Corp. v. U.S.*, 27 Ct. Cl. 795 (1993), and *Haustechnik v. U.S.*, 34 Ct. Cl. 740 (1996), resulted in the district court staying its own proceedings. Amaranth selectively quotes *Hydrocarbon Trading and Transp. Co. v. Exxon Corp.*, 89 F.R.D. 650, 652 (S.D.N.Y. 1981), to support its contention that the CFTC complaint should be resolved first. The *very next line* in the *Hydrocarbon* decision explains that the doctrine "is intended to accommodate and avoid conflict of 'the complementary roles of *courts* and administrative agencies.'" (quoting *Far East Conference v. U.S.*, 342 U.S. 570, 575 (1952)).

natural gas because that manipulation impacted Commission-jurisdictional markets.  Moreover, the CFTC does not have exclusive jurisdiction that is relevant here.

The staying of a federal agency's important enforcement proceeding by a federal district court based solely on claims before the court involving similar issues and parties, especially where the agency is not before the court, would be an extraordinary judicial act.  Amaranth fails to cite a *single case* where a court has done so.  It has not met its heavy burden here of showing that this is the case where such a sweeping judicial order should first issue.  The Motion must be denied.

DATED:  September 28, 2007                    Respectfully submitted,


                                        SUSAN J. COURT
                                        ROBERT E. PEASE
                                        LEE ANN WATSON


                                        ___/s/_ P. Todd Mullins_____
                                        Todd Mullins (D.C. Bar # 429539)
                                        Leslie B. Bellas (D.C. Bar # 429707)
                                        Mark Higgins
                                        Justin Shellaway
                                        David Tobenkin
                                        Nicole Brisker
                                        Jamie A. Jordan
                                        Aaron A. Fate
                                        FEDERAL ENERGY REGULATORY COMMISSION
                                        Office of Enforcement
                                        Division of Investigations
                                        888 First Street, NE
                                        Washington, DC  20426
                                        (202) 502-8594

                                        Attorneys for The Federal Energy Regulatory
                                        Commission