104 FERC ¶ 61, 121

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
            William L. Massey, and Nora Mead Brownell.

| | |
|---|---|
| Price Discovery in Natural Gas and Electric Markets | Docket No.  PL03-3-000 |

POLICY STATEMENT ON NATURAL GAS
AND ELECTRIC PRICE INDICES

(Issued July 24, 2003)

1.      In Docket No. AD03-7, *Natural Gas Price Formation*, the Commission has been exploring the process by which price indices influence and reflect the formation of wholesale prices for natural gas and electricity.  The Commission's current process began with the initial staff report in Docket No. PA02-2, issued August 13, 2002, in which staff reported concerns over the characteristics of publicly-reported natural gas price indices.  On January 15, 2003, staff presented a discussion paper to the Commission on staff's efforts to assure accurate and dependable wholesale natural gas price information.  The Commission encouraged its staff to work with industry representatives to restore confidence in price indices.

2.      On April 24, 2003, the Commission's staff held a technical conference participating with the staff of the Commodity Futures Trading Commission (CFTC) to explore price formation issues with respect to natural gas.  Subsequently on June 13, 2003, staff issued a "Staff Paper on Price Formation Issues" and on June 24, 2003, held a second technical conference that considered price formation in wholesale electricity markets as well as natural gas markets.  The June 24 technical conference was held with the participation of the National Association of Regulatory Utility Commissioners as well as the staff of the CFTC.

3.      Discussion at the second conference pointed out the desirability of providing some degree of regulatory certainty to industry participants that would encourage them voluntarily to report energy transactions to the providers of price indices.  This certainty, sometimes referred to as a "safe harbor" for good faith reporting, was the subject of a follow-up staff workshop on July 2, 2003.

Docket No. PL03-3-000                                                                                          - 2 -

4.      The Commission received numerous comments from interested parties in conjunction with each of the three staff conferences.  These comments and the statements presented at the conferences persuade us that the Commission can assist the industry in restoring confidence in price indices by providing guidance on some vital aspects of price reporting and price index development.

5.      Accordingly, the Commission is issuing this policy statement to explain what the Commission expects of natural gas and electricity price indices and under what conditions the Commission will give industry participants safe harbor protection for good faith reporting of transactions data to entities that develop price indices.  In particular, the Commission will create a rebuttable presumption that companies and individuals that report trade data to index developers in accordance with the standards adopted here are doing so in good faith, and will not be investigated or subjected to administrative penalties for inadvertent mistakes made in the course of reporting energy transaction information.  This should provide a measure of regulatory certainty to the process of reporting transaction data and encourage more industry participants to contribute to the formation of price indices.

**I.      Background**

6.      Price indices are widely used in bilateral natural gas and electric commodity markets to track spot and forward prices.  They are often referenced in contracts as a price term; they are related to futures markets and used when futures contracts go to delivery; basis differentials in indices are used to hedge natural gas transportation costs; indices are used in many gas pipeline tariffs to settle imbalances or determine penalties; and state commissions use indices as benchmarks in reviewing the prudence of gas or electricity purchases.  Since index dependencies permeate the energy industry, the indices must be robust and accurate and have the confidence of market participants for such markets to function properly and efficiently.

7.      Currently, daily and monthly price indices are compiled and published by several trade press entities, a practice which has followed more established oil markets.  These index developers obtain information provided on a voluntary basis by various market participants about trades occurring at a number of trading locations.  The information is verified, compiled, and in some cases assessed, and a price representing trading activity at each location is published.  In addition, other indices are provided by operators of electronic trading platforms based upon trades made on the platform and transactions confirmed by the platform operator.

20030724-3058 Issued by FERC OSEC 07/24/2003 in Docket#: PL03-3-000
Case 1:07-cv-06682-DC    Document 32-5    Filed 09/28/2007    Page 3 of 16

Docket No. PL03-3-000                                                                                                    - 3 -

8.      As the June 13 staff paper noted, however, uncertainty over industry expectations and government regulatory guidelines has inhibited the amount of transactions voluntarily reported to index developers, resulting in a lack of confidence in the reliability of energy price indices.  There also have been reports of past attempts at index manipulation and concern about the adequacy of controls over price reporting.[1]  Subsequent investigations of false reporting to price index developers has led some market participants to curtail their reporting, resulting in a decline in the number of trades voluntarily reported to index developers.  This in turn raised concerns about a lack of information about liquidity and whether market participants were making their decisions without adequate or accurate information about how many actual transactions were used to set the price.

9.      There are also concerns about changes in the amount of trading, both generally and with certain types of contracts.  There is evidence that activity in natural gas commodity markets appears to have become greater for next-day and balance-of-month markets than for next-month (bid week) markets.  Nevertheless many contractual price references are to month-ahead market indices.  Transactions for next-day delivery appear to be more robust, and some contend that a majority of next-day transactions are being executed on electronic exchange platforms.  Similarly, next-day transactions for electricity appear robust in both organized regional markets and on electronic platforms.  The apparent decline in fixed-price transactions in the month-ahead gas market, however, could be related to unwillingness to report transactions or to less fixed-price trading.  The Commission is concerned about the strength of this market, because monthly indices apparently remain important reference points for indexed contracts, settlements for swaps, and settlements for pipeline imbalances.

10.     Another concern is the degree of reliance on index-based contracts as opposed to fixed-price contracts.  It appears that many natural gas producers often sell with reference to an index and that many local distribution company purchasers buy at index-linked prices in lieu of negotiating fixed prices.  Some have commented that there is over-

---

[1]In 2002 the Western Markets Task Force investigated the role natural gas indices played in the prices charged for electricity in California.  The "Final Report on Price Manipulation in Western Markets," issued March 2003 in Docket No. PA02-2-000, determined that employees of several companies had reported false information to publishers of price indices in an effort to skew indices in favor of their trading activities positions (short or long) taken in both the physical and financial markets.  In addition, the investigation found that other companies had no system in place to ensure the accuracy of the data being reported to the index developers.

Docket No. PL03-3-000 - 4 -

reliance on index pricing and that it is due in part to perceptions of what state commissions will consider to be prudent components of a procurement portfolio. Without enough fixed-price transactions, there is a real concern that reported prices will not reflect a liquid competitive market at the affected location.[2]

11.     The Commission wants to strengthen confidence in the day-ahead, month-ahead and forward natural gas markets and the day-ahead and forward electricity markets by encouraging comprehensive reporting of energy transactions to price index developers and by encouraging price index developers to provide useful information to the industry on the volumes of transactions and number of participants trading at various trading hubs. Through such reporting, the Commission and market participants can be assured that the reported index prices are accurate and can gauge the liquidity at various reported locations through measures such as the number of deals and numbers of counterparties.

12.     The records of the staff-sponsored conferences and workshops in Docket Nos. AD03-7-000, *et al.*, show that significant progress has been made by the industry. Index developers have taken steps to make the process of compiling and publishing their indices more transparent, and to provide index users with information about the degree of liquidity at each trading point. Industry representatives, meanwhile, have worked together to develop agreement on basic principles for reporting trade data to index developers.

## II.     Policy goals and objectives

13.     There is considerable agreement in the industry on many of the steps needed to improve the accuracy, reliability, and transparency of price formation. The Commission intends to build upon that consensus to provide guidance on the desirable characteristics of a good price index and the terms under which companies or individuals should report prices to index developers. The current system has evolved on a voluntary basis with the gradual deregulation of energy markets.

---

[2]For example, Natural Gas Intelligence (NGI) recently issued an open letter to the Commission and a "Statement on Natural Gas Price Surveys" in which it noted the collapse in fixed-price trading and the increased use of indices during volatile periods. NGI urged "buyers and sellers to do less indexing . . . and more fixed-price trading, particularly in the monthly baseload market." *See* www.intelligencepress.com/features/ngi_statement.html.

Docket No. PL03-3-000                                                                                           - 5 -

14.     The Commission's views on desirable characteristics of a price index should provide price index developers with guidance on how their products can enhance both fixed-price and index-based trading and increase market awareness of liquidity conditions. Similarly, setting forth the standards companies should use when reporting energy transactions to index developers will assure the Commission that trade data reported in accordance with those standards are trustworthy. Moreover, when such entities report energy transactions in accordance with these standards, the Commission will presume that the prices are being reported honestly and accurately and that errors made are inadvertent.

15.     The Commission is basing its position upon representations made by industry representatives that we should expect to see much more voluntary participation in the price formation process. Greater participation in turn should give all industry participants more confidence in the liquidity and transparency of reported prices. The Commission will monitor developments under this policy statement. If the expected improvements in indices and the level of industry's participation in price formation do not result, the Commission will take additional steps to ensure accurate, dependable, and trustworthy wholesale price information.

## III.    Industry views

16.     The Committee of Chief Risk Officers (CCRO) addressed concerns over the adequacy of price reporting with the issuance of "Best Practices for Energy Price Indices" on February 27, 2003.[3] This document noted the importance of price indices in energy transactions and on economic and business decisions generally, and provided guidance on best practice attributes and processes for the construction of indices by index developers and data submission by market participants.

17.     Among the CCRO recommendations for index developers were that they: carefully define the product, location, and type of commodities; establish cut-off times for transactions qualifying for an index and for submission of data; establish an error resolution process both before and after publication; specify minimum sample sizes to be deemed representative; resolve double-counting of data received from multiple parties on the same transaction; explain the treatment given to outliers in data; document publicly the index calculation methodology; have a challenge process for data suspected of having

---

[3] The CCRO document is available on the CCRO website at http://www.ccro.org/pdf/energy.pdf

Docket No. PL03-3-000                                                                                           - 6 -

been excluded; publish values to indicate the level of liquidity at various trading points; and publicly document the index construction method.

18.     The CCRO also recommended that index developers publish indices through a department independent from journalistic activities, provide adequate confidentiality assurances to data providers, and conduct annual independent audits of all processes involved in formulating and publishing the indices.

19.     For data providers, the CCRO recommended that they: provide raw data on a transaction-by-transaction basis; submit data from all applicable transactions; submit a complete set of data as specified by the index developer; submit additional data such as counterparty name and buy/sell indicator if possible; provide information to enable the index developer to match transactions and eliminate duplication; and exclude intracompany and nonstandard transactions.

20.     Additionally, the CCRO recommended that data providers submit data through an office independent of the trading office (corporate risk control, middle office, or back office), adhere to the error resolution and revision processes of the index developer, provide sufficient protection against misuse of transactions data by employees, and conduct an independent audit of the data gathering and submission process at least annually.

21.     The CCRO paper provided useful context for comments submitted in the course of the April 24, June 24, and July 2 conferences and workshops. Many parties endorsed all or part of the CCRO recommendations.

22.     A number of parties also supported the development and use of an independent third party to serve as a "data hub" for transaction data. While variations were proposed, the essential concept was that an independent entity could receive transactions data from market participants; match, verify, and scrub the data; and provide the resulting clean data to others for use in publishing indices, research, and the like.

23.     For example, the University of Houston Global Energy Management Institute proposed to create an energy price data hub for these purposes and the Energy Transactions Registry proposed to create a repository for transaction data. The New York Mercantile Exchange proposed creation of one or more "self-regulatory organizations" (SRO), under conditions to be set by the Commission, to perform the function of gathering, verifying, and providing uniform data sets for use in calculating indices. Similarly, the Merchant's Exchange proposed to provide third party price

Docket No. PL03-3-000                                                                                              - 7 -

collection and dissemination under the supervision of the National Futures Association. The IntercontinentalExchange (ICE) proposed to use its existing eConfirm settlement service as the basis for independent collection and dissemination of price data.

24.     Some of these proposals may have significant long-term potential. The Commission notes that data hubs have evolved in certain financial industries, and encourages energy industry participants to consider whether some form of a data hub or hubs may improve price discovery in the energy industry in the longer term.

25.     At present, however, it is imperative to take immediate steps to improve the existing mechanisms for price discovery. Many parties focused on this issue and worked together to develop broad industry consensus on near-term improvements. A number of industry stakeholders submitted a consensus document on steps to reform natural gas price reporting and index publication.[4]

26.     The consensus document called for index developers to: adopt a public code of ethics; disclose their price collection and dissemination methodologies, which should include only reported and verified transactions; refrain from using subjective judgment or assessments; verify reported data by matching buys and sells, using counterparty data if necessary and available; contact data providers about discrepancies; publish indices which include total volume, number of transactions, number of counterparties, range of prices, and volume-weighted average price; monitor data to identify possible attempts at manipulation and, if warranted, report incidents to the Commission; submit to an annual audit; and provide all data to the Commission or other Federal agency upon request for investigative purposes.

---

[4]"Joint Recommendation from Industry Stakeholders To Reform Gas Price Reporting and Index Publication," filed June 23, 2003. The joint recommendation was sponsored by the American Gas Association, the Coalition for Energy Market Integrity and Transparency (EMIT is made up of over 200 organizations and individuals, including the American Public Gas Association, the American Public Power Association, Apache Corporation, the Louisiana Independent Oil and Gas Association, the National Association of Royalty Owners, the National Association of State Utility Consumer Advocates, the National Rural Electric Cooperative Association, the Oklahoma Independent Producers Association, and the Public Energy Authority of Kentucky), the Committee of Chief Risk Officers, the Independent Petroleum Association of America, the Interstate Natural Gas Association of America, the Natural Gas Supply Association, the National Energy Marketers Association, and the Process Gas Consumers Group.

Docket No. PL03-3-000                                                          - 8 -

27.     The consensus recommendations for data providers are to: adopt a public code of ethics; report trades by middle or back offices; provide data on all bilateral, arms-length transactions in the physical markets only; report on each transactions separately, providing the price, volume, a buy/sell indicator, the delivery/receipt location, the transaction date, and the term of the transaction; and submit to an annual process audit.

28.     The industry stakeholders accomplished a great deal.  They reported that the only areas on which they did not reach consensus were the use of data collection hubs, whether reporting should be mandatory or voluntary, and whether counterparty identities were necessary for verification.

29.     Meanwhile, index developers have been making significant changes in their published indices.  For example, on June 2, 2003, ICE began reporting the number of trades and the number of companies trading for each location reported in ICE's daily gas and electric indices; more recently ICE has begun publishing a monthly natural gas index.[5]  Reuters informed the Commission that it was adopting a new transparent and objective index methodology that will report the price, volume, high/low prices, and number of transactions at each trading point, and that will not use any subjective assessments of market activity.[6]  Platts has encouraged data providers to adopt better standards for reporting trade information and, effective July 1, 2003, began publishing a three-tier system grouping trading points according to the volume and number of trades to indicate the degree of liquidity at each point.[7]

30.     At the June 24 conference several parties stated that one obstacle to increased voluntary reporting is the concern that the Commission could take action against companies that make a mistake when reporting price data to index developers.  Many parties commented on the need for regulatory certainty and urged the Commission to adopt a safe harbor approach to good faith reporting.

---

[5]See http://www.theice.com/press/20030602.html.

[6]"Comments from Reuters on Natural Gas Price Reporting and Index Formation," filed June 20, 2003.  Reuters also supports the creation of a single independent data collection hub.

[7]"Comments by Platts on Staff Paper on Price Formation Issues," filed June 20, 2003.

Docket No. PL03-3-000                                                                                               - 9 -

31.     Accordingly, Commission staff held the workshop on use of a safe harbor approach on July 2, 2003.[8]

32.     The Commission appreciates the contributions of all participants in the debate on rebuilding confidence in price indices.  The Commission issues this Policy Statement, building on the consensus views of many industry stakeholders, to provide certainty that index development and price reporting done in accordance with the standards set forth herein will not be the subject of remedial action by the Commission.  The Commission urges index developers and market participants are urged to continue voluntary actions to rebuild confidence in indices according to the standards set forth below.

**IV.     Price index developers**

33.     Price index developers should adopt the following minimum standards for creation and publication of any energy price index:

---

[8] Several parties subsequently filed comments on the safe harbor concept discussed at the workshop.  For instance, index developer Platts suggested immediate issuance of a policy statement based on the industry stakeholders' consensus standards, and strongly urged the Commission to require that a buy/sell indicator be included in all reporting.  Platts also suggested that data providers be required to report all trades for both gas and electricity at every market location.  The Edison Electric Institute and the Alliance of Energy Suppliers urged the Commission to issue a policy statement to provide safe harbor protection against inadvertent mistakes in natural gas price reporting, but recommended that electric indices be allowed to develop further before being subjected to specific standards.  The Energy Transaction Repository recommended a policy statement followed by a rulemaking to establish measures of voluntary compliance and steps to mandatory reporting if necessary.  PacifiCorp and PPM Energy, Inc., similarly urged the Commission to issue a policy statement followed by a rulemaking to establish permanent policies.  Peoples Gas Light and Coke Company, North Shore Gas Company, and Peoples Energy Resources Corporation urged interim adoption of the industry stakeholders consensus recommendation as a step towards a mandatory system of reporting prices to a governmental entity.  In other comments, ICE stated that its platform trading and eConfirm services provide direct price discovery that obviates the need for safe harbor protection for price reporting; the University of Houston suggested that a safe harbor should be coupled with independent third party data verification; and Mark Lively commented that use of an auction process would obviate the need for reliance on price indices.

Docket No. PL03-3-000                                                                                          - 10 -

      1.    <u>Code of conduct and confidentiality</u>.  An index developer should adopt and make public a written code of conduct that discloses how the developer will obtain, treat, and maintain price data.  Specifically, the code of conduct should inform customers how the price information was developed, including index calculation method, relevant formulas and algorithms, treatment of aberrant data, and use of judgments, assessments, or similar subjective adjustments.  The code should also specify that all trade data will be treated as confidential, and will not be shared beyond those employees whose responsibility it is to examine and verify data, confirm trading information, and develop and publish the index.  With respect to confidentiality, an index developer should enter into uniform confidentiality agreements with market participants that specify that commercially sensitive individual transaction data will be held in confidence except to the extent necessary to verify the index, and allow for Commission access necessary for performance of its statutory duties such as a specific administrative investigation of price reporting.

      2.    <u>Completeness</u>.  Price reporting systems should maximize the amount of useful and appropriate information they collect and disseminate.  Complete information should be collected for individual transactions, including price, volume, buy/sell indicator, delivery/receipt location, transaction date/time, and term (next day or month).  In publishing prices, an index developer should provide, for each pricing location for the day-ahead or month-ahead market, (a) the total volume, (b) the number of transactions, (c) the number of transaction entities, (d) the range of prices (high/low), and (e) the volume-weighted average price.  Index developers should create liquidity measures that classify trading points by liquidity and/or provide specific information about the number of trades or indicate graduated levels of activity in order to inform customers how many actual transactions led to an index price.

      3.    <u>Data verification, error correction, and monitoring</u>.  An index developer should verify price data through methods such as matching buys and sells and immediately contacting data providers about any data discrepancies.  An index developer should request counterparty identities if necessary to resolve data discrepancies.  An error resolution process should be adopted to ensure timely correction of mistakes.  If significant errors are discovered after the publication of the price index, an index developer should publish a correction notice.  Moreover, an index developer should have sufficient monitoring and surveillance systems in place to identify in a timely manner activity that may reflect an attempt to manipulate energy price indices.  In the event the systems detect anomalous reported data, and the index developer is unable to resolve the accuracy of the data with the data provider, the index developer should notify the Commission and any other relevant federal agency.

20030724-3058 Issued by FERC OSEC 07/24/2003 in Docket#: PL03-3-000
Case 1:07-cv-06682-DC    Document 32-5    Filed 09/28/2007    Page 11 of 16

Docket No. PL03-3-000                                                                                              - 11 -

     4.     Verifiability.  An index developer should undergo an independent audit or verification of its processes and index production at least once annually.  The process should review the data systems, quality control measures, and data to confirm that the index is developed in accordance with the published methodology, and the report's results  should be made public. The audit may be performed by a combination of: (a) an external process audit and (b) an internal data review/implementation audit performed by personnel from the corporate auditing department.

     5.     Accessibility.  All interested customers should have reasonable access to published price reports on a timely basis.  The Commission should have access to relevant data in the possession of an index developer where necessary (a) to conduct an investigation of suspected bad faith price reporting or potential market manipulation or (b) to otherwise carry out its statutory duties.  In any such instance, the confidential data made available by an index developer will be treated on a confidential basis by the Commission.

**V.**     **Price reporting**

34.     Data providers, including exchanges reporting trades that occurred on their platform or brokers reporting trades executed, should adopt the following minimum standards for reporting transaction data to index developers:

     1.     Code of conduct.  Each data provider should adopt and make public a clear code of conduct that its employees will follow in buying or selling natural gas or electricity, and in reporting data from such transactions to index developers.

     2.     Source of data.  A data provider should have trade data reported by a department of the company that is independent from and not responsible for trading.[9] The personnel responsible for reporting trade data should also verify the accuracy and completeness of the data before submitting it.  Even in small companies, there are individuals who have accounting, bookkeeping, and other responsibilities separate from trading activities, and thus even small companies can arrange for independent personnel to report trade data.

     3.     Data reported.  Subject to an appropriate confidentiality agreement with the index developer, a data provider should report each bilateral, arm's-length transaction

---

[9]The CCRO recommended that trade data be provided by corporate risk control, middle office or back office personnel.

20030724-3058 Issued by FERC OSEC 07/24/2003 in Docket#: PL03-3-000
Case 1:07-cv-06682-DC    Document 32-5    Filed 09/28/2007    Page 12 of 16

Docket No. PL03-3-000                                                                                          - 12 -

between non-affiliated companies in the physical (cash) markets at all trading locations. Physical (cash) market reporting shall not include financial hedges, financial transactions, or swaps or exchanges of gas or electricity. Data should be provided for each transaction separately. For each transaction, the following information should be provided: (a) price; (b) volume; (c) buy/sell indicator; (d) delivery/receipt location; (e) transaction date and time; and (f) term (next day or next month).

Any errors identified in undertaking such reporting should be corrected as soon as practicable. While the Commission understands that, due to deadlines, index developers will not always be able to incorporate such corrections in their indices, we believe it is appropriate to require errors to be reported to help provide assurance that appropriate internal vigilance is being conducted and repetitive errors are not occurring.

4.    Error resolution process. A data provider should cooperate with the error resolution process adopted by the index developer, including adhering to the process and timeline for submitted corrections and for responding to inquiries from the index developer. Like the original data submission, this function should be carried out by personnel independent from and not responsible for trading.

5.    Data retention and review. A data provider should retain all relevant data relating to reported trades for a minimum period of three years. The data provider should have an independent auditor review the implementation of and adherence to data gathering and submission process adopted by the company at least once annually. The results of the audit should be made available to any index developer to which the data provider submits trade data, and the data provider should permit the index developer to recommend changes to improve the accuracy and timeliness of data reporting.

35.    As noted earlier, industry stakeholders were not able to reach consensus on requiring submission of counterparty information. Many parties support providing such information to improve matching and verification of trade data, but other parties contend that such data may require disclosure of sensitive proprietary commercial data. In addition, some parties note that confidentiality agreements prevent them from submitting counterparty information or object to providing such confidential information. While the Commission agrees with the CCRO best practices that counterparty information is the best means of creating accurate indices, it will not require data providers to report counterparty data at this time in order to gain safe harbor status (discussed below) for price reporting.

36.    The Commission is taking this step in recognition of the representations made at the July 2, 2003 workshop that, by not requiring counterparty data at this time, we will

20030724-3058 Issued by FERC OSEC 07/24/2003 in Docket#: PL03-3-000
Case 1:07-cv-06682-DC    Document 32-5    Filed 09/28/2007    Page 13 of 16

Docket No. PL03-3-000                                                              - 13 -

see a material increase in voluntary reporting. We will monitor the progress in reporting and determine whether any revisions need to be made to our policy. The Commission also encourages industry participants to amend their master agreements to permit counterparty reporting to index providers that provide appropriate confidentiality. We understand generic language has been developed to implement such amendments and expect that parties which are committed to improved indices will undertake such amendments.

## VI.   Safe harbor policy

37.    For data providers that can demonstrate that they have adopted and followed the standards discussed above, the Commission will presume that transaction data submitted to index developers is accurate and timely and submitted in good faith. The Commission does not intend to prosecute and/or penalize parties for inadvertent errors in reporting, nor will it refer such issues to other agencies having jurisdiction. Companies adhering to these guidelines, including the error resolution processes, should be able to report all relevant trade data with confidence.

38.    At the same time, however, the Commission will prosecute or refer to other agencies having jurisdiction instances in which companies violate the good faith standards, including instances of intentional submission of false, incomplete or misleading information to index developers. The good faith reporting presumption is a rebuttable presumption, and actions taken to manipulate, misinform, or mislead index developers and/or market participants will not be permitted.

## VII.   Future action

39.    The Commission issues this Policy Statement to encourage existing market processes for price discovery. The Policy Statement is not intended to interfere with improvements in current price indices or any future evolution of the price discovery process that will bring more accurate, reliable, and transparent price information to energy markets.

40.    The current system of published price indices is a voluntary one. The Commission notes that on June 26, 2003, it issued a notice of proposed rulemaking to adopt a code of conduct for unbundled pipeline sales service and holders of blanket marketing

Docket No. PL03-3-000                                                                                            - 14 -

certificates[10] and a related order seeking comment on the adoption of market behavior rules for holders of electric market-based tariffs and authorizations.[11] In both cases, the Commission included in the proposed rules a requirement that, to the extent that the pipeline, blanket certificate holder, or market-based rate seller reported transactions to index developers, the information provided must be "complete, accurate, and factual" and that the entity "shall notify the Commission of whether it engages in such reporting for all sales." In addition, the Commission provided that the seller "shall adhere to such other standards and requirements for price reporting as the Commission may order."[12]

41.    The Commission will require that any prospective use of any index in its jurisdictional tariffs meet the criteria set forth above for price index developers and reflect adequate liquidity at the referenced location to be reliable.

42.    While the Commission is hopeful that this policy statement will encourage more voluntary price reporting and that confidence in the accuracy, reliability, and transparency of price indices will increase, the Commission will watch developments over the next several months closely. The Commission will assess the degree to which voluntary reporting increases and how index developers and data providers implement the Commission's recommended standards. If voluntary reporting does not increase to the point that indices are sufficiently robust to support a healthy market, or if the standards recommended by the Commission herein are not widely adopted, the Commission will consider further action.

43.    To accomplish the foregoing, we instruct our staff to monitor both the level of reporting to index developers and the amount of adherence to the standards set forth herein. To that end, staff should take steps to: identify the level of market participants currently reporting; identify increases (or lack thereof) in reporting by market participants currently not reporting; determine the quality of reporting (i.e., adherence to the above standards by data providers); review the quality of reported indices ( i.e., adherence to the above standards by index developers); and communicate with index developers to insure appropriate Commission data access when needed. We encourage market participants and their trade associations and index developers to assist our staff in its efforts.

---

[10] "Amendments to Blanket Sales Certificates," Notice of Proposed Rulemaking, Docket No. RM03-3-000 (Code of Conduct NOPR).

[11] "Order Seeking Comments on Proposed Revisions to Market-Based Rate Tariffs and Authorizations," Docket Nos. EL01-118-000, *et al.* (Behavior Rules Order).

[12] Code of Conduct NOPR at 24; Behavior Rules Order at 22.

20030724-3058 Issued by FERC OSEC 07/24/2003 in Docket#: PL03-3-000
Case 1:07-cv-06682-DC    Document 32-5    Filed 09/28/2007    Page 15 of 16

Docket No. PL03-3-000                                                                                                          - 15 -

44.     In the event the Commission is required to take further action, we note that we have broad authority to obtain price information from market participants. For natural gas, the Commission has broad authority under Sections 14(a) and 16 of the Natural Gas Act (NGA), 15 U.S.C. §§ 717m(a) & 717o (2000), to investigate and gather relevant data and to make such orders, rules and regulations as may be necessary to carry out the provisions of the NGA. It is noteworthy that the Commission's investigative power extends over all persons, not just natural-gas companies subject to the Commission's rate and certificate authority. Of course, the Commission has direct regulatory authority over companies that transport natural gas in interstate commerce or that make sales of natural gas in interstate commerce for resales that are not "first sales."

45.     Moreover, the Commission has authority under Section 315 of the Natural Gas Policy Act of 1978 (NGPA) to "require any first sale purchaser of natural gas under a new contract, a successor to an existing contract, or a rollover contract to file with the Commission a copy of such contract, together with all ancillary agreements and any existing contact applicable to such natural gas."[13]  As defined in Sction 2(21) of the NGPA, first sale purchasers would include interstate or intrastate pipelines, local distribution companies, certain end-users, or sales that precede sales to these entities. *Id.* at § 3301(21). This authority would permit the Commission to require the submission of price information for a broad array of natural gas transactions.

46.     With respect to wholesale sales of electricity, the Commission has significant authority to require data reporting and obtain data. under the Federal Power Act (FPA) including the broad investigatory authority described with reference to the NGA, 16 U.S.C. § 824d(c) (2000). For example, recently the Commission revised its Section 205(c) filing requirements to keep pace with the changes in electricity markets. As the

---

[13] 15 U.S.C. § 3375 (2000). Current Section 315 was originally Section 315(c) when the NGPA was enacted in 1978. Section 315(a) addressed contract duration and Section 315(b) addressed the right of first refusal. The Wellhead Decontrol Act of 1989 removed Sections 315(a) and (b) but left Section 315(c), redesignated as Section 315. The House Report on the Wellhead Decontrol Act states that "the Committee intends that the Energy Information Administration of the Department of Energy, and the FERC as well, continue to collect and publish all appropriate data, including wellhead pricing data and other natural gas-related statistics, which may be reasonably necessary to a full understanding of this important industry by the public, the industry, the Congress, and others." *See* H.R. Rep. No. 29, 101st Cong., 1st Sess. At 10-11 (1989).

Docket No. PL03-3-000 - 16 -

Commission explained in Order No. 2001, "the Electric Quarterly Reports' more accessible format will make the information more useful to the public and the Commission and will better fulfill the public utilities' responsibility under FPA Section 205(c) to have rates on file in a convenient form and place. The data should provide greater price transparency, promote competition, enhance confidence in the fairness of markets, and provide a better means to detect and discourage discriminatory practices."[14] These goals are consistent with the goals of better price discovery. While the Electronic Quarterly Reports are not designed to achieve the data needed for index formation, they are illustrative of the authority that the Commission has under the FPA to require jurisdictional entities to report price data.

47.    Taken together, the authorities of the NGA, NGPA, and FPA provide the Commission with strong tools to mandate price reporting if voluntary price reporting does not increase to a level that adequately restores confidence in natural gas and electric price indices.

By the Commission.

( S E A L )

                Linda Mitry,
               Acting Secretary.

---

[14] "Revised Public Utility Filing Requirements," Order No. 2001, FERC Stats. & Regs. ¶ 31,127 at 30,123 (2002).