JEFF BINGAMAN, New Mexico, CHAIRMAN

DANIEL K. AKAKA, Hawaii
BYRON L. DORGAN, North Dakota
RON WYDEN, Oregon
TIM JOHNSON, South Dakota
MARY L. LANDRIEU, Louisiana
MARIA CANTWELL, Washington
KEN SALAZAR, Colorado
ROBERT MENENDEZ, New Jersey
BLANCHE L. LINCOLN, Arkansas
BERNARD SANDERS, Vermont
JOHN TESTER, Montana

PETE V. DOMENICI, New Mexico
LARRY E. CRAIG, Idaho
CRAIG THOMAS, Wyoming
LISA MURKOWSKI, Alaska
RICHARD BURR, North Carolina
JIM DeMINT, South Carolina
BOB CORKER, Tennessee
JEFF SESSIONS, Alabama
GORDON H. SMITH, Oregon
JIM BUNNING, Kentucky
MEL MARTINEZ, Florida

ROBERT M. SIMON, STAFF DIRECTOR
SAM E. FOWLER, CHIEF COUNSEL
FRANK J. MACCHIAROLA, REPUBLICAN STAFF DIRECTOR
JUDITH K. PENSABENE, REPUBLICAN CHIEF COUNSEL

# United States Senate

COMMITTEE ON
ENERGY AND NATURAL RESOURCES
WASHINGTON, DC 20510–6150

ENERGY.SENATE.GOV

February 6, 2007

The Honorable Joseph T. Kelliher
Chairman
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Dear Chairman Kelliher:

I write regarding a critical consumer protection issue that has, in recent years, given rise to a number of important policy questions of interest to the Senate Energy and Natural Resources Committee. In particular, increased volatility of natural gas prices has posed a significant challenge for consumers and businesses across the country, as well as the state regulators who are charged with overseeing the operations of natural gas utilities and the costs passed on to end-use consumers.

Concerns about volatility in natural gas markets have been recently cited in coverage of last fall's collapse of the Amaranth hedge fund. Specifically, a January 30, 2007, *Wall Street Journal* report noted that, "in the last half hour of trading Aug. 29 [2006], the price of the expiring contract for September delivery jumped. The surged wiped out hundreds of millions of dollars in Amaranth's gains. The fund told NYMEX [the New York Mercantile Exchange] it suspected someone had manipulated prices." This volatility was also demonstrated as recently as this past month. On Monday, January 29, 2007, *Gas Daily* reported that the previous Friday, "a day after plunging 51.6 cents to close below $7," the February NYMEX gas futures contract "continued its week-long roller coaster ride" and settled 27 cents higher, at $7.175/MMBtu. Then, on Monday, the contract ended the month 26 cents lower, at $6.917/MMBtu.

In my view, the evolution of complex and inter-related markets for financial and physical energy commodities has elevated the importance of the Federal Energy Regulatory Commission's (FERC's, or the Commission's) role in ensuring "just and reasonable" natural gas prices. As noted in a recent report from the Government Accountability Office (GAO)[1], natural gas commodity prices have risen about 190 percent since 1993--and now account for about 60 percent of the costs borne by end-use consumers, compared to 30 percent little more than a decade ago. In practice, this means states' ability to adequately regulate the costs passed on to local consumers has comparatively lessened, while FERC's market monitoring and enforcement efforts—and communication with its state partners—have taken on heightened significance for the estimated 60 million homes and 5 million businesses across this nation that rely on natural gas as an energy source. As a matter of policy, this increased volatility also raises a question as to whether the Commission can continue to consider "just and reasonable" rates for natural gas that are attached by contract to the NYMEX end-of-month price index.

---

[1] U.S. Government Accountability Office, *Natural Gas: Roles of Federal and State Regulators in Overseeing Prices*, GAO-06-968 (Washington, D.C.: Sept. 8, 2006)

Within this context, I am certain you agree that the Commission must take steps to address GAO's observation that "some stakeholders…had little confidence that natural gas commodity markets were free from manipulation," and that "because states rely on FERC to oversee the commodity market, it is increasingly important for stakeholders to understand what FERC is doing to police the market."

In view of these findings as well as bipartisan legislative proposals expected to be reintroduced this Congress related to enhancing commodity market transparency, the Committee would benefit from a greater understanding of the Commission's efforts to implement its expanded authorities under the Energy Policy Act (EPACT) of 2005. Particular attention must also be paid to the internal policies and procedures guiding FERC's market oversight, investigation, enforcement activities and timely notification of the industry and states when potential market anomalies occur. As such, I would appreciate your response to the following questions no later than February 21, 2007:

1.) The Energy Policy Act of 2005 broadened the scope of the Commission's authority to review transactions in financial markets related to natural gas. This is particularly important, given that indices derived from the trading of NYMEX gas futures contracts are included in many supply agreements entered into between producers and Local Distribution Companies (LDCs), the costs of which are ultimately passed along to end-use consumers. Please describe the Commission's efforts to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading, the last half-hour of which forms the basis of the index used in many producer/LDC supply contracts.

2.) Pursuant to provisions of EPACT, FERC and the Commodity Futures Trading Commission (CFTC) in October 2005 jointly entered into a Memorandum of Understanding regarding information sharing, which has presumably enhanced the capabilities of FERC's market monitoring unit. In general, when a potential anomaly in financial natural gas markets is detected by FERC's monitoring unit:

   a. What is the process by which the full complement of Commissioners is notified?
   b. What is the process by which the Commissioners decide whether to institute a more comprehensive investigation?
   c. What is the process by which the Commissioners determine whether to contact the CFTC?
   d. What is the process by which the Commissioners determine whether to contact state regulators or make public the existence of an anomaly or investigation?
   e. Does written guidance exist regarding these policies?

3.) Last fall's collapse of the Amaranth hedge fund--with its very large positions in financial natural gas markets--has led to heightened concerns about market transparency and potential consumer impacts of speculative trading on the prices being paid for natural gas. In 2006, were there any times FERC's market monitoring or enforcement staff detected and brought to your attention potentially anomalous market behavior related to gas futures contract trading, including end-of-month trading, which may effect the accuracy or representative nature of NYMEX indices used in LDC supply contracts? If so:

   a. Please identify the days and months in which the suspected anomalies occurred.
   b. Please describe any subsequent discussions or correspondence between you or your staff, and your counterparts at the CFTC.

    c. Please describe any subsequent discussions or correspondence between you or your staff and any members of the industry or financial communities.
    d. Please describe any subsequent discussions or correspondence between you or your staff and any state regulators.
    e. At any point or in any forum, did the Commission consider notifying the public or state regulators, given potential impacts for the end-use natural gas consumers?

4.) In its September 2006 report, the GAO identified a number of categories of information FERC should consider providing to states and the public in a more timely fashion. In addition to the recent release of the new market oversight website, is the Commission contemplating the development of additional policies to implement these recommendations?

Thank you for your attention to this request. I look forward to your timely reply.

Sincerely,

Jeff Bingaman
Chairman