DANIEL K. AKAKA, Hawaii
BYRON L. DORGAN, North Dakota
RON WYDEN, Oregon
TIM JOHNSON, South Dakota
MARY L. LANDRIEU, Louisiana
MARIA CANTWELL, Washington
KEN SALAZAR, Colorado
ROBERT MENENDEZ, New Jersey
BLANCHE L. LINCOLN, Arkansas
BERNARD SANDERS, Vermont
JOHN TESTER, Montana

PETE V. DOMENICI, New Mexico
LARRY E. CRAIG, Idaho
CRAIG THOMAS, Wyoming
LISA MURKOWSKI, Alaska
RICHARD BURR, North Carolina
JIM DeMINT, South Carolina
BOB CORKER, Tennessee
JEFF SESSIONS, Alabama
GORDON H. SMITH, Oregon
JIM BUNNING, Kentucky
MEL MARTINEZ, Florida

ROBERT M. SIMON, STAFF DIRECTOR
SAM E. FOWLER, CHIEF COUNSEL
FRANK J. MACCHIAROLA, REPUBLICAN STAFF DIRECTOR
JUDITH K. PENSABENE, REPUBLICAN CHIEF COUNSEL

# United States Senate

COMMITTEE ON
ENERGY AND NATURAL RESOURCES

WASHINGTON, DC 20510–6150

ENERGY.SENATE.GOV

February 6, 2007

The Honorable Reuben Jeffery III
Chairman
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington DC 20581

Dear Chairman Jeffery:

I write regarding a critical consumer protection issue that has, in recent years, given rise to a number of important policy questions of interest to the Senate Energy and Natural Resources Committee. In particular, increased volatility of natural gas prices has posed a significant challenge for consumers and businesses across the country, as well as the state regulators who are charged with overseeing the operations of natural gas utilities and the costs passed on to end-use consumers.

Concerns about volatility in natural gas markets have been recently cited in coverage of last fall's collapse of the Amaranth hedge fund. Specifically, a January 30, 2007, *Wall Street Journal* report noted that, "in the last half hour of trading Aug. 29 [2006], the price of the expiring contract for September delivery jumped. The surged wiped out hundreds of millions of dollars in Amaranth's gains. The fund told NYMEX [the New York Mercantile Exchange] it suspected someone had manipulated prices."

Recent press accounts have also indicated that the Commodity Futures Trading Commission (CFTC) has yet to receive data it requested from the InterContinental Exchange (ICE) in the wake of Amaranth's collapse, related to natural gas futures trading. Specifically, *Platts Commodity News* on January 30, 2007, reported that "sources told Platts that Amaranth had huge positions on ICE and in other off-NYMEX instruments to keep its big bets out of sight of regulators." Yet according to the same report, the CFTC said that "the special calls for information were not related to any investigation of a specific market participant on ICE or NYMEX, nor were the calls made to begin conducting regular market surveillance of trading on ICE."

In my view, the evolution of complex and inter-related markets for financial and physical energy commodities has elevated the importance of federal regulators' role in ensuring fair and transparent natural gas prices. As noted in a recent report from the Government Accountability Office (GAO)[1], natural gas commodity prices have risen about 190 percent since 1993--and now account for about 60 percent of the costs borne by end-use consumers, compared to 30 percent little more than a decade ago. In practice, this means states' ability to adequately regulate the costs passed on to local consumers has comparatively lessened, while federal regulators' market monitoring and enforcement efforts—and communication with states—have taken on heightened significance for the estimated 60 million homes and 5 million businesses across this nation that rely on natural gas as an energy source.

---

[1] U.S. Government Accountability Office, *Natural Gas: Roles of Federal and State Regulators in Overseeing Prices*, GAO-06-968 (Washington, D.C.: Sept. 8, 2006)

In view of these developments as well as bipartisan legislative proposals expected to be reintroduced this Congress related to enhancing commodity market transparency, the Committee would benefit from a greater understanding of the Commission's market surveillance program and efforts to implement provisions of the Energy Policy Act (EPACT) of 2005. Particular attention must also be paid to the internal policies and procedures guiding the CFTC's market oversight, investigation, enforcement activities and timely notification of the industry and states when potential market anomalies occur. As such, I would appreciate your response to the following questions no later than February 21, 2007:

1.) The Committee's interest in the CFTC's market surveillance program stems in part from the fact that indices derived from the trading of NYMEX gas futures contracts are included in many supply agreements entered into between producers and Local Distribution Companies (LDCs). These costs of are ultimately passed along to natural gas consumers across the nation. As such:
   a. Please describe the Commission's efforts to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading, the last half-hour of which forms the basis of the index used in many producer/LDC supply contracts.
   b. Please describe the Commission's efforts to monitor the trading of gas futures contracts on ICE, and the specific steps the Commission has taken to monitor the activities of traders who take positions in both ICE and NYMEX gas futures markets.

2.) Pursuant to provisions of EPACT, the Federal Energy Regulatory Commission (FERC) and the CFTC in October 2005 jointly entered into a Memorandum of Understanding regarding information sharing, which has presumably enhanced each agency's market monitoring capabilities. In general, when a potential anomaly in financial natural gas markets is detected by the CFTC's market surveillance program:

   a. What is the process by which the full complement of Commissioners is notified?
   b. What is the process by which the Commissioners decide whether to institute a more comprehensive investigation?
   c. What is the process by which the Commissioners determine whether to contact FERC?
   d. What is the process by which the Commissioners determine whether to contact state regulators or make public the existence of an anomaly or investigation?
   e. Does written guidance exist regarding these policies?

3.) Last fall's collapse of the Amaranth hedge fund--with its very large positions in financial natural gas markets--has led to heightened concerns about market transparency and potential consumer impacts of speculative trading on the prices being paid for natural gas. In 2006, were there any times the CFTC's market surveillance staff detected and brought to your attention potentially anomalous market behavior related to gas futures contract trading, including end-of-month trading, which may effect the accuracy or representative nature of NYMEX indices used in LDC supply contracts? If so:

   a. Please identify the days and months in which the suspected anomalies occurred.
   b. Please describe any subsequent discussions or correspondence between you or your staff, and your counterparts at FERC.
   c. Please describe any subsequent discussions or correspondence between you or your staff and any members of the industry or financial communities.
   d. Please describe any subsequent discussions or correspondence between you or your staff and any state regulators.

    e.  At any point or in any forum, did the Commission consider notifying the public or state regulators, given potential impacts for the end-use natural gas consumers?

Thank you for your attention to this request. I look forward to your timely reply.

                      Sincerely,

                        Jeff Bingaman
                        Chairman