

**U.S. Commodity Futures Trading Commission**
Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581

Reuben Jeffery III
Chairman

(202) 418-5050
(202) 418-5533 Facsimile
*www.cftc.gov*

February 22, 2007

The Honorable Jeff Bingaman
Chairman, Committee on Energy and Natural Resources
United States Senate
703 Hart Senate Office Building
Washington, D.C. 20510-6150

Dear Senator Bingaman:

The Commodity Futures Trading Commission ("Commission") is pleased to respond to your letter of February 6 on behalf of the Senate Energy and Natural Resources Committee ("Committee") with respect to natural gas markets.

This letter will outline the Commission's market surveillance program and our oversight, investigative, and enforcement activities pursuant to our governing statute, the Commodity Exchange Act ("CEA").[1] As you requested, please find below the Commission's responses to the questions you have posed. The questions appear in bold-faced type, followed immediately by the Commission's answers.

**1. The Committee's interest in the CFTC's market surveillance program stems in part from the fact that indices derived from the trading of NYMEX gas futures contracts are included in many supply agreements entered into between producers and Local Distribution Companies (LDCs). These costs are ultimately passed along to natural gas consumers across the nation. As such:**

> **a. Please describe the Commission's efforts to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading, the last half-hour of which forms the basis of the index used in many producer/LDC supply contracts.**

---

[1] 7 U.S.C. §§ 1, *et seq.* The provisions of the CEA, as well as the Commission's regulations promulgated thereunder, may be found on the Commission's website at www.cftc.gov.

The CEA provides that the Commission shall have exclusive jurisdiction (with certain exceptions not relevant to energy trading) with respect to accounts, agreements, and transactions involving commodity futures and options contracts that are traded or executed on a designated contract market ("DCM," which is how the CEA refers to regulated futures exchanges).[2] Pursuant to that exclusive jurisdiction, the Commission's market oversight staff conducts active, continuous monitoring and surveillance of all futures and options trading activity that occurs on DCMs.

The New York Mercantile Exchange ("NYMEX") is a DCM whose natural gas futures and options contracts are constantly monitored as part of the Commission's market surveillance program. Pursuant to the Commission's statutory mandate under the CEA, the primary mission of this program is to identify situations that could pose a threat of manipulation and to initiate appropriate preventive actions. Each day, for all active futures and option contract markets, the Commission's market surveillance staff monitors the activities of large traders, key price relationships, and relevant supply and demand factors to ensure market integrity.

The Commission's surveillance efforts for DCMs are tailored to the type of commodity (e.g., physical vs. financial) and the settlement mechanism (e.g., physical delivery vs. cash settlement). In conducting market surveillance of a physical delivery futures contract such as NYMEX natural gas futures, the Commission's surveillance staff considers questions such as:

- Are the positions held by the largest long trader(s) greater in size than deliverable supplies not already owned by such trader(s)?

- Are the long traders likely to demand delivery?

- Is taking delivery the least costly means of acquiring the commodity?

- To what extent are the largest short traders capable of making delivery?

- Is making futures delivery a better alternative than selling the commodity in the cash market?

- Is the futures price, as the contract approaches expiration, reflecting the cash market value of the deliverable commodity?

- Is the price spread between the expiring future and the next delivery month reflective of underlying supply and demand conditions in the cash market?

The Commission's surveillance staff focuses, for example, on looking for large positions, especially in comparison to potential deliverable supply of the commodity. Such a dominant position might provide a trader with market power an opportunity to cause a price manipulation, such as in a "squeeze," when a single trader holding a large long (buy-side) position can demand delivery of more of a commodity than is available for delivery. In such a situation, traders

---

[2] 7 U.S.C. § 2(a)(1)(A). The CEA also sets forth a comprehensive set of designation criteria, core principles, and other provisions governing the operations of DCMs. See Sections 5 and 5c of the CEA, 7 U.S.C. §§ 7 and 7a-2, et seq.

holding short (sell-side) positions may have no alternative but to buy back their positions at artificially high prices dictated by the dominant long trader.

To accomplish its objectives, the Commission's market surveillance program uses many sources of daily market information. Some of this information is publicly available, including data on: the overall supply, demand, and marketing of the underlying commodity; futures, option and cash prices; and data on trading volume and open contracts. Some of the information is highly confidential, including data that the Commission regularly receives from DCMs, intermediaries and large traders.

DCMs report to the Commission the daily positions and transactions of each of their clearing members. The data is transmitted electronically during the morning after the "as of" date. It shows, separately for proprietary and customer accounts, the aggregate position and trading volume of each clearing member in each futures and option contract. The data is useful for quickly identifying the firms that clear the largest buy or sell volumes or hold the biggest positions in a particular market. The clearing member data, however, does not identify the beneficial owners of the positions.

To address this limitation, the Commission uses a large-trader reporting system for DCMs. Under this system, clearing members, futures commission merchants ("FCMs," which are commodity brokers), and foreign brokers (collectively called "reporting firms") electronically file daily reports with the Commission. These reports contain the futures and option positions of individual traders that hold positions above specific reporting levels set by Commission regulations.[3] If, at the daily market close, a reporting firm has a trader with a position at or above the Commission's reporting level in any single futures month or option expiration, it reports that trader's entire position in all futures and options expiration months in that commodity, regardless of size.

Since traders frequently carry futures positions through more than one FCM, and since individuals sometimes control or have a financial interest in more than one account, the Commission routinely collects information that enables its surveillance staff to aggregate related accounts. Reporting firms must file a CFTC Form 102 to identify each new account that acquires a reportable position. In addition, once an account reaches a reportable size, the account owner periodically is required to file a more detailed report, a CFTC Form 40, to further identify accounts and reveal any relationships that may exist with other accounts or traders.

To obtain even more detailed and targeted information, the Commission may issue a "special call" to a reporting trader or firm. The special call is designed to gain additional information on a participant's trading and delivery activity, and may include the trader's positions and transactions in the underlying commodity and/or in related over-the-counter ("OTC") derivative products.

---

[3] A list of current Commission reporting levels can be found at the Commission's website, www.cftc.gov. The current reporting level for natural gas futures is 200 contracts.

Surveillance economists prepare weekly summary reports for futures and option contracts that are approaching their expiration periods. Regional surveillance supervisors immediately review these reports. Surveillance staff advises the Commissioners and senior staff of significant market developments at weekly surveillance meetings (which are non-public, closed meetings) so that they will be prepared to take prompt action if necessary.

The market surveillance process for DCM trading, however, is not conducted exclusively by the Commission. The CEA's designation criteria and core principals for DCMs impose significant market surveillance responsibilities on DCMs.[4] Accordingly, surveillance issues are usually handled jointly by Commission staff and the affected DCM itself (NYMEX, in the case of natural gas futures). Relevant surveillance information is shared and, when appropriate, corrective actions are coordinated. Situations of particular surveillance interest are jointly monitored and, if necessary, oral contacts are made with the brokers or traders who are significant participants in the market in question. These contacts may be for the purpose of asking questions, confirming reported positions, alerting the brokers or traders as to the regulatory concern regarding the situation, or warning them to conduct their trading responsibly. Throughout its history, the Commission, together with the DCMs, has been quite effective in using these methods to resolve surveillance issues at an early stage.

The Commission customarily gives the DCM the first opportunity to resolve issues arising in its markets, either informally or through emergency action. If a DCM fails to take actions that the Commission deems appropriate, the Commission has broad emergency powers under the CEA to order the DCM to take specific actions. Such actions could include limiting trading to liquidating transactions, imposing or reducing limits on positions, requiring the liquidation of positions, extending a delivery period, or closing a market. Fortunately, most issues are resolved without the need to use the Commission's emergency powers. The fact that the Commission has had to take emergency action only four times in its history demonstrates its commitment to refrain from intervening in the futures markets unless all other efforts have been unsuccessful.

The surveillance staff also monitors compliance with Commission and DCM speculative position limit rules.[5] These rules are designed to prevent traders from accumulating concentrations of contracts of a size that could potentially disrupt a market. To monitor compliance with those limits, the market surveillance staff reviews daily large-trader reports for possible violations. Although bona fide hedgers are exempt from speculative limits, Commission staff monitor hedgers' compliance with their exemption levels.

In summary, the Commission has a comprehensive market surveillance program to detect and prevent disruption of the economic functions of all the commodity futures and option markets that it oversees, including natural gas.

---

[4] See Sections 5(b)(2) and 5(d)(4) of the CEA, 7 U.S.C. §§ 7(b)(2), 7(d)(4).

[5] The speculative position limit is the maximum position, either net long or net short, in one commodity future (or option), or in all futures (or options) of one commodity combined, that may be held or controlled by one person (other than a person eligible for a hedge exemption) as prescribed by a DCM and/or by the Commission.

With respect to end-of-month trading of natural gas futures in particular, as you noted, the NYMEX natural gas futures contract settlement price on the last day of trading in an expiring contract month is the basis for pricing many producer/LDC supply contracts. DCMs establish settlement prices each day for each contract month in order to provide a basis for clearing trades and settling accounts between clearing members with positions or trades in each contract month. Settlement prices are used to determine both margin calls and invoice prices for deliveries. On the last trading day for its energy futures contracts, including natural gas futures, NYMEX establishes its daily settlement prices by calculating the weighted average price of all trades that took place during the last half-hour of trading.[6] These settlement prices are then used as the basis for a final marking-to-market of all open positions and as the basis for pricing deliveries.

In recent years, DCMs' settlement prices have taken on a new role, as other entities independently have determined to rely on these prices to price various cash market transactions, such as OTC swaps and LDC purchases of natural gas. This is a relatively new phenomenon, as futures exchanges' settlement prices were not specifically designed to serve these other purposes. In these circumstances, the Commission encourages a continuing dialogue between the marketplace (NYMEX) and market participants and users (LDCs) to ensure that the interests of all are being served.

As for Commission surveillance of end-of-month trading of natural gas futures, the surveillance staff's monitoring activities include several elements. First, it should be noted that, as expiration of trading approaches, all traders are required to reduce their positions to, or below, the speculative position limit of 1,000 contracts for the last three days of trading, unless they have been granted a hedge exemption by NYMEX. Surveillance staff monitors all positions in the market for compliance with both speculative limits and hedge exemptions. Due to this monitoring of all positions going into the last trading day, surveillance staff is aware of the identity of the large position holders who will, presumably, be large traders on the last day, including the close. If the Commission staff has any concerns about a particular trader, staff will contact counterparts on the NYMEX surveillance staff to make sure they have contacted the trader to remind him or her of the obligation to liquidate the position in an orderly manner. In this context, NYMEX has provided general guidance to market participants regarding what constitutes trading in an "orderly manner," including the concept of liquidating "ratably" on the close – i.e., liquidating a position a portion at a time, in a series of trades, rather than all at once in a single trade.

After the contract expires, if pricing activity during the closing range warrants further inquiry, Commission surveillance staff will get transaction level data from the exchange (information from the trade register with complete details of each trade). If further inquiry is warranted, the surveillance staff can conduct a more detailed review itself or refer the matter to the Division of Enforcement (see the answer to Question 2b below).

---

[6] This half-hour closing range on the last trading day is the longest in the futures industry, and is considerably longer than NYMEX's normal two-minute closing range.

5

**b. Please describe the Commission's efforts to monitor the trading of gas futures contracts on ICE, and the specific steps the Commission has taken to monitor the activities of traders who take positions in both ICE and NYMEX gas futures markets.**

The Intercontinental Exchange, Inc. ("ICE") is an exempt commercial market ("ECM"), operating in reliance on the exemption in Section 2(h)(3) of the CEA.[7] As noted in Section 2(h)(5)(F) of the CEA, ECMs, unlike designated contract markets, are not "registered with, or designated, recognized, licensed or approved by the Commission." Because of ICE's status as an ECM, both ICE itself, as well as transactions executed on ICE, are exempt from most provisions of the CEA. Trading on ICE, unlike trading on a regulated DCM such as NYMEX, is not subject to regular, ongoing market surveillance oversight by the Commission.

However, ECMs are subject to certain limited reporting requirements that are authorized under Section 2(h)(5)(B)(i) of the CEA and spelled out in Commission Regulation 36.3(b).[8] Pursuant to these provisions, an ECM is required to identify those transactions conducted on the facility with respect to which the ECM intends to rely on the statutory Section 2(h)(3) exemption, and which averaged five trades per day or more over the most recent calendar quarter. With respect to such transactions, the ECM is required to transmit weekly to the Commission certain basic trade information, including "the commodity, the [delivery or price-basing] location, the maturity date, whether it is a financially settled or physically delivered instrument, the date of execution, the time of execution, the price, [and] the quantity."[9] The reports filed pursuant to Regulation 36.3(b) can provide Commission surveillance staff with information regarding price spikes or unusual divergence between the price of a commodity traded on an ECM and the price of a related commodity traded on a DCM.[10] The Regulation 36.3(b) reports, however, do not require ECMs to identify the individual traders holding positions on the ECM. Thus, trading on an ECM is not subject to the kind of in-depth monitoring, described above, that applies to trading on a regulated DCM.

Should the Regulation 36.3(b) reports, or other information obtained by surveillance staff (including information from futures market large trader reports), indicate a need for further information from an ECM, Section 2(h)(5)(B)(iii) of the CEA and Commission Regulation 36.3(b)(3) give the Commission authority to obtain from an ECM "such information related to its business as an electronic trading facility exempt under paragraph [2(h)](3) … as the Commission may deem appropriate" pursuant to a "special call." The issuance of a special call to an ECM is simply an indication that the Commission's staff is seeking additional information. A special call, in and of itself, is not evidence of improper or illegal market behavior.

---

[7] The CEA provisions governing ECMs are found at 7 U.S.C. §§ 2(h)(3)-(5).

[8] 17 C.F.R. § 36.3(b).

[9] ICE has been submitting such trade data for natural gas transactions meeting the regulatory reporting threshold since January 1, 2005.

[10] Sections 36.3(b)(1)(iii)-(iv) of the Commission's regulations also require ECMs to maintain a record of any complaints they receive alleging fraud or manipulation in transactions executed in reliance on the Section 2(h)(3) exemption, and to provide the Commission with a copy of the record of each such complaint that would constitute a violation of the CEA or Commission regulations.

On September 28 and December 1, 2006, respectively, the Commission issued two special calls to ICE that required ICE to provide position data to the Commission, on an ongoing basis, related to transactions in ICE's most heavily traded natural gas swap contracts. Specifically, these separately-issued special calls required that ICE provide the Commission with clearing member position data and individual trader position data in the various ICE natural gas contracts that are cash-settled based on NYMEX natural gas contracts.

The special call for clearing member position data was issued by the Commission on September 28, 2006, and the Commission has been receiving responsive data from ICE, on a daily basis, since October 10, 2006. The individual trader position data special call was issued on December 1, 2006. ICE found it necessary to make various technical adjustments to its systems in order to produce the requested materials, which it has done. Those adjustments are now in place, and the Commission received the first batch of individual trader daily position data on February 16 (showing positions as of February 15).

These two special calls were issued primarily in order to assist Commission staff in its surveillance of the related NYMEX natural gas contracts. Compliance with special calls is not voluntary, but mandatory. The special calls were not issued as part of an investigation of any particular market participant or trading activity on either ICE or NYMEX. Nor, consistent with the regulatory framework governing ECMs set forth in the CEA, were they issued in order to conduct regular market surveillance of ICE contracts themselves.

2. **Pursuant to provisions of EPACT, the Federal Energy Regulatory Commission (FERC) and the CFTC in October 2005 jointly entered into a Memorandum of Understanding regarding information sharing, which has presumably enhanced each agency's market monitoring capabilities.[11] In general, when a potential anomaly in financial natural gas markets is detected by the CFTC's market surveillance program:**

   a. **What is the process by which the full complement of Commissioners is notified?**

The Commission's market surveillance program keeps the Commissioners informed of surveillance-related issues through confidential[12] regular weekly surveillance briefings. These briefings cover matters of interest in futures markets, particularly expiring futures and option contracts, as well as related cash and OTC markets where appropriate. The regular surveillance briefings include discussion of surveillance issues involving regulated contracts, but also cover a much wider range of issues that may affect futures markets. Such topics, for example, might include price volatility caused by:

- Seasonal factors (heating oil prices tend to be more volatile in the winter, gasoline prices more volatile in the summer driving season);

---

[11] The Committee's letter notes that "the Committee would benefit from a greater understanding of the Commission's ... efforts to implement provisions of the Energy Policy Act (EPACT) of 2005." The only provision of the EPACT that was subject to implementation by the Commission was the requirement that the Commission and the Federal Energy Regulatory Commission ("FERC") enter into a Memorandum of Understanding. This occurred in October 2005.

[12] Commission surveillance meetings are closed to the public pursuant to Section 8(a) of the CEA, 7 U.S.C. § 12(a).

7

- Weather (drought/rain affecting grain prices or Hurricanes Katrina and Rita affecting gas prices);

- Disease (mad cow disease affecting cattle prices);

- Political events (an upcoming OPEC meeting affecting crude oil prices); or

- Economic events (an anticipated action by the Federal Reserve on interest rates affecting financial futures, or employment or other trade statistics affecting security futures index prices).

In the context of each of these discussions, the staff reviews the identity of the largest traders in various markets and analyzes their apparent trading strategies and potential future actions. The surveillance staff also regularly covers issues of broad interest regarding futures trading, such as, for example, the role and impact of hedge funds and managed money in the futures markets. In the case of a developing event that would need the Commission's immediate attention, the surveillance staff would, of course, inform the Commissioners immediately without waiting for the next regularly scheduled surveillance meeting.

**b. What is the process by which the Commissioners decide whether to institute a more comprehensive investigation?**

The Commission's investigations are coordinated through the Division of Enforcement ("Enforcement").[13] Enforcement may receive referrals from several sources, including: the Commission's market surveillance staff; Enforcement's interaction with compliance staff at the relevant DCMs; market participants and complaints from members of the public; and State, Federal, and international regulatory authorities.

Enforcement is authorized to institute an investigation without seeking formal Commission approval when information comes its attention indicating that persons potentially have violated, are violating, or are about to violate the provisions of the CEA of the Commission's rules, regulations, or orders. The Commission also can order that an investigation be commenced, though most investigations are initiated by staff. The purpose of the investigation is to discover facts and evidence relevant to the Commission's determination as to the necessity and appropriateness of filing an administrative enforcement proceeding, instituting a civil injunctive action in a Federal district court, or taking other preventative or remedial action.

Investigative evidence may be obtained through voluntary statements and submissions, and by the exercise of inspection powers over DCMs, reporting traders, and persons required by law to register with the Commission. Enforcement also may request that the Commission authorize the issuance of administrative subpoenas. The issuance of a subpoena requires a formal "Order of Investigation" by the Commission containing a general description of the scope of the investigation, the authority under which it is being conducted, and a designation of the staff members who are authorized to issue subpoenas.

---

[13] Commission investigations are governed by the rules contained in Part 11 of the Commission's regulations, 17 C.F.R. §§ 11.1, *et seq.*

The Director of Enforcement reports to the Commission the results of staff investigations and recommends such enforcement action as may be appropriate. Enforcement provides the Commissioners weekly briefings concerning material developments in investigations, litigation, and other matters of interest. As well, Enforcement staff generally brief the Commissioners on more significant matters at a monthly, non-public Commission meeting. Informal ad hoc meetings occur as necessary to supplement these closed Commission meetings.

### c. What is the process by which the Commissioners determine whether to contact FERC?

The October 2005 Memorandum of Understanding is a formal agreement by the Commission and FERC to coordinate, on a regular basis, with respect to activities of mutual interest. Accordingly, the respective staffs of the Commission and FERC are authorized to share information concerning ongoing oversight, investigative, and enforcement activities without the need for specific Commission-level approval of each particular contact. To that end, designated Commission staff remain in regular contact with counterparts at FERC, and FERC staff is routinely invited to attend Commission enforcement and surveillance meetings. The Commission's Enforcement staff also meets with FERC counterparts on a quarterly basis to share information on issues and matters of mutual interest.

### d. What is the process by which the Commissioners determine whether to contact state regulators or make public the existence of an anomaly or investigation?

Investigative proceedings and all information and records obtained during an investigation, whether obtained pursuant to a subpoena or otherwise, are non-public. The Commission established these confidentiality provisions in Commission Regulation 11.3[14] in order to protect the interests of persons whose activities are being investigated from possible adverse implications prior to development of the facts, and to protect the investigatory process against possible obstruction. See *Rules Relating to Investigations*, 41 Fed. Reg. 29797 (July 19, 1976). The Commission has stated that "it will be the usual policy of the Commission, subject to exceptions in the Commission's discretion, not to announce publicly or acknowledge the existence of an investigation prior to its conclusion." *Id.*

Regulation 11.3 does allow the Commission to direct or authorize the public disclosure of an investigation, and that has happened on occasion. However, public disclosure of an investigation before it is completed and all the facts are known can undermine the integrity of that investigation, impede Enforcement's ability to obtain evidence and testimony necessary to determine whether violations have occurred, and malign those who subsequently may be found to have committed no wrongdoing. Where the investigation relates to trading activity on a DCM, moreover, such disclosure also may have an adverse impact on the markets (not necessarily limited to the DCM itself), which is inconsistent with the Congressional purpose underlying the CEA to prevent disruptions to market integrity.[15] Accordingly, this kind of disclosure is extremely rare.

---

[14] 17 C.F.R. § 11.3.

[15] 7 U.S.C. § 3(b).

With respect to State regulators, the Commission leverages its enforcement resources by regularly undertaking cooperative enforcement efforts with its counterparts in the States. Section 12(a) of the CEA envisions such cooperation,[16] and Section 6d authorizes State law enforcement officials, on behalf of their residents, to file suit under the CEA in Federal district court (though States may not sue DCMs and, in light of its exclusive jurisdiction in this area, the Commission has a statutory right to intervene in any State proceeding as a full party to the action).[17]

Section 8(e) of the CEA further provides that information from Commission investigations may, upon request, be made available to State departments or agencies acting within the scope of their jurisdiction. However, any information furnished to a State department or agency shall not be further disclosed except in connection with an adjudicatory action or proceeding brought under the CEA or the laws of such State to which the State department or agency is a party.[18] Upon receipt of an appropriate request from a State regulatory agency, agreeing to the disclosure prohibitions set forth in Section 8(e) of the CEA, Enforcement is authorized to share investigative information without the need for prior Commission approval.

### e. Does written guidance exist regarding these policies?

Yes. Written guidance incorporating the foregoing policies is contained in: (1) the Memorandum of Understanding between the Commission and FERC; (2) the relevant provisions of the CEA, 7 U.S.C. §§ 12(a), 12(e), 13a-2, and 16(a); (3) the Commission's regulations regarding investigations, 7 C.F.R. §§ 11.1, *et seq.*; and (4) the Commission's regulations regarding the disclosure of confidential information, 17 C.F.R. § 140.73.

3. Last fall's collapse of the Amaranth hedge fund--with its very large positions in financial natural gas markets--has led to heightened concerns about market transparency and potential consumer impacts of speculative trading on the prices being paid for natural gas. In 2006, were there any times the CFTC's market surveillance staff detected and brought to your attention potentially anomalous market behavior related to gas futures contract trading, including end-of-month trading, which may affect the accuracy or representative nature of NYMEX indices used in LDC supply contracts? If so:

   a. Please identify the days and months in which the suspected anomalies occurred.

   b. Please describe any subsequent discussions or correspondence between you or your staff and your counterparts at FERC.

   c. Please describe any subsequent discussions or correspondence between you or your staff and any members of the industry or financial communities.

---

[16] 7 U.S.C. § 16(a).

[17] 7 U.S.C. § 13a-2.

[18] 7 U.S.C. § 12(e).

    d. Please describe any subsequent discussions or correspondence between you or your staff and any state regulators.

    e. At any point or in any forum, did the Commission consider notifying the public or state regulators, given potential impacts for the end-use natural gas consumers?

For the reasons discussed above, briefings for the Commissioners concerning specific surveillance matters and enforcement investigation issues occur through confidential staff briefings in closed Commission meetings. This confidential treatment is mandated by, among other things, the regulations regarding investigations at 17 C.F.R. §§ 11.1, *et seq.*, as well as Section 8(a)(1) of the CEA, which prohibits publishing any data or information that would "separately disclose the business transactions or market positions of any person and trade secrets or names of customers."[19] The Commission holds closed meetings in accordance with requirements of the Government in the Sunshine Act to receive these non-public briefings. Moreover, to the extent Commission staff works cooperatively with its counterparts at FERC on matters relating to natural gas, the Memorandum of Understanding between the agencies requires recognition of the other's restrictions on disclosure of non-public information. Accordingly, we are unable to comment further publicly.[20]

* * * * *

In closing, we appreciate the Committee's inquiries into this complex and important area. This is truly a dynamic time in the futures markets, given the growth in trading volume, product innovation and complexity, and globalization – in all commodities, including energy. The Commission will continue to work to promote competition and innovation by proactively taking down unnecessary barriers to trading in our markets; while at the same time, fulfilling our mandate under the CEA to protect the public interest and to enhance the integrity of, and public confidence in, U.S. futures markets.

We trust that the foregoing is responsive to your inquiry. If you or your staff has any questions concerning this matter, please do not hesitate to contact me or Terry Arbit of my staff (202.418.5357), or Ianthe Zabel, Director of External Affairs (202.418.5091).

                Sincerely,

                Reuben Jeffery, III
                Chairman

---

[19] 7 U.S.C. § 12(a)(1).

[20] Upon receipt of a congressional request, Commission staff has provided private, confidential briefings in similar circumstances.