**Testimony of**
**Dr. James Newsome, CEO**
**New York Mercantile Exchange, Inc.**
**Senate Committee on Homeland Security and Governmental Affairs**
**Permanent Subcommittee on Investigations**
**Concerning**
**"Excessive Speculation in the Natural Gas Market"**
**July 9, 2007**

Mr. Chairman and members of the Subcommittee, my name is Jim Newsome and I am the President and Chief Executive Officer of the New York Mercantile Exchange, Inc. (NYMEX or Exchange).  NYMEX is the world's largest forum for trading and clearing physical-commodity based futures contracts, including energy and metals products.  NYMEX has been in the business for more than 135 years and is a federally chartered marketplace, fully regulated by the Commodity Futures Trading Commission (CFTC) both as a "derivatives clearing organization" and as a "designated contract market" (DCM), which is the highest and most comprehensive level of regulatory oversight to which a derivatives trading facility may be subject under current law and regulation.

Prior to joining NYMEX, I served as a CFTC commissioner and, subsequently, from 2001 to 2004, as the Chairman. As Chairman, I led the CFTC's implementation of the Commodity Futures Modernization Act of 2000 (CFMA). The CFMA streamlined and modernized the regulatory structure of the derivatives industry and provided legal certainty for over-the-counter (OTC) swap transactions by creating new exclusions and exemptions from substantive CFTC regulation for bilateral transactions between institutions and/or high net-worth participants in financial derivatives and exempt commodity derivatives, such as energy and metals.

On behalf of the Exchange, its Board of Directors and shareholders, I thank you and the members of the Permanent Subcommittee on Investigations (PSI) for the opportunity to participate in today's hearing on the topic of "excessive speculation in the natural gas market," which was the title of the recently released PSI Report (Report).

**OVERVIEW**

NYMEX is fully regulated by the CFTC as a DCM, the highest level of regulation for a trading platform under the Commodity Exchange Act (CEA) and, as a DCM, NYMEX has an affirmative responsibility to act as a self-regulatory organization (SRO) and to monitor and to police activity in its own markets. The DCM statutory category encompassed existing futures exchanges and established a number of "Core Principles" for regulation of DCMs. The CFMA also permitted bilateral trading of energy on electronic platforms. Under CFTC rules, these electronic trading platforms are called "exempt commercial markets" (ECM) and are subject only to the CFTC's antifraud and anti-manipulation authority. Unlike the DCM, the ECM is completely unregulated by the CFTC and thus has no self-regulatory obligations to monitor its own markets.

A series of profound changes have occurred in the natural gas market since the passage of the CFMA, including technological advances in trading, such that the regulated DCM, NYMEX, and the Intercontinental Exchange (ICE), an unregulated ECM, have become highly linked trading venues. As a result of this phenomenon, which could not have been reasonably predicted only a few short years ago, the current statutory structure no longer works for certain markets now operating as "ECMs". Specifically, the regulatory disparity between the NYMEX and certain ECMs, particularly the ICE, which are functionally equivalent, has created serious challenges for the CFTC as well as for NYMEX in its capacity as an SRO.

From its vantage point as a DCM, NYMEX was able to observe first-hand how this regulatory disparity operated in the Amaranth situation.  In August of 2006, NYMEX proactively took steps to maintain the integrity of its markets by ordering Amaranth to reduce its open positions in the Natural Gas futures contract.  However, as detailed in the Report, Amaranth then sharply increased its positions on the unregulated and nontransparent ICE electronic trading platform.  Because the ICE and NYMEX trading venues for natural gas are tightly linked and highly interactive with each other and essentially are components of a broader natural gas derivatives market,  Amaranth's response to NYMEX's regulatory directive admittedly reduced its positions on NYMEX but did not reduce Amaranth's overall market risk nor the risk of Amaranth's guaranteeing clearing member.  Furthermore, the integrity of NYMEX markets continued to be affected by and exposed to Amaranth's outsize positions in the natural gas market.  Moreover, NYMEX had no efficient means to monitor Amaranth's positions on ICE or to take steps to have Amaranth reduce its participation in that trading venue.

We do not believe that the case has been made and, thus, we do not support any new regulation of derivatives transactions that are individually negotiated and executed off-exchange, i.e., not on a trading facility, between eligible participants in the traditional bilateral OTC market.  On the other hand, we do believe that ECMs such as ICE that function more like a traditional exchange and that are linked to an established exchange should be subject to the full regulation of the CFTC.  In addition, the continuing exchange-like aggregation and mutualization of risk at the clearinghouse level from trading on active ECMs such as ICE, where large positions are not monitored, raise concerns about spill-over or ripple implications for other clearing members and for various clearing organizations that share common clearing members.  Consequently, legislative change may be necessary to address the real public interest concerns created by the current structure of the natural gas market and the potential for systemic

financial risk from a market crisis involving significant activity occurring on the unregulated trading venue.

### NYMEX'S ROLE AND RESPONSIBIILITES AS A DCM

NYMEX operates as a designated contract market.  As the benchmark for energy prices around the world, trading on NYMEX is transparent, open and competitive and fully regulated by the CFTC.  NYMEX does not trade in the market or otherwise hold any market positions in any of its listed contracts and, being price neutral, does not influence price movement.  Instead, NYMEX provides trading forums that are structured as pure auction markets for traders to come together and to execute trades at competitively determined prices that best reflect what market participants think prices will be in the future, given today's information.  Transactions can also be executed off-Exchange, i.e., in the traditional bilateral OTC arena, and submitted to NYMEX for clearing via the NYMEX ClearPort® Clearing website through procedures that will substitute or exchange a position in a regulated futures or options contract for the original OTC product.

Unlike securities markets, which serve an essential role in capital formation, organized derivatives venues such as NYMEX provide an important economic benefit to the public by serving two key functions: (1) competitive price discovery and (2) hedging by market participants.  A CFTC glossary of standard industry terms informally defines hedging as follows:

> "[T]aking a position in a futures market opposite to a position held in the cash market to minimize the risk of financial loss from an adverse price change; or a purchase or sale of futures as a temporary substitute for a cash transaction that will occur later. One can hedge either a long cash market position (e.g., one owns the cash commodity) or a short cash market position (e.g., one plans on buying the cash commodity in the future)."

The public benefits of commodity markets, including increased market efficiencies, price discovery and risk management, are enjoyed by the full range of

entities operating in the US economy, whether or not they trade directly in the futures markets.  Everyone in our economy is a public beneficiary of vibrant, efficient commodity markets, from the U.S. Treasury, which saves substantially on its debt financing costs, to every food processor or farmer, every consumer and company that uses energy products for their daily transportation, heating and manufacturing needs, and anyone who relies on publicly available futures prices as an accurate benchmark.

As a result of the CFMA, which is discussed in further detail below, NYMEX as a DCM must comply with a number of broad, performance-based Core Principles applicable to DCMs that are fully subject to the CFTC's regulation and oversight.  These include eight Core Principles that constitute initial designation criteria, as well as 18 other ongoing Core Principles for DCMs.

In general, as a DCM, NYMEX has an affirmative obligation to act as a self-regulatory organization (SRO).  As such, NYMEX must police its own markets and maintain a program that establishes and enforces rules related to detecting and deterring abusive practices.   Of particular note in relation to the Report is the series of Core Principles that pertain to markets and to market surveillance.  Thus, a DCM can list for trading only those contracts that are not readily susceptible to manipulation.  In addition, a DCM must monitor trading to prevent manipulation, price distortion and disruptions of the delivery or cash-settlement process.  Furthermore, to reduce the potential threat of market manipulation or congestion, the DCM must adopt position limits or position accountability for a listed contract, where necessary or appropriate.

NYMEX has numerous surveillance tools that are used routinely to ensure fair and orderly trading on our markets. The principal tool that is used by DCMs to monitor trading for purposes of market integrity is the large trader reporting system.  For energy contracts, the reportable position levels are distinct for each contract listed by the Exchange for trading.  The levels are set by NYMEX and are specified by rule

5

amendments that are submitted to the CFTC, typically following consultation and coordination with the CFTC staff.

For the physically delivered NYMEX natural gas futures contract (which is referenced by NYMEX by the commodity code NG), the reportable position level is 200 contracts. The NYMEX Market Surveillance staff routinely reviews price activity in both futures and cash markets, focusing, among other things, on whether the futures markets are converging with the spot physical market as the NYMEX contract nears expiration. Large trader data are reviewed daily to monitor customer positions in the market. On a daily basis, NYMEX collects the identities of all participants who maintain open positions that exceed set reporting levels as of the close of business the prior day. These data are used to identify position concentrations requiring further review and focus by Exchange staff. These data are also published in aggregate form for public display by the CFTC on its website in a weekly report referenced as the Commitments of Traders (COT) report. Historically at NYMEX, the open interest data included in large trader reports reflects approximately 80% of total open interest in the applicable contracts.

Any questionable market activity results in an inquiry or formal investigation. NYMEX closely monitors the natural gas futures market at all times in order to enforce orderly trading and liquidations. NYMEX staff additionally increases its market surveillance reviews during periods of heightened price volatility.

By rule, NYMEX also maintains and enforces limits on the size of positions that any one market participant may hold in a listed contract. These limits are set at a level that greatly restricts the opportunity to engage in possible manipulative activity on NYMEX. It is the tradition in futures markets that futures and options contracts generally are listed as a series of calendar contract months. For an expiring contract month in which trading is terminating, NYMEX uses a hard expiration position limit for NG of 1,000 contracts. For the NG futures contract, NYMEX maintains an any one month/all months

combined position accountability level of 12,000 contracts. When position accountability levels are exceeded, Exchange staff conducts heightened review and inquiry, which may result in NYMEX staff directing the market participant to reduce its positions. Breaching the position limit can result in disciplinary action being taken by the Exchange. Finally, NYMEX also maintains a program that allows for certain market participants to apply for targeted exemptions from the position limits in place on expiring contracts. Such hedge exemptions are granted on a case-by-case basis following adequate demonstration of <u>bona</u> <u>fide</u> hedging activity involving the underlying physical cash commodity or involving related swap agreements.

Beyond the formal regulatory requirements, NYMEX staff works cooperatively and constructively with CFTC staff to assist them in carrying out their market surveillance responsibilities. NYMEX staff and CFTC staff regularly engage in the informal sharing of information about market developments. In addition to the Exchange's self-regulatory program, the CFTC conducts ongoing surveillance of NYMEX markets, including monitoring positions of large traders, deliverable supplies and contract expirations. The CFTC also conducts routine "rule enforcement" reviews of our self-regulatory programs. NYMEX consistently has been deemed by the CFTC to maintain adequate regulatory programs and oversight, in compliance with its self-regulatory obligations under the Commodity Exchange Act.

Moreover, NYMEX staff can and do make referrals to CFTC staff for possible investigation, such as with respect to activity by a market participant that is not a NYMEX member or member firm. Thus, for example, in an investigation of a non-member market participant, the Exchange would lack direct disciplinary jurisdiction and the consequent ability to issue effective sanctions (other than denial of future access to the trading of our products). In that situation, NYMEX staff could and has in the past turned over the work files and related information to CFTC staff. All such referrals are

made on a strictly confidential basis.  Similarly, CFTC staff on occasion makes
confidential referrals to NYMEX staff as well.

Overall, there is a strong overlap between the CFTC's regulatory mission and
NYMEX's SRO role in ensuring the integrity of trading in NYMEX's contracts.  NYMEX
itself has a strong historic and ongoing commitment to its SRO responsibilities. As noted
in the Report, the NYMEX regulatory program has a current annual budget of
approximately $6.2 million, which reflects a significant commitment of both staff and
technology.

**NATURAL GAS MARKET**

Natural gas accounts for almost a quarter of United States energy consumption,
and the NYMEX NG natural gas futures contract is widely used as a national benchmark
price.  The Report includes a detailed description of the nature of the natural gas market.
While industrial use of natural gas has been increasing in recent years, the Report
correctly notes that one of the major uses of natural gas continues to be for home
heating, which adds a pronounced seasonal nature to the trading of this commodity.
This fundamental shift in demand has led to increased volatility in natural gas prices in
recent years.

Currently, NYMEX's core energy futures contracts trade simultaneously by open
outcry on the Exchange floor during the day and electronically on the Chicago Mercantile
Exchange (CME) Globex® electronic trading platform (pursuant to a services agreement
between NYMEX and the CME).  The core or flagship natural gas futures contract (NG)
trades in units of 10,000 million British thermal units (mmBtu). As noted, NYMEX's
futures and options contracts are listed and traded by calendar month.  For energy
contracts, trading terminates in the month preceding the month of actual delivery of the
underlying commodity  The NG price is based on delivery of the physical product at the
Henry Hub in Louisiana, the nexus of 16 intra- and interstate natural gas pipeline

systems that draw supplies from the region's prolific gas deposits. The pipelines serve markets throughout the U.S. East Coast, the Gulf Coast, the Midwest, and up to the Canadian border.  An options contract and calendar spread options contracts provide additional risk management opportunities.

NYMEX also offers a financially settled version of the NG futures contract, which is referenced by NYMEX by the commodity code of NN.   Furthermore, because of the volatility of natural gas prices, a vigorous basis market has developed in the pricing relationships between Henry Hub and other important natural gas market centers in the continental United States and Canada. The Exchange makes available for trading a series of basis futures contracts whose terms were modeled upon those of products trading in the traditional phone broker bilateral OTC venue and that are quoted as price differentials between approximately 30 natural gas pricing points and Henry Hub. The basis contracts are listed for trading in units of 2,500 mmBtu on the NYMEX ClearPort® electronic trading platform.

With regard to the volume of natural gas trading on NYMEX, in 2006, approximately 38.6 million futures and options contracts in the natural gas commodity were executed on and/or cleared by NYMEX.  More recently, during the first quarter of 2007, 9.86 million futures and options contracts in the natural gas commodity were executed on and/or cleared by NYMEX.

With respect to the number and types of natural gas traders, aside from the daily large trader reports that are filed with the CFTC, the CFTC's weekly COT reports indicate, among other statistics, the number of traders reflected in that week's report.  As a sample analysis, NYMEX staff reviewed the first weekly report issued by the CFTC for each month from July of 2005 through January 2007 and then calculated an average of that data.  Based on that review, Exchange staff calculated that there were on average 208 "large traders" for natural gas in the sample of CFTC reports that were analyzed.  As

noted previously, the large trade data collected by NYMEX typically reflects approximately 80% of the open interest in a futures contract.  Insofar as the types of traders in the market, while the COT generally categorizes open positions as either commercial or non-commercial, there is a broad range of participants that would include end users such as utilities, marketers, traders, integrated oil companies, market makers, hedge funds and individuals.

**STATUTORY CONTEXT**

In order to better understand the circumstances surrounding the demise of Amaranth, it may be useful first to establish the regulatory and market context that provided a backdrop to Amaranth's activities.   For many years, the CFTC has had exclusive jurisdiction over the regulation of contracts for a commodity for future delivery, i.e., futures contracts.  Moreover, a longstanding requirement was that futures contracts could only be traded on a futures exchange that was directly regulated by the CFTC.   A contract deemed by the CFTC to be a futures contract that was not executed on a regulated futures exchange was viewed as an illegal off-exchange transaction and would be subject to CFTC enforcement action.  Additionally, there was legal uncertainly concerning the execution of swaps, including energy swaps, on an electronic trading facility.  During the 1990s, the OTC swap market began to increase substantially in size, and swap agreements began to be more standardized and strikingly similar to futures contracts.  This transition created additional legal uncertainty around the trading of OTC swaps.

Because of the growing legal uncertainty regarding whether such products were or were not futures contracts, Congress directed the President's Working Group on Financial Markets (PWG) to conduct a study of OTC derivatives markets and to provide legislative recommendations to Congress.  The PWG Report entitled "Over-the-Counter Derivatives Markets and the Commodity Exchange Act," was issued in 1999  and

focused primarily on swap and other OTC derivatives transactions executed between eligible participants.  Among other things, the PWG Report recommended exclusion from the CEA for swap transactions in financial products between eligible swap participants.  However, the PWG Report explicitly noted that "[t]he exclusion should <u>not</u> extend to any swap agreement that involved a non-financial commodity with a finite supply." (Report of the PWG, "Over-the-Counter Derivatives Markets and the Commodity Exchange Act" (November 1999) at p. 17.)  The collective view at the CFTC at that time was that the jury was still out as to whether or not energy commodities were susceptible to manipulation and, therefore, energy commodities should not be excluded from the Act.

Thereafter, in December 2000, Congress enacted the CFMA. The CFMA provided greater legal certainty for derivatives executed in OTC markets, established a number of new statutory categories for trading facilities, and shifted away from a "one-size-fits-all" prescriptive approach to futures exchange regulation to a more flexible approach that included use of core principles for DCMs.

The CFMA also included new section 2(h) to the CEA; in particular, new subsections 2(h)(3)-(6), which exempted energy commodities from CFTC regulation and allowed the trading of energy swaps on an electronic trading platform.  Under CFTC rules, these platforms are known as "Exempt Commercial Markets" (ECM).  While transactions executed on an ECM generally are subject to anti-fraud and anti-manipulation authority, the ECM itself is essentially exempt from all substantive CFTC regulation and oversight.  In addition, the ECM by statute has no affirmative requirements to engage in any self-regulatory activities to monitor its markets or otherwise seek to prevent any manner of market abuses.  When the CFMA was adopted in 2000, there was a broad consensus in the industry, including the regulated commodity exchanges, for the various components of the CFMA.

Subsequent to the passage of the CFMA in late 2000, derivatives markets, especially natural gas derivatives markets, evolved in just a few short years to an extent and at a rate that would have been very difficult to predict in 2000.  When the CFTC was in the midst of proposing and finalizing implementing regulations and interpretations for the CFMA in 2001, even shortly following the wake of the Enron meltdown in late 2001, the natural gas market continued to be largely focused upon open outcry trading executed on the regulated NYMEX trading venue.  At that time, NYMEX offered electronic trading on an "after-hours" basis, which contributed only approximately 7-10% of overall trading volume at the Exchange.  Electronic trading (of standardized products based upon NYMEX's natural gas contracts) was at best a modest proportion of the overall market.  Moreover, it was more than six months following the Enron meltdown before the industry began to offer clearing services for OTC natural gas transactions.

But, in determining to compete with NYMEX, ICE not only copied all of the relevant product terms of NYMEX's core or flagship natural gas futures contract, but also misappropriated the NYMEX settlement price for daily and final settlement of its own contracts.  ICE's misappropriation of NYMEX's intellectual property remains a matter of dispute in ongoing litigation between the two exchanges that is now under judicial appeal.  However, as things stand today, natural gas market participants have the assurance that they can receive the benefits of obtaining NYMEX's settlement price, which is now the established industry pricing benchmark, by engaging in trading either on NYMEX or on ICE.

For some period of time following the launch of ICE as a market, ICE was the only trading platform that offered active electronic trading during daytime trading hours. In September of 2006, NYMEX began providing "side-by-side" trading of its products-- listing products for trading simultaneously on the trading floor and on the electronic screen.  Since that time, there has been active daytime electronic trading of natural gas

on both NYMEX and ICE The share of electronic trading at NYMEX as a percentage of overall transaction volume has shifted dramatically to the extent that electronic trading now accounts for 80-85% of overall trading volume at the Exchange. The existence of daytime electronic trading on both NYMEX and ICE has fueled the growth of arbitrage trading between the two markets.  Thus, for example, a number of market participants that specialize in arbitrage activity have established  computer programs for electronic trading that automatically transmit orders to one market when there is an apparent price imbalance with the other market or where one market is perceived to offer a better price than the other market.  As a result, there is now a relatively consistent and tight spread in the prices of the competing natural gas products.  Hence, the two competing trading venues are now tightly linked and highly interactive and in essence are simply two components of a broader derivatives market.  No one could have predicted in 2000, when the exemption was crafted for energy swaps, how this market would have evolved.

In addition to the misappropriation of NYMEX's settlement price, the ICE market now has a significant market share of natural gas trading, and a number of observers have suggested that most of the natural gas trading in the ICE Henry Hub swap is subsequently cleared by the London Clearing House, the clearing organization contracted by ICE to provide clearing services.   Thus, there is now a concentration of market activity and positions occurring on the ICE market as well as the exchange-like concentration and mutualization of financial risk at the clearing house level from that activity.

At the time that the CFMA was being formulated in Congress, there may have been a notion that the public interest was not implicated by trading on markets such as ICE because larger market participants did not need a regulatory agency to protect them from trading with each other.  Yet, what has become clear in the last several years is that the changing nature and role of ECM venues such as ICE do now trigger public

interest concerns in several ways, including with respect to the multiple impacts on other trading venues that are regulated as well as through the exchange-like aggregation of financial risk.

The Report analyzes the extent to which trading on one venue of a product whose price is linked to the final settlement price of a NYMEX product contributes or influences the price of that NYMEX product.  First, it is worth noting that the CFTC acknowledged in its recent proposed rule-making that there is "a close relationship among transactions conducted on reporting markets and non-reporting transactions.  (72 Fed. Reg. 34, 413, at 34,414 (2007) (proposed June 22, 2007.)  Second, it is also relevant to consider the recent statement issued on June 14, 2007 by the Department of Justice (DOJ) Antitrust Division announcing the closure of its review of the proposed acquisition by Chicago Mercantile Exchange Holdings Inc. of CBOT Holdings Inc. based upon the DOJ's determination that neither that acquisition nor the clearing agreement between the two exchanges was likely to reduce competition substantially.  NYMEX believes that this announcement is based upon a tacit recognition by the Antitrust Division that, with regard to analysis of the relevant market, at a minimum, regulated futures trading and over-the-counter trading are simply components of a broader market (that also might be defined to include some cash market activity as well).

Because ICE price data are available only to market participants, NYMEX does not have the means to establish conclusively the extent to which trading of ICE natural gas swaps contributes to or influences or affects the price of the related natural gas contracts on NYMEX.  However, what is clear is that, as a consequence of the extensive arbitrage activity between the two platforms and ICE's use of NYMEX's settlement price as well as other factors, the two natural gas trading venues are now tightly linked and highly interactive. These two trading venues serve the same economic functions and are now functionally equivalent to each other  NYMEX staff has been advised that, during

most of the trading cycle of a listed futures contract month, there is a range of perhaps only five to twelve ticks separating the competing NYMEX and ICE products. (The NYMEX NG contract has a minimum price fluctuation or trading tick of $.001, or .01 cents per mmBtu.)  NYMEX staff has also been advised by market participants who trade on both markets that a rise (fall) in price on one trading venue will be followed almost immediately by a rise (fall) in price on the other trading venue.  This may occur because prices rise first on ICE and then follow on NYMEX, or because prices rise first on NYMEX and then follow on ICE.  These observations of real-world market activity support the conclusion that trading of ICE natural gas swaps do in fact contribute to, influence and affect the price of the related natural gas contracts on NYMEX.

Aside from a lawsuit brought by NYMEX against ICE for the use of NYMEX's settlement prices, which as noted is a matter that remains under appeal in a federal court of appeals, NYMEX does not otherwise have any other ongoing formal relationship with ICE.   In particular, as ICE and NYMEX are in competition with each other, there are currently no arrangements in place, such as information-sharing, to address market integrity issues.  As stated previously, NYMEX as a DCM does have affirmative self-regulatory obligations; ICE as an ECM has no such duties.  Yet, from a markets perspective, the ICE  and NYMEX trading venues for natural gas are tightly linked and highly interactive; trading activity and price movement on one venue can quickly affect and influence price movement on the other venue.

In connection with the Exchange's ongoing routine market surveillance programs and procedures that were described previously, NYMEX staff was aware of and monitored all open positions that Amaranth maintained in NYMEX trading venues, including the physically delivered NG natural gas futures contract.  NYMEX conducted regular reviews of Amaranth's open positions in excess of position accountability levels prescribed in NYMEX Rule 9.26.  NYMEX notes that various other contracts which are

offered by NYMEX, such as American and European options on Natural Gas as well as various other futures contracts are aggregated into the Natural Gas Futures Contract (NG) for monitoring accountability levels on a futures equivalent basis.  During the period in question of the Report, the NYMEX financially-settled Henry Hub Natural Gas futures contract (NN), was also aggregated into the Natural Gas Futures Contract (NG) for monitoring accountability levels on a "futures equivalent" basis, i.e., across several related NYMEX contracts.  As such, Amaranth's positions at NYMEX, when taken on a futures equivalent basis, were of significantly less magnitude on a percentile basis than is the case when reviewing the NG contract in isolation on a "futures-only" basis. NYMEX staff did routine monitoring of back month positions, based upon the application of position accountability levels applied on a futures equivalent protocol, which is the current standard procedure for U.S. futures exchanges.  In addition to conducting market surveillance on Amaranth's activities, NYMEX staff also conducted daily analytical "stress" tests of Amaranth's carrying clearing member.

As accurately represented in the Subcommittee's Report, NYMEX staff members directed Amaranth in early August 2006 to reduce its open positions in the first two nearby contract months based upon what they believed to be a significant concentration in NYMEX markets in Natural Gas (relying upon an NG "futures only" approach). NYMEX believes that such a directive was prudent and also was effective with respect to reducing positions carried on our platform.  As previously stated, NYMEX maintains no information sharing agreement of any kind with ICE; the Exchange also observes that, during the period in question, the CFTC was not receiving any regular information from ICE as to positions on its platform.  Thus, a shift of positions by Amaranth from NYMEX to ICE was undetectable both by NYMEX and the CFTC.

It is important to distinguish the activity of Amaranth, which had accumulated open positions to the extent that a trading facility with SRO duties would direct that such

positions should be reduced, from the category of hedge funds as a class of market participant.   NYMEX issued a study in March of 2005, which was an internal market data study of trading volume and open interest analyzing the participation of hedge funds (broadly defined) in two of the Exchange's largest futures markets during 2004. The study analyzed the influence of hedge fund participation on price volatility and included a statistical test for causality. The findings were that hedge fund participation as a class of market participant did not cause volatility and, in fact, appeared to dampen volatility. In the natural gas futures contract, hedge funds made up 9.05% of trading volume.  As a percentage of open interest, hedge funds constituted 20.4% in the natural gas futures market.  In general, the study found that hedge funds tended to hold positions significantly longer than other market participants, indicating that they can be a non-disruptive source of liquidity to the market.  An update conducted by Exchange staff for the first nine months of 2006 found that while the percentage of volume contributed by hedge funds had increased (to 20.86%), the overall findings of the original study remained the same.

NYMEX is not supplied position data regarding other venues on a regular basis by either a market participant or another trading venue (for example ICE or other OTC platforms).  However, NYMEX by rule has broad authority to request from time to time and to be supplied "information" with respect to a position in excess of the prescribed accountability levels. NYMEX did gather information regarding expiring contracts in the process of approving hedge exemptions subject to NYMEX Rule 9.26 for Amaranth where they represented offsetting exposure.

On February 16, 2007, in an effort to cooperate with the Federal Energy Regulatory Commission and following consultation with CFTC staff,  NYMEX issued a compliance advisory in the form of a policy statement related to exemptions from position limits in NYMEX Natural Gas (NG) futures contracts   NYMEX adopted this new

policy on an interim basis in a good faith effort to carry out its self-regulatory responsibilities and to address on an individual exchange level the market reality demonstrated by Amaranth's trading on both regulated and unregulated markets. However, as detailed below, this experience has had an adverse impact on NYMEX's trading venues and is seemingly creating the result of shifting trading volume (during the critically important NG closing range period at NYMEX on the final day of trading) from our regulated trading venue to unregulated trading venues.

Pursuant to that advisory, NYMEX instituted new uniform verification procedures to document market participants' exposure justifying the use of an approved hedge exemption in the NG contract. These procedures apply to all market participants who carry positions above the standard expiration position limit of 1,000 contracts going into the final day of trading for the expiring contract.   Specifically, prior to the market open of the last trading day of each expiration, NYMEX now requires all market participants with positions above the expiration position limit of 1,000 contracts to supply information on their complete trading "book" of all natural gas positions linked to the settlement price of the expiring NG contract. Positions in excess of 1,000 contracts must offset a demonstrated risk in the trading book, and the net exposure of the entire book must be no more than 1,000 contracts on the side of the market that could benefit by trading by that market participant during the closing range.

NYMEX has now experienced five expirations of a terminating contract month in the NG futures contract since this new compliance advisory went into effect.  To date, only two market participants have participated in this advisory and supplied information to the Exchange on their complete trading book. By comparison, NYMEX staff has observed a number of instances where market participants have reduced their positions before the open of the final day of trading rather than share sensitive trading information about proprietary trading with Exchange staff.  As a result, NYMEX has observed

reduced trading volume on the final day of trading in an expiring contract month relative to the final day of trading for the same calendar contract month in the prior year.  The average volume on the final day of trading for the March, April, May, June and July 2007 NG contracts was 30,400 versus 37,122 for the corresponding contract month in the prior year, or an 18% reduction

Even more significantly, the closing range volume for the 30-minute closing period on the final day of trading is sharply lower than for volume during the final day closing range for the same calendar contract month in the prior year. In most instances, the volume in the closing range is less than half of the volume in the closing range for the same calendar contract month in the prior year.  The average closing range volume on the final day of trading for the March, April, May, June and July 2007 NG contracts was 14,048 versus 23,165 for the corresponding contract month in the prior year, or a 39% reduction.

Overall market volatility in the natural gas market is somewhat lower this spring and summer than from comparable periods a year ago. This lower volatility stems from a lack of price volatility in the underlying physical cash commodity and in our opinion not from our implementation of this advisory. That stated, the lower volumes seen during the recent 30-minute closing ranges on the final day of trading since the implementation of the new policy actually create the potential for even greater volatility in the event of any significant market move.  Thus, the new interim policy implemented by NYMEX on a good-faith basis has not only led to reduced volume on NYMEX during the critical 30-minute closing range period, which presumably has shifted to the unregulated trading venues, but has also failed to solve the structural imbalances brought to light by Amaranth's trading.  In addition, this policy could create new problems by diminishing the vitality of the natural gas industry's pricing benchmark.  Consequently, NYMEX believes that legislative change may be necessary and appropriate.

**RESPONSE TO REPORT RECOMMENDATIONS**

**Report Recommendation #1: Congress should eliminate the "Enron Loophole" that exempts electronic energy exchanges from regulatory oversights.** NYMEX understands the Report to be referring colloquially to Enron in proposing that the Exempt Commercial Market category be eliminated from the Commodity Exchange Act. NYMEX agrees with the Subcommittee that developments have occurred in the natural gas market subsequent to the implementation of the CFMA that need to be taken into account. Furthermore, it is NYMEX's view that these profound changes in natural gas market structure provide clear support for legislative change. These developments include:

- the exchange-like aggregation of financial risk as a great majority of the Henry Hub natural gas swap transactions executed on ICE are submitted for clearing;
- the reality of a broader linked market that includes the regulated and the unregulated trading venues;
- the copying of product terms and the appropriation of settlement prices of a regulated futures product by an unregulated market;
- the contribution to or creation of price discovery for natural gas prices in the unregulated trading venues;
- the ripple or spillover effects of activity on the unregulated venue onto the regulated trading venue; and
- the growing concentration of natural gas trading activity on the unregulated trading facility.

.

NYMEX also believes that these changes in the natural gas market trigger a series of fundamental public policy and public interest concerns that necessitate appropriate regulation that reflects the current realities of natural gas trading. The proper legislative response is a judgment call for Congress to make. Where a market does manifest the characteristics listed above, NYMEX believes that regulation that is the same as or comparable to the level of regulation of a DCM would be appropriate. More specifically, NYMEX believes that triggering the public interest concerns noted above renders an electronic trading facility sufficiently comparable to a traditional organized exchange that CFTC oversight and regulation is appropriate. The

specification of the triggers to be utilized and the extent of CFTC oversight would require follow-up discussion and review, and NYMEX is more than willing to work with policymakers and others to provide further detail to that approach.  What is clear is that these public policy concerns necessitate routine mandated large trader reporting and position limits and position accountability requirements for ECMs that are highly linked to and functionally equivalent with regulated DCMs.  Such ECMs also must be assigned SRO duties to police their own markets.  NYMEX believes strongly that such regulations are necessary and appropriate and would not negatively impact the core price discovery and hedging functions provided by derivatives markets.  To the extent that the CFTC concludes that its current authority over ECMs does not authorize the agency to impose such regulations, then legislative change may be necessary and appropriate.

Given the complexity of derivatives markets, it can be difficult to state with real precision when speculation may be deemed to be "excessive."  Moreover, speculators do provide liquidity and other positive effects to derivatives markets.  Consequently, NYMEX agrees with the view expressed in the Minority Staff opinion that it is not necessary to make a final determination about whether Amaranth's trading was excessively speculative in order to conclude that legislative change in the form of greater authority for the CFTC may be necessary and appropriate.


**Recommendation #2: If given additional legal authority, the CFTC should monitor aggregate positions on NYME and ICE.  The CFTC and exchanges should strengthen their monitoring and oversight to prevent excessive speculation for all of the months in which contracts are traded, not just for contracts near expiration.**

Given NYMEX's conclusion that the NYMEX and ICE natural gas trading platforms essentially form a broader linked market, the Exchange believes that, as noted, if the CFTC believes that it does not currently have such authority, then the CFTC

should be given additional legal authority and should use such authority to monitor aggregate positions on both ICE and NYMEX.  Although the CFTC began to receive certain data from ICE commencing last fall through use of the CFTC's "special call" procedures, this process only commenced  several months after the Amaranth meltdown had occurred, and thus long after any impact resulting from Amaranth's trading had been imposed on the natural gas market.  Moreover, the CFTC recently commented in a proposed rule-making that its use of the special call procedure was intended and designed to be infrequent in nature (rather than a routine and standard component of market surveillance oversight).

From a historical perspective, the market participants who have apparently sought to engage in attempted manipulation or in excessive speculation have generally focused upon the first few listed contract months of a listed futures contract.   From the standpoint of price causality, NYMEX's periodic analyses of trading in its trading venues, including for natural gas, support the conclusion that the front few months are the dominant causal force across the full "curve" of listed contract months.   Thus, it has been general industry practice among U.S. futures exchange compliance staff (as well as the CFTC) to have focused market surveillance efforts upon these first few listed months, while not ignoring the back months.

In reflecting, though, upon the lessons learned from the Amaranth experience, NYMEX compliance staff has shifted additional monitoring and oversight to the back contract months of its listed contracts and to the spread positions for certain natural gas winter/summer positions   In addition, NYMEX staff has increased its financial and market surveillance of hedge funds.  NYMEX has placed all hedge funds with sizable positions on its daily staff "Watch List," which mandates that the carrying clearing members supply daily account information including margin requirements and flows across both its cleared regulated (NYMEX) and cleared non-regulated/non-segregated

(e.g., ICE) trading venues.  Finally, in the spring of 2006, NYMEX financial surveillance staff had initiated a new program of heightened review of the risk management tools and programs utilized by clearing members for whom NYMEX had audit obligations. NYMEX has continued with and has further expanded this financial integrity oversight program.

**Recommendation #3: Congress should increase the CFTC budget and authorize CFTC user fees to help pay for the additional cost.**  The Report stated that the CFTC's budget should be increased "to provide the staff and technology needed to monitor, integrate, and analyze real-time transactional data from all U.S. commodity exchanges, including NYMEX and ICE."  NYMEX agrees with this assessment and supports an expanded budget for the CFTC so that it may properly carry out its regulatory mission.

However, the Report then went on to recommend that necessary funding "should be obtained from user fees imposed on commodity markets."  NYMEX disagrees strongly with this recommendation.  Previously, Congress has repeatedly rejected such a user or transaction tax as bad public policy.  As NYMEX understands it, this user fee or transaction tax being recommended by the PSI would not be imposed on foreign boards of trade that listed competing products and that are currently offering direct electronic access to their markets to market participants based in the U.S.

Thus, the proposed tax runs directly counter to the high-level efforts by key policymakers to strengthen the global competitiveness of U.S markets.  In a November 2006 speech on the competitiveness of U.S. capital markets, Treasury Secretary Hank Paulson stated that "competitive capital markets will pave the way for continued economic growth that benefits all Americans."  In addition, a study of New York's financial services industry released by Senator Chuck Schumer and New York Mayor

Michael Bloomberg warned that "to maintain our success in the long run, we must address a real and growing concern: in today's ultra-competitive global marketplace, more and more nations are challenging our position as the world's financial capital." Implementing a tax on transactions conducted on U.S. commodity markets would cause existing business to leave U.S. markets to avoid taxation. Equally as concerning, the tens of thousands of jobs that the industry provides in the United States may move or disappear as well.

U.S. futures exchanges such as NYMEX currently spend millions of dollars every year on internal self-regulatory programs. In addition, the U.S. futures regulatory system already assesses our customers a fee to provide for the self-regulation performed by the National Futures Association (NFA), a self-regulatory organization authorized by Congress. Taxing market participants twice is both burdensome and unfair. It could encourage major market participants to avoid trading on U.S. futures exchanges and instead shift trading overseas. Any such loss of market liquidity would harm hedgers and other U.S. businesses that look for the most cost-efficient venue to hedge the price risks they face every day. In addition, imposing this tax burden on U.S. market participants is particularly inappropriate given the public interests served by the U.S. futures markets, and the price discovery and dissemination benefits conferred by the exchange markets on many thousands of non-market participants.

The user tax recommended in the Report would also greatly increase the trading costs of market-makers who provide liquidity vital to U.S. exchange markets. Their profit margins are razor thin, yet they provide critical liquidity that makes U.S. exchange markets more efficient and cost-effective to all customers who use them to manage risk. These individuals and small businesses would be forced to bear the weight of the tax, without regard to their profitability.

**CONCLUSION**

A series of profound changes have occurred in the natural gas market since the passage of the CFMA, including technological advances in trading, such that the regulated DCM, NYMEX, and the Intercontinental Exchange, an unregulated ECM, have become highly linked trading venues.  As a result of this phenomenon, which could not have been reasonably predicted only a few short years ago, the current statutory structure no longer works for certain markets now operating as ECMs.  Specifically, the regulatory disparity between the NYMEX and certain ECMs, particularly the ICE, which are functionally equivalent to each other, has created serious challenges for the CFTC as well as for NYMEX in its capacity as an SRO.

We do not believe that the case has been made and, thus, we do not support any new regulation of derivatives transactions that are individually negotiated and executed off-exchange, i.e., not on a trading facility, between eligible participants in the traditional bilateral OTC market.  On the other hand, we do believe that ECMs such as ICE that function more like a traditional exchange and that are linked to an established exchange should be subject to the full regulation of the CFTC.  In addition, the continuing exchange-like aggregation and mutualization of risk at the clearinghouse level from trading on active ECMs such as ICE, where large positions are not monitored, raise concerns about spill-over or ripple implications for other clearing members and for various clearing organizations that share common clearing members.  Consequently, legislative change may be necessary to address the real public interest concerns created by the current structure of the natural gas market and the potential for systemic financial risk from a market crisis involving significant activity occurring on the unregulated trading venue.

I thank you for the opportunity to share the viewpoint of the New York Mercantile Exchange with you today.  I will be happy to answer any questions members of the Subcommittee may have.