113 FERC ¶ 61,068
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Nora Mead Brownell, and Suedeen G. Kelly.

Enforcement of Statutes, Orders, Rules,           Docket No. PL06-1-000
    and Regulations

POLICY STATEMENT ON ENFORCEMENT

(Issued October 20, 2005)

1.     The Commission issues this Policy Statement to provide guidance and regulatory certainty regarding our enforcement of the statutes, orders, rules, and regulations we administer.  The Policy Statement discusses the factors we will take into account in determining remedies for violations, including applying the enhanced civil penalty authority provided by the Energy Policy Act of 2005 (EPAct 2005).[1]  Our purpose is to provide firm but fair enforcement of our rules and regulations and to place entities subject to our jurisdiction on notice of the consequences of violating the statutes, orders, rules, and regulations we enforce.

2.     In discussing the factors we will take into account in determining the severity of penalties to be imposed for violations, we also recognize the importance of demonstrable compliance and cooperation efforts by utilities, natural gas companies, and other entities subject to the statutes, orders, rules, and regulations administered by the Commission.  We encourage regulated entities to have comprehensive compliance programs, to develop a culture of compliance within their organizations, and to self-report and cooperate with the Commission in the event violations occur.[2]

---

[1] P. L. No 109-58, 119 Stat. 594 (2005).

[2] We will apply this policy statement on enforcement, and the remedies available for any given violation, in the same manner for jurisdictional market-based rate sellers, natural gas pipelines, and holders of blanket certificate authority as well as for other

(continued)

Docket No. PL06-1-000                                                                                          - 2 -

3.      Contemporaneously herewith, we are issuing a Notice of Proposed Rulemaking in Docket No. RM06-3-000, proposing new regulations to implement sections 315 and 1283 of EPAct 2005.  The proposed regulations would make it unlawful for any entity to use or employ any device, scheme, or artifice to defraud, or to make any untrue statement of a material fact or to omit to state a material fact, or to engage in a fraud or deceit in connection with the purchase or sale of electricity, natural gas, or related transmission or transportation services subject to the jurisdiction of the Commission.  The proposed regulations will provide another basis for imposition of civil penalties.  It is therefore important that we articulate how we intend to apply our new and expanded civil penalty authority, so as to assure the industry that we will temper strong enforcement measures with consideration of all relevant factors, including mitigating factors, in determining the appropriate remedies.

   **Background**

4.      We have a variety of enforcement tools under the principal statutes we administer: the Federal Power Act (FPA), Natural Gas Act (NGA), Natural Gas Policy Act of 1978 (NGPA), and Interstate Commerce Act (ICA).[3]  If regulated utilities and natural gas companies violate the FPA, NGA, or NGPA we can order, among other things, disgorgement of unjust profits.  We have the option of conditioning, suspending, or revoking market-based rate authority, certificate authority, or blanket certificate

---

entities as described by EPAct 2005, including governmental utilities and other market participants.  We also note that the factors will be applied, as appropriate, to individuals as well as to corporate entities.

   [3] Federal Power Act, 16 U.S.C. § 791a, *et seq.* (2000); Natural Gas Act, 15 U.S.C. § 717, *et seq.* (2000); Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, *et seq.* (2000); Interstate Commerce Act, 49 App. U.S.C. § 1, *et seq.* (2000).

Docket No. PL06-1-000                                                                                           - 3 -

authority.[4] We also have the ability to refer matters to the Department of Justice for criminal prosecution.[5]

5.   Beyond these authorities, we have civil penalty authority for violations of specific provisions of the FPA and NGPA.[6] In EPAct 2005 Congress recently granted the Commission enhanced authority to assess civil penalties for violations of the FPA, NGA, and NGPA. EPAct 2005 made three major changes to our civil penalty authority. First, Congress expanded the Commission's FPA civil penalty authority to cover violations of any provision of Part II of the FPA, as well as of any rule or order issued thereunder.[7] Second, Congress extended the Commission's civil penalty authority to cover violations of the NGA or any rule, regulation, restriction, condition, or order made or imposed by the Commission under NGA authority.[8] Third, Congress established the maximum civil penalty the Commission may assess under the NGA, NGPA, or Part II of the FPA as $1,000,000 per violation for each day that it continues.[9] In addition, Congress expanded the scope of the criminal provisions of the FPA, NGA, and NGPA by increasing the maximum fines and increasing the maximum imprisonment time.[10]

---

[4] *See, e.g., Enron Power Marketing, Inc.,* 103 FERC ¶ 61,343 P 52 (2003); Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, 99 FERC ¶ 61,272 at 62,154 (2002); *San Diego Gas & Electric Company*, 95 FERC ¶ 61,418 at 62,548, 62,565 (2001), *order on reh'g*, 97 FERC ¶ 61,275 (2001), *order on reh'g*, 99 FERC ¶ 61,160 (2002); *accord* Show Cause Order, 102 FERC ¶ 61,316 at P 8 & n.10, and cases cited therein.

[5] NGA section 20(a), 15 U.S.C. § 717s(a); FPA section 314(a), 16 U.S.C. § 825m(a); NGPA section 504(b)(5),15 U.S.C. § 3414(b)(5).

[6] FPA section 316A, 16 U.S.C. § 825o-1; NGPA section 504(b)(6), 15 U.S.C. § 3414(b)(6).

[7] EPAct 2005 section 1284(e)(1), amending FPA section 316A(a).

[8] EPAct 2005 section 314(b)(1), inserting new NGA section 22.

[9] EPAct 2005 section 314(b)(1), inserting new NGA section 22(a); EPAct 2005 section 314(b)(2), amending NGPA section 504(b)(6)(A); and EPAct 2005 section 1284(e)(2), amending FPA section 316A(b).

[10] EPAct 2005 section 314, amending NGA section 21 and NGPA section 504; EPAct 2005 section 1284, amending FPA section 316. We are limited to civil

(continued)

Docket No. PL06-1-000 - 4 -

6.   In our past enforcement actions we have given credit when appropriate for cooperative conduct in audit and enforcement matters, and orders issued in past matters have discussed aspects of cooperation.[11]  With the advent of enhanced civil penalty authority, we are making our existing practice of recognizing cooperation explicit and describing some of the factors that we will consider when deciding on remedies, including penalties, for violations.  We also discuss the importance of creating and maintaining effective internal compliance processes, of self-reporting violations, and of cooperation.

### **Enforcement Policies of Other Agencies**

7.   In considering the appropriate enforcement policy, we have reviewed the policies of other federal agencies for guidance.  In 2001, the Securities and Exchange Commission (SEC) issued a decision in which it outlined conditions under which it will give credit for self-policing, self-reporting, remediation, and cooperation when determining the appropriate penalty for wrongdoing.[12]  The SEC noted the importance of vigorous enforcement action and the imposition of appropriate sanctions when violations occur, but also recognized the value of cooperation by companies when violations occur.  While not making specific commitments or limiting itself to the criteria discussed, the SEC provided a list of questions it would consider in deciding whether to bring reduced or no charges, seek lighter sanctions, or provide other mitigation of the severity of enforcement remedies that would otherwise be sought for a violation.

8.   In 2003, the Department of Justice issued a memorandum to all United States Attorneys entitled "Principles of Federal Prosecution of Business Organizations," with

---

enforcement of our statutes, orders, rules, and regulations, but we may also refer matters to the Department of Justice for criminal prosecution.

[11] *See, e.g., Dominion Resources, Inc.*, "Order Approving Stipulation and Consent Agreement," 108 FERC ¶ 61,110 (2004) (Stipulation noting that "Dominion Resources voluntarily disclosed these events to Enforcement in July 2003, virtually contemporaneously with the discovery by the company.  Dominion Resources fully and completely cooperated with Enforcement's efforts to investigate and resolve this matter").

[12] *Accounting and Auditing Enforcement*, SEC Release No. 1470 (October 23, 2001).

20051020-3050 Issued by FERC OSEC 10/20/2005 in Docket#: PL06-1-000
Case 1:07-cv-06682-DC    Document 32-14    Filed 09/28/2007    Page 5 of 14

Docket No. PL06-1-000                                                         - 5 -

guidance on charging corporate entities along with individuals in corporate fraud cases.[13] The memorandum stated that credit may be given for corporate cooperation in detecting and correcting wrongdoing, and outlined nine factors to be considered when weighing whether to bring criminal charges against business entities. In 2004, the Federal Sentencing Guidelines were amended to include a detailed discussion of effective compliance and ethics programs and the impact that such programs can have on the calculation of the culpability score used to determine the sentence to be imposed after conviction of a corporation or other business entity.[14]

9.     In 1994, the Commodity Futures Trading Commission (CFTC) issued a policy statement with guidelines regarding the CFTC's authority to impose civil penalties and the authority of CFTC-supervised, self-regulating organizations to impose sanctions.[15] The CFTC policy statement set out various factors to be considered with respect to the gravity of the offense, the financial condition of the business entity, and various other considerations that may bear on the appropriate penalty to be imposed. In 2004, the CFTC enforcement staff announced a policy of giving credit for cooperation in futures trading investigations.[16] Noting that consideration of cooperation is discretionary and depends on the circumstances presented, the CFTC staff identified three general areas of cooperative factors to be taken into account in deciding whether staff should recommend reduced sanctions to the CFTC: (1) the nature of a company's efforts to uncover and investigate violations, (2) the quality of a company's efforts in cooperating and managing the aftermath of misconduct, and (3) a company's efforts to prevent future wrongdoing.[17]

---

[13] *Memorandum from Deputy Attorney General Larry D. Thompson to Heads of Department Components and United States Attorneys*, "Principles of Federal Prosecution of Business Organizations" (Jan. 20, 2003).

[14] *Effective Compliance and Ethics Programs*, Federal Sentencing Guidelines, Chapter 8, Part B, Section 2 (2004).

[15] *CFTC Policy Statement Relating to the Commission's Authority to Impose Civil Monetary Penalties and Futures Self-Regulatory Organizations' Authority to Impose Sanctions*, "Penalty Guidelines," Comm. Fut. L. Rep. (CCH) ¶ 26,265 (Nov. 1994).

[16] *CFTC Enforcement Advisory*, "Cooperation Factors in Enforcement Division Sanction Recommendations," August 11, 2004.

[17] In addition to the three general areas, the CFTC staff noted that it would consider additional factors, such as the level or organization at which misconduct occurred, whether misconduct was the result of pressure from superiors, how long the

(continued)

Docket No. PL06-1-000                                                                    - 6 -

10.     In adopting enforcement policies, the SEC and the CFTC declined to establish a penalty schedule or formulas for how certain factors would be weighed for given violations. Instead, they emphasized the importance of considering a range of factors that may lead to different penalty decisions depending on the circumstances presented by each case.

### Relation of Existing and New Civil Penalty Authority

11.     Existing section 316A of the FPA provides that "[i]n determining the amount of a proposed penalty, the Commission shall take into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner."[18] Section 314 of EPAct 2005 includes identical language in new section 22(c) of the NGA. Thus, the seriousness of the violation is the first touchstone for our determination of the level of penalty to be imposed. Second, the actions by an entity that has engaged in misconduct are relevant to deciding whether the penalty should be reduced or even eliminated. These requirements are reflected in our existing regulations governing imposition of civil penalties under section 31 of the FPA for violations related to hydropower projects.[19] The guidance of this Policy Statement is consistent with the existing rule on factors we consider in the context of hydropower project violations and penalties. In addition, we have a generally applicable policy for considering reductions or waivers of penalties for small entities.[20]

12.     Our enhanced civil penalty authority will operate in tandem with our existing authority to require disgorgement of unjust profits obtained through misconduct and/or to condition, suspend, or revoke certificate authority or other authorizations, such as market-based rate authority for sellers of electric energy. This is similar to the ability of the SEC to require an accounting and disgorgement to investors for losses and also to impose penalties for the misconduct, or of the CFTC to order restitution or obtain disgorgement and also to impose fines for violations.[21] In doing so, we intend to take the full range of

---

misconduct lasted after discovery, whether the company responded with adequate resources, and whether actions were taken to mitigate the misconduct.

[18] 16 U.S.C. § 825o-1(b) (2000).

[19] 18 C.F.R. § 385.1505 (2005).

[20] 18 C.F.R. § 2.500 (2005).

[21] *See* sections 21-21C of the Securities Exchange Act, 15 U.S.C. §§ 78u-78u-3 (2000). The CFTC can revoke or suspend a registration, suspend or prohibit certain

(continued)

Docket No. PL06-1-000                                                                                          - 7 -

possible remedies into account in determining whether a penalty should be imposed in addition to other remedies and, if so, the appropriate amount of the penalty.[22] Entities faced with enforcement thus will be subject to the full array of possible enforcement tools, but we will exercise our discretion to apply remedies in a fair, reasonable, and appropriate manner.

13.     We noted that the practice of the SEC and CFTC is to decide on remedies on a case-by-case basis, and not to create a schedule of penalties. Likewise, we will not prescribe specific penalties or develop formulas for different violations. It is important that we retain the discretion and flexibility to address each case on its merits, and to fashion remedies appropriate to the facts presented, including any mitigating factors.

14.     In the Notice of Proposed Rulemaking issued in Docket No. RM06-3-000 today we propose rules to implement the anti-manipulation provisions of EPAct 2005 while retaining Market Behavior Rule 2 issued in 2003.[23] We note there that we will not seek duplicative sanctions for the same conduct in the event it violates both the new rules and the Market Behavior Rules. This is because both rules, although different in scope and application, address manipulation. In other contexts, violations of more than one statute, order, rule, or regulation may result in separate penalties. Moreover, under our enhanced civil penalty authority, we will develop a consistent approach to the amount of penalties for misconduct so that the penalties are similar in analogous cases, and are evenhanded for similar conduct, taking all relevant factors into account.

15.     We do, of course, reserve the right to impose remedies, including civil penalties, and also to refer a violation for criminal prosecution if the facts of the case so warrant.

---

trading, issue cease and desist orders, order restitution, and seek equitable remedies (injunction, rescission, or disgorgement), all in addition to imposing a monetary fine. 7 U.S.C. § 13a & 13b (2000); Comm. Fut. L. Rep. (CCH) ¶ 26,265, p. 42,247.

[22] In considering all available remedies for a violation, we are mindful that the new and enhanced civil penalties are applicable only to violations on and after August 8, 2005. To the extent a previous violation is continuing, however, the new and enhanced penalties are applicable to that violation as of August 8, 2005.

[23] *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, "Order Amending Market-Based Rate Tariffs and Authorizations," 105 FERC ¶ 61,218 (2003), *reh'g denied*, 107 FERC ¶ 61,175 (2004); Order No. 644, *Amendment to Blanket Sales Certificates*, FERC Stats. & Regs. ¶ 31,153 (2003), *reh'g denied*, 107 FERC ¶ 61,174 (2004).

Docket No. PL06-1-000 - 8 -

There is no doubt that entities and individuals are subject both to prosecution under criminal provisions of our statutes and to civil remedies.[24] Moreover, perjury, obstruction, and making false statements to members of the Commission staff are criminal offenses.[25] If the misconduct is serious enough, we may refer the matter for criminal prosecution to provide adequate punishment and deterrence. We will take all factors into account in deciding what cases should be referred for criminal prosecution, including the seriousness of the violation, the extent of the harm done, the evidence of willful behavior, and the strength of the evidence of wrongdoing.

16.  When we exercise our new civil penalty authority under the NGA, and the expanded authority under Part II of the FPA, we are required to provide "notice and opportunity for a public hearing."[26] While procedures for issuing civil penalties are in place under the FPA,[27] EPAct 2005 is silent with respect to procedures under the NGA. When we issue civil penalty notices under the NGA, we intend to provide companies with hearing procedures before an administrative law judge.

### **Factors Guiding the Selection of Enforcement Remedies**

17.  Vigorous and even-handed enforcement of our statutes, orders, rules, and regulations protects energy markets and consumers. At the same time it is in the best interest of all segments of the industry that compliance, self-reporting, and cooperation in dealings with the Commission are emphasized. We therefore describe below factors we will take into account in determining the appropriate level of penalty to be imposed for violations of our rules or regulations. We recognize that no list can cover every possible significant factor, and we will consider other pertinent factors as appropriate.

---

[24] *See* FPA sections 316 and 316A, 16 U.S.C. §§ 825o and 825o-1; NGA sections 21 and 22, 15 U.S.C. § 717t; and NGPA section 504, 15 U.S.C. § 3414. We note that in EPAct 2005 section 1284(d), Congress repealed FPA section 316(c), which previously had exempted FPA sections 211, 212, 213, and 214 from the criminal sanctions of FPA section 316(a) and (b). Thus, in addition to extending civil penalty authority to all matters under FPA Part II, Congress made clear that both civil penalties and criminal sanctions apply to violations of any rule or order issued under FPA Part II.

[25] *See, e.g.,* 18 U.S.C. § 1001 (2000).

[26] EPAct 2005 section 314(b), inserting new NGA section 22(b); FPA section 316A(b), 16 U.S.C. § 825o-1(b) (2000).

[27] 16 U.S.C. § 823b (2000).

Docket No. PL06-1-000                                                                                         - 9 -

18.     In doing so, we first emphasize that we must make enforcement decisions based on all relevant factors, and we therefore must retain the flexibility to weigh all relevant information and apply the policy in light of the facts of each case.  This Policy Statement does not confer any rights or guarantees with respect to enforcement actions.  We reserve the right to impose appropriate sanctions based on all the facts presented, and we recognize that there may be circumstances where the conduct is so egregious that the full use of the Commission's penalty authorities is necessary regardless of the presence of other factors.

19.     In addition, the enhancement of our civil penalty authority does not mean that we will refrain from ordering the disgorgement of unjust profits or economic benefits that are the result of wrongdoing.  To the contrary, companies will be expected to disgorge unjust profits whenever they can be determined or reasonably estimated.  The purpose of disgorgement is to nullify the value of gains acquired through misconduct.  When evaluating an appropriate remedy, above disgorgement of profit, the Commission will assess the factors described below to determine whether and to what extent other remedies, including suspension or revocation of certificate or market-based rate authority and/or civil penalties, are warranted.

20.     As mandated by sections 316A of the FPA and new section 22 of the NGA, the seriousness of the offense is the first consideration in determining appropriate penalties.  Factors that may be considered in judging the seriousness of the offense include:

- What harm was caused by the violation?  Was there loss of life or injury or endangerment to persons?  Was there damage to property or the environment?  Was the harm widespread across markets or customers, or was it limited in scope and impact?  Did it involve significant sums of money?  Were others indirectly affected by the wrongdoing?  What benefit did the wrongdoer gain from the violation?

- Was the violation the result of manipulation, deceit, or artifice?  Did the wrongdoer misrepresent material facts?  Was the conduct fraudulent?  Were the actions reckless or deliberately indifferent to the results?

- Was the action willful?  Was the violation part of a broader scheme?  Did the wrongdoer act in concert with others?

- Is this a repeat offense or does the company have a history of violations?  Is this an isolated instance or a recurring problem?  Was the wrongdoing systematic and persistent?  How long did the wrongdoing last?

Docket No. PL06-1-000 - 10 -

- ➢ Was the wrongdoing related to actions by senior management, the result of pressure placed on employees by senior management to achieve specific results, or done with the knowledge and acquiescence of senior management? Did management engage in a cover-up?

- ➢ How did the wrongdoing come to light? Did senior management resist or ignore efforts to inquire into actions or otherwise impede an inquiry into the violation?

- ➢ What effect would potential penalties have on the financial viability of the company that committed the wrongdoing?

### Credit for Internal Compliance, Self-Reporting, and Cooperation

21. The second point to be taken into account as required by section 316A of the FPA and new section 22 of the NGA is what efforts the company made to remedy the violation in a timely manner. This aspect of company reaction to wrongdoing involves what consideration will be given for steps taken by entities to prevent, monitor, and immediately stop misconduct, to report violations to the Commission, and to cooperate with the Commission's enforcement actions.

### 1.    Internal compliance

22. Internal compliance is an important proactive tool. We encourage companies engaged in jurisdictional activities to take steps to create a strong atmosphere of compliance in their organizations. To this end, the following are factors that will be taken into account in determining credit given for a company's commitment to compliance:

- ➢ Does the company have an established, formal program for internal compliance? Is it well documented and widely disseminated within the company? Is the program supervised by an officer or other high-ranking official? Does the compliance official report to or have independent access to the chief executive officer and/or the board of directors? Is the program operated and managed so as to be independent? Are there sufficient resources dedicated to the compliance program?

- ➢ Is compliance fully supported by senior management? For example, is senior management actively involved in compliance efforts and do company policies regarding compensation, promotion, and disciplinary action take into account the relevant employees' compliance with Commission regulations and the reporting of any violations?

Docket No. PL06-1-000                                                                                         - 11 -

- How frequently does the company review and modify the compliance program? How frequently is training provided to all relevant employees? Is the training sufficiently detailed and thorough to instill an understanding of relevant rules and the importance of compliance?

- In addition to training, does the company have an ongoing process for auditing compliance with Commission regulations?

- How has the company responded to prior wrongdoing? Did it take disciplinary action against employees involved in violations? When misconduct occurs, is it a repeat of the same offense or misconduct of a different nature? Does the company adopt and ensure enforcement of new and more effective internal controls and procedures to prevent a recurrence of misconduct?

23.   The answers to these questions will indicate what credit, if any, can be given for the existence of a compliance program when we are considering enforcement action and penalties. We reiterate that credit extends to penalties, compliance plans, and the like but not to disgorgement of unjust profits. As noted earlier, at a minimum a company involved in wrongdoing must disgorge any unjust profits resulting from the wrongdoing.

### 2.  Self-reporting

24.   We place great importance on self-reporting. Companies are in the best position to detect and correct violations of our orders, rules, and regulations, both inadvertent and intentional, and should be proactive in doing so. When a company self-reports violations to the Commission it facilitates remedies to affected parties. The following are considerations in deciding what level of credit to give for self-reporting violations to the Commission when determining the penalties for violations so reported:

- How did the company uncover the misconduct? Was it through a self-evaluation, internal audit, or internal compliance program? Did the company act immediately when it learned of the misconduct?

- Did the company notify the Commission promptly? Did senior management actively participate and encourage employees to provide information to identify the misconduct?

- Did the company take immediate steps to stop the misconduct? Did it implement or create an adequate response to the misconduct?

- Did the company arrange for individuals with full knowledge of the matter to meet with Commission enforcement staff?

Docket No. PL06-1-000 - 12 -

- ➢ Did the company present its findings to the Commission and provide all relevant evidence regarding the misconduct, including full disclosure of the scope of the wrongdoing; the identity of all employees involved, including senior executives; the steps taken by the company upon learning of the misconduct; communications among involved employees; documents evidencing the misconduct; and measures taken to remedy the misconduct?

25.     As stated earlier, we cannot determine in advance how much credit is given for self-reporting. It is possible, however, that prompt and full self-reporting of violations, coupled with steps to correct the adverse impact on customers or third parties from the misconduct, may result in a significant reduction in the amount of civil penalty or no civil penalty being assessed. Companies should still expect to disgorge any unjust profits.

### 3.      **Cooperation**

26.     Cooperation may come in any context—a company response to a Commission inquiry, audit, or investigation, or in voluntary self-reporting of misconduct. We expect cooperation, as entities subject to our jurisdiction are required to provide us with information at our request.[28] Still, we will give some consideration to exemplary cooperation, that is, cooperation which quickly ends wrongful conduct, determines the facts, and corrects a problem. Cooperation must come very early in the process, however, and must be in good faith, consistent, and continuing. No credit will be given if a company does no more than the minimum, or delays cooperation, or purports to cooperate but actually engages in conduct that impedes the Commission's activities or consumes Commission resources unnecessarily. The following are indicative of cooperation for which credit may be given when we determine the appropriate penalty to be imposed for wrongdoing. Although these factors are similar to those described above with respect to self-reporting, they remain relevant in the context of cooperation because, under appropriate circumstances, the Commission will consider these factors even for entities that did not self-report violations, provided that cooperation was provided once the violation was uncovered.

- ➢ Did the company volunteer to provide internal investigation or audit reports relating to the misconduct? Did the company hire an independent outside entity to assist the company's investigation?

---

[28] FPA section 301(b), 16 U.S.C. § 825b(b); NGA section 8(b), 15 U.S.C. § 717g(b); NGPA section 304(a), 15 U.S.C. § 3314(a).

20051020-3050 Issued by FERC OSEC 10/20/2005 in Docket#: PL06-1-000
Case 1:07-cv-06682-DC    Document 32-14    Filed 09/28/2007    Page 13 of 14

Docket No. PL06-1-000                                                              - 13 -

- ➢ Did senior management make clear to all employees that their cooperation has the full support and encouragement of management and the directors of the company?

- ➢ Did the company facilitate Commission access to employees with knowledge and information bearing on the issue, and actively encourage such employees to provide the Commission with complete and accurate information?

- ➢ Did the company identify culpable employees and assist the Commission in understanding their conduct?

- ➢ Did the company make records readily available, with assistance on searching and interpreting information in the records?

- ➢ Did the company fairly and accurately determine the effects of the misconduct, including identifying the revenues and profits resulting from the misconduct and the customers or market participants adversely affected by the misconduct?

27.     It is possible for an entity to comply with the majority of the stated factors in part, but without wholeheartedly devoting its resources and efforts to cooperation.  Likewise, it is conceivable for an entity to cooperate in certain aspects yet hinder enforcement investigation in others.  Lack of cooperation is a serious matter and will be weighed in deciding appropriate remedies.  Uncooperative conduct includes such things as failing to respond to data requests in a timely manner; failing to produce documents and witnesses within a reasonable period; misrepresenting the nature or extent of the misconduct; claiming that records are unavailable when they are; limiting staff access to employees; inappropriately directing or influencing employees or their counsel not to cooperate fully or openly with the investigation; engaging in obstructive conduct during investigative testimony or interviews; providing specious explanations for instances of misconduct that are uncovered; failing properly to search computer hard drives for documents and electronic images; and failing to provide documents in the way they are maintained in the normal course of business.  The manner in which a company approaches cooperation will be an important factor in determining whether, and how much, credit may be given for cooperation.

### Conclusion

28.     The factors discussed in this Policy Statement provide guidance to the industry on the approach we will take to future enforcement.  It is consistent with past Commission practice, and with the practices of other federal agencies with similar powers.  Entities subject to the Commission's jurisdiction should expect firm but fair enforcement in the

20051020-3050 Issued by FERC OSEC 10/20/2005 in Docket#: PL06-1-000

Docket No. PL06-1-000                                                                                              - 14 -

future, including the use, as appropriate, of the substantial new civil penalty authority provided by EPAct 2005.

29.     At the same time, entities can take steps to improve and ensure compliance by their officers, employees, and agents with our statutes, orders, rules, and regulations.  We place a high value on internal compliance, self-reporting, and cooperation.  The credit we will give for mitigating factors, including proactive steps taken by companies, depends on many factors and cannot be reduced to a predictable quantity.  But where many of the positive factors of internal compliance, self-reporting, and cooperation are present, we will take those factors into account in determining the appropriate penalties for violations.

By the Commission.

( S E A L )

                                                                    Magalie R. Salas,
                                                                       Secretary.