JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



07 CIV 6377

----------------------------------------X

ROBERTO E. CALLE GRACEY,
on behalf of himself and all others
similarly situated,

                   Plaintiff,

      -against-

AMARANTH ADVISORS, LLC, NICHOLAS M.
MAOUNIS, J.P. MORGAN CHASE & CO., and
JOHN DOES NOS. 1-10,

           Defendants.

----------------------------------------X

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Docket No.
07 Civ. _____

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

JUL 12 2007

U.S.D.C. S.D.N.Y.
CASHIERS

     Roberto E. Calle Gracey ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, for his Complaint against the above-named defendants ("Defendants"), upon knowledge as to matters relating to himself and upon information and belief as to all other matters, alleges as follows:

### SUMMARY OF ALLEGATIONS

     1.  Defendants, through diverse means, lawful and unlawful, manipulated and made artificial the prices of natural gas futures contracts traded on the New York Mercantile Exchange ("NYMEX") in this District during the Class Period as defined in ¶ 12, <u>infra</u>.

     2.  Specifically, Defendants

     a) caused the price of natural gas futures contracts traded on NYMEX to be artificial by repeatedly violating NYMEX exchange rules and amassing positions in natural gas futures contracts that drastically exceeded applicable position limits;

b) further caused the price of natural gas futures contracts to be artificial by surreptitiously amassing a huge position in natural gas swaps on the Intercontinental Exchange ("ICE"), the other major U.S. energy exchange; and

c) concealed their manipulative trading from regulators and market participants by reconstructing and eventually increasing the size of defendant Amaranth Advisors, LLC's natural gas portfolio on the ICE after being ordered by the NYMEX to reduce Defendants' positions (which were so large that they were disrupting the market).

3.    Defendants' foregoing manipulative conduct caused NYMEX natural gas futures contracts to trade at artificial prices and violated of Section 9 of the Commodity Exchange Act, as amended (the "CEA").    Defendants' manipulative trading caused traders of natural gas futures contracts, including Plaintiff, to suffer substantial losses.

4.    When Defendants' unlawful scheme of highly leveraged trading collapsed in September 2006, the price of natural gas and natural gas futures contracts traded on NYMEX experienced an almost unprecedented drop as the price artificiality caused by Defendants' trading dissipated.    For example, the price of the NYMEX futures contract to deliver natural gas in October 2006 plunged from $8.45 per million British Thermal Units (MMBTU) to

2

$4.80 per MMBTU.  The price for immediate delivery of natural gas, referred to as the "spot price", plunged from $7.49 per MMBTU in late August 2006 to $3.66 per MMBTU in early October- a collapse that the Electric Power Research Institute described as "stunning... one of the steepest declines ever."

5.    Plaintiff now brings this class action under the CEA seeking recovery of damages resulting from Defendants' unlawful market manipulation scheme.

**<u>JURISDICTION AND VENUE</u>**

6.    (i)    Natural gas is a "commodity" and is the "commodity underlying" NYMEX natural gas futures contracts, as those terms are defined and used in Sections 1a(3) and 22 of the CEA, 7 U.S.C. §§ 1a(3) and 25.

(ii)    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 7 U.S.C. §§ 1 <u>et seq</u>.

(iii)    Venue is proper under 28 U.S.C. § 1391(a) and (b) and 7 U.S.C. § 25( c), because Defendants' manipulative course of conduct occurred in large part in this District and caused the prices of natural gas futures contracts traded on the NYMEX, which is located in this District  at One North End Avenue, New York, New York, to be made and remain artificial throughout the Class Period.

**PARTIES**

7.    Plaintiff traded NYMEX natural gas futures contracts during the Class Period.  Plaintiff was damaged by Defendants' manipulation of the price of natural gas futures contracts to artificial levels.

8.  a) Defendant Amaranth Advisors, LLC ("Amaranth") is a Delaware limited liability corporation having its principal place of business at One American Lane, Greenwich, Connecticut.  At relevant times Amaranth held itself out as a multi-strategy hedge fund with substantial investments in energy.

b) Defendant Nicholas M. Maounis ("Maounis") is the Managing Member of Amaranth and was a control person of Amaranth at all relevant times.  Defendants Amaranth and Maounis are hereinafter sometimes referred to as the "Amaranth Defendants."

9.    Defendant J.P. Morgan Chase & Co. ("JPMC") is a diversified banking, investment banking and brokerage firm that is headquartered at 270 Park Avenue, New York, New York.  JPMC maintains (among many other business units) one of the largest futures and options brokerage businesses in the world.  JPMC acted as prime broker to Amaranth at relevant times and aided and abetted Amaranth's violations of the CEA as further alleged below.

10.  Plaintiff alleges on information and belief that at all relevant times, Defendants John Does 1-10, inclusive, were also

engaged in the manipulation of natural gas futures prices as alleged herein. Plaintiffs are presently unaware of the true names and identities of those Defendants sued herein as John Does 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 1-10, inclusive.

11.    The acts alleged in this Complaint to have been committed by Defendants Amaranth and JPMC were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## CLASS ALLEGATIONS

12.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class in this action consists of persons, other than Defendants, their employees, affiliates and co-conspirators, who purchased or held NYMEX natural gas futures contracts between February 23, 2006 and September 20, 2006 ("Class Period").

13.    NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC for approval various rules and regulations through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options on

futures contracts, including futures and options contracts for natural gas.

14.    Natural gas and other futures and options contracts are standardized according to the terms specified by the NYMEX or the other contract market/commodity exchange that creates the futures contract.  Futures markets, the standardized and fungible futures and options contracts, and the mechanism of the clearing house to hold the other side of every futures and options contract, are specifically designed to facilitate and ease trading in one central marketplace by traders who are located throughout the world.

15.    Thousands of natural gas futures contracts were traded on many business days during the Class Period.  The number of persons or entities who purchased and/or sold futures contracts during the Class Period is in the thousands, and those persons or entities are geographically dispersed.  Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

16.    Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).

17.    Futures contracts are firm commitments to make or accept delivery of a specified quantity and quality of a commodity during a specific month in the future at a price agreed upon at the time the commitment is made.

18.   There are two sides to a natural gas futures contract traded on a contract market/exchange.  The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity.  The "short" side is the seller of the contract and is obligated to make delivery of the commodity.

19.   However, only a small percentage of all natural gas futures contracts traded each year result in delivery of the underlying commodities.  Instead, traders generally offset their futures positions before their contracts mature.  For example, a purchaser of a  futures contract can cancel or offset his future obligation to the contact market/exchange clearing house to take delivery of natural gas by selling an offsetting futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

20.   On April 3, 1990, the NYMEX began trading and currently trades for delivery of natural gas during the current calendar month (sometime called the "spot month contract" or "spot contract") and for each of the next 72 consecutive future calendar months.

21.   Prices for all natural gas futures contracts are quoted in 10,000 MMBTU.  The NYMEX natural gas futures contracts is the benchmark for forward natural gas markets because of its

7

liquidity and transparency.  Other natural gas futures contracts have settlement prices pegged to the prices of the "Henry Hub" contracts.

22.    Accordingly, each and every Class member purchased or held standardized and fungible natural gas futures contract in the same centralized NYMEX market and subject to the same NYMEX market rules and regulations.

23.    The NYMEX market for natural gas futures contracts was an efficient market and the prices therein reflected available information.

24.    Common issues of law and fact include but are not limited to:

(i)    whether the manipulative activities alleged herein existed;

(ii)   whether such manipulative activities had the result of manipulating prices in the market for NYMEX natural gas futures contracts;

(iii)  whether, as a result of any such violation, Defendants caused prices in the NYMEX market for natural gas futures to be artificial during the Class Period;

(iv)   if so, to what extent were prices artificial;

(v)    whether Defendants' course of conduct violated the CEA; and

(vi) whether a constructive or actual trust should be impressed upon the ill-gotten gains obtained by Defendants as fruits of their misconduct.

25.    Plaintiff's interests are typical of, and not antagonistic to the interests of, the Class.

26.    Plaintiff has retained competent counsel experienced with class actions and commodities litigation and intends to vigorously prosecute this action.

27.    Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method by which plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.  The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged manipulation and unlawful conduct.

28.    (a)  Upon acceptance of any natural gas futures trade on the NYMEX, the NYMEX clearinghouse effectively becomes the seller to every buyer of a NYMEX futures contract and the buyer to every seller.  The NYMEX clearinghouse's functions include matching and recording trades, collecting and maintaining margins, allocating margins according to the positions of the clearing members, and matching open short with open long positions.

9

(b)    Class members' identities and their trades generally can be identified by members of the NYMEX clearing house and the futures brokers clearing through them.

(c)    Plaintiff does not anticipate any difficulties in the management of this action as a class action.

### UNDERLYING ALLEGATIONS

I.    The Integrated NYMEX and ICE Market for Natural Gas

29.    NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  NYMEX submits to the CFTC for approval various rules and regulations through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and option contracts for natural gas.

30.    A futures contract is an agreement to buy or sell a commodity, such as natural gas, at a date in the future.  Every aspect of a futures contract traded on the NYMEX is standardized, except the price.  Futures markets are specifically designed to facilitate and ease trading in one central market place of traders who are located throughout the United States.

31.    Natural gas futures contracts have two sides.  The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity for as long as the buyer holds the contract.  The "short" side is the seller of the contract and

is obligated to make delivery of the commodity for as long as the seller holds the contract.

32.    NYMEX uses the "Henry Hub" as the point of delivery for natural gas pursuant to its futures contracts.  The Henry Hub is the largest centralized point for natural gas spot trading in the United States and is physically situated at Sabine's Henry Gas Processing Plant.

33.    Prices for all natural gas futures contracts are quoted in 10,000 MMBTU.  The market for Henry Hub natural gas futures contracts is the benchmark for forward natural gas markets because of its liquidity and transparency.

34.    Henry Hub is an example of a "Market Hub", operating as a physical transfer point (commonly known as "headers"), where numerous pipelines are connected to a facility that allows for the redirection of gas volumes from one pipeline to another.

35.    Market Hubs offer services that facilitate the buying, selling and transportation of the actual natural gas within the local facility including, but not limited to, making arrangements for storage and plant processing services, transfer of title for natural gas sales and purchases, and transportation of the natural gas.

36.    The Henry Hub links nine interstate and four intrastate pipelines, including Acadian, Columbia Gulf, Dow,

Equitable (Jefferson Island), Koch Gateway, LRC, Natural Gas Pipe Line, Sea Robin, Southern Natural, Texas Gas, Transco, Trunkline and Sabine's mainline.

37.    For a storable commodity, such as natural gas, there is a clear relationship between spot and futures contract prices.

38.    There is also a clear relationship between the NYMEX futures contract prices and the market prices that prevail for derivative instruments known as "swaps", which are traded on ICE. The settlement prices for ICE swaps are pegged to the final settlement prices for the corresponding NYMEX futures contract. Therefore, the two instruments are functionally equivalent for risk management purposes, and (with minor deviations) their prices essentially move in lockstep with one another.    Traders base their trading decisions on whether to transact in ICE swaps or NYMEX futures contracts based on factors such as which market has greater liquidity at a given time.  Many traders have positions in multiple contracts on both exchanges at the same time.

39.    The price curves for ICE swaps and NYMEX futures contracts indicate that the price risks from purchasing ICE swaps are identical to the price risks from purchasing NYMEX futures contracts.  Since both contracts are exchange-cleared, there exists no greater counterparty credit risk from trading in one market versus the other.  While there exists a substantial volume

12

of arbitrage trading attempting to exploit minor, temporary price discrepancies between the NYMEX and the ICE markets, the two markets' prices essentially move in lockstep, and the two markets de facto function as a single, integrated market.

40.    However, there exists one crucial difference between the trading in ICE swaps and NYMEX futures contracts— the degree of regulatory oversight.  CFTC Designated Contract Markets like NYMEX are subject to a panoply of regulation, including regulations that require and authorize them to prevent manipulative trading.  Pursuant to a provision of the Commodities Futures Modernization Act of 2000 ("CFMA") referred to as the "Enron loophole" unregulated markets such as ICE (unlike Direct Contract Markets like NYMEX) have no legal obligation to monitor trading, prevent manipulation or price distortion, or ensure that trading is fair and orderly.  Additionally, under the CFMA's "Enron loophole" the CFTC has neither the authority nor the obligation to monitor trading on unregulated exchanges such as the ICE.

II.    The Defendants' Manipulative Trading Creates Artificial Prices for NYMEX Natural Gas Futures

41.    During the Class Period defendants, as far and away the largest participant in the natural gas market, had the ability through their trading to influence the price of NYMEX natural gas futures contracts.

42.   During February through August 2006, Defendants intentionally drove up the price of NYMEX natural gas futures contracts as part of a trading scheme to artificially increase the "spread" between the prices of futures contracts for delivery of natural gas during the summer of 2006 and those for delivery during the winter of 2006-2007.

43.   Despite higher-than-usual inventories of physical natural gas, unusually high winter/summer price spreads persisted throughout the February through September, 2006 period. According to a report on an investigation conducted by the Senate Permanent Subcommittee on Investigations, which reviewed subpoenaed natural gas trading records from NYMEX, ICE, Amaranth, and other traders (comprising data concerning several million individual trades), the extreme levels of winter/summer price spreads were driven by Amaranth's excessive speculative trading in natural gas contracts on both NYMEX and ICE, persisting over several months.

44.   Prior to its collapse, Amaranth dominated trading in the U.S. natural gas market.  It bought and sold thousands of natural gas contracts on a daily basis, and tens of thousands of contracts on certain days.  All but a few of the largest energy companies and hedge funds consider trades of a few hundred contracts to be large trades. Amaranth held as many as 100,000 natural gas futures contracts at once, representing one trillion

cubic feet of natural gas, or **5% of the natural gas used in the United States in a year.**

45.    During parts of the Class Period, Amaranth controlled up to 40% of all of the open interest on NYMEX for the winter months (October 2006 through March 2007). Amaranth accumulated such large positions and traded such large volumes of natural gas futures that it distorted market prices, widened price spreads, and increased price volatility.  On almost every day from mid-February through July 2006, Amaranth held more than 50% of the open interest on NYMEX in the January 2007 and November 2006 NYMEX natural gas futures contracts.

46.    In late July 2006, Amaranth held a total of more than 80,000 NYMEX and ICE contracts for January 2007-representing a volume of natural gas that equaled the entire amount of natural gas eventually used in that month by U.S. residential consumers nationwide.  During parts of the Class Period, Amaranth's trading represented almost 70% of the total NYMEX trading volume in a given contract on a given date, and Amaranth controlled between 25% and 48% of the outstanding contracts (open interest) in all NYMEX natural gas futures contracts for 2006, and approximately 30% of the outstanding contracts (open interest) in all NYMEX natural gas futures contracts for 2007.

47.   Thus, during the Class Period Amaranth's trading
dominated the NYMEX natural gas futures market, and Defendants
intentionally caused artificial prices for NYMEX natural gas
futures via their trading strategies calculated to cause (and
capitalize on) widening price "spreads" between summer 2006 and
winter 2006-2007 NYMEX futures contracts.

III.  <u>After Warnings from NYMEX, Defendants Continue Their Market
      Manipulation via Secret Trading in Natural Gas Swaps on ICE</u>

48.   In early August 2006, out of concern that Amaranth was
disrupting the market, NYMEX directed Amaranth to reduce its
holdings in certain natural gas futures contracts.  This
instruction was the culmination of several previous run-ins that
Amaranth had had with NYMEX regulators as the result of its
massive natural gas positions.  Amaranth responded to NYMEX's
instructions by decreasing its positions on NYMEX, but also
surreptitiously moving its positions in the September and October
contracts to ICE by opening corresponding positions in ICE swaps.

49.   After moving its positions from NYMEX to ICE via a
series of secret, orchestrated trades, Amaranth then placed even
more trades on ICE and **actually increased its overall positions
in natural gas.**  JPMC carried these trades, provided financing
for them, and was contemporaneously aware of Amaranth's positions
in natural gas futures and swaps (including the fact that

16

Amaranth had moved its NYMEX positions to ICE after NYMEX directed Amaranth to reduce its holdings).

50.   Thus, NYMEX's attempts to prevent Amaranth's large volume of trading from disrupting the market were unsuccessful due to Amaranth's ability to conduct its speculative trading without any limitation or disclosure on ICE.

51.   Neither the CFTC nor NYMEX had a full view of Amaranth's trades, positions, or overall market presence because Amaranth's trades on ICE were exempt from regulatory oversight and scrutiny.  Unlike NYMEX, ICE had no legal obligation to monitor positions held by traders, or to report positions to the CFTC.  Without a view of natural gas trades on ICE, neither the CFTC nor NYMEX had a full appreciation or understanding of how Amaranth's trading in natural gas was causing the price of natural gas to be artificial.

52.   Amaranth deliberately exploited the opacity of the ICE swap market in order to effectively flout regulators' attempts to curtail its excessive speculative trading on NYMEX.

IV.   <u>Defendants' Scheme Collapses, Causing the Price of Natural Gas to Drop Drastically</u>

53.   In mid-September 2006, the winter/summer price spreads suddenly tightened due to aggressive trading by other speculators, continuing large on-hand supplies of natural gas, and weather forecasts indicating that the 2006 hurricane season

would pass with no major storm damage to natural gas production or storage facilities.

54.  As the price spreads suddenly tightened, Amaranth incurred substantial mark-to-market losses in its natural gas futures contracts and swaps, including in "long" positions in contracts for delivery of natural gas during the winter of 2006-07.

55.  These spiraling losses had the effect of decreasing and eventually eliminating Amaranth's ability to influence the price of natural gas.  Amaranth's trading had been heavily financed by money borrowed on margin from defendant JPMC.  Therefore, when the market began to turn against it, Amaranth did not have sufficient capital to add to its positions and counteract adverse price movements (as it had done earlier in 2006).

56.  As its margin debt spiraled, defendant JPMC eventually forced Amaranth to reduce its exposure in natural gas futures and swaps, as the margin loan from JPMC was no longer adequately collateralized.

57.  Amaranth then conducted secret meetings with major investment firms including Goldman Sachs, Morgan Stanley and Merrill Lynch, beginning on or about September 15, 2006, attempting to arrange private transactions in which Amaranth would reduce its exposure to natural gas in a privately negotiated transaction or transactions, without collapsing the

market.  Despite Amaranth's attempts to conceal its precarious situation, word of these secret meetings leaked out, fueling speculation that Amaranth was about to collapse.

58.  Amaranth did manage to strike a deal with Goldman Sachs that would have enabled it to substantially lower its risk exposure to natural gas.  However, the deal was scotched on September 18, 2006, when JPMC refused to deliver Amaranth's cash collateral held by JPMC to Goldman Sachs as part of a deal that Amaranth had negotiated with Goldman Sachs.  JPMC claimed that the deal between Goldman Sachs and Amaranth did not adequately protect JPMC from exposure to losses as a result of additional trading losses by Amaranth.

59.  Just two days later, on September 20, 2006, JPMC then scooped up much of Amaranth's natural gas portfolio for its own account.  JPMC later profited by some **$725 million** when the market rebounded.

60.  Amaranth lost more than $2 billion in the natural gas market during the first three weeks of September 2006, precipitating the liquidation of the entire $8 billion fund. During and after what amounted to Amaranth's forced liquidation, the price of natural gas and natural gas futures contracts traded on NYMEX experienced an astounding drop as the price artificiality caused by Amaranth's trading dissipated.  For example, the price of the NYMEX futures contract to deliver

19

natural gas in October 2006 plunged from $8.45 per million British Thermal Units (MMBTU) to $4.80 per MMBTU. The price for immediate delivery of natural gas, referred to as the "spot price", plunged from $7.49 per MMBTU in late August 2006 to $3.66 per MMBTU in early October- a collapse that the Electric Power Research Institute described as "stunning... one of the steepest declines ever."

61.   On June 25, 2007, the U.S. Senate Permanent Subcommittee on Investigations issued a report summarizing the conclusions of its investigation into Amaranth and excessive speculation in the natural gas market. The Committee reached the following conclusions, among others:

A. FINDINGS

(1) A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas market in 2006.

   (a) Amaranth accumulated massive natural gas holdings on NYMEX and ICE spanning five years, from 2006-2010.

   (b) Amaranth accumulated such large positions and traded such large volumes of natural gas in 2006, on both NYMEX and ICE, that it had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market. The larger than usual differences between winter and summer futures prices that prevailed during the spring and summer of 2006 were largely the result of Amaranth's large-scale trades rather than the normal market interaction of many buyers and sellers.

   c) Amaranth's 2006 positions in the natural gas market constituted excessive speculation.

(2) In August 2006, Amaranth traded natural gas contracts on ICE rather than on NYMEX so that it could trade without any restrictions on the size of its positions.

> (a) When NYMEX directed Amaranth to reduce its positions in September 2006 and October 2006 natural gas futures contracts, Amaranth simply transferred those positions to ICE, an unregulated market, thereby maintaining its overall speculative position in the natural gas market.

> (b) NYMEX's attempt to limit speculative trading during the last day of trading on the September 2006 natural gas futures contract failed, because neither NYMEX nor the CFTC had any authority, mandate, or ability to limit trading on ICE that affected the pricing of the NYMEX futures contract.

(3) Amaranth's actions in causing significant price movements in the natural gas market demonstrate that excessive speculation distorts prices, increases volatility, and increases costs and risks for natural gas consumers, such as utilities, who ultimately pass on inflated costs to their customers.

See PSI Staff Report: Excessive Speculation in the Natural Gas Markets, available at http://hsgac.senate.gov/_files/REPORTExcessiveSpeculationintheNaturalGasMarket.pdf

## FRAUDULENT CONCEALMENT

62.   By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, inter alia, engaged in secret and surreptitious trading on the ICE in order to manipulate and make artificial prices for natural gas futures on the NYMEX.

63.   Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts

that could or would have led to the discovery thereof, until they became public in or about June 2007.

64.    Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about June 2007.

65.    Due to the fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

**AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE AMARANTH DEFENDANTS AND JOHN DOES 1-10 FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. SECTION 1**

66.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

67.    Plaintiff bought one or more NYMEX natural gas futures contract(s) during the Class Period, and was injured as a result of the Defendants' manipulations of the price of those natural gas futures contracts, and/or the price of the natural gas underlying those contracts, in violation of the CEA, 7 U.S.C. § 1 *et seq.*

68.    Defendants' trading activities alleged herein constitute manipulation of the price of natural gas futures contracts, and/or the price of natural gas underlying those

22

contracts, in violation of Section 9(a) and 22(a) of the CEA, 7
U.S.C. §§ 13(a), 25(a).

69.  As set out more fully above, during the Class Period,
Defendants engaged in a pattern of manipulative and surreptitious
trading that caused the market prices for natural gas to be
artificial.  Defendants had the ability to influence market
prices, intended to influence market prices, and through their
conduct caused artificial prices to exist during the Class
Period.

70.  Through the activities alleged herein, Defendants
perpetrated a fraud on the market, artificially affected demand,
and intentionally and continuously concealed information from
trade reporters, regulators and participants in the market for
natural gas futures contracts.

71.  By engaging in the foregoing unlawful acts and
practices, which were designed to mislead plaintiff and the
Class, Defendants, in or in connection with the purchase and/or
sale of natural gas commodity contracts, (i) cheated or defrauded
or attempted to cheat or defraud Plaintiff and the Class; (ii)
willfully made false reports and statements; and/or (iii)
willfully deceived or attempted to deceive Plaintiff and the
Class with regard to Plaintiff's and the Class's natural
gas futures orders, in violation of Section 4b(a)(i), (ii) and
(iii) of the CEA, 7 U.S.C. § 6b(a)(i), (ii), (iii).

72.   Defendants entered into transactions involving natural gas, and intentionally undertook these transactions to cause the prices of natural gas futures contracts to be reported registered or recorded that were not true and bona fide prices, in violation of Section 4c of the CEA, 7 U.S.C. §6c.  Defendants were direct participants in this unlawful conduct to manipulate and make artificial the prices of natural gas futures contracts.

73.   Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT JPMC FOR AIDING AND ABETTING VIOLATIONS OF THE COMMODITY EXCHANGE ACT

74.   Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

75.   Defendant JPMC knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendant JPMC did so knowing of other Defendants' manipulations of natural gas futures prices, and willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts to be artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

76.  Defendant JPMC substantially assisted in the aforesaid manipulations by executing the trades and providing credit to Amaranth, while simultaneously being informed of the nature of

24

the manipulative pattern of trading engaged in by Amaranth.  JPMC had risk management procedures in place at relevant times that caused it to be fully aware of Amaranth's positions and the effects of same on the market.

77.  Plaintiff and the Class are each entitled to actual damages for the violation of the CEA alleged herein.

78.  As a further direct and proximate result of the acts of Defendants, plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees, and other expenditures in a sum to be proven in trial.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANT
MAOUNIS FOR AIDING AND ABETTING COMMODITIES FRAUD
AND CONTROL PERSON LIABILITY**

79.  Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

80.  Defendant Maounis was the principal of defendant Amaranth and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by defendant Amaranth.

81.  Additionally or alternatively, defendant Maounis directly controlled defendant Amaranth.  As a controlling person defendant Maounis is liable under  Section 4(b) of the Commodities Exchange Act, 7 U.S.C. § 6(b) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

25

82.    Plaintiff and the Class are each entitled to actual damages for defendant Maounis's violations of the CEA alleged herein.

## JURY DEMAND

83.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment:

(a)    ordering that this action proceed as a class action as to all claims previously alleged;

(b)    awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

c)    awarding statutory attorneys' fees and costs, and other relief;

(d)    impressing a trust on the ill-gotten gains of Defendants in the ultimate res of which each Class member shall have an undivided interest;

(e)  directing further proceedings to determine the distribution of the trust among Class members, <u>inter</u> <u>se</u>, and award attorneys' fees and expenses to Plaintiff's counsel; and

(f)  awarding such other relief as to this Court may seem just and proper.

Dated:  New York, New York
        July 12, 2007

                    LAW OFFICE OF
                    CHRISTOPHER J. GRAY, P.C.

                    By: _____
                    Christopher J. Gray (CG 0334)
                    460 Park Avenue, 21ST Floor
                    New York, NY 10022
                    (212) 838-3221

                    LOUIS F. BURKE, P.C.

                    By: _____
                    Louis F. Burke (LB 4686)
                    460 Park Avenue, 21ST Floor
                    New York, NY 10022
                    (212) 682-1700

                    *Attorneys for Plaintiff*