LEXSEE 2003 U.S. DIST. LEXIS 15264

UNITED STATES OF AMERICA, v. MICHELLE VALENCIA.

CRIMINAL ACTION NO. H-03-024

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION

2003 U.S. Dist. LEXIS 15264

August 25, 2003, Decided
August 26, 2003, Entered

**SUBSEQUENT HISTORY:** Vacated by, in part United States v. Valencia, 2003 U.S. Dist. LEXIS 24327 (S.D. Tex., Nov. 13, 2003)

**DISPOSITION:** [*1] Defendant's Vagueness Motion and Incorrect Application Motion denied. Defendant's Overbreadth Motion granted. Counts One, Two, and Three of the Indictment dismissed.

**COUNSEL:** For MICHELLE M VALENCIA, defendant: Chris Flood, Flood & Flood, Michelle M Valencia, Houston, TX.

U. S. Attorneys: Financial Litigation, Southern District of Texas, John Richard Braddock, U S Attorneys Office, U S Probation - H, Pretrial Services - H, Houston, TX.

**JUDGES:** NANCY F. ATLAS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NANCY F. ATLAS

**OPINION**

**MEMORANDUM AND ORDER**

This criminal case is before the Court on Defendant Michelle Valencia's motions to dismiss three of six counts in the Indictment against her as unconstitutionally vague and overbroad and as an incorrect application of 7 U.S.C. § 13(a)(2). [1] Having considered the parties' submissions, all matters of record, and applicable legal authorities, the Court concludes that Defendant's Overbreadth Motion should be **granted in part and denied in part,** and her the other Motions are **denied.**

1 Before the Court are Defendant's Motion to Declare Title 7 U.S.C. § 13(a)(2) Unconstitutionally Vague and Motion to Dismiss Counts One, Two and Three of the Indictment ("Vagueness Motion") [Doc. # 25], and Memorandum of Law in support thereof [Doc. # 33]; Motion to Declare Title 7 U.S.C. § 13(a)(2) Unconstitutionally Overbroad, and Motion to Dismiss Counts One, Two and Three of the Indictment ("Overbreadth Motion") [Doc. # 27], and Memorandum of Law in support thereof [Doc. # 34]; Defendant's Motion to Dismiss Counts One, Two and Three of the Indictment Due to an Incorrect Application of Title 7 U.S.C. § 13(a)(2), or, in the Alternative, Request for a Bill of Particulars ("Incorrect Application Motion") [Doc. # 26], and Memorandum of Law in support thereof [Doc. # 32]; United States' Consolidated Response to Motions to Dismiss and to Declare Title 7 U.S.C. § 13(a)(2) Unconstitutional (Docs. # 25, 27); and to Motion to Dismiss for Misapplication of Title 7 U.S.C. § 13(a)(2) or for Bill of Particulars (Doc. # 26) [Doc. # 38]; Defendant's Reply to United States' Consolidated Response [Doc. # 41]; United States' Sur-Reply to Valencia's Reply to the United States' Consolidated Response to Motions to Dismiss or for Bill of Particulars [Doc. # 47]; Defendant's Post-Hearing Memorandum in Support of Defendant's Motions to Dismiss [Doc. # 51]; United States' Response to Post-Hearing

Memorandum Filed by Valencia in Support of Motions to Dismiss [Doc. # 55]. The Court also has received Defendant's June 24, 2003 letter citing additional authorities, and the United States' June 25, 2003 letter in response.

[*2] **I. THE FACTS ALLEGED IN THE INDICTMENT**

A grand jury indicted Defendant Michelle M. Valencia on three counts of false reporting in violation of 7 U.S.C. § 13(a)(2). The January 22, 2003 Indictment alleges that at all material times natural gas was a commodity that traveled in interstate commerce through a vast network of pipelines that spanned Canada, the United States and Mexico. Valencia was employed by Dynegy Marketing and Trade, a natural gas marketer, in Houston, Texas, as a natural gas trader. Natural gas traders such as Valencia were in the business of buying and selling natural gas for profit. Traders often entered into "physical trades," transactions calling for the physical delivery of natural gas. Physical trades occurred at fixed prices or at "index" prices.

Movements in index prices often affected the size of profits that traders such as Valencia were able to generate. Electric utilities often purchased natural gas at prices tied to index prices. In addition, prices of natural gas contracts were often based on index prices. Certain index prices were published by an industry newsletter called *Inside FERC Gas Market Report ("Inside* [*3] *FERC")* on the first day of each month. *Inside FERC* calculated index prices by using information it received from traders during monthly surveys. That information included the price and volume of fixed price, physical natural gas trades during a period of time at the end of each month called "bid week."

If false information was reported to *Inside FERC,* that information could affect the price of natural gas in subsequent months by pushing index prices up or down.

The Indictment alleges Valencia knowingly delivered false and misleading and knowingly inaccurate reports to *Inside FERC* that included volume and price data for trades that did not actually occur. Count One is based on a November 30, 2000 report of three trades, Count Two is based on a January 31, 2001 report of thirty-three trades, and Count Three is based on a February 28, 2001 report of seven trades.

Section 13(a)(2), the statute on which Counts One, Two and Three of the Indictment are based, reads as follows:

It shall be a felony ... for:

> **Any person [i] to manipulate** or attempt to manipulate **the price of any commodity in interstate commerce,** or for future delivery on or subject [*4] to the rules of any registered entity, or [ii] to corner or attempt to corner any such commodity or [iii] **knowingly to deliver or cause to be delivered** for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication **false or misleading or knowingly inaccurate reports concerning** crop or **market information** or conditions **that affect or tend to affect the price of any commodity in interstate commerce** ....

7 U.S.C. § 13(a)(2) (emphasis added). Section 13(a)(2) is found in Chapter 1 of Title 7, which is designated the Commodity Exchange Act ("CEA"). [2]

> 2    The CEA originated in 1922 as the Grain Futures Act. In 1936, the legislation was renamed the Commodity Exchange Act. The Commodity Futures Trading Commission ("CFTC") was created in 1974 and given enforcement and oversight powers. In 1992 the Futures Trading Practices Act authorized the CFTC to grant exemptions from most provisions of the CEA and provided legal certainty for the over-the-counter derivatives market. In 2000, the Commodity Futures Modernization Act codified swap exclusions and legal certainty for transactions in exempt commodities, and further provided legal certainty in the markets for certain derivatives and futures transactions.

[*5] At the Court's request, the parties presented at a hearing on June 25, 2003, background information about natural gas trading, the commodities futures exchange, ways in which natural gas trading may be conducted, and the traditional role of *Inside FERC.* [3] The parties' focus was Valencia's motion that the Indictment incorrectly applies § 13(a)(2) to the facts of this case, but

some of the information is helpful to an understanding of the parties' arguments and is included here. [4]

> 3   References to the transcript of the June 25, 2003 hearing are cited as "Tr. at    ."
>
> 4   At that hearing, the parties presented expert testimony about the nature of transactions and participants in the physical or spot markets and in the futures market. The parties also provided testimony on the issue of how, if at all, reported "index prices" could actually, practically and/or theoretically affect futures trading. Defendant relied on the testimony of Arthur Gelber of Gelber & Associates, an advisor and consultant to the natural gas industry. The Government relied on the testimony of Albert Helmig, who served as a member of New York Mercantile Exchange ("NYMEX") from 1985-2000, a member of NYMEX's board of directors from 1991-2000, and the exchange's vice chairman for the last two years of his term.
>
> It is improper on a motion to dismiss for the Court to make credibility determinations or weigh the testimony by the parties' experts and the Court has not done so. The Court merely has relied on these witnesses' testimony for background information on matters that are not in dispute.

[*6] It is unnecessary for the Court to recount all the witnesses' testimony. Suffice it to say that there is no dispute that, in general, a fixed gas physical contract is a bilateral agreement agreed between two counter-parties for delivery of a physical commodity of a known volume at a known price, and the term "spot market" is largely synonymous with the "physical market" for natural gas. The spot or physical market is not regulated by the CFTC.

Physical trades of natural gas may occur at a price specified in the contract or at an "index price," which is a published price for natural gas based on the publisher's survey of trades reported to have taken place within roughly the last seven days of the month, called "bid week." Insofar as pertinent to this case, the indices for natural gas trades are reported for transactions at various specified geographic locations in the United States and Canada. Publishers create the index prices from information about physical trades received from traders, which information the publisher weights according to one or more proprietary formulas.

Often, transactions for physical or spot natural gas provide that the price of the gas will be at, or a certain [*7] number of cents higher or lower than, a specified published index price, even though at the time of the contract negotiation, the parties do not know what that price will be. These indices embody an historical perspective. *Inside FERC* publishes one of the most well-known indices.

In addition to physical trades, there may also be financial contracts related to natural gas. The most popular type of financial contract, or transaction, is known as a "swap." A swap arrangement can be for physical exchange of product at different locations or for delivery in different months (an exchange of product), or a purely financial transaction where the parties make a financial agreement but do not agree to delivery of any product. These transactions settle at maturity for payment by one party to another of cash to account for price differentials at the settlement date. In any event, in a swap arrangement generally, the parties do not contemplate physical delivery of the commodity. Swap arrangements are all conducted over-the-counter; there is no centralized market for swaps. Swap transactions are not regulated by the CFTC.

Another type of physical contract is a "forward contract," a bilateral [*8] agreement between a buyer and a seller for delivery of a commodity at some time in the future at a negotiated price, not a price set by the NYMEX.

In contrast, futures contracts for commodities take place within regulated futures exchanges, which generally have an open outcry trading pit and are regulated and overseen by the CFTC. Commodity exchanges commonly have clearing facilities as third party intervenors of regulated financial integrity which act as the counterparty for every transaction. Each person who buys a futures contract in a commodity makes a transaction with a financial institution, not with a counter-party buying or selling the commodity. Most natural gas futures are traded over the NYMEX. The exchange requires performance guarantees before the parties can transact business over that exchange, although the requirements can be waived in appropriate circumstances. All futures contracts for natural gas through the NYMEX are deemed to involve delivery at the Henry Hub in Louisiana. A futures contract is basically a financial instrument (at least until the

maturation date of the contract) involving the sale or purchase of a commodity sold at a fixed price specified in dollars [*9] and cents. Futures contract prices are established by the amounts that buyers and sellers on an exchange (through brokers or traders on the exchange floor) are willing to pay or receive for the commodity at Henry Hub on a specified date in the future. [5] Valencia contends there are no futures contracts for gas to be delivered in California. There is no "index" for the NYMEX. [6] The parties' experts agree that index prices are a "point of departure" for gas prices in the month of publication. All agree that natural gas is essentially fungible. [7] Futures contracts start trading roughly three years prior to their expiration. The "prompt month" is the most current futures month trading. Futures contracts expire two days prior to the first day of flow, which is generally the first day of the month. The expiration of futures contracts generally overlaps with "bid week," which is the last several days of the month and which is generally the time when physical cash transactions occur.

5    Another type of physical transaction is a "basis transaction" that may be settled as a financial transaction. A basis transaction can take place where a buyer and seller agree directly between each other (not on any exchange) that one will take gas at a particular location and the other will sell at a different location, with the price reflecting "basis points" that essentially are the transportation costs (apparently from Henry Hub to the point of delivery of the physical contract). Basis, as described by Gelber, is "cash minus futures." Tr. at 41. There is a type of "basis transaction" where a person "buys a financial instrument where one of the arms of the transaction is the NYMEX price and the other arm of the transaction, the other price is some sort of index to the NYMEX." Tr. at 40-41. Thus, for off-exchange transactions, prices for natural gas can include a dollar and cents price plus or minus specified "basis points." In any event, a basis transaction is not a futures contract and does not occur on any futures exchange. The basis relationship is 30 days of physical gas compared against 30 days of NYMEX gas. The calculation of basis points is the difference between the two.

[*10]

6    Generally, futures transactions take place on a regulated exchange, but Gelber recognized that there are some instances where futures contracts

take place "off exchange." On the futures exchange, parties do not get to set their own terms and conditions -- the contracts are not negotiated. Id.

7    For instance, natural gas that is obtained in the Appalachian Basin is, for all practical purposes, the same commodity that comes from the Gulf Coast Basin, the Permian Basin, basins in Canada, or anywhere else. It is very difficult to get gas physically from Henry Hub to California. Gelber stated, nevertheless, that the "NYMEX is a fantastic barometer for national natural gas value ... anywhere in North America .... But [it] doesn't really speak in and of itself to the price of gas, let's say, [in] California, because this is price of gas in Louisiana at a certain place at a certain point in time." Tr. at 41.

## II. ANALYSIS

### A. Valencia's Vagueness Motion

#### 1. Legal Standards

A statute is void for vagueness under the due process clause of the Fifth Amendment if [*11] it does not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 358, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983); *Connally v. General Const. Co.*, 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926); *see also Women's Med. Ctr. of Northwest Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (stating that "[a] law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement"). A statute must provide "fair notice" to citizens as to the conduct it prohibits. *City of Chicago v. Morales*, 527 U.S. 41, 56, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999). In order to invalidate a statute on the ground that it fails to sufficiently direct law enforcement, the challenge must do more than assert speculative danger of arbitrary enforcement. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982). [*12]

Constitutional analysis must necessarily begin with the language of the statute. *United States v. Harris*, 25

F.3d 1275, 1280 (5th Cir. 1994). "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Atchison v. Collins,* 288 F.3d 177, 180 (5th Cir. 2002). The meaning or ambiguity of statutory language must be interpreted in context. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132-33, 146 L. Ed. 2d 121, 120 S. Ct. 1291 (2000). However, if the literal reading of a statute would compel an "odd" result inconsistent with the purpose for which the statute was enacted, the court will search for other evidence of congressional intent to lend the statute its proper scope. *United States v. Wallington,* 889 F.2d 573, 576 (5th Cir. 1989).

If a statute is vague, it may still constitutionally be enforced against a defendant where the conduct charged in the indictments is the sort of "hardcore" conduct that would obviously be prohibited under any construction of the statute. *See Dombrowski v. Pfister,* 380 U.S. 479, 491-92, 14 L. Ed. 2d 22, 85 S. Ct. 1116 (1965) [*13] (holding "it is readily apparent that abstention serves no legitimate purpose where a statute regulating speech is properly attacked on its face, and where, as here, the conduct charged in the indictments is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not the sort of 'hardcore' conduct that would obviously be prohibited under any construction").

## 2. Valencia's Contentions

Valencia relies on legislative history that indicates that Congress intended to exclude "spot" transactions from regulation by the CEA to support her position that § 13(a)(2) is void for vagueness under the Fifth Amendment to the United States Constitution. Valencia argues that natural gas is designated by the CFTC to be an "exempt" commodity [8] and thus subject only to CEA provisions that prohibit manipulation of the market price for any commodity in interstate commerce. Further, Valencia interprets the statute to require manipulation of futures prices, not just prices in the market at large for natural gas.

    8    An "exempt commodity" is any commodity that is not an "excluded commodity" or an "agricultural commodity," 7 U.S.C. § 1a(14). An "excluded commodity," defined in 7 U.S.C. § 1a(13), includes things such as interest rates, exchange rates, currency, securities, and certain

economic indices and occurrences.

[*14] In this case, although natural gas is traded on the NYMEX, Valencia contends there are no futures contracts for gas deliverable to West Coast locations traded on any exchange. Valencia argues that the Government's interpretation of the statute makes it applicable to any goods capable of being traded on a futures market, even if not currently traded on a futures market, and that, under this interpretation, nothing is excluded from CFTC oversight and CEA regulation. Valencia contends a better interpretation is that § 13(a)(2) applies to goods currently traded on a futures market, which does not include West Coast natural gas.

Valencia further contends that § 13(a)(2) provides no notice to ordinary citizens that criminal liability extends to persons who are not licensed under the CEA or who do not deal in commodities futures markets. Valencia contends that because the CEA was enacted to regulate individuals in the commodities futures trading arena, the term "any person" in the statute is vague and allows the statute to be interpreted to mean any person who makes a statement about a commodity in interstate commerce, an interpretation that would criminalize conduct beyond that necessary [*15] to further the express purpose of the CEA. Valencia asserts that, under the Government's interpretation, a person with no connection to the "market" whatsoever, such as a politician or reporter, could be liable for statements they make that have even minimal affect on the market. In addition, Valencia contends the term "market information" is vague because it could reasonably be interpreted to mean either information about registered exchanges only or information about private, wholesale markets.

Valencia further argues that the statute is vague in that it could be interpreted to apply to persons who knowingly deliver information that they thought was correct but which turned out to be false or misleading. Because there has been no judicial construction of the terms "false" and "misleading" to exclude unintentionally false or misleading, Valencia argues, those terms are vague. [9] In addition, Valencia argues that what is "misleading" to one person, may not be misleading to another, and therefore the statute is vague because compliance is measured by the subjective evaluation of information by others. *See Women's Med. Ctr. of Northwest Houston,* 248 F.2d at 422.

    9    The Court addresses in this section only

whether the terms "false" and "misleading" are vague for lack of judicial or regulatory interpretation. The issues of whether the statute is unconstitutional for lack of a scienter requirement, or because the statute punishes constitutionally protected speech or conduct, will be addressed in connection with Defendant's overbreadth challenge.

[*16] Valencia also argues that the ways in which the statute fails to give notice to the public apply equally to the police, and that the statute is vague because it allows police to enforce its provisions in an excessively broad range of circumstances. According to Valencia, this is evidenced by the fact that in its eighty years of existence, the statute has never been applied in a criminal prosecution. Thus, Valencia concludes, the use of § 13(a)(2) in this case is itself evidence that the statute is susceptible to arbitrary enforcement.

In addition, Valencia invokes the "rule of lenity," contending that the above-described infirmities make § 13(a)(2) ambiguous such that the Court should resolve all ambiguities in favor of the defendant and find this case outside the scope of the statute. *See Moskal v. United States,* 498 U.S. 103, 107-08, 112 L. Ed. 2d 449, 111 S. Ct. 461 (1990) (explaining that "rule of lenity" applies where "a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute" (emphasis in original)).

### 3. The Government's Contentions

[*17] The Government counters by arguing that § 13(a)(2), by its plain language, is not limited to transactions in futures contracts. Section 13(a)(2) applies to the delivery of false, misleading or knowingly inaccurate market information that affects or tends to affect "the price of commodities in interstate commerce." The term "commodities" includes goods that can be the subject of futures contracts. *See* 7 U.S.C. § 1a(4). Natural gas is a commodity based on this statutory definition, and it is bought and sold on the New York Mercantile Exchange, among other places. So, according to the Government, § 13(a)(2) unambiguously makes it a crime to make a false report of market information that affects or tends to affect the price of natural gas in interstate commerce. This interpretation is consistent with the predecessor statute, The Grain Futures Act, the purpose of which was to prevent and remove "obstructions and

burdens upon interstate commerce in grain." P.L. 67-331, Ch. 309 (September 21, 1922). "Interstate commerce" means "commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof ..."7 U.S.C. § 1a (22). [*18] Thus, a reasonable person who reads the statute would be on notice that the false reporting aspect of the statute applies to conduct relating to any goods that could be the subject of a futures contract.

The Government further disputes Valencia's contention that application of the statute to "any person" renders the statute vague. The term "person" is defined in 7 U.S.C. § 1a(28) as "importing the plural or singular, and includes individuals, associations, partnerships, corporations and trusts." "Any" has an expansive meaning, that is "one or some indiscriminately of whatever kind." *United States v. Gonzales,* 520 U.S. 1, 5, 137 L. Ed. 2d 132, 117 S. Ct. 1032 (1997). Thus, the plain language of the statute is unambiguous in applying to any person, and not just those who deal in futures markets or who are required to be licensed under the CEA. This interpretation is supported by the language of § 13(a)(1), which by its terms is limited to "any person registered or required to be registered under this chapter." "Where Congress included particular language in one section of a statute but omits it in another section of the same Act, it is generally [*19] presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Saunders,* 318 F.3d 1257, 1264 (11th Cir. 2003) (quoting *Russello v. United States,* 464 U.S. 16, 23, 78 L. Ed. 2d 17, 104 S. Ct. 296 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972))). Moreover, the Government contends that the statute contains a scienter requirement that saves it from being unconstitutionally vague as to who is covered.

As to the term "market information," the Government concedes it is not defined in the CEA. However, the Government submits that the common meaning of the term "market information" includes the type of information alleged in the Indictment (*i.e.,* volume and price data for commodities rather than futures contracts). The Government cites *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 215 (9th Cir. 1974), for the proposition that the term "marketing" has been defined as being broader than conduct involving sales, and includes the "aggregate of functions involved in transferring title and in moving

goods from [*20] producer to consumer." The common meaning of the term "market information," according to the Government, should be interpreted consistently with these common meanings of "marketing." Moreover, the Government argues that whatever ambiguity the term "market information" may have at the margins, any such uncertainty has little relevance where the defendant's "conduct falls squarely within the 'hardcore' of the statute's proscriptions ...." *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973).

**4. Discussion on Vagueness**

*Additional Legal Precedent.* -- For guidance in making its vagueness determination, the Court looks to precedent in the Supreme Court and the Fifth Circuit in which statutes were declared unconstitutionally vague. The Supreme Court held in *City of Chicago v. Morales* that when a criminal statute is under challenge for vagueness, a two-part void-for vagueness test is appropriate:

> Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize [*21] and even encourage arbitrary and discriminatory enforcement.

527 U.S. at 56; *accord, Ford Motor Co. v. Tex. Dep't Transportation,* 264 F.3d 493, 507 (5th Cir. 2001); *United States v. Escalante,* 239 F.3d 678, 680 (5th Cir. 2001). The Supreme Court in *Morales* held that a Chicago ordinance that prohibited "criminal street gang members" from "loitering" with one another or others in any public place was unconstitutionally vague. [10] 527 U.S. at 45-46. The ordinance defined "loitering" as "to remain in any one place with no apparent purpose." *Id.* at 47 n.2. The ordinance was defective because the Court could not imagine how any citizen standing in a public place would know whether he or she had any "apparent purpose" in the eyes of law enforcement. *Id.* at 57. The fact that the statute only imposed a sanction on persons who disobeyed an officer's dispersal order did not save the statute because if the loitering were in fact harmless and innocent, the dispersal order itself was an unjustified impairment of liberty. *Id.* at 58. Further, the ordinance was subject to arbitrary [*22] enforcement because the

"no apparent purpose" standard governing a police officer's decision to issue a dispersal order "is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id.* at 62. "This is not an ordinance that 'simply regulates business behavior and contains a scienter requirement.' It is a criminal law that contains no *mens rea* requirement, and infringes on constitutionally protected rights. When vagueness permeates the text of such a law, it is subject to facial attack." *Morales,* 527 U.S. at 55.

[10]   The ordinance was enacted because the Chicago City Council had found that criminal street gang activity was responsible for the city's rising murder rate and escalation of other violent crimes, and that the presence of gang members in public places intimidated many law abiding citizens and created a fear for the safety of persons and property in areas where gang members established control. *Id.* at 46-47. An offense under the ordinance had four predicates. *Id.* at 47. First, the police officer must have reasonably believed that one or more persons in a public place was at that time a "criminal street gang member." *Id.* Second, the persons had to have been "loitering." *Id.* Third, the officer had to have ordered all persons gathered to disperse. *Id.* Fourth, a person had to have disobeyed the officer. *Id.* Any person who disobeyed the officer's order, whether a gang member or not, was guilty of violating the ordinance. *Id.*

[*23] The Fifth Circuit struck down a vague Texas statute in *Kramer v. Price,* 712 F.2d 174 (5th Cir. 1983). At issue in *Kramer* was a Texas Harassment Statute that provided a "person commits an offense if he intentionally" "(1) communicates by telephone or in writing in vulgar, profane, obscene, or indecent language or in a coarse and offensive manner and by this action intentionally, knowingly, or recklessly annoys or alarms the recipient." *Id.* at 176 (quoting TEX. PENAL CODE ANN. § 42.07). The court of appeals held that the terms "annoys" and "alarms" were inherently vague. *Id.* at 178. Texas courts had refused to construe the statute to indicate whose sensibilities must be offended, and the statute made no attempt to specify a standard. *Id.* "In the absence of judicial clarification, enforcement officials, as well as the citizens of Texas, are unable to determine what conduct is prohibited by the statute." *Id.* Thus, the Fifth Circuit found the statute unconstitutional on its face

for vagueness. *Id.*

In *Women's Medical Center of Northwest Houston v. Bell,* 248 F.3d 411 (5th Cir. 2001), the Fifth Circuit struck [*24] down as unconstitutionally vague regulations requiring licensed abortion providers to "ensure that all patients ... are cared for in a manner and in an environment that enhances each patient's dignity and respect in full recognition of her individuality"; to ensure that each patient will "receive care in a manner that maintains and enhances her self-esteem and self-worth"; and to provide "quality" care, which the regulations defined as "the degree to which care meets or exceeds the expectations set by the patient." *Id.* at 421-22. The Fifth Circuit found the regulations unconstitutionally vague because they subjected physicians to sanctions not for their own conduct, but based on the subjective expectations or requirements of an individual patient. *Id.* at 422. Thus, the regulations failed to afford fair warning of what conduct was proscribed. *Id.* With these standards in mind, the Court addresses the specific statute at issue in this case. [11]

> 11    Judge Koeltl of the United States District Court for the Southern District of New York recently applied these standards to find 18 U.S.C. § 2339B, a statute making it unlawful to conspire to provide material support and resources to a foreign terrorist organization ("FTO"), unconstitutional as applied because the defendants were not put on notice that merely using communications equipment was covered by the statute's prohibition against "provision" of communication equipment, nor does the statute give notice as to what behavior constitutes an impermissible "provision of personnel." *See United States v. Sattar,* 272 F. Supp. 2d 348, 2003 U.S. Dist. LEXIS 12531, 2003 WL 21698266, *4-10 (S.D.N.Y. July 22, 2003).

[*25]    ***Statutory Analysis of § 13(a)(2) - Scope of Exclusions from Coverage.*** - The Court is persuaded that § 13(a)(2) is not unconstitutionally vague under the standards discussed above. The Government's position that the statute applies to "any person" and not just those licensed by the CFTC is supported by the plain, unambiguous language of the statute and the phrase "any person" is not vague. The term "person" is defined in the CEA as "importing the plural or singular, and includes individuals, associations, partnerships, corporations, and

trusts." 7 U.S.C. § 1a(28). In contrast to the unrestricted term "any person" in § 13(a)(2), Congress restricted § 13(a)(1) to "persons" who are "registered or required to be registered under [the CEA]." [12] This express limitation of the scope of § 13(a)(1) demonstrates that Congress intended the application of § 13(a)(2) to be more broad than § 13(a)(1). This linguistic distinction supports the Government's interpretation of § 13(a)(2) to cover people who are not registered with or trading on the futures exchanges.

> 12    Section 13(a)(1) makes it a felony for "any person registered or required to be registered under this chapter" to "embezzle, steal, purloin, or with criminal intent convert" a client's property having a value in excess of $ 100.

[*26]    In addition, natural gas, for delivery on the West Coast or otherwise, is a commodity within the coverage of § 13(a)(2). A "commodity" is:

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions as provided in section 13-1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in.

7 U.S.C. § 1a (4). Valencia does not dispute that natural gas in general is a "commodity," but argues instead that there are no futures contracts for "West Coast gas" and that natural gas is an "exempt commodity." These arguments are rejected. Natural gas is fungible. Tr. at 67-68. Natural gas has been traded on NYMEX since 1990. Tr. at 121. The issue raised by Valencia of whether "West Coast gas" is a commodity "in [*27] which contracts for future delivery are presently or in the future dealt in" is a fact question. [13] Any dispute over that fact may be relevant to Valencia's guilt, but does not make the statute unconstitutionally vague as a matter of law.

13  While futures traders apparently do not buy and sell West Coast natural gas on the NYMEX, there is no evidence that West Coast gas could not in the future be traded on a futures exchange.

Further, Valencia's contention that § 13(a)(2) does not apply to contracts for delivery of West Coast natural gas (as opposed to futures contracts entered into on a futures exchange) is not supported by the CEA's language. Section 13(a)(2), by its literal terms may be violated three different ways potentially pertinent to this case:

(i) by manipulating or attempting to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity [14] (the "manipulation prong"), or

(ii) by cornering or attempting [*28] to corner any such commodity (the "cornering prong"), or

(iii) by knowingly delivering or causing to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information that affect or tend to affect the price of any commodity in interstate commerce ... (the "reporting prong"). [15]

14  The section uses the term "registered entity," which is defined in the CEA to include a "contract market," a board of trade and other entities where futures transactions are cleared. See 7 U.S.C. § 1a(29). A "contract market" is a board of trade that meets specified criteria. See 7 U.S.C. § 7. Transactions in futures contracts must be conducted on a contract market. See 7 U.S.C. § 6.
15  Section 13(a)(2) contains a fourth prong that is not pertinent here and is not addressed.

The manipulation [*29] prong of § 13(a)(2) provides that it is a felony to manipulate prices of a commodity "in interstate commerce, or for future delivery on or subject to the rules of any registered entity." The CEA defines

"interstate commerce" as commerce "between any State, territory, or possession, or the District of Columbia, and any place outside thereof" or "between points within the same state, territory, or possession, or the District of Columbia, but through any place outside thereof, or within any territory or possession, or the District of Columbia." 7 U.S.C. § 1a(22) (footnote omitted). Thus, Congress clearly intended the term "interstate commerce" to have a meaning distinct from the phrase "for future delivery on or subject to the rules of any registered entity." Congress could have, and presumably would have, added the latter phrase to the reporting prong of § 13(a)(2) if it had intended to limit the offense in that regard. See United States v. Saunders, 318 F.3d 1257, 1264 (11th Cir. 2003) ("Where Congress includes particular language in one section of a statute but omits is in another section of the same Act, it is generally presumed that Congress [*30] acts intentionally and purposely in the disparate inclusion or exclusion."). Thus, § 13(a)(2) on its face applies to the false reporting of information that tends to affect the price of a commodity in interstate commerce. Natural gas is such a commodity.

The Court turns to Valencia's argument that spot transactions are excluded from the CEA. [16] The Government does not dispute that the CEA is inapplicable to cash or spot transactions, or that natural gas is an "exempt commodity" under the CEA. It is the effect of other limitations on the scope of § 13(a)(2) that is at issue.

16  Valencia points to legislative history in which Senator Capper, the sponsor of the original Senate version of the Grain Futures Act, the predecessor to the CEA, explained in 1921:

The bill does not concern itself at all with the sale or purchase of actual grain, either for present or future delivery. *The entire business of buying and selling the actual grain, sometimes called 'cash' or 'spot' business is expressly excluded.* It deals only with the 'future' or 'pit' transaction in which the transfer of actual grain is not contemplated.

61 Cong. Rec. 4762 (1921) (statement of Sen. Capper) (emphasis added). It is noted that the

anti-manipulation provision now appearing in § 13(a)(2) was added to the statute in 1936 and other offenses were included in that provision in the 1968 amendments. Thus, Senator Capper's comments are not probative on the issue before this Court.

[*31] The Court first determines the scope of § 13(a)(2). Section 13(a)(2), through its three prongs, prohibits a broad range of conduct: (i) the manipulation of the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of a commodities futures exchange, (ii) the cornering of commodities, and (iii) false reporting of market information that tends to affect prices of commodities in interstate commerce. Section 13(a)(2) thus prohibits conduct involving a futures contract if the contract also fits within one of the prongs of § 13(a)(2), as well as conduct not involving futures contracts if the conduct fits within one of § 13(a)(2)'s prongs. The prohibitions in § 13(a)(2) are broadly written and must be enforced, and Valencia's construction is artificially narrow. Section 13(a)(2) applies as written unless an exemption in the CEA applies.

Valencia argues that an exemption derived from a 1993 CFTC Final Order precludes enforcement of § 13(a)(2) to her conduct. The 1993 CFTC Final Order provides:

> The Commission, pursuant to Section 4(c) of the Act, hereby exempts from all provisions of the Commodity Exchange Act, 7 U.S.C. 1 et seq. [*32] , except sections 2(a)(1)(B) of the Act and the provisions of sections 6(c), 6(d) and 9(a)(2) of the Act [codified as of U.S.C. § 13(a)(2)], to the extent that these provisions prohibit manipulation of the market price of any commodity in interstate commerce or for future delivery on or subject to the rules of any contract market, the following transactions entered into on or after October 23, 1974: Contracts for the purchase and sale of crude oil, condensates, natural gas, natural gas liquids ..."

58 F.R. 21286-02, 21294 (1993). In the 2000 amendments to the CEA, Congress adopted and codified

that language as 7 U.S.C. § 2(h). Section 2(h) is captioned "Legal certainty for certain transactions in exempt commodities" and eliminates certain transactions from the CEA's coverage. Specifically, §§ 2(h)(l)and (2) together provide generally that "nothing in this chapter shall apply to a contract, agreement, or transaction in an exempt commodity" except "[various] sections [including §] 13(a)(2) of this title, to the extent such sections prohibit manipulation of the market price of any commodity in interstate commerce and the agreement, [*33] contract, or transaction would otherwise be subject to such sections." Section 2(h)(1) makes explicit that the CEA generally does not cover a "contract, agreement, or transaction" (collectively, a "contract") in an exempt commodity, such as natural gas, entered into between large, financially responsible entities outside a trading facility (*i.e.,* a commodities futures exchange). [17] However, § 2(h)(2) limits the exemption; under § 2(h)(2)(C), the exemption in § 2(h)(1) does not apply to the coverage of § 13(a)(2) to the extent the latter section "prohibits manipulation of the market price of any commodity in interstate commerce **and** the agreement, contract, or transaction would otherwise be subject to such sections" (emphasis added). [18] The issue presented here is what effect, if any, § 2(h) has on § 13(a)(2) for conduct that is not a contract.

[17] The exemption from the CEA's coverage established by § 2(h)(1) applies to contracts between "eligible contract participants" entered into outside a "trading facility." These terms are defined in § la(12) ("eligible contract participant" is a person or entity acting for its own account meeting specified financial requirements or others defined in the section) and § la(33) ("trading facility" means a "group of persons that ... provides a physical or electronic facility or system in which multiple participants have the ability to execute or trade agreements, contracts, or transactions by accepting bids and offers made by other participants ...''").

[*34]

[18] Thus, § 2(h)(2)(C) is an exception to the exemption, and means that § 13(a)(2)'s prohibitions continue to apply to a contract for natural gas entered into by large entities outside a futures exchange if the contract involves "manipulation of the market price of any commodity in interstate commerce" **and** the contract would otherwise be subject to § 13(a)(2).

In addition, contracts for exempt commodities such as natural gas between entities who are not "eligible contract participants" are not covered by § 2(h)(1)'s exemption.

The Court concludes that conduct proscribed by § 13(a)(2)'s reporting prong is unaffected by § 2(h). [19] There is nothing vague about this congressional policy decision. [20] The Court's statutory interpretation does not conflict with the express purpose of the CEA, which, in pertinent part, is:

> to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or [*35] other abusive sales practices and misuses [sic] of customer assets; and to promote responsible innovation and fair competition among boards of trade, *other markets* and market participants.

7 U.S.C. § 5(b) (emphasis added). Nor does this interpretation conflict with Congress's intent to exclude regulation of cash or spot transactions from the Act, because as discussed, § 13(a)(2) addresses a broader range of conduct than simply commodity transactions.

19    For these purposes, this prong of § 13(a)(2) prohibits "knowingly delivering ... for transmission ... false or misleading ... reports ? that affect the price of any commodity in interstate commerce." In addition, a contract in an exempt commodity that does not "manipulate ... the price of any commodity" or a contract outside § 13(a)(2)'s proscriptions generally is unaffected by § 2(h)'s exemption.

20    Congress's decision to exclude registered entities engaging in contracts in exempt commodities from the sanctions of § 13(a)(2), but not individual traders such as Valencia, is a matter of legislative policy that does not alter this Court's analysis.

[*36] This interpretation of § 2(h) avoids the putative ambiguity in § 13(a)(2) argued by Valencia. Valencia's reading of the CEA's exemption in § 2(h)(1)

and the exception to that exemption in § 2(h)(2)(C) ignores the predicate language in § 2(h)(1) confining the entire exemption to *contracts* in exempt commodities. Her argument also fails to appreciate the breadth of § 13(a)(2)'s language prohibiting manipulation and fraud potentially applicable both to contracts and to other conduct. The Court is unpersuaded that there is an ambiguity in § 13(a)(2) and thus the Court need not address Valencia's argument concerning the rule of lenity in this regard. [21]

21    "When there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 123 S. Ct. 1057, 1067-68, 154 L. Ed. 2d 991 (2003) (citations omitted) (holding that petitioners who did not obtain or attempt to obtain property from others could not be guilty of "extortion" under the Hobbs Act). This doctrine is called the "rule of lenity." *See Moskal v. United States,* 498 U.S. 103, 107-08, 112 L. Ed. 2d 449, 111 S. Ct. 461 (1990) (explaining that "rule of lenity" applies where "a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute" (emphasis in original)); *United States v. Phipps,* 319 F.3d 177, 187-88 (5th Cir. 2003) (applying rule of lenity to find that statute making it a crime of violence to use a firearm in the commission of a crime does not authorize multiple convictions for a single use of a single firearm based on multiple predicate offenses). "The rule of lenity is not invoked by a grammatical possibility. It does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose." *Caron v. United States,* 524 U.S. 308, 316, 141 L. Ed. 2d 303, 118 S. Ct. 2007 (1998) (citations omitted).

[*37] *"False" and "Misleading."*- Valencia also argues that the terms "false" and "misleading" are vague as used in § 13(a)(2) of the CEA. [22] The terms false and misleading have meanings in the law and generally in the English language that are commonly understood. [23] "False" means untrue, deceitful, lying, not genuine, inauthentic. [24] BLACK'S LAW DICTIONARY 618 (7th ed. 1999). "Misleading" means delusive, calculated to be misunderstood. [25] *Id.* at 1015. These are terms with

ascertainable meanings appreciated by ordinary people. These terms also are used in many criminal statutes. *See, e.g.,* 18 U.S.C. §§ 152 (presenting false claim in bankruptcy proceeding); 287 (false claims against the United States government);471 (counterfeiting); 495 (uttering a forced writing to defraud the United States); 1001 (false statements to federal agencies or agents (includes "misleading statements"); 1341 (mail fraud); 1344(2) (bank fraud); 1623 (false statement to the grand jury or court);7206(1) (false statements on income tax returns). Section 13(a)(2) simply is not a statute which fails to specify any standard of conduct at all, as in *Morales* and [*38] *Kramer.* Nor are "false" or "misleading" terms that requires reference to the sensibilities of a particular individual, as in *Women's Medical Center.* The Government at trial will be held to its burden to prove that the information was, in fact, false or misleading. [26]

> 22  Whether or not the statute contains a *mens rea* requirement in connection with the false or misleading information is discussed in connection with Valencia's overbreadth challenge in section II.B below.
>
> 23  *United States v. Singleton,* 946 F.2d 23, 24-25 (5th Cir. 1991) ("'It is a fundamental canon of statutory construction ... that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' *Perrin v. United States,* 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979)."); *Perrone v. GMAC,* 232 F.3d 433, 435 (5th Cir. 2000) ("Courts give the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import." (quoting *Williams v. Taylor,* 529 U.S. 420, 146 L. Ed. 2d 435, 120 S. Ct. 1479 (2000)).

[*39]

> 24  Other definitions of "false" include "not true or correct"; "uttering what is untrue; lying"; "not faithful or loyal"; and "tending to deceive or mislead." RANDOM HOUSE WEBSTER'S DICTIONARY 235 (1993).
>
> 25  Other definitions of "mislead" include "to lead in the wrong direction"; "to lead into error, as of conduct." RANDOM HOUSE WEBSTER'S DICTIONARY 422 (1933).
>
> 26  The Government alleges that the information Valencia provided to *Inside FERC* was based on

fake trades that never happened. There can be no doubt that information about "fake" trades is "false" or "misleading" under any definition of those terms. Thus, even if those terms were vague on the margins, Valencia's conduct falls within the "hard core" of conduct prohibited by this element of the offense for which she is indicted. *See Dombrowski,* 380 U.S. at 492.

**"Market Information."**- Valencia also argues that § 13(a)(2) is vague because the phrase "market information" is not defined and thus the statute is ambiguous in this regard. Valencia then deduces that the ambiguity of the [*40] term "market information" renders § 13(a)(2) facially void for vagueness and unconstitutionally vague as applied to her, and reasons that the rule of lenity precludes application of this provision in this case. [27] This argument raises a difficult issue but ultimately is not persuasive.

> 27  It is clear that if the statute is interpreted to apply only to information about the futures contract market *per se,* then Valencia's provision of allegedly false information regarding the price and volume of physical trades does not fall within the ambit of the statute. Valencia argues that the Government's interpretation that market information relates to information about physical trades of commodities, at best, renders the statute ambiguous.

The Court must start with the language of the statute. *See Bailey v. United States,* 516 U.S. 137, 144-45, 133 L. Ed. 2d 472, 116 S. Ct. 501 (1995) (citing *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989)). [*41] The Court "considers not only the bare meaning of the word but also its placement and purpose in the statutory scheme. The meaning of statutory language, plain or not, depends on context." *Bailey,* 516 U.S. at 145 (internal quotations and citations omitted). Section 13(a)(2), to the extent pertinent here, expressly prohibits the delivery of false or misleading reports "concerning .. market information ... that affect or tend to affect the price of any commodity in interstate commerce ...." It is clear that this provision prohibits the reporting of false information about the futures market if the report affects or tends to affect the price of any commodity in interstate commerce. The question presented is what other information § 13(a)(2) encompasses and whether the term "market information"

in that section is sufficiently clear to give fair notice to the public and law enforcement that price, volume, date and location information about physical trades of commodities conducted off the commodities futures exchanges is included.

The analysis must begin with the definitions of "market." Black's Law Dictionary contains several broad definitions for the term "market." [*42] For instance, "market" is defined as "a place of commercial activity in which goods or services are bought and sold"; "a geographic area or demographic segment considered as a place of demand for particular goods or services"; "the opportunity for buying and selling goods or services; the extent of economic demand"; "a securities or commodities exchange"; "the business of such an exchange; the enterprise of buying and selling securities or commodities"; and "the price at which the buyer and seller of a security or commodity agree." BLACK'S LAW DICTIONARY 982 (7th ed. 1999). [28] The lay definition of "market" is similarly broad: "a place where buyers and sellers convene for trade; a store for the sale of food; a meeting of people for buying and selling; demand for a commodity; a particular group of potential buyers; a region in which goods and services are bought or used ...." RANDOM HOUSE WEBSTER'S DICTIONARY 405 (1993). These definitions of "market" run the gamut from physical locations such as a supermarket or open-air farmer's market where goods physically change hands, to physical locations where multilateral contracts for sale of rights to goods or services occur for traders' [*43] own or others' accounts (*i.e.*, the commodity futures exchanges), to physical locations where intangible transactions occur regarding transfers of passive investments in business entities (*i.e.*, securities exchanges), to the purely abstract concept of "opportunity" for engaging in transactions for the buying and selling of goods, services and intangibles. These definitions of the word "market" *per se* are expansive but are not merely subjective concepts. The word has different commonly understood meanings depending on the context in which it appears.

28    Black's Law Dictionary includes defined phrases that incorporate the term "market," such as a "futures market," BLACK'S LAW DICTIONARY 982 (7th ed. 1999).

Next, the Court considers the two-word term "market information" that appears in § 13(a)(2) to assess if it is

facially void for vagueness or unconstitutionally vague as applied in this case. The Court evaluates this phrase in its immediate context and in the broader context of the other provisions [*44] of the CEA. *See Food & Drug Admin.,* 529 U.S. at 132-33; *Wallington,* 889 F.2d at 576-77.

The term "market information" in § 13(a)(2) is expressly limited by the requirement that the information affect (or tend to affect) the price of a commodity in interstate commerce. The information thus somehow must relate to the interstate commodities market and refers to the intangible opportunity for buying and selling of goods or services and measures of the extent of economic demand, the business of buying and selling commodities, and the price at which the buyer and seller of a commodity agree. *See* BLACK'S LAW DICTIONARY, at 982. Data on the price, volume, date and place of sale of goods are squarely within typical market information. This conclusion is bolstered by the requirement in § 13(a)(2) that the information about the market must be shown to affect (or tend to affect) the price of the commodity. Accordingly, when the term market information is considered in its immediate context, it is not so amorphous that vagueness permeates the text of this law making it subject to facial attack. *See City of Chicago v. Morales,* 527 U.S. at 55. [*45] There is no indication that this term authorizes or encourages arbitrary or discriminatory enforcement. *Id.; see also Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 215 (9th Cir. 1974), (holding in the context of the Capper-Volstead Act [29] that the term "marketing" is broader than conduct involving sales of agricultural products, and includes the "aggregate of functions involved in transferring title and in moving goods from producer to consumer").

29    The Capper-Volstead Act of 1922 allowed persons engaged in the production of agricultural products to act together in association "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" such products without violating anti-trust laws. *See Treasure Valley,* 497 F.2d at 212 (quoting *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 27-29, 8 L. Ed. 2d 305, 82 S. Ct. 1130 (1962)). At issue in *Treasure Valley* was whether trade associations, who did not engage in the actual production or sale of products but assisted in contract negotiations, were covered by the

Capper-Volstead Act. *Id.* at 212-15.

[*46] This conclusion is consistent with the use of the term "market" in the rest of the CEA. Congress' primary purpose in enacting the CEA (and the predecessor statute) was regulation of the futures trading market, *see, e.g.,* 7 U.S.C. §§ 2, 6, 6a through 12c. The CEA generally employs the word "market" as a noun coupled with another explanatory word. For instance, the CEA refers to organized futures markets as "contract markets." Coverage of the Act, however, is not restricted to futures trading. Congress' findings in support of the enactment are:

> The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financial secure trading facilities.

7 U.S.C. § 5(a). The reference by Congress to management and assumption of price risks appears to relates, at least in part, to risks of commodities trading. Futures contracts are a means to hedge risks associated with large physical commodities [*47] transactions. [30] *See generally id,* § 1a(11)(A) (eligible contract participant is one that (i) has a "demonstrable ability ... to make or take delivery of the underlying commodity", (ii) incurs risks, in addition to price risk, related to the commodity", (iii) "provides risk management or hedging services to, or engages in market-making activities with, the foregoing entities involving transactions to purchase or sell the commodity ... or transactions in the commodity").

> [30]    Defendant does not appear to contest this fact. *See* Tr. at 93 (Gelber testimony that a substantial reason the futures market came into existence was so that parties with positions in the physical market could hedge the risk of price changes).

Congressional interest in protecting markets related to futures contracts covered by the CEA is evidenced further by the Act's reference to "market" or "markets" generally in other contexts, such as "market integrity"

and "other markets" in describing the purposes of the Act, *Id.,* § 5(b). [*48] [31] Congress prohibited persons convicted of a felony under the CEA from registering with the CFTC and barred such persons from using or participating in any "market regulated by the Commission." *Id.* § 13(b). This modification of the term "market" here suggests that Congress intended the term "market" to have a broader meaning than the futures market. *See also* 7 U.S.C. § 6(a) (making it unlawful, unless certain conditions are met, "for any person to offer to enter into, to enter into, to execute, to confirm the execution of ... a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange or market located outside the United States, it territories or possessions)"); *id.* § 6(b) (CEA permits the CFTC to adopt regulations proscribing fraud (and requiring minimum financial standards) and registration by any person in the United States who engages in the offer or sale of any commodities futures contract made "on or subject to the rules of a board of trade, exchange, or market located outside the United States"). [32]

> [31]    The last clause of § 5(b) describing the purpose of the statute is "to promote responsible innovation and fair competition among boards of trade, *other markets* and market participants." 7 U.S.C. § 5(b).

[*49]

> [32]    *See also id,* § 1a(11)(A)(iii) (referring to a dealer who engages in "market-making activities" (emphasis added)); *id.* § 7(b)(2) (requiring a board of trade seeking designation as a contract market to "have the capacity to prevent market manipulation through market surveillance, compliance and enforcement practices ..." (emphasis added)); Congressional statement of Purposes for Commodities Futures Modernization Act of 2000, reproduced following 7 U.S.C. § 1 ("the purposes of this Act are -- ... (8) to enhance the competitive position of United States financial institutions and financial markets").

Congress also uses the term "market participant" in the CEA without giving a specific definition. The term appears to refer often to participants in the business of the futures exchanges but is not limited to the narrow class of members of the exchanges. The term also is intended to have a meaning broader than solely participants in the

futures transactions because it sometimes is modified by clarifying phrases when intending to limit it to that arena. *See. e.* [*50] *g.,* 7 U.S.C. § 5(b) (in the description of "the purpose of the chapter" the goal to "serve the public interests ... through a system of effective self-regulation of trading facilities, ... market participants and market professionals under the oversight of the [CFTC]" with the further goal "to protect all market participants from fraudulent or other abusive sales practices and misuses [*sic*] of customer assets," and "to promote responsible innovation among boards of trade, other markets and market participants" (emphasis added)). [33]

[33] It is noted that in § 7, which governs the authorization of boards of trade as "contract markets" authorized to execute futures contracts, the use of the term "market participant" appears to refer principally to a participant in the futures trading through the board. The fact that the term "market participant" and other references to the word "market" in § 7 are focused on the futures trading business is not dispositive of the meaning of the term "market" elsewhere in the CEA. Section 7 addresses solely the requirements for a board of trade to obtain and retain the status of a futures exchange, and provisions on any other topic would be irrelevant and confusing in context.

[*51] Congress' wording in § 13(b) further evidences its intention that § 13(a)(2) address information about topics other than merely the futures market. [34] Congress also included crimes relating solely to the futures markets in other provisions of the CEA (such as § 6a (excessive speculation), § 6b (prohibition of fraud, false reporting and deception), and § 6c (prohibited transactions)), in broad terms without restriction to matters regulated by the CFTC or futures contracts executed on the registered exchanges. [35] Limiting § 13(a)(2) as Valencia proposes would make that section largely duplicative of crimes and prohibitions in other sections of the CEA, thereby violating the tenet the Court must assume that Congress intended each of the provisions in a statute to have a particular, non-superfluous meaning. *See United States v. American Library Ass'n, Inc.,* 539 U.S. 194, 156 L. Ed. 2d 221, 123 S. Ct. 2297, 2319 (2003); *see also Bailey v. United States,* 516 U.S. 137, 144-46, 133 L. Ed. 2d 472, 116 S. Ct. 501 (1995); *see Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S. Ct.

1942, 147 L. Ed. 2d 1 (2000).

[34] Section 13(b) provides that a person convicted of a felony under § 13 shall be suspended from registration and denied re-registration for five years and barred from using or participating in any "market regulated by the Commission" for five years or longer.

[*52]
[35] This is also true of the cornering prong of § 13(a)(2).

In sum, when Congress used the word "market" other than in defined terms in the CEA, Congress appears not to have intended to restrict the provision to the futures contracts or the regulated futures market, and instead refers to the regulated and unregulated arenas somehow related to those contracts. Where a restriction to the futures market was intended, Congress so indicated by using the term "contract market," some defined term, or some modifying phrase. The Court therefore rejects Valencia's argument that, because the term "market" is limited to markets for futures contracts in some contexts, the term "market information" in § 13(a)(2) is comparably limited.

The Court also concludes that Valencia had sufficient notice from the term "market information," when read in context -- "reports concerning ... market information ... that affect or tend to affect the price of a commodity" -- that reports of entirely fictitious natural gas trades were prohibited by § 13(a)(2). Section 13(a)(2) is not a statute that fails to specify any [*53] standard of conduct at all, as in *Morales* and *Kramer*. The statute does not use words dependent on entirely subjective interpretations, such as "annoy" or "alarm." *See Kramer,* 712 F.2d at 178; *see also Morales,* 527 U.S. at 55. The term "market information" in § 13(a)(2) is not subject to arbitrary and discriminatory enforcement because its ordinary meaning in the context is sufficiently discernible to guide law enforcement. [36] In addition, although the term cannot be defined precisely at the outer limits, the proposition that it relates only to futures market information is implausible because of the general interrelationship between the futures market and the commodities markets. The Court concludes that the term "market information" is not ambiguous as applied to Valencia and it is not necessary to invoke the rule of lenity. *See Caron v. United States,* 524 U.S. 308, 316, 141 L. Ed. 2d 303, 118 S. Ct. 2007 (1998) (citations

omitted); *United States v. Cyprian*, 197 F.3d 736, 739 (5th Cir. 1999).

36  The Court also is unpersuaded by Valencia's contention that the lack of prior enforcement of § 13(a)(2) in the precise manner the Government seeks here supports her void for vagueness theory. There are a multitude of reasons that the Government chooses to enforce a statute. The fact that this enforcement is different from earlier prosecutions, particularly with a rarely enforced law such as the CEA, is not suggestive of anything. The novelty of the Government's theory is no basis to conclude that there is constitutionally cognizable confusion as to the scope of the statute.

[*54] Finally, as the Government contends, even if the use of "market information" is ill-defined at the margins in the reporting prong of § 13(a)(2) and thus is vague at its outer limit, Valencia's conduct falls within the "hard core" of the statute. *See Broadrick*, 413 U.S. at 608; *Dombrowski*, 380 U.S. at 491-92. The allegedly false price, volume, date and location information on physical trades of a commodity Valencia provided to the publisher of a widely recognized index on that commodity is "obviously ... prohibited under any construction" of the term "market information" that allegedly "affects the price of the commodity in interstate commerce."

Therefore, Valencia's Motion to Dismiss on the grounds of vagueness is denied.

## B. Valencia's Overbreadth Motion

### 1. Legal Standards

The statute at issue limits speech. Thus, a First Amendment analysis is necessary. Protections afforded by the First Amendment are not absolute -- the Government may regulate certain categories of expression consistent with the Constitution. *R.A.V. v. St. Paul*, 505 U.S. 377, 383, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992). An overbroad statute is one that punishes speech that is not [*55] constitutionally protected, but includes within its scope protected speech. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 152 L. Ed. 2d 403, 122 S. Ct. 1389 (2002); *Hill v. City of Houston*, 764 F.2d 1156, 1161 (5th Cir. 1985). "The mere fact that one can conceive of some impermissible applications of a statute

is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 80 L. Ed. 2d 772, 104 S. Ct. 2118 (1984). Moreover, the chilling effect of an overbroad law does not always justify prohibiting all enforcement of the law, particularly a law that reflects "legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 156 L. Ed. 2d 148, 123 S. Ct. 2191, 2197 (2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973)).

There are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally [*56] unprotected conduct. To ensure that these costs do not swallow the social benefits of declaring a law 'overbroad,' we have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications ... before applying the 'strong medicine' of overbreadth invalidation.

*Id.* (emphasis in original).

In order for offensive speech to be illegal, the Government must prove the *mens rea* of the speaker. *See Virginia v. Black*, 538 U.S. 343, 155 L. Ed. 2d 535, 123 S. Ct. 1536, 2003 U.S. LEXIS 2715, 2003 WL 1791218 (April 7, 2003) (striking down portion of statute prohibiting burning a cross to intimidate which makes fact of cross burning itself *prima facie* evidence of intent to intimidate). Where intent is not expressed in the statute, "the structure and purpose of the statute [may] demand the inclusion of intent as an element of the crime." *Dennis v. United States*, 341 U.S. 494, 499, 95 L. Ed. 1137, 71 S. Ct. 857 (1951); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 130 L. Ed. 2d 372, 115 S. Ct. 464 (1994); *Staples v. United States*, 511 U.S. 600, 128 L. Ed. 2d 608, 114 S. Ct. 1793 (1994); [*57] *Morissette v. United States*, 342 U.S. 246, 96 L. Ed. 288, 72 S. Ct. 240 (1952). Where the statute contains no scienter requirement "it is supplied by the general rule of construction that 'knowledge of the facts constituting the offense is ordinarily implied' where a 'statute does not

expressly mention any mental element.'" *Harris,* 25 F.3d at 1279-80 (citations omitted).

Commercial speech is entitled to less protection than other types of speech and may be regulated to the extent it is false or misleading, but not beyond the scope of the Government's interest. *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 106 L. Ed. 2d 388, 109 S. Ct. 3028 (1989); *see R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 388-89, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992), and cases cited therein. "It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758-59, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985) (citations omitted).

A federal statute should be narrowly construed to avoid overbreadth, [*58] if the statute is fairly subject to such a limiting construction. *United States v. Wallington,* 889 F.2d 573, 576 (5th Cir. 1989). However, if a statute is genuinely overbroad, the court may strike it down even if the defendant's conduct would be prohibited even under a narrowly tailored statute. *NAACP v. Button,* 371 U.S. 415, 432, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

## 2. Valencia's Contentions

Valencia argues that § 13(a)(2), as written and as applied in this case, criminalizes innocent conduct because the Government has not alleged any specific intent to manipulate the marketplace by Valencia. She also contends that her confidential responses to an independent publication's survey were legal, protected speech not intended to manipulate the futures market. She contends that because any person who provides false or misleading information regarding anything that could affect or tend to affect the price of any good that could ever be sold for future delivery could be covered by the statute as written, the statute is overbroad. She posits that § 13(a)(2) could encompass publicly reported comments made by reporters and politicians about commodities, [*59] for example. Moreover, Valencia argues that the statute does not require that the defendant knew the information was false or misleading, and thus the statute criminalizes too much speech. Valencia also distinguishes § 13(a)(2) from statutes in which a *mens rea* requirement properly may be implied. Here, the word "knowingly" was used to describe the term "inaccurate," but not the other categories of covered reports *i.e..* "false and misleading." She contends that the court must assume that Congress intentionally omitted the *mens rea*

requirement from the statute's coverage when it comes to "false" and "misleading" reports. Valencia contends that the interpretation the Government seeks exceeds the purpose of the statute, which is to avoid disruption to the futures market.

In addition, Valencia disputes that the speech at issue here is commercial speech. Valencia defines commercial speech as speech which proposes a commercial transaction. *See Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 340, 92 L. Ed. 2d 266, 106 S. Ct. 2968 (1986). Even if it is commercial speech, Valencia argues, the statute goes beyond the restrictions necessary [*60] to serve its substantial interests. *See Cent. Hudson Gas & Elec. Corp v. Pub. Serv. Comm'n,* 447 U.S. 557, 566, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980).

## 3. The Government's Contentions

The Government counters that § 13(a)(2) is not overbroad. The Government argues that a purpose of the CEA generally, and § 13(a)(2) in particular, is prevention of disruption of the integrity of commodities markets. The Government contends that the statute requires proof both that Valencia knew she was delivering false, misleading or knowingly inaccurate market information, and that such delivery affected or tended to affect the price of a commodity in interstate commerce Protection against this type of activity furthers the CEA's purpose, in the Government's view.

The Government also contends that the statute contains the *mens rea* requirement "knowingly," that the Indictment tracks that allegation, and that the term "knowingly" does not require specific intent, just proof of knowledge of the facts that constitute the offense. *Bryan v. United States,* 524 U.S. 184, 141 L. Ed. 2d 197, 118 S. Ct. 1939 (1998); *United States v. Morales,* 272 F.3d 284, 287-89 (5th Cir. 2001). [*61] Thus, Defendant, the Government argues, does not need to have the specific intent to manipulate the market to violate § 13(a)(2). Furthermore, the Government argues that knowingly reporting false, misleading or inaccurate market information is not constitutionally protected conduct and accordingly the statute does not require the specific intent to manipulate the market. *See X-Citement Video, Inc.,* 513 U.S. at 72-77; *United States v. Sablan,* 92 F.3d 865, 868 (9th Cir. 1996).

The Government also argues that the type of false,

misleading, or inaccurate information covered by the statute is limited to "market information" about commodities, not just any information about goods of any kind, as Valencia contends. The Government points to the statutory definitions of "commodity" and "future delivery," 7 U.S.C. §§ 1a(4), 1a(19), which narrow the scope of goods presently covered by futures contracts and futures contracts that may someday be traded. The Government urges that there also are practical limitations on what goods can be the subject of futures contracts; the goods must be fungible, the price must be volatile, and there must [*62] be a diverse and large number of buyers and sellers.

The Government alternatively argues that Valencia's attempt to limit § 13(a)(2) to conduct that specifically affects the market price of futures contracts -- as opposed to the price of the commodities themselves -- ignores the plain language of the statute, which applies to the price of the commodity, not the futures price.

The Government also points out that the grand jury has not charged Valencia with violation of the manipulation prong of § 13(a)(2), which prohibits manipulation of the "price of any commodity" "in interstate commerce" or "for future delivery on or subject to the rules of any registered entity ...." Valencia is charged with violation of the reporting prong, which does not require -- under the statute as drafted -- a showing of a direct effect on commodity futures prices. The Government contends that interpreting § 13(a)(2) to apply to the reporting of false market information that "tends to affect" the cash price of a commodity is consistent with the purpose of the CEA because of the integral relationship between the cash and futures price of commodities. The Government points to the CFTC's recognition that [*63] disruption of the commodities pricing will disrupt the futures contract markets and vice versa. *See In re Dynegy Mktg. & Trade,* 2002 C.F.T.C. LEXIS 175, 2002 WL 31835506 (CFTC December 18, 2002); *In re El Paso Merch. Energy, L.P.,* 2003 C.F.T.C. LEXIS 31, 2003 WL 1539777 (CFTC March 26, 2003).

The Government further contends that the plain language of the statute does not raise First Amendment concerns at all because fraud is not constitutionally protected conduct. *Schneider v. Town of Irvington, N.J.,* 308 U.S. 147, 84 L. Ed. 155, 60 S. Ct. 146 (1939); *Durgins v. City of East St. Louis, Ill.,* 272 F.3d 841, 843 (7th Cir. 2001).

### 4. Discussion on Overbreadth Arguments

***Commercial Speech.*** -- As an initial matter, the Court must determine whether this case involves commercial speech. Commercial speech is entitled to less protection than other types of speech and may be regulated to the extent it is false or misleading, but regulation may not extend beyond the scope of the Government's interest. *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 106 L. Ed. 2d 388, 109 S. Ct. 3028 (1989); *see R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 388-89, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992), [*64] and cases cited therein. Such speech occupies a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 56 L. Ed. 2d 444, 98 S. Ct. 1912 (1978). The overbreadth doctrine is inapplicable to commercial speech. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496-97, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982).

Commercial speech has been defined by the Supreme Court as speech that proposes a commercial transaction. *Fox,* 492 U.S. at 482; *Posadas de Puerto Rico Ass'n v. Tourism Co.,* 478 U.S. 328, 340, 92 L. Ed. 2d 266, 106 S. Ct. 2968 (1977) (citing *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976)). The nature of speech as commercial is not evaluated simply on the basis of whether the speech concerns a commercial subject. *Virginia State Bd. of Pharm.,* 425 U.S. at 761-62 (stating that purely factual matter of public interest may claim First Amendment protection). As the Supreme Court noted in *Fox,* "some of our most [*65] valued forms of fully protected speech are uttered for a profit." *Id.* The Fifth Circuit has identified three factors that help determine whether speech is commercial: (i) whether the communication is an advertisement; (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539, 552 (5th Cir. 2001). If all three factors are present, there is "strong support" for the conclusion that the speech is commercial. [37]

> [37] *Procter & Gamble* is based on the Supreme Court's decision in *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66-68, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983). In *Bolger,* the Supreme Court addressed whether certain mailings advertising

contraceptives constituted commercial speech. The Court defined the core notion of commercial speech as "speech which does no more than propose a commercial transaction," *Id.* at 66. But noted that certain of the mailings were "informational" and the mere fact that they also were advertisements would not compel the conclusion that they are commercial speech. Also, the reference to a commercial product does not alone render the mailings commercial, nor does the fact that the mailer had an economic motive. *Id.* However, all these factors taken together lead to the characterization of the mailings as commercial speech. "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.* at 68. The Supreme Court, citing *Bolger*, has noted that the precise bounds of the category of commercial speech are perhaps subject to doubt, but it undoubtedly includes pure advertising. *Zauderer v. Office of Disc. Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 637, 85 L. Ed. 2d 652, 105 S. Ct. 2265, 17 Ohio B. 315 (1985). The focus must be on the 'commonsense' distinction between speech proposing a commercial transaction and other types of speech.*Id.* The Supreme Court faced in *Bolger* and *Zauderer* the issue of what characteristics may take speech relating to a commercial transaction outside the limited protection of commercial speech, but gave no indication that the definition of commercial speech should be broadened to cover speech not related to a commercial transaction at all.

[*66] Valencia's speech does not meet the first two of the three factors set forth in *Procter & Gamble.* Valencia reported statistics relating to prior natural gas transactions. Her speech was not a solicitation to buy, sell or trade. She did not encourage anyone to buy, sell or trade natural gas, nor to buy it from one source rather than another.

More generally, § 13(a)(2)'s reporting prong regulates speech that does not merely propose a commercial transaction. The statute applies to "any person" who makes a false report about market information affecting the price of a commodity. Thus, § 13(a)(2) potentially regulates speech by people not making reports as part of economic transactions at all, such as reporters, politicians, activists and educators. The Court concludes that this case does not involve commercial speech as defined by the Supreme Court. Therefore, the Court conducts a traditional overbreadth analysis under the standards discussed above. [38]

> 38   The Court recognizes that if commercial speech were at issue, the four-part test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 566, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980), would apply.

[*67] ***Scienter Requirement of § 13(a)(2)'s Reporting Prong,* --** In this case, the Court must analyze the reporting prong of § 13(a)(2), which makes it illegal to "**_knowingly_ deliver** or cause to be delivered for transmission through ... interstate commerce by telephone ... or other means of communication **false or misleading or _knowingly_ inaccurate reports** concerning market information that affect or tend to affect the price of any commodity in interstate commerce," 7 U.S.C. § 13(a)(2) (all emphasis added). This is not a statute with no *mens rea* requirement at all. It is clear that a person accused of violating this prong of § 13(a)(2) must know he is delivering information through a telephone or some means of communication. As drafted, Congress has included an express knowledge requirement for "inaccurate" reports, but not for "false" or "misleading" reports. The issue is whether under § 13(a)(2), as drafted or interpreted under the canons of statutory construction, the person also must *know* that the reported information is "false" or "misleading." [39]

> 39   It is clear that, contrary to Valencia's arguments, the reporting prong of § 13(a)(2) does not require proof of an intent to manipulate the market. Intentional manipulation of the market is a separate crime set forth in the first prong of § 13(a)(2).

[*68] The Government urges the Court to imply a scienter requirement for "false" and "misleading" information, to match Congress' express knowledge requirement for "inaccurate" information. The Government justifies this interpretation by suggesting that the word "knowingly" preceding "to deliver or cause to be delivered" in § 13(a)(2) should be construed to cover the nature of the reports as well as the verb, to deliver. The Government's argument, however, is

essentially a request that the Court rewrite the statute. Unlike the statutes in any of the cases cited by the Government or any located by the Court, Congress included an explicit intent requirement for one alternative way that the subsection could be violated -- but not the other pertinent two ways.

The Court concludes that Congress' failure to require that a defendant be aware that the information she provided was false or misleading renders the statute overbroad on its face. A literal interpretation of this portion of § 13(a)(2) could subject citizens to strict liability for inadvertently providing false or misleading information. The Government's offer to prove that Valencia knew she was delivering false information, as alleged [*69] in the Indictment, and its willingness to bear that burden at trial do not save the statute from a facial overbreadth attack. *See Virginia v. Hicks,* 539 U.S. 113, 156 L. Ed. 2d 148, 123 S. Ct. 2191, 2196-97 (2003) (an overbroad statute may not be enforced at all "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression" citing *Broadrick,* 413 U.S. at 615); *NAACP v. Button,* 371 U.S. 415, 432, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

The Court cannot infer the Congressional intent as the Government suggests because the Court must assume that Congress intended each of the terms it used in the statute to have a particular, non-superfluous meaning. *Bailey v. United States,* 516 U.S. 137, 144-46, 133 L. Ed. 2d 472, 116 S. Ct. 501(1995); *see Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000). If the Court accepted the Government's argument, then Congress included "knowingly" to modify "to deliver" and reports that were "false" and "misleading," but inexplicably [*70] and unnecessarily repeated the knowingly intent requirement in reference to "inaccurate" reports. Were it not for this second "knowingly," this Court likely would agree with the Government. [40] However, as drafted, that statute cannot be construed to require knowledge that the information was false or misleading without rendering the second use of "knowingly" mere surplusage. A basic canon of statutory construction warns against superfluousness. "Judges should hesitate ... to treat [as surplusage] statutory terms in any setting, and resistance should be heightened when the words describe an element of a criminal offense." *United States v. Ceballos-Torres,* 218 F.3d 409, 412 (5th Cir. 2000)

(alteration in original) (citing *Bailey v. United States,* 516 U.S. 137, 145, 133 L. Ed. 2d 472, 116 S. Ct. 501 (1995)). *See also United States v. Rayo-Valdez,* 302 F.3d 314, 318 (5th Cir. 2002) (the court's analysis of whether an offense constitutes a "crime of violence" "reflects the principle that when interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous"); *Kashanchi v. Texas Commerce Med. Bank, N.A.,* 703 F.2d 936, 939 (5th Cir. 1983) [*71] (noting "it is a well-established principle of statutory construction that 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" (citation omitted)). This Court cannot ignore the express language of the statute, or rewrite it to pass constitutional muster. [41] Congress "says in a statute what it means and means in a statute what it says there," *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000) (citing *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 254, 117 L. Ed. 2d 391, 112 S. Ct. 1146 (1992)). "As we have previously noted in construing another provision ..., when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms."*Id.* (internal quotation marks and citations omitted). There is no rule of statutory construction that justifies the Government's proposed construction. *See* [*72] *Texaco v. Duhe,* 274 F.3d 911, 920 (5th Cir. 2001) (holding that had Congress intended to exclude warranty contracts from the price ceilings of § 105 of the Natural Gas Policy Act, it would have written the section to do so, and stating "no principle of statutory interpretation grants us judicial license simply to rewrite statutory language by ascribing additional, material terms ...") [42]

40    *See, e.g., United States v. Rodriguez-Rios,* 14 F.3d 1040, 1044 (5th Cir. 1994) (noting that "although it cannot be discerned immediately from [18 U.S.C. § 1001]," the "knowingly and willfully" requirement contained in the phrase "knowingly and willfully ... makes any false, fictitious, or fraudulent statements or representations" applies to all three types of conduct).

41    Congress' inclusion of the word "knowingly" twice (both before the verbs "deliver" or "cause to be delivered" and before the word "inaccurate

reports") also suggests that Congress intended not to include that requirement for "knowing and misleading" in § 13(a)(2).

[*73]

42 The Court also is unpersuaded that the facial overbreadth of the reporting prong of § 13(a)(2) can be saved by interpreting the "knowingly" immediately preceding "deliver" to require knowledge that the information would affect or tend to affect the price of a commodity in interstate commerce. The constitutional issue is whether the statute impermissibly criminalizes a substantial amount of protected speech. *Id.; see also Carter v. United States,* 530 U.S. 255, 268, 147 L. Ed. 2d 203, 120 S. Ct. 2159 (2000) (holding that the presumption in favor of scienter requires a court to read into a statute only that *mens rea* that is necessary to separate wrongful conduct from otherwise innocent conduct"). *Liparota v. United States,* 471 U.S. 419, 85 L. Ed. 2d 434, 105 S. Ct. 2084 (1985), in which the Supreme Court addressed a federal statute governing food stamp fraud that provides that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations" is subject to a fine and imprisonment, does not apply here. *Id.* at 420. In that case, based on the specific the wording of the statute in issue, the Supreme Court found "absent indication of contrary purpose in the language or legislative history of the statute, we believe that [the statute] requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Id.* at 425. *Liparota* thus stands for the proposition that a criminal statute should be interpreted to require that the Government prove that the defendant intend to do the act that the statute is intended to prohibit. Even if, under *Liparota,* the knowledge requirement extends to include knowledge that the information would have an effect on a commodity's price, without more, does not cure the overbreadth; the statute would still impermissibly punish innocent conduct, the reporting of information the defendant erroneously thought was truthful. In order to save the statute, the Court must be able to interpret the statute to require the defendant's knowledge that the information was false or misleading. As discussed in the text above, the statute simply does not allow such an interpretation.

[*74] While the Court hesitates to declare a congressional enactment unconstitutional, here it must do so. "The duty to avoid constitutional questions is not a license to rewrite the statute." *Atchison v. Collins,* 288 F.3d 177, 181 (5th Cir. 2002).

The Government relies on *Dennis* and *Wellington,* but these decisions do not support the result the Government urges. In *Dennis,* the statute at issue omitted a knowledge requirement from one subsection, while expressly including such a requirement in two other subsections. In *Dennis,* the Supreme Court affirmed the Second Circuit's interpretation of 18 U.S.C. § 2385, the Smith Act, which makes it unlawful to knowingly advocate the overthrow of the government. 341 U.S. at 496. Section 2(a)(1) of the statute expressly includes a "knowingly and willfully" element, but § 2(a)(3) omits the "knowingly and willfully" language. *Id.* at 499. The Supreme Court found that the "structure and purpose of the statute demand the inclusion of intent as an element of the crime." *Id.* In implying an intent element in *Dennis,* the Supreme Court was not faced with the choice [*75] between a statutory construction that would render a particular word or element of the subsection meaningless and a construction that would avoid overbreadth. Instead, the language of the statute was capable of an interpretation that avoided any constitutional infirmity and comported with legislative intent.

The same was true in *Wallington,* in which the Fifth Circuit interpreted 18 U.S.C. § 1905, a statute making it a crime for an officer or employee of the United States to disclose certain information obtained by the employee in the course of his employment, to require an element of intent in order to avoid an illogical result. *Wallington,* 889 F.2d at 574-75. The Fifth Circuit found that it would be "absurd" to construe the statute to punish the disclosure of any information, regardless of the Government's interest in secrecy. *Id.* at 576. The court found support for its interpretation of the statute in its heading, which was "Disclosure of Confidential Information Generally," and in the fact that certain categories of information specifically listed in the statute are confidential in nature, such as "trade secrets" and [*76] "confidential statistical data." [43] *Id.* at 577. Second, the Fifth Circuit interpreted the statute to include

a *mens rea* element, specifically, that the employee had to know the information was confidential. The result in *Wallington* is not at odds with the Court's interpretation here. Section 13(a)(2) includes an express *mens rea* element; the issue is how far should the Court extend the scienter requirement beyond the express language used by Congress. The Fifth Circuit was not faced in *Wallington* with a statutory construction that would render any word or element of the statute superfluous, as is the case here.

43    The Court notes that the heading of the statute here is very general and offers no clue to Congress's intent. The heading for § 13 as a whole is "Violations generally; punishment; costs of prosecution." The heading for § 13(a) is "Felonies generally."

The Court must assume Congress meant what it wrote and believed that the terms false and misleading were sufficient [*77] to support criminal liability. While the words "false" and "misleading" may imply conduct more culpable than the word "inaccurate," and may suggest more negligent conduct, it cannot be said that statements that are "false" or "misleading" are necessarily made intentionally or knowingly. In legal parlance, the term "false" does not inherently imply intentional wrongdoing. "What is false can be so by intent, by accident, or by mistake." BLACK'S LAW DICTIONARY 618 (7th ed. 1999). In the common law, there is a material distinction between falsity and fraud. To prevail at trial on a fraud claim, a plaintiff must show that (1) the defendant made a material representation that was false, (2) the defendant either knew the representation to be false at the time or asserted it without knowledge of its truth, (3) the defendant intended the plaintiff to act on its representation, and (4) that his reliance on the representation caused him injury. *See Herrmann Holdings Ltd. v. Lucent Technologies Inc.,* 302 F.3d 552, 564 (5th Cir. 2002); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.,* 960 S.W.2d 41, 47-48, 41 Tex. Sup. Ct. J. 289 (Tex. 1998); *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282, 37 Tex. Sup. Ct. J. 685 (Tex. 1994). [*78] 44 Congress is presumed to know that courts consistently consider intent to be a necessary element of criminal statutes, including statutes regulating "false" information. *See, e.g., United States v. Blanton,* 281 F.3d 771, 774 (8th Cir. 2002) (stating that a violation of 18 U.S.C. § 1623(a), which makes it a crime to "knowingly make any false material declaration" to a

court or grand jury, requires knowledge that the statement was false at the time it was made); *United States v. Lange,* 528 F.2d 1280, 1287 (5th Cir. 1976) (holding that 18 U.S.C. § 1001, making it a crime to make a false statement in any matter within the jurisdiction of any agency or department of the United States, requires proof that the defendant intended to give a false statement). Yet, Congress chose to draft § 13(a)(2) in such a way to limit the applicability of a knowledge requirement to the provision of inaccurate reports but not "false" or "misleading" ones. The Court must give effect to Congress's purposeful choice to draft the statute the way it did.

44    The lay definitions of "mislead" and "false" have varying implications. The lay definition of "mislead" is "to lead in the wrong direction; lead into error, as of conduct." RANDOM HOUSE WEBSTER'S DICTIONARY 422 (1993). The commonly understood lay definition of "false" is "not true or correct; uttering what is untrue"; "not genuine"; "counterfeit." *See* RANDOM HOUSE WEBSTER'S DICTIONARY 235 (1993). But, the dictionary contains other definitions for "false" such as "tending to deceive or mislead" and "lying," *id.,* which suggest the actor knowingly leads another astray. As an adverb, "false" means "dishonestly; treacherously," *id.,* again suggesting an intentional act. It is noted, in contrast, that the standard definition of "accurate" is "free from error; carefully precise," RANDOM HOUSE WEBSTER'S DICTIONARY 6 (1993), making its antonym "inaccurate" mean "containing error" or "not carefully precise." The terms do not have any implication about intent. In sum, it is possible that Congress believed that the words "false and misleading" included their own intent requirement, while Congress perceived that the term "inaccurate" was more innocuous and could include negligent conduct, therefore requiring an express *mens rea* modifier. However, this Court cannot decipher Congressional intent in omitting the modifier in connection with the terms "false" and "misleading" with so little information.

[*79]    The Court concludes that § 13(a)(2) is constitutionally overbroad because it lacks a requirement that the defendant *knew* the false or misleading nature of the reported information forming the basis of the offense of delivery of false or misleading information. Thus, the

statute impermissibly sweeps up a significant amount of protected speech in its net. The Court is not authorized to remedy this deficiency by implying a knowledge requirement or some other *mens rea* requirement because the statute is not reasonably susceptible to such an interpretation. [45] The Government makes this proposal and offers to prove that Valencia knew she was delivering false information, as alleged in the Indictment, but does not offer any explanation for Congress's decision to include the modifier "knowingly" only in connection with inaccurate information. For this reason, Counts One, Two, and Three of the Indictment must be dismissed.

> 45    There is no basis for the Court to impose a different standard, such as "should have known." *See United States v. Garrett,* 984 F.2d 1402, 1411-13 (5th Cir. 1993); *United States v. Delahoussaye,* 573 F.2d 910, 912-13 (5th Cir. 1978).

[*80]    **C.  Valencia's  Motion  on  Incorrect Application of § 13(a)(2)** [46]

> 46    For the sake of completeness, the Court addresses Valencia's arguments on the incorrect application of § 13(a)(2) despite the Court's overbreadth ruling above, which largely moots the "incorrect application" argument.

### 1. Valencia's Contentions

Valencia argues § 13(a)(2) is improperly applied to her because there is no allegation that she attempted to manipulate the market price of a commodity in interstate commerce. Valencia argues that § 2(h) precludes the application to her of § 13(a)(2) because natural gas is an "exempt commodity," and because the CEA does not govern physical trades. In a different vein, Valencia also contends that she did not engage in false reporting related to a commodity covered by § 13(a)(2) because there are no contracts for future delivery of West Coast natural gas traded on the futures exchanges.

### 2. The Government's Contentions

The Government points out that Valencia is charged with [*81] violating the "reporting prong" of § 13(a)(2). Specifically, she is charged with knowingly reporting fictitious trades of natural gas, including price and volume data. The Government contends that, if the price

and volume data on spot trades of natural gas on the West Coast constitutes "market information" within the meaning of the CEA, and if the information was false and tended to affect the price of natural gas, then the conduct violated the statute. The Government also argues that the reporting prong of § 13(a)(2) does not require a showing of intent to manipulate the price of commodities (or futures markets), as the anti-manipulation prong of the statute does. [47] The Government thus contends that the anti-manipulation exception of § 2(h)(1), which only applies to agreements, contracts or transactions in exempt commodities, does not apply.

> 47    The common meaning of "manipulation" is "skillful or artful management," and "manipulate" means "to handle, manage, or use, esp. with skill, in some process of treatment or performance" and "to manage or influence by artful skill." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 872 (1996). Thus, the common meaning of the term "manipulation" inherently implies an element of intent.

[*82]    In addition, the Government argues that natural gas is a commodity that can be the subject of a futures contract and that the only difference between natural gas for delivery to the West Coast and natural gas at the Henry Hub is the transportation cost. Thus, Valencia's argument that West Coast gas is not traded on the futures market amounts to a challenge to the Government's proof and is not grounds for dismissal.

Finally, the Government disputes Valencia's factual argument that there is no relationship between the price indexes (such as the one published by *Inside FERC*) and the prices of futures contracts.

### 3. Discussion on Incorrect Application of § 13(a)(2)

Valencia's arguments are rejected. Most of these points have been addressed earlier in this opinion. However, the Court points out that whether Valencia's conduct had an effect on the futures market of index prices for spot trades is an issue not now presented. The Indictment does not allege that Valencia violated the manipulation prong of § 13(a)(2), by manipulating the market price of a commodity in interstate commerce. She is charged with violating the reporting prong of the statute by falsely reporting "market [*83] information" that "affects, or tends to affect the price of a commodity in interstate commerce," which does not require proof

that prices of commodities or commodities futures contracts were manipulated. In addition, the Court previously rejected Valencia's arguments that § 13(a)(2) does not apply to natural gas, an "exempt" commodity, or to information related to physical transactions. [48] Valencia's argument about "incorrect application" of § 13(a)(2) is not a ground for dismissal of Counts One, Two, and Three of the pending Indictment. [49]

48    In support of her Incorrect Application Motion, Valencia cites the comments of James E. Newsome, chairman of the Commodity Futures Trading Commission in hearings before the Subcommittee on Energy and Air Quality and the Committee on Energy and Commerce in the House of Representatives on February 13, 2002, in which she stated "the CFTC does not regulate trading of energy products on spot (cash) markets or forward markets, which are excluded from our jurisdiction by the CEA." In addition, at the hearing on June 25, 2003, Valencia submitted an October 2002 report by the Energy Information Administration titled "Derivatives and Risk Management in the Petroleum, Natural Gas, and Electricity Industries," which Valencia contends shows that the United States Department of Energy ("DOE") believes that spot transactions are not covered by the CEA. This argument is not persuasive. General comments by the DOE purportedly addressing the jurisdiction of the CFTC are not probative on the issues presented. It is improper for the Court to look beyond the unambiguous language of the statute to determine legislative intent. *United States v. Rodriguez-Rios,* 14 F.3d 1040, 1044-45 (5th Cir. 1994) (recognizing the Supreme Court's admonishment in *Demarest v. Manspeaker,* 498 U.S. 184, 190, 112 L. Ed. 2d 608, 111 S. Ct. 599 (1991) that "when we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances"). The Court has found no exceptional reason justifying deviation from the plain language of the statute in this case.

[*84]

49    To the extent Valencia argues as a factual or a legal matter that West Coast transactions of natural gas are not covered by § 13(a)(2), the Court disagrees. As discussed above in connection with Valencia's vagueness motion, the fact that West Coast contracts are not generally traded on the futures exchanges does not take Valencia's conduct outside of the coverage of § 13(a)(2). *See supra* at 18-19. Further, Valencia's argument that West Coast gas is not traded on the futures market amounts to a challenge to the Government's proof that the allegedly false prices reported to *Inside FERC* did not affect the futures market. This is a factual matter not presented in the charges against Valencia at this time. Even if a charge under the manipulation prong of § 13(a)(2) were brought, any issue of the effect of Valencia's conduct would be a factual issue requiring a trial, not grounds for pre-trial dismissal of the charge as a matter of law.

## III. CONCLUSION AND ORDER

The Court concludes that § 13(a)(2) is not unconstitutionally vague. Because § 13(a)(2) is not ambiguous, [*85] the rule of lenity does not apply. The Court also rejects Valencia's contention that the Indictment incorrectly applies § 13(a)(2). The Court, however, concludes that § 13(a)(2) is unconstitutionally overbroad because it does not require that a defendant know the information he or she reported was false or misleading. The Court cannot imply intent or rewrite the statute to correct this constitutional infirmity because to do so would result in surplusage in Congress' language. It is therefore

**ORDERED** that Defendant's Vagueness Motion [Doc. # 25] and Incorrect Application Motion [Doc. # 26] are **DENIED.** It is further

**ORDERED** that Valencia's Overbreadth Motion [Doc. # 27] is **GRANTED.** It is hereby further

**ORDERED** that Counts One, Two, and Three of the Indictment are **DISMISSED.**

SIGNED at Houston, Texas, this 25th day of August, 2003.

NANCY F. ATLAS

UNITED STATES DISTRICT JUDGE