

**Commodity Futures Trading Commission**
Office of External Affairs
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
202.418.5080

# Remarks

**Remarks of Commissioner Michael V. Dunn
before the American Public Gas Association's Annual Meeting
Albany, NY
August 7, 2007**

Thank you, for asking me here to speak today.

Over the past two years I have had the opportunity to meet with a wide range of audiences regarding regulation of derivatives markets. I have been struck that the basic thing people desire, is simple. They want to have confidence that the game is not rigged.

Events such as the recent alleged manipulation by Amaranth of the natural gas markets, the alleged manipulation of propane markets by BP, and the proven manipulations of Enron, have led the public to question the integrity of derivatives markets, and to ask, "Who is in charge?"

Well, when it comes to energy derivative markets, the answer is sometimes, no one, and that is by design. We have people on tape and in e-mails boasting that they can get away with gaming the markets because no one is watching them.

While the Commission aggressively pursues market manipulations that come to its attention, in the absence of a regulatory structure based on accountability and transparency, manipulative behavior may go undetected.

The central problem is that the CFMA placed large swaths of the energy derivatives markets beyond key elements of the CFTC's jurisdiction. We have to consider today whether this makes sense, and what tools are necessary to safeguard energy markets from fraud and manipulation.

Today, I want to lay out how we ended up where we are from a regulatory standpoint, and offer some thoughts about what should be done next to address problems in the energy derivatives area.

I will also note that this is something that Acting Chairman Lukken is also concerned with and he has scheduled a hearing on these issues for September 18th in Washington, DC.

**Background**

Markets for commodities like corn, cotton and wheat, which began in the 1870s, were the first modern futures markets in the U.S. Participants in these markets found out quickly these markets were readily susceptible to manipulations by traders who, through disinformation or schemes, sought to acquire dominant positions in markets to try and make prices move where they wanted them.

Farmers, always suspicious of the price they get for their crops, refused to accept these machinations, and pushed Congress to require oversight of futures markets. Following the Great Depression, they gained new traction with the Roosevelt administration, and in 1936, Congress enacted the Commodity Exchange Act, giving oversight of futures markets to the U.S. Department of Agriculture.

The driving force behind the Commodity Exchange Act was, 1) to protect the price discovery function; (2) to prevent the manipulation of commodities through corners, squeezes and similar schemes; and (3) to ensure an effective vehicle for risk transference.

The Commodity Exchange Act originally treated all futures and options derivative contracts alike. It did not draw a distinction between whether the contracts were traded on a regulated exchange versus being negotiated directly between to parties. The Act looked to the underlying nature of the contract itself. Essentially, was it operating as a commodity futures contract or an option on a futures contract?

The Commodity Futures Modernization Act (CFMA) changed that by creating new categories for derivative transactions with varying levels of regulation depending on the type of commodity involved and where it was traded.

Derivatives are divided into three basic categories under the CFMA, agricultural, excluded, and exempt.

Energy is considered to be an exempt commodity. It is not excluded because it is a physically delivered commodity. And it is not an agricultural commodity. So, it is an exempt commodity.

As an exempt commodity energy can be traded in several different venues: a Designated Contract Market (DCM) (NYMEX), a Bilateral Exempt Market (Over-the-Counter market), or an Exempt Commercial Market (ECM) (ICE).

There is one other potential venue under the CEA for trading energy derivatives, the Derivatives Transaction Execution Facility (DTEF), however, to date, no one has registered as a DTEF.

The distinctions made by the CFMA are often arbitrary when compared to how the contracts in question are used in the real world. Thus a natural gas futures contract traded on NYMEX, a regulated designated contract market, is fully regulated, while a virtually identical futures contract on ICE, an exempt commercial market, is not--solely because of where the natural gas contract is traded, not what the contract actually does, or how it is used by traders.

As I said before, the CEA originally treated all derivative contracts alike. Prior to the CFMA, therefore, the Commission would have had the option to require that these natural gas contracts be subject to the same level of regulation since they are essentially equivalent.

However the CFMA stripped away that flexibility and left a regulatory hole that traders have been more than willing to exploit.

The reason there is a hole is that ECM's such as ICE have no self-regulatory obligations, no duty to report large trader information, and the Commission has very limited authority over them.

DCM's on the other hand have broad self-regulatory obligations, including the duty to conduct regular surveillance of their markets, ensure they have rules to protect against manipulation or excessive speculation, and comprehensive requirements to insure their own financial integrity and that of their customers.

DCMs, of course, existed prior to the CFMA. Bilateral exempt markets also existed as a result of a series of "swaps" policy statements that the Commission issued in the 1990s, but the CFMA codified them, and removed much of the Commission's jurisdiction over them. Exempt Commercial Markets are wholly a creation of the CFMA, and they are where the largest regulatory problem seems to reside when it comes to energy markets.

The key to understanding how this situation regarding energy markets arose is understanding the role of "swaps" in commodity derivative debates over the past two decades.

**Swaps Muddy the Water**

A swap is a contract where two counterparties negotiate directly to exchange or "swap" one stream of cash flow for another. (e.g., fixed interest rates for floating interest rates, or a fixed price for corn versus a floating price for corn.)

A future contract, on the other hand, is a contract where one party agrees to buy or sell a fixed quantity of a commodity at some future date, at a price determined at the time the contract is signed.

As they are individually negotiated, swaps can have elements of futures contracts incorporated into them.

Swaps began in the 1980s as a way for parties to "swap" payment streams and transfer risk. The first swaps were interest rate swaps where parties exchanged floating interest rates for fixed interest rates. From their debut in 1981, swaps exploded as financial players quickly grasped their utility for hedging. Swaps migrated from financial markets to virtually all commodity markets because traders quickly saw their potential utility in hedging risks for almost any commodity market.

These swaps were largely individually negotiated directly between large institutional players and involved financial commodities for which there was little risk of manipulation. They may have had elements of futures and options contracts, but there was no central market for them, thus they did not perform a price discovery function.

Consequently, the Commission largely exempted swaps from regulation under a series of swaps policy statements in the 1980s and 90s, based on the theory that the swaps markets did not really affect the Commission's ability to police the regulated futures and options markets.

Things began to change during the 1990s as "traditional" swaps became more standardized and swaps markets began to coalesce. The Commission began to view swaps as potentially affecting price discovery in some situations. The Commission issued a "concept release" questioning whether it was time to reexamine its swaps policy, and reevaluate whether additional regulation over swaps was necessary in order for the Commission to fulfill its mission.

The Commissions concept release was met with alarm by the derivatives industry, the Federal Reserve, the SEC, Treasury, and eventually, Congress. With an appropriations rider, Congress forbid the CFTC from revising its swaps policy. Much debate ensued and eventually the CFMA was passed.

**The Problem**

The CFMA included a new section, 2(h)—the provision creating exempt markets. This provision was included despite the fact that the whole prior debate regarding swaps had been focused mostly on financial commodities that by their nature were not subject to manipulation, i.e. the excluded commodities.

The physical, deliverable supply of energy, in comparison, is finite, and therefore subject to manipulation. In addition, many exempt derivative markets today play a price discovery role whereby they help to set the energy prices paid by actual consumers.

The exempt markets provision sought to create a sort of hybrid commodity, falling somewhere between the fully regulated agricultural derivatives and the essentially unregulated excluded derivatives.

In so doing, Congress prevented the CFTC from regulating energy contracts that are essentially off-exchange energy futures contracts fulfilling a price discovery function, such as several of those traded by Enron in the early 2000s and ICE today. In foreclosing the option of further regulation, Congress created today's situation were large swaths of the energy futures and options markets are largely beyond its jurisdiction.

This ultimately makes it quite difficult, if not impossible to meet the CEA's objectives of protecting price discovery, guarding against manipulation, and ensuring that the futures and options markets remain effective tools for hedgers.

Enron provided a stark example of how energy markets could be manipulated. In addition, the Commission has recently filed major manipulation cases against British Petroleum for allegedly manipulating a propane market, and the hedge fund Amaranth for allegedly manipulating the NYMEX natural gas contract. The Amaranth case and the report by Senators Levin and Coleman on Amaranth show clearly how inextricably intertwined off-exchange and on-exchange energy markets are. There are many other cases that we have successfully prosecuted, but those cases are just the ones we caught. Who knows if it is only the tip of the iceberg?

Based on our actual experience with these off-exchange energy markets, why should we expect the public to have confidence in these markets? At best, all we can now do is file a case after the damage is done. The public expects that some cop is on the beat preventing these things from happening.

The public today, is viewing energy markets the way the public of the 1920s and 30s viewed agricultural markets. Markets need regulatory oversight to help ensure that the prices the public is paying is fair.

The Commission has done what it can within the confines of the Commodity Exchange Act, but we are at the limits of our authority to address the regulatory gaps that exist.

We have requested, for instance, that ICE futures, an exempt market, provide us with daily trading information on their NYMEX "look-alike" natural gas contract. Our staff felt it was necessary to get this information so that we could better understand what was happening on the NYMEX markets we regulate. We have also asked the U.K. Financial Services Administration for similar information regarding ICE's NYMEX look-alike, West Texas Intermediate crude oil contracts traded on ICE futures in London.

While I commend ICE's cooperation, the shortcoming of this information collection is that on a Designated Contract Market (DCM), or a Derivatives Execution Transaction Facility (DTEF), trading firms are required to report information directly to the Commission. Exchanges are also required to have compliance divisions to self regulate and certify that they are following core principles. Therefore, if an exchange has concerns about trading in their markets, they are empowered to take action to redress those concerns.

Even with the reporting, I already mentioned, an exempt market ICE has no obligation or authority to undertake those kinds of self regulatory functions or actions. That is problematic because self regulation is the heart of ensuring regulated markets operate openly and transparently.

**Possible Solutions**

So what is the solution? In my judgment Congress needs to revisit energy regulation in light of the core objectives of the CEA: protecting price discovery, guarding against fraud and manipulation, and preserving the effectiveness of futures and options markets as hedging tools. Congress should remove the current bars it has put in place that limit the Commission's ability to achieve these objectives.

I think Congress should consider removing the 2(h)(3) exempt markets provision from the Act as part of reauthorization. This is the cleanest and most common sense way to restore the Commission's authority. Exempt Electronic Markets go far beyond the original logic of special treatment for swaps. First, they are not bilateral, they allow many buyers and many sellers to bid against each other and match them. Second, as I have already discussed, exempt commodities are subject to manipulation... Lastly, by virtue of offering many-to-many matching, and often clearing, these exempt electronic markets have rapidly become major players in price discovery.

Alternatively we could try to tweak 2(h)(3) to carve out a subset of transactions that the Commission should have authority over versus those that it does not. However, the CEA is already so complicated that such tinkering seems, as often as not, to create new loopholes rather than closing old ones.

Regarding true, energy derivative swaps embodied by 2(h)(1), I believe, at a minimum, that Congress should give the Commission clear authority to mandate appropriate record keeping and reporting. The Commission needs access to those records so that when it does appear there has been wrongdoing, the Commission can more efficiently assess what role the bilateral transactions may have played.

I believe Congress should also consider providing explicit authority for the Commission to approve Foreign Boards of Trade who wish to provide direct access to customers into the United States. This authority should track the approach of the U.K. Financial Services Authority, and their "Registered Overseas Investment Exchange" category.

This would allow us to codify our existing no action process, give that process a firm legal footing, and provide legal certainty for Foreign Boards of Trade operating in the United States. It would give us a solid legal ground for putting appropriate conditions on a foreign board of trade wishing to offer direct access to U.S. residents if the contract is inextricably intertwined with our domestic economy as in the case of ICE Futures West Texas Intermediate Contract. This authority is one that most foreign jurisdictions already have.

A change in the foreign board of trade regime is important because the U.S. is the only major financial jurisdiction in the world that regularly pursues futures and options manipulation cases. Other jurisdictions, even the FSA, do not regularly file any manipulation cases. At the end of the day, it is the U.S. government that is responsible for ensuring that U.S. commodity markets are safe from manipulation. We need to make sure we have the legal tools necessary to do that.

False reporting of energy prices has been a major focus of the Commission's enforcement division, due to the fact that would-be schemers use price reporting as a tool to manipulate the markets. Reporting publications have often resisted working with the Commission, forcing us into lengthy and costly litigation to obtain vital information necessary to form a clear picture of certain energy markets and discern the intent of certain traders.

While I wholeheartedly support freedom of the press, and applaud recent changes they have made, companies that undertake to fulfill a price discovery function in interstate markets are fulfilling a public function, and they need to be accountable. Some of these companies have resisted working with the commission, forcing us into lengthy costly litigation to obtain vital information necessary to form a clear picture of certain energy markets and the intent of certain traders. As a result, we need to provide explicit authority for the federal government to oversee energy price reporting, even to require mandatory price reporting if that is what is necessary to provide fair and transparent price information.

Lastly, when the Congress gave FERC anti-manipulation authority over select energy markets, it adopted a different manipulation standard than that traditionally used by the CFTC. This has led to confusion in the regulatory market place. Congress should direct the CFTC to review its legal definition of manipulation and harmonize it with the FERC and SEC approach. This will create a common body of manipulation law that is consistent across regulatory agencies.

Essentially, the FERC and CFTC have joint jurisdiction over large parts of the energy market. However, their different statutory schemes may lead to two agencies filing different lawsuits over the same set of facts in many energy cases.

Not only is this going to create problems for the regulated industry and the marketplace, it will lead to duplicative litigation and create questions about why one agency is pursuing one legal theory while the other agency another. It raises possible double jeopardy concerns if traders get caught up in enforcement actions by bother the CFTC and FERC. I think Congress is going to have to examine if this is what they intended, and if it is the best way of preventing and pursuing wrongdoing in the energy markets.

**Commission Budget**

Before I conclude, I would be remiss if I did not point out that expanding the Commission's role in energy markets will require additional staff and resources. The Commission is maxed out when it comes to utilizing existing resources to fulfill its mission.

This year, President Bush has requested $116 million for fiscal year 2008 funding for the Commission. I want to thank the American Public Gas Association for their written support of the President's budget.

The Senate Appropriations Committee approved the full $116 million requested by the President. The House Appropriations Committee approved $103 million. If Congress approves this full level of funding requested, this will allow the Commission to address its two major needs – staff increases and technology investment. But this increase will only enable us to keep doing what we are currently doing. Less than that amount will mean the Commission will face hard choices in how to allocate its resources to meet its mission.

To conclude, I think our economy has benefited greatly from the expanded hedging opportunities offered by the explosive growth of futures and options markets. But, we must always be vigilant; the markets remain useful for those they were created for—the hedgers.

When we hear complaints or concerns from market users, we need to take them seriously, and try and understand what the concerns are. Our statements in the past have often seemed to convey the message everything is fine in the energy markets, even while we are investigating suspected fraud and manipulation.

The growth of exempt markets has begun to threaten our ability to do our job. That needs to be addressed, and I will do all I can to facilitate that process. Thank you again for having me here today.