UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : | |
| | : | |
| Plaintiff, | : | 07 Civ. 6682 (DC) |
| | : | |
| v. | : | |
| | : | |
| AMARANTH ADVISORS L.L.C., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------------

### MEMORANDUM OF LAW OF THE AMICI CURIAE FUTURES GROUP IN SUPPORT OF PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S EXCLUSIVE JURISDICTION AND DEFENDANT AMARANTH ADVISORS' STAY MOTION

Mark D. Young
**KIRKLAND & ELLIS LLP**
655 15th Street, N.W., Suite 1200
Washington, D.C.  20005
(202) 879-5084

Eric F. Leon
**KIRKLAND & ELLIS LLP**
153 East 53rd Street
New York, New York  10022
(212) 446-4731

*Attorneys for Amici Curiae Futures Group*
*Futures Industry Association, Inc.*
*Managed Funds Association, Inc.*
*New York Mercantile Exchange, Inc.*
*Chicago Mercantile Exchange Group, Inc.*
*International Swaps and Derivatives*
*    Association, Inc.*

## LIST OF AMICI CURIAE FUTURES GROUP

Barbara Wierzynski, Esq.
**FUTURES INDUSTRY ASSOCIATION, INC.**
2001 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20006
(202) 466-5460

John G. Gaine, Esq.
**MANAGED FUNDS ASSOCIATION, INC.**
2025 M Street, N.W., Suite 800
Washington, D.C. 20006
(202) 367-1140

Christopher K. Bowen, Esq.
**NEW YORK MERCANTILE EXCHANGE, INC**.
One North End Avenue
World Financial Center
New York, New York 10282
(212) 299-2200

Jerrold E. Salzman, Esq.
**CHICAGO MERCANTILE EXCHANGE GROUP, INC.**
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0718

Gregory P.J. Zerzan, Esq.
**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.**
1101 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20004
(202) 756-5008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................... 3

I.    Because the CEA's Exclusive Jurisdiction Provision Ousts FERC of Futures
      Market Price Manipulation Jurisdiction, Defendants Have a Strong Likelihood of
      Success. .................................................................................................... 3

      A.    The Statutory Text of the CEA's Grant of Exclusive Jurisdiction. ........................ 4

      B.    The 1974 Legislative History Affirms the Scope of Exclusive Jurisdiction. .......... 7

      C.    Courts Uniformly Hold CEA Exclusive Jurisdiction Bars Other Agencies
            From Futures Regulation. ................................................................... 9

      D.    The 2005 Energy Act Did Not Repeal CEA Exclusive Jurisdiction. ................... 11

II.   A Stay Would Serve The Public Interests Underlying CFTC Exclusive
      Jurisdiction. .............................................................................................. 12

CONCLUSION ................................................................................................ 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAM v. CBOT,*
  977 F.2d 1147 (7th Cir. 1992) ................................................................ 3

*Bartels v. International Commodities Corporation,*
  435 F. Supp. 865 (1977) .................................................................... 10

*Board of Trade of the City of Chicago v. SEC,*
  677 F.2d 1137 (7th Cir. 1982),
  *vacated as moot,* 459 U.S. 1026, 103 S.Ct. 434 (1982).............................. 7, 10

*California v. Arizona,*
  440 U.S. 59 (1979)............................................................................ 6

*Chicago Mercantile Exchange v. Securities and Exchange Commission,*
  883 F.2d 537 (7th Cir. 1989) ............................................................ 6, 10

*FTC v. Roberts,*
  276 F.3d 583 (D.C. Cir. 2001) ....................................................... 5, 8, 10

*Hughes Aircraft Co. v. Jacobson,*
  525 U.S. 432, 119 S. Ct. 755 (1999)..................................................... 3

*International Trading v. Bell,*
  556 S.W. 2d 420 (Ark S.C. 1977).......................................................... 9

**Statutes**

7 U.S.C. § 1(a)(4)..................................................................... 5, 7

7 U.S.C. § 2(a)(1)(A) ............................................................... passim

7 U.S.C. § 2(a)(1)(C) ...................................................................... 6

7 U.S.C. § 2(a)(1)(D) ...................................................................... 6

7 U.S.C. § 2(c)-(i) ......................................................................... 6

7 U.S.C. § 5(a) ......................................................................... 12, 14

7 U.S.C. § 5(b) ............................................................................ 14

7 U.S.C. § 7................................................................................. 5

7 U.S.C. § 7(d)(3) ........................................................................................ 1

7 U.S.C. § 7(d)(4) .................................................................................. 1, 14

7 U.S.C. § 9 ................................................................................................. 5

7 U.S.C. § 13b ............................................................................................ 5

Commodity Futures Modernization Act, Public Law 106-544 ..................... 6

## Other Authorities

120 Cong. Rec. 30459 (1974) .................................................................... 12

120 Cong. Rec. 34736 (1974) .................................................................... 12

120 Cong. Rec. 34737 (1974) ...................................................................... 9

120 Cong. Rec. 34997 (1974) ...................................................................... 9

Energy Policy Act of 2005,
    Pub. L. No. 109-58 (2005) ................................................................. 11

H.R. Rep. No. 93-1383 (1974) ..................................................................... 8

H.R. Rep. No. 93-975 (1974) ........................................................... 3, 8, 9, 13

H.R. Rep. No. 95-1181 (1978) ..................................................................... 3

Memorandum of Understanding (MOU) ...................................................... 11

New York Mercantile Exchange,
    No. EL 95-81-000, 74 FERC (1996) ................................................. 12

Peterson, Goodlatte, Etheridge, Moran
    Letter to CFTC Acting Chairman Walt Lukken, Sept. 27, 200[7] .................. 12

Public Law 97-303 Sec 1 (1982) .................................................................. 6

Public Law 97-303 Sec 2 (1982) .................................................................. 6

Public Law 97-444 Sec 101 (1983) .............................................................. 6

S. Rep. No. 93-1131 ................................................................................ 8, 9

S. Rep. No. 95-850 (1978) ......................................................................... 12

Talley, I.,
   *UPDATE:  Court May Settle CFTC, FERC Oversight Turf Battle,* Factiva® ,
   Dow Jones International News,
   Sept. 26, 2007 ................................................................................................................... 2

## INTRODUCTION

On August 16, 2007, the Court summed up this case's posture succinctly: "two federal agencies [are] going after the same parties based on the same conduct seeking essentially the same relief." (Ct. Conf. Tr. 4, Aug. 16, 2007). In this action, the Commodity Futures Trading Commission alleges under its statute -- the Commodity Exchange Act -- an attempt to manipulate the natural gas futures market price. In an administrative proceeding, the Federal Energy Regulatory Commission alleges under its statute -- the Natural Gas Act -- an actual manipulation of the natural gas futures market price. To reduce the possibility of conflicting adjudications, defendant Amaranth Advisors has moved to stay the FERC proceeding. Granting this motion would not dismiss FERC's proceeding or affect any Court of Appeals jurisdiction. It would simply allow the CFTC action in this court to be decided first.

The *amici curiae* Futures Group is comprised of the Managed Funds Association, Inc. and International Swaps and Derivatives Association, Inc. (major futures market participants); the Futures Industry Association, Inc. (major futures market intermediaries); and the New York Mercantile Exchange, Inc. and Chicago Mercantile Exchange Group, Inc. (major futures exchanges). The bulk of all U.S. futures trading occurs on NYMEX and CME in a wide-range of commodities, including natural gas, crude oil, metals, currencies, corn, soybeans, U.S. Treasury Securities and stock indexes. The Futures Group expresses no view on Amaranth's guilt or innocence. We know well the dangers of futures price manipulation; no legitimate market participant, brokerage firm or exchange would tolerate misconduct designed to create an artificial price. The CEA imposes on CFTC-approved exchanges, like NYMEX and CME, a clear affirmative duty to deter or detect manipulation of futures prices on their markets. 7 U.S.C. § 7(d)(3) and (4). Their efforts combine with the CFTC's constant policing to make preventing and punishing price manipulation the core of the CEA and CFTC regulation.

1

The Futures Group has a substantial interest in addressing two of the factors the Court will consider in deciding the stay motion: likelihood of success on the merits and the public interest. On the former, the issue the Court posed on August 16 was: "whether FERC is precluded from pursuing this matter administratively because the CFTC has exclusive jurisdiction." (Ct. Conf. Tr. 11) The answer is "yes," based on the text of the CEA's exclusive jurisdiction provision, 7 U.S.C. § 2(a)(1)(A), as well as its history and an unbroken chain of judicial precedent. (See Section I.)

Exclusive jurisdiction is not a matter of agency turf: it was intended instead to make the CEA and CFTC regulations supreme as the body of law for futures markets and trading thereon. CEA exclusive jurisdiction is therefore central to the public interests served by, as well as the operation and competitiveness of, the U.S. futures markets. Allowing FERC to proceed now would undermine these public interests. For 32 years, the CEA and CFTC regulations have provided the single legal standard -- the intentional creation of an artificial price -- for deciding whether a futures market price was manipulated. Every day, the NYMEX, CME and other self-regulating futures exchanges apply that standard to discharge their statutory duties. Now FERC claims a different legal standard for manipulation should be applied to futures markets, and possibly not just natural gas futures markets.[1] Its claim has generated considerable uncertainty among self-regulatory bodies, like NYMEX and CME, as well as futures market participants.

Congress enacted CEA exclusive jurisdiction to avoid this type of legal uncertainty, by preventing both duplicative and conflicting regulation of futures trading. Congress knew "the futures markets play a significant role in the economic well being of our country," (H.R. Rep.

---

[1]    On September 26, 2007, Dow Jones cited the view of a FERC Commissioner that FERC's jurisdiction could extend to currency and metals futures markets as well. I. Talley, *UPDATE: Court May Settle CFTC, FERC Oversight Turf Battle*, Factiva® , Dow Jones International News, Sept. 26, 2007.

No. 93-975, at 60 (1974)), and designed the CEA's exclusive jurisdiction provision "to bring the markets under a uniform set of regulations" found in the CEA, and subject to the CFTC's expert administration. *AAM v. CBOT*, 977 F.2d 1147 at 1156 (7th Cir. 1992). After 32 years under CEA exclusive jurisdiction, the U.S. futures markets have grown to $5 trillion in daily trading volume by escaping the uncertainty, confusion and cost of "varying and potentially conflicting legal standards" (*id.*), exactly as Congress intended.

In sum, Congress enacted CEA exclusive jurisdiction because it did "not believe the public interest would be served by duplicating in one or more additional agencies regulatory authority over futures markets that presently exists in the Commodity Futures Trading Commission." H.R. Rep. No. 95-1181, at 13 (1978). Neither does the Futures Group. Neither should this Court. (See Section II.)

## ARGUMENT

I.    **Because the CEA's Exclusive Jurisdiction Provision Ousts FERC of Futures Market Price Manipulation Jurisdiction, Defendants Have a Strong Likelihood of Success.**

The Commodity Exchange Act's exclusive jurisdiction provision means what it says: the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving" natural gas futures contracts trading on a CFTC-designated contract market, like NYMEX. 7 U.S.C. § 2(a)(1)(A). Where, as here, a statute's terms are patently clear, that is the end of the inquiry. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 at 438, 119 S. Ct. 755 (1999). "This Court's review . . . begins with the statute's language. Where that language provides a clear answer, it ends there as well." (internal citations omitted)

Ironically, FERC responds with a different "exclusive jurisdiction" claim -- that appellate courts have "exclusive jurisdiction" on appeal from FERC orders. FERC Br. at 1, 18-21. Embedded in this argument is a telling, perhaps conclusive, admission. FERC concedes that if

one party is granted by statute "exclusive jurisdiction," that statute must be read to preclude any other party from exercising its powers within the "exclusive" area. Otherwise the word "exclusive" is meaningless. FERC never explains, because it cannot explain, why the asserted appellate "exclusive jurisdiction" divests this Court of jurisdiction, but CFTC "exclusive jurisdiction" does not divest FERC of jurisdiction. As the CFTC's brief confirms, FERC should lose on the merits because Congress granted "exclusive jurisdiction" to the CFTC to preclude other agencies from acting as FERC has here.

A.    The Statutory Text of the CEA's Grant of Exclusive Jurisdiction.

The text of the Commodity Exchange Act reveals why FERC has no jurisdiction to pursue a case for futures price manipulation. It says:

> The [CFTC] *shall have exclusive jurisdiction, except to the extent otherwise provided* in subparagraphs (C) and (D) of this paragraph and subsections (c) through (i) of this section, *with respect to* accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and *transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated* or derivatives transaction execution facility registered pursuant to section 7 or 7a of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. *Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

7 U.S.C. § 2(a)(1)(A) (emphasis supplied). This provision establishes three things: 1) CFTC jurisdiction over futures trading on an exchange like NYMEX is "exclusive;" 2) any exceptions to exclusive jurisdiction are set out in the provision itself; and 3) "except" for those matters committed to CFTC exclusive jurisdiction, FERC and other agencies retain their full powers.

The FERC alleges that Amaranth's futures trading misconduct manipulated the natural gas futures price on NYMEX. Those allegations fit comfortably within the statutory description of the statute's mandate: the CFTC "shall have exclusive jurisdiction . . . with respect to . . . transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market." 7 U.S.C. § 2(a)(1)(A). Giving meaning to each statutory term in that provision, FERC has no valid jurisdictional claim.

Three parts of the exclusive jurisdiction grant have specific statutory definitions. Natural gas is a "commodity" under 7 U.S.C. § 1(a)(4) (any goods, articles, rights and interests in which futures are traded). NYMEX is a "designated contract market" under 7 U.S.C. § 7. Its futures contracts are what the statute calls "contracts of sale of a commodity for future delivery."

The issue here thus turns on whether the elastic phrase -- "jurisdiction . . . with respect to . . . transactions involving" NYMEX natural gas futures contracts -- encompasses a market participant's trading of such contracts. An order to buy or sell, as well as the buying and selling of a futures contract, are surely "transactions." See *FTC v. Roberts*, 276 F.3d 583, 590 (D.C. Cir. 2001) ("transactions" in the exclusive jurisdiction provision "seems most naturally read as encompassing . . . a set of arrangements directly related to the actual sale of commodities futures"). All trading conduct is easily covered by jurisdiction "with respect to" and "involving" orders to buy and sell futures contracts, including misconduct which constitutes futures price manipulation (7 U.S.C. § 9, 13b). FERC's claim that futures price manipulation is not captured by that phrase (FERC Br. 34-36) cannot be squared with the actual words Congress used: futures price manipulation is surely conduct "with respect to transactions involving futures contracts."

Now consider the statutory prelude, the "[CFTC] shall have exclusive jurisdiction." The Random House Dictionary (2d ed. 1967) defines "exclusive" to mean "shutting out all others from a part or share."[2] The plain meaning of 7 U.S.C. § 2(a)(1)(A) is that the CFTC's jurisdiction over Amaranth's trading in natural gas futures contracts shuts out FERC from sharing that jurisdiction. As the Seventh Circuit has ruled, the congressional grant of exclusive jurisdiction under the CEA could have "no other possible meaning." *Chicago Mercantile Exchange v. Securities and Exchange Commission*, 883 F.2d 537, 544 (7th Cir. 1989).

FERC argues Congress created an exception to CFTC exclusive jurisdiction in 2005. The text of 7 U.S.C. § 2(a)(1)(A) disproves that contention. When Congress wants to shave off part of exclusive jurisdiction, it enacts exemptions within 7 U.S.C. § 2(a)(1)(A) itself, as exemplified by the phrase "except to the extent otherwise provided in subparagraphs (C) and (D) of this paragraph and subsections (c) through (i) of this section." FERC is not relying on any of those exceptions for its jurisdictional claim. Nor could it. Those provisions cover amendments in 1982 and 2000 that were designed to a) reassign some CFTC jurisdiction to the Securities and Exchange Commission, b) identify new products over which CFTC and SEC share jurisdiction or c) describe areas where the CFTC had no jurisdiction, let alone exclusive jurisdiction.[3]

The second sentence in 7 U.S.C. § 2(a)(1)(A) also is of no help to FERC. It begins "except as hereinabove provided" and then recites that agencies other than the CFTC retain their

---

[2]    The plain meaning of exclusive should be beyond dispute. The Supreme Court itself has construed its own "exclusive jurisdiction" to deny the jurisdiction of other federal courts to hear cases brought by one state against another. *California v. Arizona*, 440 U.S. 59 (1979).

[3]    Subparagraph (C) originally was enacted as part of the 1982 Shad-Johnson Jurisdictional Accord. The 1982 Accord reassigned jurisdiction over some products to the SEC. Public Law 97-303 Sec 1, 2 (1982); Public Law 97-444 Sec 101 (1983). *See* 7 U.S.C. § 2(a)(1)(C). In 2000, the Commodity Futures Modernization Act, Public Law 106-544 (Appendix E) (2000), created security futures products to be jointly regulated by CFTC and SEC 7 U.S.C. § 2(a)(1)(D) and granted various statutory exclusions and exemptions under 7 U.S.C. § 2(c)-(i).

own statutory powers under the statutes they administer.   Through this phrase, Congress has reaffirmed that CFTC exclusive jurisdiction is a trump card.  If actions or conduct are subject to CFTC authority with respect to transactions involving futures contracts, the CFTC's authority is exclusive.  If not, and only if not, then other agencies may exercise their applicable statutory powers.  As the Seventh Circuit noted long ago, what is provided "hereinabove" in 7 U.S.C. § 2(a)(1)(A) is CFTC exclusive jurisdiction. *Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137 at 1145 (7th Cir. 1982), *vacated as moot*, 459 U.S. 1026, 103 S.Ct. 434 (1982).  Thus, if Amaranth's trading activities fit within CFTC exclusive jurisdiction, the savings clause does not revive FERC's jurisdictional claim.

The statute's terms offer strong support for Defendant's likely success on the jurisdictional merits.  Its history and relevant case law further strengthen that support.

B.     The 1974 Legislative History Affirms the Scope of Exclusive Jurisdiction.

Congress enacted exclusive jurisdiction in the Commodity Futures Trading Commission Act of 1974.  Before 1974, the Commodity Exchange Act applied to futures trading in only the commodities listed in 7 U.S.C. § 1(a)(4) and was enforced by an agency within the U.S. Department of Agriculture.  In the CFTC Act, Congress expanded the reach of the CEA so that it applied to futures trading in anything but onions (*see Board of Trade of the City of Chicago,* 677 F.2d at 1142, n. 9), and created the CFTC as an independent regulatory agency charged with administering the provisions of the CEA.

The key feature of the 1974 legislative history was the role of the Conference Committee in reconciling the differing House and Senate versions of the pending bills' exclusive jurisdiction provisions.  The Conference Committee decided the House version was ambiguous, so the Committee adopted the Senate's provision to make sure "the Commission's jurisdiction over futures contract markets …is exclusive … and *the Commission's jurisdiction, where applicable,*

7

*supersedes* State as well as *Federal agencies*."[4]  The Conference Committee further explained: "Under the exclusive grant of jurisdiction to the Commission, the authority of the Commodity Exchange Act (and regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

The context in which Congress acted in 1974 adds further support to the expansive and crucial nature of exclusive jurisdiction.  A number of themes run throughout this history.

- Congress recognized "the futures markets play a significant role in the economic well being of our country." H.R. Rep. No. 93-975, at 60 (1974).

- Congress wanted to strengthen futures regulation, create a comprehensive regulatory structure for the esoteric futures trading complex, and avoid regulatory gaps. H.R. Rep. No. 93-975, at 1 (1974); S. Rep. No. 93-1131, at 19; 120 Cong. Rec. 34736 (1974) (statement of H. Comm. Chairman Poage) ("It was the intent of the [Conference] Committee to fill all regulatory gaps -- to regulate trading in futures and in options relating to commodities or commodity futures, because such trading is now poorly regulated, if it is regulated at all.").

- Congress wanted to create an independent agency for futures, modeled after the SEC, but recognized securities regulation principles would be a poor fit for futures. S. Rep. No. 93-1131, at 19 (1974; H.R. Rep. No. 93-975, at 70-72 (1974).

- Congress wanted the new agency to be an expert in futures regulation which "requires highly specialized skills;" H.R. Rep. No. 93-975, at 71 (1974), see also S. Rep. No. 1131, at 22 (1974 ("persons of demonstrated knowledge in futures trading").

- Congress wanted the CFTC to be a neutral arbiter of futures prices, without the conflict of interest (not inclined to seek higher or lower prices) other agencies, including USDA, would have, H.R. Rep. No. 93-975, at 60 (1974).  "The proper regulatory function of an agency which regulates futures trading is to assure the market is free of manipulation and other practices which prevent the market from being a true reflection of supply and demand." (S. Rep. No. 93-1131, at 21 (1974.)

---

[4]  H.R. Rep. 93-1383, at 35 (1974) (Conf. Rep.) (*emphasis supplied)*; S. Rep. No. 93-1131, at 23 (1974) (same).  It is surprising in light of this clear statement twice from Committees of Congress -- CFTC regulatory authority over futures where applicable supersedes other federal agencies -- for the D.C. Circuit to have called it "specious" to contend that what the CFTC regulates it regulates exclusively. *FTC v. Roberts*, 276 F.3d at 591. Perhaps the difference is that the FTC investigation at issue in Roberts did not focus on regulation of futures trading.

- Congress appreciated that as futures trading and regulation expanded to new commodities other agencies could try to regulate or otherwise exercise jurisdiction over futures markets. (S. Rep. No. 93-1131, at 23 (1974).)

- Congress knew that futures and options trading had been subjected to the vagaries of state blue sky laws and SEC enforcement actions prior to 1974. (H R. Rep. No. 93-975, at 48, 120 Cong. Rec. 34737 (1974) (statement of H. Chairman Poage), 120 Cong. Rec. 34997 (1974) (Statement of Sen. Comm. Chairman Talmadge).

This last point is critical in the context of FERC's jurisdictional assertions. Congress enacted CFTC exclusive jurisdiction to close down efforts by the SEC and state regulators to enforce their laws against those engaged in futures and options activities. This broad reach of CFTC exclusive jurisdiction was so well understood in 1974 that Congress added Section 412 to the CFTC Act to make sure that other agencies knew they could continue to investigate pre-1974 cases under their existing regulatory statutes. However, no regulatory agencies would be able to investigate or prosecute cases relating to futures misconduct arising after CFTC exclusive jurisdiction took effect, as the case law the CFTC's brief cites makes clear.

C.    Courts Uniformly Hold CEA Exclusive Jurisdiction Bars Other Agencies From Futures Regulation.

The CFTC's brief describes well the history of judicial acceptance of CFTC exclusive jurisdiction largely in two contexts. The first group of decisions arose when state or federal regulators have sought to enforce their regulatory statutes against persons engaging in alleged misconduct with respect to transactions within the CFTC's exclusive jurisdiction. A universal theme running through these decisions is that, because Congress had established exclusive authority in the CFTC over activities in the futures markets, other regulatory agencies could not "exercise concomitant or supplemental regulatory authority over the identical activity." *International Trading v. Bell*, 556 S.W. 2d 420 at 425 (Ark S.C. 1977). One court, in discussing the SEC's attempt to patrol commodity options trading, was particularly blunt stating "whatever

9

authority the Securities and Exchange Commission previously exercised . . . [it] has been unequivocally ended by Congress." *Bartels v. International Commodities Corporation*, 435 F. Supp. 865 at 869 (1977). [5]

A second class of cases illustrates further the reach of CFTC exclusive jurisdiction. Even where the SEC approved and stood ready to regulate securities exchange trading of new products that were, as a matter of economic substance, a commodity option or a stock index futures contract, the U.S. Court of Appeals for the Seventh Circuit nullified the SEC's approval, holding the CFTC's authority over the trading of such products to be exclusive. *Board of Trade of the City of Chicago*, 677 F.2d at 1138; *Chicago Mercantile Exchange*, 883 F.2d at 549-550.

The one case FERC relies upon where an exclusive jurisdiction claim was not upheld actually read 7 U.S.C. § 2(a)(1)(A) to include "business deals that involve the buying and selling of futures, which comports with Congress' goal of conferring the CFTC with sole regulatory authority over 'futures contract markets . . .'" *FTC v. Roberts*, 276 F.3d at 590. If the *Roberts* reading of CFTC exclusive jurisdiction is applied here, FERC plainly has no jurisdiction. In *Roberts* the Court concluded that CFTC exclusive jurisdiction did not preclude the Federal Trade Commission from investigating (rather than prosecuting) a firm that instructed people in how to trade futures, activity the D.C. Circuit was not at all sure was subject to any CFTC regulatory jurisdiction, let alone exclusive jurisdiction. 276 F.3d at 589. In contrast, as the CFTC's brief shows, it is patently clear that the Defendants' futures trading here falls well within the CEA's exclusive jurisdiction provision.

---

[5]    The FERC's brief asserts that its new manipulation powers, modeled after SEC Rule 10b-5, overcome the word "exclusive" in the CEA's exclusive jurisdiction provision. FERC Br. at 10, 30-36. In 32 years, no court has ever held that the SEC itself could bring an enforcement action under Rule 10b-5 against futures traders solely for futures market manipulation. The SEC has never filed such a case.

D.    The 2005 Energy Act Did Not Repeal CEA Exclusive Jurisdiction.

The CFTC's brief also correctly analyzes the 2005 Energy Act. As FERC's brief explains, its jurisdiction, like that of the CFTC, is transaction-based (FERC Br. at 4). ("NGA grants FERC jurisdiction over 'the sale of natural gas for re-sale.'") In 2005, Congress did not expand the scope of natural gas sales subject to FERC's jurisdiction in any way. The best evidence again is found in the statute itself: FERC's new manipulation authority is expressly limited to misconduct in connection with natural gas sales that already are "subject to the jurisdiction of the Commission." Energy Policy Act of 2005, Pub. L. No. 109-58, § 315 (2005). The absence of any stated change to FERC's transaction-based jurisdiction dispels any possible notion its new authority silently repealed CEA exclusive jurisdiction.

FERC itself is on record agreeing with that statement. At Congress' direction in the 2005 Energy Act, the FERC and CFTC entered into a Memorandum of Understanding (MOU). FERC explicitly recognized "the CFTC has exclusive jurisdiction with respect to . . . transactions involving" natural gas futures contracts, while CFTC recognized FERC's natural gas physical market jurisdiction was "exclusive." FERC and CFTC MOU, Oct. 12, 2005. This agreement shows that contemporaneous with the passage of its new anti-manipulation powers in 2005, FERC did not challenge the scope of CFTC exclusive jurisdiction in any way or suggest that it had been implicitly, partially repealed by Congress.

FERC claims the words "in connection with" in its new manipulation authority excuse it from the CEA's exclusive jurisdiction provision because natural gas physical sales may rely derivatively on futures prices and may result from that small percentage of futures contracts that are not offset, but held to delivery. (FERC Br. at 7-9) FERC cites, however, no evidence that Congress understood those words to override the CEA's provisions. Moreover, if FERC's theory is accepted, it would end CFTC exclusive jurisdiction because other agencies, including

11

the SEC, Treasury Department and Agriculture Department, would have similar claims on futures market jurisdiction.  Congress surely never intended that.

## II.     A Stay Would Serve The Public Interests Underlying CFTC Exclusive Jurisdiction.

If a stay is denied and FERC proceeds with its administrative action, it would imperil the public interests served by the CEA's exclusive jurisdiction provision.  Congress designed exclusive jurisdiction to prevent uncertain and conflicting legal standards, as well as regulatory duplication, from interfering with the smooth functioning of U.S. futures markets in order to allow those markets to serve the public interests in hedging and price dissemination.  7 U.S.C. § 5(a).  FERC's proceeding endangers that congressional objective.

In 1974, Senator Herman Talmadge emphasized: "In establishing this Commission, it is the Committee's intent to give it exclusive jurisdiction over those areas delineated in the act.  This will ensure that the affected entities -- exchanges, traders, customers, et cetera -- will not be subject to conflicting agency rulings."[6]  The FERC itself has read this same history and found that Congress intended the CEA's exclusive jurisdiction provision "to give a single expert agency the responsibility for developing a coherent regulatory program for the commodities industry and to prevent the costs and confusion associated with multiple regulators."[7]  Yet

---

[6]     120 Cong. Rec. 30459 (1974) (Sen. Comm. Chairman Talmadge).  *See also* 120 Cong. Rec. 34736 (1974) (House Committee Chairman Poage explained the Conference Committee adopted the Senate exclusive jurisdiction formulation "in an attempt to avoid unnecessary overlapping and duplicative regulation.")  In 1978, the Senate Committee on Agriculture, Nutrition and Forestry again reported, "The vesting of jurisdiction to regulate commodity futures trading in more than one agency would only lead to costly duplication and possible conflict of regulation or over-regulation."  S. Rep. No. 95-850 at 23 (1978).

[7]     New York Mercantile Exchange, No. EL 95-81-000, 74 FERC ¶ 61311 (1996).  Just last week, the leadership of the House Committee on Agriculture echoed FERC's understanding of this history.  *See* Sept. 27, 200[7] Letter to CFTC Acting Chairman Walt Lukken from U.S. Reps. Peterson, Goodlatte, Etheridge and Moran. ("Congress made this unusual grant of exclusive jurisdiction to end the confusion caused by two separate federal regulators.  This wisdom continues to prove itself.")

FERC's proceeding will lead to just the sort of "costs and confusion" it acknowledged Congress sought to prevent.

The CEA has a well-known, time-tested legal standard for futures price manipulation -- intentional creation of an artificial price. In FERC's proceeding, it will apply a different standard for futures price manipulation, one modeled after SEC Rule 10b-5. Congress long ago realized, however, that securities law concepts should not be exported to futures regulation, concluding it was "erroneous" to view futures and securities regulation as "twins." H.R. Rep. No. 93-975, at 71 (1974). Thus, a futures manipulation standard grounded in securities regulation cannot be further from the result Congress envisioned in 1974.

FERC's manipulation standard would be problematic even if it was not securities law-based as it will result in legal uncertainty or conflict, the worst of the ills for which exclusive jurisdiction was to be the antidote.[8] Neither futures market participants nor self-regulating futures exchanges will know what price manipulation standard applies to their trading or market surveillance. Just that uncertainty alone may cause large and reputable market participants to find other markets or methods by which to manage natural gas price risks. But if FERC adopts, as its brief suggests, a definition of manipulation that would punish unintentional, yet reckless, conduct, the impact on futures trading could be potentially devastating.

In futures markets, even the most innocent futures trader or commonplace trading strategies may have a price impact, depending upon market liquidity and other circumstances. Logically, that would be more true when market participants take larger futures positions, as

---

[8]    Merely duplicative futures regulation will inevitably lead to increased costs for market participants, firms and exchanges. This would be enough to tilt the public interest scales in favor of a stay. Higher trading costs make it more costly to hedge or provide necessary market liquidity. They could also lead to a serious competitive disadvantage for U.S. futures markets.

many businesses do that use futures markets to hedge, for example, the risk of a future change in natural gas prices. If FERC applies an unintentional price manipulation standard to this futures trading (including its now undefined "reckless disregard" standard), legitimate traders engaging in common trading practices may eschew U.S. futures markets for fear of becoming ensnared in an after-the-fact dragnet by FERC, which lacks the CFTC's experience and expertise in futures markets and trading. FERC might even miscite such a trader's positions and conduct as reckless and the cause of a FERC-perceived manipulative price movement in natural gas futures.

The point is that FERC's enforcement of a new futures market manipulation standard will, at best, breed uncertainty, and more likely, legal conflict, into this important economic activity. That uncertainty or conflict may trigger a loss in market liquidity and related hedging opportunities, with dire consequences for U.S. futures markets. 7 U.S.C. § 5(a) (Congress finds national public interest served by liquid, fair and financially secure futures markets).

The problems for self-regulating exchanges are just as profound. NYMEX conducts constant market surveillance to prevent price manipulation of its natural gas futures markets under the CEA. 7 U.S.C. § 7(d)(4). In fact, Congress found that "effective self-regulation" by NYMEX and other exchanges under the CEA "serve[s] the public interests." 7 U.S.C. § 5(b). Technically, NYMEX would be expected to discharge its statutory duty to prevent manipulation under the legal standard defined in the CEA. Are NYMEX and other exchanges also supposed to apply the FERC manipulation standard? The CFTC's brief would say "no," because the CFTC's jurisdiction is exclusive and it is NYMEX's regulator. But FERC's brief and its proceeding cast a cloud on the CFTC's position.

The FERC might answer that NYMEX is supposed to enforce one set of anti-manipulation rules under the CEA, while FERC waits in the wings with admittedly very different

14

standards. It is hard to think of a more confused or uncertain law enforcement scenario where one set of cops on the beat (NYMEX and CFTC) are enforcing one set of traffic laws at the "Futures Square Intersection," while another officer (FERC) enforces a different, yet unknown, set of traffic laws at the same Intersection. Any reasonable driver would avoid that intersection.

The stay motion urges this Court to provide for an orderly, sequential adjudication of these price manipulation cases. Logically, that would avoid the conundrum this Court could face if FERC proceeds first and finds Amaranth not to have intended to manipulate the futures price and not to have recklessly done so either. How could this Court then find that Amaranth intended to attempt to manipulate the futures price? Similarly, if this Court finds that Amaranth *did not* intend to attempt to manipulate the futures price under the CEA, and FERC finds that Amaranth *did* intend to manipulate the futures price, how will that conflict be resolved? And what market impact would be triggered by such legal uncertainty about the law of manipulation?

Granting the stay would allow the CFTC's case against Amaranth to move forward expeditiously. In the interim, FERC could concentrate its resources on other matters. It would also allow the CFTC and FERC to discuss ways to ensure the two agencies do not find themselves again in the situation where the CFTC believes FERC has no jurisdiction, but cannot convince FERC to stand down, even temporarily. This Court's eventual resolution of the merits of this case also could make it unnecessary or impractical for FERC itself to proceed. Thus, an orderly approach may conserve government resources.

The CFTC's posture in this Court is understandably conflicted. On the merits of exclusive jurisdiction, the CFTC knows FERC is wrong. But the CFTC does not want to appear to support a defendant whom it believes engaged in serious misconduct. What the CFTC's brief discounts, however, is that Congress enacted the CEA's grant of exclusive jurisdiction to serve

15

identified public interests, not to protect any agency's territory. Exclusive jurisdiction was designed expressly to allow those, like the Futures Group, who compete in this specialized and complex area of commerce to conduct their legitimate and important business operations with the certainty that they must meet one set of legal standards, established by one regulatory body with experience and expertise in futures trading and markets. Granting the stay would promote that public interest. Denying the stay would not.

## CONCLUSION

For the above stated reasons, the *amici curiae* Futures Group urges this Court to find that defendant Amaranth has a strong likelihood of success on the merits of its argument based on the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)(A) and that the public interest would be well served by granting the requested stay.

Respectfully submitted,

_____

Mark D. Young
**KIRKLAND & ELLIS LLP**
655 15th Street, N.W., Suite 1200
Washington, D.C.  20005
(202) 879-5084

Eric F. Leon
**KIRKLAND & ELLIS LLP**
153 East 53rd Street
New York, New York  10022
(212) 446-4731

*Attorneys for Amici Curiae Futures Group*
*Futures Industry Association, Inc.*
*Managed Funds Association, Inc.*
*New York Mercantile Exchange, Inc.*
*Chicago Mercantile Exchange Group, Inc.*
*International Swaps and Derivatives*
*    Association, Inc.*

16