# EXHIBIT F

| 93D CONGRESS 2d Session } | HOUSE OF REPRESENTATIVES { | REPORT No. 93–975 |
|---|---|---|

# COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

## REPORT

### Together With

### MINORITY VIEWS AND ADDITIONAL MINORITY VIEWS

ON

## H.R. 13113

A BILL TO AMEND THE COMMODITY EXCHANGE ACT TO STRENGTHEN THE REGULATION OF FUTURES TRADING, TO BRING ALL AGRICULTURAL AND OTHER COMMODITIES TRADED ON EXCHANGES UNDER REGULATION, AND FOR OTHER PURPOSES



APRIL 4, 1974.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

30–443

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

Case 1:07-cv-06682-DC    Document 37-3    Filed 10/03/2007    Page 3 of 21

| 93D CONGRESS | } HOUSE OF REPRESENTATIVES { | REPORT |
|---|---|---|
| 2d Session | | No. 93–975 |

# COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

APRIL 4, 1974.—Committed to the Committee of the While House on the State of the Union and ordered to be printed

Mr. POAGE, from the Committee on Agriculture, submitted the following

# REPORT

together with

## MINORITY VIEWS AND ADDITONAL MINORITY VIEWS

[To accompany H.R. 13113]

The Committee on Agriculture to which was referred the bill (H.R. 13113) to amend the Commodity Exchange Act to strengthen the regulation of futures trading, to bring all agricultural and other commodities traded on exchanges under regulation, and for other purposes, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

## PURPOSE OF THE LEGISLATION

H.R. 13113 is major legislation strengthening the federal regulation of the nation's 400 billion dollar commodity futures trading industry. It provides the first complete overhaul of the Commodity Exchange Act since its inception, and proposes a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.

H.R. 13113 is a considered approach toward solving both immediate and readily perceivable problems besetting futures markets, and makes several major changes in the role of the Federal Government in regulating all futures trading enterprises.

H.R. 13113 is the result of a labor by the Committee on Agriculture that began in August 1973, proceeded through two complete sets of Committee hearings, and the formation of a special ad hoc subcommittee for the drafting of a predecessor bill (H.R. 11955). H.R. 13113 is a so-called "clean" bill, embodying the more than fifty changes made by the Committee in H.R. 11955.

The Committee believes that, properly implemented, the bill will provide the basis for a stronger futures industry and a stronger econ-

modity Futures Trading Commission. The Secretary of Agriculture would be the permanent Chairman of the Commission, and all existing CEA employees, property, records and funds would be transferred to the new Commission. Commission budgets would be prepared by the Commission and forwarded to the Secretary of Agriculture for transmittal with the Department's budget requests.

These provisions apparently are intended to combine the advantages of independence in budgeting and staffing while continuing to retain the Department's experience and support for both technical and administrative purposes. The structure of the proposed futures trading authority would appear to be a distinct improvement over that of the present CEA. We believe, however, that an independent agency might be a more appropriate solution.

Our principal reasons for advocating an independent agency follow:

1. A potential conflict of duties and responsibilities might exist if the Commission were located within the Department of Agriculture, and chaired, on a permanent basis, by the Secretary of Agriculture, who is charged by law to influence and maintain the prices of many of the commodities traded in the futures markets. In the past Congress has established independent commissions, such as the Securities and Exchange Commission, Interstate Commerce Commission, and Federal Communications Commission, to perform functions that are primarily regulatory in nature. Presently, the Congress is considering legislation to separate the regulatory function from the research and development activities of the Atomic Energy Commission primarily in order to minimize potential conflicts of duties and responsibilities. With respect to the Commodity Futures Trading Commission, the removal of any appearance of conflict of duties and responsibilities is necessary to instill the fullest public confidence.

2. The extension of Federal regulation to all futures trading would encompass many commodities other than agricultural, such as metals (copper, silver and lead), forestry products (lumber and plywood) and foreign currencies. It is also expected that, in the near future, noncommodities such as ocean freight, residential mortgages and others will be traded in the futures markets. Because the Department of Agriculture has little or no expertise regarding many of these items, it is at least questionable whether the Commission should be placed within the Department.

Because the futures markets play a significant role in the economic well-being of our country, and in order to instill the fullest public confidence, we believe they should be regulated by a strong and prestigious agency that is as free from outside influence as possible. The Securities and Exchange Commission enjoys the reputation of being such an agency and we believe that the futures market is as vital and important as the securities market. In order to achieve a similar reputation and to obtain and retain the high quality personnel necessary, we suggest that the committee consider making the Commissioners full-time employees of an independent agency.

*The Structure of the Commodity Futures Trading Commission (CFTC)*

At the outset there were several suggestions before the Committee as to the structure of the regulatory body that should have oversight over futures trading.

First, there were suggestions to keep the present regulatory body as it was in, and completely under, the jurisdiction of the Department of Agriculture, run by the Secretary of Agriculture and the Commodity Exchange Commission.

The strength of such a proposal was that it found support among the exchanges; it recognized that approximately 90 percent of futures contracts traded on exchanges were agricultural products; that the Department had historical expertise in dealing with commodities futures and the personnel and an existing structure oriented toward regulation. Also, proponents pointed out that the Department itself was showing an increasing willingness to strengthen the CEA within its structure.

The other side of the proposal was the historical weakness of the Commodity Exchange Authority, often finding itself being treated as a stepchild by the Department, the Office of Management and Budget and with little respect as a regulatory body within the industry itself—despite the sincere and well-meaning efforts of its officials. The CEA has failed to move with the times. The number of contracts traded has more than doubled, while the level of employment at the Commodity Exchange Authority had, at the time H.R. 13113 was being conceived, actually declined from its 1971 level. Additionally, the level of employees within the GS systems is inadequate to attract and retain the necessary expertise to supervise such a complicated market structure.

Additionally, under the present Act, there is a great confusion of authority as a result of the division of powers between the largely inactive Commodity Exchange Commission and the Secretary. For example, the CEA Administrator is actually subject to direction from two sources—directly under the CEC and under two tiers of control within the Department itself. Legal staff and Administrative Law Judges are borrowed from the Department.

A second concept presented to the Committee was the creation of a new independent Commission. In addition to the practical difficulties of putting such a concept into effect without tremendous associated costs, and the creation of yet another giant bureaucracy with its demands for increasing space, costly new buildings, and associated demands for an entirely new separate support structure, was the practical difficulty of creating an effective organization de novo. Neither the public nor the industry can afford such a gap in the regulation of this volatile economic force.

Yet, there were significant strengths associated with the Commission concept: independence of budgetary authority, separate legal staff, and the input of public members who could do much to temper the thrust of an agency completely subject to the political winds which fan every Administration.

There was also a proposal advanced briefly to place the regulation of futures trading within the present SEC. The advantage was the

existence of the SEC as an independent regulatory structure. The disadvantages were legend.

Often erroneously viewed as twins, there is little correlation in theory or in fact between the regulation of futures trading and the regulation of securities transactions. Futures trading regulation is essentially a regulation of a marketing device, that is, a contract right which is terminable at a time certain, for mainly agricultural commodities while the SEC regulates the handling of certificates of tangible ownership which are permanent in nature.

Futures, and their handling require highly specialized skills which are normaly obtained expensively in the marketplace. Few universities teach the ins and outs of commodities trading, and those that do usually present it as an adjunct to coursework in agricultural economics. While securities markets attract the small speculator, with a limited exposure to loss, futures speculation is normally limited to the more venturesome and solvent speculator. In fact, many commission merchants discourage small investors, since according to a major board of trade, three out of four first-time investors in commodities suffer a net loss. Additionally, the concepts of margin—which is a guarantee of performance in the futures market as contrasted with an extension of credit by the broker in the securities industry—the actual delivery of commodities in certain limited situations—approximately 3 percent—of all contracts, and the handling of devices such as options are, and should remain, entirely different within the respective spheres of regulation.

The existence of another, more volatile regulatory function within the SEC could create difficulties that could probably never be overcome. No SEC Commissioner is appointed because of expertise in futures trading, and a merger of the staffs of the CEA within the respective organizations would do little more than precipitate a continuing conflict as to the priorities of the Commission with its jurisdiction so confused. The possibility seemed to terrify experts on futures trading who appeared before the full Committee, and who met with the Committee staff on numerous occasions. Neither is it a welcome prospect at the SEC.

In adopting the concept of the Commodities Futures Trading Commission, the bill seeks to build a bridge between the philosophy of regulatory independence and the reality of maintaining the expertise of the Department of Agriculture. The CFTC combines the two concepts—drawing upon the strengths of the existing structure and leaving behind the weaknesses. In doing so, H.R. 13113 gives the CFTC independence in policy budgetary authority, staff, including legal staff, Administrative Law Judges and the additional guarantees provided by the bipartisan composition of the public members. Personnel and policy are the strengths of the independent Commission concept. From the existing regulatory body the CFTC will be able to retain experience, cohesiveness of purpose, and limited administrative support for both technical and administrative purposes. Additionally, with an administration official as a member of the Commission, the Commission will be continually connected to the policies of the Government, which so strongly affect the reactions of the market. For example, if an emergency embargo on all commodity exports were

decided by the administration to be necessary, the Commission would have a headstart in promulgating emergency policies to meet any crisis created through such an action, hopefully, even before the markets had reacted. Additionally, because of the committee's decision to keep the Commission responsible for cash market manipulations, it will have closer ties to the Department most responsible for those cash transactions regulated.

Open markup sessions were held on H.R. 13113 during the month of February, on the 6th, 7th, 13th, 14th, 15th and 27th, with final consideration of the bill by the Committee on March 6, 1974. The Committee voted to instruct the Chairman to introduce a bill incorporating the more than 50 amendments to H.R. 11955 adopted by the Committee during markup. This bill, H.R. 13113, was introduced on February 27, referred to the Committee, and subsequently reported by a record vote of 24 ayes to 8 voting no. A quorum was present and voting.

## DEPARTMENTAL POSITION

The Department of Agriculture appeared before the Committee on January 23, 1974, generally in support of the legislation. Assistant Secretary Yeutter presented the Department's views. His statement, taken from the Committee transcript, follows:

STATEMENT OF DR. CLAYTON YEUTTER, ASSISTANT SECRETARY OF AGRICULTURE, ACCOMPANIED BY ALEX CALDWELL, ADMINISTRATOR, CEA AND HAROLD CARTER, OFFICE OF GENERAL COUNSEL

Dr. YEUTTER. Thank you, Mr. Chairman. I appreciate those remarks.

I want to join in those accolades, because our staff has enjoyed the relationship it has had, both with the Subcommittee and Mr. Stubblefield and the members of that Subcommittee and with John O'Neal and John Rainbolt. It seems to me, Mr. Chairman, that this group of people has done the finest job of legislative draftsmanship on a very complicated subject that any of us has seen in the agriculture area in a long time. They are really to be complimented. As you know, this is one of the most complex subject matter areas that any one of us can deal with. It is not easy to draft legislation in this area. Yet it is extremely important. I suppose few people recognize how truly important this legislation is.

Mr. Chairman, you are to be complimented on your leadership, too, because this might well be one of the most important pieces of legislation that has come out of the Committee on Agriculture in a long, long time. So it does merit everyone's attention.

Now, turning to the statement, I would like to add preliminarily that like Mr. Smith, there will be some critical comments in this testimony, but this should not detract from our general impressions of this legislation, because as I said, we are very pleased with the substance of this legislation, and though that may not be indicated by the fact that I am concentrating the testimony on what we feel to be some of the shortcomings, I would like to emphasize that we feel that basically, this is a very fine piece of legislation.

| 93D CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| 2d Session | | No. 93–1383 |

# COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

SEPTEMBER 27, 1974.—Ordered to be printed

Mr. POAGE, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany H.R. 13113]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 13113) to amend the Commodity Exchange Act to strengthen the regulation of futures trading, to bring all agricultural and other commodities traded on exchanges under regulation, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment insert the following:

*That this Act may be cited as the "Commodity Futures Trading Commission Act of 1974".*

## TITLE I— COMMODITY FUTURES TRADING COMMISSION

*SEC. 101. (a) Section 2(a) of the Commodity Exchange Act, as amended (7 U.S.C. 2, 4), is amended—*

*(1) By inserting "(1)" after the subsection designation.*

*(2) By striking the last sentence of section 2(a) and inserting in lieu thereof the following new sentence: "The words 'the Commission' shall mean the Commodity Futures Trading Commission established under paragraph (2) of this subsection."*

*(3) By adding at the end thereof the following new paragraphs:*

*"(2) There is hereby established, as an independent agency of the United States Government, a Commodity Futures Trading Commis-*

(1)

38-006

35

Under section 6(b) of the Act, the findings of the Commission, as to the facts, would, if supported by the weight of the evidence, be conclusive. The *Conference* substitute retains the *Senate* provision that the period of time for a person to comply with or appeal a reparations order entered against him is 15 days.

*(3) Antitrust laws.*

Under the *House* bill, the Commission—in issuing any order, rule, or regulation or in requiring or approving any bylaw, rule, or regulation of a contract market—is to take into consideration the public interest to be protected by the antitrust laws.

The *Senate* amendment retains this provision, and, in addition, requires the Commission to endeavor to take the least anticompetitive means of achieving the objectives of the Commodity Exchange Act.

The *Conference* substitute adopts the *Senate* amendment with only a technical change. However, the requirement that the Commission endeavor to take the least anticompetitive means of achieving the objectives of the Commodity Exchange Act is not intended to constitute any procedural roadblock to the Commission in regulating the futures trading industry, and separate proceedings to consider antitrust and anticompetitive matters are not required by the Commission in issuing any order, adopting any Commission rule or regulation, or in requiring or approving any bylaw, rule, or regulation of a contract market.

*(4) Jurisdiction of the Commission.*

The *House* bill provides for exclusive jurisdiction of the Commission over all futures transactions. However, it is provided that such exclusive jurisdiction would not supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities.

The *Senate* amendment retains the provision of the *House* bill but adds three clarifying amendments. The clarifying amendments make clear that (a) the Commission's jurisdiction over futures contract markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity options; (b) the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies; and (c) Federal and State courts retain their respective jurisdictions.

In addition, the *Senate* amendment provides that interbank trading of foreign currencies and specified financial instruments is not subject to Commission regulation.

Also, the *Senate* amendment provides that the Commission's authority in section 217 of the bill to regulate transactions for the delivery of silver bullion, gold bullion, or bulk silver coins or bulk gold coins pursuant to standardized margin or leverage contracts is exclusive.

The *Conference* substitute adopts the *Senate* amendment, including the provision in section 402(d) of the bill which strikes the last sentence of section 4c of the Commodity Exchange Act. The language being struck provides that "Nothing in this section [section 4c] or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections."

Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive State law regu-

Calendar No. 1080

| 93D CONGRESS<br>2d Session } | SENATE | { REPORT<br>No. 93–1131 |
|---|---|---|

# COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

## REPORT

ON

### H.R. 13113

A BILL TO AMEND THE COMMODITY EXCHANGE ACT TO STRENGTHEN THE REGULATION OF FUTURES TRADING, TO BRING ALL AGRICULTURAL AND OTHER COMMODITIES TRADED ON EXCHANGES UNDER REGULATION, AND FOR OTHER PURPOSES



AUGUST 29, 1974.—Ordered to be printed
Filed under authority of the order of the Senate of August 22, 1974

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

38–643

## II.

While the futures markets in a number of agricultural commodities have been regulated in varying degrees since 1922, many large and important futures markets are completely unregulated by the Federal Government. These include such agricultural and forest commodities as coffee, sugar, cocoa, lumber, and plywood, plus various metals, including the highly sensitive silver market and markets in a number of foreign currencies. A person trading in one of the currently unregulated futures markets should receive the same protection afforded to those trading in the regulated markets. Whether a commodity is grown or mined, or whether it is produced in the United States or outside, makes little difference to those in this country who buy, sell, and process the commodity, or to the U.S. consumers whose prices are affected by the futures market in that commodity. There are indications that futures markets will be further expanded to cover additional goods and services. Discussions are already underway concerning futures markets in such things as home mortgages and ocean freight.

It is apparent that a regulatory agency cannot be expected to oversee the rapidly expanding and complex futures markets without additional tools with which to do the job and proper organization and funding. In addition to providing the tools that the regulatory body would need in preventing violations and disciplining violators directly, its role in supervising exchanges must be substantially expanded. Unquestionably, exchanges are going to have to perform their regulatory role better in order to provide a viable market in which the public can have confidence. The Federal regulatory agency must be given the authority to require that exchanges do so.

The value of futures trading has reached $500 billion annually, substantially exceeding the value of securities trading on the various stock exchanges in this country. The importance of futures trading to the general public and to the Nation equals the importance of the securities markets. It is, therefore, time to establish a regulatory authority in the commodity field similar to the Securities and Exchange Commission and to give that authority a strong law which will enable it to regulate both agricultural and nonagricultural goods and services in the public interest.

## III.

The appendices to this report contain information showing (1) the size of the commodity futures business in 1973, (2) the commodities which are presently regulated under the Commodity Exchange Act, (3) the commodities currently being traded which are not regulated under the Commodity Exchange Act, (4) the commodity futures contracts traded during the period 1969–73, (5) the names and addresses of the commodity exchanges, (6) speculative limits on positions and daily trading, (7) the quantities of commodities requiring that traders file reports with the Commodity Exchange Authority, (8) examples of typical exchange limits on daily price fluctuations, and (9) a glossary of terms used in commodity futures trading.

Appendix X contains a summary of the provisions of the present Commodity Exchange Act.

22

regulation could not be accomplished by Commissioners working on a part-time basis.

Moreover, members of the Committee expressed some dissatisfaction with agencies which are dominated and run by staff members who are not appointed by the President and subject to Senate confirmation. They felt that such a regulatory agency is often unresponsive to either Congress or to the needs of the people. It noted that in all probability a part-time commission would really be a staff-dominated commission.

In the Committee hearings, as well as the informal sessions that members had with both the commodity exchanges and the users of these exchanges, there was great concern expressed about the type of persons who would serve on the Commission. Many segments of the industry, particularly those who are now non-regulated, expressed strong concern that the Commission include members with expertise in the so-called "world commodities."

The Committee itself was quite concerned about the type of individual who would serve on the Commission. The Committee felt that it would be impossible to get the best qualified and most knowledgeable individuals to serve on the Commission on a part-time basis, for most of these individuals would have a conflict of interests. It felt that people who use the market to hedge, or people who speculate in the market, or other knowledgeable individuals who are involved in the market in one way or another, would be reluctant to give up all involvement in the market for a part-time job.

By establishing a full-time prestigious commission, the Committee felt that it would induce the best and most knowledgeable people to serve.

The Committee does not want a commission that is dominated by any particular interest group. It wants a commission that has broad knowledge of all aspects of the industry to be regulated, as well as a commission that is responsive to the needs of farmers and the needs of consumers. Therefore, the Committee adopted an amendment which requires the President, in making appointments, to seek to establish a balanced commission that would include, but not be limited to, persons of demonstrated knowledge in futures trading and its regulation and persons of demonstrated knowledge in the production, merchandising, processing or distribution of commodities or other goods and services. The Committee wishes to emphasize that the Commissioners are to have a broad range of knowledge.

## Relationship of the Commission to antitrust laws (Sec. 107)

During the hearings, the Committee received testimony from the Department of Justice regarding the relationship of the new Commodity Futures Trading Commission to the antitrust laws. The Department of Justice did not like the language of the House bill which merely required the Commission to take into consideration the public interest to be protected by the antitrust laws as well as the policies and purposes of the Act. The Department of Justice objected to this language stating, "We believe, however, that the language of Section 106 is not sufficiently precise to guard against anticompetitive agency action. A requirement merely to 'take into consideration' antitrust

and status to the Securities and Exchange Commission or whether it should be a quasi-independent, part-time Commission as provided for in the House bill. The Committee received a great deal of testimony on this issue during the hearings and Committee members asked many of the witnesses very direct questions on this point. The overwhelming weight of the testimony was in favor of the full-time, independent Commission, particularly when the Committee members asked the witnesses who testified for their own personal views. In some cases, the organization for which the witness was testifying had no position on this point, but the witness' own personal view was that the Commission should be full-time and independent. Although some witnesses did want the Commission to retain some ties to the Department of Agriculture and a few questioned the need for a full-time commission, only the USDA witness strongly opposed a full-time Commission.

The Committee felt that the weight of the testimony was correct on this issue. Some members felt that there was an inherent conflict between the role and mission of the Department of Agriculture and the regulation of commodity futures trading. Since the enactment of the Agricultural Adjustment Act of 1933, as a result of the great depression, it has been the duty of the Department of Agriculture to provide price and income protection for farmers.

The USDA role in providing price and income protection for farmers has grown through the years, and the need for assistance to the Nation's farmers is as great in this day of skyrocketing costs of farm production and extreme fluctuations in commodity prices as it was in the depression years of the 1930's.

However, the Committee felt that it is not the function and the role of the commodity markets to have an impact one way or the other on farm prices. The proper regulatory function of an agency which regulates futures trading is to assure that the market is free of manipulation and other practices which prevent the market from being a true reflection of supply and demand. Therefore, the agency which regulates futures trading must have a neutral role on commodity prices. The Committee felt this neutral role can best be maintained by a completely independent agency. Moreover, while in the past the Commodity Exchange Authority of the USDA has been authorized to regulate only certain agricultural commodities that are produced in the United States, the Committee felt that agricultural products not produced in this country and commodities such as silver and copper, which have no relation to agriculture, could not be effectively regulated within the Department of Agriculture or an agency dominated by the Department of Agriculture.

The Committee noted that the estimated value of commodities traded in 1973 was over $520 billion, over twice the volume of trading in all securities in the United States. It felt that the importance of futures trading to the economy of this country warranted a full-time, independent commission. Because this Commission would have to regulate futures trading in a wide diversity of commodities ranging from precious metals to agricultural commodities, and because the Commission would need to bring under regulation those exchanges which are now non-regulated, the Committee felt that effective

policy might result in agency imposition or approval of an anticompetitive rule which was not necessary to achieve a valid regulatory objective." The Department of Justice suggested in lieu of this language a requirement that the Commission insure that its action represent the least anticompetitive means of achieving the objectives of the Act.

The Committee did not want to encourage excessive litigation to test the decisions of the Commission to determine whether they represented the least anticompetitive means of achieving the objectives of the Act. It did not want to make the antitrust laws more restrictive in the commodities industry than they are in the securities industry.

However, the Committee did not want to exempt the futures industry from the antitrust laws and it did not wish to encourage the Commodity Futures Trading Commission to restrict competition and ignore the public policies protected by the antitrust laws. Therefore, the Committee amendment would retain the requirement in the House bill that the Commission take into consideration the public interest to be protected by the antitrust laws and it would go one step further by requiring that the Commission endeavor to take the least anticompetitive means of achieving the objectives of the Act.

*Exclusive jurisdiction over futures trading (Sec. 201)*

While the Committee did wish the jurisdiction of the Commodity Futures Trading Commission to be exclusive with regard to the trading of futures on organized contract markets, it did not wish to infringe on the jurisdiction of the Securities and Exchange Commission or other government agencies. Therefore, the Committee adopted clarifying amendments to the House bill. The Committee wished to make clear that where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies. The Commitee also wished to make clear that nothing in the Act should be construed as superseding or limiting jurisdiction of Federal and State courts.

Also, the Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange. A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers. The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary.

Likewise, the Committee believes that regulation by the Commission of transactions in the specified financial instruments (i.e., security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, mortgages and mortgage purchase commitments), which generally are between banks and other sophisticated institutional participants, is unnecessary, unless executed on a formally organized futures exchange.

*Exemption of world commodities (Sec. 201)*

During the hearings, the Committee received testimony regarding the exemption from regulation of the so-called "world commodities". The overwhelming weight of the testimony favored the regulation of

Case 1:07-cv-06682-DC   Document 37-3   Filed 10/03/2007   Page 15 of 21

The Clerk read the concurrent resolution as follows:

H. CON. RES. 661

*Resolved by the House of Representatives (the Senate concurring),* That in the enrollment of the amendment to the text of the bill (S. 1769) to reduce the burden on interstate commerce caused by avoidable fires and fire losses, and for other purposes, the Secretary of the Senate is authorized and directed in the enrollment of the said bill to make the following correction, namely, in section 16(a) (2) (G) of the Act of March 3, 1901 as added by section 18 strike out "of such stress, and the alleviation and reduction of such conditions" and insert in lieu thereof "of fire as have significance for purposes of control or prevention of fires".

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

The concurrent resolution was agreed to.

A motion to reconsider was laid on the table.

## CONFERENCE REPORT ON H.R. 13113, COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

Mr. POAGE. Mr. Speaker, I call up the conference report on the bill (H.R. 13113) to amend the Commodity Exchange Act to strengthen the regulation of futures trading, to bring all agricultural and other commodities traded on exchanges under regulation, and for other purposes, and ask unanimous consent that the statement of the managers be read in lieu of the report.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

The Clerk read the statement.

(For conference report and statement, see proceedings of the House of September 27, 1974.)

Mr. POAGE. Mr. Speaker, I am happy today to call up the conference report on H.R. 13113, "The Commodity Futures Trading Commission Act of 1974." The purpose of the bill is to provide a comprehensive system of regulation of all futures trading under the aegis of one regulatory body—the Commodity Futures Trading Commission—established by the act.

The bill itself was born over 1 year ago in the Committee on Agriculture.

During the August recess of 1973, the committee staff began a review of the existing act, studies of problems of the regulation of the industry and their possible solution. On the return of the Congress, the chairman and several members of the committee met informally with small separate groups of Commodity Exchange Authority officials, heads of regulated boards of trade, and users of the futures market. Without exception, these groups indicated dissatisfaction with the present law regulating futures trading.

After orientation meetings for members of the full committee, hearings were set on a series of concepts taking the form of amendments to the present

Act. No actual language was before the witnesses or the Committee in order to provide an atmosphere of completely free discussion.

These hearings continued into a following week with testimony from a broad spectrum of witnesses. As a result of these hearings, the committee directed that a special ad hoc subcommittee be formed, to formulate actual legislation. In a series of informal sessions over a period of several weeks, the subcommittee, chaired by the gentleman from Kentucky (Mr. STUBBLEFIELD) formulated and refined legislation. During the same period, the members of the subcommittee officially traveled to Chicago to view the floor operations on the Chicago Board of Trade and the Mercantile Exchange, and met also with Department and CEA officials.

H.R. 11955, introduced on December 13 by the chairman on behalf of all members of the ad hoc subcommittee, was the product of those efforts.

H.R. 11955 had five titles, amending the Commodity Exchange Act as follows: Title I created a new Commodity Futures Trading Commission to regulate the trading of futures. Title II made certain major and minor changes in activities allowed under the present Act, and moved to generally strengthen the authority for regulation of the exchanges and persons registered under the act. Title II created a new Federal Commodity Account Insurance Corporation to provide protection to smaller investors against the financial failure of the brokerage house servicing their commodity account. Title IV contained enabling authority for the creation of National Futures Association(s), and title V contained several sections implementing programs contained in earlier titles, and providing necessary changes in the act to provide for the new authority to regulate futures not covered under the present act.

Time was again set aside for hearings before the full committee on January 23, 24, 29, 30, and 31. During the course of the hearings governmental and public witnesses again appeared before the committee, this time directing their comments to specific bills before the committee, principal of which was H.R. 11955.

Open markup sessions were held on H.R. 13113 during the month of February, on the 6th, 7th, 13th, 14th, 15th, and 27th, with final consideration of the bill by the committee on March 6, 1974. The committee voted to instruct the chairman to introduce a bill incorporating the more than 50 amendments to H.R. 11955 adopted by the committee during markup. This bill, H.R. 13113, was introduced on February 27, referred to the committee, and subsequently reported by a record vote of 24 ayes to 3 voting no.

Subsequently, the bill was adopted by the House on April 11. Senate hearings before the Committee on Agriculture and Forestry were completed May 22, and the legislation reported from that committee in August was adopted September 9. The conferees reached agreement after 2 days of negotiations. The conference report is the product of those negotiations and

was signed by all conferees of both bodies.

Mr. Speaker, I will not burden the Members with all of the details of the legislation. The bill is comprehensive. H.R. 13113 is major legislation strengthening the Federal regulation of the Nation's $500-billion commodity futures trading industry. It provides the first complete overhaul of the Commodity Exchange Act since its inception, and creates a comprehensive regulatory structure to oversee the trading of futures. The bill is a considered approach toward solving both immediate and readily perceivable problems besetting futures markets and the public interest, and makes several major changes in the role of the Federal Government in regulating all futures trading enterprises.

The conference version of the bill consists of four titles. Title I creates a new independent commission—to be known as the Commodity Futures Trading Commission—to replace the present weak regulatory structure within the Department of Agriculture. The Commission will consist of five members, not more than three of whom shall be members of any one political party. The members will be appointed to serve staggered terms. One of the members will be nominated by the President to serve as Chairman of the Commission.

Title II spells out the increased jurisdiction of the Commission, and provides broad new regulatory powers to the CFTC. The provision relating to jurisdiction of the Commission—section 201—is extensive and complete relative to the trading of futures.

One of the most difficult issues to be resolved in the Commodity Futures Trading Commission Act was the jurisdiction of the new Commission. Both the House Committee on Agriculture and the Senate Committee on Agriculture and Forestry sought to avoid the usurpation by the new Commission of the jurisdiction of the Securities and Exchange Commission and other Federal agencies. It was the intent of the committees to fill all regulatory gaps—to regulate trading in futures and in options relating to commodities or commodity futures, because such trading is now poorly regulated, if it is regulated at all. As passed by the House, H.R. 13113 made clear that nothing in the Act would supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities. The Senate refined this language in an attempt to avoid unnecessary overlapping and duplicative regulation.

I understand that there is some concern that in effectuating the intent to fill regulatory gaps, the Conference substitute appears to have an unintended impact on the jurisdiction of the Securities and Exchange Commission.

This misconception apparently has arisen because of certain provisions in section 201 of the bill, in particular the revised definition of commodities, the limited grant of exclusive jurisdiction to the Commodity Futures Trading Commission, and the reference to trading in futures contracts and options, not only on designated contract markets, but also

on "any other board of trade, exchange or market." I wish to emphasize that the words "any other board of trade, exchange or market" were included in the conference substitute only for the purpose of giving the Commodity Futures Trading Commission jurisdiction over futures contracts purchased and sold in the United States and executed on a foreign board of trade, exchange or market. This grant of exclusive jurisdiction is not to be construed as preempting the jurisdiction of the Securities and Exchange Commission over securities, including stock options, traded on any national securities exchange or any other U.S. securities market.

With respect to the definition of commodities, it was intended to apply to a broader class of goods, articles, rights and interests than previously were subject to the Commodity Exchange Act. It was not intended, however, to apply to trading in interests and rights traditionally known as securities, including, for example, stocks, corporate bonds, warrants, and debentures, nor was it intended to apply to trading in options to purchase any of the foregoing. However, the last sentence of subsection (b) of section 201 of the bill helps to clarify that the intent of the conferees was to subject all trading in futures contracts on a "contract market" designated pursuant to section 5 of the act, to the jurisdiction of the CFTC.

I further understand, however, that the Securities and Exchange Commission has jurisdiction over other types of securities, including investment contracts, and that the term investment contract includes a broad category of arrangements and contracts relating to investments. In this area, there may be some apparent overlap between the jurisdiction of the Securities and Exchange Commission and the intended jurisdiction of the Commodity Futures Trading Commission over trading in futures contracts relating, or purporting to relate, to tangible commodities. It was not intended that the jurisdiction of the Securities and Exchange Commission with respect to investment contracts be superseded, except to the extent that jurisdiction is granted to the CFTC with respect to contracts for future delivery or options relating, or purporting to relate, to tangible commodities, or which are effected on a contract market designated pursuant to section 5 of the act. As a result, the act is designed to supplement the present framework of regulation and to operate in conjunction with existing statutes; it is not intended to create any regulatory gaps.

In addition, the conferees wished to make clear that nothing in the act would supersede or limit the jurisdiction presently conferred on courts of the United States or any State. This act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the CFTC. Congress was aware that there have been ongoing efforts by various State and Federal regulators to prevent some of these abuses. Accordingly, section 412 was included in the bill to make clear that all pending proceedings, including ongoing investigations, as well as court proceedings, should continue unabated by any provision of the act. This also is necessary in order to prevent the creation of any regulatory gaps, particularly during the time between the adoption of this legislation and the full implementation of its provisions by the CFTC. During the course of our deliberations, we learned, for example, that the SEC has a number of such matters currently under investigation. We would expect that those investigations will continue and any proceedings resulting therefrom will not be affected by the passage of this act.

To the extent that the language of subsection (b) subjects rights and interests or transactions involving rights and interests to the concurrent jurisdiction of the new Commodity Futures Trading Commission and the Securities and Exchange Commission, the conferees intended that the two Commissions would consult and cooperate in determining what approaches to the exercise of their respective jurisdictions will best serve the public interest.

Title III of the bill provides enabling authority for persons registered under the act and in the commodity trading business to establish voluntary futures association for regulating the practices of its members. Such authority could only be exercised if approved by the Commission, and only if the association has met the requirements of title III.

Title IV makes a number of important technical and conforming changes in present law designed to enhance the ability and authority of the Commission to meet the mandate of the strengthened Act, as well as to make other necessary changes in existing law.

In order that it might be more clear as to the changes in existing law contemplated by the bill, I insert in the RECORD at this point the following, showing the amendments to present law present in the conference bill:

SEC. 2. (a)(1) For the purposes of this Act, "contract of sale" shall be held to include sales, agreements of sale and agreements to sell. The word "person" shall be construed to import the plural or singular, and shall include individuals, associations, partnerships, corporations, and trusts. The word "commodity" shall mean wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, [onions,] Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, *and all other goods and articles, except onions as provided in Public Law 85–839, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in: Provided, That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market,* and transactions subject to regulations of the Commission pursuant to section 217 of the Commodity Futures Trading Commission Act of 1974: *and provided further, That, except as hereinabove provided, nothing contained in this section shall* (i) supersede or limit the jurisdiction at any time conferred on the Securites and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securites and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State. Nothing in this Act shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade.

The words "board of trade" shall be held to include and mean any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling any commodity or receiving the same for sale on consignment. The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.. The words "interstate commerce" shall be construed to mean commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof, or within any Territory or possession, or the District of Columbia. The words "cooperative association of producers" shall mean any cooperative association, corporate or otherwise, not less than 75 per centum in good faith owned or controlled, directly or indirectly, by producers of agricultural products and otherwise complying with an Act of Congress of February 18, 1922 (U.S.C. 1934 ed., title 7, secs. 291 and 292), as now or hereafter amended, including any organization acting for a group of such associations and owned or controlled by such associations, provided that business done for or with the United States of America, or any agency thereof, shall not be considered either member or nonmember business in determining the compliance of any such association with said Act of Congress of February 18, 1922. The words "member of a contract market" shall mean and include individuals, associations, partnerships, corporations, and trusts owning or holding membership in, or admitted to membership representation on, a contract market or given members' trading privileges thereon. The words "futures commission merchant" shall mean and include individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom. The words "floor broker" shall mean any person who, in or surrounding any "pit", "ring", "post", or other place provided by a contract market for the meeting of persons similarly engaged, shall purchase or sell for any other

## COMMODITY FUTURES TRADING COMMISSION ACT OF 1974

The PRESIDING OFFICER. Under the previous order, the Senate will now proceed to the consideration of H.R. 13113, which the clerk will report.

The second assistant legislative clerk read as follows:

A bill (H.R. 13113) to amend the Commodity Exchange Act to strengthen the regulation of futures trading, to bring all agricultural and other commodities traded on exchanges under regulation, and for other purposes.

The Senate resumed the consideration of the bill.

The PRESIDING OFFICER. Time for debate on this bill shall be limited to 2 hours to be equally divided and controlled by the Senator from Vermont (Mr. AIKEN) or his designee and the Senator from Georgia (Mr. TALMADGE), with 1 hour on any amendment, 30 minutes on any amendment to an amendment, and 10 minutes on any debatable motion or appeal.

Who yields time?

Mr. CURTIS. Mr. President, will the Senator yield?

Mr. TALMADGE. I yield to the distinguished Senator.

Mr. CURTIS. Mr. President, I ask unanimous consent that the time allotted to the distinguished Senator from Vermont be granted to the junior Senator from Nebraska.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. TALMADGE. Mr. President, I ask unanimous consent that the following members of the staff of the Committee on Agriculture and Forestry be granted the privilege of the floor during the consideration of H.R. 13113: Michael R. McLeod, Carl P. Rose, Henry J. Casso, Forest Reece, William Taggart, and James E. Thornton.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. TALMADGE. Mr. President, H.R. 13113 makes extensive changes in the Commodity Exchange Act, brings under Federal regulation all agricultural and other commodities, goods, and services traded on exchanges, and otherwise strengthens the regulation of the Nation's $500 billion commodity futures trading industry.

The bill is designed to further the fundamental purpose of the Commodity Exchange Act in insuring fair practice and honest dealing on the commodity exchanges and providing a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, consumers, and the exchanges themselves.

Mr. President, one of the earliest signals of the current economic troubles was evident in the commodity futures markets. Unexpectedly, large export sales, very tight stock positions, and continued uncertainties due to weather all contributed to major surges in commodity prices.

The most dramatic price swings were in the futures markets. At the same time, the volume of futures trading has increased enormously. The expanded ac-

tivity of futures trading and especially the persistent price increases have caused a wide-felt concern that market abuse and manipulation of prices were occurring.

In response to the apparent problem, several bills were introduced in both the House and Senate. The House, after extensive hearings, passed H.R. 13113, which was referred to the Committee on Agriculture and Forestry, as were several Senate bills.

The Committee on Agriculture and Forestry during consideration of these proposed bills held extensive hearings. In total, over 75 firms, associations, government agencies and other interested parties appeared before the committee or submitted testimony for the record.

The most evident fact in both the evidence presented to the House and in our hearings was the inadequacy of the currently regulatory machinery, established by the Commodity Exchange Act, to cope with the changing nature of futures markets.

Briefly, the development of futures markets—which took shape between 1850 and 1900—was a natural development to meet producers' needs for stable markets as well as commodity users' need to assure supplies in the future. These markets also enable widely separated buyers and sellers to "hedge" and carry on market operations without meeting face to face. They also allow the shifting of risk to third parties through speculation.

Legislative focus during the formative years was mostly on prohibiting futures trading, but during the early part of this century the focus switched from prohibiting futures trading to regulation of futures trading.

The Futures Trading Act of 1921, based on the taxing power of the Constitution, was the first regulatory effort, but this law was ruled unconstitutional. The same legislation was reintroduced in 1922 as the Grain Futures Act, but it was based on the commerce clause of the Constitution and was upheld.

The Grain Futures Act proved inadequate, but it did provide the basis for investigations by USDA, which subsequently submitted legislative recommendations beginning in 1927. After extensive hearings in the 1934-36 period, the legislation was renamed the Commodity Exchange Act in 1936, and broader coverage and authority were included in the act.

Between 1936 and 1968, the Commodity Exchange Act was amended repeatedly to meet the changing conditions and needs of the market. But these many amendments have not changed the basic form of commodity futures regulations, and the flexibility and general capability to regulate are limited by the law. Specifically, a large number of commodities are exempted from regulation. While the current act has served us well, it is clear that it was written for a much simpler economy and at a time of significantly lower trading volumes.

During the past fiscal year alone, the value of contracts traded on the regulated exchanges jumped 28 percent to

over $341 billion. This represents a five-fold increase in just 5 years.

In addition, the value of futures contracts of nonregulated commodities traded in 1973 exceeded $150 billion. This makes the total commodity futures industry a $500 billion a year business—something quite different from what was envisioned when the act was drafted.

It is clear that the existing Commodity Exchange Act was not designed to handle the volume or complexity of today's market. The overwhelming weight of the testimony in 2 weeks of hearings before the Committee on Agriculture and Forestry was in favor of major revisions of the act as well as in the Commission's role and composition.

Several fundamental changes seem imperative to assure the Commission's basic purpose of insuring fair practices and honesty on the exchanges; controlling speculative activities that periodically demoralize markets, represent potential injury to producers, processors, consumers and ultimately the exchanges themselves; and efficiently providing the economic services so necessary to our economy.

The most basic question considered was what type of Commission would be best and what its relationship to other Government agencies should be. The overwhelming weight of the testimony favored a full-time and independent Commission. The size of futures markets, the importance of futures trading to our overall economy, and the need for neutrality all require an independent full-time Commission free of any potential conflicts of interest.

A part-time Commission would lack the prestige needed to carry out effectively their responsibilities. It would be difficult if not impossible to attract the quality of people needed for this Commission on a part-time basis, and the decisions of a part-time Commission could easily become staff-dominated, negating the importance of the Commissioners.

A clear possibility of conflict of responsibilities exists if the Commission continued as a part of the Department of Agriculture. The Department of Agriculture has a duty under the law to provide price and income protection to farmers thus affecting commodity prices. And for the same reason, it is clear the Commission needs its own legal staff and the authority to go directly to the courts. Finally, the expansion of Commission regulatory authority to the currently nonregulated commodities dilutes the appropriateness of continued direct affiliation with the Department of Agriculture.

To achieve its objectives, the Commission must have the authority to review and modify rules, regulations, and by-laws of exchanges. It must also be able to set uniform fitness standards for all persons engaged in futures trading activities and to accomplish the regulatory function. The Commission must have an adequate and appropriate array of administrative and criminal penalties. Only through these measures can the integrity and adequacy of futures markets be assured to all parties.

Case 1:07-cv-06682-DC    Document 37-3    Filed 10/03/2007    Page 18 of 21

In establishing this Commission, it is the committee's intent to give it exclusive jurisdiction over those areas delineated in the act. This will assure that the affected entities—exchanges, traders, customers, et cetera—will not be subject to conflicting agency rulings. However, it is not the intent of the committee to exempt persons in the futures trading industry from existing laws or regulations such as the antitrust laws, nor for the Commodity Futures Trading Commission to usurp powers of other regulatory bodies such as those of the Federal Reserve in the area of banking or the Securities and Exchange Commission in the field of securities.

The vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way. It is hoped that giving the Commission this authority will somewhat lighten the burden upon the courts, but the entire appeal process and the right of final determination by the courts are expressly preserved.

The question of extending regulation to the unregulated exchanges and commodities received extensive consideration. The conclusion reached by the committee was that it is unthinkable to recognize the need for closer regulation in one sector of futures trading while totally exempting another. Whether a commodity is grown or mined, or whether it is produced in the United States or outside, makes little difference to those in this country who buy, sell, and process the commodity, or to the U.S. consumers whose prices are affected by the futures market in that commodity.

A person trading in one of the currently unregulated commodities should receive the same protection afforded to those who trade in the regulated markets. Moreover, this conclusion was supported by the great weight of the testimony, including testimony for exchanges which deal in both regulated and unregulated commodities. The committee did, however, recognize that the "world commodities" represent some special problems and has given the Commission the flexibility to distinguish between different commodities.

Mr. President, at this point I ask unanimous consent to have printed in the RECORD two sections of the committee report: a summary of the major provisions of H.R. 13113, and the text of the committee consideration of H.R. 13113.

There being no objection, the summary and text were ordered to be printed in the RECORD, as follows:

SUMMARY OF MAJOR PROVISIONS OF H.R. 13113, AS AMENDED BY THE COMMITTEE

The bill, as amended by the Committee, consists of three titles.

### TITLE I

Title I creates an independent regulatory commission called the Commodity Futures Trading Commission consisting of a Chairman and four other Commissioners. The Commissioners will be appointed by the President, by and with the advice and consent of the Senate. In nominating persons for appointment, the President is to seek to estab-

lish and maintain a balanced Commission that will include persons of demonstrated knowledge.

Not more than three of the members of the Commission shall be members of the same political party. The Commissioners shall be appointed for staggered five-year terms. With certain exceptions, the executive and administrative functions of the Commission shall be exercised by the Chairman. The Chairman is to be compensated at Executive Level III. The other Commissioners are to be compensated at Executive Level IV.

The Commission will have a General Counsel and an Executive Director to be appointed by the President, by and with the advice and consent of the Senate. They are to be compensated at Executive Level V.

All existing authority under the Commodity Exchange Act which is presently vested in the Secretary of Agriculture and the Commodity Exchange Commission will be transferred to the new Commission. All existing personnel of the Commodity Exchange Authority will be transferred to the new Commission.

A customers' reparation procedure before the new Commission is authorized for handling customers' complaints which arise from violations of the Act. A reparation by the Commission is subject to judicial review. However, the Commission's findings of fact and order are reviewable only for determining in such findings and order are supported by substantial evidence. The procedure will not become effective until one year after the date of enactment of the bill. However, claims arising within nine months immediately before such effective date could be heard by the Commission after the one-year period.

The Commission—in issuing any order, rule, or regulation or in requiring or approving any bylaw, rule, or regulation of a contract market—is to take into consideration the public interest to be protected by the antitrust laws and to endeavor to take the least anticompetitive means of achieving the objectives of the Act.

### TITLE II

Title II provides broad authority to the Commission to regulate futures trading and exchange activities.

All goods, articles, services, rights, and interests traded for future delivery are brought under Federal regulation.

Commodity trading advisors and commodity pool operators are required to register with the Commission. In addition, the existing registration and examination for futures requirements applicable to futures commission merchants and floor brokers are expanded to include all individuals handling customers' accounts.

The new Commission will determine whether trading by floor brokers and futures commission merchants for their own account and at the same time trading for their customers will be permitted. If the Commission determines that such dual trading will be permitted, the Commission shall further determine the circumstances under which it shall be conducted. The Commission may make separate determinations for different contract markets.

Contract markets will be required to demonstrate that futures contracts for which they seek designation will not be contrary to the public interest.

The new Commission may establish additional points for the delivery of a commodity in order to diminish price manipulation, market congestion, or the abnormal movement of the commodity in interstate commerce.

Contract markets must submit for Commission approval bylaws, rules, regulations, and resolutions which relate to the terms and conditions of futures contracts or other trading requirements. In addition, the Com-

mission may require a contract market to make changes in its rules and practices which are necessary or appropriate for the protection of the public interest.

The Commission will have authority to go directly into court to enjoin any contract market or other person from violating the Act or restraining trading in any commodity for future delivery. However, no restraining order, injunction, or writ of mandamus will be issued ex parte.

The Commission will have authority to act in emergency situations and direct a contract market to take such action as is necessary to maintain or restore orderly trading. The term "emergency" is defined as meaning—in addition to threatened or actual market manipulations and corners—any act of government affecting a commodity or any other major market disturbance which prevents the market from accurately reflecting the forces of supply and demand. In addition, the "emergency" itself must have a greater adverse impact on the market than the action the Commission proposes to take.

Penalties in amounts up to $100,000 could be imposed in both administrative and criminal proceedings for violations of the Act.

The Commission will have authority to regulate transactions for the delivery of silver bullion, gold bullion, and bulk silver and gold coins pursuant to standardized margin or leverage account contracts.

### TITLE III

Title III makes it a felony for Commissioners, employees, or agents of the Commission to participate, directly or indirectly, in any transaction in commodity futures or options or an actual commodity. It is also a felony for such person to impart confidential information to others for the purpose of assisting them in participating in such transactions. The persons receiving the confidential information are likewise prohibited from using such information.

The ban on trading in options in commodities presently subject to regulation is continued. Options trading with respect to all other commodity futures is likewise banned if contrary to Commission rules or regulations prohibiting or allowing such trading. The Commission is to prescribe the regulations governing such trading within one year after the effective date of the bill.

The term "arbitrage" is added to the Commission's authority to allow the exceeding of speculative limits. Arbitrage in domestic markets is defined as meaning the same as a "spread" or "straddle". The Commission is authorized to define the term "international arbitrage".

The Commission is authorized to define bona fide hedging transactions or positions. However, the new definition must permit hedging of a person's anticipated production of seed quantities of a commodity and hedging by the users of products of traded commodities as well as users of the commodities.

The authority under which a futures commission merchant or floor broker may "cross trades" for cotton is made applicable to all commodities under rules and regulations issued by the Commission.

The Commission is authorized to conduct regular investigations of the markets for commodities which are the subject of futures contracts, and furnish reports of its findings to the public on a regular basis. Every clearinghouse must prepare a daily trading report in the form and manner prescribed by the Commission. The Commission could disclose daily trading reports, or information from the reports, if disclosure furthers the regulations of futures trading.

It would be unlawful for a futures commission merchant to accept a futures con-

The Senate joint resolution is almost identical to section 208 as it passed the Senate on Monday except that there have been certain technical amendments to the provisions clarifying the congressional intent that rail service continuation subsidies are available for services (a) not designated to be continued by the final system plan, (b) over lines owned, leased, operated, or invested in by a State agency, and (c) abandoned after enactment of the Regional Rail Reorganization Act.

The technical clarifications insure that rail service continuation subsidies are in accordance with the State plan for rail transportation of local rail services. The clarifications also restate in a more precise manner that a line or service for which a State agency or local or regional transportation authority receives an acquisition loan is no longer eligible for a rail service continuation subsidy.

The PRESIDING OFFICER. The joint resolution is open to amendment. If there be no amendment to be proposed, the question is on the engrossment and third reading of the joint resolution.

The joint resolution (S.J. Res. 250) was ordered to be engrossed for a third reading, was read the third time, and passed, as follows:

S.J. RES. 250

Whereas, the Senate and Congress recently enacted major reorganization legislation to prevent economic disaster in the area served by the Penn Central Railroad and six other bankrupt Class I railroads (Regional Rail Reorganization Act of 1973, Public Law 93–236); and

Whereas, such legislation provided for the immediate establishment of a new entity, the United States Railway Association, to plan such reorganization and to adopt and release a "preliminary system plan" within 300 days after the enactment of the legislation, and to prepare and submit the "final system plan" to the directors of the Association within 420 days after enactment, pursuant to a funding authorization not to exceed $26,000,000; and

Whereas, as a result of circumstances not within the control of the Congress or the United States Railway Association, the Association was unable to commence full-scale operations until more than four months later than was contemplated in the legislation; and

Whereas, the Association will not be able to prepare reorganization plans for an efficient, adequate, safe, and reliable rail transportation system in the Midwest and Northeast region of the United States unless it is granted an additional 120 days in which to adopt the preliminary system plan and an additional 120 days in which to prepare the final system plan and authorization for funding for such additional period; and

Whereas, such legislation provided a system of rail service continuation subsidies so that shippers and local and State governments could, on a matching basis with the Federal Government, continue rail service on selected lines within a State which might not otherwise continue to be operated; and

Whereas, confusion has been engendered by the failure to include in such legislation a definition of which rail services are eligible for such subsidies:

Now, therefore, be it

Resolved, That

(a) Section 207 (a)(1) of the Regional Rail Reorganization Act of 1973 (87 Stat. 985) is amended by striking the figure "300" in the first sentence thereof and substituting therefor figure "420".

(b) Section 207 (c) of the Regional Rail Reorganization Act of 1973 (87 Stat. 985) is amended by striking the figure "420" in the first sentence thereof and substituting therefor the figure "540".

(c) Section 214(b) of the Regional Rail Reorganization Act of 1973 (87 Stat. 985) is amended by striking the figure "$26,000,000" and substituting therefor the figure "$40,000,000".

(d) Section 402(c) of the Regional Rail Reorganization Act of 1973 (87 Stat. 985) is amended by inserting "(1)" before the first sentence thereof, redesignating paragraphs (1), (2), (3), and (4) as subparagraphs (A), (B), (C), and (D), respectively, and by adding the following new paragraph:

"(2) Rail freight services eligible for rail service continuation subsidies pursuant to subsection (b) of this section are—

"(A) those rail services of railroads in reorganization in the region which the final system plan does not designate to be continued;

"(B) those rail services in the region which have been at any time during the 5 year period prior to the date of enactment of this Act, or which are subsequent to the date of enactment of this Act, owned, leased, or operated by a State agency or a local or regional transportation authority or with respect to which a State, a political subdivision thereof, or a local or regional transportation authority has invested at any time during the 5 year period prior to the date of enactment of this Act, or invests subsequent to the date of enactment of this Act, substantial sums for improvement or maintenance of rail service; and

"(C) those rail services in the region with respect to which the Commission issues a certificate of abandonment effective on or after the date of enactment of this Act.".

(D) The last sentence of section 403(a) of the Act is amended to read: "Provided, however, that any rail service for which a State agency or local or regional transportation authority receives such loan is no longer eligible for a rail service continuation subsidy pursuant to section 402 of this title.".

Mr. BEALL. Mr. President, I ask that the clerk be instructed to expeditiously transport immediately the just-passed resolution to the House of Representatives.

The PRESIDING OFFICER. The Chair will so instruct.

---

ORDER OF BUSINESS

Mr. CANNON. Mr. President, I ask unanimous consent that I may be permitted to yield a minute and a half to the distinguished Senator from Nebraska.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CURTIS. I thank my distinguished colleague.

---

COMMODITY FUTURES TRADING COMMISSION ACT—CONFERENCE REPORT

Mr. CURTIS. Mr. President, on behalf of the senior Senator from Georgia (Mr. TALMADGE), I submit a report of the committee of conference on H.R. 13113, and ask for its immediate consideration.

The PRESIDING OFFICER. The report will be stated by title.

The legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill

(H.R. 13113) to amend the Commodity Exchange Act to strengthen the regulation of futures trading, to bring all agricultural and other commodities traded on exchanges under regulation, and for other purposes, having met, after full and free conference, have agreed to recommend to their respective Houses this report, signed by all the conferees.

The PRESIDING OFFICER. Is there objection to the consideration of the conference report?

There being no objection, the Senate proceeded to consider the report.

(The conference report is printed in the House proceedings of the CONGRESSIONAL RECORD of September 30, 1974, at page 33032.)

Mr. CURTIS. Mr. President, the distinguished chairman of the Committee on Agriculture and Forestry (Mr. TALMADGE) was unable to be present today because of a previous engagement in Georgia. However, he was very anxious that this important legislation be enacted into law before the recess.

Therefore, he requested that I bring up the conference report on H.R. 13113 on his behalf. I am, of course, delighted to do so, and I ask unanimous consent that Senator TALMADGE's statement on H.R. 13113, which explains the intent of the conferees, be printed in full in the RECORD at this point in my remarks.

Also, I ask unanimous consent that the colloquy which the chairman had agreed to conduct with the distinguished junior Senator from Iowa (Mr. CLARK) be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

STATEMENT BY MR. TALMADGE

Mr. President, I am indeed proud of the conference report we are now considering. I believe that this report represents an excellent compromise between the House and Senate versions of H.R. 13113, the Commodity Futures Trading Commission Act of 1974. On April 11 of this year, the House passed H.R. 13113. The House bill was a good bill and reflected a great deal of work by the House members. It made huge improvements over the existing Commodity Exchange Act.

On May 3, the Senate Committee on Agriculture and Forestry began eight days of hearings on H.R. 13113 and the three Senate bills, S. 2485, S. 2578, and S. 2837. The committee heard a broad range of views during the hearings, receiving testimony from 58 witnesses and written statements from 18 other parties.

Futures trading has become a very important part of the Nation's economy. During 1973, the total volume of trading in futures contracts was over $500 billion. This is over twice the volume of trading on all stock exchanges in this country. Currently, futures markets perform a vital function for agricultural producers, for manufacturers, for exporters, for consumers and for others.

It is essential to businessmen in this country that they be able to set certain costs of doing business as far in the future as possible. For example, millers have long used the futures market to set the price of their wheat in advance. However, under the existing Commodity Exchange Act, bakers are prohibited from using the futures market to hedge against increased flour costs. One of the things the committee agreed to do when it reported H.R. 13113 was to allow the users of the products of agricultural commodities,

Case 1:07-cv-06682-DC    Document 37-3    Filed 10/03/2007    Page 20 of 21

as well as the users of the commodities themselves, to hedge on the futures market. The conference committee adopted this provision. Thus, bakers will now be able to use wheat futures to hedge the cost of their chief ingredient—flour.

The committee attempted to obtain all possible views and to give due consideration to every point of view in both the hearings and the committee markup because it realized that futures markets will assume an even greater role in the future. In this day of rampant inflation, businessmen find that they must attempt to stabilize more and more of their costs as far in advance as possible. In the past, there have been futures contracts only in certain tangible commodities such as wheat, cotton and soybeans. However, there is increasing interest in creating viable futures contracts in such rights and services as mortgages and ocean freight rates. Such futures trading would be permitted under the legislation agreed upon by the conferees, and it would be regulated by the new Commodity Futures Trading Commission.

I believe the legislation we are now considering will be considered landmark legislation in the future. It creates an agency comparable in stature and responsibility to the Securities and Exchange Commission. By assuring that the futures markets are not manipulated by a few large speculators, it will provide protection for the American consumer. It will also provide protection for the small businessman who needs to use the futures market to do business more efficiently.

I am particularly proud of the way the committee worked together on this legislation. In a matter of only two days the Committee on Agriculture and Forestry resolved vast differences between the three Senate bills and the House bill. We were able to reach an agreement and report unanimously a strong regulatory bill which made substantial improvements over the House bill. Moreover, because we worked diligently to fairly accommodate the interests of as many people as possible, not even one controversial floor amendment was offered on the floor of the Senate. I believe that this kind of action was possible only because all of the members of the committee who worked on this legislation had one goal in mind—to develop a strong, but fair regulatory scheme that will protect investors, businessmen and consumers. I believe that we achieved this goal in the committee and in the conference with the House.

The bill adopted by the conference committee consists of four titles:

### TITLE I

Title I creates an independent regulatory commission called the Commodity Futures Trading Commission consisting of a Chairman and four other Commissioners. The Commissioners will be appointed by the President, by and with the advice and consent of the Senate. In nominating persons for appointment, the President is to seek to establish and maintain a balanced Commission that will include persons of demonstrated knowledge in futures trading or its regulation and persons of demonstrated knowledge in the production, merchandising, processing, or distribution of the goods, articles, services, rights, and interests covered by the Act.

Not more than three of the members of the Commission shall be members of the same political party. The Commissioners shall be appointed for staggered five-year terms. With certain exceptions, the executive and administrative functions of the Commission will be exercised by the Chairman. The Chairman is to be compensated at executive level III. The other Commissioners are to be compensated at executive level IV.

The Commission will have a general counsel and an executive director. The executive director will be subject to Senate confirmation, and both the general counsel and the executive director are to be compensated at executive level V.

For the purpose of maintaining liaison between the Commission and the Department of Agriculture, the Secretary of Agriculture shall appoint a liaison officer. The Commission shall furnish the liaison officer with appropriate office space and clerical help, and he shall have the right to attend and observe all deliberations and proceedings of the Commission.

Likewise, the Commission, in cooperation with the Secretary, shall establish a separate office within the Department of Agriculture to be staffed with employees of the Commission for the purpose of maintaining liaison between the Department and the Commission. The Secretary is to take such steps as may be necessary to enable the Commission to obtain information and utilize such services and facilities of the Department as may be necessary in order to maintain effectively such liaison.

All existing authority under the Commodity Exchange Act which is presently vested in the Secretary of Agriculture and the Commodity Exchange Commission will be transferred to the new Commission. All existing personnel of the Commodity Exchange Authority will be transferred to the new Commission.

A reparations procedure before the new Commission is authorized for handling complaints which arise from violations of the Act. A reparations order by the Commission is subject to judicial review in the Court of Appeals pursuant to section 6(b) of the Commodity Exchange Act. Under section 6(b), the findings of the Commission, as to the facts, shall, if supported by the weight of the evidence, be conclusive. The reparations procedure will not become effective until one year after the date of enactment of the bill. However, claims arising within nine months immediately before such effective date could be heard by the Commission after the one-year period.

The Commission—in issuing any order, rule, or regulation, or in requiring or approving any bylaw, rule, or regulation of a contract market—is to take into consideration the public interest to be protected by the antitrust laws and to endeavor to take the least anticompetitive means of achieving the objectives of the Act.

### TITLE II

Title II provides broad authority to the Commission to regulate futures trading and exchange activities.

All goods, articles, services, rights, and interests traded for future delivery are brought under federal regulation.

Commodity trading advisors and commodity pool operators are required to register with the Commission. In addition, the existing registration and examination for fitness requirements applicable to futures commission merchants and floor brokers are expanded to include all individuals handling customers' accounts.

The new Commission will determine whether trading by floor brokers and futures commission merchants for their own account and at the same time trading for their customers will be permitted. If the Commission determines that such dual trading will be permitted, the Commission shall further determine the circumstances under which it shall be conducted. The Commission may make separate determinations for different contract markets.

Contract markets will be required to demonstrate that futures contracts for which they seek designation will not be contrary to the public interest.

The new Commission may establish additional points for the delivery of a commodity in order to diminish price manipulation, market congestion, or the abnormal movement of the commodity in interstate commerce.

Contract markets must submit for Commission approval bylaws, rules, regulations, and resolutions which relate to the terms and conditions of futures contracts or other trading requirements. In addition, the Commission may require a contract market to make changes in its rules and practices which are necessary or appropriate for the protection of the public interest.

The Commission will have authority to go directly into court to enjoin any contract market or other person from violating the Act or restraining trading in any commodity for future delivery. However, no restraining order, injunction, or writ of mandamus will be issued ex parte. In lieu of bringing actions itself, the Commission may request the Attorney General to bring the action. Where the Commission elects to bring the action, it shall inform the Attorney General and advise him of subsequent developments.

The Commission will have authority to act in emergency situations and direct a contract market to take such action as is necessary to maintain or restore orderly trading. The term emergency is defined as meaning—in addition to threatened or actual market manipulations and corners—any act of the United States or a foreign government affecting a commodity or any other major market disturbance which prevents the market from accurately reflecting the forces of supply and demand.

Penalties in amounts up to $100,000 could be imposed in both administrative and criminal proceedings for violations of the Act.

The Commission will have authority to regulate transactions for the delivery of silver bullion, gold bullion, or bulk silver coins or bulk gold coins pursuant to standardized margin or leverage account contracts.

### TITLE III

Title III provides enabling authority at the discretion of the Commission for persons registered under the Commodity Exchange Act and in the commodity trading business to establish voluntary futures associations for regulating the practices of the members. The Commission's annual reports to the Congress are to include information concerning any futures association registered pursuant to Title III and the effectiveness of such associations in regulating the practices of the members.

### TITLE IV

Title IV makes it a felony for Commissioners, employees, or agents of the Commission to participate directly or indirectly in any transaction in commodity futures or commodity options or (with certain exceptions) in an actual commodity. It is also a felony for such persons to impart confidential information to others for the purpose of assisting them in participating in such transactions. The persons receiving the confidential information are likewise prohibited from using such information.

The ban on trading in options in commodities presently subject to regulation is continued. Options trading with respect to all other commodity futures is likewise banned if contrary to Commission rules or regulations prohibiting or allowing such trading. The Commission is to prescribe the regulations governing such trading within one year after the effective date of the bill unless the Commission determines and notifies the Senate Committee on Agriculture and Forestry and the House Committee on Agriculture that it will be unable to promulgate such regulations within the one-year period.

The Commission, in fixing trading and po-

sition limits, is authorized to exempt transactions known to the trade as "arbitrage". "Arbitrage" in domestic markets is defined as being the same as a "spread" or "straddle". The Commission is authorized to define the term "international arbitrage".

The Commission is authorized to define bona fide hedging transactions or positions. The new definitions must permit hedging of a person's anticipated production of seed quantities of a commodity and hedging by the users of products of traded commodities as well as users of the commodities. Immediately upon the enactment of the bill, the Secretary of Agriculture is to issue regulations defining bona fide hedging transactions so as to allow hedging by such persons. Such regulations would, of course, only be applicable with respect to the now-regulated commodities. The new Commission would issue hedging definitions for the other commodities.

The authority under which a futures commission merchant or floor broker may "cross trades" for cotton is made applicable to all commodities under rules and regulations issued by the Commission.

The Commission is authorized to conduct regular investigations of the markets for commodities which are the subject of futures contracts and furnish reports of its findings to the public on a regular basis.

Every clearinghouse and contract market must maintain daily trading records. The Commission is to determine the type of trading records and the type and frequency of trading reports to be required of clearinghouses and contract markets. Reports are to be submitted to the Commission on a daily basis if, in the Commission's judgment, such a requirement is necessary for effective regulation of futures trading.

The Commission is to establish research and information programs to investigate the feasibility of trading by computer and the expanded use of modern information system technology.

The Commission is to investigate and report to Congress not later than June 30, 1976, on the need for legislation providing insurance against losses caused by the financial failure of futures commission merchants.

The bill (with certain exceptions) is effective 180 days after enactment. However, the new Commission is created upon enactment, and activities necessary to implement the bill may be carried out after enactment and before the effective date.

There were 26 major differences between the House bill and the Senate amendment. Perhaps the most important difference concerned the nature of the commission to regulate futures trading.

In lieu of the House provision—which would have created a five-man commission consisting of four public members and the Secretary of Agriculture or his designee—the conference substitute adopts (as I have noted) the Senate amendment creating a five-man independent commission consisting of a chairman and four other commissioners.

However, in view of the expertise of the department of agriculture and the fact that a major portion of the commodity futures contracts traded are in agricultural commodities, it is important that close liaison be maintained between the commission and the department. Therefore, liaison offices will be maintained by both the Commission and the Department.

One of the most difficult issues to be resolved in the Commodity Futures Trading Commission Act was the jurisdiction of the new Commission. Both the House Committee on Agriculture and the Senate Committee on Agriculture and Forestry sought to avoid the usurpation by the new Commission of jurisdiction of the Securities and Ex-

change Commission and other federal agencies. It was the intent of the Committees to fill all regulatory gaps—to regulate trading in futures and in options relating to commodities or commodity futures, because such trading is now poorly regulated, if it is regulated at all. As passed by the House, H.R. 13118 made clear. that nothing in the Act would supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities. The Senate refined this language in an attempt to avoid unnecessary overlapping and duplicative regulation.

I understand that there is some concern that, in effectuating the intent to fill regulatory gaps, the conference substitute appears to have an unintended impact on the jurisdiction of the Securities and Exchange Commission.

This misconception apparently has arisen because of certain provisions in section 201 of the bill, in particular the revised definition of commodities, the limited grant of exclusive jurisdiction to the Commodity Futures Trading Commission, and the reference to trading in futures contracts and options, not only on designated contract markets, but also on "any other board of trade, exchange or market."

I wish to emphasize that the words "any other board of trade, exchange, or market" were included in the conference substitute only for the purpose of giving the Commodity Futures Trading Commission jurisdiction over futures contracts purchased and sold in the United States and executed on a foreign board of trade, exchange, or market. This grant of exclusive jurisdiction is not to be construed as preempting the jurisdiction of the Securities and Exchange Commission over securities, including stock options, traded on any national securities exchange or any other United States securities market.

With respect to the definition of commodities, it was intended to apply to a broader class of goods, articles, rights, and interests than previously were subject to the Commodity Exchange Act. It was not intended, however, to apply to trading in interests and rights traditionally known as securities, including, for example, stocks, corporate bonds, warrants, and debentures; nor was it intended to apply to trading in options to purchase any of the foregoing. However, the last sentence of subsection (b) of section 201 of the bill helps make clear that the intent of the conferees was to subject all trading in futures contracts on a "contract market" designated pursuant to section 5 of the Act to the jurisdiction of the Commodity Futures Trading Commission.

I further understand, however, that the Securities and Exchange Commission has jurisdiction over other types of securities, including investment contracts, and that the term investment contract includes a broad category of arrangements and contracts relating to investments. In this area, there may be some apparent overlap between the jurisdiction of the Securities and Exchange Commission and the intended jurisdiction of the Commodity Futures Trading Commission over trading in futures contracts relating, or purporting to relate, to tangible commodities. It was not intended that the jurisdiction of the Securities and Exchange Commission with respect to investment contracts be superseded, except to the extent that jurisdiction is granted to the Commodity Futures Trading Commission with respect to contracts for future delivery or options relating, or purporting to relate, to tangible commodities, or which are effected on a contract market designated pursuant to section 5 of the Act. As a result, the Act is designed to supplement the present framework of reg-

ulation and to operate in conjunction with existing statutes; it is not intended to create any regulatory gaps.

In addition, the conferees wished to make clear that nothing in the Act would supersede or limit the jurisdiction presently conferred on courts of the United States or any state. This Act is remedial legislation designed to correct certain abuses which Congress found to exist in areas that will now come within the jurisdiction of the Commodity Futures Trading Commission. Congress was aware that there have been ongoing efforts by various state and federal regulators to prevent some of these abuses. Accordingly, section 412 was included in the bill to make clear that all pending proceedings, including ongoing investigations, as well as court proceedings, should continue unabated by any provision of the Act. This also is necessary in order to prevent the creation of any regulatory gaps, particularly during the time between the adoption of this legislation and the full implementation of its provisions by the Commodity Futures Trading Commission. During the course of our deliberations, we learned, for example, that the SEC has a number of such matters currently under investigation. We would expect that those investigations will continue and any proceedings resulting therefrom will not be affected by the passage of this Act.

To the extent that the language of subsection (b) of section 201 subjects rights and interests or transactions involving rights and interests to the concurrent jurisdiction of the new Commodity Futures Trading Commission and the Securities and Exchange Commission, the conferees intended that the two Commissions would consult and cooperate in determining what approaches to the exercise of their respective jurisdictions will best serve the public interest.

The responsibilities that will be vested in the new Commodity Futures Trading Commission are important and demanding. It is obvious that the new Commission's work will be especially taxing between the date of enactment and 180 days after enactment. The date on which the new law will become fully operational. Much work will have to be done by the Commission to assure that futures trading in all commodities is regulated effectively immediately on the effective date. It is necessary that studies be made, hearings held, and proposed regulations published in the Federal Register.

It is, therefore, of the utmost importance that the President nominate persons for appointment as Commissioners who are first-rate individuals and "broadly knowledgeable", as the act requires. It is also of the utmost importance that the nominations be made forthwith in order that the Commission can begin its work as soon as possible.

I can assure the President that the Committee on Agriculture and Forestry will act promptly on the nominations he submits.

### COLLOQUY ON TIME STAMPING

Mr. CLARK. As you know, the Senate bill had contained a provision for daily trading reports. Under the Senate bill, every clearinghouse would have been required to deliver a daily report to the Commission specifying for each trade made on the exchange that day, the time, the subject, the number of contracts, the price, the delivery month, and the identification of the traders. As you know the Conferees adopted the Senate amendment with an amendment authorizing the Commission to determine the type of trading records and the frequency of reports to be required of clearinghouses and contract markets. The Conference substitute does not specify what type of information will be required or how often this information must be reported. As I understand the Conferees'