Exhibit B

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, DC 20426

OFFICE OF THE CHAIRMAN

February 21, 2007

The Honorable Jeff Bingaman
Chairman
Committee on Energy and Natural Resources
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

I am writing in response to your February 6, 2007 letter relating to the Federal Energy Regulatory Commission's efforts to implement its expanded enforcement authority under the Energy Policy Act of 2005 (EPAct 2005). I agree with you that the evolution of complex and inter-related markets for financial and physical energy commodities has elevated the importance of the Commission's role, and I am pleased to share with you information on many initiatives and actions that the Commission has taken under EPAct 2005, which was enacted in large part because of your efforts. I am also pleased to have the opportunity to respond to your specific questions, to the extent I can do so publicly, as the Chairman, individual Commissioners, and Commission staff are bound by certain legal constraints to ensure the confidentiality of the existence and the nature of ongoing investigations. Any infraction of those rules, of course, would be a violation of law and a very serious matter.

In general, your letter seeks information about how the Commission has discharged the regulatory, oversight, and enforcement authorities that were greatly expanded by EPAct 2005. EPAct 2005 amended Part II of the Federal Power Act (FPA), the Natural Gas Act (NGA), and the Natural Gas Policy Act of 1978 (NGPA), and gave the Commission the authority to assess civil penalties of up to $1 million per day per violation for violations of rules, regulations, and orders issued under these laws.[1]

---

[1] Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 1284(e), 314 (b) (1) (B), and 314(b) (2), 119 Stat. 594 at 950 and 691 (2005), respectively. Under FPA Part II, the Commission can assess a penalty "of not more than $1,000,000 for each day that such violation continues." FPA section 316A (b). Under the NGA, the Commission can assess a penalty "of not more than $1,000,000 per day per violation for as long as the violation continues." NGA section 22(a). Under the NGPA, the Commission can assess a penalty "of not more than $1,000,000" and "each day of violation shall constitute a separate violation." NGPA section 504(b) (6) (A) and (C). There was no change to the

2

I have long thought the Commission needed stronger enforcement authority. The basic enforcement tool available to a regulatory body is the ability to impose civil penalties. We largely lacked that necessary tool before EPAct 2005. I began to argue in favor of expanding the Commission's enforcement authority nearly ten years ago, when I was majority counsel to the House Energy and Commerce Committee. When I was an advisor to former Secretary of Energy Spencer Abraham, I argued in favor of granting the Commission increased civil penalty authority. As the Commission Chairman, I argued in favor of retaining the penalty provisions during consideration of EPAct 2005. It was a matter of great personal satisfaction to exercise this authority last month, when the Commission imposed civil penalties for the first time under our new penalty authority.

EPAct 2005 also authorized the Commission to issue regulations prohibiting manipulation in wholesale electric and natural gas markets.[2] I want to take the opportunity to commend you for your leadership in granting the Commission this anti-manipulation authority. I have long believed that the lack of an express prohibition of market manipulation was a tragic flaw in federal electricity and natural gas law. I urged Congress to establish such a prohibition, grant us discretion to define market manipulation, and also grant us civil penalty authority comparable to other economic regulatory bodies.[3] You agreed, and thanks in large part to your efforts Congress gave us the tools we needed. I have no doubt that without your leadership the anti-manipulation provisions of EPAct 2005 would not have become law.

EPAct 2005 permanently changed the Commission. It represented the largest grant of regulatory power to the agency since the New Deal. It also turned us into an enforcement agency for the first time. We are dedicated to being a premier enforcement agency. I believe the Commission has a good record implementing our new EPAct 2005 responsibilities, particularly our enforcement authorities.

I promised that if Congress gave the Commission the tools we needed, we would use them – and we have. Upon enactment of EPAct 2005, the Commission acted promptly to implement its new enforcement authority. We have launched a number of new investigations, and expanded the scope of our investigations. Let me review the major actions we have taken to implement our new enforcement authority since implementation of EPAct 2005.

---

Commission's existing FPA Part I civil penalty authority, under which the Commission can assess civil penalties of up to $11,000 "for each day that such violation or failure or refusal continues." FPA section 31(c), as adjusted for inflation by 18 C.F.R. § 385.1602 (2006).

[2] EPAct §§ 315, 1283 (*codified as* 15 U.S.C. § 717c-1, 16 U.S.C. § 824v).

[3] Joseph T. Kelliher, *Market Manipulation, Market Power, and the Authority of the Federal Energy Regulatory Commission*, 26 Energy L.J. 1, 30 (2005).

- In October 2005, the Commission issued the *Policy Statement on Enforcement*, describing the factors the Commission will consider when assessing civil penalties or developing remedies for violations of the statutes, orders, rules, and regulations the Commission administers.[4] This Policy Statement was modeled on the practices of other enforcement agencies, such as the U.S. Department of Justice, the Securities and Exchange Commission (SEC), and the Commodity Futures Trading Commission (CFTC). In the Policy Statement, we laid out a goal of firm but fair enforcement of the statutes committed to us by Congress. Our goal is compliance, and in the Policy Statement we proposed to use our penalty authority to encourage compliance. Our experience to date shows the Policy Statement has been successful in encouraging compliance. One measure of that success is the number of self reports we have received since issuance of the Policy Statement, which exceeds 40. Our subsequent enforcement actions have been guided by and consistent with the Policy Statement.

- In October 2005, the Commission issued a notice of proposed rulemaking to implement the anti-manipulation authority granted by Congress in EPAct 2005.[5] Consistent with the direction of Congress in EPAct 2005, this proposed rule was modeled closely on SEC anti-manipulation rules.

- In October 2005, the Commission also entered into the *Memorandum of Understanding between the Federal Energy Regulatory Commission and the Commodity Futures Trading Commission Regarding Information Sharing and Treatment of Proprietary Trading and Other Information* (MOU), which established the framework for ongoing coordination and sharing of information between the Commission and the CFTC with respect to markets of mutual interest, including natural gas related financial markets. I note that EPAct 2005 directed the two agencies to enter into an MOU within 180 days of enactment. The agencies accelerated the MOU and concluded it much sooner, in 65 days. We did so because we recognized the importance of close coordination between the two agencies in the wake of hurricanes Katrina and Rita, given resulting high prices and volatility.

- In November 2005, the Commission issued an *Interpretive Order Regarding No-Action Letter Process* clarifying that section 388.104(a) of its regulations may be used to obtain informal staff advice regarding certain matters, including the new

---

[4] *Enforcement of Statutes, Orders, Rules, and Regulations*, 113 FERC ¶ 61,068 (2005).

[5] Notice of Proposed Rulemaking, *Prohibition of Energy Market Manipulation*, 70 Fed. Reg. 61,930 (October 27, 2005), FERC Stats. & Regs. ¶ 32,591 (2005).

proscriptions on energy market manipulation under EPAct 2005. [6]

- In January 2006, the Commission adopted Order No. 670, the Commission's new anti-manipulation rule, which prohibits energy market manipulation by any entity in connection with a Commission-jurisdictional transaction.[7] Recognizing the importance of preventing manipulation of natural gas markets during a period of high prices, the Commission invoked the emergency provisions of the Administrative Procedure Act and made the anti-manipulation rule effective immediately.

- In December 2006, the Commission issued the *Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties*, setting forth the specific procedures required under the FPA, NGA, and NGPA when assessing a civil penalty.[8] While the Commission continues to encourage settlement, we cannot assume that all investigations that find wrongdoing will result in settlement. We must be prepared to litigate. The Statement of Administrative Policy details how we would assess civil penalties if we resort to administrative litigation.

  With the groundwork for enforcement laid, the Commission exercised for the first time its new civil penalty authority in January 2007, assessing a total of $22.5 million in civil penalties on five companies for various violations of their tariffs or other regulatory obligations.

Against this backdrop of broad-reaching developments, I will address your more specific questions. Before doing so, however, I would like to describe the legal restrictions with respect to disclosing non-public information, laws which govern the Commission, and apply equally to the Chairman, individual Commissioners, and the Commission staff. Indeed, the same or comparable laws and rules apply to other federal enforcement agencies, including the CFTC, the U.S. Department of Justice, and the SEC.

The Commission's processes relevant to your questions are governed in most respects by the investigations provisions of 18 C.F.R. Part 1b. Accordingly, the Commission may conduct an investigation relating to any matter subject to its jurisdiction.[9] Investigations may be "formal" or "preliminary," and "public" or "non-

---

[6] *Interpretive Order Regarding No-Action Letter Process,* 113 FERC ¶ 61,174 (2005), *modified,* 117 FERC ¶ 61,069 (2006).

[7] *Prohibition of Energy Market Manipulation,* Order No. 670, 71 Fed. Reg. 4244 (January 26, 2006), FERC Stats. & Regs. ¶ 31,202, *order denying reh'g,* 114 FERC ¶ 61,300 (2006).

[8] *Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties,* 117 FERC ¶ 61,317 (2006).

[9] 18 C.F.R. § 1b.3 (2006).

5

public."[10] The Commission may, by order, in its discretion initiate an investigation.[11] The initiation may be based on its own information or in response to a request from a member of the public or the staff.[12] The Commission's staff is also authorized to initiate "preliminary" (non-formal) investigations at its discretion.[13] All information and documents obtained during an investigation and the investigative proceeding are treated as non-public. This means that neither staff nor the Chairman nor an individual Commissioner may reveal the existence of the investigation or related information except to the extent the Commission directs or authorizes the public disclosure.[14] Only the Commission can order a "formal" investigation, which results in subpoena authority being vested in investigating officers[15] as opposed to preliminary investigations where no process issues.[16]   In practice, almost all investigations are initiated by staff and are both preliminary and non-public. Finally, in general, whether in the context of an investigation or otherwise, the nature and time of any proposed action by the Commission are confidential and may not be divulged to anyone outside the Commission.[17]

The non-public treatment of these matters is critical to the accomplishment of the Commission's mission, especially the enforcement role that has become one of the Commission's priorities, as Congress intended under EPAct 2005. Many of the investigations undertaken by the Commission deal with issues and markets that are vital to the nation's economy and could be disrupted by a disclosure that the Commission is investigating players or phenomena in those markets. Where wrongdoing has clearly occurred, such disruption might be an unavoidable consequence of necessary public action by the Commission. But, by their very nature, investigations begin based on incomplete information. Frequently, indeed in most instances, the Commission staff through discovery determines that what was at first glance suspicious or anomalous is in fact legitimate and legal. An announcement of the investigation of such matters might lead to unnecessary and adverse consequences in the markets, such as driving participants out of otherwise legitimate, competitive, and economically beneficial markets or transactions. In addition, companies are more willing to provide information and cooperate with an investigation when they have a reasonable expectation that the information they provide (which is usually proprietary trade data) and the existence of the investigation will not be made public. There are limits to such expectations (because ultimately some information will come out as part of the process if there has been wrongdoing), but before culpability can be determined, an investigation is typically

---

[10] 18 C.F.R. § 1b.4 (2006).
[11] 18 C.F.R. § 1b.5 (2006).
[12] 18 C.F.R. §§ 1b.8 and 1b.6 (2006).
[13] 18 C.F.R. § 1b.6 (2006).
[14] 18 C.F.R. § 1b.9 (2006).
[15] 18 C.F.R. § 1b.5 (2006).
[16] 18 C.F.R. § 1b.6 (2006).
[17] 18 C.F.R. § 3c.2 (b) (2006).

6

required and some level of company cooperation is important to the efficient utilization of Commission resources in the prosecution of those investigations. At the end of an investigation, the Commission generally pursues a settlement with companies that have violated Commission rules, orders, or tariffs. We do so in order to expand the reach of our enforcement resources, and enable staff to conduct a greater number of investigations. Public disclosure of the existence of an investigation would certainly impede settlements, and may make settlement impossible.

The Commission frequently relies on information from third party witnesses who do not wish it to become known publicly that they were the source. Finally, intra-agency communications pertaining to investigations almost always involve at least three privileges that are vital to the Commission's ability to perform its work: the attorney-client communication privilege, the work product doctrine (because litigation is always a potential outcome), and the deliberative process privilege. Failure to keep non-public these communications poses the danger of waiving or violating those privileges.

The importance of these principles is embraced by a number of statutory and regulatory protections such as: (a) exemptions to the Government in the Sunshine Act, (permitting the Commission to hold "Closed Meetings" when discussing sensitive law enforcement and litigation related matters)[18]; (b) exemptions to the Freedom of Information Act, (exempting from disclosure records pertaining to confidential trade data, privileged material, and records pertaining to law enforcement activities)[19]; (c) the Commission's investigations regulations, (discussed above)[20]; and (d) the Commission's regulations pertaining to the confidentiality of its decision making process, (described above)[21]. These principles and restrictions are fundamental to our work. The Chairman and every Commissioner and Commission staff member involved in these activities are repeatedly made aware of their importance by way of annual ethics training required of all Commission employees. Violations of these requirements are also ethical violations.

As I stated earlier, an unauthorized disclosure of the existence of a nonpublic investigation would be a violation of the law and a very serious matter. It would damage the integrity of the investigative process. An unauthorized disclosure would allow the subjects of an investigation to attack the integrity of the investigation. In some circumstances, an improper disclosure could make it difficult or impossible for the Commission to ultimately prosecute parties who are found to have engaged in market manipulation or otherwise violated Commission rules, tariffs, or orders. Companies who might have been required to pay substantial civil penalties may escape payment altogether.

---

[18] 5 U.S.C. § 552 (2000).

[19] 5 U.S.C. §§ 552(b) (4), (5), and (7) (2000).

[20] 18 C.F.R. Part 1b (2006).

[21] 18 C.F.R § 3c.2 (2006).

The responses below are set against the backdrop of these legal restrictions.

## Question 1

The Energy Policy Act of 2005 broadened the scope of the Commission's authority to review transactions in financial markets related to natural gas. This is particularly important, given that indices derived from the trading of NYMEX gas futures contracts are included in many supply agreements entered into between producers and local distribution companies (LDCs), the costs of which are ultimately passed along to end-use consumers. Please describe the Commission's efforts to monitor trading of NYMEX gas futures contracts, especially as it relates to end-of-month natural gas trading, the last half-hour of which forms the basis of the index used in many producer/LDC supply contracts.

## Response

EPAct 2005 did not broaden the Commission's jurisdiction over the financial sales of natural gas that take place on designated contract markets such as the New York Mercantile Exchange (NYMEX). Those markets remain under the exclusive jurisdiction of the CFTC.[22] The MOU entered into between the Commission and CFTC recognizes CFTC jurisdiction:

> [T]he CFTC has exclusive jurisdiction with respect to accounts, agreements and transactions involving contracts of sale of a commodity for future delivery, including, but not limited to, natural gas, electricity, or any other energy product, traded or executed on or subject to the rules of a designated contract market, registered derivatives transaction execution facility, or any other board of trade, exchange, or market as described in section 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A).

However, EPAct 2005 did grant the Commission authority to prohibit market manipulation "in connection with" the purchase or sale of natural gas subject to the jurisdiction of the Commission.[23] We interpret the anti-manipulation language of EPAct 2005 as allowing the Commission to sanction market manipulation in financial

---

[22] 7 U.S.C. § 2(a) (1) (A) (2000). It appears to be clear Congressional intent to maintain the respective jurisdictions of the Commission and the CFTC. The jurisdictional balance was clear before enactment of EPAct 2005, there is no grant of authority to the Commission over financial sales of natural gas in the new laws, and some provisions of EPAct 2005 reflect a conscious decision by Congress to preserve the respective jurisdictions. EPAct 2005 § 316.

[23] EPAct 2005 § 315.

8

transactions of natural gas that affect jurisdictional sales, or physical sales. In brief, the CFTC has exclusive jurisdiction over futures, the Commission has exclusive jurisdiction over interstate natural gas transportation and certain natural gas sales, and where matters relate to both markets, both agencies have jurisdiction. Therefore, as a general matter, Commission staff does not monitor trading of NYMEX Natural Gas Futures Contracts (NYMEX Futures) looking across *all* trading activities for *any* potential misbehavior or structural flaws. We monitor trading for trading activities that may affect jurisdictional sales, or physical sales.

Certain physical markets for natural gas that fall under the Commission's jurisdiction make use of prices that are derived, in part, from final settlement prices of NYMEX Futures. In particular, transactions that make use of NYMEX Futures settlement prices include "physical basis" transactions. In physical basis transactions, the price for the next month's delivery is set directly by taking the NYMEX Futures settlement price and adding or subtracting a fixed amount to take account of a variety of other considerations, mainly the value of gas at the location of the delivery as compared to delivery at the Henry Hub in Louisiana.

Physical basis transactions conform to the standards of "fixed price" deals that are used in the construction of monthly indices by publishers such as *Platts* and *Natural Gas Intelligence*, and by the IntercontinentalExchange (ICE). The proportion of physical basis transactions used in these indices varies by location, with Eastern and Gulf Coast indices predominantly made up of physical basis transactions, the Midcontinent indices containing a mix of physical basis and fixed price transactions, and those in the West not using physical basis at all.

As a result, indices in these Eastern and Gulf Coast areas are closely, even mathematically, related to the NYMEX Futures final settlement prices. The index prices are related to, but not the same as, the NYMEX Futures settlement prices because the fixed amounts added or subtracted from the settlement price change the final price level of the physical basis contract. And, not all prices reported to the indices are physical basis – in some cases, index prices are also based on fixed-price bilateral transactions that do not rely on NYMEX Futures prices. However, in general, changes in the next-month NYMEX Futures price as it enters its settlement period are very influential in these monthly indices.

As a consequence, Commission staff has reviewed trading into the last half hour final settlement period for NYMEX Futures since Fall of 2004. In particular, since early 2006, Commission staff follows, in real time, trading in the NYMEX Futures contract and trading in the ICE swap designed to settle against the NYMEX Futures settlement

price.[24] Subsequent to final settlement, Commission staff collects and documents the "tick trading" in these periods, and reports to the Chairman and the Commissioners when changes into and during this final period appear significant.

## Question 2

Pursuant to provisions of EPACT, FERC and the Commodity Futures Trading Commission (CFTC) in October 2005 jointly entered into a Memorandum of Understanding regarding information sharing, which has presumably enhanced the capabilities of FERC's market monitoring unit. In general, when a potential anomaly in financial natural gas markets is detected by FERC's monitoring unit:

a. What is the process by which the full complement of Commissioners is notified?
b. What is the process by which the Commissioners decide whether to institute a more comprehensive investigation?
c. What is the process by which the Commissioners determine whether to contact the CFTC?
d. What is the process by which the Commissioners determine whether to contact state regulators or make public the existence of an anomaly or investigation?
e. Does written guidance exist regarding these policies?

## Response

As an initial matter, it would be helpful to provide some additional background on the MOU. Pursuant to that agreement, the CFTC staff and the Commission's Office of Enforcement staff are in regular contact with respect to matters of mutual interest and concern through meetings and teleconferences.[25] One reason for the MOU was to ease sharing of information between the two agencies. Before the MOU, the Commission had to authorize each information exchange. Under the MOU, information sharing occurs continually at the staff level without any need of Commission authorization. That improves the ability of both agencies to detect market manipulation. Both staffs routinely advise each other of investigations pertaining to their agencies' respective jurisdictions, and also typically work together to investigate and resolve matters where appropriate. These communications occur at the staff level on almost a weekly basis and the Chairmen and Commissioners of each agency are kept informed by their respective staffs. In

---

[24] In September 2006, NYMEX began supporting simultaneous trading at its Exchange and electronically through GLOBEX through the settlement period. Thus, Commission staff follows trading in real time through each of these two NYMEX trading mechanisms, both of which contribute to the calculation of the settlement.

[25] MOU ¶¶ 5, 6.

10

addition, the CFTC Chairman and I confer as necessary or appropriate. Written guidance exists regarding the process on contact with the CFTC, namely the MOU.

The principal objective of the MOU was to carry out Congress's directive in EPAct 2005 to ensure that "information requests to markets within the respective jurisdictions of each agency are properly coordinated to minimize duplicative information requests and to address the treatment of proprietary trading information."[26] Accordingly, the MOU requires the Commission to proceed through the CFTC to obtain data from any designated contract markets.[27] And, notwithstanding this sharing of information between the agencies, the staffs of each agency are bound to maintain the important restrictions in place at each agency as to the further dissemination of non-public information.[28]

Your other questions primarily relate to Commission processes. Indeed, these processes pertain to Commission oversight of *any* of the markets or aspects of the markets over which the Commission has jurisdiction (electric, natural gas, hydropower, oil). In this regard, the Office of Enforcement Division of Energy Market Oversight (DEMO) conducts a daily meeting at 11 a.m. where staff, mainly from DEMO but also from other Commission program offices, discusses current market conditions and identifies issues that require further review. Individual Commissioners and their personal staffs, of course, are also invited to attend these meetings, as long as there are no more than two Commissioners present at the same time. When staff detects market anomalies, they notify the Chairman and Commissioners through a variety of methods (reports, e-mails, meetings). In addition, DEMO staff is available to brief the Commission, the Chairman, individual Commissioners, or their staffs upon request and frequently do so.

Sometimes, an anomaly identified by DEMO may warrant an investigation. At this time, the Office of Enforcement Division of Investigations pursues the matter, according to the processes and restrictions discussed above at pages 4-6. In short, the Commission staff is authorized to open an investigation on their own initiative. The Commission may also order the initiation of an investigation. In practice, most investigations are initiated by staff. The origins of investigations initiated by staff vary. As indicated above, sometimes an investigation is initiated when staff observes market anomalies. Other Office of Enforcement investigations are initiated based on a referral by a Commission program office, a complaint, a hotline call, a tip by an informant, a self report, or a referral by a market monitor, among other ways.

Individual Commissioners are notified of the opening of staff-initiated investigations through a variety of methods (reports, e-mails, meetings) and staff is available to brief individual Commissioners or their staffs as requested and frequently do

---

[26] EPAct 2005 §§ 316, 1281.

[27] MOU at ¶ 1.

[28] MOU at ¶¶ 2, 4.

11

so. In addition, the Commission periodically convenes "Closed Meetings" where staff briefs the full Commission in a non-public forum on the progress of investigations that may pertain to suspected market anomalies (as well as possible violations of the Commission's statutes, rules, regulations, and orders). These meetings are closed to the public pursuant to the Government in the Sunshine Act, referenced above on page 6.

As to discussing investigations outside of the Commission (other than with the CFTC under the MOU), neither staff nor the Chairman or an individual Commissioner may make public or otherwise disclose an investigation.[29] An unauthorized disclosure is a violation of the law and a serious ethical violation. However, the Commission staff does regularly interact with the staff of state regulators as to general market activities as described in greater detail below in the response to Question 4. The controlling written guidance on most of these matters is contained in the Commission's regulations at 18 C.F.R. Part 1b and 18 C.F.R. § 3c.2 (b), and also the MOU. In addition, of course, the Commission staff is prohibited from engaging in any off-the-record communication about an issue in a contested on-the-record proceeding.[30]

## Question 3

Last fall's collapse of the Amaranth hedge fund—with its very large positions in financial natural gas markets—has led to heightened concerns about market transparency and potential consumer impacts of speculative trading on the prices being paid for natural gas. In 2006, were there any times FERC's market monitoring or enforcement staff detected and brought to your attention potentially anomalous market behavior related to gas futures contract trading, including end of month trading, which may affect the accuracy or representative nature of NYMEX indices used in LDC supply contracts? If so:

a. Please identify the days and months in which the suspected anomalies occurred.
b. Please describe any subsequent discussions or correspondence between you or your staff, and your counterparts at the CFTC.
c. Please describe any subsequent discussions or correspondence between you or your staff and any members of the industry or financial communities.
d. Please describe any subsequent discussions or correspondence between you or your staff and any state regulators.
e. At any point or in any forum, did the Commission consider notifying the public or state regulators, given potential impacts for the end-use natural gas consumers?

## Response

---

[29] 18 C.F.R. § 1b.9 (2006).
[30] 18 C.F.R. § 385.2201 (2006).

12

DEMO staff began reviewing NYMEX Futures settlement closes in Fall of 2004. Starting in April 2006, DEMO staff has monitored in real time trading patterns into the last half hour of NYMEX Futures settlement closes and has regularly reported such patterns to the Commission. Staff also discussed the concept of physical basis and its role linking the NYMEX Futures settlement close with monthly indices in a September 26, 2006 public workshop on the transparency of natural gas and electric energy prices. The material was shared with individual Commissioners and their staffs, who were invited to the workshop. Staff also included a comprehensive analysis of many of the market fundamentals and relationships pertaining to NYMEX Futures and physical natural gas markets in Section 7 of its 2006 *State of the Markets Report*, which is available at www.ferc.gov/oversight. In that discussion, and as discussed more fully below in response to Question 4, staff addressed the increase in the last decade of trading volume and open interest in NYMEX Futures, the relationship between trading in NYMEX Futures and physical basis transactions and indices, and the relative degree of transparency of these markets. With respect to other aspects of Question 3 that may implicate the existence or nature of an ongoing nonpublic investigation, as indicated above, I am unable to comment publicly pursuant to, *inter alia*, 18 C.F.R. Part 1b.

## Question 4

In its September 2006 report, the GAO identified a number of categories of information FERC should consider providing to states and the public in a more timely fashion. In addition to the recent release of the new market oversight website, is the Commission contemplating the development of additional policies to implement these recommendations?

## Response

In its September 2006 report titled *Roles of Federal and State Regulators in Overseeing Prices*, the GAO noted that the Commission has taken many steps to improve the understanding of the Commission's role in overseeing the market and deterring market manipulation. GAO complimented how the Commission had implemented its expanded EPAct 2005 authority.[31] The report also discussed the substantial efforts the Commission has made in the past to inform state regulators about our oversight activities regarding gas markets.[32] GAO recognized that disclosure of information can damage the integrity of market manipulation investigations and impede enforcement efforts.[33]

---

[31] *Roles of Federal and State Regulators in Overseeing Prices* at 14 (U.S. Gov't Accountability Off., September 2006) ("FERC has made substantial progress implementing the additional authorities related to natural gas provided to it in EPAct 2005").

[32] *Id.* at 19.

[33] *Id.* at 22 ("We agree that disclosure of information that is specific or detailed

13

The report provided recommendations that the Commission could consider to further improve our market oversight and deterrence of market manipulation by providing stakeholders, particularly state regulators, information regarding: (1) how staff analyzes natural gas markets and identifies anomalies or unusual behavior, (2) the types of unusual market behavior that warrant further investigation, and (3) investigations under way. My letter to the GAO with respect to the report generally concurred in its conclusions and findings. I also pointed out that the Commission continues to work toward instilling greater overall confidence in the natural gas market by developing vigilant market oversight to ensure that commodity prices are competitive and free from manipulation.

Shortly after the GAO report was released, I asked to meet with the National Association of Regulatory Utility Commissioners' Gas Committee at its Annual Convention. Commissioner Donald L. Mason from Ohio, Chairman of the Gas Committee, graciously granted my request. I met with the Gas Committee, accompanied by Susan J. Court, Director of the Office of Enforcement. At that meeting, I reviewed the Commission's new enforcement role under EPAct 2005, how we have implemented our new authorities, and how we conduct oversight of gas markets. I also discussed how we conduct investigations, and the remedies available in the event we find there have been violations of our rules, orders, and tariffs. I had a good discussion with Chairman Mason and Committee members, and will continue to work with them.

The Commission has made, or is in the process of making, several changes to the way market oversight efforts are conducted. First, as you noted, the Commission released its new market oversight web pages at www.ferc.gov/oversight in January. The web site allows Commission staff to share more information about natural gas markets faster than in the past and with a wider set of interested stakeholders. The web pages were inaugurated with five regularly updated slides relating to NYMEX trading, two of which focus explicitly on the relationship between Henry Hub physical (or "cash") and futures trading.

The Commission also recently posted on its website the staff's *2006 State of the Markets* report, mentioned also in response to Question 3. In coordination with the new web pages, the *State of the Markets* report is an up-to-date assessment of major issues in the electric and natural gas markets. The *2006 State of the Markets* report includes detailed discussions of trading in financial and futures markets and the relationship to physical markets, including a discussion of physical basis as a link between NYMEX Futures and monthly gas indices. The regular update of web pages permits the staff to present this kind of market assessment far sooner than was possible in the past (when

---

could provide would-be market manipulators with information about FERC's sources and methods of operations.").

*State of the Market* reports were published months into the next year and, being in book form, could not be updated with new data).

Further, DEMO staff has been for some months conducting conference calls with interested state regulatory staffs to discuss electric and gas market observations on a regional basis. Staff is in the process of reorganizing its monthly conference calls in order to improve regional coverage, extend participation more broadly, and make use of information now available through the web pages. There have been frequent meetings with state staff, predominantly in New England and the West, often involving discussion of natural gas price trends and relationships with NYMEX Futures trading.

As a final matter, in response to Question 4, in coordination with the meeting of the National Association of Regulatory Utility Commissioners this week here in Washington, D.C., DEMO staff has begun promoting a more intensive program of working with state regulatory staff members, inviting as many as three at a time to spend a week working closely with market oversight staff both in their daily market monitoring efforts and on a natural gas or electricity research topic of interest to them in their regulatory efforts. It is my hope that this coordination will better inform state regulators about our oversight and investigation activities.

I hope this information is useful to the Committee in its evaluation of these important matters. If I can be of any further assistance with this or any other Commission matter, please let me know.

Sincerely,

Joseph T. Kelliher
Chairman