David E. Mollón (DM-5624)
Steven M. Schwartz (SS-4216)
Lauren B. Lepore (LL-0772)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Defendants Amaranth Advisors L.L.C.*
*and Amaranth Advisors (Calgary) ULC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | : | |
| Plaintiff, | : | |
| | : | **Electronically Filed** |
| v. | : | |
| | : | **07 Civ. 6682 (DC)** |
| **AMARANTH ADVISORS L.L.C., AMARANTH ADVISORS (CALGARY) ULC and BRIAN HUNTER,** | : | **Oral Argument Requested** |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS BY DEFENDANTS**
**AMARANTH ADVISORS L.L.C. AND**
**AMARANTH ADVISORS (CALGARY) ULC**

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................................ ii

Preliminary Statement ...................................................................................................... 1

Factual Background ........................................................................................................... 3

     A.    Amaranth's Trading ................................................................................ 3

     B.    The CFTC's Year-Long Investigation Of Amaranth's Trading ........................... 4

     C.    The Complaint ................................................................................... 5

Argument .......................................................................................................................... 6

I.      THE CFTC'S CLAIM FOR ATTEMPTED MANIPULATION (COUNT I)
       SHOULD BE DISMISSED BECAUSE IT ALLEGES ONLY LAWFUL
       TRADING, NOT MANIPULATIVE CONDUCT, AND FAILS
       ADEQUATELY TO ALLEGE INTENT ............................................................. 6

     A.    Rule 12(b)(6) Standard ......................................................................... 6

     B.    The Complaint Fails To Allege Facts Demonstrating The Plausibility
        Of Plaintiff's Attempted Manipulation Claim ............................................. 7

        1.   The Complaint Fails To Allege Manipulative Conduct ........................... 7

        2.   The Complaint Fails Adequately To Allege Intent To
           Manipulate The Market ............................................................... 12

II.    THE CFTC'S CLAIM FOR ATTEMPTED MANIPULATION (COUNT I)
       SHOULD BE DISMISSED FOR FAILURE TO ALLEGE FACTS JUSTIFYING
       A STRONG INFERENCE OF INTENT AS REQUIRED BY RULE 9(b) .................. 15

     A.    The Attempted Manipulation Claim Is Subject To Rule 9(b) ........................... 15

     B.    The Complaint Fails To Satisfy Rule 9(b)'s Heightened Pleading
        Requirements ................................................................................. 18

        1.   The CFTC Must Allege Facts Justifying A Strong Inference Of
           Manipulative Intent ................................................................... 18

        2.   February 24, 2006 ...................................................................... 19

        3.   April 26, 2006 ........................................................................... 21

III.   THE CFTC'S "COVER-UP" CLAIM (COUNT 2) SHOULD BE DISMISSED ......... 23

Conclusion ........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................ *passim*

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007)..................................... 6, 14

*B. H. Papasan v. Allain*, 478 U.S. 265 (1986)........................................................ 6

*Board of Trade of Chicago v. SEC*,
  187 F.3d 713 (7th Cir. 1999)...................................................................... 14

*Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971)........................................ 11

*CFTC v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006)................................... 11, 17

*CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) .......................... 11, 17

*CFTC v. Delay*,
  No. 05 CV 5026, 2006 WL 3359076 (D. Neb. Nov. 17, 2006)................ 13-14

*CFTC v. Enron Corp.*,
  No. H-03-909, 2004 WL 594752 (S.D. Tx. March 10, 2004) ................... 11, 17

*CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tx. 2005) .......................... 11, 13, 17

*CFTC v. Reed*, 481 F. Supp. 2d 1190 (D. Co. 2007) .................................... 11, 17

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424 (D. N.J. 2000)..................................... 5

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ...................................................... 5

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)............................ 14

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)............................................ 15

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001).............. 2-3, 8-10

*Glidepath Holding B.V. v. Spherion Corp.*,
  No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007)................... 18

*Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y. 1995)........ 10, 15

## TABLE OF AUTHORITIES
(Continued)

Page(s)

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999).................................. ........................... 7

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007)........................... ................. ..... 6

*In re College Bound Consol. Litig.*,
    No. 93 Civ. 2348, 1995 WL 450486 (S.D.N.Y. July 31, 1995)............................... 12

*In re Crude Oil Commodity Litig.*,
    No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ...................... *passim*

*In re Hohenberg Bros. Co.*,
    CFTC No. 75-4, 1977 WL 13562 (C.F.T.C. Feb. 18, 1977) ........................... 7, 12-13

*In re Indiana Farm Bureau Coop. Assoc.*,
    CFTC No. 75-14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982) ........................ 7, 12-13

*In re Natural Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004) ........................... ................................ 11, 16

*In re Natural Gas Commodity Litig.*,
    358 F. Supp. 2d 336 (S.D.N.Y. 2005) ........................... ................................ 16, 17

*In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286 (N.D. Ill. 1985) ................... 10

*In re Parmalat Secur. Litig.*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007) ............................... 18

*In re Soybean Futures Litig.*, 892 F. Supp. 1025 (N.D. Ill. 1995) ........................ 2, 4, 7, 8

*In the Matter of Avista Energy Inc. & Michael T. Griswold*,
    CFTC No. 01-21, 2001 WL 951736 (C.F.T.C. Aug. 21, 2001)............................... 11

*In the Matter of Louis Abrams*,
    CFTC No. 88-10, 1994 WL 506250 (C.F.T.C. Sept. 15, 1994)............................... 12

*In the Matter of Global Minerals & Metals Corp.*,
    CFTC No. 99-11, 1999 WL 1023586 (C.F.T.C. Nov. 12, 1999)............................. 13

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ................................... ............... 23

*Krause v. Forex Exch. Market, Inc.*, 356 F. Supp. 2d 332 (S.D.N.Y. 2005).................... 17

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ................................... ............... 23

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Miller v. N.Y. Produce Exchange,*
   550 F.2d 762 (2d Cir.), *cert. denied,* 434 U.S. 823 (1977)................................. ......... 8

*Mormels v. Girofinance, S.A.,* 544 F. Supp. 815 (S.D.N.Y. 1982)................................. ....8

*Nilsen v. Prudential-Bache Secur.,* 761 F. Supp. 279 (S.D.N.Y. 1991) ........................ 24

*Premium Plus Partners v. Davis,*
   No. 04 C 1851, 2005 WL 711591 (N.D. Ill. March 25, 2005) ................................ ..17

*Reddy v. CFTC,* 191 F.3d 109 (2d Cir. 1999).................................... ............................ ...8

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004)............................. .......................... 15

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462 (1977).................................... ...................... 15

*Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105 (2d Cir. 1986) ................................. ......... 8

*Smith v. Local 819 I. B. T. Pension Plan,* 291 F.3d 236 (2d Cir. 2002)............................ 6

*Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857 (7th Cir. 1995) ........................ 10

*Tellabs, Inc. v. Makor Issues & Rights Ltd.,*127 S. Ct. 2499 (2007) ............. 14, 18-19, 22

*Three Crown Limited Partnership v. Caxton Corp.,*
   817 F. Supp. 1033 (S.D.N.Y. 1993) ............................. ............................... ......... 17

*Transnor (Bermuda) Ltd. v. BP N. Am.,*
   738 F. Supp. 1472 (S.D.N.Y. 1990) ............................. ............................... ... 11, 13

*United States v. Finnerty,* 474 F. Supp. 2d 530 (S.D.N.Y. 2007)................................ .... 10

*United States v. Mulheren,* 938 F.2d 364 (2d Cir. 1991) ................................. ........... 8, 10

*Vitanza v. Board of Trade of N.Y.,*
   No. 00 CV 7393, 2002 WL 424699 (S.D.N.Y. March 18, 2002) ............................... 6

*Volkart Bros., Inc. v. Freeman,* 311 F.2d 52 (5th Cir. 1962) ................................ ......... 13

## STATUTES AND RULES

7 U.S.C. § 1 *et seq*.............................. ............................... ................................ ......... 3

7 U.S.C. § 9............................... ............................... ................................ ............ *passim*

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

7 U.S.C. § 13(a)(2) .......................... .......................... .......................... ......... 5

7 U.S.C. § 13(a)(4) .......................... .......................... .......................... ......... 5

7 U.S.C. § 13(b) .......................... .......................... .......................... ............. 5

Federal Rule of Civil Procedure 9(b) .......................... .......................... ...... *passim*

Federal Rule of Civil Procedure 12(b)(6) .......................... .......................... ..... 1, 5

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and Rule 9(b),

Defendants Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary) ULC (together,

"Amaranth" or "Defendants") respectfully submit this memorandum of law in support of their

motion to dismiss the Complaint filed by Plaintiff United States Commodity Futures Trading

Commission ("CFTC" or "Plaintiff").

## Preliminary Statement

The CFTC seeks to create new law by recharacterizng legitimate open-market

trading, absent any of the well-established indicia of manipulative conduct, as attempted

manipulation.  The CFTC alleges that on two occasions, February 24, 2006 and April 26, 2006,

Amaranth sold a large number of expiring futures contracts, on the New York Mercantile

Exchange ("NYMEX") during the closing range for such contracts, in an attempt to manipulate

the prices of natural gas futures contracts.[1]  There is nothing inherently improper, however, about

trading during the closing range, or even trading large volumes of contracts in that time frame,

and the CFTC does not assert otherwise.  The CFTC does not assert that Amaranth's trading

during the closing range violated any NYMEX rules.  It does not assert that Amaranth had

sufficient market power to control the prices of natural gas futures, that Amaranth conspired with

anyone in an attempt to manipulate futures prices, or that Amaranth injected any false or

misleading information into the market in order to affect prices.  Further, the CFTC does not

allege that Amaranth engaged in any of the typical manipulative trading techniques:  wash sales,

matched orders, rigged bids, fictitious trades, squeezes or corners.

This case truly is unprecedented, as Amaranth is not aware of any case in this

Circuit holding a party liable for manipulation, or even attempted manipulation, based solely on

---

[1] The CFTC does not claim that the alleged attempted manipulation was successful.  Thus, there is no claim that Amaranth actually manipulated the market or that the prices of natural gas futures contracts were in any way artificial.

open-market trading such as Amaranth engaged in here, absent these types of deceptive trading schemes or the injection of inaccurate data into the marketplace. To the contrary, the cases make clear that such conduct is an essential element of the CFTC's attempted manipulation claim.

The Complaint asserts in mere conclusory fashion that Amaranth acted with an intent to manipulate the price of natural gas futures contracts. Strikingly absent from the Complaint, however, are factual allegations sufficient to raise a strong inference of manipulative intent, as required under applicable Second Circuit and Supreme Court precedent. The facts alleged instead support the more plausible and compelling inference that Amaranth engaged in legitimate speculative trading, seeking to profit based on its analysis of market conditions and its expectation of price movements for natural gas futures contracts.

Lacking any deceptive trading techniques, direct evidence of manipulative intent or facts supporting a strong inference of manipulative intent, the CFTC seeks to blur beyond recognition the crucial line between legitimate speculation and unlawful trading.

> Speculators assume the risks that hedgers avoid in order to make a profit from unexpected price movements. Although hedging is the main purpose of the futures market, hedgers benefit from the presence of speculators in the market. Speculators add liquidity and capital to the futures market; bridge price gaps between longs and shorts; dampen extreme price movements by assuming risk and adding to demand; and facilitate market entry and exit by increasing trading volume.

*In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1033 (N.D. Ill. 1995) (citations omitted). The CFTC improperly seeks to transform legitimate speculative trading into the basis for a claim of attempted manipulation without sufficient allegations of actual manipulative conduct or facts justifying a strong inference of manipulative intent. *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) ("courts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate

prices and deceive purchasers and sellers").

The Complaint's failure to allege manipulative conduct or facts supporting a strong inference of manipulative intent is particularly striking because this is not a case in which the CFTC lacks access to information uniquely in the possession of Amaranth that is necessary to develop more facts, or in which additional discovery will flesh out the claims. Prior to filing the Complaint, the CFTC conducted a year-long investigation of Amaranth's trading. As part of this investigation, Amaranth produced over one-and-one-half million pages of documents to the CFTC, including emails and instant messages ("IMs"). The CFTC also has Amaranth's trading records and complete market trading data from the NYMEX. Moreover, the CFTC questioned, under oath, Amaranth's executive management, as well as its entire natural gas trading team, including defendant Brian Hunter, who headed Amaranth's natural gas futures trading desk and co-managed Amaranth's energy and commodities trading desk. It is telling that the CFTC does not cite any such testimony as evidence of manipulative conduct or in support of its conclusory allegations of manipulative intent. Rather, it relies on a few selective IM excerpts from which legitimate trading, not manipulative intent, is the stronger, more compelling inference.

Particularly in light of its pre-Complaint discovery, the CFTC's attempted manipulation claim should be dismissed for failure to state a claim and for failure to satisfy Rule 9(b). Further, because the CFTC's "cover-up" claim is premised on the same alleged attempted manipulative scheme, and is not plead with particularity, it too should be dismissed.

### Factual Background

#### A.    Amaranth's Trading

Amaranth was an active trader in, among other things, the natural gas futures and swaps markets. Under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (2002) ("CEA"), futures contracts traded on exchanges such as the NYMEX are regulated by the CFTC. A

3

NYMEX natural gas futures contract is a standardized contract, which takes the form of an obligation of the buyer to accept and the seller to deliver a specified quantity of natural gas at a specified place in the future. Contracts "expire," or reach the date upon which trading of the contract ceases, monthly. Any net contract positions left open at expiration must be fulfilled through physical delivery. Settlement prices for expiring natural gas futures contracts are determined on the last day they trade, which is the third to last day of the month prior to which delivery has to be made on open contracts ("settlement day"). Specifically, pricing is based on trading during the last half-hour on that day (2:00-2:30 p.m.) ("closing range"). Thus, for the March 2006 expiring natural gas futures contracts, the settlement day was February 24, 2006, and for the May 2006 expiring contracts, the settlement day was April 26, 2006.

The vast majority of natural gas futures contracts are not left open at expiration, and thus do not result in the physical delivery of natural gas. The purpose of futures contracts is to allow producers and users of natural gas to hedge against price changes and for speculators to trade in an effort to profit from price movements. Thus, before the time for delivery arrives, buyers and sellers usually negate their obligations by entering into an offsetting contract. As the CFTC concedes, Amaranth did not have the capacity to make or take physical delivery of natural gas underlying NYMEX natural gas futures contracts, and thus it always sought to offset its natural gas futures contract positions prior to expiration, or roll them into a following month.[2]

**B.    The CFTC's Year-Long Investigation Of Amaranth's Trading**

The CFTC conducted an extensive investigation into Amaranth's natural gas futures trading. Amaranth cooperated with the investigation, produced over one-and-one-half million pages of documents, made more than a dozen of its current and former employees

---

[2] For a detailed discussion of the operation of the commodity futures market, see *Soybean Futures Litig.*, 892 F. Supp. at 1032-34.

4

available to testify under oath in response to questions by the CFTC, and had its counsel attend

numerous meetings with the CFTC staff counsel. On April 12, 2007, the CFTC gave notice

regarding a possible enforcement proceeding against Amaranth for alleged manipulation of the

price of the May 2006 NYMEX natural gas futures contract during the closing range on April 26,

2006. The notice did not mention trading on February 24, 2006, the settlement day for March

2006 contracts. On May 3, 2007, Amaranth submitted a detailed written response to the CFTC

denying that it engaged in any manipulative trading.

### C.    The Complaint

On July 25, 2007, the CFTC commenced this action asserting that, on February

24, 2006 and April 26, 2006, Amaranth attempted to manipulate the settlement price of expiring

NYMEX natural gas futures contracts, in violation of sections 6(c), 6(d) and 9(a)(2) of the CEA,

7 U.S.C. §§ 9, 13(b) and 13(a)(2) (Count 1). The Complaint also asserts that Amaranth violated

section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4), by virtue of a letter dated August 15, 2006, from

Amaranth to the NYMEX, which allegedly contained misrepresentations. (Count 2). The

Complaint seeks various forms of injunctive relief, monetary penalties, disgorgement and

restitution. The Complaint fails to allege any of the hallmarks of manipulative trading, but rather

seeks to transform legitimate speculative trading into a violation of the CEA, and also fails to

allege facts justifying a strong inference of manipulative intent. Accordingly, pursuant to Rules

12(b)(6) and 9(b), the Complaint should be dismissed in its entirety.[3]

---

[3] Even if the Court finds that either of the two claims survive this motion to dismiss, it should strike the CFTC's request for disgorgement and restitution. "Disgorgement is a non-punitive equitable remedy meant to deprive wrongdoers of ill-gotten gains." *CFTC v. Vartuli*, 228 F.3d 94, 113 (2d Cir. 2000) (citations omitted). The CFTC does not allege that Amaranth made or realized any profits from its purported manipulative scheme. Indeed, as the CFTC is aware, Amaranth actually lost money on the challenged trading on both February 24, 2006 and April 26, 2006. Accordingly, the request for disgorgement and restitution of "ill-gotten gains" (Compl. ¶ 5 and Section VI G) has no legal or factual basis. *See CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 455 (D.N.J. 2000).

## Argument

### I.    THE CFTC'S CLAIM FOR ATTEMPTED MANIPULATION (COUNT I) SHOULD BE DISMISSED BECAUSE IT ALLEGES ONLY LAWFUL TRADING, NOT MANIPULATIVE CONDUCT, AND FAILS ADEQUATELY TO ALLEGE INTENT

#### A.    Rule 12(b)(6) Standard

The Supreme Court recently held that, in order to withstand a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). The Supreme Court mandated that the Complaint set forth "plausible" grounds for relief, not the mere possibility that plaintiff may ultimately succeed. *Id.* at 1965-68. Although *Twombly* was an antitrust case, the Second Circuit has applied this plausibility standard to cases outside the antitrust context. *See Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007).

For purposes of a motion to dismiss, the Court is required to accept factual allegations in the complaint as true. It need not, and should not, however, accept conclusory statements unsupported by assertions of fact. *See Smith v. Local 819 I. B. T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (citations omitted); *see also B. H. Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[a]lthough for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation"). In short, vague or conclusory allegations are not sufficient to withstand a motion to dismiss. *See Vitanza v. Board of Trade of N.Y.*, No. 00 CV 7393, 2002 WL 424699, at *2 (S.D.N.Y. March 18, 2002).

6

B.   **The Complaint Fails To Allege Facts Demonstrating The Plausibility Of Plaintiff's Attempted Manipulation Claim**

As one court correctly stated, "manipulation cases generally have not fared well with either the CFTC or the courts." *Soybean Futures Litig.*, 892 F. Supp. at 1043 (citations omitted). "Neither manipulation nor attempted manipulation is defined in the Commodity Exchange Act. That task has fallen to case-by-case judicial development." *In re Indiana Farm Bureau Coop. Assoc.*, CFTC No. 75-14, 1982 WL 30249, at *3 (C.F.T.C. Dec. 17, 1982). The elements of a market manipulation claim under section 9(a)(2) of the CEA are that: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. 2007). An attempted manipulation is simply a manipulation that has not succeeded, *i.e.*, the conduct engaged in has failed to create an artificial price. *See In re Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL 13562, at *7 (C.F.T.C. Feb. 18, 1977). In order to prove attempted manipulation, plaintiff must establish: (1) a specific intent to affect the market price; and (2) some overt act in furtherance of that intent. *Id.* The Complaint fails to set forth sufficient allegations supporting these elements.

1.   **The Complaint Fails To Allege Manipulative Conduct**

Market manipulation is based on the "deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). As the Second Circuit recently stated in describing manipulation in the securities law context, "[t]o be actionable as a manipulative act, [the conduct] must be willfully combined with something more to create a false impression of how market participants value a security." *ATSI*,

7

493 F.3d at 101.[4]  Similarly, the Third Circuit stated that, to demonstrate manipulation there

must be "some action [that] was taken to *artificially* depress or inflate prices, whether by

purposely making false statements or by employing illegitimate, deceptive trading techniques

that mislead investors. . . . [T]he essential element of [a market manipulation] claim is that

*inaccurate* information is being injected into the marketplace." *GFL*, 272 F. 3d at 204-05

(emphasis in original) (citations omitted).  Therefore, "market manipulation requires an

additional element, something beyond otherwise legal trading." *Id.* at 205 (citations omitted).

Accordingly, market manipulation cases typically allege that a defendant either

made false or misleading statements in order to affect market prices or engaged in illegitimate or

deceptive trading practices, such as wash sales, matched orders, rigged bids, fictitious trades,

corners or squeezes. *See ATSI*, 493 F.3d at 99-101.[5]  The CFTC, however, alleges neither.  The

CFTC does not assert that Amaranth engaged in any of these types of deceptive trading or that it

made any misrepresentations designed to affect market prices.[6]  It asserts only that Amaranth

bought contracts on the open market and then sold, on the open market, a large volume of

contracts during the closing range.  Amaranth is not aware of any case in this Circuit finding

attempted or actual manipulation based simply on such open-market trading.  Thus, the

---

[4] Cases interpreting the securities laws are applicable in evaluating claims under the CEA. *See Miller v. N.Y. Produce Exchange*, 550 F.2d 762, 769 n.4 (2d Cir.), *cert. denied*, 434 U.S. 823 (1977) (in context of alleged manipulation claim under section 9 of the CEA the court applied the reasoning of securities cases); *Mormels v. Girofinance, S.A.*, 544 F. Supp. 815, 817 n.8 (S.D.N.Y. 1982) ("Securities cases and principles are used as persuasive aids to interpretation of the CEA.") (citations omitted); *see also Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 111 (2d Cir. 1986) (materiality standard for fraud is the same in securities context as in commodities).

[5] In a wash sale transaction, there is no intent to take a genuine, *bona fide* position in the market. *See Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999).  Matched orders involve prearranged purchases and sales of the same amount at substantially the same price and time.  Wash sales and matched orders give the "appearance" of legitimate market activity. *See United States v. Mulheren*, 938 F.2d 364, 371 n.5 (2d Cir. 1991).  A party corners the market when it has a long futures position and owns substantially all of the physical supply of the commodity.  A squeeze occurs where the party has a dominant long futures position while the physical supply is limited. *See Soybean Futures Litig.*, 892 F. Supp. at 1034.

[6] The "cover-up" claim (Count 2) does not allege a misrepresentation with the intent to affect prices, but rather purportedly to hide from NYMEX (not other market participants) alleged prior manipulative conduct.

Complaint fails to state a claim for attempted manipulation.

Indeed, only a few months ago, the Second Circuit dismissed a complaint alleging market manipulation based on high-volume short-selling that purportedly resulted in a substantial decline in stock price. Although the plaintiff alleged trading patterns and anomalous stock fluctuations from which it asked the Court to infer manipulative conduct, the Second Circuit rejected those inferences as too speculative to state a claim for market manipulation. *See ATSI*, 493 F.3d at 102-03. The Court emphasized the need for "manipulative acts" and that legitimate, open-market trading cannot be deemed market manipulation in the absence of actual market deception. *Id.* at 99-100. Rather, "[t]here must be some market activity such as 'wash sales, matched orders or rigged prices.'" *Id.* at 101 (citations omitted). The Court explained, "short selling – even in high volumes – is not by itself manipulative . . . .To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *Id.*

Similarly, in *GFL*, the Third Circuit rejected a manipulation claim based on an alleged scheme to depress stock prices through concentrated short sales that purportedly created a false impression of supply and demand for the stock. In that case, as here, the claim of market manipulation was limited to open and legitimate trades (*e.g.*, short sales) without any fictitious transactions or materially misleading statements to the market. The Third Circuit affirmed summary judgment dismissing the manipulation claim, stating,

> [t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed artificially.

*GFL*, 272 F.3d at 207 (citations omitted). The Third Circuit distinguished the case before it from others that involved a deceptive practice such as unreported sales, sham transactions, false

9

and misleading registration statements and reports, or matched buy and sell orders. *Id.* at 207-208 (citations omitted). It then held that, "short selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded a evidence of market manipulation." *Id.* at 209. The Court concluded,

> to make out a claim of market manipulation, Colkitt must present evidence that GFL engaged in some other type of deceptive behavior in conjunction with its short selling that either injected inaccurate information into the marketplace or created artificial demand for the securities. Colkitt has offered nothing but evidence that GFL engaged in lawful short sales . . . which alone is insufficient to prevail on a claim of market manipulation.

*Id.* at 211; *see also United States v. Mulheren,* 938 F.2d 364, 370-72 (2d Cir. 1991) (traditional badges of manipulation were absent where defendant purchased shares on the open market without wash sales, matched orders or fictitious accounts; "the fact that [defendant] dominated the market between 9:30 a.m. and 11:10 a.m. . . carries little weight"); *United States v. Finnerty,* 474 F. Supp. 2d 530, 542 (S.D.N.Y. 2007) (Chin, J.) (under securities law, manipulation requires misleading or deceiving someone by artificially affecting the market) (citations omitted); *Gruntal & Co., Inc. v. San Diego Bancorp,* 901 F. Supp. 607, 618 (S.D.N.Y. 1995) (Chin, J.) ("Section 10(b) was designed to protect investors from manipulative and deceptive conduct, not to protect share prices from the adverse consequences of large block sales"); *Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 864 (7th Cir. 1995) (defendant's "unprecedented massive short selling" did not create "a false impression of supply or demand" because the transactions involved "real buyers, betting against [defendant]"); *In re Olympia Brewing Co., Sec. Litig.,* 613 F. Supp. 1286, 1289, 1296 (N.D. Ill. 1985) (dismissing manipulation claim based on "short sales at end of the trading days" because "short selling is simply not unlawful, even in large numbers and even if the trading does negatively affect the purchase price").

The manipulation cases specifically involving the CFTC and commodity futures

contracts assert, as the conduct purportedly prohibited by the CEA, the very same types of illegitimate activity present in manipulation cases under the securities laws. For instance, in *In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 503 (S.D.N.Y. 2004), defendants allegedly submitted false price and volume information to several gas industry publications with the goal of artificially skewing the published reports regarding the physical market, and thereby artificially altering the futures market for natural gas. In *Transnor (Bermuda) Ltd. v. BP N. Am.*, 738 F. Supp. 1472, 1493-96 (S.D.N.Y. 1990), the alleged manipulative conduct in violation of CEA included wash sales). *See also Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1164-72 (8th Cir. 1971) (dominant long position allegedly used to engage in a manipulative squeeze); *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1200 (D. Co. 2007) (alleged manipulation included numerous acts of false reporting concerning natural gas physical trades); *CFTC v. Atha*, 420 F. Supp. 2d 1373, 1381 (N.D. Ga. 2006) (CFTC alleged that defendants made up fictitious counterparties to their transactions and that they fabricated price and volume reports); *CFTC v. Johnson*, 408 F. Supp. 2d 259, 266-68 (S.D. Tex. 2005) (defendants allegedly submitted biased trade information and fictitious gas trades with the intent to affect prices); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005) (defendants allegedly fabricated transaction information for the specific purpose of manipulating prices); *CFTC v. Enron*, No. H-03-909, 2004 WL 594752, at *2 (S.D. Tex. March 10, 2004) (alleging conspiracy among traders to bid up the price through a "prearranged buying spree" and to cover any losses suffered by certain traders); *In the Matter of Avista Energy Inc. & Michael T. Griswold*, CFTC No. 01-21, 2001 WL 951736, at **2, 10 (C.F.T.C. Aug. 21 2001) (CFTC alleged scheme to manipulate prices by selling futures contracts below prevailing bids and purchasing them at prices higher than prevailing bids with no apparent business or economic rationale, and other non-competitive trading).

11

In stark contrast to this consistent line of cases, the attempted manipulation alleged in the CFTC Complaint amounts to nothing more than legitimate trading. The Complaint describes the "scheme" as merely "the purchase of a substantial amount of NYMEX natural gas futures contracts in advance of the closing range that Defendants planned to sell during the last half hour on the final day of trading such contracts" with the hope of benefiting Amaranth's legitimate positions on another exchange, the IntercontinentalExchange ("ICE"). (Compl. ¶¶ 23, 30). There are no allegations of false reporting, wash sales, conspiracy, sales below prevailing bids or any other unlawful activity. The failure to allege any such conduct compels dismissal of the CFTC's attempted manipulation claim. *See, e.g., In re College Bound Consol. Litig.*, No. 93 Civ. 2348, 1995 WL 450486, at *5-7 (S.D.N.Y. July 31, 1995) (claim based on open-market trading at end of trading day dismissed because such trading is neither illegal nor deceptive)*; In the Matter of Louis Abrams*, CFTC No. 88-10, 1994 WL 506250, at *10-11 (CFTC Sept. 15, 1994) (dismissing claim for attempted manipulation in violation of the CEA because respondent simply was trying to make money through lawful trading and thus his conduct did not show attempted manipulation); *Indiana Farm Bureau*, 1982 WL 30249, at *5 ("a clear line between lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation").

### 2.    The Complaint Fails Adequately To Allege Intent To Manipulate The Market

Intent is the essence of manipulation. *See Indiana Farm Bureau*, 1982 WL 30249, at *4; *Hohenberg Bros.*, 1977 WL 13526, at *7. Allegations of general intent are not sufficient. Rather, "specific intent to create an 'artificial' or 'distorted' price is a *sine qua non* of manipulation." *Indiana Farm Bureau*, 1982 WL 30249, at *5. No difference exists between the intent required for an actual manipulation claim and that required for an attempted manipulation

12

claim. *See Indiana Farm* Bureau, 1982 WL 30249, at \*4; *Hohenberg*, 1977 WL 13526, at \*7.

To demonstrate the intent element, the CFTC must show that the defendant acted "with the

purpose or conscious object of causing or effecting a price that . . . did not reflect the legitimate

forces of supply and demand." *See CFTC v. Johnson*, 408 F. Supp. 2d at 267 (quoting *Indiana*

*Farm Bureau*).    In addition, the conduct must be calculated to produce a price distortion. *See*

*Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962).

As one CFTC administrative law judge observed, establishing intent in an

attempted manipulation case is extremely difficult:

> The Complaint's allegations of "attempted," as well as actual,
> manipulation, provide the [CFTC] with no easy shortcut to proving
> liability.  In the absence of a completed manipulation, the [CFTC]
> may face enormous difficulty in circumstantially proving specific
> intent, i.e., that the conduct was calculated to produce a price
> distortion.  Indeed, proof of specific intent - in the absence of the
> strongest circumstantial evidence (i.e., a completed manipulation)
> or direct evidence (e.g., credible admissions against interest) - may
> require particularly robust analyses of the very same considerations
> necessary to prove actual manipulation (i.e., domination of
> relevant market, whether trading practices were inconsistent with
> competitive behavior, and ability to leverage across markets).

*In the Matter of Global Minerals & Metals Corp.*, CFTC No. 99-11, 1999 WL 1023586, at \*7

n.8 (C.F.T.C. Nov. 12, 1999) (internal citations and quotations omitted).  This is particularly true

because, where a trader acts with a legitimate investment or commercial purpose, no

manipulative intent can be found. *See Transnor*, 738 F. Supp. at 1495; *see also Crude Oil*, 2007

WL 1946553, at \*8 (the generalized motive that defendants had a large presence in the crude oil

market, the NYMEX futures and options market, and also engaged in the purchase and sale of

over the counter contracts, and thus stood to gain from their dealings in crude oil by

manipulating prices, could be imputed to any corporation with a large market presence in any

commodity market and thus is insufficient to show intent); *CFTC v. Delay*, No. 05 CV 5026,

2006 WL 3359076, at *3 (D. Neb. Nov. 17, 2006) (legitimate trading absent sham transaction or knowingly false reporting precluded finding of manipulative intent).

The CFTC offers only bare-bones conclusory allegations of intent. The Complaint merely states that "Defendants intended to create artificial natural gas futures prices by placing large sell orders in the closing range on expiration day" (Compl. ¶ 26) and that "Defendants sought to lower the prices of the NYMEX natural gas futures contract to benefit Amaranth's larger short natural gas swaps positions on ICE and elsewhere." (Compl. ¶ 30).

Notwithstanding its extensive pre-Complaint discovery, the CFTC does not allege any direct evidence of an intent to artificially distort market prices. Further, the Complaint fails to set forth sufficient circumstantial evidence to infer such intent. The CFTC only cites to a few isolated IMs which do not provide any plausible basis for the scheme alleged by the CFTC.[7] For instance, the Complaint and the IMs fail to provide any cogent explanation as to how Amaranth could have artificially affected prices. As one court stated, without control over the "deliverable supply" of the underlying commodity, manipulation of futures is not even possible. *Board of Trade of Chicago v. SEC*, 187 F.3d 713, 724 (7th Cir. 1999). Absent such control, "there can never be a mismatch between demand and supply near the expiration, or at any other time." *Id.* at 725. The CFTC concedes that Amaranth had no supply of physical natural gas. (Compl. ¶¶ 15, 19). Given the lack of a plausible way to manipulate prices, no adequate allegation of intent exists.[8] Accordingly, the attempted manipulation claim should be dismissed under *Twombly*.

Further, as detailed below, the failure to allege direct or even circumstantial

---

[7] The IM conversations referred to herein are annexed as Exhibit A to the Complaint. Accordingly, the Court may consider them in connection with this motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 127 S. Ct. 2499, 2509 (2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

[8] Amaranth is not asserting as a basis for this motion that a claim for attempted manipulation requires proof that defendants could possibly have manipulated the market. Should the Complaint survive this motion, that issue may need to be addressed. Here, the point is that the CFTC does not allege a sufficient factual basis to infer intent, in part, due to the lack of any allegation or explanation as to how Amaranth could manipulate futures prices.

evidence of intent particularly compels dismissal in light of the necessity for the CFTC's

attempted manipulation claim to satisfy Rule 9(b)'s heightened pleading requirements.

II.    **THE CFTC'S CLAIM FOR ATTEMPTED MANIPULATION (COUNT I)
       SHOULD BE DISMISSED FOR FAILURE TO ALLEGE FACTS JUSTIFYING
       A STRONG INFERENCE OF INTENT AS REQUIRED BY RULE 9(b)**

       A.    **The Attempted Manipulation Claim Is Subject To Rule 9(b)**

              Rule 9(b) mandates that "all averments of fraud" be pled with particularity. Fed.

R. Civ. P. 9(b). In *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), the Second Circuit held

that Rule 9(b) "is not limited to allegations styled or denominated as fraud or expressed in terms

of the constituent elements of a fraud cause of action." Rather, Rule 9(b) is broader and applies

to "claims insofar as the claims are premised on allegations of fraud." *Id.* As the Supreme Court

explained, market manipulation generally refers to fictitious or otherwise deceptive trading

practices "that are intended to mislead investors by artificially affecting market activity." *Santa*

*Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *see also Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 199 (1976) (manipulation "connotes intentional or willful conduct designed to deceive

or defraud investors by controlling or artificially affecting the price of securities"); *Gruntal*, 901

F. Supp. at 618 (while section 10(b) is a catchall provision, "what it catches must be fraud")

(quoting *Chiarella v. U. S.*, 445 U.S. 222, 234-35 (1980)). A few months ago, the Second

Circuit concluded, "[b]ecause a claim for market manipulation is a claim for fraud, it must be

pled with particularity under Rule 9(b)." *ATSI*, 493 F.3d at 101 (citations omitted). It reasoned,

> case law in this circuit and elsewhere has required a showing that
> an alleged manipulator engaged in market activity aimed at
> deceiving investors as to how other market participants have
> valued a security. The deception arises from the fact that investors
> are misled to believe that prices at which they purchase and sell
> securities are determined by the natural interplay of supply and
> demand, not rigged by manipulators.

*Id.*, at 100 (citations omitted). Thus, the CFTC's attempted manipulation claim under the CEA is

15

subject to the heightened pleading requirements of Rule 9(b).[9]

Even prior to the Second Circuit's decision in *ATSI*, two cases in this district applied Rule 9(b) to claims for manipulation under section 9(a)(2) of the CEA, the same section at issue here. *See In re Natural Gas Commodity Litig.*, 358 F.Supp.2d 336 (S.D.N.Y. 2005) (*"Natural Gas II"); In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007). The Court in *Natural Gas II* stated that Rule 9(b) applied because, "a complaint that sounds in fraud must comply with Rule 9(b)'s requirements even if the Complaint does not allege a cause of action requiring proof of fraud." *Id.* at 343. In a prior decision, the Court quoted the Seventh Circuit which, in an action brought by the CFTC for violation of the CEA, classified "manipulation as a 'species of fraud'." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004) ("*Natural Gas I*") (quoting *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000)). The Court held that because the alleged manipulative scheme was "classically associated with fraud" the Complaint must comply with the requirements of Rule 9(b). *See Natural Gas II*, 358 F. Supp. 2d at 343.[10]

In *Crude Oil,* the Court dismissed plaintiff's claim alleging manipulation of the price of futures contracts in violation of section 9(a)(2) of the CEA for failure to plead in compliance with Rule 9(b). Notwithstanding that the plaintiffs, like the CFTC here, had "carefully avoided the word 'fraud' in their complaint," because the "crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand," the manipulation claim was subject to Rule 9(b)'s heightened pleading requirements. *Crude Oil,*

---

[9] The Court in *ATSI* indicated that a more relaxed Rule 9(b) pleading standard could apply to manipulation claims if the facts regarding the alleged manipulative scheme were "solely within the defendant's knowledge." *ATSI*, 493 F.3d at 102. Here, that is clearly not the case given the CFTC's extensive pre-Complaint discovery detailed above.

[10] In *Natural Gas I*, the Court analyzed the Complaint under Rule 8, not Rule 9(b). *See Natural Gas I,* 337 F. Supp. at 509. In *Natural Gas II*, the Court applied Rule 9(b), noting that in *Natural Gas I*, no party argued that Rule 9(b) governed. *See Natural Gas I,* 337 F. Supp. at 509; *Natural Gas II*, 368 F. Supp. 2d at 342.

2007 WL 1946553, at *5; *see Krause v. Forex Exch. Market, Inc.*, 356 F. Supp. 2d 332, 338-39 (S.D.N.Y. 2005) (Rule 9(b) applies to claim for aiding and abetting violation of the CEA).[11]

The Courts in *Natural Gas II* and *Crude Oil* both held that the manipulation claims under section 9(a)(2) of the CEA in their respective cases were subject to Rule 9(b), but did not mandate heightened pleading for all manipulation cases. Rather, those two Courts applied a case-by-case approach, analyzing whether the specific allegations sounded in fraud. Both of those cases, however, were decided before the Second Circuit issued its opinion in *ATSI*, which, as noted above, explicitly holds that market manipulation is a claim for fraud and thus is subject to Rule 9(b). *See ATSI*, 493 F.3d at 101. Therefore, any attempted manipulation claim under the CEA must be pled in accordance with Rule 9(b).

Even under a case-by-case approach, however, the CFTC's Complaint is subject to Rule 9(b). The essence of the allegations is that Amaranth's trading was designed to mislead the market regarding the true supply and demand for NYMEX futures contracts. The CFTC alleges that Amaranth attempted to manipulate the price of natural gas futures contracts on the NYMEX by placing large sell orders in the closing range on expiration day. (Compl. ¶¶ 7, 23, 26, 31, 44). Further, the Complaint asserts that "Defendant Hunter knew that his selling would mute the effect of buyers, whose purchases would tend to exert upward price pressure." (Compl. ¶ 54). Thus, even if not all manipulation claims are subject to Rule 9(b), the CFTC's claim in

---

[11] There are some cases outside this Circuit holding that Rule 9(b)'s heightened pleading requirements do not apply to claims for manipulation in violation of the CEA. *See, e.g., CFTC v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at *3 (S.D. Tx. March 10, 2004); *CFTC v. Johnson*, 408 F. Supp. 2d 259, 270 (S.D. Tx. 2005). In *Premium Plus Partners v. Davis*, No. 04 C 1851, 2005 WL 711591, at *14-15 (N.D. Ill. March 28, 2005), the Court held that, on the facts presented, Rule 9(b) did not apply. For the reasons articulated above, Amaranth respectfully asserts that these decisions fail to recognize that manipulation is a "species of fraud," and thus requires compliance with Rule 9(b). This is particularly true in light of the recent Second Circuit decision in *ATSI* which was issued subsequent to all of the foregoing decisions. Prior to *ATSI*, other courts declined to reach the issue of whether Rule 9(b) applies to manipulation claims under the CEA, but expressed the view that the issue was unresolved. *See, e.g., Three Crown Limited Partnership v. Caxton Corp.*, 817 F. Supp. 1033, 1043 n.19 (S.D.N.Y. 1993); *CTFC v. Bradley*, 408 F. Supp. 2d 1214, 1222 (N.D. Ok. 2005); *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1200 (D. Co. 2007); *CFTC v. Atha*, 420 F. Supp. 2d 1373, 1381-82 (N.D. Ga. 2006).

this case must satisfy its heightened pleading requirements.

### B.    The Complaint Fails To Satisfy Rule 9(b)'s Heightened Pleading Requirements

#### 1.    The CFTC Must Allege Facts Justifying A Strong Inference Of Manipulative Intent

The Supreme Court's recent landmark decision, *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 127 S. Ct. 2499 (2007), provides critical direction regarding the standard that the CFTC must meet in pleading intent. That is because *Tellabs* addressed the pleading requirements for claims brought under the Private Securities Litigation Reform Act ("PSLRA"), and the PSLRA codified the Second Circuit's pre-existing "strong inference standard" for pleading scienter under Rule 9(b). *Id.* at 2509; *Crude Oil*, 2007 WL 1946553, at *7 n.5. As a result, courts in this district have applied the heightened scienter requirement enunciated in *Tellabs* to non-PSLRA fraud claims. For instance, as noted above, the Court in *Crude Oil* applied Rule 9(b) to a claim for manipulation under the CEA stating that the "adoption of a heightened pleading standard in the context of the claims presented herein is in conformity with the direction of the Court" in *Tellabs. Crude Oil*, 2007 WL 1946553, at *7 n.5; *see also Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *10 (S.D.N.Y. July 26, 2007) (analysis for interpreting inferences in *Tellabs* extends beyond the specific context of the PSLRA to common law fraud claims subject to Rule 9(b)); *In re Parmalat Secur. Litig.*, 501 F. Supp. 2d 560, 573 n.88 (S.D.N.Y. 2007) (citing *Tellabs* for scienter standard in context of common law fraud claim).

In *Tellabs*, the Supreme Court instructed that, when determining whether a plaintiff has alleged facts that give rise to a strong inference of scienter, courts "must take into account plausible opposing inferences." *Id.* at 2509. The Supreme Court further stated that:

> [T]he inference of scienter . . . must be more than merely
> 'reasonable' or 'permissible' - it must be cogent and compelling,
> thus strong in light of other explanations.  A complaint will
> survive, we hold, only if a reasonable person would deem the
> inference of scienter cogent and at least as compelling as any
> opposing inference one could draw from the facts alleged.

*Id.* at 2510.  The CFTC fails to meet this standard.

Despite pre-Complaint examinations of over a dozen former or current Amaranth employees, the CFTC does not cite any testimony in support of its conclusory allegations of manipulative intent.  It relies instead on a few isolated IMs that fail to raise a strong inference of intent.  All that is alleged, and all that the IMs show, is that on two days, February 24, 2006 and April 26, 2006, Amaranth made lawful trades it hoped would be profitable, based on its expectation of price movements of natural gas futures contracts.  That is simply not enough to meet the CFTC's pleading burden.  *See ATSI*, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation.") (citations omitted).

### 2.    February 24, 2006

The CFTC tries to infer an intent to manipulate in connection with Amaranth's February 24, 2006 trading because Brian Hunter stated in an IM that he needed March natural gas futures to get "smashed," *i.e.*, prices to fall fast.  (Compl. ¶¶ 36-37).  The Complaint lacks any explanation of why or how this conversation supports a specific intent to create an artificial price.  There is no admission of a manipulative intent, no mention of manipulation or any language that could even be interpreted to suggest such an intent contained in any IM conversation attached to the Complaint.  Additionally, there is no mention in these IMs of Amaranth's positions on ICE which seems, in the CFTC's theory, to provide the motive as to

19

why Amaranth sold its NYMEX natural gas futures contracts. (Compl. ¶ 30).[12]

Indeed, while the Complaint selectively quotes a few IMs, a review of the complete conversations upon which the CFTC relies demonstrates that Mr. Hunter simply was trying a trading strategy he hoped would succeed based on recent price movements, and was not attempting to manipulate the market. For example, the fact that Amaranth wanted to have "lots of futures" to sell on February 24 is because it had noticed a radical shift (*i.e.* "big changes") in pricing on February 23 as a part of large volume buying by some other market participant. (Compl. Ex. A, AALLC__REG0684055-56). This is clear because the request to have "lots of futures" cited by the CFTC (Compl. ¶ 32), came *after* the discussion of the market changes which occurred on February 23. Further, a review of the complete IM containing the language about the market getting "smashed" indicates nothing more than Mr. Hunter and Mr. Donohoe discussing market conditions and the potential impact on their positions. This is evident from the fact that Mr. Hunter was responding to a comment from another trader, Mr. Calhoun, that there was "pain everywhere" in the market that day. (Compl. Ex. A, AALLC__REG0684186-87). In the language of the Supreme Court, the "cogent" and more "compelling" inference is that Mr. Hunter hoped prices would come down, not that he engaged in any scheme to manipulate prices.

The CFTC also asserts that Mr. Hunter disclosed the alleged "manipulative scheme" to another trader. (Compl. ¶¶ 38-39). This inference simply is not compelling, and actually cuts against the CFTC's theory. If Mr. Hunter was truly trying to manipulate the market, he would not disclose that to another trader at any time, and he certainly would not do so

---

[12] The CFTC makes the conclusory statement that "Defendants sought to lower the prices of the NYMEX gas futures contract to benefit Amaranth's larger short natural gas swaps positions on ICE and elsewhere." (Compl. ¶ 30). The CFTC provides no detail of how this alleged manipulation could work in practice. Moreover, the CFTC fails to allege why a trader would engage in such a "scheme" given the virtual impossibility of knowing what volume of trading would occur, and thus how one's other positions would be affected. Certainly, this lack of specificity fails to satisfy Rule 9(b).

before the close of the trading day, as is alleged. These IMs actually discuss the market conditions and that Amaranth was trying a strategy, *i.e.* "an experiment" (and nowhere are the specifics of the "experiment" described in IMs ), based on the unusual market conditions seen the previous day. (Compl. Ex. A, AALLC__REG0684227; AALLC__REG0684264). It is clear from the IMs that Mr. Hunter's reference to "an experiment" specifically refers to the price spike on February 23 and his belief that there may be a similar price spike on February 24. Further, because the CFTC does not allege that Mr. Hunter conspired with any other trader to manipulate prices, any disclosure of the alleged manipulative scheme to another trader is wholly irrelevant.

The CFTC also points to an IM on February 24 at 2:15 p.m. in which Mr. Hunter states, "today came together quite nicely." (Compl. ¶ 40). The statement, taken out of context, appears to be used by the CFTC to support its notion of a purported scheme by Amaranth to manipulate the settlement price. Discussion about the profit and loss for the day, however, certainly does not support a strong inference manipulative intent. Rather, it merely demonstrates typical conversations among traders. (Compl. Ex. A, AALLC__REG0704931).

### 3.    April 26, 2006

With respect to the April 26, 2006 trading, the CFTC asserts that Amaranth obtained a large long futures position in order to sell near the end of the closing range. (Compl. ¶ 44). Again, this is nothing more than lawful trading. Amaranth's strategy going into the expiration for the May 2006 contract on April 26, 2006 was to reduce the risk in its overall natural gas portfolio. (Compl. Ex. A, A__CFTC032874-76) (discussing plan to reduce long winter position). The Complaint itself alleges that Amaranth's strategy was driven, in part, by a concern that another hedge fund was going to be a large buyer of natural gas futures near the close. (Compl. ¶¶ 48-50). Further, the Complaint asserts that Mr. Hunter thought other buyers existed and thus he was waiting to sell. (Compl. ¶¶ 52-53). Far from suggesting any

21

manipulative conduct, the Complaint itself reflects a legitimate business response to the anticipated actions of other traders.

The Complaint makes much of the fact that Amaranth waited until the last eight minutes of the April 26 closing range to sell its natural gas futures contracts. (Compl. ¶¶ 55-60). First, and most importantly, the CFTC does not, and could not, allege that there is anything inherently improper about selling near the end of the close. Second, placing orders for the last eight minutes provided Amaranth the most time to effectuate sales of its winter positions and subsequently determine, based on the success or failure of those efforts, whether to sell its May contracts or roll them into June. Third, even assuming the CFTC's theory of price effect, selling late in the closing range actually is less likely to affect prices because there would be less time for other traders to react. Once again, the more compelling inference, especially given that all of Amaranth's trading was lawful and lacked any deceptive techniques, is that no specific intent existed to manipulate the market. Rather, Amaranth was implementing a legitimate trading strategy based on its analysis of the market. *See ATSI*, 493 F.3d at 103-04 (speculative inferences are insufficient to plead intent to manipulate). The facts on which the CFTC seeks to rely simply do not provide a compelling basis to infer manipulative intent.

Under the standard set forth in *Tellabs*, with respect to both February 24, 2006 and April 26, 2006, the inference of legitimate trading is more compelling than an inference of manipulative intent, and the Complaint certainly does not provide a cogent, or even plausible, basis to infer intent. Thus, the Complaint should be dismissed for failure to satisfy the heightened pleading standard applicable to claims sounding in fraud. Indeed, in affirming dismissal of manipulation claims for failure to satisfy the heightened pleading requirements, the Second Circuit stated, in language equally applicable here,

22

> there is a "plausible nonculpable explanation [    ]" for the
> defendants' actions that is more likely than any inference that the
> defendants intended to manipulate the market, *see Tellabs*, 127
> S.Ct. at 2510: ATSI and the defendants simply entered into
> mutually beneficial financing transactions. Further, because ATSI
> has not adequately pled that the defendants engaged in any short
> sales or other potentially manipulative activity, there is no
> circumstantial evidence of manipulative intent. *See Ganino*, 228
> F.3d at 168-69. Accordingly, more specific allegations are
> required.

*ATSI*, 493 F.3d at 104.[13]

## III. THE CFTC'S "COVER-UP" CLAIM (COUNT 2) SHOULD BE DISMISSED

The Complaint alleges that Amaranth engaged in a "cover up" related to its

trading activity on April 26, 2006. According to the Complaint, by letter dated August 2, 2006,

the NYMEX requested a "written explanation of the commercial need and justification" for

Amaranth's trading on April 26, 2006. (Compl. Ex. B). Amaranth submitted a letter providing

such explanation (the "August 15 Letter") (Compl. Ex. C). Allegedly, "[i]n that letter Amaranth

willfully falsified, concealed, or covered up by trick, scheme or artifice a material fact and/or

made false, fictitious, or fraudulent statements or representations in describing its April 26, 2006

trading." (Compl. ¶ 66). This claim is wholly dependent on the existence of the alleged

attempted manipulation because absent an attempt to manipulate, there was nothing to "cover

up." Thus, if the attempted manipulation claim is dismissed, so should the "cover-up" claim.

Moreover, even if the attempted manipulation claim survives, the "cover-up"

claim should be dismissed because the Complaint does not adequately allege the necessary

elements of such a claim. As the "cover-up" claim is essentially a claim for fraudulent

---

[13] Even under the pre-*Tellabs* Second Circuit standard for pleading scienter, the Complaint should be dismissed. That standard required plaintiff to show a strong inference of intent by alleging facts either showing (a) motive and opportunity to commit fraud; or (b) circumstantial evidence of conscious wrongdoing. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (citations omitted). The only motive alleged is the general motive of all businesses to profit, which as a matter of law, is not sufficient. *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). For the reasons detailed above, no adequate allegations of circumstantial evidence of intent exist.

concealment, it must satisfy Rule 9(b)'s heightened pleading requirements. *See Nilsen v. Prudential-Bache Securities*, 761 F. Supp. 279, 290 (S.D.N.Y. 1991) (Rule 9(b) applies to a claim for fraudulent concealment in violation of the CEA). Although the Complaint states, in conclusory fashion, that the August 15 Letter contained "a number of false and misleading statements," it does not provide any cogent explanation as to how or why any of the statements are untrue. (Compl. ¶ 68). The August 15 Letter explained that Amaranth's primary natural gas futures trading strategy leading up to April 2006 was to hold long winter month positions and short summer month positions, and that its goal was to reduce its overall holdings. The August 15 Letter explains, however, that Amaranth was unable to sell its winter contracts at attractive prices. (Compl. Ex. C). The Complaint does not allege if, or how, these statements of strategy were false or misleading.

Instead, the Complaint alleges, in conclusory fashion, that the statement that "Amaranth decided (to the best of its recollection) at some time between approximately at 2:17 p.m. – 2:23 p.m., to sell" somehow is untrue. (Compl. ¶ 68, Ex. C). Despite the CFTC's extensive pre-Complaint discovery, no documentary evidence, testimony or any other basis is provided to substantiate this allegation. The IMs attached to the Complaint do not demonstrate that Mr. Hunter had decided to sell the expiring contracts earlier in the day, *i.e.*, before the closing range. He merely stated, during the close at approximately 2:06 p.m., a difference of only 11 minutes, that Amaranth had "yet to sell" and "we are waiting to sell." The Complaint also alleges that Amaranth's statement that it did not instruct any sales to be executed post-close is false. (Compl. ¶ 68). The CFTC provides no factual basis for this conclusory allegation. To the contrary, elsewhere in the Complaint the CFTC makes much of the allegation concerning Amaranth's instruction to sell its expiring May 2006 NYMEX natural gas futures contracts in the

24

last eight minutes of the close (Compl. ¶¶ 55-60), which certainly is not post-close.[14]

## Conclusion

For all the foregoing reasons, and those stated in the memorandum of law

submitted by defendant Brian Hunter, Amaranth respectfully requests that this Court dismiss the

Complaint in its entirely and grant such other relief as this Court deems just and proper.

Dated: New York, New York
      November 8, 2007

                    Respectfully submitted,

                    **WINSTON & STRAWN LLP**

                    By:   /s/ Steven M. Schwartz
                        David E. Mollón (DM-5624)
                        Steven M. Schwartz (SS-4216)
                        Lauren B. Lepore (LL-0772)

                    200 Park Avenue
                    New York, New York 10166
                    (212) 294-6700

                    Stephen J. Senderowitz
                    Kristen V. Grisius
                    35 West Wacker Drive
                    Chicago, IL 60601
                    (312) 558-5600

                    *Attorneys for Defendants Amaranth*
                    *Advisors L.L.C. and Amaranth*
                    *Advisors (Calgary) ULC*

---

[14] At the time it sent the August 15 Letter, Amaranth did not have in its possession the order tickets, the only documentation relied on by the CFTC, which the CFTC apparently obtained from floor brokers during its investigation. Further, Amaranth did not have any other documentation, indicating that an instruction was in fact given to execute orders in the last eight minutes. Months after the fact it is hard to imagine anyone even remembering such an instruction, and the August 15 Letter itself expressly provides that the statement regarding the timing of when Amaranth decided to sell was made "to the best of its recollection." (Compl. Ex. C).