UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                             :

U.S. COMMODITY FUTURES TRADING   :   07 Civ. 6682 (DC)
COMMISSION,                          :

                             :   ECF Case
    Plaintiff,                 :

                             :   **Oral Argument Requested**
    v.                      :

AMARANTH ADVISORS, L.L.C., AMARANTH :
ADVISORS (CALGARY) ULC AND BRIAN   :
HUNTER,                       :

    Defendants.              :
                             :
———————————————————————x


**DEFENDANT BRIAN HUNTER'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT**

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

*Counsel for Brian Hunter*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 3

    I.     THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF
          PERSONAL JURISDICTION ................................................................... 3

          A.     The CFTC Has Failed To Allege Sufficient "Minimum
               Contacts" With The United States ............................................... 3

          B.     The Exercise Of Jurisdiction Is Not Consistent With
               Traditional Notions of Fair Play and Substantial Justice ........... 5

    II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR
          ATTEMPTED MANIPULATION BECAUSE IT FAILS TO
          PLEAD THAT THE RESULTING PRICE WOULD BE
          ARTIFICIAL ............................................................................................ 7

          A.     To State A Claim For Attempted Manipulation, CFTC
               Must Adequately Allege That Hunter Sought A Price
               That Would Be Artificial, Thereby Deceiving Investors ........... 8

          B.     The Complaint Fails To Adequately Plead That The
               Price Would Be Artificial ........................................................ 14

    III.   THE CFTC FAILS TO ADEQUATELY PLEAD INTENT
          UNDER RULE 9(B) ................................................................................ 16

          A.     The CFTC Must Plead Facts Giving Rise To A Strong
               Inference Of Specific Intent, Taking Into Account All
               Plausible Opposing Inferences .................................................. 17

          B.     The CFTC Fails to Allege A Motive That Is Personal to
               Hunter ...................................................................................... 18

          C.     The CFTC Fails To Allege Facts Constituting Strong
               Circumstantial Evidence Of Intent To Manipulate ................. 20

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Group, Inc*., 47 F.3d 47 (2d Cir. 1995) ................................................ 19

*Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989) ................................... 10, 13

*Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1997) ....................................... 6

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87
(2d Cir. 2007) ..................................................................... 9, 10, 15, 17, 18

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d
Cir. 2002) .......................................................................................................... 4

*Bell Atlantic Corp. v. Twombly*, ---U.S.----, 127 S.Ct. 1955 (2007) ............................... 15

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.), *cert. denied*, 423
U.S. 1018 (1975) .............................................................................................. 4

*C.F.T.C. v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) ............................................... 14

*C.F.T.C. v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) ....................................... 14

*C.F.T.C. v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) ........................................... 14

*Calder v. Jones*, 465 U.S. 783 (1984) .............................................................................. 5

*Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971) ..................................................... 8

*Castillo v. Dean Witter Discover & Co.*, 97 Civ. 1272 (RPP), 1998 WL
342050 (S.D.N.Y. June 25, 1998) ................................................................... 20

*CFTC v. Enron*, No. H-03-909, 2004 WL 594752 (S.D. Tex. March 10,
2004) ................................................................................................................ 14

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996) ............................................ 16

*DGM Investments, Inc. v. New York Futures Exchange, Inc.*, 265 F.Supp.2d
254 (S.D.N.Y. 2003) ........................................................................................ 14

*Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991) ..................................... 19

*Fisher v. Offerman & Co.*, Inc., 95 Civ. 2566 (JGK), 1996 WL 563141
(S.D.N.Y. Oct. 2, 1996) ................................................................................... 20

*Frey v. CFTC*, 931 F.2d 1171 (7th Cir. 1991) ............................................................ 8, 13

*G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir. 1958) .................................. 13

*General Foods Corp. v. Brannan*, 170 F.2d 220 (7th Cir. 1948) ...................................... 13

*GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ................... 10, 11, 12

*Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476 (7th Cir.
1953) ................................................................................................................ 13

*Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y.
1995) .......................................................................................................... 10, 11

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ............................................................. 9

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................................................................................ 19

*In re College Bound Consolidated Litigation*, Nos. 93 Civ. 2348 (MBM), 94 Civ. 3033 (MBM), 1995 WL 450486 (S.D.N.Y. July 31, 1995) ............................ 10, 15

*In re Crude Oil Commodity Litigation*, 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ............................................................... 14, 17

*In re Henner*, 30 A.D. 1151 (Agric. Dec. 1971) ............................................................. 14

*In re Natural Gas Commodity Litigation*, 337 F.Supp. 2d 498 (S.D.N.Y. 2004) ................................................................................................................................ 13, 17

*In re Olympia Brewing Co.*, 613 F. Supp. 1286 (N.D. Ill. 1985) ...................................... 10

*In re Soybean Futures Litigation*, 892 F. Supp. 1025 (N.D. Ill. 1995) ............................... 8

*In the Matter of Avista Energy, Inc.*, CFTC No. 01-21, 2001 WL 951736 (C.F.T.C. 2001) .............................................................................................................. 14

*In the Matter of Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL 13562 (C.F.T.C. 1977) ........................................................................................................... 8, 13

*In the Matter of Indiana Farm Bureau Coop. Ass'n*, CFTC No. 75-14, 1982 WL 30249 (C.F.T.C. 1982) ......................................................................... 8, 13, 16, 17

*Internet Law Library, Inc., v. Southridge Capital Management*, LLC, 223 F. Supp. 2d 474 (S.D.N.Y. 2002) ...................................................................................... 14

*Kohen v. Pacific Investment Management Company LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) ......................................................................................................... 13

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) ............................................................................................................... 4, 5

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) ................................................................................................................... 3, 5

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, 02 Civ. 0767 (LBS), 2002 WL 31819207 (S.D.N.Y. October 10, 2002) ........................... 14

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .............................................................. 19

*S.E.C. v. Schiffer*, 97 Civ. 5853 (RO), 1998 WL 307375 (S.D.N.Y. June 11, 1998) ................................................................................................................................ 14

*S.E.C. v. U.S. Environmental*, 82 F.Supp.2d 237 (S.D.N.Y. 2000) .................................. 17

*S.E.C. v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .................................................... 4, 5

*Santa Fe Industries, Inc., v. Green*, 430 U.S. 462 (1977) ............................................ 9, 10

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994) ................................ 17, 19

*Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236 (2d Cir. 2002) ............................. 15

*Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 862 (7th Cir. 1995).......... 10, 12, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ----, 127 S.Ct. 2499
    (2007) ..................................................................................................... 18, 21

*Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033 (S.D.N.Y.
    2003)........................................................................................................... 13

*United States v. Finnerty*, 474 F. Supp. 2d 530, 542 (S.D.N.Y. 2007)............................ 11

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).................................................. 10

*Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730 (S.D.N.Y. 2001)................................ 20

*Volkart Brothers, Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962) ................................... 8, 13

**Statutes**

Alberta Rules of Court, Rules 518, 601(1) ........................................................................ 7

Defendant Brian Hunter ("Hunter") respectfully submits this memorandum of law in support of his motion to dismiss the complaint of plaintiff United States Commodity Futures Trading Commission (the "CFTC").

## PRELIMINARY STATEMENT

In essence, the CFTC's Complaint against Brian Hunter—a non-resident, non-U.S. citizen working in Canada for a Canadian entity during the relevant time period—alleges that he attempted to "manipulate" the price of two natural gas futures contracts traded on the New York Mercantile Exchange ("NYMEX") solely by conducting legitimate, open-market trades on the NYMEX futures exchange.  (Complaint ¶¶ 23-30.)[1]

Other than repeating the conclusory word "artificial" like a mantra, the Complaint does not allege a single fact to support the inference that Hunter sought to effect a price that would in fact *be* artificial under the law, *i.e.*, that the resulting price would somehow "mislead" or "deceive" investors about the forces of supply and demand.  No one is alleged to have been deceived about who was buying and selling the futures, how many futures were actually traded, when the futures were traded, or at what price.  Hunter is not alleged to have attempted fictitious or inherently deceptive trades such as wash sales, matched orders or rigged prices, or to have otherwise spread misinformation.  He is not alleged to have attempted to manipulate prices through a "corner" or "squeeze" on the commodities, or otherwise force counterparties to deal with him.  No NYMEX rule is alleged to have been violated by the fact that these sales occurred during the closing range.  Indeed, Hunter is not alleged to have sought or sold the futures at anything other than the prevailing market prices.

In short, there is no allegation that the price resulting from the alleged transactions would be anything other than the product of open trading at prevailing market prices.  As a

---

[1]    Hereinafter, all citations to paragraph numbers ("¶") will be in reference to the Complaint.

result, the Complaint fails to state a claim for attempted manipulation and should be dismissed under Rule 12(b)(6).  *See* Point II, *infra*.

The Complaint also fails to allege specific facts regarding intent, which is a necessary element of the causes of action that have been pled.  The Complaint alleges in a conclusory manner that Hunter was motivated to depress prices by a desire for Amaranth to profit from expiring short positions the fund held on certain over-the-counter ("OTC") markets, including the InterContinentalExchange ("ICE").  (¶¶ 30, 41, 47-8.)  However, there is no allegation that an alleged price depression scheme would in fact benefit Amaranth's overall portfolio on a net basis.  Nor is there any allegation that Hunter stood to personally benefit from such a scheme.  Furthermore, while the Complaint purports to quote snippets of certain instant messages ("IMs"), these messages do not lead to a legally sufficient inference that Hunter intended to depress prices through his trades ("artificially" or otherwise).  Thus, the Complaint has also failed to allege the element of intent sufficient to satisfy the applicable pleading requirements of Rule 9(b).  *See* Point III, *infra*.

But the Court need not address these issues, as the Complaint suffers from a more fundamental, threshold defect.  It fails to establish, as it must, that this Court's exercise of personal jurisdiction over Hunter would satisfy Due Process.  As such, it should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.[2]  *See* Point I, *infra*.

---

[2]     Pursuant to Your Honor's suggestion made at the pre-motion conference on November 1, we wish to note for the record that we made only a special appearance at that conference, while continuing to maintain and not waiving any of Hunter's objections to this Court's exercise of personal jurisdiction.

## **ARGUMENT**

## I.    **THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION**

The CFTC's Complaint fails to allege facts that are legally sufficient to establish this Court's jurisdiction over Brian Hunter. Indeed, all of Hunter's alleged acts occurred outside the United States, and *are not alleged to have had any actual manipulative effect on U.S. markets*. There is simply no precedent for this Court to exercise jurisdiction over a non-resident, non-U.S. citizen in such a situation.

To meet its burden, the Complaint must satisfy a two-part test: first, it must demonstrate that Hunter had sufficient "minimum contacts" with the United States; and second, it must establish that subjecting Hunter to this Court's jurisdiction comports with "traditional notions of fair play and substantial justice." *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). The CFTC's allegations fail under both prongs.

### A.    The CFTC Has Failed To Allege Sufficient "Minimum Contacts" With The United States

The Complaint fails to establish that Hunter had sufficient "minimum contacts" with the United States. Brian Hunter is a resident of Canada. (¶ 14.) He is not alleged to be a U.S. citizen. During the relevant time period, Hunter was a non-resident employee of a Canadian entity that has its principal place of business in Canada and has never been registered with the CFTC. (¶¶ 11, 14.) Hunter is not alleged to have committed a single act within the United States related to the alleged violation or to have even been present here during the relevant time period.

In such a situation, where an individual has not acted within the forum, the relevant test for specific jurisdiction[3] is whether the individual "cause[d] effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and the individual's relationship to the state makes the exercise of . . . jurisdiction unreasonable." *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972) (quoting Restatement (Second) of Conflict of Laws § 37 (1989)).

The Second Circuit has warned, however, that the principal of "causing effects" within the forum state is one that "must be exercised with caution, particularly in an international context." *Leasco,* 468 F.2d at 1341. "At minimum the conduct must meet the test laid down in § 18 of the Restatement (Second) of Foreign Relations Law, including the important requirement that the *effect 'occurs* as a direct and foreseeable result of the conduct outside the territory.'" *Id.* (emphasis added). Thus, the Second Circuit has held that, "[N]ot every causal connection between action abroad and ultimate injury to American investors will suffice" for personal jurisdiction purposes. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 1000 (2d Cir.), *cert. denied*, 423 U.S. 1018 (1975)). Moreover, as the Second Circuit has cautioned, "Not every securities law violation involving shares of a United States corporation will have the requisite effect within the United States." *Unifund SAL*, 910 F.2d at 1033.

Thus, decisions finding jurisdiction over foreign traders who trade on U.S. exchanges allege conduct that actually has an injurious effect on U.S. markets or investors. In *Unifund*, for example, the Second Circuit found jurisdiction over a foreign trader only after having

---

[3]    The Complaint has not alleged any facts that would even remotely suggest that Hunter had "continuous and systematic general business contacts" with the United States sufficient to give rise to "general jurisdiction," *i.e.*, jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).

concluded that the violation was one that had "serious effects" upon U.S. shareholders and that the defendant's conduct was "alleged to have had a rather *direct* and an unmistakably foreseeable *effect* within the United States." *Id.* (emphasis added).

Here, there is *no* allegation that Hunter's actions had *any* effect on U.S. investors or markets. Indeed, by the very nature of the claim that the CFTC has brought—*attempted* manipulation—the CFTC implicitly concedes that Hunter's alleged acts had no effect on U.S. markets (or at least fails completely to allege any). No U.S. investor or trader is even alleged to have been injured.

Our research has not uncovered a single decision holding that a court may exercise jurisdiction over a foreign person for merely *attempting* to cause an injury or violation in the forum state, without actually having caused an injurious effect. Thus, the CFTC is asking this Court to create new law. Given the Second Circuit's warning that the principle should be "applied with caution, particularly in an international context," *Leasco*, 468 F.2d at 1341, we respectfully submit that the Court should not do so here.[4]

B.    The Exercise Of Jurisdiction Is Not Consistent With Traditional Notions of Fair Play and Substantial Justice

The assertion of jurisdiction over Hunter also fails to "comport[] with traditional notions of fair play and substantial justice." *See Metropolitan Life*, 84 F.3d at 568. This second prong of the due process analysis requires the Court to consider several factors,

---

[4]    In addition, aside from the failure to allege any effect on the U.S. markets, the Complaint should be dismissed because the relationship that Hunter is alleged to have had with the NYMEX trades at issue is too attenuated. There is no allegation that Hunter personally executed the trades. Furthermore, even if Hunter could be deemed to have somehow "caused" the trades at issue, he was trading on behalf of his foreign-based employer. While the fact that he was acting as an employee does not insulate him from a finding of jurisdiction, there is no allegation supporting the proposition that Hunter was a "primary participant" in the alleged violation. *Compare Calder v. Jones*, 465 U.S. 783 (1984) (in a *non-international* case, finding jurisdiction comported with due process where defendants were the ones who *actually wrote and edited the article* alleged to have caused the injury).

including the burden on the defendant, the interests of the forum jurisdiction, and the plaintiff's interest in obtaining relief. *See id.* These factors counsel for dismissal.

*Burden on the defendant.* The burden on Hunter would be severe. Hunter—a Canadian citizen residing in Western Canada who at all relevant times was working in Canada for a Canadian affiliate of Amaranth Advisors LLC—would be forced to traverse several thousand miles from his home in Calgary to this Court and be required to litigate in what for him are a foreign set of procedures and laws.[5] The Court should place significant weight on these unique burdens in assessing the reasonableness of stretching personal jurisdiction over national borders. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1997) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." (internal citation omitted)).

*Interest of the forum jurisdiction.* As described above, the Complaint alleges no connection between any actual harm to persons in the United States and the case against Hunter individually. The Complaint is essentially faulting Hunter for allegedly "thinking bad thoughts" in Canada although the trading at issue on the NYMEX was not fraudulent or deceptive and had no effect on U.S. markets. In this context, the interest of the United States in adjudicating this matter is less than compelling.

---

[5]     Hunter's home jurisdiction has procedural rules that differ markedly from ours. For example, in Canada, there are fewer jury trials in civil cases than there are in the United States (as there is no constitutional right in Canada to trial by jury in such suits), which generally results in greater certainty and predictability of outcomes in complex commercial matters, less bias against a deep-pocket or a foreign defendant, and generally lower damage awards. *See* S. Wayne Morris, *A Comparison of Legal Systems: Canada and the United States*, *at* http://64.233.169.104/search?q=cache:8RLRNx2v9OUJ:www.projecteagle.com/articles/pe001.pdf+comparison+of+legal+systems+canada+united+states&hl=en&ct=clnk&cd=1&gl=us. In addition, in Canada, there is a general rule that the party who loses the lawsuit must pay the winning party's legal costs, as opposed to in the United States where each party bears the costs of his or her own legal fees (regardless of who wins), with only a few exceptions. *See* Alberta Rules of Court, Rules 518, 601(1). The loser-pays rule in Canada increases the monetary risk to the losing party and thus discourages frivolous or weak claims.

*Plaintiff's interest in obtaining convenient and effective relief.*  An action here would do little to advance the CFTC's ability to obtain the relief it seeks:  Even assuming the CFTC were successful in this litigation, it would still need to have that judgment domesticated in Alberta Province, Canada (where Hunter lives and works).  A United States judgment against Hunter, in turn, may not necessarily be recognized or enforced in Alberta, as it would likely neither be summarily imported in Alberta nor imported as a matter of right.[6]  Thus, in order to enforce a judgment against Hunter, the CFTC would likely need to commence a civil action in the Alberta courts and may have to litigate the entire case against Hunter all over again.  At best, then, the CFTC would be able to domesticate such judgment in Canada but only after a lengthy and litigious battle.  Thus, this factor does not weigh in favor of forcing Hunter to undergo a lengthy proceeding in this Court, where most likely the entire litigation would have to be repeated in Canada.

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR ATTEMPTED MANIPULATION BECAUSE IT FAILS TO PLEAD THAT THE RESULTING PRICE WOULD BE ARTIFICIAL

The CFTC's Complaint is fatally defective for another reason:  it fails to allege—as it must—facts to establish that Hunter sought to cause a price that would be "artificial."  Indeed, the Complaint alleges that Hunter made entirely legitimate, non-fictitious trades on the open market, without any allegation that he sought anything less than prevailing market prices.  As such, the Complaint fails to state a claim for attempted manipulation and must be dismissed.

---

[6]     The Canadian statute that provides a litigant the ability to register a foreign judgment as an Alberta judgment (the Reciprocal Enforcement of Judgments Act (c. R-6, Statutes of Alberta) ("REJA")) appears inapplicable here.  Under REJA, it appears the procedure by which to domesticate a judgment in Alberta is only available to a limited number of "reciprocating jurisdictions," none of which include the Southern District of New York.

A.      To State A Claim For Attempted Manipulation, CFTC Must Adequately Allege That Hunter Sought A Price That Would Be Artificial, Thereby Deceiving Investors

CFTC's claim against Hunter for attempted manipulation requires it to allege specific facts establishing: (a) that Hunter had the specific intent to cause an *artificial* price; and (b) that Hunter engaged in some overt act in furtherance of that intent. *See In the Matter of Indiana Farm Bureau Coop. Ass'n*, CFTC No. 75-14, 1982 WL 30249, at *5 (C.F.T.C. 1982); *In the Matter of Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL 13562, at *7 (1977).

Importantly, it is not enough to allege that Hunter attempted to "affect" or "influence" the price of natural gas futures.[7]  Rather, the CFTC must allege facts supporting the inference that Hunter sought to cause a price that would actually be "*artificial*," *i.e.*, one that would not reflect the legitimate trading forces of supply and demand.[8]  Both the CFTC and federal courts consistently define manipulation (both attempted and perfected) as conduct intended to create an *artificial* price.[9]

The difference between an "artificial" price and a "legitimate" price does not depend merely upon the *subjective intent* of the person conducting the trade; rather, it depends upon whether his *activity* is one that would deceive the market as to the conditions and forces of

---

[7]      *Indiana Farm Bureau*, 1982 WL 30249, at *5 (C.F.T.C. 1982) ("[S]ince the self-interest of every market participant plays a legitimate part in the price setting process, it is not enough to prove simply that the accused intended to influence price.").

[8]      *Id.* at *6 ("[W]e hold that in order to prove the intent element of manipulation . . . it must be proven that the accused acted (or failed to act) with the purpose of conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand . . .")

[9]      *See, e.g.*, *Hohenberg Brothers*, 1977 WL 13562, at *7 (defining manipulation as "conduct intentionally engaged in resulting in an artificial price, *i.e.*, a price that does not reflect the basic forces of supply and demand."); *id.* (defining both perfected and attempted manipulation as "the performance of an act or conduct which was intended to effect an artificial price."); *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1053 (N.D. Ill. 1995) ("Artificiality is a 'crucial element' of a manipulation claim, without which Defendants cannot be found liable for manipulation . . ."); *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991) (defining manipulation as "an intentional exaction of a price determined by forces other than supply and demand"); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) (defining manipulation as "the creation of an artificial price by planned action . . ." (internal citations and quotations omitted)); *Volkart Brothers, Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) ("[T]here must be a purpose to create prices not responsive to the forces of supply and demand; the conduct must be 'calculated to produce a price distortion.'")

supply and demand.  As the Second Circuit recently framed the issue in the closely analogous

context of securities markets, "[T]he critical question, then, becomes *what activity*

'artificially' affects a security's price in a deceptive manner."  *ATSI Communications, Inc. v.*

*Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) (emphasis added).  The Second Circuit

then provided the following guidance:

> [C]ase law in this circuit and elsewhere has required a showing that an
> alleged manipulator engaged in market *activity* aimed at *deceiving*
> investors as to how other market participants have valued a security.
> The deception arises from the fact that investors are *misled* to believe
> "that prices at which they purchase and sell securities are determined
> by the natural interplay of supply and demand, not *rigged* by
> manipulators."

*Id.* (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)) (emphases added).  In

identifying activity that is "outside the natural interplay of supply and demand," courts

generally ask "whether a *transaction* sends a false pricing signal to the market."  *Id.*

(emphasis added).

Thus, the Supreme Court has described manipulation as "virtually a term of art when

used in connection with securities markets," *Santa Fe Industries, Inc., v. Green*, 430 U.S. 462,

463 (1977) (internal quotation marks and citations omitted).  Consistent with the notion that

manipulation turns on the activity of the alleged manipulator, not his subjective state of mind,

the Supreme Court stated that manipulation "refers generally to *practices* such as wash sales,

matched orders, or rigged prices, that are intended to mislead investors by artificially affecting

market activity."  *Id.*

Importantly, courts in this Circuit and elsewhere recognize that simply selling a

security or commodity in large quantities—even with the (natural and self-evident)

expectation that such selling will affect prices—is *not* activity that "sends a false pricing

signal to the market" and thus "is not, by itself, manipulative."  *ATSI Communications*, 493

F.3d at 100-1.  Rather, courts require that allegations of open-market selling "be willfully combined with *something more* to create a *false* impression of how market participants value a security." *Id.* at 101. (emphasis added).[10]  Thus, courts distinguish manipulative from legal conduct by asking whether the alleged manipulator "inject[ed] inaccurate information into the marketplace or creat[ed] a false impression of supply and demand for the security." *Id.* (quoting *GFL Advantage Fund,* 272 F.3d at 207).  Obviously, for something to be "false" to the marketplace, it must be contrary to some established representation or understanding that can be proven.  Hence, "[t]here must be some market *activity,* such as 'wash sales, matched orders, or rigged prices.'" *ATSI Communications*, 493 F.3d at 101 (quoting *Santa Fe*, 430 U.S. at 476) (emphasis added).[11]

Indeed, this Court has recognized that very principle.  In *Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y. 1995) (Chin, J.), this Court dismissed defendant's counterclaim which alleged that the plaintiff had manipulated the market by

---

[10]     *See, e.g.*, *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) (holding that the creation of a false impression of market activity is a necessary element in any manipulation claim, discussed further *infra*); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995) (finding that large-scale short selling alone, did not constitute market manipulation, discussed further *infra*); *In re College Bound Consolidated Litigation*, Nos. 93 Civ. 2348 (MBM), 94 Civ. 3033 (MBM), 1995 WL 450486, *7 (S.D.N.Y. July 31, 1995) (dismissing complaint not only because complaint failed to allege the defendant's sole intent was to raise the price of stock, but also because plaintiffs failed to allege facts that suggest the open-market purchase of securities was deceptive, and rejecting notion that mere "closing the market" trading was deceptive as "[s]uch trading is neither illegal nor even comparable to the masked purchases that the *Mulheren* Court found manipulative in its discussion of *Delafield*."); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 606 (S.D.N.Y. 1989) (finding that defendant could not be held liable "if futures or wet market prices dropped simply because of its sale of short contracts.  That the market work in its usual way is precisely the object of the laws against market manipulation"); *In re Olympia Brewing Co.*, 613 F. Supp. 1286, 1292 (N.D. Ill. 1985) (dismissing on summary judgment market manipulation claim based on pattern of short sales, stating "it is clear that the essential element of the claim [of market manipulation] is that *inaccurate* information is being injected into the marketplace").

[11]     Even prior to *ATSI Communications*, the Second Circuit stated it had "misgivings" and "doubt" about a theory of manipulation purely through large-volume sales, regardless of intent.  *See United States v. Mulheren*, 938 F.2d 364, 366, 368 (2d Cir. 1991).

intentionally purchasing defendant's stock in order to sell it in bulk and consequently depress the price. In doing so, the Court stated:

> Even if this is true, under the facts as alleged it is not conduct proscribed by section 10(b) or Rule 10b-5. . . . *Artificially affecting the marketplace necessarily implies the existence of information that, if generally known, would change investors' assessment and thus the price of the stock*. In the present case, *SDBC has not alleged that Gruntal misrepresented or failed to disclose a single material fact in connection with Gruntal's sale of SDBC shares. I agree that Gruntal must have known that the sale of nearly 10% of SDBC's freely tradeable shares might well depress the market price of the stock. But section 10(b) was designed to protect investors from manipulative and deceptive conduct, not to protect share prices from the adverse consequences of large block sales.* SDBC is correct that section 10(b) covers "a full range of ingenious devices that might be used to manipulate securities prices," *Santa Fe*, 430 U.S. at 477, 97 S.Ct. at 1303, but while the section "is aptly described as a catchall provision, ... *what it catches must be fraud*." *Chiarella v. United States*, 445 U.S. 222, 234-35, 100 S.Ct. 1108, 1117-18, 63 L.Ed.2d 348 (1980)

*Id.* at 618 (emphasis added); *cf. United States v. Finnerty*, 474 F. Supp. 2d 530, 542 (S.D.N.Y. 2007) (Chin, J.) (reversing conviction where the government failed to adduce evidence that investors were deceived by defendant specialist's "interpositioning," rejecting the government's argument that the conviction could be sustained on theory that interpositioning is "manipulative" even if not "deceptive," stating "The term 'manipulative' . . . cannot be isolated from the context of the statute. In the securities context, manipulation still requires *misleading or deceiving someone*." (emphasis added)).

The reasoning used by this Court in the *Gruntal* and "interpositioning" cases has been followed by appellate courts in other circuits as well. In *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d. Cir. 2001), for example, the Third Circuit affirmed dismissal of claims brought by a borrower, claiming that the lender had artificially depressed the price of the shares of borrower's company to benefit from a collateral effect of such drop in price (*i.e.,*

entitling the lender to receive more shares in the borrower's company as repayment for the same amount of debt because of the effects of the lower price per share on certain contractual conversion rates).   The borrower alleged that the artificial price depression had been accomplished by the lender's massive short selling of the company's stock.

In rejecting this misguided theory (which is remarkably similar to the CFTC's theory in this matter), the Third Circuit held that, in alleging manipulation solely through non-fraudulent trading, the borrower had failed to allege that the lender had injected inaccurate information into the marketplace, which the court held to be a necessary element of "artificiality."   It reasoned, "Requiring a Section 10(b) plaintiff to establish that the alleged manipulator injected 'inaccurate information' into the market or created a false impression of market activity" solved the problem of courts needing to "distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers."   *Id.* at 205.   The court concluded that, "[t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed *artificially*."   *Id.* at 207 (emphasis added).   "That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are *natural consequences* of a lawful and carefully regulated trading practice."   *Id*. at 209 (emphasis added).

Likewise, in *Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857 (7th Cir. 1995), the Seventh Circuit affirmed the dismissal of a claim brought against a market maker alleged to have sold short "tens of millions of . . . shares a week" of stock in a company, which allegedly

12

injured plaintiffs who held certain warrants in the stock.  The court reasoned that "nothing alleged in the complaint is the kind of conduct that the securities laws are aimed at combating."  *Id.* at 864.  The price was not "artificial" because "[o]n the other side of all of [defendant's] transactions were real buyers, betting against [defendant], however foolishly, that the price of [the company's stock] would rise.  And [defendant] made no representations, true or false, actual or implicit, concerning the number of shares that it would sell short. . . . Since there was no deception—no *relevant* deception . . .—there is also no basis for a claim under Rule 10b-5, which requires proof of either deception or manipulation."  *Id.*

The commodities futures context is no different.  Consistent with the "artificiality" requirement, manipulation in the commodities futures market is most often considered with respect to allegations of "squeezes" or "corners," where prices are the artificial result of non-efficient market forces combined with defendant's purposeful conduct designed to *force* counterparties to pay prices they would not otherwise have to pay, but are forced to pay due to inefficiencies in the market and defendant's controlling interest in the commodities futures.[12] Manipulation also arises where defendants spread false information relating to supply and demand[13] or engaged in some other clearly deceptive conduct.[14]

---

[12]    *See, e.g.*, *Indiana Farm Bureau*, 1982 WL 30249, at *8-9 (finding failure to prove a "squeeze" in the corn futures market); *Hohenberg Bros*, 1977 WL 13562, at *7-9 (finding failure to prove a short "corner" in the cotton futures market); *Kohen v. Pacific Investment Management Company LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) (alleged corner in Treasury Notes); *Frey*, 931 F.2d at 1171 (addressing failure to prove alleged "squeeze" in the wheat futures market); *Apex Oil*, 713 F. Supp. at 606 (dismissing a claim for manipulation brought against defendant alleged to have flooded the market for deliverable crude oil in order to benefit large short positions); *Volkart Brothers*, 311 F.2d at 52 (5th Cir. 1962) (reversing a finding of manipulation in alleged cotton squeeze); *G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir. 1958) (finding a corner on the egg market, in which defendants held 100% of the available futures on particular dates and held corresponding positions in the cash egg market); *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476 (7th Cir. 1953) (corner on the egg market); *General Foods Corp. v. Brannan*, 170 F.2d 220 (7th Cir. 1948) (alleged corner of the rye market); *Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033 (S.D.N.Y. 1993) (finding manipulation where defendants had artificially restricted the supply of certain bonds by financing them in such a way that they could only be circulated in the secondary market at great cost).

[13]    *See, e.g.*, *In re Natural Gas Commodity Litigation*, 337 F.Supp. 2d 498 (S.D.N.Y. 2004) (denying motion to dismiss where complaint alleged manipulation through submission of false price and volume

Our research has revealed no case where a court in this Circuit, in either the securities or the commodities futures market context, found potential manipulation based solely on buying or selling securities or commodities in large volumes, at least without some allegation that the alleged manipulator purchased or sold at something other than prevailing market prices.[15]

B.    The Complaint Fails To Adequately Plead That The Price Would Be Artificial

Tracking the language of the elements of attempted manipulation, the Complaint asserts that Hunter sought to "manipulate" the price of the NYMEX natural gas futures

_____

information to trade publications with the intent of altering natural gas futures and physical prices); *C.F.T.C. v. Atha*, 420 F. Supp. 2d 1373 (N.D. Ga. 2006) (denying motion to dismiss where complaint alleged attempted manipulation through submission of false report of market information to trade publications responsible for publishing gas price indexes); *C.F.T.C. v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) (denying motion to dismiss where complaint alleged attempted manipulation through submission of false or misleading reports regarding natural gas transactions); *C.F.T.C. v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) (denying motion to dismiss in similar situation involving intentional provision of false price information to publishers of natural gas price indexes).

[14]    *See, e.g.*, *In re Crude Oil Commodity Litigation*, 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) (dismissing complaint where plaintiffs did not particularize facts supporting allegations that defendants manipulated the market through a variety of manipulative and deceptive acts including depriving market participants of pipeline transmission and other physical facilities, conspiring to conceal the availability of crude oil at the main delivery point, attempting to hide their own selling, holding large futures position with no apparent economic motivation, making misrepresentations to market participants, and "bidding up" spot prices); *DGM Investments, Inc. v. New York Futures Exchange, Inc.*, 265 F.Supp.2d 254 (S.D.N.Y. 2003) (denying motion to dismiss where defendants, including members of exchange settlement committee, had deliberately set settlement prices and disregarded futures exchange rules to benefit themselves).

[15]    *Compare Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, 02 Civ. 0767 (LBS), 2002 WL 31819207, at *2 (S.D.N.Y. October 10, 2002) (denying motion to dismiss where defendant conducted sales through a non-market maker at something other than best price); *Internet Law Library, Inc., v. Southridge Capital Management*, LLC, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002) (denying motion to dismiss where defendants made a number of misstatements regarding their intent not to sell short and then did so by employing a number of techniques including "pre-arranged sales" and "painting the tape"), *overturned on other grounds ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007); *S.E.C. v. Schiffer*, 97 Civ. 5853 (RO), 1998 WL 307375 (S.D.N.Y. June 11, 1998) (ordering preliminary injunction where SEC alleged, in addition to false filing, insider trading and sale of unregistered stock, that defendant "marked the close" by executing transactions through nominee accounts and timing the transactions to be the very last transaction of the day at prices higher than the previous transactions).

Similarly, in the commodities market context, the only decisions our research has uncovered that found potential manipulation based on large volume trading (none of which are from the Second Circuit) did so where there were allegations suggesting that the defendant purchased or sold at *something other than prevailing market prices*. *See CFTC v. Enron*, No. H-03-909, 2004 WL 594752 (S.D. Tex. March 10, 2004) (noting allegations that trader was intending to "bid up" the natural gas spot market); *In the Matter of Avista Energy, Inc.*, CFTC No. 01-21, 2001 WL 951736 (C.F.T.C. 2001) (consent decree where CFTC alleged repeated transactions at something other than prevailing market prices); *In re Henner*, 30 A.D. 1151, 1232-1239 (Agric. Dec. 1971) (finding that defendant intentionally purchased egg futures at prices higher than he had to).

contracts by creating "artificial" natural gas futures prices (*see, e.g.*, ¶¶ 23, 26). However, simply repeating the words "manipulate" and "artificial" like a mantra does not qualify as adequate pleading. The Complaint does not provide any facts that support those bald, conclusory allegations. The CFTC must support its claims through more than mere labels and conclusory allegations. *Bell Atlantic Corp. v. Twombly*, ---U.S.----, 127 S.Ct. 1955 (2007). "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (internal citations ommited).

The CFTC's only specific factual allegations to support its conclusory claim that Hunter sought to create an "artificial" price is that he sought to do so "by placing large sell orders in the closing range on expiration day." (¶ 26.) However, as discussed above, mere selling—even in large quantities—is simply not manipulative. *See ATSI Communications*, 493 F.3d at 100. This is not a case of fictitious trades or rigged prices. Hunter did not collude with any counterparty. He is not alleged to have sought to trade at anything other than prevailing market prices. No inaccurate information was injected into the market. The market was not given a false impression as to how many transactions were actually taking place, by whom or at what price. As alleged, these were open trades. No NYMEX rule is alleged to have been violated by the fact that these sales occurred during the closing range. Furthermore, the mere fact that the alleged sales took place during the closing range does not make them manipulative either. *See College Bound*, 1995 WL 450486 at *7 (noting that "closing the market" trading is not illegal or inherently deceptive).

Permitting this Complaint to survive, especially without any allegation that Hunter engaged in fraudulent or deceptive conduct, would cause serious negative consequences for

the investors in the commodities and futures markets—consequences that the above-cited decisions sought to avoid.  It would essentially deter any legitimate buyer or seller of a large volume of securities and commodities from trading, for fear of being hauled into court on a claim that he did so with the knowledge that the price of that security or commodity would be affected thereby (a self-evident proposition to anyone who trades in such marketplaces).  As the CFTC itself explained in *Indiana Farm Bureau*, "a clear line between lawful and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation."  *Indiana Farm Bureau*, 1982 WL 30249 at *5.  Further, "since the self-interest of every market participant plays a legitimate part in the price setting process, it is not enough to prove simply that the accused intended to influence price."  *Id.*  The CFTC's theory of Hunter's actions is nothing more than just that.  It should be rejected, and the Complaint should be dismissed.

## III.     THE CFTC FAILS TO ADEQUATELY PLEAD INTENT UNDER RULE 9(B)

The Complaint also fails to meet the applicable pleading requirements for pleading Hunter's state of mind.  The Complaint alleges that Amaranth would benefit from a depressed NYMEX settlement price due to certain short positions in those contracts it held on ICE. (¶¶ 30, 41, 47-8.)  However, this generic allegation is inadequate for pleading intent.[16] Moreover, it does not allege any motive that belongs to *Brian Hunter*.  Furthermore, the instant messages alleged in the Complaint do not give rise to a strong inference of a specific

---

[16]     *See, e.g.*, *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (rejecting motive as too "generalized" in that it is "one which could be imputed to any publicly-owned, for-profit endeavor"). In addition, there is no allegation that the alleged scheme would actually be beneficial to Amaranth's overall portfolio on a *net* basis;  that is, even if price depression is presumed to have benefited some portion of Amaranth's expiring month position, there is no allegation that it would benefit Amaranth's *overall* position, which may have been net long and therefore harmed by the alleged price depression.   Without a specific allegation that Amaranth as a whole would have benefited, the observation that a specific position would benefit is irrelevant.

intent to depress prices (*artificially* or otherwise).   As such, the Complaint should be dismissed under Rule 9(b).

> A.   The CFTC Must Plead Facts Giving Rise To A Strong Inference Of Specific Intent, Taking Into Account All Plausible Opposing Inferences

Because this is a claim alleging attempted manipulation, Rule 9(b)'s heightened pleading standards apply.   The Second Circuit has explicitly held in the closely analogous context of the securities market that "a claim for market manipulation is a claim for fraud" and therefore "must be pled with particularity under Rule 9(b)."  *ATSI Communications,* 493 F.3d at 101.[17]   Thus, courts in the Second Circuit have applied Rule 9(b) to claims of manipulation under the Commodities Exchange Act.  *See, e.g.*, *In re Crude Oil*, 2007 WL 1946553, at *4-5 (applying Rule 9(b) to a claim of manipulation); *In re Natural Gas*, 358 F. Supp. at 342-43 (same).[18]

Under Rule 9(b), the CFTC must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. *Shields*, 25 F.3d at 1128. The plaintiff may satisfy this requirement by alleging facts: (1) showing that the defendants had both motive and opportunity to commit the manipulation or (2) constituting strong circumstantial evidence that the defendant had the requisite state of mind.  *Id.*  In this case of attempted manipulation under the Commodities Exchange Act, the requisite state of mind is "*specific* intent," *i.e.*, "*purposeful* conduct."  *Indiana Farm Bureau*, 1982 WL 30249, at *5 (emphasis added).

---

[17]       *See also S.E.C. v. U.S. Environmental*, 82 F.Supp.2d 237, 239 (S.D.N.Y. 2000).

[18]       The fact that this is an action brought by a government agency (as opposed to private plaintiffs) also does not change the applicability of Rule 9(b), as courts routinely apply Rule 9(b) equally to claims brought by government agencies as well.  *See, e.g.*, *U.S. Environmental*, 82 F.Supp.2d at 240 (finding Rule 9(b) applies to allegations of market manipulation brought by S.E.C. "insofar as it effects the Rule's purpose of:  'provid[ing] a defendant with fair notice of a plaintiff's claim' and 'safeguard[ing] a defendant's reputation from improvident charges of wrongdoing.'") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

The Supreme Court recently observed that in determining whether the factual allegations give rise to a "strong inference":

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, --- U.S. ----, 127 S.Ct. 2499, 2510 (2007).[19] Thus, for a complaint to give rise to a "strong inference," it is not enough that it "alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 2506. Rather, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences" and must engage in a "comparative inquiry." *Id.* at 2509. For an inference to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Communications*, 493 F.3d at 99 (quoting *Tellabs*, 127 S.Ct. at 2510).

B.    <u>The CFTC Fails to Allege A Motive That Is Personal to Hunter</u>

In attempting to plead motive, the CFTC alleges that the depression of the NYMEX settlement price would benefit the fund's short position on certain OTC markets. (¶ 30.) However, even if fair, there is no allegation that this benefit would flow personally to Hunter in any way. As such, it fails.

To establish scienter by demonstrating motive, it is necessary to allege facts that demonstrate the defendant would "benefit[] in some concrete *and personal* way" from the

---

[19]    In *Tellabs*, the Supreme Court was specifically addressing the "strong inference" standard of the PSLRA; however, the logic obviously applies equally to the "strong inference" standard of Rule 9(b).

alleged scheme. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (emphasis added). Obviously, where the benefits are not alleged to be shared by a particular defendant, the complaint fails to plead motive as to that defendant.

Here, there is no allegation that Hunter would personally benefit from any depression in the NYMEX settlement price. Thus, the complaint fails to plead motive as to him.

Even if it could be inferred that Hunter would somehow benefit from the fund's profitability—though such speculation is entirely unsupported by any allegation in the complaint—such a motive should surely fail. As a threshold matter, the Complaint does not even specificy that the trading at issue increased the fund's overall profitability. Moreover, courts universally reject the idea that such "general motives," possessed by virtually all corporate executives, are sufficient to raise a strong inference of intent. *See, e.g., Acito v. IMCERA Group, Inc*., 47 F.3d 47, 54  (2d Cir. 1995) (upholding dismissal and rejecting motive allegations where plaintiffs had alleged motive because an increase in stock price would increase defendants' compensation); *Shields*, 25 F.3d at 1130-31 (rejecting motive allegations based on defendants' desire to "protect their executive positions and the compensation and prestige they enjoy thereby").[20]  In *Shields*, the Second Circuit stated:

> Incentive compensation can hardly be the basis on which an allegation of fraud
> is predicated. On a practical level, were the opposite true, the executives of
> virtually every corporation in the United States could be subject to fraud
> allegations.

*Id.*, at 1130 (quoting *Ferber*, 785 F.Supp. at 1107).  Courts apply the same logic to cases involving brokers as well. *See, e.g.*, *Castillo v. Dean Witter Discover & Co.*, 97 Civ. 1272

---

[20]    *See also Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) (rejecting motive based on allegation that defendants were compensated based on yearly corporate financial performance,); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 593-94 (S.D.N.Y. 2006) (rejecting motive based on large performance-based bonuses, stating "the law is clear that the desire of individual defendants 'to . . . increase their compensation by artificially inflating . . . stock price' is not sufficient to establish motive").

(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) (dismissing claim against broker-dealer alleging that defendants had motive to conceal poor performance of their proprietary funds because doing so ensured that more customers would invest in those funds, resulting in increase in commissions and various fees, on the grounds that mere economic gain from fraud was insufficient to survive motion to dismiss).[21]

### C. The CFTC Fails To Allege Facts Constituting Strong Circumstantial Evidence Of Intent To Manipulate

Having failed to allege motive, the CFTC resorts to quoting snippets of instant messages ("IMs"), from which it seeks to establish the requisite specific intent to manipulate. However, not only do the quoted portions fail to give rise to a strong inference of specific intent to depress prices (let alone to depress prices *artificially*), they are extracted from broader, more extensive IM conversations, appended to the Complaint, which contain other statements supporting far more plausible inferences of indisputably legitimate activity.

#### 1. February 24, 2006

Although the CFTC's central theory appears to be that Hunter allegedly intended to depress prices in order to benefit a certain larger short swap position held by Amaranth on ICE (¶ 30), the Complaint does not allege that Hunter was even aware of that short position. Indeed, the alleged short swap position is—quite noticeably—never once mentioned in any of the IM's cited by the CFTC as evidencing just such a manipulative plan.

Moreover, among the hundreds of lines of IM text referenced in and appended to the Complaint, there is not a single suggestion that Hunter ever instructed Donohoe to sell the

---

[21]    *See also Fisher v. Offerman & Co.*, Inc., 95 Civ. 2566 (JGK), 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996) (dismissing complaint against underwriter where basis of alleging intent was underwriter's motive to earn its underwriting fees, stating "[i]t would defy common sense to hold that the motive element of the . . . scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered . . ."); *Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) (rejecting motive allegation based on desire to realize greater transaction fees).

futures at less than the prevailing market price on NYMEX.  Indeed, such an instruction—which would logically be integral to a plan to depress prices—is noticeably absent from precisely where one would expect it to be:  Hunter's alleged instruction to Matthew Donohoe ("Donohoe"), "make sure we have lots of futures to sell MoC tomorrow" (¶ 32).

Indeed, the *full* text of the conversation referenced in Paragraph 32, which the CFTC fails to quote, contain statements that support a far more plausible inference as to the purpose behind selling futures during the closing range—that it was part of a new strategy (what Hunter later allegedly refers to as an "expiriment" [sic]) designed to respond to "big changes" observed in the marketplace during the close of trading on February 23.  Such a reading is far more plausible than the CFTC's speculative theory, especially given that the alleged instruction is given shortly after Matthew Donohoe's observation "rallying here" and immediately following Hunter's comment "PBN trading 13.5 for size H.J [March/April spread]."  (Ex. A, AALLC_REG0684055.)[22]  As discussed above, the Court must consider these plausible opposing inferences and dismiss the complaint where the CFTC's proffered inferences are not "cogent and at least as compelling as any opposing inference."  *Tellabs,* 127 S.Ct. at 2510.

Indeed, the IM conversation later cited at Paragraph 38 further supports for the inference that Hunter's decision to sell contracts was a response to unusual market behavior in options contracts the day before, as Hunter apparently tells Glover that the reason he had "4000 to sell MoC" was "all from options yestrday [sic]."  (Ex. A., AALLC_REG0684227.) Rather than supporting the theory that Hunter was seeking to depress prices by offering at beneath prevailing prices, this IM suggests that he was experimenting in order to see if he could make a profit on the futures, *i.e.*, if there would be sufficient market demand for the

---

[22]    References to Exhibits are to those attached to the Complaint.

futures he planned to sell:  Hunter tells Glover, "so we'll see *what the floor has* / bit of an expiriment [sic] mainly." (*Id.* (emphasis added).)

The CFTC implies manipulative intent from alleged comments between Hunter and Donohoe congratulating themselves "at about half way through the closing range." (¶ 40, Ex. A., AALLC_REG0704932.)  However, the CFTC has again quoted selectively, excising the portions that would negate the very inferences it propounds.  For example, the CFTC's quotation of Dohonoe's comment "h will settle lower and h/j wider" is offered to suggest that Donohoe means, in substance, the price will settle lower and wider than it would have but for the manipulative scheme.  Indeed, the CFTC places the quote in a way to make it appear as if this comment immediately follows "today came together quite nicely" (¶ 40).[23]   In fact, however, the immediately preceding statement in the IM conversation makes it clear that Donohoe is responding to Hunter having sent him a new pricing "curve" (*i.e.*, estimates for the prices Amaranth would use to mark its portfolio) and to Hunter's question, "what' [sic] do you think? / of this curve?" (Ex. A, AALLC-REG0704932)  Indeed, the rest of the message makes even more clear that the context of this conversation is Hunter's estimated price curves, not any manipulative scheme:  *See, e.g.*, "I might adjust a little;" "nice and concervative [sic] on cals spreads too" (*Id.*)  Clearly then, Donohoe's comment is merely commenting on Hunter's estimates.

The portion quoted by the CFTC also contains a number of apparently self-congratulatory statements (e.g., "I am flexing here").  However, given the context, it is clear the statements refer to Amaranth's profit and loss *for the month* ("2nd best . . . sept/oct last

---

[23]    It is also noteworthy that the "today came together nicely" comment occurred at 2:15, with half of the closing yet to occur and well before the alleged statement by Hunter that he had "a lot more to sell . . . waiting until 2:20" (¶ 39), strongly suggesting that the "came together nicely" comment had nothing to do with the sale of futures during the close.

year still the best"), and *not* to any alleged manipulative scheme performed that day during the closing range.

The CFTC also alleges that Hunter's statement that he was waiting until 2:20 to sell futures evidence that the "Manipulative Scheme was not yet concluded." (¶ 39.)  However, the very IM's cited in the Complaint by the CFTC demonstrate that there were plenty of plausible reasons why Hunter may have waited to sell during the closing range, including that he predicted increased buying during the close.  *See, e.g.*, "Sandy and RBI bidding the H" (Ex. A., AALLC_REG0684227); "did you hear Merrill bought 10k 8.00 calls?" (Ex. A., AALLC_REG0684264).  Thus, it is a far more plausible inference that the reason Hunter allegedly waited to sell was to benefit from the possibility of selling at a higher price.

Finally, the CFTC attempts to suggest from Hunter's alleged statement "just need H to get smashed on settle then day is done" that Hunter intended *to cause* the price of that contract to drop (¶ 36).  However, at best the alleged statement only shows that Hunter may have *hoped* that the price of March natural gas futures contracts would fall, not that he would attempt to cause it to do so.  Furthermore, again noticeably absent from this long IM conversation is any reference to the alleged short swap position, the alleged *raison-d'être* of the attempted price depression.[24]

     2.    <u>April 26, 2006</u>

The CFTC's allegations regarding April 26 fare no better.  Again, as with February 24, there is no allegation that Hunter ever instructed anyone to sell futures at below market prices.

---

[24]     The CFTC's allegation that there is something improper to be inferred from the fact that Hunter was told that he was short and to "[p]lease make sure we are flat by the end of today" (¶ 34) barely deserves comment.  There is simply no allegation that on the day of expiry speculative traders only seek to liquidate open positions and have no other purpose behind their trades for that day, and that it should therefore be perceived as unusual that Amaranth's futures position became long before ultimately zeroing out at the end of the day.

The CFTC alleges that Hunter was concerned about buy-side pressure stemming from the trading activity of Centaurus Advisors LLC. (¶ 48.) However, at most these IMs merely reflect that Hunter was attempting to predict what another trader may be thinking or doing, a natural thing for him to consider, given that a trader's job obviously involves attempting to predict price movements. Nowhere in these IMs is there a suggestion that Hunter planned to do something improper in response to his predictions regarding the other trader.

The CFTC also allege that defendants placed orders to sell in the last eight minutes of the close. However, even if true, there is nothing manipulative or unlawful about such an order. Indeed, even assuming *arguendo* the CFTC's theory of price effect, such an order would tend to negate the inference that Hunter sought to depress prices (let alone to depress prices *artificially*), since the settlement price was allegedly based on the volume-weighted average of sales during the half-hour closing range: That is, assuming the CFTC's theory, if Hunter wanted to maximize the price impact of heavy-volume selling, he would much more likely have sold at the *beginning* of the closing range, not at the end.

Furthermore, the scanned copies of the order tickets belie the claim that Hunter sought to depress prices, as they contain no instruction to sell at anything other than prevailing market price. In any case, there is a much more plausible inference to be drawn from a decision to wait until the end of the close: As Hunter allegedly stated in the IM quoted by the CFTC, he believed that Arnold may be "running the market up on the close" (Ex. A., AALLC_REG032875). It would stand to reason that Hunter would wait to sell his futures in order to profit from this expected price increase.

We are not asking the Court to adopt any particular interpretation of these IMs and other allegations over another. However, these differing inferences demonstrate that the

CFTC's are not cogent and compelling, and therefore fail to meet the heightened pleading requirements of Rule 9(b).

## CONCLUSION

The Court should dismiss the CFTC's Complaint against Hunter for lack of personal jurisdiction pursuant to Rule 12(b)(2), or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6) and for failure to plead intent under Rule 9(b).

Dated:  New York, New York
       November 8, 2007

                                      Respectfully submitted,

                                      KOBRE & KIM LLP

                                      __/s/ Michael S. Kim_____
                                      Michael S. Kim (MK-0308)
                                      Leif T. Simonson (LS-5915)
                                      800 Third Avenue
                                      New York, New York 10022
                                      Tel: 212.488.1200
                                      Fax: 212.488.1220