UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                    Plaintiff,

v.                                                    07-CV-6682 (DC)

                                                      ECF CASE
AMARANTH ADVISORS, L.L.C.,
AMARANTH ADVISORS (CALGARY) ULC,
and BRIAN HUNTER,

                    Defendants.


**MEMORANDUM OF LAW OF PLAINTIFF
COMMODITY FUTURES TRADING COMMISSION
IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**


COMMODITY FUTURES TRADING
COMMISSION
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9766


December 20, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 3

I. THE COMPLAINT PROVIDES MORE THAN AMPLE NOTICE OF THE
   MANIPULATION CLAIMS AND THE GROUNDS ON WHICH THEY REST ............ 3

    A.    Standard of Review ................................................................................ 3

    B.    The Complaint Properly Alleges Attempted Manipulation ...................... 4

    C.    The Complaint Alleges Defendants Had the Requisite Intent for
         Attempted Manipulation ........................................................................ 6

         1.    The Intent Element of Attempted Manipulation under the CEA ................ 6

         2.    The Complaint Alleges Facts Showing Defendants' Requisite
              Manipulative Intent ........................................................................ 7

    D.    The Complaint Alleges Defendants Engaged in Multiple Overt Acts in an
         Attempt to Manipulate NYMEX Natural Gas Futures ............................ 10

II. RULE 9(b) DOES NOT APPLY TO THE MANIPULATION CLAIMS ................... 12

    A.    Manipulation Claims Under the Commodity Exchange Act Are Not
         Subject To Rule 9(b) ........................................................................... 12

    B.    Even If Rule 9(b) Does Apply to Manipulation Claims, the Complaint
         Pleads Those Claims With Particularity ................................................. 14

         1.    The Attempt to Manipulate Futures Prices on February 24, 2006 ........... 15

         2.    The Attempt to Manipulate Futures Prices on April 26, 2006 ................. 16

    C.    The Complaint Need Not Allege Fraud or Deception ............................. 18

III. THE MOTION TO DISMISS THE SECTION 9(a)(4) CLAIM SHOULD BE DENIED ..... 21

    A.    The Complaint Adequately Pleads That Defendant Amaranth Violated
         Section 9(a)(4) in its Letter to NYMEX ............................................... 21

    B.    The Section 9(a)(4) Allegations Satisfy Rule 9(b) ................................. 22

C.      The Section 9(a)(4) Claim Is Pled Independently From the Attempted
        Manipulation Claims .............................................................................. 23

IV. DEFENDANT HUNTER'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE
    THIS COURT HAS PERSONAL JURISDICTION OVER HIM ................................... 24

    A.      Defendant Hunter Had Sufficient Minimum Contacts To Satisfy Due
            Process ................................................................................................... 25

            1.      Specific Jurisdiction .................................................................. 25

            2.      General Jurisdiction ................................................................... 26

    B.      It is Reasonable for this Court to Assert Personal Jurisdiction over
            Defendant Hunter .................................................................................. 30

            1.      Litigating In The Southern District Of New York Does Not Impose
                    A Significant Burden On Defendant Hunter ............................... 31

            2.      Interests of the United States in Adjudicating the Case ............. 31

            3.      Plaintiff's Interest in Obtaining Convenient and Effective Relief ............ 32

            4.      The Judicial System's Interest in Obtaining the Most Efficient
                    Resolution of the Controversy ................................................... 32

            5.      The Interest of the United States in Furthering Substantive Social
                    Policies ...................................................................................... 33

CONCLUSION .............................................................................................................. 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ATSI Committee, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ............................................................................18

*Asahi Metal Industry Co. v. Superior Court*,
    480 U.S. 102, 107 S. Ct. 1026 (1987) ....................................................30

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002) ....................................................................31

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)................................................................................3, 4

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ....................................................................25, 27, 30

*CFTC v. Bradley*,
    408 F. Supp. 2d 1214 (N.D. Okla. 2005)................................................5, 10

*CFTC v. Enron Corp.*,
    2004 WL 594752 (S.D. Tex. Mar. 10, 2004) ............................1, 5, 6, 11, 19

*CFTC v. McGraw-Hill*,
    507 F. Supp. 2d 45 (D.D.C. 2007)..........................................................31

*CFTC v. Risk Capital Trading Group, Inc.*,
    452 F. Supp. 2d 1229 (N.D.Ga. 2006)....................................................19

*CFTC v. Vartuli*,
    228 F.3d 94 (2d Cir. 2000) ......................................................................19

*CFTC v. Worldwide Commodity Corp.*,
    366 F. Supp. 2d 276 (E.D Pa. 2005)........................................................25

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) ................................................................5, 19

*Commodity Trend Service, Inc. v. CFTC*,
    233 F.3d 981 (7th Cir. 2000) ..................................................................13

*In re College Bound Consolidated Litigation*, 93 Civ. 2348 (MBM),
    1995 WL 450486 (S.D.N.Y. July 31, 1995)............................................................20

*In re Crude Oil Commodity Litig.*, 06 Civ. 6677(NRB),
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) ......................................................14

*D.H. Blair & Co. v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006) ....................................................................................25

*Drexel Burnham Lambert Inc. v. CFTC*,
    850 F.2d 742 (D.C. Cir. 1988)...............................................................................13

*Ebrahimi v. E.F. Hutton & Co., Inc.*,
    852 F.2d 516 (10th Cir. 1988) ...............................................................................13

*GFL Advantage Fund, Ltd. v. Colkitt*,
    272 F.3d 189 (3d Cir. 2001) ..................................................................................18

*Global Intellicom Inc. v. Thomson Kernaghan & Co.*, 99 Civ. 342 (DLC),
    1999 WL 544708 (S.D.N.Y. July 27, 1999)..........................................................26

*Gurary v. Winehouse*,
    190 F.3d 37 (2d Cir. 1999) ....................................................................................18

*Helicopteros Nacionales de Colombia, S.A. y. Hall*,
    466 U.S. 408 (1984) ..............................................................................................25

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007) ....................................................................................3

*Kassner v. 2nd Avenue Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007) ....................................................................................9

*Kernan v. Kurz-Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999) ..................................................................................32

*Leasco Data Processing Equipment Co. v. Maxwell*,
    468 F.2d 1326 (2d Cir. 1972) ..........................................................................25, 30

*MBH Commodity Advisors, Inc. v. CFTC*,
    250 F.3d 1052 (7th Cir. 2001) ...............................................................................12

*Messer v. E.F. Hutton & Co.*,
    833 F.2d 909 (11th Cir. 1987) ...............................................................................13

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,*
  84 F.3d 560 (2d Cir. 1996) ................................................................24, 25, 27, 30, 31

*Mills v. Polar Molecular Corp.,*
  12 F.3d 1170 (2d Cir. 1993) .................................................................................22

*In re Natural Gas Commodity Litigation,*
  358 F. Supp. 2d 336 (S.D.N.Y. 2005) ..................................................................14

*Premium Plus Partners v. Davis,* 04C 1851,
  2005 WL 711591, (N.D. Ill. Mar. 28, 2005) ........................................................14

*Press v. Chemical Investment Services Corp.,*
  166 F.3d 529 (2d Cir. 1999) ........................................................................9, 20, 23

*SEC v. U.S. Environmental, Inc.,*
  82 F. Supp. 2d 237 (S.D.N.Y. 2000) ...............................................................14, 18

*In re Soybean Futures Litigation,*
  892 F. Supp. 1025 (N.D.Ill. 1995)...........................................................................5

*Starr v. Time Warner, Inc.,* 07 Civ. 5871 (DC),
  2007 WL 4144627 (S.D.N.Y. Nov. 21, 1997)....................................................3, 9

*Sullivan & Long, Inc. v. Scattered Corp.,*
  47 F.3d 857 (7th Cir. 1995) ..................................................................................18

*In re Sumitomo Copper Litigation,*
  120 F. Supp. 2d 328 (S.D.N.Y. 2000) ..................................................................25

*Trading & Milling Corp. v. Federal Rep. of Nigeria,*
  647 F.2d 300 (2d Cir. 1981) .................................................................................25

*Transnor (Bermuda) Ltd v. BP N. America,*
  738 F. Supp. 1472 (S.D.N.Y. 1990) .....................................................................19

*SEC v. Euro Security Fund,* 98 Civ. 7347 (DLC),
  1999 WL 76801 (S.D.N.Y. Feb. 17, 1999) ..........................................................24

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) ...............................................................................30

*United States v. O'Hagan,*
  521 U.S. 642 (1997) ..............................................................................................13

*United States v. United States Gypsum Co.*,
  438 U.S. 422 (1978) ..................................................................................7

*United States v. Finnerty*,
  474 F. Supp. 2d 530 (S.D.N.Y. 2007) ...................................................18

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991) ...................................................................18

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
  241 F.3d 135 (2d Cir. 2001) .............................................................25, 26

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ...............................................................................27

## ADMINISTRATIVE CASES

*In re Abrams*,
  1994 WL 506250 (C.F.T.C. Sept. 15, 1994),
  *aff'd*, 1995 WL 455791 (C.F.T.C. July 31, 1995). ...............................20

*In re Avista Energy, Inc.*,
  CFTC Docket No. 01-21, 2001 WL 951736 (C.F.T.C. Aug. 21, 2001).....................19

*In re Cox*,
  1987 WL 106879 (C.F.T.C. July 15, 1987)...............................................5

*In re Hohenberg Bros. Co.*,
  1977 WL 13562 (CFTC Feb. 18, 1977) ...............................................5, 7

*In re Indiana Farm Bureau*,
  1982 WL 30249 (C.F.T.C. Dec. 17, 1982)..............................5, 6, 7, 10, 20

## FEDERAL STATUTES, RULES AND REGULATIONS

CEA § 3(b); 7 U.S.C. § 5(b)......................................................................4, 32

CEA § 4b, 7 U.S.C. § 6b ..............................................................................13

CEA § 4o, 7 U.S.C. § 6o ...............................................................................13

CEA § 6(c), 7 U.S.C. § 9...........................................................................4, 6

CEA § 6(d), 7 U.S.C. § 13b.......................................................................4, 6

CEA § 6c, 7 U.S.C. §13a-1 ................................................................................25

CEA § 9(a)(2), 7 U.S.C. § 13(a)(2) ....................................................4, 6, 12, 13

CEA § 9(a)(4), 7 U.S.C. § 13(a)(4) ...................................................................21

CEA § 9(d); 7 U.S.C. § 13(d) ............................................................................13

17 C.F.R. 240.10b5-1 ........................................................................................13

Fed. R. Civ. P. 8(a)(2) ...............................................................3, 4, 6, 11, 14

Fed. R. Civ. P. 9(b) ...................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 9, 11

## LEGISLATIVE HISTORY

S. Rep. No. 1431 (1935) .....................................................................................12

Plaintiff Commodity Futures Trading Commission ("CFTC") respectfully submits this memorandum of law in opposition to Defendants Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary) ULC (together, "Amaranth") and Brian Hunter's motions to dismiss.

## PRELIMINARY STATEMENT

Defendants' motions to dismiss the attempted manipulation count of the Complaint under Fed. R. Civ. P. 12(b)(6) should be denied, as the Complaint sets forth in detail the overt acts the Defendants took to carry out their scheme to manipulate the price of natural gas futures contracts traded on the New York Mercantile Exchange ("NYMEX") on February 24 and April 26, 2006, in violation of the Commodity Exchange Act ("CEA"). These overt acts included trading activity on the NYMEX, and over-the-counter trading including on the IntercontinentalExchange ("ICE"). Specifically, the Complaint describes the huge volumes of natural gas futures contracts Defendants traded during the closing range (often referred to as a "banging-the-close" manipulation) on each of those days, and even attaches evidence (including multiple instant messages in which Defendants describe, for example, how they are "flexing" their trading power in such a way that the futures contract price will be "smashed on settle") that Defendants did those acts with the requisite manipulative intent.

Nor can the attempted manipulation count be dismissed under Fed. R. Civ. P. 9(b), because that Rule does not apply here. *See CFTC v. Enron Corp.*, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004). Even if Rule 9(b) were applicable to that claim, the Complaint is sufficiently specific to meet the Rule's requirements. The Complaint describes the futures trades Defendants made, how and when those trades were made, and other overt acts Defendants took in their attempts to manipulate, such as building up large futures positions in advance of the closing range so that they would be in a position to bang the close by executing a very high volume of trades. As to Defendants' intent, the Complaint cites, and attaches as exhibits,

Defendants' own words – namely, their instant messages describing why they executed the trades at issue.

Defendant Amaranth's motion to dismiss the count arising out of its cover-up relating to NYMEX's official inquiry of the manipulative scheme also fails. The Complaint sets forth detailed and plausible allegations regarding the violation of CEA § 9(a)(4). Even assuming that Rule 9(b) applies to the pleading of this claim, it too is pleaded with sufficient detail to meet the Rule's requirements. The Complaint sets forth the false statements that violate § 9(a)(4) of the CEA, which are contained in the August 15, 2006 letter that is attached to the Complaint, shows that the statements were made by Amaranth Advisors L.L.C. to the NYMEX, and indicates specifically why the letter is in various respects materially false.

Finally, Defendant Hunter's motion to dismiss the Complaint as against him for lack of personal jurisdiction should also be denied. Defendant Hunter, as the head of Amaranth's natural gas trading operation, contacted a NYMEX broker to execute the majority of the futures trades at issue on April 26, 2006, and the trades on February 24, 2006 were placed by an Amaranth broker in Connecticut supervised by Defendant Hunter and at Hunter's direction. Thus, Defendant Hunter himself directly placed, or directed others he supervised to place, the very natural gas futures trades on NYMEX that are the subject of the Complaint. In addition, Defendant Hunter had more than sufficient contacts with the United States to justify this Court's exercise of jurisdiction over him. Specifically, even after Defendant Amaranth permitted Hunter in late 2005 to set up a thinly-staffed Calgary trading outpost with no on-site compliance personnel, he continued to supervise Amaranth natural gas traders located at Amaranth's Connecticut office, and he himself often returned to work at the Connecticut office for

significant periods of time throughout the balance of his employment at Amaranth, including between 60-70% of the time during the Spring and Summer of 2006.

## ARGUMENT

### I.

### THE COMPLAINT PROVIDES MORE THAN AMPLE NOTICE OF THE MANIPULATION CLAIMS AND THE GROUNDS ON WHICH THEY REST

**A.    Standard of Review**

The Federal Rules of Civil Procedure only require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must say enough "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In considering a motion to dismiss pursuant to Rule 12(b)(6), "the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Starr v. Time Warner, Inc.*, 07 Civ. 5871 (DC), 2007 WL 4144627, at *2 (S.D.N.Y. Nov. 21, 2007) (citations omitted). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Starr, supra*, at *2 (internal quotations omitted). As this Court held, the Second Circuit interpreted *Bell Atlantic* as not announcing a "'universal standard of heightened fact pleading, but ... instead requir[es] a flexible "plausibility standard," which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.'" *Id.* (emphasis in original) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). A court should not dismiss a complaint for failure to state a

claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atlantic,* 127 S.Ct. at 1965.

As described further below, the CFTC's Complaint against Defendants meets the pleading requirements of Rule 8(a)(2) and the test set forth in *Bell Atlantic*. The Complaint contains sufficient, plausible and detailed factual allegations of when, where, who and how Defendants attempted to manipulate the price of NYMEX natural gas futures on February 24, 2006, and April 26, 2006. Thus, Defendants' motions to dismiss pursuant to Rule 12(b)(6) should be denied.

**B.      The Complaint Properly Alleges Attempted Manipulation**

A core purpose of the CEA is "to deter and prevent price manipulation or any other disruptions to market integrity." CEA § 3(b); 7 U.S.C. § 5(b). To achieve that core purpose, Congress explicitly made it a violation of the CEA to manipulate or attempt to manipulate commodity prices, including commodity futures markets and commodity cash markets. CEA § 9(a)(2); 7 U.S.C. § 13(a)(2).

For example, Sections 6(c) and 6(d) of the CEA together make it unlawful for any person to manipulate or attempt to manipulate "the market price of any commodity, in interstate commerce or for future delivery on or subject to the rules of any registered entity . . . ." CEA § 6(c) and (d); 7 U.S.C. §§ 9 and 13b. Similarly, Section 9(a)(2) of the CEA provides that it is unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." CEA § 9(a)(2); 7 U.S.C. § 13(a)(2).

Manipulation is not defined by statute. Federal courts and the CFTC have developed a fact-specific, case-by-case, flexible analysis to determine whether particular conduct constitutes

market manipulation under the CEA. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir.

1971) (explaining that the test of manipulation "must largely be a practical one" because

"methods and techniques of manipulation are limited only by the ingenuity of man"); *In re*

*Soybean Futures Litigation*, 892 F.Supp. 1025, 1044 (N.D.Ill. 1995) (opining that the "'know it

when you see it' test may appear most useful" in manipulation cases) (quoting *Frey v. CFTC*,

931 F.2d 1171, 1175 (7th Cir. 1991)); *In re Indiana Farm Bureau*, 1982 WL 30249 at * 3

(C.F.T.C. Dec. 17, 1982) (task of defining manipulation or attempted manipulation "has fallen to

case-by-case judicial development").

     The following elements generally are required to show an attempted manipulation: (1) an

intent to affect the market price of a commodity; and (2) some overt act in furtherance of that

intent. *See In re Hohenberg Bros. Co.*, 1977 WL 13562, at *7 (CFTC Feb. 18, 1977); *CFTC v.*

*Bradley*, 408 F.Supp.2d 1214, 1220 (N.D. Okla. 2005).[1] In regard to the intent element for an

attempted manipulation, the CFTC must show that "respondents intended their actions to have a

depressant effect on the market and that they took some action in furtherance of that

manipulative intent." *Hohenberg,* ¶ 20,271 at 21,477.

     "'Buying and selling in a manner calculated to produce the maximum effect upon prices,

frequently in a concentrated fashion and in large lots' is one form of manipulation, among

others." *Enron*, 2004 WL 594752 at *5 (quoting *In re Henner*, 30 A.D. 1151, 1227 (Agric. Dec.

1971)). In *Enron,* the CFTC charged defendants with engaging in a scheme to manipulate natural

gas spot and futures prices by purchasing an extraordinary large amount of spot natural gas on

---

[1] To sustain a cause of action for actual price manipulation, the CFTC must show (1) that defendants had the ability to influence market prices, (2) that they specifically intended to do so, (3) that artificial prices existed, and (4) that defendants caused the artificial prices. *In re Cox*, 1987 WL 106879, at *3, (C.F.T.C. July 15, 1987).

Enron Online ("EOL") within a short period of time which resulted in artificial prices of both EOL and NYMEX natural gas futures. *Id.* at *5. The CFTC alleged that the head of Enron's Central Desk colluded with another Enron trader to engage in a buying spree on EOL that forced natural gas spot prices to rise and then they liquidated those positions, causing spot natural gas prices to decline and resulting in artificial prices for NYMEX natural gas futures. *Id.* at *5-6. *Enron* is nearly identical to the case at bar in that both involve trading a large amount of natural gas in a relatively short period of time with the intent to create artificial prices.

Here, the Complaint alleges that Defendant Hunter, acting as an employee and on behalf of Defendant Amaranth, engaged in a scheme on at least two days in 2006, February 24 and April 26, to attempt to create artificial NYMEX natural gas futures prices by selling a substantial amount of contracts in the closing range on the final day of trading for those contracts. Complaint ("Compl.") ¶¶ 23, 24, and 26. Defendant Hunter attempted this manipulation of NYMEX natural gas futures in order to benefit Defendant Amaranth's much larger NYMEX look-alike swaps positions the value of which was based on the NYMEX futures settlement price. Compl. ¶ 30.

The allegations in the Complaint meet the test for the pleading requirements under Rule 8(a)(2) and *Bell Atlantic* and show clear and plausible claims for violations of Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

**C.    The Complaint Alleges Defendants Had the Requisite Intent for Attempted Manipulation**

**1.    The Intent Element of Attempted Manipulation under the CEA**

"[I]ntent of the parties is a determinative element of a punishable manipulation." *Indiana Farm Bureau*, 1982 WL 30249, at *5. The manipulator's intent separates "lawful business

6

conduct from otherwise unlawful manipulative activity." *Id.* To prove the intent element of manipulation, it must be shown that "the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand influencing futures prices in the particular market at the time of the alleged manipulative activity." *Id.* at *6.

Intent can be "inferred from the objective facts and may, of course, be inferred from a person's actions and the totality of the circumstances." *Hohenberg*, 1977 WL 13562, at *7. "[O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium of efficient prices – the price that reflects market forces of supply and demand – the mental element of manipulation may be inferred." *Indiana Farm Bureau*, 1982 WL 30249, at *6. While knowledge of market conditions is relevant, "it is not necessary to prove that the accused knew to any particular degree of certainty that his actions would create an artificial price. It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id.* (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978)).

### 2. The Complaint Alleges Facts Showing Defendants' Requisite Manipulative Intent

The Complaint alleges sufficient facts showing Defendants' intent to lower prices of the March and May NYMEX natural gas futures contracts to benefit Defendant Amaranth's larger short natural gas swaps positions on ICE. Compl. ¶ 30.

In connection with the manipulative scheme in February, Defendant Amaranth had at least 12,000 NYMEX-equivalent look-alike swaps that would benefit from a lower futures

7

settlement price. Compl. ¶ 41. On February 23, 2006, Defendant Hunter directed Amaranth

natural gas trader Matthew Donohoe to "make sure we have lots of futures to sell MoC [market

on close] tomorrow." Compl. ¶ 32. On February 24, 2006, Defendant Hunter stated to another

Amaranth trader that he would "just need H [March natural gas futures contract] to get smashed

on settle then day is done." Compl. ¶ 36. On the same day, Defendant Hunter informed a natural

gas trader at another firm that he had 4,000 natural gas futures contracts to sell and that he was

trying a bit of an experiment.  Compl. ¶ 38. While in the closing range (last half hour of trading

on final day of trading for that contract month), Defendant Hunter informed this same trader that

he was not yet done selling and was waiting until 2:20 p.m. Compl. ¶ 39. Even before their

trading was done on February 24, 2006, Hunter and Donohoe congratulated each other on

Hunter's plan, stating that the March futures contract will settle lower and the spread between the

March and September futures prices would therefore be wider. Compl. ¶ 40.  Defendant Hunter

bragged about Defendants' ability to trade large volumes of futures in an instant message ("IM")

at 2:30 p.m. on February 24, 2006, wherein Hunter wrote, "I am flexing here." Compl. ¶ 40 and

Compl. Ex. A (Bates AALLC_REG0704932) (the IMs referred to throughout the Complaint are

attached to the Complaint as Exhibit A).

 With respect to the attempted manipulation on April 26, 2006, of the May natural gas

futures contract, the Complaint alleges that Defendant Hunter was concerned that large trading

by Centaurus Advisors LLC ("Centaurus"), another hedge fund, would adversely affect

Defendant Amaranth's large positions in NYMEX look-alike swaps. Compl. ¶ 48. Defendant

Hunter sent IM messages to an Amaranth risk manager wherein he described what he thought

Centaurus was planning to do and suggested that Hunter was planning to sell a large amount of

contracts to offset Centaurus' plans.  Compl. ¶ 49. Defendant Hunter also informed an Amaranth

risk manager, prior to the closing range, that he had already decided to wait to sell futures in the closing range on April 26. Compl. ¶ 52. Defendant Hunter knew his selling of a large volume of futures in the closing range would mute the effect of the buyers. Compl. ¶ 54. Defendants instructed their NYMEX floor brokers to wait until the last eight minutes of the close before executing Defendants' order to sell over 3,000 contracts. Compl. ¶ 55. The reasonable inferences from these allegations, which must be drawn in Plaintiff's favor on a motion to dismiss, are that Hunter intentionally chose to wait until the last eight minutes of trading on April 26, 2006, to place a very large order of futures contracts to depress futures prices. Hunter's expectation was that, as a result, natural gas futures prices would be lower, benefiting Defendant Amaranth's NYMEX look-alike swaps positions. Compl. ¶ 30.

While Defendants offer strained explanations for some of the IMs cited in the Complaint, in a motion to dismiss, all reasonable inferences should be construed in the plaintiff's favor. *See Starr, supra*, 2007 WL 4144627, at *2; *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). The determination of whether these IMs and any other evidence adduced prove the requisite intent for attempted market manipulation "is generally a question of fact, appropriate for resolution by the trier of fact," and should not be decided on a motion to dismiss under Rule 12(b)(6). *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)(internal quotations omitted).

Defendant Hunter asserts that a claim for attempted manipulation must specifically allege that the resulting price would be artificial. *See* Hunter Brief at 14-16. This is an incorrect interpretation of the relevant case law. As stated above, the elements of attempted manipulation are (1) intent to affect the market price of a commodity and (2) some overt act(s) in furtherance of that intent. There is nothing in CEA-related precedent that suggests the Complaint must allege

the resulting price would have been artificial had the defendant succeeded. The accused must

have acted purposefully to effect prices that did not reflect forces of supply and demand. *See*

*Indiana Farm Bureau*, 1982 WL 30249 at *5. The Complaint alleges such intent. Further, the

Complaint specifically alleges that Hunter intended to create artificial natural gas futures prices,

in part to benefit Defendant Amaranth's natural gas swaps positions and, in part, to counter

perceived actions by another trader (Centaurus). Compl. ¶¶ 26, 30, 36, 48-51, and 54.

Similarly, Hunter argues incorrectly that the CFTC must specifically allege a motive or

expectation of financial benefit. However, a plaintiff is not required to allege a profit motive,

perception of market power, or likelihood that alleged price manipulation would actually affect

prices. *Bradley*, 408 F.Supp.2d at 1220. In any event, the Complaint alleges a profit motive.

Compl. ¶ 30.

## D.     The Complaint Alleges Defendants Engaged in Multiple Overt Acts in an Attempt to Manipulate NYMEX Natural Gas Futures

The second element of attempted manipulation is overt acts in furtherance of the intent to

manipulate prices. *Bradley*, 408 F.Supp.2d at 1220. With respect to Defendant Amaranth's

trading of the March natural gas futures contract on February 24, 2006, the Complaint alleges

that Hunter directed Amaranth trader Donohoe on February 23, 2006, to be sure to have a lot of

futures to sell on the close of February 24. Compl. ¶ 32. Defendant Amaranth started February

24, 2006, with a short position of over 1,700 March natural gas futures contracts but purchased

futures to completely reverse its overall position to become long over 3,000 March natural gas

futures contracts before the closing range. Compl. ¶¶ 33, 35. During the closing range,

Defendants placed orders to sell over 3,000 March natural gas futures contracts. Compl. ¶ 41.

Defendant Amaranth had also built up its look-alike swaps position to being short at least 12,000 NYMEX equivalents. Compl. ¶ 41.

With respect to Defendants' attempted manipulation of the May natural gas contract on April 26, 2006, the Complaint alleges that on April 21, 2006, Defendant Amaranth reversed its overall natural gas futures position by acquiring a long May natural gas futures position. Compl. ¶ 45. Defendant Amaranth also built up its May natural gas swaps position to over 19,000 contracts (futures equivalent). Compl. ¶ 47. With over 3,000 May natural gas futures contracts to sell in the final day of trading for the May contract, Defendants' intentionally waited until the last eight minutes of the day's trading to sell in order to affect the price. Compl. ¶¶ 51 and 55. At about halfway through the closing range of trading on April 26, Defendants placed two orders with NYMEX floor brokers to sell a total of 1,044 May natural gas futures contracts and to hold execution until the last eight minutes of trading. Compl. ¶ 55-58. Then at about eight minutes before the end of trading, Hunter placed another order through one NYMEX floor broker to sell 2,000 May natural gas futures contracts; a quantity so large that it could not all be executed before the close of trading. Compl. ¶¶ 59-61.

Thus, the Complaint properly alleges the requisite intent and overt acts to sustain a cause of action for attempted manipulation under the CEA. As stated above, "'[b]uying and selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in large lots' is one form of manipulation, among others." *Enron*, 2004 WL 594752 at *5 (quoting *In re Henner*, 30 A.D. at 1227). Under the liberal pleading rules of Rule 8(a)(2) and the precedent in the Second Circuit, Defendants' motions to dismiss under Rule 12(b)(6) should be denied.

## II.
## RULE 9(b) DOES NOT APPLY TO THE MANIPULATION CLAIMS

**A.     Manipulation Claims Under the Commodity Exchange Act Are Not Subject To Rule 9(b)**

As noted, the CEA explicitly forbids "any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." CEA § 9(a)(2); 7 U.S.C. § 13(a)(2).  The anti-manipulation prohibition in what is now Section 9(a)(2) was part of the 1936 amendments to the Grain Futures Act of 1922 to address the demonstrated "need for some limiting power over the speculative trading of large operators who *by force of their own trading* have been able to take advantage of technical conditions in the market to the disadvantage of hedgers and others using those markets." S. Rep. No. 1431, at 3 (1935) (emphasis supplied). Thus, as the court in a case most similar to this Complaint held, CEA § 9(a)(2) claims "need not be pled with the factual specificity required by Fed.R. Civ.P. 9(b)." *Enron*, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004) (denying motion to dismiss allegations that Enron trader manipulated natural gas futures market by large volume trading in the natural gas spot market).

Defendants' overdrawn comparisons between CEA § 9(a)(2) claims and Securities Exchange Act ("SEA") § 10(b) claims are misplaced. No court has ever held that Section 9(a)(2) of the CEA should be interpreted like SEA § 10(b), or that the two sections are otherwise analogous. Conversely, courts have recognized that the CEA and SEA are different laws with different histories that do not require similar readings. *See MBH Commodity Advisors, Inc. v.*

12

*CFTC*, 250 F.3d 1052, 1062 (7th Cir. 2001) ("the statute guiding the SEC . . . and the statute guiding the CFTC (the CEA) are different statutes, which have a different history . . . .")[2]

Further, the CEA specifically sets out prohibitions on fraud, *see* CEA § 4b and 4o, 7 U.S.C. § 6b and 6o, that are wholly separate from the prohibitions of CEA § 9(a)(2) against the manipulations that are at issue in this case. Indeed, courts recognize that CEA § 4b, 7 U.S.C. § 6b, is the section most analogous to Section 10(b) of the SEA. *See, e.g., Ebrahimi v. E.F. Hutton & Co., Inc.*, 852 F.2d 516, 519 (10th Cir. 1988) ("The federal law most closely analogous to the antifraud provision [§ 6b] of the CEA is § 10(b) of the [SEA]."); *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (same). Courts also analogize CEA § 4o, 7 U.S.C. § 6o, which prohibits commodity trading advisors or commodity pool operators from defrauding clients or participants, with comparable antifraud provisions in other parts of the securities laws. *See Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 918 (11th Cir. 1987) ("Section 6o(1)(A) . . . closely tracks two other antifraud provisions, Section 17(a)(1) of the Securities Act of 1933 and Section 206(1) of the Investment Advisers Act.") (citations omitted); *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 990 (7th Cir. 2000) (analogizing fiduciary obligations imposed by Section 206(1) of Investment Advisers Act with CEA § 6o). Given that SEA § 10(b) and the other antifraud provisions are thus not comparable to the CEA § 9(a)(2)

---

[2]    For example, except for narrow cases of the use of information obtained from the CFTC or boards of trade directly, *see* CEA § 9(d) and (f), 7 U.S.C. § 13(d) and (f), the CEA does not prohibit *per se* trading on insider information. *Compare United States v. O'Hagan*, 521 U.S. 642 (1997) (trading on misappropriated inside information prohibited by §10(b) and Rule 10b-5); 17 C.F.R. 240.10b5-1 (2007) (defining when purchase or sale of securities is on the basis of material nonpublic information).

manipulation claims in this case, Defendants' reliance on securities law cases to invoke Rule 9(b) is misplaced.[3]

**B.    Even If Rule 9(b) Does Apply to Manipulation Claims, the Complaint Pleads Those Claims With Particularity**

Even if Rule 9(b) applies to the manipulation claims, the Complaint satisfies its requirements.  Rule 9(b) has been interpreted (in securities cases) to require the following allegations: "[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue." *SEC v. U.S. Environmental, Inc.*, 82 F. Supp.2d 237, 240 (S.D.N.Y. 2000) (internal quotation marks and citations omitted).  If Rule 9(b) applied to the attempted manipulation claims here, the same test would govern. *See In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d at 336, 343 (applying the *U.S. Environmental* test to a complaint alleging that defendants manipulated natural gas market by knowingly reporting false prices, volume information, and transaction data to publications reporting natural gas market data).

---

[3]    Defendants' arguments that this court should follow the reasoning applied by Judges Marrero and Buchwald to private CEA claims are also mistaken.  In both the *Natural Gas Commodity Litigation* and *Crude Oil Commodity Litigation* cases, the courts decided that Rule 9(b) should be applied only after determining that the complaints relied upon allegations of the dissemination of "inaccurate, misleading, and false trading information." *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (concluding that complaint satisfied Rule 9(b)); *see In re Crude Oil Commodity Litig.*, 06 Civ. 6677(NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (noting that claim was based on defendant's "talking up" of non-existent commercial needs and falsely representing to market participants its physical commitments). Of course, the Complaint in this case makes no such allegations and thus the cases are not apposite. *Cf Premium Plus Partners v. Davis*, 04 C 1851, 2005 WL 711591, at *15 (N.D. Ill. Mar. 28, 2005). (the "Court declines . . . to require Plaintiff to plead its case consistent with the strictures of Federal Rule of Civil Procedure 9(b), as Plaintiff's claims under Section 9 of the CEA do not sound in fraud.")

1.    **The Attempt to Manipulate Futures Prices on February 24, 2006**

First, the Complaint identifies with particularity the acts taken by the Defendants to attempt the manipulation of the March Natural Gas ("NG") contract:

- On the day prior to the expiry of the March NG futures contract, Hunter told his subordinate trader at Amaranth to "make sure we have lots of futures to sell" during the close. Compl. ¶ 32.

- During the morning of the expiry day, February 24, 2006, traders at Amaranth who reported to Hunter reversed Amaranth's positions from a short position of 1,729 March NG contracts to being long by over 3,000 March NG futures; in other words Defendants directed the purchase of over 4,730 futures during the morning of the expiry. Compl. ¶¶ 33-35.

- Defendants then placed orders to sell over 3,000 futures during the close. Compl. ¶ 41.

Second, the Complaint identifies that the actors who took these acts were the Defendants:

- Hunter told his subordinate trader at Amaranth to "make sure we have lots of futures to sell" during the close. Compl. ¶ 32.

- Traders at Amaranth who reported to Hunter followed through with this command, and established a long position of over 3,000 March NG futures before the closing range. Compl. ¶ 33-35, 41.

- Hunter then directed the sale of over 3,000 March NG futures during the closing range. Compl. ¶ 41.

- The Complaint also alleges that Amaranth was responsible for the acts of Hunter and his subordinates pursuant to Section 2(a)(1)(B) of the CEA, which makes Amaranth liable for the acts of its official, agent or other person acting within the scope of his employment. Compl. ¶ 75.

Third, the Complaint identifies when the acts were taken: on the day before and the day of the expiry of the March NG futures. Compl. ¶¶ 32, 35, 41.

Fourth, the Complaint explains the intended effect of the manipulative scheme. It states that Defendants sought to lower the price of the NYMEX futures contracts to benefit Defendant Amaranth's short positions in natural gas swaps on ICE and elsewhere. Compl. ¶ 30. Hunter

admitted his desire to bring the price down in a contemporaneous instant message to another Amaranth natural gas trader when he stated that he would "just need H [the symbol for March NG futures] to get smashed[4] on settle then day is done." Compl. ¶ 36 and Compl. Ex. A, AALLC_REG0684186. On the expiry day for the March NG futures, Defendant Amaranth had a short swaps position of at least 12,000 futures equivalents that would benefit from the lower settlement price of the March NG futures. Compl. ¶ 41.

The Complaint thus pleads with sufficient particularity the claim that Defendants attempted to manipulate futures prices on February 24, 2006.

### 2.    The Attempt to Manipulate Futures Prices on April 26, 2006

First, the Complaint identifies with particularity the acts taken by the Defendants to attempt the manipulation of the May NG futures:

- On April 21, 2006, three trading days prior to the expiry of the May NG futures contract, Defendant Amaranth reversed its May NG futures position to become long futures for the first time in the month. Compl. ¶ 45.

- From that day until the expiry day on April 26, Defendants continued to build their long position until they were long in excess of 3,000 May NG futures. Compl. ¶ 46.

- Before the closing range on April 26, Defendant Amaranth also had a short position in May NG swaps of over 19,000 futures equivalents. Compl. ¶ 47.

- Despite seeing many buyers to whom he could sell his long May NG futures, Hunter decided to wait to sell, as he confirmed to multiple persons within Amaranth at the beginning of the close. Compl. ¶¶ 52-53 and Compl. Ex. A, Bates A_CFTC032878 and 032910.

---

[4]  Hunter testified that the term "smashed" in this context means "the prices fell really, really quickly." Compl. ¶ 37.

- At about the middle of the close, Defendants placed their first order with NYMEX floor broker TFS Energy Futures to sell 500 May NG futures, but instructed the floor broker to hold the execution until the last eight minutes of the closing range. Compl. ¶¶ 55-56.

- Around the same time, Defendants placed an order with another NYMEX floor broker, Gotham, to sell 544 May NG futures, and again instructed the broker to hold execution until the last eight minutes. Compl. ¶¶ 57-58.

- At about 2:22 p.m., with only eight minutes left in the closing range, Defendants placed a third order to yet another floor broker, ALX Energy, to sell 2,000 May NG futures. Compl. ¶¶59-60.

Second, the Complaint identifies that the actors who took these acts were the Defendants:

- Amaranth natural gas traders built up Amaranth's long position in futures and short position in swaps. Complaint ¶¶45-47.

- Hunter decided to wait to sell, as he confirmed to multiple persons within Amaranth at the beginning of the close. Compl. ¶¶ 52-53 and Compl. Ex. A, Bates A_CFTC032878 and 032910.

- At about the middle of the closing range, Defendants placed their first order to sell 500 May NG futures with explicit instruction to hold execution until the last eight minutes of the close. Compl. ¶ 55-56.

- Around the same time, Defendants place a second order to sell 544 May NG futures with the same instructions. Compl. ¶¶ 57-58.

- With only eight minutes left in the closing range, Defendants place a third order to sell 2,000 May NG contracts. Compl. ¶¶ 59-60.

Third, the Complaint identifies when the acts were taken – beginning on April 21, 2006 and continuing through the day of the expiry of the May NG futures contract on April 26, 2006. Compl. ¶¶ 45-47, 54-61.

Fourth, the Complaint alleges that Defendants sought to lower the price of the NYMEX futures contracts on April 26, 2006, to benefit Defendant Amaranth's short positions in natural gas swaps on ICE and elsewhere. Compl. ¶ 30. Specifically, Defendant Amaranth had a short

17

swaps position of at least 19,000 futures equivalents that would benefit from the lower settlement price of the March NG contract. Compl. ¶ 47

The Complaint thus pleads with sufficient particularity the claim that Defendants attempted to manipulate futures prices on April 26, 2006.

## C.    The Complaint Need Not Allege Fraud or Deception

Defendants incorrectly claim that attempted manipulation requires an allegation of false or misleading statements to affect market prices or deceptive trading practices. *See* Amaranth Brief at 8-12; Hunter Brief at 8-13. Virtually all of the cases Defendants cite relate to manipulation of trading *a security* under the securities laws, not a claim for commodity market price manipulation under the CEA. *See e.g. Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) (complaint alleged violations 1934 SEA); *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (same); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) (same); *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) (same); *United States v. Finnerty*, 474 F.Supp.2d 530, (S.D.N.Y. 2007) (same); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995) (same plus violations of 1933 Securities Act); *SEC v. U.S. Environmental, Inc.*, 82 F.Supp.2d 237 (S.D.N.Y. 2000) (same). SEA § 10(b) and Rule 10b-5 inherently sound in fraud; thus courts have quite naturally found that a claim of manipulation under these provisions requires an allegation of false and misleading statements or some injection of inaccurate statements into the market place. *See, e.g., GFL*, 272 F.3d at 204-05.

Here, the Complaint alleges manipulation under Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2). As described above, courts have developed a different test for determining a manipulation claim under the CEA than in the securities context, one which does not necessarily require alleging fraud or misleading statements. Importantly, under

the CEA, there is a separate and distinct test for fraud claims. *See CFTC v. Risk Capital Trading Group, Inc.,* 452 F.Supp.2d 1229, 1243-44 (N.D.Ga. 2006); *CFTC v. Vartuli,* 228 F.3d 94, 101 (2d Cir. 2000). Also, and notably, certain provisions of the CEA apply to certain electronic trading platforms in exempt commodities. For instance, under CEA §2(h)(4), 7 U.S.C. § 2(h)(4), Congress reserved the Commission's fraud and manipulation authority with respect to such platforms by specifically making applicable to them CEA §§ 4b(fraud), 4o(fraud), 6(c), 6(d) and 9(a)(2) (manipulation). Defendants have cited no CEA cases in which the courts have held that fraud, misleading statements or inaccurate information into the marketplace is a necessary element of market manipulation.

While fraud or deception can be part of a manipulative scheme involving commodity futures, it is not a required element under CEA case law, and none of the cases cited by Defendants suggest that it is required.[5] Many of the CEA manipulation cases they cite did not involve fraud or deceit. *See Cargill,* 452 F.2d at 1172 (intentional market squeeze by grain merchandisers); *Enron,* 2004 WL 594752 at *2 (purchase of large amount of natural gas spot contracts within a short period of time to cause artificial prices in spot and futures prices); *In re Avista Energy, Inc.,* CFTC Docket No. 01-21, 2001 WL 951736 at *3-4 (C.F.T.C. Aug. 21, 2001) (manipulation scheme in which Avista purchased a large amount of electricity futures at non-economic prices; no fraud or deceit involved in scheme). Thus, while market manipulation schemes under the CEA can involve fraud, misleading statements or placing inaccurate information into the marketplace, these are by no means the only ways one can manipulate or

---

[5] *Transnor (Bermuda) Ltd v. BP N. Am.,* 738 F.Supp. 1472 (S.D.N.Y. 1990), cited by Defendant Amaranth, involved, *inter alia,* a claim for manipulation based on wash trades. In denying defendant's motion for summary judgment, *Transnor* reiterated the four part test for manipulation cited by other courts in CEA cases and did not hold that fraud or deception is a necessary element of a CEA manipulation claim. *Id.* at 1493.

attempt to manipulate the commodity markets. "Buying or selling in a manner calculated to produce the maximum effect upon prices, especially in a concentrated fashion and in relatively large lots is one form of manipulation. *See Enron*, 2004 WL 594752, at *2.

Defendant Amaranth also argues that failure to allege some unlawful activity warrants dismissal. *See* Amaranth Brief at 12. However, the cases Defendant Amaranth cites in that regard do not stand for the proposition that some unlawful activity must be alleged in manipulation claims (other than the manipulation itself). *In re College Bound Consol. Litig.*, 93 Civ. 2348 (MBM), 1995 WL 450486 (S.D.N.Y. July 31, 1995), is inapplicable because it is based on § 10(b) of the federal securities laws and not the CEA. *In re Abrams* was a decision by an administrative law judge, made after an evidentiary hearing, dismissing a manipulation claim because intent to create artificial price had not been proven by a preponderance of the evidence. *See In re Abrams* 1994 WL 506250, at *14-15 (C.F.T.C. Sept. 15, 1994) (ALJ initial decision), *aff'd*, 1995 WL 455791 (C.F.T.C. July 31, 1995). *Abrams* does not hold that some other unlawful activity must be alleged in a manipulation claim. Likewise in *Indiana Farm Bureau*, which involved an alleged manipulative squeeze, the CFTC held, on appeal after an evidentiary hearing, that there was insufficient evidence to prove respondents had acted with the requisite intent to cause an artificial or distorted price. 1982 WL 30249, at *8. *Indiana Farm Bureau* does not hold that some unlawful activity must be alleged to have accompanied the manipulative acts.

The Complaint alleges Defendants had the requisite manipulative intent and committed overt acts in furtherance of that intent. Whether the CFTC's evidence is sufficient to meet its burden of proof for the intent element of manipulation is a determination for the trier of fact and not a motion to dismiss under Rule 12(b)(6). *Press,* 166 F.3d at 538.

## III.
## THE MOTION TO DISMISS THE SECTION 9(a)(4) CLAIM SHOULD BE DENIED

Section 9(a)(4) of the Act makes it unlawful for any person to

> willfully falsify, conceal or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, or futures association designated or registered under this Act acting in furtherance of its official duties under this Act.

CEA §9(a)(4), 7 U.S.C. § 13(a)(4).[6] No reported case has interpreted this section of the

Commodity Exchange Act (or whether a §9(a)(4) claim is subject to Rule 9(b).)

### A.     The Complaint Adequately Pleads That Defendant Amaranth Violated Section 9(a)(4) in its Letter to NYMEX

As described in the Complaint, NYMEX, in furtherance of its official duties under the

Act, requested that Amaranth Advisors L.L.C. explain its trading behavior on April 26, 2006 and

the economic reasons for Defendant Amaranth to sell 99% of its contracts in the last four

minutes of the closing range.  Compl. ¶ 62-65 and Compl. Ex. B. Defendant Amaranth, aware

that NYMEX was investigating its trading and that its manipulative scheme would unravel if a

true account of its trading activity was disclosed, submitted the August 15 Letter. Compl. ¶ 66-

67 and Compl. Ex. C.  In that letter Amaranth Advisors L.L.C. willfully falsified, concealed, or

---

[6]   As is evident from the statute, Section 9(a)(4) prohibits three categories of activities to registered boards of trade (like NYMEX) when acting in furtherance of their official duties:

- willful falsification, concealment or cover up of a material fact by any trick, scheme, or artifice;
- the making of any false, fictitious, or fraudulent statements or representations; or
- using any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entries.

In this case, because the actions by Defendant Amaranth fall under all three categories, it is unnecessary to parse out further the distinctions between the three.

covered up by trick, scheme or artifice a material fact or made false, fictitious, or fraudulent statements or representations in describing its April 26, 2006 trading. *See* Compl. ¶ 68 and Compl. Ex. C. The Complaint therefore contains sufficient, plausible and detailed factual allegations of violation Section 9(a)(4) of the Act, and thus the motion to dismiss for failure to state a claim should be denied.

**B.    The Section 9(a)(4) Allegations Satisfy Rule 9(b)**

Assuming *arguendo* that Rule 9(b) does apply to the §9(a)(4) claim alleged here, the Complaint pleads with particularity the facts supporting this claim.  As stated above, in order to satisfy Rule 9(b) a complaint should "(1) specify the statements that plaintiff contends [violate §9(a)(4)], (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were [in violation of §9(a)(4)]." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

First, the Complaint specifies the writing in question (the August 15 letter, attached to the Complaint as Ex. C) and specific parts of that letter that violate §9(a)(4), including:

- Amaranth's depiction of "its positions and trading strategy,"

- the concealment that "Amaranth had given specific instructions to its floor brokers on April 26, 2006 as to when Amaranth's sales orders should be executed," claiming that it did not decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later, and

- claiming that to the extent any part of Amaranth's orders was executed in the post-close trading session it was not due to Amaranth's instructions but perhaps occurred because a floor broker erroneously failed to comply with Amaranth's directive to complete the execution of its orders during the closing range.

*See* Compl. ¶ 68 and Compl. Ex. C.

Second, the Complaint identifies the speaker – namely, Amaranth Advisors, L.L.C. *See* Compl. ¶ 67.

Third, the Complaint states where and when the statements were made – namely on or about August 15 in the August 15 letter. *Id.*

Fourth, the Complaint explains that the statements were in violation of Section 9(a)(4) because they did not state that Defendant Amaranth's trading strategy involved (i) deliberately waiting to sell the contracts in order to mute the effect that large buyers would have on the settlement price, and (ii) this strategy included deliberately instructing its brokers to wait until the last eight minutes of the closing range to place its orders to sell. Compl. ¶¶ 48-61

In short, as stated in the Complaint, these statements were false and misleading because they misrepresented Defendant Amaranth's actual trading conduct on April 26, 2006. Compl. ¶ 66. The Complaint thus identifies the statements made, who made them, when the statements were made, and why the statements were fraudulent. Rule 9(b) requires nothing more.

Contrary to Defendants' arguments, the inferences which can be drawn from the facts alleged are best left to the ultimate trier of fact and are not to be determined on a Rule 12(b)(6) motion to dismiss. *Press,* 166 F.3d at 538.

## C.    The Section 9(a)(4) Claim Is Pled Independently From the Attempted Manipulation Claims

Section 9(a)(4) is a separate section of the Commodity Exchange Act that, on its face, is intended to protect the ability of boards of trade and other similar registered entities to fulfill their obligations under the CEA. Its language and purpose exists independent of the other sections of the act – thus, Defendant Amaranth's cover up in the August 15 letter (including hiding the directions to its floor brokers to wait until the last eight minutes to execute the trades) would still violate Section 9(a)(4) even if the trier of fact determines that it did not attempt to manipulate futures prices.

## IV.
## DEFENDANT HUNTER'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THIS COURT HAS PERSONAL JURISDICTION OVER HIM

As described in detail below, the facts support the conclusion that this Court can exercise personal jurisdiction over Defendant Hunter. In particular, on February 24 and April 26, 2006, Defendant Hunter himself directly placed, or directed others he supervised to place, the very natural gas futures trades on NYMEX, in Manhattan, that are the subject of the Complaint. Defendant Hunter also developed the trading strategy for Defendant Amaranth in the natural gas market for the days that are at issue. He was responsible for making all the decisions regarding the trades which were part of the manipulative scheme and the timing of execution of these trades that Defendant Amaranth placed on U.S. exchanges.

The Second Circuit has adopted a two part analysis to determine whether the exercise of personal jurisdiction over a particular defendant comports with due process: the "minimum contacts" inquiry and the "reasonableness" inquiry. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567- 573 (2d Cir. 1996) ("*Met Life*").

Where, as in this case, there has been no discovery regarding personal jurisdiction,[7] a plaintiff may defeat a motion to dismiss based upon legally sufficient allegations of jurisdiction, and is not limited to the facts plead in the Complaint. *SEC v. Euro Security Fund,* 98 Civ. 7347 (DLC), 1999 WL 76801, at *2 (S.D.N.Y. Feb. 17, 1999). As demonstrated below, the Commission has met its burden establishing both Defendant Hunter's minimum contacts with the United States and the reasonableness of exercising personal jurisdiction over Defendant Hunter.

---

[7]    While Defendant Amaranth notes that the Commission conducted an investigation prior to the filing of this litigation, that investigation focused on the natural gas trading at issue as opposed to the scope of Hunter's personal contacts with the United States.

**A.    Defendant Hunter Had Sufficient Minimum Contacts To Satisfy Due Process**

The minimum contact analysis distinguishes between "specific" jurisdiction and

"general" jurisdiction. Courts have found that a defendant had sufficient minimum contacts with

the Untied States[8] when the Court has either (1) specific jurisdiction which exists when the

exercise of personal jurisdiction is over a defendant "in a suit arising out of or related to the

defendants' contacts with the forum" *Met Life*, 84 F.3d at 568 (citing *Helicopteros Nacionales de

Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & nn. 8-9 (1984)) or (2) general jurisdiction which

exists when the defendant has "continuous and systematic" general business contacts with the

United States. *Helicopteros*, 466 U.S. at 416.

**1.    Specific Jurisdiction**

To establish the minimum contacts necessary for specific jurisdiction, a plaintiff's claim

must arise out of or relate to defendant's contact with the forum.  *In re Sumitomo Copper

Litigation*, 120 F.Supp.2d 328, 342 (S.D.N.Y. 2000). These contacts can arise through the simple

telephone call, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985), or through the

acts taken in the forum by the defendant's broker. *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95

(2d Cir. 2006) (personal jurisdiction existed over foreign investors that entered into brokerage

account agreements with plaintiff and executed numerous stock trades through plaintiff's New

York offices on various New York exchanges); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua*

---

[8]    As Hunter acknowledges (Hunter Brief at 3), the relevant forum is the United States because, where
Congress statutorily has authorized notionwide service (*see* CEA §§6c(a) and (e), 7 U.S.C. §§13a-1(a) and (e)), the
required "minimum contacts" are the defendant's contact with the United States. *See CFTC v. Worldwide
Commodity Corp.*, 366 F. Supp.2d 276 (E.D Pa. 2005); *cf. Trading & Milling Corp. v. Fed. Rep. of Nigeria*, 647
F.2d 300, 314 (2d Cir. 1981) (applying same test under comparable statutory service provisions in Foreign
Sovereign Immunities Act); *Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326, 1341-42 (2d Cir. 1972)
(analyzing defendants' contacts with United States rather than New York).

*Shipping Co.*, 241 F.3d 135, 152-53 (2d Cir. 2001) (jurisdiction existed over defendant who utilized a broker to carry out specific transaction where claims relate to that transaction).

This Court has specific jurisdiction over Defendant Hunter because he developed the trading strategy for Defendant Amaranth in the natural gas market at all times relevant to the Complaint. Declaration of Michael McLaughlin ("McLaughlin Dec.") Ex. 1 at 174:10-13, 199:11-15; Compl. Ex. A (Bates #AALC_REG0684055). Defendant Hunter was responsible for making all the decisions regarding the timing of execution of all relevant trades. *Id.* Defendant Hunter personally placed an order with a floor broker for the majority of the natural gas futures contracts that are at issue in the Complaint on April 26, and personally directed others at Amaranth under his supervision to place all of the other futures contract trades on February 24 and April 26, 2006 that are the subject of the Complaint. *Id.* Ex. 3 at 81:6-17; Ex. 1 at 174:10-13, 199:16-23. In addition, Defendant Hunter determined the volume and directed the over-the-counter trades Defendant Amaranth placed on February 24 and April 26 and on the days leading up to those dates, which the Complaint alleges were part of the Defendants' manipulative scheme. *Id.* Ex. 1 at 198:9-13. *See Global Intellicom Inc. v. Thomson Kernaghan & Co.*, 99 Civ. 342 (DLC), 1999 WL 544708, at *19 (S.D.N.Y. July 27, 1999) (court held there was "no basis under minimum contacts" analysis to dismiss complaint against Canadian resident and officer of Canadian corporation that shorted securities traded on a United States exchange).

### 2.     General Jurisdiction

This Court can also exercise general personal jurisdiction over Defendant Hunter because his contacts with the United States were "continuous and systematic." *U.S. Titan*, 241 F.3d at 152; *see also Helicopteros*, 466 U.S. at 415-16. Thus, a defendant who "purposefully availed" himself of the privilege of doing business in the United States and could reasonably foresee

being "haled into court" here is subject to the personal jurisdiction of its courts. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The minimum contacts inquiry is fact-intensive and the appropriate period for evaluating the defendant's contacts will vary. Under this test, courts examine a defendant's contacts with the forum "over a period of time that is reasonable under the circumstances—*up to and including the date the suit was filed*—to assess whether they satisfy the "continuous and systematic" standard." *Met Life*, 84 F.3d at 569-70 (emphasis added) (holding that six-year period before action filed was appropriate period).

Even if the Court were to find that it does not have specific jurisdiction over Defendant Hunter in this case, Defendant Hunter had long-term, continuous and systematic contacts with the United States which give this Court general jurisdiction over him. Some of these contacts are as follows:

**Defendant Hunter's Contacts with The United States Prior to His Employment with Amaranth**

- Defendant Hunter resided in the United States from at least May 2001, during his employment with Deutsche Bank. (McLaughlin Dec. Ex. 2 at 16:6-9; Ex. 4 at ¶¶ 6-8).

- While employed at Deutsche Bank, Defendant Hunter was responsible for executing natural gas trades in the United States. (McLaughlin Dec. Ex. 4 at ¶ 8).

- After leaving Deutsche Bank, Defendant Hunter filed a lawsuit in New York against Deutsche Bank relating to the size of his bonus. (McLaughlin Dec. Ex. 4).

**Defendant Hunter's Contacts with The United States While Employed At Amaranth**

- Defendant Hunter continued to reside in the United States while employed at Amaranth and working out of the Amaranth Connecticut office, until late 2005 when Amaranth set up its Calgary office. (McLaughlin Dec. Ex. 2 at 16:2-3; Ex. 5; Ex. 8 at 17:9-11).

- While working at Amaranth, Defendant Hunter met with investors of Amaranth. (McLaughlin Dec. Ex. 2 at 121:2-14, 122:5-14; Ex. 6 at 43:25-44:15; Ex. 7 at 42:4-14).

- While at Calgary, Amaranth only permitted Defendant Hunter to set up a thinly-staffed trading outpost with no on-site compliance personnel. (McLaughlin Dec. Ex. 8 at 17:9-18:3).

- Even after Amaranth's Calgary office opened, Defendant Hunter made frequent trips back to Amaranth's Connecticut offices for significant periods of time throughout the balance of his employment at Amaranth; for example Defendant Hunter worked out of the Amaranth Connecticut office between 60-70% of the time during the Spring and Summer of 2006. (McLaughlin Dec. Ex. 3 at 37:1-6; Ex. 6 at 104:1-13; Ex. 10; Ex. 11 at 9:1-7).

- As Amaranth's head Natural Gas trader including while in Calgary, Defendant Hunter controlled and was responsible for Amaranth's trading of natural gas product both on NYMEX and ICE, located in the United States, as well as with American counter-parties. (McLaughlin Dec. Ex. 13 at ¶ 10; Ex. 2 at 19:13-14, 20:1-3; Ex. 1 at 198:9-13; Ex. 27 17:21-18:2).

- Defendant Hunter, both before and after the Calgary office was established, continued to supervise on a daily basis many of Amaranth's traders who were located in Connecticut. (McLaughlin Dec. Ex. 2 at 28:8-12; Ex. 6 at 64:5-13; Ex. 14).

- While in Calgary, Defendant Hunter communicated continuously with the risk managers in Connecticut. (McLaughlin Dec. Ex. 6 at 65:12-22; Ex. 8 at 17:22-18:3; Ex. 15 at 22:11-16, 109:22-110:1, 164:8-10).

- Before and after the Calgary office was established, Defendant Hunter's trading positions were in the Amaranth system in Connecticut which his managers in Connecticut had access to and could review. (McLaughlin Dec. Ex. 6 at 65:18-22).

- Amaranth's risk manager directed Defendant Hunter to be available, or to direct someone who is knowledgeable of Defendant Hunter's portfolio from his group in Calgary to be available every morning at 8:30 a.m. Eastern Time to address any issues that may arise. (McLaughlin Dec. Ex. 2 at 46:4-14; Ex. 12 at 125:1-6).

- Both before and after the Calgary office was established, all back office operations and risk management for Defendant Hunter's trading, including natural gas futures trading, were done in Amaranth's Connecticut office. (McLaughlin Dec. Ex. 8 at 20:11-23, 21:1-15; Ex. 17 at 19:23-20:9).

- Both before and after the Calgary office was established, the accounting group for Defendant Hunter's book was in Connecticut. (McLaughlin Dec. Ex. 12 at 129:17-19).

- During his employment at Amaranth, and while he was in Calgary, Defendant Hunter met with NYMEX brokers and clerks in New York. (McLaughlin Dec. Ex. 3 at 25:1-6; Ex. 18 at 38:3-12; Ex. 20 at 88:7-18).

- During his employment at Amaranth, Defendant Hunter frequently called NYMEX floor brokers to obtain market information or to place trades. (McLaughlin Dec. Ex. 21 at 19:19-23, 28:10-13; *see also* Ex. 3 at 25:10-16; Ex. 18 at 56:3-8).

- During his employment at Amaranth, Defendant Hunter visited the NYMEX floor. McLaughlin Dec. Ex. 19 at 51:15-22).

- Defendant Hunter was in the United States when he participated in drafting the August 15, 2006 letter to NYMEX explaining Amaranth's trading strategy on April 26, 2006 (the same letter that is the subject of the third count of the Complaint charging Amaranth with lying to NYMEX). (McLaughlin Dec. Ex. 22 at 71:11-72:9).

- Defendant Hunter continuously utilized the Unites States financial markets to earn his income and to maintain his finances including owning at least one bank account in the United States. (McLaughlin Dec. Ex. 13 at ¶ 10; Ex. 23).

## Defendant Hunter's Contacts with The United States After His Employment At Amaranth

- Subsequent to his employment with Amaranth, Defendant Hunter continued conducting business in the United States and set up a new hedge fund, Solengo Capital Advisors ULC ("Solengo"), with an office in Connecticut. (McLaughlin Dec. Ex. 24 at ¶ 7).

- Defendant Hunter's new venture, Solengo, filed a lawsuit in this District. (McLaughlin Dec. Ex. 25).

- Subsequent to his employment with Amaranth, Defendant Hunter maintained his ties with NYMEX brokers and clerks by calling and meeting with them. (McLaughlin Dec. Ex. 21 at 125:19-21, 128:10-25).

- Defendant Hunter filed a lawsuit in the United States against the Federal Energy Regulatory Commission just prior to the filing of the CFTC Complaint. This lawsuit involved, for the most part, the same natural gas futures trading at issue in this case. (McLaughlin Dec. Ex. 26).

Thus, the Commission has amply demonstrated that Defendant Hunter had continuous and systematic contacts with the United States sufficient to establish this Court's general jurisdiction over him. Defendant Hunter's contacts with the U.S. were not sporadic or occasional, but a repeated pattern of regular and consistent contact with the United States.[9]

**B.    It is Reasonable for this Court to Assert Personal Jurisdiction over Defendant Hunter**

Once minimum contacts are established, the inquiry turns to whether the defendant presents a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. That inquiry is determined by weighing the five-factor test of *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033 (1987): (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Met Life*, 84 F.3d at 568. Here, Defendant Hunter's claim that assertion of jurisdiction over him is not "reasonable" under some of the five *Asahi* factors has no merit especially in light of his significant actions in the United States over many years.

---

[9]    Hunter's argument that that the "effects test" applies to the facts of this case (*See* Hunter Brief at 4-5) misstates the law. The "effects test" is applicable only where a defendant's minimum contacts cannot be established but where a defendant's acts occurring outside the forum have effects felt within the forum. Indeed, in *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), the court held that the only defendant whose motion to dismiss for lack of personal jurisdiction should have been granted had "done no act within the United States giving rise to the present cause of action." *Leasco*, 468 F.2d at 1341. In *Unifund*, the foreign defendant also had no direct contact with the United States, but rather transacted with brokers located outside the United States. *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (holding personal jurisdiction existed despite lack of direct contacts with United States). Here, as discussed above, Hunter had significant on-going contacts with the United States sufficient to establish personal jurisdiction over him.

1. **Litigating In The Southern District Of New York Does Not Impose A Significant Burden On Defendant Hunter**

Defendant Hunter's claim that he would be burdened by travel from his Calgary residence to litigate this case[10] and by being subject to foreign sets of procedure and law is meritless. Defendant Hunter has retained, long before the Complaint was filed in this action, counsel located in New York. Therefore, there will be little need for Defendant Hunter to be present in New York over the course of this litigation.

Finally, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) (quoting *Met Life*, 84 F.3d at 574.) This litigation does not present an undue burden on Defendant Hunter.

2. **Interests of the United States in Adjudicating the Case**

It is indisputable that the CFTC is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act, "the purview of which includes protecting the integrity of the [U.S.] energy markets." *CFTC v. McGraw-Hill*, 507 F.Supp.2d 45, 48 (D.D.C. 2007). Thus, Defendant Hunter's argument that the CFTC has "less than compelling" interests in adjudicating this matter because the acts alleged in the Complaint "had no effect on

---

[10]  Belying his claim that it is a burden for him to litigate in the U.S., Hunter himself has been a plaintiff in multiple recent lawsuits in the U.S. including in this court: (i) lawsuit as the managing director of the plaintiff in litigation in this District, *see Solengo Capital Advisors ULC v. Dealbreaker, et al.*, 07 CV 2657 (S.D.N.Y.); (ii) litigation personally against the FERC in the District of Columbia, *see Hunter v. Federal Energy Regulatory Commission*, 07 Civ. 1307 (D.D.C.), which involved the very same trading that is at issue in the present case; and (iii) a previous action against Deutsche Bank in New York State Court over his compensation related to trading; *see Hunter v. Deutsche Bank AG;* Index No. 04602791 (N.Y. Sup. Ct. (N.Y. Co.)).

U.S. markets" is baseless. (Hunter Brief at 6.) The Commodity Exchange Act does not differentiate between an attempt to manipulate and a perfected manipulation as to the civil monetary penalty. They are both violations of Section 9(a)(2) of the Act. In addition, the purpose of the Commodity Exchange Act explicitly is "to deter and prevent price manipulation or any other disruptions to market integrity . . . ." CEA § 3(b); 7 U.S.C. § 5(b). An attempt to manipulate a U.S. market is thus disruptive to other market participants and diminishes their ability to rely on the market being fair. Thus, this factor weighs heavily in favor of finding that this court has personal jurisdiction over Defendant Hunter.

3.    **Plaintiff's Interest in Obtaining Convenient and Effective Relief**

It is beyond question that the CFTC has a great interest in obtaining effective relief when a U.S. market that it regulates has been subjected to an attempted manipulation. For that reason, a substantial portion of the relief that the CFTC seeks here and that is enforceable within the United States is a permanent trading ban against Defendant Hunter preventing him from trading commodities in the United States.

4.    **The Judicial System's Interest in Obtaining the Most Efficient Resolution of the Controversy**

In evaluating this factor, courts "generally consider where witnesses and evidence are likely to be located." *Met Life,* 84 F.3d at 574; *see also Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244-45 (2d Cir. 1999). This litigation, in which the CFTC has brought charges against Defendant Hunter as well as Amaranth, furthers the Court's interest in obtaining efficient resolution of the controversy since most of the parties as well as a significant number of witnesses and evidence are located in the United States. Specifically:

- Documents have been produced by Defendant Hunter in New York. (McLaughlin Dec. ¶ 4).

- Most of the Amaranth witnesses, including Amaranth's former managers and traders, are currently residing in the United States. (McLaughlin Dec. ¶ 5).

- Other witnesses including NYMEX floor brokers and clerks reside in the United States. (McLaughlin Dec. ¶ 6).

- Relevant trading records and data that are in possession of the NYMEX are located in New York. (McLaughlin Dec. ¶ 7).

Therefore, this factor also weighs heavily in favor of finding that this court has personal jurisdiction over Defendant Hunter.

### 5.    The Interest of the United States in Furthering Substantive Social Policies

As noted earlier, Congress has charged the CFTC with the responsibility of protecting the integrity of the energy markets in the United States. Because attempted manipulation of NYMEX natural gas contract prices causes harm to the integrity of the U.S. commodities market, this factor weighs heavily in favor of finding that this court has personal jurisdiction over Defendant Hunter.

In summary, this Court's assertion of jurisdiction over Defendant Hunter is "reasonable" under the factors set forth in *Met Life*. In light of Defendant Hunter's significant specific contacts with the United States out of which this lawsuit arises as well as his overall significant systematic and continuous contacts with the United States, and because the exercise of personal jurisdiction over Defendant Hunter comports with the reasonableness standard, Defendant Hunter's motion to dismiss the Complaint for lack of personal jurisdiction should be denied.

**CONCLUSION**

For the foregoing reasons, it is respectfully requested that the motions to dismiss be

denied.


Dated:    New York, New York
          December 20, 2007

                              Respectfully submitted,

                              COMMODITY FUTURES TRADING
                              COMMISSION


                              Stephen J. Obie
                              Regional Counsel/Associate Director
                              David W. MacGregor
                              Manal Sultan
                              Chief Trial Attorneys
                              Elizabeth C. Brennan
                              David W. Oakland
                              Karin N. Roth
                              W. Derek Shakabpa
                              Senior Trial Attorneys
                              Division of Enforcement
                              140 Broadway, 19th Floor
                              New York, NY 10005
                              (646) 746-9766

                              Attorneys for Plaintiff