EXHIBIT
1

1

UNITED STATES OF AMERICA

2          BEFORE THE

COMMODITY FUTURES TRADING COMMISSION

3    ---------------------------------------------x

4    In the Matter of:

5    Natural Gas Trading By Amaranth Advisors,

LLC and Others.

6

---------------------------------------------x

7

8              800 Third Avenue

New York, New York

9

June 15, 2007

10             8:52 a.m.

11

12        DEPOSITION of BRIAN HUNTER, the

13    witness herein, taken by the Commodity

14    Futures Trading Commission, pursuant to

15    Subpoena, held at the above-noted time and

16    place, before a Notary Public of the State

17    of New York.

18

20

21

22

23

24

25

1           Hunter

2    until" -- you say, "have a lot more to sell,

3    waiting until 2:20," you see that?

4        A    Yeah.

5        Q    When you say waiting until 2:20,

6    what is that referring to?

7        A    If it's futures it would have

8    been waiting to sell futures until 2:20, but

9    I would doubt we were actually doing that.

10   I'm pretty sure that was a ratable sale,

11   that whole settlement, so I don't think

12   that's actually -- if it's referring to

13   futures.

14       Q    What else might it be referring

15   to?

16       A    Again, it could be options.  I

17   don't know.  I'd have to look.

18       Q    What would you look at?

19       A    Trade blotter.

20       Q    Trade blotter?

21       A    Yeah.

22       Q    What kind of trade blotter would

23   you consult?

24       A    I have to look at it to try to

25   piece it together.  It could be that.  If

1          Hunter

2    it's futures, this is probably not accurate.

3    I'm almost certain that was a ratable close.

4          Q    Why would you tell him you were

5    waiting until 2:20 if it's not accurate?

6          A    I'm not sure.

7          Q    What is it on the trade blotter

8    that you would look for to try to figure out

9    what you were saying here?

10         A    If it was referring to something

11   else, I just look and see if there's -- you

12   know, what else I did that day, because I

13   see later on we start talking about a bunch

14   of options that traded, that's what

15   initially made me think that might not be

16   futures.  So if there was a bunch of other

17   options to trade I could see something like

18   that.

19         I have to look at it.  It could

20   be futures.  If it was futures, I don't

21   think it's accurate.  That was a ratable

22   sale.  We didn't go in and say sell 500

23   here, 500 there, I don't remember doing

24   that.  I'm almost certain we placed that

25   order ratable.

1          Hunter

2     as well just be doing it myself.  He's

3     a good executor, so he would know how

4     to manage his duties properly.

5     Q     But on April 26th you told him,

6     here's the number of futures you've got to

7     sell?

8     A     Yeah.

9     Q     The swap trade that we talked

10    about on April 26, 2006 with Centaurus, that

11    was -- you decided to enter into that,

12    right?

13    A     The swap spread, yeah.  Well,

14    with him but from the company.  It was a

15    risk management decision, so I informed Dave

16    Chaseman that I think I'd like to do this,

17    this is how we're going to lower our risk,

18    it's not unilaterally I'm doing that and

19    then telling people, it's like, I think I'd

20    like to do this, what do you think and it

21    makes sense, okay, then let's do it.

22    Q     Did you discuss the 10,000 lot

23    swap trade with Mr. Chaseman before you

24    entered into it?

25    A     I think so.

Hunter, Brian 6/15/2007 8:52:00 PM

1          Hunter

2     Q     What do you recall saying to him

3     and what did he say to you?

4     A     I don't recall the exact

5     conversation, but I kind of remember a

6     conversation taking place, and certainly we

7     would have had some discussion even before

8     that day that we can roll off risk, it's

9     always an option, expire off short

10    positions.

11    Q     The decision to wait until near

12    the end of the close to do the execution on

13    April 26th, that was your decision?

14    A     Yeah, so we could sell more.  I

15    mean, the overall strategy is my decision.

16    Q     This experiment in the February

17    close, that was your decision, right?

18    A     Yeah.  So is the overall

19    summer/winter position and the option

20    positions.

21    Q     Sure.  That was your

22    responsibility?

23    A     Yeah.

24    Q     Do you recall anything about

25    trading on July 31, 2006?

EXHIBIT
2

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:    )

4                ) File No. B-2278

5    AMARANTH ADVISORS LLC   )

6    WITNESS:  Brian Hunter

7    PAGES:   1 through 180

8    PLACE:   Securities and Exchange Commission

9       3 World Trade Center, Room 414

10      New York, New York  10281

11    DATE:   Thursday, November 16, 2006

12

13      The above-entitled matter came on for hearing, pursuant

14    to notice, at 10:35 a.m.

15

16

17

18

19

20

21

22

23

24

25

1    A    No.

2    Q    Prior to that employment who were employed by?

3    A    Amaranth Advisors LLC, I believe it's LLC.

4    Q    What was your employment prior to that?

5    A    Deutsche Bank AG, New York.

6    Q    When did you leave Deutsche Bank?

7    A    April 2004.

8    Q    When did you start Deutsche Bank approximately?

9    A    May 2001.

10    MR. BLOCK:   What was your employment prior to

11   Deutsche Bank?

12    THE WITNESS:   At the end or beginning?

13    MR. BLOCK:   From the beginning to the end.

14    THE WITNESS:   Vice president and at the end it

15   was director.

16    Q    What were your responsibilities?

17    A    As a VP, it was option trading and market making

18   and as director it was heading the trading desk.

19    Q    Was there any position between vice president and

20   director?

21    A    No.

22    Q    Any other responsibilities other than those you

23   just described, job responsibilities?

24    A    No.

25    Q    What was your employment before Deutsche Bank?

1         THE WITNESS:   He had done some deals with

2    Deutsche, some natural gas volatility trades with Deutsche.

3    Q    While he was at Amaranth?

4    A    While he was at Amaranth.  I'm sorry, I met Hai

5    Chen before.

6    Q    How did you know Mr. Chen, Hai Chen?

7    A    I had dinner with him once.

8    Q    What was -- I'm sorry, your start date was April

9    of `04?

10   A    Yes, at Amaranth.

11   Q    Who did you report to when you started?

12   A    Harry Arora.

13   Q    What were your responsibilities when you started?

14   A    Develop and manage a natural gas trading business.

15   Q    Was there already a natural gas trading business

16   at Amaranth before you arrived?

17   A    Yes.

18   Q    Who was in charge of it before you?

19   A    Harry.

20   Q    What exactly did you do in developing and managing

21   the natural gas trading business?  Let's confine it to your

22   first -- to 2004.

23   A    Can you be a little more specific.

24   Q    What did you do on a day to day basis in 2004

25   while you were working at Amaranth?

1    A    Generate trade ideas, execute trades, help develop

2    systems, help develop general systems, basic day to day

3    interaction with everybody on the trading desk.

4    Q    Who else was on the trading desk at that time?

5    A    Harry Arora, Hai Chen, Peter Geary, Jaime Gualy.

6    Q    Could you spell that one for me.

7    A    Jaime, J-A-I-M-E, G-U-A-L-Y, I believe there was

8    Gary Wu, someone else's name who I can't remember, Uday Garg.

9    Q    Can you spell that one for us.

10    A    U-D-A-Y  G-A-R-G and Nadman.

11    Q    You said Nadman?

12    A    Nadman, yes.

13    Q    Which of these persons reported to you, if any, at

14    that time?

15    A    No one.

16    Q    They all reported to Mr. Arora?

17    A    Yes.

18    Q    Who did Peter Geary report to?

19    A    Harry.

20    Q    How about Hai Chen?

21    A    Harry.

22    Q    Gary Wu?

23    A    Rob Jones.

24    Q    And Mr. Garg?

25    A    Harry.

(SEC) Hunter, Brian 9/16/2006 10:35:00 AM

1       A    Analyst.

2       Q    Mr. Eck?

3       A    European power and gas.

4       Q    Where was Mr. Eck?

5       A    In London.

6       Q    How about Mr. Parks?

7       A    Calgary.

8       Q    Basarowich, Donohoe and Calhoun all in Calgary?

9       A    Basarowich, Donohoe, Calhoun was not in Calgary a

10   majority of the summer.

11      Q    He was in Greenwich?

12      A    Yes.

13      Q    Where was Hai Chen in the summer of `06?

14      A    Greenwich.

15      Q    Who did he report to?

16      A    Me.

17      Q    What was he doing?

18      A    Eastern power and some precious metals -- sorry,

19   base metals.

20      Q    What are base metals?

21      A    Non-precious metals such as copper, zinc.

22      Q    Beginning back in 2004 into 2005 at the time, at

23   least for the period you reported to Mr. Arora, were you

24   required to get his approval for your trading strategies or

25   the size of your positions?

1    that's significantly different that happens at 7:00 a.m.,

2    that happens from 8:00 a.m.  I think that's what you're

3    asking.

4    Q    Did you ask Mr. Jones why he wanted someone in the

5    office early in the morning?

6    A    I don't know if I ever asked that question, I just

7    generally said okay, I'll try to get someone in there.

8    Q    Did Mr. Jones ever specifically state why he

9    wanted someone there early in the morning?

10    A    He would say different things, all of which I

11    mentioned before.  There may be more, I'm not sure but one of

12    the resolutions was you're feel free to call or e-mail first

13    thing in the morning so we can answer questions.  You don't

14    have to wait until we get in the office, you can call me on

15    my cell phone.

16    Q    At any point in time did you insure that someone

17    would be in the office early in the morning to receive calls

18    from Mr. Jones or others?

19    A    Yes, we asked people to be in early, sometimes

20    they were.

21    MR. KIM:  He obviously could reach you on your

22    cell phone.

23    THE WITNESS:  Always.

24    BY MR. POMFRET:

25    Q    How many risk management people were there in

1    Calgary?

2        A    None.

3        Q    When you were in Greenwich, so prior to October

4    2005, was there -- where did the risk management people sit

5    physically?

6        A    At various places.

7        Q    On a different floor.

8        A    Yes.

9        Q    Any risk management people ever visit you in

10    Calgary?

11        A    Yes.

12        Q    Who?

13        A    Rob Jones.

14        Q    How frequently did Mr. Jones visit?

15        A    Just once.

16        Q    For how long?

17        A    A few days.

18        Q    When?

19        A    July.

20            MR. BLOCK:   July of when?

21            THE WITNESS:   I believe it was the first half of

22    July.

23            MR. BLOCK:   What year?

24            THE WITNESS:   I'm sorry, 2006.

25        Q    How frequently did Mr. Chasman visit?

1    Harry left, Harry would have communications with investors.

2    Q    After Harry left.

3    A    A little bit because I was looking at Calgary, not

4    too frequently in April or May.  There was some, I was up

5    there a few times for a meet and greet.  Harry always did the

6    communication, so people wanted to meet me and see what I was

7    like.  Then there was pretty extensive by my past experience

8    pretty extensive investor meetings to explain the losses at

9    the end of May and then I had very little investor

10    interaction in July, August and September.

11    Q    Before the losses at the end of May, how many

12    times a week were you meeting investors?

13    A    I'm not sure.  On average because sometimes it

14    would be six or seven, sometimes it would be none.  I don't

15    know, a couple times a week.  Some of those might be over the

16    phone.

17    Q    The losses at the end of May, how many total

18    interactions or how many investors did you interact with

19    regarding the losses in May?

20    A    I'm not sure.  I flew up I think it was two weeks

21    in a row, two or three a day, something along those lines.

22    So maybe fifteen to twenty-five.  That's really an

23    approximate guess.

24    Q    This may be a challenge but tell me which

25    investors as best you can you spoke with.

1    redemption.  I think it would be listed on the bottom.

2    Q    Typically when you met with investors was it just

3    you or were there others present?

4    A    I was never alone except once in Calgary.

5    Q    Who else was typically present?

6    A    Generally if it was an in person meeting --

7    generally it's Nick and Charlie.  There would be almost

8    always be an investor relations representative and I was at

9    the ones in June, Rob was on the call, Jeff was generally in

10    the room, those specific ones.  Occasionally there may be

11    another portfolio manager coming into the meeting.

12    Q    Did you take notes of investor meetings you

13    attended?

14    A    No.

15    Q    Did anybody?

16    A    I'm not sure.

17    Q    For example was there maybe a more junior IR

18    person?

19    A    It could be.  They would have stuff in front of

20    them but I don't know if there were any.

21    Q    Did anybody circulate a summary of the meeting for

22    your review?

23    A    I don't think so.  There may have been a summary

24    but it wasn't submitted to me.

25    Q    Did you attend -- if investors were at Amaranth

1    for an hour, were you with the investors the whole time or

2    were you called in to address specific topics?

3        A    I'll divide into two again.

4        Q    Sure.

5        A    If investors came in just to do a general meeting

6    with the firm, I would only be called in to do -- just to

7    talk about investment philosophy, about energy and specific

8    questions about natural gas and they would have other

9    meetings with other portfolio managers.  So I was just do

10   part of the meeting.  Those rarely would go over twenty

11   minutes and then in June when we were talking about the

12   natural gas losses for May, I was generally present.  I

13   remember them mostly being calls instead of in person.  Those

14   I participated in most of the call.

15       Q    Let's talk about May.  We addressed the Morgan

16   Stanley deal a little bit.  How was the size of that

17   transaction, the $300 million, how was the size of that

18   determined?

19       A    There were a couple options.  I can't remember

20   exactly how they were but we generally wanted to reduce the

21   vast majority of our short position in calendar `10 and so

22   that's mainly how we determined how to size that part of the

23   spread and the option transaction, the calendar `08 option,

24   it's mainly the size of our current position.  It's not

25   exactly the size, it's pretty much like that risk.

Amaranth 365

EXHIBIT
3

1   UNITED STATES COMMODITY FUTURES TRADING COMMISSION

2

3   In the Matter of:        )

4   NATURAL GAS TRADING BY   )   Case No. B-2278

5   AMARANTH ADVISORS LLC    )

6   AND OTHERS               )

7   WITNESS:  Brian Hunter

8   PAGES:    1 through 206

9   PLACE:    Securities and Exchange Commission

10      3 World Trade Center, Room 414

11      New York, New York  10281

12   DATE:    Friday, November 17, 2006

13

14      The above-entitled matter came on for hearing, pursuant

15   to notice, at 9:45 a.m.

16

17

18

19

20

21

22

23

24

25

1    Q    Did you ever meet Vinny Rufa?

2    A    Yes.

3    Q    Did he come to Calgary or you went to New York?

4    A    I don't know if I ever met him in Calgary.  Most

5    of the time it would have been in New York, if not all the

6    time.  I can't remember actually going to Calgary.

7    Q    Did you ever meet the broker, ALX?

8    A    The guy who executes -- I don't think so.  I may

9    have.

10    Q    Other than ALX, who else would you call on the

11    floor?

12    A    In the futures pit?

13    Q    Yes.

14    A    Once in a while I talked to Energy Links, if I

15    called somebody but not very often, just to get a different

16    perspective.

17    Q    Other than ALX and Energy Links, would you call

18    anyone else in the futures pit?

19    A    Almost never.

20    Q    Who would Matt Donohoe speak to?

21    A    He would speak to those two, I believe he spoke to

22    TFS on the floor, he had somebody else he talked to, I can't

23    remember the name.

24    Q    Gotham?

25    A    Gotham.

1    Q   And during that period of time, end of May until

2    the middle of September of this year, how much time roughly

3    did you spend working in Connecticut versus working in

4    Calgary?

5    A   That's tough, 60 to 70 percent in Connecticut I

6    think.

7    Q   How about Donohoe, the same question for him?

8    A   What period of time, the end of May?

9    Q   End of May until the middle of September.

10    A   50 to 60 percent.

11    Q   Calhoun, the same question?

12    A   He was located in --

13    Q   He was in Connecticut, okay.  How about Mr. Lee,

14    the same question?

15    A   40 percent in Connecticut.

16    Q   And the same question for Mr. Basarowich.

17    A   It could have been quite a bit less because they

18    had a baby, maybe 20 to 30 percent.

19    Q   Who was it who decided when you would come back to

20    Connecticut, was that Mr. Maounis' decision?  Did he call and

21    say come on back or did you decide, how did that work?

22    A   Most of the time it would have been a request by,

23    a very informal request but I took it seriously, with Maounis

24    and Rob Jones.

25    Q   When we're talking about the typical size of the

1    the order was placed?

2        A    No.

3            BY MR. COMPA:

4        Q    Did you place any of the orders that day?

5        A    I believe so.

6        Q    And according to the letter there were three

7    orders.  Is that correct?  2,000 contracts with ALX, 500

8    contracts with Gotham and 500 contracts with TFS and that's

9    from the third paragraph on Exhibit No. 10.  Is that right?

10       A    Yes.

11       Q    Out of those three orders which of those did you

12   call to the floor?

13       A    Me personally?

14       Q    Yes.

15       A    I don't recall exactly but almost certainly it

16   would be ALX.

17       Q    The 2,000 contract order to ALX.

18       A    Yes.

19       Q    Who did the 500 contracts with Gotham?

20       A    I'm not totally certain but I assume it was Matt

21   Donohoe.

22       Q    And who would have done the 500 contracts with

23   TFS?

24       A    I assume it's Matt Donohoe.

25       Q    Do you recall what you said to the ALX phone clerk

EXHIBIT
4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X  Date Purchased
                                                           :   Index No.        04602791
BRIAN J. HUNTER,                                           :
                                                           :   Plaintiff designates
                                                           :   NEW YORK
                                   Plaintiff,              :   County as the place of trial
                                                           :
           -against-                                       :   The Basis of the venue is:
                                                           :   PLAINTIFF'S RESIDENCE
DEUTSCHE BANK AG,                                          :
                                   Defendant.              :   **SUMMONS**
                                                           :
-------------------------------------------------------------X  Plaintiffs' Residence:
                                                               20 West 70th Street, Apt. BB
                                                               New York, New York 10023

**FILED**

AUG 26 2004

NEW YORK
COUNTY CLERK'S OFFICE

To the above named Defendant:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance on the Plaintiffs' Attorney within 20 days after service of this summons, exclusive of
the day of service (or within 30 days after the service is complete if this summons is not
personally delivered to you within the State of New York); and in case of your failure to appear
or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated:  August 24, 2004
        New York, New York

                              Yours, etc.

                              THOMPSON WIGDOR & GILLY LLP
                              Attorneys for Plaintiff
                              350 Fifth Avenue – Suite 5720
                              New York, New York 10018
                              (212) 239-9292

                              By:  Scott B. Gilly, Esq.

Defendant's Address:
60 Wall Street
New York, New York 10005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
BRIAN J. HUNTER,                                        :

                     Plaintiff,      :       Index No. _____

       -against-                             :       **VERIFIED**

                               :       **COMPLAINT**
DEUTSCHE BANK AG,                                       :

              Defendant.      :
-----------------------------------------------------------X

       Plaintiff, BRIAN J. HUNTER, by and through his attorneys, Thompson Wigdor & Gilly

LLP, as and for his Complaint against Defendant DEUTSCHE BANK AG, hereby states and

alleges as follows:

## PRELIMINARY STATEMENT

     1.    This is an action for breach of contract, promissory estoppel, unjust enrichment,

quantum meruit and declaratory relief arising out of Defendant's failure to pay Plaintiff Brian

Hunter the bonus compensation that he earned in 2002 and 2003 as a commodities trader and/or

as the head of Defendant's natural gas trading desk, and its failure to accelerate the vesting of

Mr. Hunter's equity awards upon his termination of employment without Cause by Defendant,

pursuant to an express and/or implied contract.

     2.    Defendant secured and retained Mr. Hunter's employment through material

representations concerning the payment to him of base salary and annual bonus compensation

based upon the value of (a) Mr. Hunter's skills and experience, (b) Mr. Hunter's individual

contribution, and (c) the performance of Mr. Hunter's division and Defendant overall.

     3.    By failing to pay Mr. Hunter the promised bonus compensation, and by

subsequently terminating his employment without accelerating the vesting of his equity awards,

Defendant has breached its agreement with Mr. Hunter and has violated New York Labor Law §§ 190 et seq., which has caused and continues to cause Mr. Hunter substantial economic damages.

4.      This action also seeks monetary damages to redress Defendant's tortious conduct and/or defamation of Mr. Hunter.

5.      Defendant's conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Mr. Hunter, which has caused and continues to cause Mr. Hunter to suffer substantial economic and noneconomic damages, permanent harm to his professional and personal reputations, and severe mental anguish and emotional distress.

### PARTIES

6.      Plaintiff Brian J. Hunter ("Mr. Hunter") is a resident of New York County in the State of New York. At all times relevant hereto, Mr. Hunter was employed by Defendant Deutsche Bank AG ("DB" or the "Firm"), and was an "employee" within the meaning of the New York Labor Law.

7.      Upon information and belief, DB is an international financial services provider authorized to do business in the State of New York and elsewhere in the United States, with offices located at 60 Wall Street, New York, New York 10005. At all relevant times herein, DB employed Mr. Hunter, was an "employer" within the meaning of the New York Labor Law, and has been a member of the National Association of Securities Dealers and the New York Stock Exchange, Inc.

- 2 -

## Mr. Hunter's Employment with DB

8.    Mr. Hunter joined DB in or around May 2001 as Vice President, Global Markets — Commodities, and, at all relevant times herein, was a trader on DB's natural gas trading desk.

9.    In order to induce Mr. Hunter to resign from a stable, financially rewarding and long-term position with TransCanada Pipelines Ltd. ("TransCanada"), DB managers represented to Mr. Hunter that in addition to his base salary, Mr. Hunter would be paid 10% of the profits that he generated through proprietary trading, which would be reduced on a scale as his profitability increased.  Mr. Hunter's bonus opportunity was to equal several multiples of his base salary.  This bonus compensation structure is consistent with both industry and DB's compensation practices for commodities (and proprietary) traders.  But for his reasonable reliance on these and other representations, Mr. Hunter would not have resigned his position from TransCanada and, to this day, would continue to be gainfully employed with that firm.

10.    When Mr. Hunter began working at DB, the Firm employed approximately 50 people in its worldwide commodities division.  During his employment with DB, the Firm's commodities division expanded to approximately 85 employees, but only six of those employees (i.e., approximately 7% of DB's commodities employees) worked on the natural gas desk.

11.    On or about May 7, 2001, Mr. Hunter signed an employment offer letter from DB.  The letter and DB's written policies both state that an employee's total compensation is composed of base salary and incentive compensation.

- 3 -

## Mr. Hunter's Performance and Compensation History

12.    Each year at the Firm, consistent with representations made to secure and retain Mr. Hunter's employment, with industry practice, with DB practice, and with the parties' course of conduct throughout Mr. Hunter's employment, DB was obligated to pay Mr. Hunter a compensation package that consisted of a base salary and an annual year-end bonus (which, at times, included cash and equity components), as promised in DB's offer letter, that equaled several multiples of his base salary.

13.    At DB, bonuses for professionals like Mr. Hunter in the commodities division are distributed from a "total bonus pool" for all of DB's employees in the commodities division, which is then divided into separate "desk bonus pools" for each commodities desk. The amount of each individual employee's distribution from the bonus pool is based upon the external market value for (a) his or her skills and experience, (b) his or her individual contribution, and (c) the performance of his or her division and the Firm overall.

14.    In 2001, DB's worldwide commodities business generated revenues of approximately $86 million, with the natural gas desk contributing about $26 million and Mr. Hunter's individual trading profit equaling approximately $17 million (with an additional approximately $12 million held in the natural gas reserve fund). The total bonus pool for the worldwide commodities division that year was approximately $15 million, and the distribution to the natural gas desk pool was approximately $1 million.

15.    For services performed in 2001, Mr. Hunter was paid an annual base salary of $100,000, and he received a cash bonus of $330,000 and a deferred equity award equal to $370,000, for total compensation of $800,000.

- 4 -

16.   When Mr. Hunter commenced his employment with DB, he was promised by, among others, his direct supervisor, Robert Jonke ("Jonke"), and a managing director in his division that, in addition to his base salary, he would be paid 10% of the profits that he generated through proprietary trading. Mr. Hunter's percentage was supposed to be reduced on a scale as his profitability increased. This is consistent with DB's practice and is standard practice in the industry.

17.   In or around February 2002, Kerim Derhalli ("Derhalli"), one of DB's senior commodities managers in charge of making bonus decisions, also told Mr. Hunter that he wanted to set the budget for the natural gas desk at $25 million for 2002, and that he "would pay [Mr. Hunter] very well" if the desk made $50 million.

18.   In or around March 18, 2002, Mr. Hunter signed a letter agreement with DB that provided him with a guaranteed minimum incentive compensation for 2002 in the amount of $400,000, to be paid either in cash or equity.

19.   In 2002, DB's worldwide commodities business grew exponentially, and generated revenues of approximately $140 million, with the natural gas desk contributing about $76 million under Mr. Hunter's direction and supervision. In addition, Mr. Hunter's individual trading profit during 2002 was approximately $52 million (of which $14 million went into the natural gas reserve fund). Mr. Hunter's and the natural gas desk's unprecedented performance far exceeded Derhalli's expectations as stated to Mr. Hunter in February 2002.

20.   The total bonus pool for the worldwide commodities division that year was approximately $25 million, but the distribution to the natural gas desk pool was only

- 5 -

approximately $2.15 million, despite the fact that the natural gas desk accounted for more than one-half of the total revenues for DB's worldwide commodities division.

21.    For services performed in 2002, Mr. Hunter was paid an annual base salary of $125,000, and he received a cash bonus of approximately $1.07 million and a deferred equity award equal to $430,000, for total compensation of approximately $1.625 million for 2002.

22.    Mr. Hunter's incentive compensation for 2002 was well below what was promised to him by Jonke, a managing director in his division and/or others, and was not even close to what Derhalli intimated in February 2002.  Based on the representations that were made to Mr. Hunter by Jonke, Derhalli and others, Mr. Hunter was entitled to be paid between $2.5 million and $4.5 million in incentive pay for 2002.

23.    In addition to the natural gas desk's unprecedented financial year in 2002, Mr. Hunter's individual performance as a trader was stellar and far exceeded the Firm's expectations. His exceptional individual performance was memorialized in his year-end written evaluation by Jonke.

24.    In that evaluation, Jonke rated Mr. Hunter with either a 4 (Exceeds expectations) or a 5 (Far exceeds expectations) out of a 5 point scale in every single evaluation category, and lauded Mr. Hunter's performance, both in terms of financial and non-financial objectives.  For example, Jonke stated, among other things, that "P&L contribution and management of P&L volatility have been excellent in the face of limited staffing, back office system transition and changes in the market place," "[y]our ability to value and generate customer business through original trade ideas has won significant business and respect with our clients and marketers," and "[y]ou had a standout year and are our standout performer in commodities this year."

- 6 -

25.    As referenced in Mr. Hunter's year-end evaluation, DB had broad-based problems with its back office functions, including, but not limited to the April 2002 forced implementation of Openlink -- a trade system destined to be the "next generation" commodities trade system at DB. These problems caused Mr. Hunter and other commodities traders several million dollars in losses due to, among other reasons, inadequate programming and missed trade capture due to deficiencies with the new trade system.

26.    Needless to say, in light of his acknowledged exceptional performance, Mr. Hunter was extremely disappointed with both the natural gas desk bonus pool and his individual distribution from the 2002 bonus pool. Specifically, he believed that the natural gas desk was entitled to a distribution far greater than the $2.15 million (or 9% of the total bonus pool) that was allocated to it because the desk contributed more than 50% of the total revenue of DB's commodities business worldwide, and that he was entitled to an individual distribution of at least $4 million based on the representations made to him when he commenced his employment at DB, and in February 2002 by Derhalli.

27.    Mr. Hunter raised his concerns regarding his bonus for 2002 in a telephone conference with Michele Faisola ("Faisola") (Head of OTC derivatives) on or about December 27, 2002. Faisola stated that Mr. Hunter's compensation was very "light" based on his unprecedented contribution during 2002, but assured Mr. Hunter that he "would be taken care of" in the event that the commodities division had a bad year in the future.

28.    Similarly, in or about February 2003 (shortly before bonuses for 2002 were distributed), Derhalli and Jonke each stated to Mr. Hunter that his bonus for 2002 was low in light of his performance, but stated that although DB is paying Mr. Hunter less in a year in which

- 7 -

he had an outstanding performance, DB will pay Mr. Hunter more in years when his performance decreased, resulting in a more stable compensation pattern.

### DB's Zero Bonus for 2003 and Termination of Mr. Hunter

29.    On or around February 3, 2003, in recognition of his invaluable contributions to the Firm, Mr. Hunter was promoted to Director, Global Markets – Commodities, and, as a result, formally was placed in charge of the natural gas trading desk.  As a Director, Mr. Hunter had two natural gas traders reporting to him, and was responsible for market-making and proprietary trading.  However, for all intents and purposes, Mr. Hunter served in this leadership position in 2002 (prior to his official title change to "Director"), and performed all duties and responsibilities associated with being a desk head at DB.

30.    Mr. Hunter was told by senior executives at DB, including Amrik Sandhu, DB's Head of Metals, that his incentive compensation for being a Director would be between five percent (5%) and eight percent (8%) of the total profits booked by the natural gas desk in 2003. This is consistent with DB's practice and is the standard practice in the industry for desk heads.

31.    In November 2003, this compensation structure was confirmed by Kevin Rodgers, one of DB's senior commodities managers who, along with Derhalli, was in charge of making bonus decisions.  This potentially enhanced incentive compensation package was in connection with Mr. Hunter's promotion to Director and the corresponding additional duties and responsibilities, including running the natural gas trading desk.

32.    In reliance upon all of these representations, Mr. Hunter decided to forego a number of lucrative offers of employment and continue his employment with DB.

Supreme Court Records OnLine Library - page 9 of 33

33.    Again, Mr. Hunter was having an exceptional performing year in 2003.  Between January and November 2003, the natural gas desk had generated a profit of approximately $76 million.  However, during the first week of December 2003, the natural gas trading desk lost approximately $51.2 million due to an unprecedented and unforeseeable run-up in gas prices coupled with Mr. Hunter's and the other natural gas traders' inability to effectively trade out of their positions due to well-documented and widely known problems with Openlink, DB's electronic system for monitoring and reporting risk for commodities, and accounting errors due to a backlog of trade and cash reconciliations in the back office.

34.    The back-office and trading system problems were specifically referenced in Mr. Hunter's 2002 evaluation and, despite DB's promises to address them, these problems continued to plague Mr. Hunter and other commodities traders at the Firm.  The problems with Openlink were so severe that other commodities traders at DB have refused to use it, and the commodities division's 2004 budget was reduced to account for the difficulties and problems of trading with DB's Openlink system.

35.    Upon information and belief, DB recently announced its plan to completely abandon the use of the Openlink system due to the numerous and incurable problems with the program which have directly caused DB's natural gas traders to lose significant amounts of money.

36.    The money that was lost by the natural gas desk during December 2003 was due to a number of long-term positions that both Derhalli and Rodgers were well aware of.

- 9 -

37.    Despite the unforeseeable trading abnormalities and the system and back-office problems, the natural gas trading desk had a successful year in 2003, profiting approximately $25.8 million.

38.    In 2003, DB's worldwide commodities business generated revenues of approximately $96 million, with the natural gas desk contributing about $25.8 million and Mr. Hunter's individual trading profit equaling approximately $40 million.  The total bonus pool for the worldwide commodities division was $22 million, and the distribution to the natural gas trading desk was $0.00, despite the fact that the natural gas trading desk contributed approximately 27% of the total profits for the commodities division, and had a year that was substantially the same in performance as 2001.

39.    Notwithstanding Mr. Hunter's substantial contributions to DB's revenues in 2003 and despite his reliance upon a promised bonus by Sandhu and Rodgers in rendering his valuable services and efforts during the year, DB awarded him no bonus for services performed during 2003.

40.    The arbitrary and capricious "zero bonus" decision cannot be reconciled with Mr. Hunter's individual performance, the natural gas desk's overall performance or the performance of the Firm.

41.    There was no good faith reason for DB's refusal to pay Mr. Hunter his bonus for 2003.  To the contrary, Mr. Hunter was told by Jim Turley ("Turley"), DB's Head of Foreign Exchange, that the zero bonus decision was not based on his trading ability or performance. Rather, Turley stated that Mr. Hunter was taken out of the 2003 bonus pool because of his

Supreme Court Records OnLine Library - page 11 of 33

purported "lack of professionalism," "attitude" and "lack of maturity," none of which was communicated to Mr. Hunter at any time prior to his zero bonus.

42.    These generalizations were the only reasons proffered by DB to defend its arbitrary and capricious decision to deny Mr. Hunter the incentive compensation that he earned in 2003. Mr. Hunter was not provided with any specific examples of alleged conduct that led to the zero bonus decision. Moreover, DB has not – and cannot – provide any examples that would rebut the strong trading performance that Mr. Hunter had in 2003.

43.    Not only was Mr. Hunter's individual revenue performance in 2003 outstanding, but at the same time, the natural gas desk also was responsible for generating nearly 27% of the total profits for DB's commodities business worldwide. The natural gas desk produced the highest profit per employee of any commodities desk at DB.

44.    In other words, under any analysis, Mr. Hunter, the natural gas desk, and DB all had a strong year, for which Mr. Hunter expected, and is entitled to, a bonus and total compensation of at least $2.2 million for 2003.

45.    The objective facts and data undermine any argument by DB that Mr. Hunter's individual or his group's performance warrants a decrease, let alone a 100% reduction, in his bonus compensation.

46.    Upon information and belief, DB awarded substantial bonus compensation to other employees within commodities who had less significant a contribution than Mr. Hunter. By way of example only, upon information and belief, DB paid incentive compensation to commodities traders on the oil desk who returned a net loss during 2003.

- 11 -

47.    DB's conduct constitutes a material breach of the parties' agreement. It also violates equitable quasi-contractual principles.

48.    Contrary to the Firm's expected defense to this claim, DB's decision to give bonuses to its professional employees, and determine the specific amount of those bonuses, is not entirely discretionary. It is well known that bonuses, or year-end lump sum payments are, specifically at DB and in the industry in general, an integral portion of a trader's total compensation. Professionals in the financial industry, like Mr. Hunter, do not simply work for their base salaries and the mere chance of receiving a year-end bonus. In short, bonus payments, determined on a fair and consistent basis, are an implied and/or express contractual right of the employee.

49.    Indeed, the term "discretionary" in the industry is understood to mean that the employer has the limited discretion to determine the reasonable amount of such bonus. In other words, the term "discretionary" is not applied in an absolutely unfettered manner, i.e., that a firm on a whim, or due to its supposed business desires or purported business conditions, may refuse to pay an employee a reasonable bonus. Securities firms treat and view bonuses as an obligation essential to maintaining their franchise, and the fact that this commitment may not be secured does not diminish its level of importance.

50.    The understanding in this industry is that when an employee agrees to forego a firm, pre-determined or minimum level of total compensation, it is in exchange for a significantly greater financial upside; in essence, the Firm limits its fixed, secured obligations in exchange for agreeing to give the employee the potential of greater total compensation. This

- 12 -

Supreme Court Records OnLine Library - page 13 of 33

explicit and implicit contractual division of financial risk in the securities industry is never intended to be unilaterally beneficial to the employer.

51.    Notwithstanding due demand by Mr. Hunter that DB rectify this situation, DB has failed and refused to address its decision to provide Mr. Hunter with no bonus for 2003.

52.    To the contrary, DB subsequently retaliated against Mr. Hunter by engaging in affirmative conduct that prevented Mr. Hunter from returning to his position and assuming any of his essential job functions. Thus, Mr. Hunter's tenure at the Firm was terminated by the Firm without Cause.

53.    By way of example only, Mr. Hunter was locked out of the trading system on or about February 11, 2004, and was unable to enter any transactions on DB's trading system. This action completely stripped Mr. Hunter of the ability to effectively perform the essential duties of his job.

54.    Mr. Hunter also learned that DB had been pursuing a pre-meditated plan to replace him at the end of 2003 with a group of traders that DB hired behind Mr. Hunter's back.

55.    Moreover, Mr. Hunter's seat was physically moved off the natural gas trading desk, isolating him from any activities being performed on the desk and preventing him from communicating with any of the employees who reported to him, and any of the clients that he dealt with on a daily basis.

56.    DB also shut Mr. Hunter out of the recruiting process. For example, towards the end of 2003, DB was actively recruiting another senior trader for the natural gas desk who was scheduled to report to Mr. Hunter. However, after DB effectively changed Mr. Hunter's job

- 13 -

Supreme Court Records OnLine Library - page 14 of 33

function, he was excluded from participating in the interviewing and evaluation process. Moreover, DB's senior management stopped introducing Mr. Hunter to potential candidates and no longer requested his opinion regarding such candidates.

57.    DB had no justifiable reason for its decision to terminate Mr. Hunter's employment. To the contrary, during Mr. Hunter's tenure at DB, he was personally responsible for generating approximately $126 million, or 42% of the total revenues of the commodities division at DB, and was known in the industry as one of the best and most influential natural gas traders in the world.

58.    Moreover, during that time, the natural gas desk was responsible for generating approximately $153 million, or 51% of the total revenues for the commodities division, despite the fact that the natural gas desk comprised only 7% of DB's commodities employees.

59.    Subsequent to Mr. Hunter's termination without Cause, DB has not responded to Mr. Hunter's request that his unvested stock options and restricted stock that were awarded to him as part of his 2002 incentive compensation immediately vest and become freely tradeable. Although DB has not responded to such request, it appears that the Firm has taken the position that Mr. Hunter has forfeited the unvested portions of his equity awards. This is completely contrary to DB's well-known past practice for other similarly-situated former employees of DB and contradicts the policy set forth in the Firm's applicable equity plans.

**DB Defamed Mr. Hunter After Terminating His Employment Without Cause**

60.    DB also has engaged in a pattern of slanderous, libelous and/or tortious conduct against Mr. Hunter, including, but not limited to, the making of false statements about Mr.

- 14 -

Hunter's lack of "control" over the natural gas business and his alleged lack of expertise, which purportedly led to "problems in the book at the end of [2003]."

61.    Moreover, DB has stated that Mr. Hunter's problems with book marks and skew reserves, and his purported responsibility in connection with a "huge vol swap with Harvard" and "extremely expensive P/L hits from out-trades" has caused the book to be down around 18.5 million euros.

62.    DB also has criticized Mr. Hunter's "way of doing things, where risk had to be managed on creaky spreadsheets, made it difficult to see the risk and almost impossible to figure our P/L."

63.    These false and defamatory statements were published and distributed to, among others, all employees in DB's commodities group.

64.    As a direct and proximate result of DB's slanderous, libelous and/or tortious conduct, Mr. Hunter has suffered, and continues to suffer, loss of career fulfillment and harm to his career as well as his professional and personal reputation.

65.    As a direct and proximate result of DB's conduct, Mr. Hunter has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of damages.

66.    As a direct and proximate result of DB's conduct, Mr. Hunter has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence

Supreme Court Records OnLine Library - page 16 of 33

and personal dignity, and emotional pain and suffering for which he is entitled to an award of damages.

## AS AND FOR A FIRST CAUSE OF ACTION

(Breach of Express or Implied Contract)

67.     Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 66 above with the same force and effect as though fully set forth herein.

68.     As part of DB's effort to induce Mr. Hunter to resign from a stable and financially rewarding, long-term position with his previous employer, and to retain Mr. Hunter's services throughout his tenure at DB, senior executives authorized to act on behalf of DB promised Mr. Hunter on several occasions that in addition to his base salary, Mr. Hunter would be paid 10% of the profits that he generated through proprietary trading, which would be reduced on a scale as his profitability increased.  Mr. Hunter's bonus opportunity was to equal several multiples of his base salary, and, pursuant to written DB policies, was to be based upon the value of (a) Mr. Hunter's skills and experience, (b) Mr. Hunter's individual contribution, and (c) the performance of Mr. Hunter's division and the Firm overall.

69.     Mr. Hunter also was told by senior executives at DB, including Amrik Sandhu, DB's Head of Metals, that his incentive compensation in 2003 for being a Director would be between five percent (5%) and eight percent (8%) of the total profits booked by the natural gas desk in 2003.  This is consistent with DB's practice and is the standard practice in the industry for desk heads.

- 16 -

70.     Mr. Hunter relied upon these representations and policies when he accepted DB's offer of employment, and when he decided to forego other lucrative employment opportunities and continue working at DB each subsequent year.

71.     Mr. Hunter had exceptional individual trading performances during 2002 and 2003, and successfully managed the natural gas trading desk as a Director during 2003. During those years, not only did Mr. Hunter far exceed DB's expectations, but the natural gas trading desk also surpassed all expectations.

72.     Despite the outstanding results by both Mr. Hunter and the natural gas trading desk in both 2002 and 2003, DB willfully, and without notice or cause, paid Mr. Hunter an acknowledged "light" bonus in 2002, and zero bonus in 2003.

73.     DB's payment to Mr. Hunter of a "light" bonus in 2002 and zero bonus in 2003 constitutes a breach of an express and/or implied contract with Mr. Hunter. As a direct result of DB's breach of contract, Mr. Hunter has suffered, and continues to suffer, substantial damages.

74.     In addition, separate and apart from DB's failure to pay Mr. Hunter his bonus for 2002 and 2003, DB breached its contract and/or implied contract with Mr. Hunter by failing to accelerate the vesting of Mr. Hunter's equity awards upon his termination by DB without Cause. As a direct result of DB's breach of contract, Mr. Hunter has suffered, and continues to suffer, substantial damages.

- 17 -

Supreme Court Records OnLine Library - page 18 of 33

## AS AND FOR A SECOND CAUSE OF ACTION

(Promissory Estoppel)

75.     Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 74 above with the same force and effect as though fully set forth herein.

76.     As part of DB's effort to induce Mr. Hunter to resign from a stable and financially rewarding, long-term position with his previous employer, and to retain Mr. Hunter's services throughout his tenure at DB, senior executives authorized to act on behalf of DB promised Mr. Hunter on several occasions that in addition to his base salary, Mr. Hunter would be paid 10% of the profits that he generated through proprietary trading, which would be reduced on a scale as his profitability increased.  Mr. Hunter's bonus opportunity was to equal several multiples of his base salary, and, pursuant to written DB policies, was to be based upon the value of (a) Mr. Hunter's skills and experience, (b) Mr. Hunter's individual contribution, and (c) the performance of Mr. Hunter's division and the Firm overall.

77.     In February 2002, Dehalli specifically told Mr. Hunter that he "would pay [Mr. Hunter] very well" if the desk made $50 million in 2002.

78.     In December 2002, Faisola specifically stated to Mr. Hunter that he "would be taken care of" in the event that the commodities division had a bad year in the future.

79.     Mr. Hunter also was told by senior executives at DB, including Amrik Sandhu, DB's Head of Metals, that his incentive compensation in 2003 for being a Director would be between five percent (5%) and eight percent (8%) of the total profits booked by the natural gas

- 18 -

desk in 2003. This is consistent with DB's practice and is the standard practice in the industry for desk heads.

80.     Mr. Hunter reasonably and foreseeably relied on these promises to his detriment when he resigned from his previous employer and when he decided to forego a number of lucrative offers of employment and continue his employment with DB.

81.     Based on Mr. Hunter's reasonable and foreseeable detrimental reliance upon these promises, DB was estopped from not paying Mr. Hunter the bonus compensation for 2002 and 2003 that was promised to him.

82.     DB paid Mr. Hunter bonus compensation in 2002 that was far below what was promised to him based on his exceptional performance, and paid Mr. Hunter zero bonus in 2003 despite his outstanding individual trading performance and numerous promises which were made to Mr. Hunter by senior executives of DB, resulting in a gross injustice if DB's promises are not enforced.

83.     As a direct result of Mr. Hunter's reasonable and foreseeable reliance upon the promises made to him by senior executives regarding his bonus compensation and/or DB's breach of those promises, Mr. Hunter has suffered, and continues to suffer, substantial damages.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Unjust Enrichment)

84.     Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 83 above with the same force and effect as though fully set forth herein.

- 19 -

85.    As part of DB's effort to induce Mr. Hunter to resign from a stable and financially rewarding, long-term position with his previous employer, and to retain Mr. Hunter's services throughout his tenure at DB, senior executives authorized to act on behalf of DB promised Mr. Hunter on several occasions that in addition to his base salary, Mr. Hunter would be paid 10% of the profits that he generated through proprietary trading, which would be reduced on a scale as his profitability increased.  Mr. Hunter's bonus opportunity was to equal several multiples of his base salary, and, pursuant to written DB policies, was to be based upon the value of (a) Mr. Hunter's skills and experience, (b) Mr. Hunter's individual contribution, and (c) the performance of Mr. Hunter's division and the Firm overall.

86.    In February 2002, Derhalli specifically told Mr. Hunter that he "would pay [Mr. Hunter] very well" if the desk made $50 million in 2002.

87.    In December 2002, Faisola specifically stated to Mr. Hunter that he "would be taken care of" in the event that the commodities division had a bad year in the future.

88.    Mr. Hunter also was told by senior executives at DB, including Amrik Sandhu, DB's Head of Metals, that his incentive compensation in 2003 for being a Director would be between five percent (5%) and eight percent (8%) of the total profits booked by the natural gas desk in 2003.  This is consistent with DB's practice and is the standard practice in the industry for desk heads.

89.    During 2002 and 2003, Mr. Hunter had exceptional trading years, resulting in individual annual trading profits benefiting DB approximately $52 million and $40 million, respectively.

- 20 -

90.    During 2002 and 2003, the natural gas trading desk also had exceptional years, resulting in annual desk profits benefiting DB approximately $76 million and $25.8 million, respectively.  During these years, the natural gas trading desk contributed approximately 43% of DB's worldwide commodities trading business.

91.    Clearly, DB benefited substantially from both Mr. Hunter's hard work and the performance of the natural gas trading desk, which Mr. Hunter managed.

92.    DB paid Hunter bonus compensation in 2002 that was far below what was promised to him based on his exceptional performance, and paid Mr. Hunter zero bonus in 2003 despite his outstanding individual trading performance and numerous promises which were made to Mr. Hunter by senior executives of DB, resulting in a gross injustice if DB's promises are not enforced.

93.    As a direct result of Mr. Hunter's reasonable and foreseeable reliance upon the promises made to him by senior executives regarding his bonus compensation and/or DB's breach of those promises, DB has been unjustly enriched and Mr. Hunter has suffered, and continues to suffer, substantial damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Quantum Meruit)

94.    Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 93 above with the same force and effect as though fully set forth herein.

- 21 -

95.    As part of DB's effort to induce Mr. Hunter to resign from a stable and financially rewarding, long-term position with his previous employer, and to retain Mr. Hunter's services throughout his tenure at DB, senior executives authorized to act on behalf of DB promised Mr. Hunter on several occasions that in addition to his base salary, Mr. Hunter would be paid 10% of the profits that he generated through proprietary trading, which would be reduced on a scale as his profitability increased.  Mr. Hunter's bonus opportunity was to equal several multiples of his base salary, and, pursuant to written DB policies, was to be based upon the value of (a) Mr. Hunter's skills and experience, (b) Mr. Hunter's individual contribution, and (c) the performance of Mr. Hunter's division and the Firm overall.

96.    In February 2002, Dehalli specifically told Mr. Hunter that he "would pay [Mr. Hunter] very well" if the desk made $50 million in 2002.

97.    In December 2002, Faisola specifically stated to Mr. Hunter that he "would be taken care of" in the event that the commodities division had a bad year in the future.

98.    Mr. Hunter also was told by senior executives at DB, including Amrik Sandhu, DB's Head of Metals, that his incentive compensation in 2003 for being a Director would be between five percent (5%) and eight percent (8%) of the total profits booked by the natural gas desk in 2003.  This is consistent with DB's practice and is the standard practice in the industry for desk heads.

99.    During 2002 and 2003, Mr. Hunter performed his services as a natural gas trader and/or the head of the natural gas desk diligently and in good faith.  In fact, during that time, Mr. Hunter had exceptional trading years, resulting in individual annual trading profits of approximately $52 million in 2002 and $40 million in 2003.

- 22 -

100.     Based on the specific promises made to Mr. Hunter regarding the bonus compensation that he would be paid, Mr. Hunter had a reasonable expectation that he would be compensated for his services in accordance with the promises made to him by senior executives of DB and others who were authorized to act on behalf of the Firm.  The bonus compensation formulas which were promised to Mr. Hunter are consistent with DB's practice and is standard practice in the industry.

101.     DB paid Hunter bonus compensation in 2002 that was far below what was promised to him based on his exceptional performance, and paid Mr. Hunter zero bonus in 2003 despite his outstanding individual trading performance and numerous promises which were made to Mr. Hunter by senior executives of DB, resulting in a gross injustice if DB's promises are not enforced.

102.     As a direct result of Mr. Hunter's reasonable and foreseeable reliance upon the promises made to him by senior executives regarding his bonus compensation and/or DB's breach of those promises, Mr. Hunter has suffered, and continues to suffer, substantial damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

(Declaratory Relief Pursuant to CPLR §§ 3001, 3017(b) – Vesting of Equity Awards)

103.     Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 102 above with the same force and effect as though fully set forth herein.

104.     On or about, February 15, 2002, Mr. Hunter was awarded restricted shares, restricted stock units and/or stock options in DB's common stock, subject to the terms and conditions of the relevant DB plans governing such awards.

- 23 -

105.    As alleged above, in or about February 2004, DB terminated Mr. Hunter's employment without Cause as defined in the relevant equity plans of the Firm, entitling Mr. Hunter to have his outstanding unvested equity awards become immediately vested and freely tradeable without restriction consistent with DB's past practice and in accordance with the relevant equity plans of the Firm.

106.    DB willfully, intentionally and deliberately has refused to accelerate the vesting of Mr. Hunter's equity awards, despite his demand for the Firm to immediately accelerate such equity awards.

107.    As a direct result of DB's failure to accelerate the vesting of Mr. Hunter's equity awards, Mr. Hunter has suffered, and continues to suffer, substantial damages for which he is entitled to a declaratory judgment pursuant to CPLR §§ 3001 and 3017(b) deeming his equity awards immediately vested and freely tradeable.

### AS AND FOR A SIXTH CAUSE OF ACTION

(Violation of New York Labor Law)

108.    Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 107 above with the same force and effect as though fully set forth herein.

109.    At all relevant times, Mr. Hunter was an "employee" within the meaning of the New York Labor Law.  Similarly, at all relevant times, DB was and is an "employer" within the meaning of the New York Labor Law.

- 24 -

110.    As previously alleged, Mr. Hunter was employed by DB from in or around May 2001 through in or around February/March 2004 as a commodities trader and/or desk head.  The terms under which he worked for DB were set forth in written agreements, in DB's policies and practices and in specific promises made to him by senior executives of DB who were authorized to act on behalf of the Firm, which included, among other things, commission-based compensation and/or wages based upon his performance as a trader for DB.

111.    During 2002 and 2003, Mr. Hunter earned and was due payment of bonus compensation and/or wages from DB based upon his performance.  DB nonetheless failed to pay the proper bonus commission and/or wages to Mr. Hunter is 2002 and failed to make any bonus commission payments to Mr. Hunter in 2003.

112.    DB willfully, intentionally and deliberately refused to make the commission and/or wage payments owed to Mr. Hunter despite his demand for payment of the compensation — he was and remains owed by DB.

113.    DB's failure and refusal to pay the wages and/or commissions due and owing Mr. Hunter were willful violations of New York Labor Law §§ 190 et seq.

114.    As a result of the foregoing, Mr. Hunter has been denied wages and/or commissions required under the New York Labor Law §§ 190 et seq., and has suffered substantial damages.

- 25 -

## AS AND FOR A SEVENTH CAUSE OF ACTION

(Defamation and Slander Per Se)

115.    Mr. Hunter repeats and realleges the allegations contained in paragraphs 1 through 114 above with the same force and effect as though fully set forth herein.

116.    In and around the termination of Mr. Hunter's employment, DB published false and defamatory statements about Mr. Hunter that were intended to, and did in fact, disparage, malign and degrade him in the eyes of others and/or impugn his honesty, trustworthiness, dependability, and professional fitness and abilities.

117.    Specifically, in or about June 2004, DB published an email which alleged that Hunter's lack of "control" over the natural gas business and his lack of expertise purportedly led to "problems in the book at the end of [2003]."

118.    DB has also stated that Mr. Hunter's problems with book marks and skew reserves, and his purported responsibility in connection with a "huge vol swap with Harvard" and "extremely expensive P/L hits from out-trades" has caused the book to be down around 18.5 million euros.

119.    DB also criticized Mr. Hunter's "way of doing things, where risk had to be managed on creaky spreadsheets, made it difficult to see the risk and almost impossible to figure our P/L."

120.    These statements are false and defamatory, and DB knew or should have known that such statements were false.

- 26 -

121.    These statements also constitute slander per se because they impugn Mr. Hunter's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely charging him with conduct that would tend to injure Mr. Hunter in her trade, business or profession.

122.    Upon information and belief, DB published these statements to third parties, including but not limited to, all commodities employees at DB and/or others with no need to know such information.

123.    Upon information and belief, DB is continuing to publish these statements to third parties with no need to know such information.

124.    DB published, and continues to publish, these false and defamatory statements with malice.

125.    DB published, and continues to publish, these false and defamatory statements with knowledge of their falsity and/or with a reckless disregard for the truth or falsity of such statements.

126.    As a direct and proximate result of DB's conduct, Mr. Hunter has suffered, and continues to suffer, loss of career fulfillment and harm to his career as well as his professional and personal reputation.

127.    As a direct and proximate result of DB's conduct, Mr. Hunter has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of damages.

- 27 -

128.     As a direct and proximate result of DB's conduct, Mr. Hunter has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering for which he is entitled to an award of damages.

129.     DB's conduct was intentional, malicious and/or showed a deliberate, willful and wanton or reckless disregard for Mr. Hunter, for which he is entitled to an award of punitive damages.

- 28 -

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in his favor and against Defendant, containing the following relief:

A.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Hunter for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment resulting from DB's breach of contract and/or implied contract;

B.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Hunter for physical injury, mental anguish, humiliation, embarrassment and emotional distress, including but not limited to, loss of self-esteem and self-confidence, loss of career fulfillment, and continual stress, anxiety and uncertainty over his ability to meet his personal and familial financial obligations resulting from DB's breach of contract and/or implied contract;

C.    An award of actual damages in an amount to be determined at trial, plus prejudgment interest, for lost wages in violation of New York Labor Law §§ 190 et seq.;

D.    An award of liquidated damages in the amount of twenty-five percent (25%) of the total wages due pursuant to New York Labor Law §§ 190 et seq.;

E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Mr. Hunter for harm to his professional and personal reputation and loss of career fulfillment;

F.    A declaratory judgment pursuant to CPLR §§ 3001 and 3017(b) directing DB to immediately accelerate the outstanding unvested equity awards, making them immediately vested and freely tradeable without restriction,

- 29 -

G.    An award of punitive damages;

H.    Pre-judgment interest on all amounts due;

I.    An award of damages for any and all other economic losses suffered by Mr.

Hunter in an amount to be determined at trial, plus prejudgment interest;

J.    An award of costs that Plaintiffs incurred in this action, as well as Plaintiffs'

reasonable attorneys' fees to the fullest extent permitted by law, including but not limited to New

York Labor Law §§ 190 et seq.; and

K.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Brian J. Hunter hereby demands a trial by jury on all issues of fact and

damages stated herein.

Dated:  New York, New York
        August 24, 2004

                        Respectfully submitted,

                        THOMPSON WIGDOR & GILLY LLP

                        By: _____
                            Scott B. Gilly, Esq.  (SG-6861)
                            Douglas H. Wigdor, Esq. (DW-9737)
                            Kenneth P. Thompson, Esq. (KT-6026)


                        350 Fifth Avenue, Suite 5720
                        New York, NY  10118
                        Telephone:  (212) 239-9292
                        Facsimile:  (212) 239-9001

                        COUNSEL FOR PLAINTIFF
                        BRIAN J. HUNTER

Supreme Court Records OnLine Library - page 31 of 33

## VERIFICATION

STATE OF NEW YORK     )
                      :
COUNTY OF NEW YORK  )

        Brian J. Hunter, being duly sworn, deposes and says that he is the Plaintiff in this matter, that he has read the foregoing Verified Complaint and that he believes that the facts set forth therein are true and correct to the best of his knowledge, information and belief.  Mr. Hunter's knowledge or information and belief is based on personal knowledge of the facts of this case.

_____
BRIAN J. HUNTER

Sworn to before me this
_16th_ day of August, 2004

_____
NOTARY PUBLIC

ERIC GERSTEIN
Notary Public, State of New York
No. 02GE6085419
Qualified in New York County
Commission Expires December 30, 20 06

Index No.

---

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BRIAN J. HUNTER,

                     Plaintiff,

     -against-

DEUTSCHE BANK AG,

                     Defendant.

---

## SUMMONS AND VERIFIED COMPLAINT

---

THOMPSON WIGDOR & GILLY LLP
Scott B. Gilly
Douglas H. Wigdor
Kenneth P. Thompson

Empire State Building
350 Fifth Avenue, Suite 5720
New York, NY   10118
(212) 239-9292

*Attorneys for Plaintiffs*

I/AUG 26 2004

Supreme Court Records OnLine Library - page 33 of 33

EXHIBIT
5

## AMARANTH GROUP INC.
### EMPLOYMENT INQUIRY RELEASE

In connection with, and for the duration of, my employment (including contract for services) with you, I understand that investigative background inquiries are to be made on myself including consumer, credit, criminal, driving, educational and other reports and reports from the National Association of Securities Dealer's Central Registration Depository (or any similar system operated by other professional self-regulatory organizations). These reports will include information as to my character, work habits, performance and experience along with reasons for termination of past employment from previous employers. Further, I understand that you will be requesting information from various federal, state, and other agencies which maintain records concerning my past activities relating to my driving, credit, criminal, civil and other experiences as well as claims involving me and the files of insurance companies. A copy of this document is as valid as the original.

I have read and understand this Employment Inquiry Release. This document serves as my valid authorization to any and all persons, educational institutions, past and/or current employers, landlords, organizations, professional licensing boards and similar bodies, credit agencies, law enforcement or criminal records agencies, and other agencies to release information about me to this company, or its designated agent, and hereby release and hold harmless all such persons, institutions, agencies, employers, and organizations providing such information from liability and any claims and damages connected with providing any requested information.

In furtherance of the foregoing, I agree to sign any additional documents as may be required by applicable law to give my consent to any such inquiry or investigation.

I authorize, without reservation, any party or agency contacted by this employer to furnish the above mentioned information:

PRINT FULL NAME   Brian John Hunter

SOC. SEC. NO. ████████████

DATE OF BIRTH   June 7, 1974

CURRENT ADDRESS ████████████████████

CITY/STATE/ZIP   NYC / NY / 10023

COUNTY OF RESIDENCE   USA

PHONE NUMBER (INCLUDING AREA CODE) ███████████

DRIVER'S LICENSE NO. ██████████   STATE   Alberta

EXPIRATION DATE   06/07/2007

CONFIDENTIAL TREATMENT REQUESTED

/α/Amaranth

One American Lane
Greenwich CT 06831

T 203 422 3300
F 203 422 3500

August 16, 2005

U.S. Citizenship and Immigration Services

Re: <u>Brian Hunter</u>

Dear Sir or Madam:

Mr. Brian Hunter is a United States-based, full time employee of Amaranth Group Inc., who is presently executing the duties and responsibilities of Trader – Energy Derivatives. Amaranth Group Inc. is a United States company with its principal offices in Greenwich, Connecticut. This letter confirms that Amaranth Group Inc. intends to continue to employ Mr. Hunter in the job described in his approved H-1B petition prior to, during, and following his visit to London. Mr. Hunter's current salary is $150,000 per annum.

We expect that Mr. Hunter's stay in London will last for about three days, and is currently scheduled for August 22, 2005 through August 23, 2005.

Thank you for your assistance with this matter.

Sincerely,

Stanley K. Friedman
Managing Director,
Global Head of Human Resources

EXHIBIT
6

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:        )

4                             )  File No. B-2278

5    AMARANTH ADVISORS LLC     )

6    WITNESS:  Charles Winkler

7    PAGES:    1 through 179

8    PLACE:    Securities and Exchange Commission

9        3 World Trade Center, Room 414

10       New York, New York  10281

11   DATE:    Thursday, December 14, 2006

12

13       The above-entitled matter came on for hearing, pursuant

14   to notice, at 10:10 a.m.

15

16

17

18

19

20

21

22

23

24

25

1          In addition I said from time to time but not

2      always we had another member of the IR department attending.

3      Frequently they would be taking notes more for their personal

4      use and not as part of a policy of the firm, simply because

5      part of the reason why we would have the junior people

6      attending as part of their training and they would take notes

7      as a way of learning.  It was not something that we required

8      as part of the meeting.

9      Q     Typically did anybody at Amaranth circulate any

10     sort of post mortem discussion regarding meetings with

11     prospective investors?

12     A     I'm not sure I understand what you mean by post

13     mortem discussions.

14     Q     Did anybody, just in general, would somebody

15     circulate any sort of memorandum or e-mail after a

16     prospective investor meeting describing what happened at the

17     meeting, action items to --

18     A     Not as a matter of general practice, no.

19     Q     That happened occasionally?

20     A     It may have happened occasionally where an e-mail

21     went out saying we had an investor meeting, somebody needs to

22     follow up on this point, somebody needs to get the investors

23     some information that they request.  That would be more

24     typical of what might have happened as a meeting item.

25     Q     In 2006 did prospective investors ask to meet with

1    Brian Hunter?

2    A    Yes.

3    Q    Did that happen more frequently in 2006 than it

4    did in 2005?

5    A    Quite frankly it happened most frequently during

6    probably September, October of `05.  It was not Brian Hunter

7    per se, they wanted to speak to somebody from the Energy

8    group.

9    Q    Typically who was that person that would speak

10    with prospective investors?

11    A    Many times it was Harry Arora and it was also

12    Brian Hunter.  Harry used to do it more often than Brian and

13    then obviously after Harry left Brian took over the mantel of

14    doing that.  From time to time Jeff Baird also met investors

15    to discuss the energy platform.

16    Q    Prior to Mr. Arora's departure did Mr. Hunter meet

17    with prospective investors?

18    A    On occasion yes.

19    Q    Roughly what's the breakdown percentage-wise

20    between the prospective investor meetings that Mr. Arora

21    attended versus those that were attended by --

22    A    I have no recollection of that.

23    Q    Did Mr. Arora attend more of the meetings than Mr.

24    Hunter did?

25    A    Yes, he did.

1      Q     Did some of Brian Hunter's team stay in Greenwich?

2      A     For a while we were working out some of the tax

3     issues.

4      Q     Did any of Mr. Hunter's team remain in Greenwich

5     for the duration, if you will?

6      A     There were certain people that reported to Mr.

7     Hunter that remained in Greenwich.  Mr. Hunter was

8     responsible for natural gas trading as well as some other

9     trading.  I believe metals was one of them.  Let me think for

10    a second -- there were a couple members of the team that

11    traded other commodities, I don't remember which, that stayed

12    in Greenwich and there was a person who reported to Mr.

13    Hunter that was in London as well.

14     Q     Did any of the natural gas traders who reported to

15    Mr. Hunter stay in Greenwich?

16     A     For the duration?

17     Q     Yes.

18     A     I don't recall.

19     Q     Does that mean you think probably not or something

20    else?

21     A     It depends on how much leeway you're going to give

22    me on this, I think probably not but I don't want to forget

23    somebody who I just forgot.

24     Q     But you can't think of anybody.

25     A     On the natural gas team I can't think of anybody.

1      That's not to say there wasn't somebody.

2      Q    I understand.  Did anybody from the Compliance

3    group move up to Calgary?

4      A    No.

5      Q    Did anybody from Risk Management move up to

6    Calgary?

7      A    Not for the duration.

8      Q    Did anybody from the Risk Management group move up

9    to Calgary for a period of time?

10      A    I recall that Mr. Chasman had gone to Calgary from

11    time to time but not a move as I think you're defining it.

12      Q    Were there any concerns expressed by anybody at

13    Amaranth that you're aware of about the fact that the natural

14    gas team was in essence moving to Calgary without anybody

15    from Compliance or Risk Management being on site?

16      A    There was no concern expressed by anybody at

17    Amaranth regarding members of the Compliance team moving to

18    Calgary because Compliance had a centralized function.  All

19    the reporting, all the trades and everything come through

20    Greenwich on a centralized basis and the only trading that --

21    the only thing that's done in Calgary is the actual

22    completing of the orders so to speak.

23          So from a Compliance perspective having them in

24    Calgary versus having them in Greenwich didn't matter because

25    we had the same information at the same time to perform the

1    No, I did not use that tool to rely on that.  Typically when

2    I wanted to understand the P&L for the energy book and I

3    wanted to understanding on a fairly regular basis, typically

4    we got the best understanding at the end of the day of

5    trading.

6         I didn't wait to get the report.  I would

7    typically go to David Chasman who was the one who was really

8    preparing a P&L for the day at the end of the day and ask him

9    how did we do today.

10        MR. LYDON:  Can you just for the record explain

11   when, I don't think it's clear in the record, you gained the

12   understanding.

13        THE WITNESS:  Excuse me?

14        MR. LYDON:  Can you explain when it was that you

15   gained this understanding however loose it was.

16        THE WITNESS:  Over the period, end of August,

17   beginning of September during the period that the September

18   expirey occurred and we had daily meetings and ad hoc

19   meetings in the office.  I would sit and listen to some of

20   those discussions.

21   Q    Was Mr. Hunter in Greenwich at that time?

22   A    Yes, he was clearly in Greenwich the week of

23   September 11th.

24   Q    How about the tie frame leading up to the expirey

25   of the September contract in August?

1      A      He was in Greenwich a lot over the summer. I

2    don't recall exactly which days he would be in and which days

3    he wasn't. I know he was there clearly the week of September

4    11th. I remember that. I know he was down in Greenwich with

5    other members of the team frequently during that period but

6    exactly which days I don't remember.

7      Q      Why was Mr. Hunter in Greenwich a lot during the

8    summer of 2006?

9      A      My understanding is so that -- Rob and Nick felt

10    that we wanted the whole team together. It was a big

11    position, it was a big job and we thought having everybody

12    together and making sure it got done would be the best way to

13    have it at that time.

14      MR. KELCOURSE:   Did Mr. Jones or Mr. Maounis ever

15    express a concern to you that the job wouldn't get done if

16    Mr. Hunter was working out of Calgary?

17      THE WITNESS:   No, they did not express concern to

18    me that the job would not get done if Mr. Hunter was working

19    out of Calgary. The view was that everybody working together

20    in one location was the best way to get the job done.

21      Q      Did you ever get an understanding that Mr. Hunter

22    was taking more time than necessary to reduce the exposures

23    in the natural gas book, that he was kind of delaying the

24    process because he perhaps believed in his positions more so

25    than others at Amaranth?