EXHIBIT
7

1

2    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

3

4    In the Matter of:        )

5    AMARANTH ADVISORS, LLC   )  File No. B-2278

6                             )

7

8    WITNESS:  Steven Johnson

9    PAGES:    1 through 163

10    PLACE:    Securities and Exchange Commission

11         3 World Financial Center, Room 414

12         New York, New York  10281

13    DATE:     Monday, November 27, 2006

14

15         The above-entitled matter came on for hearing, pursuant

16    to notice, at 10:10 a.m.

17

18

19

20

21

22

23

24

25

1    Q    Did you ever get the impression that Mr. Maounis or

2    Mr. Winkler had lost control of Mr. Hunter?

3    A    No.

4    Q    I understand that Mr. Hunter and some of the team

5    that was with him in Calgary spent time in Greenwich during

6    the summer of 2006, June, July and August.  Is that true?

7    A    Yes.

8    Q    Why was that, if you know?

9    A    Two reasons that I recall.  One was investor

10   meetings, so reason Number 1.  Reason Number 2 was the market

11   started to get quite active in natural gas, and I think there

12   was a view that it would be helpful during certain periods of

13   time to have Brian and later certain members of his team

14   there, sitting right outside Nick and Rob's office.

15   Q    Did somebody express that to you?

16   A    Yes.

17   Q    Who?

18   A    Rob.

19   Q    Did Mr. Jones say why he thought it would be

20   helpful?

21   A    No.

22   Q    Did anyone else express that they thought it would

23   be helpful to have Hunter back due to the active nature of

24   the natural gas market?

25   A    Not that I recall.

EXHIBIT
8

1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:          )

4   AMARANTH ADVISORS, LLC        )      File No. B-2278

5                     )

6

7   WITNESS:  Nicholas Maounis

8   PAGES:    1 through 149

9   PLACE:    Securities and Exchange Commission

10      Three World Financial Center

11      Room 414

12      New York, New York

13   DATE:    Monday, November 20, 2006

14

15      The above-entitled matter came on for hearing, pursuant

16   to notice, at 10:00 a.m.

17

18

19

20

21

22

23

24

25

1    other business reasons for to open a Calgary office?

2        A    Sure.  As I said, Calgary is a big hub for energy

3    trading.  There are lots, there's lots of people in the

4    energy business in Calgary so you're able to network very,

5    very efficiently.  And so we thought it was quite a good move

6    to have a presence there.

7        Q    Anything else?

8        A    Not that I recall.

9        Q    When did Mr. Hunter actually go to Calgary?

10       A    Sometime late in '05.  Maybe it was November,

11   December.  Somewhere in there.  I don't recall exactly when.

12       Q    Who, who else moved with him at that time in '05?

13       A    Well, there are people that were slated to move.  I

14   don't remember who exactly moved at the end of '05, but some

15   of the team.  Brian had somewhere between seven and nine

16   people that ultimately reported to him and they all had

17   various times that they were able to effect the move up

18   there.

19       Q    Do you know if any of them moved in 2005?

20       A    I don't remember the exact timing of their moves,

21   no.

22       Q    How many risk management people, if any, were in

23   Calgary?

24       A    We didn't have any direct reports to risk

25   management in Calgary to my knowledge.

(SEC) Maounis, Nicholas 11/20/2006 10:00:00 AM

1    Q    Were there indirect reports?

2    A    There were no members of the risk management team

3    in Calgary.

4         MR. BLOCK:   Is that something you considered when

5    opening the Calgary office?

6         THE WITNESS:   That is something that we, that we

7    considered and it may have in fact been something that we

8    ultimately pursued.  But our branch operation was really the

9    central hub and I mean to us we didn't think that there was

10   any reason for concern nor do I believe that there was any

11   reason for concern to have an office in Calgary.

12        We also have offices in Toronto, we have offices in

13   Singapore, we have an office in London, we have a small

14   office in Houston, and there are many other multi-strategy or

15   hedge funds with international offices.  In fact, there are

16   many other dealers, Alexa, Goldman Sachs, Merrill Lynch, et

17   cetera, et cetera, who have global presences.

18        So this was not unusual for us to open the Calgary

19   office.

20   Q    Do you know, do you know if those other entities

21   you talked about that have global offices have risk

22   management presences --

23   A    I don't, I don't believe that any of them have

24   dedicated, a dedicated member of the risk management team in

25   any of those offices.

1          THE WITNESS:  -- did I consider?

2          MR. BLOCK:   -- in the Calgary office?

3          THE WITNESS:  Did I consider whether other

4    organizations --

5          MR. BLOCK:  Yes.

6          THE WITNESS:  No, I did not consider that.

7     Q   Was there any change in the risk management

8    processes or procedures as the result of Mr. Hunter's move to

9    Calgary?

10    A   Not that I'm aware of any change.

11    Q   How about any change in operations as a result of

12    the move to Calgary?

13    A   There may have been as obviously an international

14    office requires some sort of technology linkage and

15    interface.

16          So that would be, that would be under the realm of

17    operations.  But I couldn't tell you what they were.

18    Q   Were there any, anything about that technology,

19    whatever technology linkage that was come up with, was there

20    any difference from your perspective in terms of whether you

21    could see what Mr. Hunter was doing in terms of trading or

22    reduced your ability to communicate with him?

23    A   Nope.

24    Q   So it's largely seemless to you?

25    A   Absolutely.

(SEC) Maounis, Nicholas 9/20/2006 10:00:00 AM

1    Q    Anything else about operations that changed as a

2    result of his move to Calgary?

3    A    Not to my understanding.

4    Q    Were there any compliance people in Calgary?

5    A    Not to my knowledge.

6    Q    Did you have somebody who was responsible for

7    Canadian compliance?

8    A    We had a lawyer who was in our Canadian office.

9    Q    That's Mr. Panet?

10    A    Yes, Phil.  That's right.  And I believe he was

11    acting in that same capacity for the Calgary office as

12    another Canadian place, but he was not located in Calgary.

13    Q    He was in Toronto?

14    A    That's right.

15    Q    During 2006 and from time to time Mr. Hunter and

16    members of his team came back to Greenwich for periods of

17    time?

18    A    Yes.

19    Q    How frequently did that happen?

20    A    Well, it happened quite frequently, well, in July I

21    believe they spent time in Greenwich.  Now when you say how

22    frequently did they come, my understanding is they went home

23    for the weekends and came back for Monday.  So they went back

24    and forth on a plane.

25        So they came for periods of July, August and

EXHIBIT
9

1    UNITED STATES COMMODITY FUTURES TRADING COMMISSION

2      In the Matter of:          )

3      NATURAL GAS TRADING BY        )

4      AMARANTH ADVISORS, LLC        )        File No. B-2278

5      AND OTHERS               )

6                        )

7      WITNESS:  Nicholas Maounis

8      PAGES:    1 through 61

9      PLACE:    Securities and Exchange Commission

10        Three World Financial Center

11        Room 414

12        New York, New York

13      DATE:    Tuesday, November 20, 2006

14        The above-entitled matter came on for hearing, pursuant

15    to notice, at 3:15 p.m.

16

17

18

19

20

21

22

23

24

25

Maounis, Nicholas 11/20/2006 3:15:00 PM

1    were tied to the performance of the fund in cases that they

2    did have that type of compensation structure.

3        Q    And that would be people like risk management

4    group?

5        A    That's right.

6        Q    Okay.  When, going back to becoming a PM and co-

7    head of the energy book, you believe, you said that the other

8    reason why this happened was because Mr. Hunter had said that

9    he'd received offers from other hedge funds.

10        A    Yes.

11        Q    Did you take any steps to verify whether or not he

12    actually had received any offers?

13        A    We did verify it.

14        Q    You did?

15        A    Yes.

16        Q    You just called up the other hedge fund to confirm

17    that or?

18        A    We didn't just call.  We knew who it was because

19    they were unhappy.

20        Q    Okay.  So you confirmed it after the fact?

21        A    I confirmed it after the fact?

22        Q    After you made your offer to Mr. Hunter and he

23    withdrew talking with whatever other hedge fund was --

24        A    Mr. Hunter resigned and told me that he had, my

25    recollection is several offers that he had made.  I made him

1    a counteroffer to stay, and then he disclosed that he had in

2    fact accepted an offer to go to a specific hedge fund.

3        MR. MacGREGOR:   What was the fund?

4        THE WITNESS:   SAC.

5        MR. MacGREGOR:   Did you talk with SAC at some

6    point about Mr. Hunter?

7        THE WITNESS:   Yes.

8        MR. MacGREGOR:   Tell me about that conversation.

9        THE WITNESS:   Brian had signed a, a contract to go

10   work for SAC.  And so we had some protracted discussions with

11   SAC about retaining Brian's services.  And ultimately, we

12   came to some settlement that he stayed with us.

13       MR. MacGREGOR:   A settlement with SAC?

14       THE WITNESS:   Yes.

15       BY MR. OAKLAND:

16   Q    Was that also reduced to writing?

17   A    I'm sorry?

18   Q    Was that reduced to a written agreement between you

19   and SAC?

20   A    I believe so.

21       MR. MacGREGOR:   What was Mr. Hunter's 2005

22   compensation?

23       THE WITNESS:   Including deferred compensation, it

24   was over $100 million.

25   Q    And so again, of that he received 70 percent

EXHIBIT
10

# Brad Basarowich

## AMARANTH GROUP
## EXPENSE SUMMARY REPORT

| Date | DESCRIPTION: VENDOR, LOCATION, ITEM/SERVICE, BUSINESS PURPOSE, PERSONS IN ATTENDANCE. ORIGINAL RECEIPTS AND DESCRIPTIONS REQUIRED BEFORE PAYMENT CAN BE MADE | Entity Allocation | Credit Card(CC) or Reimbursable(R) | AMOUNT |
|---|---|---|---|---|
| 04/19/06 | Calgary Airport Authority | NCALEN | R ✓ | $43.07 |
| 04/20/06 | Westin NY at Times Square | NCALEN | R ✓ | $817.70 |
| | Working In Greenwich Office | | | |
| 05/04/06 | Banff Springs Hotel Tax 14.77 GST 19.17 Room 316.35 Net 13.78 | NCALEN | R ✓ | $356.85 |
| 07/31/06 | CIBC Crude Conference | | | |
| 07/31/06 | Air Canada | NCALEN | R ✓ | $1,733.86 |
| | Ticket for Brian Hunter - Airfare to work in Greenwich office (Dept Date 08/01/06) | | | |
| 07/31/06 | United Airlines | NCALEN | R ✓ | $1,524.63 |
| | Ticket for Brian Hunter - Airfare to work in Greenwich office (Dept Date 08/09/06) | | | |
| 07/31/06 | Travel Agency Service | NCALEN | R ✓ | $39.00 |
| | Service Fee | | | |
| 08/01/06 | Travel Agency Service | NCALEN | R ✓ | $39.00 |
| | Service Fee | | | |
| 08/15/06 | Air Canada | NCALEN AA | R ✓ | $1,787.05 |
| 08/15/06 | Ticket for Wife (Trisha Noland) $1995.91 Canadian (1 Canadian Dollar = 0.896147 USD) | NCALEN AA | R ✓ | $1,480.26 |
| 09/17/06 | Accomodations (working In Greenwich office) | AGOT | R ✓ | $472.87 |
| | Tribeca Grand Hotel | | | |
| 09/18/06 | Accomodations (Richard Miller) | NCALEN | R ✓ | $80.00 |
| 09/18/06 | Cab fare to Greenwich | No Receipt | | |
| | Total To Be Reimbursed: | | | $8,434.32 |

Employee's Signature:

Employee's Name: Brad Basarowich

Manager's Signature/Approval: Brian Hunter

Date: 09/18/06

Approved By: Charles H. Winkler

Nicholas M. Maounis
President
Amaranth Group Inc

10/13/06

CONFIDENTIAL TREATMENT REQUESTED

BASAROWICH000189

EXHIBIT
11

1    UNITED STATES COMMODITY FUTURES TRADING COMMISSION

2

3    In the Matter of:        )

4    NATURAL GAS TRADING      )  File No. B-2278

5    BY AMARANTH ADVISOR, LLC )

6    AND OTHERS              )

7    WITNESS: Robert Jones

8    PAGES:    1 through 51

9    PLACE:    Securities and Exchange Commission

10        3 World Financial Center

11        New York, New York 10281

12    DATE:    Monday, November 13, 2006

13

14        The above-entitled matter came on for hearing, pursuant

15    to notice, at 5:05 p.m.

16

17

18

19

20

21

22

23

24

25

1          THE WITNESS:  Yes.

2          MR. OAKLAND:  And that testimony lasted from about

3     10:30 in the morning until about 5 o'clock this afternoon?

4     Is that about right?

5          THE WITNESS:  Yes.

6          MR. OAKLAND:  With breaks?

7          THE WITNESS:  Yes.

8          MR. OAKLAND:  I'm going to ask you a couple of

9     questions that will probably follow on from the questions

10    that were asked during that time, and then I'll ask some

11    other questions as well.  If at any time, given the lateness

12    of the hour, my voice drops please let me know and I'll try

13    to repeat or rephrase the question.

14              EXAMINATION

15         BY MR. OAKLAND:

16    Q    First of all, earlier today you were talking about

17    when Brian Hunter's group moved to Calgary Alberta.  Do you

18    remember that?

19    A    Yes.

20    Q    During the time that Mr. Hunter's desk was

21    stationed in Calgary were there any traders trading natural

22    gas still in Greenwich, Connecticut?

23    A    I believe so.  Yes.

24    Q    Do you know who they were?

25    A    Matt Calhoun and Hai Chen.

1    to the SEC that on at least a couple of occasions Brian

2    Hunter's entire group came back to Connecticut and was

3    trading out of Connecticut.  Do you recall that?

4        A    At least the main people from the group.  Yes.

5        Q    Who would you define as the main people of the

6    group?

7        A    Brian Hunter, Matt Donohoe would be really the main

8    people.  Brad Verserowich would be, I would say, secondary

9    but not less senior.  But really Matt Donohoe and Brian are

10   the key people trading in Brian's main book.

11       Q    And the main book being Natural Gas?

12       A    Yes.  Well, yes.  The main Natural Gas book.

13       Q    All right.  What books are there within Natural

14   Gas?

15       A    There could be -- I mean Natural Gas Trading can

16   take several different forms.  You can trade on sort of a

17   location bases.  So the West Gas versus East Gas or North Gas

18   versus South Gas.  There are geographical differences.  And

19   that would be the type of thing that Matt Calhoun would

20   primarily trade.  As I said, that book was smaller -

21   significantly smaller - than Brian Hunter's main book, which

22   was sort of Henry Hubb concentrated.

23       Q    And you mentioned that Hunter and I'm assuming

24   Donohoe came back for the week of April 28th?

25       A    Yes.

EXHIBIT
12

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:        )

4                             )  File No. B-2278

5    AMARANTH ADVISOR, LLC    )

6    WITNESS: Robert Jones

7    PAGES:    1 through 184

8    PLACE:    Securities and Exchange Commission

9        3 World Financial Center

10        New York, New York 10281

11    DATE:    Monday, November 13, 2006

12

13        The above-entitled matter came on for hearing, pursuant

14    to notice, at 10:25 a.m.

15

16

17

18

19

20

21

22

23

24

25

1      A    Yes.

2      Q    In the text of your first e-mail to Mr. Hunter

3    dated April 24, 2006, 9:20 a.m. it says "You need to have

4    someone on the desk by 8:30 EST.".  I assume that means

5    Eastern Standard Time?

6      A    Yes.  That's right.

7      Q    "... every day.  Ideally someone who has a

8    qualified opinion on your portfolio or who can quickly

9    contact someone who has."  Do you recall what precipitated

10   this e-mail?

11     A    Yes.  I mean I think that there's a normal process

12   that goes on just about every day when we can see what trades

13   have been booked into the accounting system.  You know, when

14   the accounting update is complete when you'll be able to

15   expose differences between what's gone into the system.  In

16   other words, the trades that the systems knows versus the

17   trades that the trader knows.  And the difference between

18   those two things you can call breaks.  You know, you can have

19   a counterparty who calls up and says "We did a trade with

20   your desk yesterday, and if it's not booked then you need to

21   resolve".  Well who's correct?  The counterparty or the desk?

22         And when it came to the energy book, I wanted to

23   make sure that the Chasman-Koster risk reports have the

24   correct positions in them and that we know that the positions

25   that we're seeing are the correct positions.  And so what I

1    there were times when I called and there were people, and

2    there were times when I called and there might not have been

3    people there.  I think I might have gone ahead and called

4    Brian's cell phone directly.  I mean usually I'm not the one

5    who is involved in resolving the breaks.  It's just I sort of

6    noticed this, and it sort of stuck in crow a little bit.  So

7    I was being passive/aggressive here and just trying to get

8    Brian to just behave in a way that I would prefer him to

9    behave.

10        Q    Did his behavior ever get satisfactory from your

11    perspective with respect to this issue?

12        A    I think it evolved in the right direction.  I don't

13    know if it was ever perfect, but I think it did evolve.

14        BY MR. BLOCK:

15        Q    In what sense?

16        A    I mean I think that there were -- more frequently

17    there were people there earlier in the morning.  I mean I

18    should add, I think, that the accounting group for Brian's

19    book is obviously in Greenwich.  So there was no issue with

20    respect to the people doing the bookkeeping for Brian's book

21    or the people who were actually interfacing with

22    counterparties to identify the potential trades.  That's all

23    happening just fine.  This is really just a trader thing.

24    And their market opens later than the stock market does, and

25    they sort of have more time.  But I just sort of felt like it

EXHIBIT
13

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------x
                                             :
BRIAN HUNTER,                                :
                                             :
        Plaintiff,                           :    07 Civ. 1307 (RJL)
                                             :
              v.                             :
                                             :
                                             :
                                             :    **DECLARATION OF**
                                             :    **BRIAN HUNTER IN SUPPORT**
                                             :    **OF PLAINTIFF'S MOTION**
FEDERAL ENERGY REGULATORY                    :    **FOR A TEMPORARY**
COMMISSION,                                  :    **RESTRAINING ORDER,**
                                             :    **PRELIMINARY INJUNCTION,**
                                             :    **AND DECLARATORY RELIEF**
                                             :
                                             :
        Defendant.                           :
---------------------------------------------x

## DECLARATION OF BRIAN HUNTER

I, Brian Hunter, declare as follows:

1.    I was employed as a natural gas trader and portfolio manager at Amaranth Advisors LLC ("Amaranth") from June 2004 through October 2005. Amaranth is the main trading advisory entity to Amaranth LLC, a hedge fund based in Greenwich, Connecticut.

2.    From October 2005 until September 2006, I was employed in the same capacity by Amaranth Advisors (Calgary) ULC ("Amaranth Calgary"), an unlimited liability company registered under the laws of the Province of Nova Scotia. Like Amaranth, Amaranth Calgary is also a trading advisory entity to Amaranth LLC (Amaranth and Amaranth Calgary are referred to collectively as "Amaranth" in this declaration).

1

3. I currently serve as the president of Solengo Capital Advisors, ULC ("Solengo"), a company registered under the laws of the Province of Alberta, Canada ("Alberta").

4. Solengo is making the necessary preparations to actively solicit investments that are crucial to its successful launch as a commodity derivatives investment fund. Solengo intends to serve as an investment adviser to private investment funds for select qualified investors (the "Solengo Managed Funds"). I maintain a 60% ownership stake in Solengo.

5. I am aware that the Federal Energy Regulatory Commission ("FERC") commenced a preliminary, non-public investigation into trading conducted by Amaranth in late September 2006.

6. I am further aware that, in a letter addressed to me received on July 20, 2007, the FERC provided notice of its intent to issue an Order to Show Cause and Notice of Proposed Penalties ("OSC") against me, no sooner than five days after the date of the letter (July 19, 2007) , which is Tuesday, July 24, 2007.

7. I have provided on-the-record testimony pursuant to subpoena before the Securities and Exchange Commission ("SEC") on November 16, 2006, where representatives of the Commodity Futures Trading Commission ("CFTC"), FERC, and the Alberta Securities Commission ("ASC") were present.

8. I have provided on-the-record testimony pursuant to subpoena before the CFTC on November 17, 2006, where representatives of the SEC, FERC, and ASC were present.

9. I have never been a defendant in any regulatory proceeding.

2

10. In my capacity as a natural gas trader and portfolio manager at Amaranth, along with other traders at Amaranth, I traded certain types of commodity derivatives, including natural gas futures traded on the New York Mercantile Exchange ("NYMEX").

11. During my employment at Amaranth, I never traded contracts for the exchange or delivery of physical natural gas. Amaranth did not have the capacity to make or take delivery of physical natural gas.

12. Unlike the trading activity of entities that are able to make or take physical delivery of natural gas, Amaranth's trading was designed to seek profit from price changes in the derivative instruments themselves, rather than to hedge against anticipated price movements in the market for physical natural gas.

13. If FERC files the unlawful action it contemplates against me, Solengo and I will suffer irreparable injury. The ability of the Solengo Managed Funds to attract potential investors in the future is based primarily on my personal reputation as well as Solengo's ability to qualify for certain registrations, permits, and other legal arrangements.

14. As the majority owner of Solengo, any losses suffered by Solengo, including the closing of the business, have a direct impact on me, in the form of forgone unquantifiable income from potential profit earned and fees assessed by Solengo and the loss of my new business.

15. The funds I have advanced to develop Solengo have been substantial. If Solengo is unable to operate due to the OSC, this substantial investment will be lost.

16. The OSC will substantially imperil the prospective investments in the Solengo Managed Funds necessary for their successful launch, and will thereby destroy their

viability and the viability of Solengo. The monetary amount of the lost business opportunity is impossible to quantify, since the Solengo Managed Funds are not yet opened for investments. No concrete investments can be made without the registration of Solengo with the Monetary Authority of the Cayman Islands.

17.    Solengo's existence as a business venture depends upon its successfully registering as an investment advisor in the Province of Alberta, Canada, and certain of the Solengo Managed Funds registering in the Cayman Islands.

18.    I am aware that the ASC may well deny Solengo's pending application to serve as an investment adviser based upon the pendency of the OSC. I am also aware that the Monetary Authority of the Cayman Islands may well deny the application of certain of the Solengo Managed Funds for registration under the laws of the Cayman Islands on the same basis. These denials will prove fatal to Solengo's business.

19.    Under the laws of the Cayman Islands, the existence of the Solengo Managed Funds that are incorporated in the Cayman Islands is also contingent upon the agreement of unaffiliated individuals to serve as their directors. The OSC will greatly reduce the possibility that any outside individuals will choose to serve as directors of the Solengo Managed Funds.

20.    The Solengo Managed Funds must also engage the services of a prime brokerage firm in order to implement its intention to trade in commodity derivatives. The OSC would create a dramatic increase in the risk such a firm would take on by agreeing to clear and execute Solengo's trades. Were the OSC permitted to go forward, no prime brokerage firm would agree to service Solengo's trading.

21.  In order to conduct its business and to be regulated in certain jurisdictions, Solengo and the Solengo Managed Funds must also solicit and retain other third party administrative services, including accounting and other financial services. Such financial vendors will be unwilling to contract with Solengo and the Solengo Managed Funds were the OSC permitted to move forward. Without such service providers, Solengo and the Solengo Managed Funds could not obtain registration, and as a result, could not operate.

22.  Particularly important in this regard are the services of a third-party administrator, hired to perform independent Net Asset Value calculations on behalf of a fund's investors. These administrators are exposed a high degree of risk to their professional reputations and will not agree to provide such services to the Solengo Managed Funds if the OSC is issued.

23.  Solengo's success also depends on the hiring of individuals with unique educational and professional backgrounds. Certain functions critical to Solengo's business, such as the development of proprietary computerized trading and risk management systems, cannot be performed without the employment services of such individuals. Any delay in Solengo's ability to move forward in hiring represents an unquantifiable business loss because of the likelihood that individuals with the relevant educational background and industry experience will accept other employment opportunities and the unique team of such professionals who have been assembled may break up and be essentially irreplaceable.

24.    I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and accurate to the best of my knowledge and belief.


Brian Hunter

Dated: Calgary, Alberta, Canada
       July 23, 2007

EXHIBIT
14

# Amaranth Group Inc.

## Global Energy and Commodities Group



CONFIDENTIAL TREATMENT REQUESTED

AALLC_REG1081164

EXHIBIT
15

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:          )

4    AMARANTH ADVISORS, LLC      )      File No. B-2278

5                          )

6

7    WITNESS:  David Chasman

8    PAGES:    1 through 175

9    PLACE:    Securities and Exchange Commission

10        Three World Financial Center

11        Room 414

12        New York, New York

13    DATE:    Tuesday, November 28, 2006

14

15        The above-entitled matter came on for hearing, pursuant

16    to notice, at 10:00 a.m.

17

18

19

20

21

22

23

24

25

1    positions with them and get information from them as well as

2    understand their views so they'll make intelligent, informed

3    recommendations.

4        Q    During your time at Amaranth, and let's focus on

5    the time before, ending at September 30, 2006, from that time

6    back through September of 2004, what were your duties and

7    responsibilities?  And if they changed over time, give me a

8    sense of sort of when they changed and how they changed.

9        A    I don't particularly have a sense that they changed

10   over time.

11       Q    Okay.  So what were your duties and

12   responsibilities at Amaranth?

13       A    My duties and responsibilities at Amaranth were

14   first, you know, making sure that we had adequate systems to

15   monitor our positions in the growth sense and also using

16   those systems in the analysis of risk.

17       Q    Where were you physically located in Amaranth's

18   offices?  Where was your office?  Where did you sit?

19       A    I had a seat on the trading floor as well as an

20   office.

21       Q    How much of your time did you spend on the trading

22   floor and how much --

23       A    I spent most of my time on the trading floor.

24       Q    How is the trading floor laid out?  I mean sort of

25   where did you sit with respect to others?

1    scenario when we were looking at Exhibit 38.

2        So I take it that when you had -- did you have

3    discussions with anybody at Amaranth about incorporating what

4    happened in May into any of your scenarios?

5    A    Well, we in fact didn't incorporate it.

6    Q    My question is did you have discussions --

7        MR. ARKIN:   Had you discussions or speak with

8    anybody.  He's asking you what was happening in May and

9    whether you incorporated it into the various scenarios with

10   which you prepared whatever you prepared.

11   Q    Actually, my question is slightly different.

12       It's whether you had any discussions with folks at

13   Amaranth about incorporating --

14       MR. MOLLON:   Again, other than what he's testified

15   this morning on that very topic?

16       MR. KELCOURSE:   Yes.

17   A    Not to the best of my recollection.  The primary

18   discussion of this issue was with Robert Jones.  It's

19   possible that I also discussed this with other individuals,

20   but I think that was the main focus.  I might have discussed

21   it with the traders.

22   Q    Do you recall discussing what happened in May with

23   Brian Hunter?

24   A    We discussed what was happening in May constantly

25   as it was happening.  It was obviously something that

1  required everybody's attention.

2    Q   What did Mr. Hunter tell you about what was

3  happening in May?

4    MR. ARKIN:  Are you asking about just generally or

5  particular conversations?

6    MR. KELCOURSE:   Generally.

7    MR. ARKIN:  You can give him an answer if it's

8  sensible.

9    A   I mean I think, again, the pressure on calendar

10  2007 was one of the primary drivers of our losses during May,

11  and obviously there were many discussions.  That was one of

12  the overall themes.

13    Q   Did you have discussions with Mr. Hunter about

14  whether or not liquidity effected the energy book's

15  performance in May?

16    A   I'm trying to remember whether I had specific

17  conversations on that topic with him.

18    I don't know if I had any specific conversations

19  with him on that topic.

20    Q   Do you have, did you have any understanding as to

21  whether or not liquidity had an effect on the energy book's

22  performance in May of 2006 with Mr. Hunter or otherwise?

23    A   When you say liquidity, I mean what are you getting

24  at there?

25    Q   Are you aware that representatives of Amaranth told

1    Q    Were you ever consulted by a trader in the energy

2    group about whether or not he should do a particular trade

3    ahead of time?

4    A    I'm sure I was on some occasions, yes.

5    Q    Why are you sure?

6    A    Because I can think of a few traders who might

7    have, you know, run trades by me.

8    Q    Did Brian Hunter ever run trades by you before

9    executing them?

10    A    I think so.  I think on some occasions he did, yes.

11    Q    Who are the traders that you can think of that did

12    run trades by you ahead of time?

13    A    Our European power trader.

14    Q    Who is that?

15    A    Ulf Eck and I think some of the guys on the trading

16    desk also on occasion would run trades by me.

17    Q    Anybody who was trading natural gas run trades by

18    you ahead of time?

19    A    On occasion.

20    Q    Do you recall any specific instances when a natural

21    gas trader ran a trade by you ahead of time?

22    A    In other words, for my clearance?  I mean when you

23    say ran it by me, what are you --

24    Q    Well, I was actually using a term that you used, so

25    I'm not sure.

EXHIBIT
16

# AMARANTH ADVISORS (CALGARY) ULC

# COMPLIANCE MANUAL

## March 10, 2006

**CONFIDENTIAL**

CONFIDENTIAL TREATMENT REQUESTED

AALLC_REG1081201

## TABLE OF CONTENTS

Compliance Function .................................................................................................... 1
Commodity Trading Practices .................................................................................... 8
Registration ...................................................................................................................... 14
Trading Practices and Supervision ......................................................................... 20
Insider Trading ............................................................................................................... 27
Anti-Money Laundering .............................................................................................. 35

**CONFIDENTIAL**

Amaranth Advisors (Calgary) ULC

## Compliance Function

### Background Information

Amaranth Advisors (Calgary) ULC ("AACal") was incorporated as an unlimited liability company in Nova Scotia on October 21, 2005. AACal was registered under the *Securities Act* on March 10, 2006 (Alberta) (the "Act") as an advisor in the categories of Investment Counsel and Portfolio Manager (Securities and Exchange Contracts).

AACal is a 99%-owned indirect subsidiary of Amaranth Advisors L.L.C. ("Amaranth US")[1]. Amaranth US, based in Greenwich, Connecticut, is the primary investment advisor and the manager of the Amaranth group of private investment funds, including Amaranth LLC (a multi-strategy private investment fund with over US$6.75 billion in equity capital as at September 30, 2005). Interests in the Amaranth feeder funds, which are the sole investors in the Amaranth group of private investment funds, are all distributed primarily outside of Canada. The small number of Canadian resident investors in these funds are accredited investors or their equivalent.

AACal's sole business is providing investment management advisory services directly to private investment funds in the Amaranth group. Currently, AACal's only client is Amaranth LLC, pursuant to an advisory agreement with that entity. *AACal does not provide investment management or other advisory services to unrelated third party clients.*

Although the advisory relationship between AACal and Amaranth LLC is formally structured for administrative efficiencies as a direct advisory relationship, *the substance of this relationship is more similar to that of a sub-advisor* due to the limited nature of AACal's advisory arrangement and to the continuing oversight provided by Amaranth US. Under the terms of the advisory agreement, AACal has no authority or control over non-core investment decision-making functions such as settlement, custody, accounting or investor relations, which are all administered by Amaranth Group Inc. ("AGI"), an affiliate of Amaranth US. While AACal is in regular contact with the operations group of AGI to assist where necessary on these matters, AACal's responsibility extends only to core investment advisory functions. Furthermore, AACal has no contact with investors in Amaranth funds independent of AGI and has no material involvement in any Amaranth fundraising activity.

Under the terms of its advisory agreement, AACal is responsible for providing investment management and advisory services in respect of energy-related commodity instruments and related investments (the "Calgary Energy Portfolio"), although the advisory agreement provides that AACal may also provide advisory services in respect of other classes of investments if approved by Amaranth US. AACal's focus is to use fundamental and quantitative models to exploit various relative value and statistical arbitrage opportunities based on intra-commodity, inter-commodity and temporal relationships in commodity markets, as well as to make directional investments in respect of commodity instruments. Commodity instruments traded

---

[1] The remaining 1% interest is indirectly held by an affiliate of Amaranth US.

1

CONFIDENTIAL

CONFIDENTIAL TREATMENT REQUESTED

AALLC_REG1081203

**Amaranth Advisors (Calgary) ULC**

include the most liquid exchange-traded commodities, options (both vanilla and exotic options) over commodity instruments, and bilateral commodity trading arrangements with other sophisticated commodity market participants. The commodity instruments traded in the Calgary Energy Portfolio primarily focus on natural gas or natural gas liquids, although AACal's volatility and asset modelling capabilities are also applicable to other commodity markets, such as crude oil and power.

The advisory agreement also provides that Amaranth US, as primary advisor to Amaranth LLC, determines the amount of capital allocated to AACal.

The following diagram outlines AACal's relationship with Amaranth US and the Amaranth investment funds, as of the date of this manual:

### Amaranth Calgary
### Corporate Structure



Most finance, operational and management functions for the Amaranth group of investment funds are performed by AGI and centralized in Greenwich, Connecticut offices, for administrative efficiency and internal control reasons. These functions include investor relations, accounting, risk management, settlement and custody management, portfolio finance and certain legal and compliance functions for the Amaranth group. This approach ensures consistent treatment of these functions and ensures a separation of finance and operational functions from investment decisions making, which is important to Amaranth's internal control systems. AGI also provides support services to AACal pursuant to a Services Agreement, to assist AACal in developing and implementing its compliance program and in its general operations.

Given AACal's business model and its relationship with Amaranth US, AACal and its employees are governed by both the Amaranth US Compliance Manual and Code of Ethics

2

**CONFIDENTIAL**

CONFIDENTIAL TREATMENT REQUESTED

**Amaranth Advisors (Calgary) ULC**

(other than those portions directed to compliance with US rules and regulations which are not applicable in Canada), which governs all employees in the Amaranth group, and by the policies and procedures in this AACal compliance manual, which are specific to AACal. However, in the event of any inconsistency, this AACal compliance manual governs for employees of AACal. Given that its role is functionally more similar to that of a sub-advisor, compliance operations for AACal are directed to ensuring that matters within the scope of AACal's responsibilities, as outlined in the advisory agreement, are conducted in accordance with applicable rules, regulations and standards of conduct. In this respect, certain compliance activities are delegated by AACal to AGI, subject to AACal's supervision. However, those Amaranth activities that do not fall within the scope of AACal's advisory agreement (and which therefore do not directly implicate AACal) are not governed by these AACal compliance policies and procedures. Appendix B outlines the compliance roles and responsibilities which are not applicable to AACal.

## Compliance Function Framework

Compliance at AACal means complying with the applicable laws and regulations, and integrating compliance obligations into AACal's investment advisory activities and business policies and processes in order to ensure that regulatory requirements and internal policies and procedures are met on an ongoing basis. The compliance process consists of several steps:

1. Identify and understand the relevant laws, regulations and guidance;

2. Educate AACal personnel about the relevant laws, regulations and guidance;

3. Develop policies and procedures in response to specific legal and regulatory requirements;

4. Establish or revise AACal's operational processes to ensure that compliance policies and procedures can be met in a practical manner, including implementing appropriate internal controls;

5. Perform scheduled reporting of significant compliance issues to the Board of Directors of AACal by the Compliance Officer (CO) and/or the President; and

6. Reporting from the CO to the Compliance Committee on compliance findings and high risk areas; reporting from the Compliance Committee to the President and then to the Board of Directors of AACal.

## Roles and Responsibilities

**President of AACal**

The President's responsibilities include:

- **Overall Compliance Function** – ensuring an effective compliance framework is in place to ensure compliance with all laws and regulations;

- **Compliance Culture** – establishing a strong compliance culture within AACal;

3

CONFIDENTIAL

EXHIBIT
17

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:      )

4                           )  File No. B-2278

5    AMARANTH ADVISOR, LLC    )

6    WITNESS:  Harpreet Singh Arora

7    PAGES:    1 through 101

8    PLACE:    Securities and Exchange Commission

9        3 World Financial Center

10       New York, New York 10281

11    DATE:    Tuesday, November 14, 2006

12

13       The above-entitled matter came on for hearing, pursuant

14    to notice, at 10:15 a.m.

15

16

17

18

19

20

21

22

23

24

25

1    as well?

2    A    Yes.  Allison Mackey was his assistant.  Originally

3    she was my assistant.  You know, on the trading desk you

4    don't need that much help. You're there pretty much all the

5    time.  So everybody was -- she was helping everybody on the

6    desk out.  And since Brian was doing this transition thing,

7    it was pretty much -- and they had a good energy working

8    between them, so she pretty much ended up working for him.

9    Q    Anybody else whose name you can think of that was

10    up in Calgary with him?  Even if only part-time.

11    A    I can't think what else.  It's been a while.  But

12    these are three main guys who traded for him.

13    Q    If at any time today you think of any answer that

14    you could add to a previous answer, feel free to interrupt us

15    and say "Oh, I just remembered something that was responsive

16    to your last question" or whatever, and we'll get it on the

17    record.

18        Did anybody ever raise any concerns about this

19    Calgary shop either in terms of its isolation or the ability

20    to manage it or anything that was going on up there in the

21    time before you left?

22    A    There was -- I don't remember any concerns.

23    Q    Were there any changes in operational or risk

24    management procedures due to Mr. Hunter being up in Calgary?

25    A    The operations as in the booking of the deals and

1   the recording of all the data was still down in Greenwich.

2   I'm under the impression that there were some changes being

3   tied off so to have supplemental help in Calgary.  And so I

4   don't think there was an operational side.  From my

5   perspective and my business perspective, there were not any

6   changes on either the risk or the operational side.  There

7   were resources which were now being given to two businesses

8   instead of one. But other than that, there was no other

9   change.

10       BY MR. BLOCK:

11       Q    With respect to monitoring risk or the risk

12   monitoring process, was there any difference at all in the

13   way the operations changed as far as oversight or review?

14       A    Not that I would -- in terms of the differences of

15   the businesses, yes.  His business was not -- I stopped

16   looking at his portfolio thereafter because I had a lot of

17   things to do on my own.  I, as I would say, increased my

18   business by adding more things in it.  And so with my

19   portfolio management there were changes which were evolving.

20   But in terms of other people monitoring risk or operations --

21       Q    -- Yes.

22       A    -- I did not perceive any difference.

23       MR. HILER:   But would you necessarily know?

24       THE WITNESS:   If Rob Jones, who was the Chief Risk

25   Officer, would change his value with regard to that, I would