EXHIBIT
18

1

2          UNITED STATES OF AMERICA

            BEFORE THE

3      COMMODITY FUTURES TRADING COMMISSION

        ----------------------------------------------X

4

        In the Matter of:

5

        NATURAL GAS TRADING BY AMARANTH ADVISORS, LLC

6      AND OTHERS

7      ----------------------------------------------X

8                140 Broadway

                  New York, New York

9

                  February 27, 2007

10              10:20 a.m.

11

12

13

14

15

16          DEPOSITION of THOMAS J. O'CONNOR,

17      the Witness herein, taken by the

18      Commodity Futures Trading Commission,

19      pursuant to Subpoena, held at the

20      above-noted time and place before a

21      Notary Public of the State of New York.

22

23

24

25

1          O'Connor

2    account?

3        A    We met someone from Amaranth.  Well,

4    I was trying to solicit Brian Hunter's business

5    for quite some time.  I would cold call him at

6    times.  I had gotten an order here, an order

7    there out of him, but he was a very tough guy to

8    get on the phone.  He had everybody trying to

9    talk to him.  I didn't know him personally.  I

10   met him over a beer at a bar when he was in New

11   York a couple of times, but he wouldn't really

12   know me from Adam until a later date.  But I had

13   the opportunity to meet one of the traders that

14   worked under him through a friend of mine who

15   invited him to a Notre Dame game that we were

16   hosting for some other clients in November of '05

17   or October of '05.

18       Q    Who was your friend?

19       A    Tommy Marcott, who is an OTC broker,

20   who was coming to the game with us.  And we had

21   an extra ticket, so he suggested we invite Matt

22   who he knew and that I knew of.  He thought it

23   could be a good introduction, and the ticket was

24   going to go to waste anyway.

25       Q    This is Matt Donohue?

O'Connor, Thomas J. 12/27/2007 10:20:00 AM

1          O'Connor

2     other than Donohoe, you yourself?

3          A    I think, sure, I took a few orders

4     from Brian Hunter or relayed fills to Brian

5     Hunter.  I talked to one of the young kids that

6     just started up there, Jason, real good kid, I

7     forget his last name, but he had just started.

8     He was really green.

9          Q    Up there do you mean Calgary?

10         A    Calgary, yes.  A lot of times I would

11    give him a fill and he would relay them.  At the

12    end of the day I might check out with him rather

13    than with Matt.  So he was an entry-level clerk

14    for them.  Sometimes I would have to explain

15    exactly what I was talking about to him, kind of

16    hold his hand through it, but I would say 99

17    percent of the time I was talking to Matt

18    Donohoe.  And once in a while, once a direct line

19    was in and Shane was on that phone with one of

20    our other clerks I might have been on with Shane

21    here and there a handful of times.

22    EXAMINATION BY MR. COMPA:

23         Q    The Jason you spoke about, was that

24    Jason Parks?

25         A    Jason Parks, the good kid.

EXHIBIT
19

(PERO) Belucia, James   7/9/2007   1:00:00 PM

1    know about Brian Hunter?

2        A    Generally speaking, I know that he

3    traded for Amaranth.  I know he was a big trader.

4    And I know he didn't do too well.

5        Q    What do you mean when you say "big

6    trader"?

7        A    He traded large quantities of natural

8    gas, futures.

9        Q    What kind of reputation did he have?

10       A    I would say    before or after?

11       Q    Before.

12            MR. HUNTER:  Before.

13       A    He had a good reputation,

14   knowledgeable young kid.

15       Q    Have you ever met or spoken directly

16   with Brian Hunter?

17       A    I met him once and I shook his hand

18   once.  Other than that, no.

19       Q    Where was that?

20       A    It was on the floor of New York

21   Mercantile Exchange.  He was in for some kind of

22   conference.

23       Q    When was that?  An approximation, if

24   you can't remember.

25

EXHIBIT
20

1          FEDERAL ENERGY REGULATORY COMMISSION

2                    x

3    NON PUBLIC ORDER OF    :  Docket No. IN07 26 000

4    INVESTIGATION        :

5                    x

6          DEPOSITION OF ERIC THOMAS BOLLING

7               Washington, D.C.

8                  Friday, June 29, 2007

9    REPORTED BY

10    DONALD R. THACKER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    house perceives a risk, they can liquidate me.

2         Q    Is that something that is relatively easy to do,

3    keep track of someone's book?

4         A    I don't know.

5         Q    If you have the right system in place?

6         A    Absolutely.

7         Q    Have you ever met or spoken directly with Brian

8    Hunter?

9         A    I have.

10        Q    Can you talk to me about what kind of

11   relationship you have with him?

12        A    I met him about three weeks ago.

13        Q    Was that the first time you met him?

14        A    Yes, first time I ever spoke to him.

15        Q    What were the circumstances, what was the

16   context?

17        A    He had, he was coming to New York and I was

18   introduced by a friend.

19        Q    Do you recall the name of your friend?

20        A    I do.

21        Q    What is his name?

22        A    Sanford Goldfarb.

23        Q    Is he known as Trot?

24        A    Yes.

25

EXHIBIT
21

1

2          UNITED STATES OF AMERICA

           BEFORE THE

3      COMMODITY FUTURES TRADING COMMISSION

       ----------------------------------------------X

4

       In the Matter of:

5

       NATURAL GAS TRADING BY AMARANTH ADVISORS, LLC

6      AND OTHERS

7      ----------------------------------------------X

8              140 Broadway

               New York, New York

9

               March 7, 2007

10             10:05 a.m.

11

12

13

14

15

16          DEPOSITION of VINCENT RUFA, the

17      Witness herein, taken by the Commodity

18      Futures Trading Commission, pursuant to

19      Subpoena, held at the above-noted time

20      and place before a Notary Public of the

21      State of New York.

22

23

24

25

1          Rufa

2    a member since October of -- what year is this?

3    October of '05, October of '05.

4        Q    What does Mike Legname do?

5        A    Phone clerk.

6        Q    Mr. Gallagher?

7        A    Phone clerk.

8        Q    Mr. Scaglione?

9        A    Phone clerk.

10        Q    Now, were these the employees in or

11    around say January through April of 2006, or was

12    anyone different?

13        A    They were all there.  I think Phil

14    was there, too.  I think Phil started just right

15    before that.  He was with us a short time before

16    that, so probably yes.

17        Q    And you were present?

18        A    I was present.

19        Q    Did you at all act as a phone clerk

20    when you were with ALX Energy?

21        A    Yes.

22        Q    And you were also a floor broker?

23        A    Yes.

24        Q    How does that work exactly?

25        A    I am hands on.  The clients are

1          Rufa

2      Q   Who at Centaurus did you usually deal

3   with?

4      A   Whoever picked up the phone.  I don't

5   know the voices.  You know, sometimes you would

6   recognize Johnny Arnold's voice, sometimes it was

7   Jeb Leggums, but whoever picked up the phone.

8   Most of the time I didn't know who I was talking

9   to there.

10     Q   Who at Amaranth did you usually talk

11  to?

12     A   Brian, either Brian Hunter or Matt

13  Donohue.

14     Q   Anyone else?

15     A   Just briefly Brad, Brad Basarowich,

16  but usually -- really it was Matt and Brian that

17  you would really talk to.

18     Q   Between Mr. Hunter and Mr. Donohoe,

19  who did you talk to more often?

20     A   It was probably 50/50.

21     Q   What generally happens after the

22  trading starts?

23     A   You just, you try to see where things

24  are going, which way the market is -- what piece

25  of the board, which way the market may be moving,

1              Rufa

2        A    Socially.

3        Q    When did ALX start dealing with

4   Amaranth's business?

5        A    Shortly after Brian started at

6   Amaranth, I think it was April of 2005, if I'm

7   not mistaken.  Just got a phone call, got an

8   order and then we just started doing business.

9        Q    Did Mr. Hunter call you, or did he

10  call ALX?

11       A    He probably called me, because I

12  don't remember exactly, but I was the one who had

13  met him, and best guess would be he called and

14  asked for me and said this is what I want to do.

15       Q    Have you met anybody else from

16  Amaranth?

17       A    Sure, Matt Donohoe, I was working

18  with him, Brad Basarowich, and I can't remember

19  the other guy.  Shane, Shane Lee.

20       Q    Anyone else?

21       A    Those are the people that I really

22  spoke to.  There was a gentleman in Connecticut,

23  I can't remember his name.  There was a gentleman

24  in Connecticut who actually used to place

25  orders.  I can't remember his name for the life

1                  Rufa

2        Q    If you had received a communication

3    from the CFTC to preserve records, what would you

4    do?

5        A    Preserve the records.

6        Q    What would you do?

7        A    I would have gathered them up and

8    preserved them I guess.

9        Q    Would you tell anybody else?

10       A    Sure.

11       Q    Who?

12       A    Jim Delucia, Matt Aldaresi.

13       Q    Prior to your testimony here today,

14   do you recall speaking to anybody within ALX

15   about whether or not ALX preserved any audio

16   tapes?

17       A    I don't think I spoke to anybody

18   about that.

19       Q    When was the last time you spoke to

20   Brian Hunter?

21       A    Probably about two weeks ago.

22       Q    What was that in reference to?

23       A    See how he is doing, how his kids

24   are, say hello.

25       Q    Was that on the phone or in person?

1                Rufa

2        The guy that gave me the order was

3    Uday Garg.

4        Q    That was the Amaranth person that you

5    were trying to remember?

6        A    Yes, yes.  It was bothering me.

7        Q    G-A-R-G you said?

8        A    I think so.

9    EXAMINATION BY MR. COMPA:

10       Q    Since the time Amaranth stopped

11    trading natural gas to the present, how often

12    have you spoken with Mr. Hunter?

13       A    Sporadically, maybe once a month

14    tops, but just it's random, very random.

15       Q    When you would speak with him, what

16    were the conversations about?

17       A    Nothing.  You know, I had lunch with

18    him a few months ago, hello, how are you, what's

19    going on? Talk about hockey.

20       Q    You had lunch with him here in New

21    York?

22       A    Yes.

23       Q    When was that?

24       A    A few months ago.  I don't remember

25    the exact date.

EXHIBIT
22

1

2              UNITED STATES OF AMERICA

                      BEFORE THE

3      COMMODITY FUTURES TRADING COMMISSION

       ---------------------------------------------X

4

       In the Matter of:

5

       Natural Gas Trading By Amaranth Advisors, LLC

6      and Others

7      ---------------------------------------------X

8                    140 Broadway

                     New York, New York

9

                     May 15, 2007

10                   10:15 a.m.

11

12

13

14

15

16            DEPOSITION of MICHAEL CARRIERI, the

17     Witness herein, taken by the Commodity

18     Futures Trading Commission, pursuant to

19     Subpoena, held at the above-noted time

20     and place before a Notary Public of the

21     State of New York.

22

23

24

25

1                    Carrieri

2        Q    As you sit here, do you recall having

3    any communications with traders regarding a

4    response to Exhibit 159 other than maybe

5    scheduling a meeting?

6        A    Well, I was present at the meetings

7    when the traders were explaining what happened on

8    this day, and I may have asked questions along

9    the way, but I just don't remember if I did or

10   what the questions were.

11       Q    How many meetings were you present at

12   with traders in connection with preparing a

13   response to the August 2 letter?

14       A    I believe there were two.

15       Q    Who attended these meetings?

16       A    Myself, the first meeting that I

17   remember would have been myself, in-house

18   counsel, outside counsel, Mike Cairo and Brian

19   Hunter.

20       Q    That was the first meeting?

21       A    Correct.

22       Q    Was that in Connecticut?

23       A    Yes.

24       Q    And Mr. Hunter was in attendance

25   personally or by phone?

1          Carrieri

2      A    Personally.

3      Q    How about the second meeting, who was

4    present there?

5      A    I believe it was Rob Jones, myself,

6    Brian Hunter and in-house counsel by phone, I

7    don't remember exactly whether they were in the

8    room or by phone, and potentially outside counsel

9    on the phone.

10     Q    Did you attend any other meetings

11   besides these two meetings in connection with

12   responding to the August 2 letter?

13     A    Not formal meetings, no.

14     Q    How about informal meetings?

15     A    I don't believe so, probably just

16   e-mail chain, reviewing drafts of letters.

17     Q    How many drafts did you review?

18     A    Two or three.

19     Q    Did you yourself do any writing of

20   the letter that responded to the August 2 letter?

21     A    Not that I remember, no.

22     Q    You signed it, right?

23     A    I signed it.

24     Q    You didn't actually do any of the

25   writing?

EXHIBIT
23

**BRIAN J. HUNTER**
**CARRIE L. WIVCHARUK**

1-32/210
9445337336

DATE

PAY TO THE
ORDER OF _____ $ _____

_____ DOLLARS

⭕ *Fleet*
www.fleet.com
Broadway Office
94124    New York, New York 10038

MEMO _____

## ANTI-H

Amaranth and Ambrose are committed to maintaining a work environment free of unwarranted harassment and discrimination. A copy of the company's Anti-Harassment and Equal Opportunity policy has been provided along with this Employment Form. I understand that it is my responsibility to read, understand and abide by this policy.

## EMPLOYMENT MANUAL AND ONLINE EMPLOYEE ACCESS

I understand that other important company policies are available online at www.hrdatasystems.com. I understand that it is my responsibility to read these policies and ask my supervisor or the Ambrose office about any company policy or procedure in the manual that I do not understand. I will receive my username via email at which point I will have access to the Web site. If I do not receive this email by the day of my first payroll, I will notify the Ambrose office. My initial password will be my social security number (no spaces or dashes) and I understand that I should change this initial password to a secret, private password the first time I access the system.

## U.S. WORK ELIGIBILITY

I understand that I am required to complete Section I of the INS Employment Eligibility Verification and provide the required identification (as specified on the backside of the form) proving my eligibility to work and that I will not be paid until such materials have been provided and my work eligibility has been verified by Ambrose.

## ACKNOWLEDGEMENT

To the best of my knowledge the information contained on this application is true. I agree that my employment relationship with Amaranth and Ambrose will be "at-will", which means that I can terminate the relationship at any time, with or without cause, and that either Amaranth and Ambrose can do the same and that the nature of this relationship cannot be changed except by written agreement.

| Signature | Date |
|-----------|------|
|           | Apr. 21, 2004 |

FORM EF 09/01 REV. 08/01

CONFIDENTIAL TREATMENT REQUESTED

EXHIBIT
24

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

———————————————————————x
: 
BRIAN HUNTER,                                :
                                             :
          Plaintiff,                         :       07 Civ. 1307 (RJL)
                                             :
                 v.                          :
                                             :
                                             :
                                             :       **SUPPLEMENTAL**
                                             :       **DECLARATION OF**
                                             :       **BRIAN HUNTER IN**
FEDERAL ENERGY REGULATORY             :       **FURTHER SUPPORT OF**
COMMISSION,                                  :       **PLAINTIFF'S MOTION**
                                             :       **FOR A PRELIMINARY**
                                             :       **INJUNCTION AND**
                                             :       **DECLARATORY RELIEF**
                                             :
          Defendant.                         :
———————————————————————x

**SUPPLEMENTAL DECLARATION OF BRIAN HUNTER
IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND DECLARATORY RELIEF**

I, Brian Hunter, declare as follows:

Overview

1.     I am the plaintiff in the above-captioned action.

2.     On July 23, 2007, I filed a complaint seeking declaratory relief as well as a temporary

       restraining order ("TRO") and a preliminary injunction enjoining the Federal Energy

       Regulatory Commission ("FERC") from pursuing an *ultra vires* enforcement action

       against me. In support of my complaint, I made a declaration, dated July 23, 2007, in

       which I described the irreparable harm that FERC's enforcement action would cause

       me.

1

3.  Since the filing of my complaint and declaration, and after the Court denied my request for a TRO, FERC initiated the enforcement action by issuing an Order to Show Cause and Notice of Proposed Penalties ("OSC") on July 26, 2007.

4.  I now make this supplemental declaration to describe for the Court how the FERC's pursuit of its enforcement action through its OSC has caused me specific, identifiable, concrete and irreparable harm, how the continued existence of the FERC enforcement action will cause additional irreparable harm.

### Solengo Capital Advisors, ULC Is An Operating Business With Valuable Assets Even Apart From Investments In The Solengo Managed Funds

5.  As described more fully in my July 23 declaration, I currently serve as President of Solengo Capital Advisors, ULC, a company registered under the laws of the Province of Alberta, Canada ("Alberta"). I maintain a 60% ownership stake in Solengo Capital Advisors.

6.  Solengo Capital Advisors is an ongoing business that has been and continues to be actively engaged in several activities, including: (a) recruiting and retaining a unique team of investment professionals in a highly competitive labor market; (b) building and maintaining office space and administrative infrastructure in two different countries; (c) managing a variety of business affairs, including ongoing legal matters, financing efforts, and investment research projects, among others; and (d) researching, building and maintaining highly valuable proprietary trading systems, strategies, and intellectual property associated with commodity derivatives trading. In addition, Solengo Capital Advisors is currently poised to execute its principal business strategy of providing investment advisory services to private investment funds for select qualified investors (the "Solengo Managed Funds"). As explained

2

further below, Solengo Capital Advisors was working toward being able to accept investors into Solengo Managed Funds before the FERC's OSC. The FERC's OSC has continued to damage Solengo Capital Advisors significantly and the company is now on the brink of complete disintegration.

7.      Solengo Capital Advisors currently has 11 employees, and maintains offices in Calgary, Alberta and indirectly leases desk space in Greenwich, Connecticut. These offices are used for Solengo Capital Advisors' ongoing activities in human resources, financing, legal affairs, technical research into and development of trading strategies and investment opportunities, and other business areas, and are filled with furniture, computers, and other equipment that are being used every day.

8.      Several other persons and I have spent significant time, money, and energy in establishing and operating Solengo Capital Advisors. Solengo Capital Advisors' employees and I have spent the past six months working full-time for Solengo Capital Advisors: leasing office space, designing proprietary trading strategies and systems, addressing questions from prospective investors, working to obtain relevant approvals and registrations, recruiting and retaining employees, developing and documenting a sophisticated legal structure, and negotiating critical business relationships. I have invested the bulk of the funds required by Solengo Capital Advisors up to this point, which has exceeded US $1.7 million, and spent an enormous amount of my time building Solengo to its present state.

9.      These efforts are more than just aspirations or ideas; there is a real company there with employees, equipment, intellectual property, research, and other valuable assets. Solengo Capital Advisors now owns significant physical and intellectual property,

including proprietary trading and risk management software and hardware and complex quantitative and qualitative trading strategies designed by Solengo Capital Advisors' portfolio managers and operations team (including risk managers) and commodity derivatives trading experts.

10.    Solengo Capital Advisors' principals and portfolio managers all have advanced quantitative educational backgrounds and a high level of trading experience. Although Solengo Capital Advisors has many assets – physical and intangible – one of its most important assets is the team of highly qualified investment professionals that has been recruited, assembled, and retained at great expense.  We have employees recruited from New York City, London, Connecticut, and Canada.  These professionals have now worked together for several months researching investment opportunities and refining trading strategies that are to be executed as a team – an asset that, although intangible, is as valuable as any precious physical good.

11.    I will first describe these professionals' backgrounds then detail the enormous difficulty of assembling and keeping together such a group of people – a task that would be difficult if not impossible replicate because once this team disperses, there would be numerous obstacles to reassembling them.

12.    Of Solengo Capital Advisors' two principal portfolio managers, one holds a Bachelor's degree in Commerce, with distinction, from the University of Calgary, and the other holds a Bachelor's of Science degree in Finance and Management Information Systems from Kansas State University.  Collectively, both have approximately 20 years of experience and have traded energy derivatives for industry leaders, including Citadel Investment Group and TransCanada Energy.  Their trading

4

leverages their knowledge of the intricacies of the North American natural gas market, with a focus on location-based price differentials.

13. Solengo Capital Advisors' Chief Operating Officer has also spent over 10 years in the energy derivatives industry, most recently at TD Securities, where he was a Vice President and Director. He has also been employed by a number of other leading firms, including Shell Canada and Sempra Energy Trading. He holds a Bachelor's of Commerce degree in Finance and is a Chartered Financial Analyst ("CFA"). He is also a past president of the Calgary CFA society.

14. Solengo Capital Advisors' Head of Systems Engineering has over 20 years of experience in software engineering. He has developed proprietary software systems for a number of large companies, including Morgan Stanley, Lehman Brothers, and HBO. He holds a Bachelor's of Science degree in Mathematics from Mercy College.

15. Solengo Capital Advisors also employs a Quantitative Analyst, who has done significant post-graduate work, an individual in charge of Information Technology with over 10 years of experience in the field, a Director of Tax and Accounting, who holds a Master's degree in tax law, a Director of Operations and a Director of Marketing.

16. Recruiting and retaining such highly qualified professionals has required hundreds of hours of work and more than US $300,000 in recruitment expenses and incentives. If the team — which has spent the past several months working together on various investment research and other business projects — were to disperse, it would be virtually impossible to reassemble them. In the financial services industry, it is common for highly qualified individuals to be restricted from switching employers by

5

non-compete and non-solicitation covenants, and it would be impossible to reacquire these individuals from their subsequent employers after their departure from Solengo Capital Advisors if the firm were to disintegrate.

17.    Over the past six months, Solengo Capital Advisors and, in particular, our Head of Systems Engineering, has developed a number of proprietary trading and risk management systems. Because of the complex nature of the trading that is the focus of Solengo Capital Advisors, these systems may not be purchased "off-the-shelf," and therefore have been developed from the ground up by Solengo Capital Advisors to suit the specific needs of commodity derivatives trading by the specific individuals at Solengo Capital Advisors.

18.    Solengo Capital Advisors' proprietary risk management systems include the capacity to perform a number of complex, scenario-based "stress" tests, which evaluate the resiliency of a given portfolio to various types of potential market events.

19.    Solengo Capital Advisors' proprietary trading systems are able to collect and analyze large-volume market data, a critical function that will allow Solengo Capital Advisors' traders and risk management personnel to ultimately be able to value Solengo Capital Advisors' trading positions in real-time.

20.    These proprietary trading systems and strategies have required at least several hundred hours of effort by highly qualified professionals, and cost more than US $600,000 thus far to design and implement. If Solengo Capital Advisors were to disintegrate, these unique systems would lose their primary value.

21.    As explained in greater detail below, the FERC enforcement action is a significant

ongoing force in the disintegration of Solengo Capital Advisors, and the valuable

assets it possesses.

The FERC Enforcement Action Is A Significant Force
That Is Destroying Solengo Capital Advisors Regardless Of The CFTC Action

22.    On Wednesday, July 25, 2007, the Commodity Futures Trading Commission

("CFTC"), filed an enforcement action against me and other defendants in the

Southern District of New York.  The CFTC enforcement action charges *attempted*,

not actual, manipulation.

23.    On Thursday, July 26, 2007, FERC issued the OSC and has been pursuing an

enforcement action against me.

24.    As anticipated in my prior declaration, the FERC's pursuit of its enforcement action

has paralyzed Solengo Capital Advisors' business.

25.    In stark contrast to the CFTC enforcement action, which charges only attempted

manipulation that did not cause any damages, FERC's OSC charges me with

*perfected* manipulation and seeks to order *US $30 million* in civil penalties against

me.  FERC's enforcement action therefore raises the specter of a significant judgment

against me and the strong possibility of follow-on civil litigation by private parties,

making it immensely difficult if not impossible for Solengo Capital Advisors

(because of my majority ownership stake) to obtain financing and lines of credit and

creating a major disincentive for potential business partners to work with me.

26.    As described further below, the response to the FERC enforcement action from

various parties that are critical to Solengo Capital Advisors' business has been very

7

different from their response to the CFTC action. These parties have provided clear indications that they view the FERC's OSC as a significantly greater threat to their involvement with Solengo Capital Advisors than the CFTC enforcement action, largely because of the extent of the civil penalties sought against me.

27. I have personally served as the guarantor for certain surety bonds and insurance policies necessary for Solengo Capital Advisors' business. I believe these surety bonds and insurance policies for Solengo Capital Advisors are now unobtainable because of the enforcement action by FERC and its threat of US $30 million in civil penalties.

28. Additionally, because the OSC alleges a *perfected* manipulation scheme, both the qualified investors who have expressed interest in investing in the Solengo Managed Funds and my business partners are concerned about additional private litigation stemming from the OSC.

29. Because the CFTC has alleged only *attempted* manipulation (as opposed to *perfected* manipulation), I believe that the CFTC's enforcement action poses no material risk from follow-on civil actions to Solengo Capital Advisors' business activities, since by definition, attempted manipulation did not lead to any actual damages to others.

30. In contrast, because the FERC OSC is based on a theory of perfected manipulation, the risk of adverse private litigation arising from the FERC enforcement action is very high.

31. Clearly, the CFTC action presents an unfortunate and difficult situation for me and I do not mean to suggest to the Court that it does not present problems for me and Solengo Capital Advisors. However, the FERC action is clearly a significant

additional factor that is causing (and contributing to causing) ongoing harm to me and

Solengo Capital Advisors.

<u>Resignation of Outside Directors</u>

32. The Solengo Managed Funds (which are private investment funds for qualified

investors) must obtain registration with the Cayman Islands Monetary Authority in

order to accept funds from any investors.    Solengo Capital Advisors intends to

execute a contract with the Solengo Managed Funds by which it will receive

management and performance fees in exchange for advisory services.    As is

customary in the industry, some of these fees would be independent of trading

performance while other fees would be tied to trading performance.

33. Under the laws of the Cayman Islands, without the services of directors, the Solengo

Managed Funds cannot be registered and cannot accept investor funds.

34. Solengo Capital Advisors' business, therefore, depends on the agreement of directors

to serve the Solengo Managed Funds in that capacity.

35. Prior to last week, the Solengo Managed Funds had two directors.  On July 25, both

of these directors resigned.  Their resignations came within a couple of hours of my

having communicated to them that the FERC would be filing an OSC against me.

36. On either July 23 or July 24, I had communicated to the directors that the CFTC

would very likely be filing an enforcement action against me (which it ultimately did

on July 25).  I explained to the directors that the CFTC would only be charging

attempted manipulation and that, as a result, follow-on civil litigation was unlikely.

Then, on July 24, the Court denied my request for a temporary restraining order

against the FERC.  The next day, on July 25, in the early afternoon, I called one of the

9

two directors and left a detailed message. (The two directors work together, so it was effectively a message to both of them.) In the message, I explained that the FERC would be issuing an OSC against me, that it would charge actual manipulation, that it would be seeking a very heavy fine, and that the FERC procedures for deciding the OSC was something I wanted to discuss with them. Within a couple of hours, both directors faxed over their resignation letters.

37.    Given that the directors resigned immediately following my explaining the FERC situation to them (whereas they had not done so even after learning about the impending CFTC action), I believe that the resignation was primarily the result of the FERC action.

38.    Since the resignation of the Fund directors, no new directors have agreed to serve in their place and I do not anticipate being able to find replacements. As a result, the Solengo Managed Funds will not be able to obtain the registration necessary to begin accepting funds from investors. I believe that if an end were put to the FERC action, Solengo Managed Funds would be able to obtain directors.

39.    Solengo Capital Advisors' third-party administrator for its investment operations also requires that the Solengo Managed Funds engage the services of directors. As set out above, the Solengo Managed Funds' directors have resigned and new directors will be unwilling serve. Consequently, Solengo Capital Advisors is unable to obtain income from advising on investments to be held by the Solengo Managed Funds, since the Solengo Managed Funds cannot operate without directors.

Draining Away Of Solengo Capital Advisors' Resources

40.    The threat to Solengo Capital Advisors posed by the FERC's enforcement action
represents more than just harm to the Solengo Managed Funds' ability to proceed to
accepting investments.    FERC's enforcement action imperils Solengo Capital
Advisors' existence as a viable business entity.    With the initiation of FERC's
enforcement action, the resignation of the outside directors of the Solengo Managed
Funds, and the resulting inability of Solengo Capital Advisors to begin trading as
planned, the unique expertise acquired by and the substantial commitments made to
Solengo Capital Advisors have begun to drain away, causing irreparable and
continuing harm.    The continuation of the enforcement action begun by the OSC is
therefore substantially likely to destroy Solengo Capital Advisors.

41.    The individuals whom Solengo Capital Advisors employs and has recruited are in
extremely high demand, due to the limited supply of people with the specialized skills
required.    Because of the localized nature of natural gas derivatives trading, in order
to execute their trading, these individuals must have acquired expertise in the
intricacies of the supply and demand of North American natural gas at specific
delivery points around the continent, including the ability to analyze the weather
patterns that are a primary driver of natural gas derivatives prices.

42.    They must also be fluent in the complex mathematical calculations that underlie
trading in commodity derivatives.    These calculations are critical for evaluating
returns from investments based on expected price volatilities over long-term time
horizons.

11

43.    These types of individuals are concerned specifically about the FERC enforcement action and are not simply going to wait for Solengo's highly precarious future to be resolved, but will seek other employment opportunities, and have already informed me as such.

44.    Each lost trader represents a significant blow to Solengo Capital Advisors' assets. This threat is not speculative.  Last week, two individuals who had previously committed to serve as portfolio managers at Solengo withdrew their commitment.

45.    The events surrounding their withdrawal are as follows:  I had been keeping these traders abreast of my legal situation and had explained to them the significance of the FERC action, explaining that, as a result of the directors of the Solengo Managed Funds having resigned, it was now very unlikely that the Funds would be able to obtain registration (and therefore could not accept investments).  I also explained to the portfolio managers that, as described further below, I had learned that the Alberta Securities Commission ("ASC") was unlikely to permit Solengo Capital Advisors to register as an investment advisor under the laws of Alberta if I were to remain in the ownership structure.  (As explained below, the ASC had cited the FERC action as a primary concern.)  I told the traders that they could stay at Solengo Capital Advisors, but explained that the Fund would likely not be up and running if I remained involved.  The two traders responded that they did not want to work at Solengo without my involvement and so they decided to go elsewhere and forego their commitment to Solengo.  The traders also told me that if the FERC action were to be discontinued and Solengo could obtain its necessary registrations, they would come back to Solengo.

12

46.    One of these individuals has over 12 years of experience trading certain types of natural gas derivative products and holds a Master's Degree in Business Administration. The other individual has over 20 years of experience trading other types of commodity derivatives.

47.    The loss of the unique trading talents of these individuals, have caused irreparable harm to Solengo Capital Advisors, as Solengo Capital Advisors will not be able to find an adequate replacement for their skills.

48.    I believe it is highly certain that many other such individuals with unique skills will withdraw their employment commitments as a result of the pendency of FERC's enforcement action against me. The loss of such highly talented employees to Solengo Capital Advisors is irreparable, both because of the small number of such potential employees within the market place and the unique nature of their skills. Thus, the threat of further irreparable harm to Solengo Capital Advisors from the FERC's enforcement action is ongoing.

49.    Additionally, as mentioned above, it is standard practice in the financial services industry, including the commodity derivatives trading industry, for traders to sign non-compete and non-solicitation agreements.

50.    As a result, Solengo will not simply be able to replace these lost employees and lost recruits, since, their talents and expertise will be legally bound to another employer for a fixed period of time.

### Loss Of Potential Investors

51.    As with all other investment firms of its type, Solengo Capital Advisors and the Solengo Managed Funds must await the approval of regulatory authorities prior to

soliciting and accepting specific investments from qualified investors.  During the period prior to such approval, however, potential investors often express an intent to invest in the investment company in question; when the investment firm in question obtains all necessary approvals, these potential investors submit investments and become actual investors.

52.    Prior to the initiation of the FERC's action, a total of approximately 25 qualified investors had expressed intent to invest approximately US $800 million in planned investments into the Solengo Managed Funds.  As is the case with investment firms who become registered, these expressions of interest in the Solengo Managed Funds – which are of significant value to an investment advisory firm with an arrangement to advise such funds, such as Solengo Capital Advisors – would ordinarily become investments as soon as the law permitted.

53.    Although obviously there is no guarantee that a potential investor who has expressed an intent to invest would actually invest (in the same way that for any trading firm there is no guarantee that any existing investor will continue to invest with the firm in the future), such expressions of interest from investors are valuable to the firm.

54.    Since the issuance of the OSC, the expressions of qualified investor interest in the Solengo Managed Funds have decreased from over US $800 million to less than US $100 million just in the past several days.

55.    Slightly more than half of the investors who had expressed an interest in investments in the Solengo Managed Funds have contacted Solengo Capital Advisors to indicate that they are no longer interested in investing.  I believe that the vast majority of

investors who have not changed their intent yet will do so if the FERC's enforcement action is allowed to continue.

56.     Significantly, a number of prospective investors have cited the *FERC's* enforcement action (as opposed to CFTC's action) as a primary reason for their decision to contact us concerning the fact they are no longer interested in investments in the Solengo Managed Funds, largely because of the amount of civil penalties sought by FERC and because of the nature of the allegations presented – namely, actual manipulation that allegedly damaged the markets significantly as opposed to attempted manipulation that did not have any effect on the markets.

57.     The expressions of qualified investor interest in the Solengo Managed Funds have been made by sophisticated, knowledgeable investors.  In putting forward these expressions of interest, these investors possessed full knowledge of the damage to my personal reputation suffered as a result of the publicity associated with the dissolution of Amaranth Advisors LLC ("Amaranth") and the filing of a related action by a former investor in funds advised by Amaranth, the San Diego County Employees Retirement Fund, which names me as a defendant.  In addition, the hearings at the United States Senate which the FERC references, in which certain statements criticizing my trading activities were made public, are well known to these potential investors who nevertheless stated that they intend to invest in the Solengo Managed Funds.   Those events occurred well before they made and maintained their expressions of intent to invest.  (Further, to my knowledge I am not currently a defendant in the action captioned *Gracey v. Amaranth Advisors et al.*, 07 Civ. 6377 as the FERC incorrectly claims in its memorandum of law.)

15

58.    After the issuance of the OSC approximately one week ago, Solengo Capital

Advisors has not received any new inquiries or expressions of intent to invest from

potential investors.

### Additional Harm

59.    The damage suffered by Solengo Capital Advisors from the FERC's enforcement

action is ongoing.

60.    Since last week, Solengo Capital Advisors has already required an additional capital

injection of at least US $500,000 to US $1 million, which I will be making from my

personal funds, and will more than likely require additional capital injections based

on continued delays.

61.    Additionally, since FERC informed me and my attorneys of its intent to issue the

OSC and pursue an enforcement action against me, the Alberta Securities

Commission ("ASC") contacted Solengo Capital Advisors for an update on the status

of the enforcement actions against me.   The ASC provided indications that it is

unlikely permit Solengo Capital Advisors to register as a commodities investment

advisor under the laws of Alberta if I remain in the ownership structure.   The ASC

indicated that a primary concern in this regard was the FERC's enforcement action.

62.    As a result of the foregoing, I have considered stepping down from my position as

president of Solengo.   Despite the prior damage to my reputation discussed above, I

have only contemplated doing so as a result of the extremely damaging consequences

to Solengo Capital Advisors of the FERC's enforcement action.

16

<u>Additional Harm to Other Business Interests</u>

63.    Prior to the issuance of the OSC, I had been involved in a land transaction in Alberta.
My business partners in this deal informed me on July 29, 2007 that they have
determined that they can no longer agree to my participation in the deal, because of
the perceived risk to their own finances primarily due to the large nature of the civil
penalties sought by FERC against me personally if I were to become a co-owner of an
asset with them and the FERC were to eventually levy against my share of the asset.
If the FERC were to be enjoined from pursuing its enforcement action, I believe these
partners would be willing to proceed with the transaction.

64.    Finally, I have also been involved in a prospective business transaction in the "self-
storage" business in the Calgary area.   Based on the issuance of the OSC and the
FERC's enforcement action, my business partners in this transaction informed me on
July 27, 2007 that I could no longer participate in the transaction, because of the
perceived risk to their own finances due to the large nature of the penalties sought by
FERC against me personally.    If the FERC were to be enjoined from pursuing its
enforcement action, these partners would be willing to proceed with the transaction,
assuming it still exists at the time of the injunction is issued.

65.    Since the FERC's pursuing its enforcement action against me is causing me to
completely lose these transactions at the outset, it is difficult if not impossible for me
to value precisely the money damages for losing the ability to participate in these
transactions.  However, it is clear that losing the ability to participate in an attractive
business transaction for which I have devoted a large amount of time and effort is a
significant harm.  If the FERC is permitted to proceed with its enforcement action, no

17

matter the outcome, I fully expect that these particular partners in these transactions

will have found other partners and consummated these transactions without me.

66.    I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and accurate to the best of my knowledge and belief.

Brian Hunter

Dated: Calgary, Alberta, Canada
       August 3, 2007

EXHIBIT
25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————x
SOLENGO CAPITAL ADVISORS ULC,                    :

      Plaintiff,                                 :       07 Civ. 2657
             v.                      :       ECF Case
                               :

                               :

DEALBREAKER, ELIZABETH SPIERS, JOHN :
CARNEY, BESS LEVIN, JOHN DOE AND                **COMPLAINT**
JANE DOE,                                        :

                               :

      Defendants.                               :
———————————————————x

      Plaintiff Solengo Capital Advisors ULC ("Solengo"), by its attorneys, submits the

following, for its complaint against Defendants DealBreaker, Elizabeth Spiers, John Carney,

Bess Levin, John Doe and Jane Doe (collectively "DealBreaker" or "Defendants").

## JURISDICTION AND VENUE

      1.      This Court possesses subject matter jurisdiction of this Complaint pursuant to 17

U.S.C. § 102 *et seq* (the "Copyright Act").

      2.      The Court has personal jurisdiction over Defendants because, upon information

and belief, Defendants committed the acts discussed in the Complaint within the judicial district

of the Southern District of New York and are doing business within the State of New York.

      3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400.

      4.      This Court possesses power to grant injunctive relief pursuant to 17 U.S.C. § 502.

**PARTIES**

5.     Plaintiff Solengo Capital is a business that has been structured to become a commodity investment vehicle, with its principle place of business located at Suite 201, 3320 17th Ave SW, Alberta, Calgary.

6.     Upon information and belief, defendant DealBreaker is an internet tabloid and gossip blog focused on the financial sector.

7.     Defendant DealBreaker has offices at 262 Mott Street, Suite 102A, New York, New York.

8.     Defendant Elizabeth Spiers is Publisher and Founder of DealBreaker and has unknown place of residence.

9.     Defendant John Carney is Editor in Chief of DealBreaker and has unknown place of residence.

10.    Defendant Bess Levin is Contributing Editor of DealBreaker and has unknown place of residence.

11.    Defendants John Doe and Jane Doe are all individuals, including all employees and agents of DealBreaker, involved in posting the Document (as defined below) on DealBreaker's website or otherwise distributing it and have unknown place of residence.

**THE FACTS**

12.    The principals of Solengo are attempting to grow it into a multi-billion dollar commodities investment vehicle. Solengo is structured to include numerous sector-specific funds across the commodities spectrum.

2

13.    The Solengo investor prospectus (the "Document") sets forth the venture's planned structure, trading and risk management platforms, offering information, and biographies of its founders.

14.    The Document sets forth extremely sensitive, proprietary information relating to Solengo's business.  For example: page 2 of the Document contains a description of Solengo's business model, which sets forth the fund's unique investment approach; pages 7-10 of the Document set forth a novel portfolio manager payment scheme and office structure; and pages 11-12 of the Document set forth what is essentially an outline of Solengo's entire offering memorandum, which specifies Solengo sub-funds' margin-to-capital ratio, fees and bonus structures, lock-up periods, and allocation of investor funds.

15.    This proprietary information is integral to Solengo's ability to gain an edge over competitors, standing in the marketplace, and appeal to potential investors.

16.    Due to its highly confidential nature, Solengo placed a confidentiality stamp on the top of the first page of the Document stating the following:

> The document and any information enclosed within the document contains restricted, privileged, and confidential information and are therefore intended for distribution to authorized persons only.   If you are not the intended recipient of this document, you must not disseminate, modify, copy/plagiarize or take action in reliance upon it, unless permitted by Solengo capital.  None of the materials provided on this file may be used, reproduced, transmitted, in any form, or by means whatsoever including but not limited to electronically, mechanically, by way of recording or by the use of any information storage and retrieval system, without written permission from Solengo Capital.

17.    As noted, the Document was created by Solengo principals and represents the fruits of many hours of work that were required to develop the novel ideas contained therein and market them in a convincing manner.

3

18.    Solengo has met any registration requirement that may apply by virtue of 17 U.S.C. § 411. Among other things, Soleno has deposited the Document in the Copyright Office and paid the registration fee, and the Copyright Office has received plaintiff's application.

19.    On the afternoon of March 28, 2007, DealBreaker posted the Document on its Web site in its entirety.

20.    Shortly thereafter, attorneys for Solengo informed DealBreaker by letter that the Document posted was copyrighted material that contained sensitive, confidential information and demanded that DealBreaker remove the post.

21.    Despite this demand, DealBreaker refused to remove the Document.

22.    Attorneys for Solengo have continued to demand that DealBreaker remove the Document from its websites, including as late as 3:45 p.m. on March 30, 2007.  These demands have been refused.


## FIRST CAUSE OF ACTION
### (Copyright Infringement)

23.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs of this Complaint enumerated "1" through "22", inclusive with the same force and affect as if hereinafter set forth in full.

24.    Solengo is entitled to copyright protection of the Document as an original work of authorship.

25.    Solengo controls exclusive rights to publish, copy, and distribute the work pursuant to the Copyright Act.

26.    Defendants posted the Document on their website without authorization from Solengo and, in fact, refused to take it down upon receiving a demand to do so.

4

27.     DealBreaker took the Document in its entirety and disseminated an image of the Document "as is" to the public through the DealBreaker website.

28.     Defendants acted in bad faith by posting a Document that was clearly designated as confidential and which, therefore, they must have known they did not have authority to post.

29.     Furthermore, Defendants chose to keep the Document posted even after receiving notice from Solengo's counsel that the document was confidential and should be removed.

30.     The Document, although circulated to a limited number of potential investors, was not a published document in that it was not publicly available or otherwise widely disseminated.

31.     Continued disclosure will cause irreparable harm to Solengo, *inter alia,* by (1) placing it at a competitive disadvantage by allowing potential competitors to mimic or strategize against its investment strategy, operations, and marketing procedure; (2) revealing prospective trading strategy to other market players; and (3) discouraging prospective investors through raising confidentiality concerns.

32.     This Complaint is verified upon the accompanying declarations of Jonathan Cogan and Brian Hunter.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, plaintiff respectfully requests that this Court:

1.  Issue a temporary restraining order to prohibit Defendants from continuing to post the Document on DealBreaker's website or otherwise disseminating it, pursuant to 17 U.S.C. § 502;

2.  Issue an order compelling expedited discovery, pursuant to the Federal Rules of Civil Procedure;

5

3. Set a return date for a preliminary injunction hearing;

4. Order Defendants to pay Plaintiff's actual damages and profits, pursuant to 17 U.S.C. § 504;

5. Order Defendants to pay, upon Plaintiff's election prior to the entry of final judgment, statutory damages, pursuant to 17 U.S.C. § 504;

6. Order Defendants to pay fully costs and attorneys fees, pursuant to 17 U.S.C. § 505; at this time, Plaintiff expects attorneys fees will be in excess of $100,000.

Dated: April 2, 2007
New York, New York

Respectfully submitted,

KOBRE & KIM LLP

By: _____

Michael S. Kim
Leif T. Simonson
Jonathan D. Cogan
800 Third Avenue
New York, New York 10022
Telephone:    212.488.1200
Facsimile:    212.488.1220

ATTORNEYS FOR PLAINTIFF
SOLENGO CAPITAL ADVISORS ULC

6

EXHIBIT
26

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

x
:
BRIAN HUNTER,                                     :
:
      Plaintiff,                              :   07 Civ. 1307 (RJL)
:
          v.                              :
:
:
:
:
:
FEDERAL ENERGY REGULATORY             :   **COMPLAINT**
COMMISSION,                                       :
:
:
:
      Defendant.                              :
x

Plaintiff Brian Hunter ("Hunter"), by his attorneys, Kobre & Kim LLP, submits the following, for his complaint, against the Federal Energy Regulatory Commission ("FERC").

## NATURE OF THE ACTION

1.      This action arises from FERC's assertion of jurisdiction to bring an investigation and enforcement action against Plaintiff for Plaintiff's trading of natural gas futures contracts. FERC's unlawful interpretation of its investigative and enforcement power exceeds its statutory authority and exposes Plaintiff, a former employee of Amaranth Advisors LLC and Amaranth Advisors (Calgary) ULC (collectively "Amaranth"), to significant and irreparable harm.

2.      The Commodity Futures Trading Commission ("CFTC") is charged with regulatory authority over futures markets, including natural gas futures, on the New York Mercantile Exchange ("NYMEX").  FERC's statutory jurisdiction is limited to regulation of

1

wholesale energy markets, including certain transactions requiring the exchange of physical natural gas. FERC is *not* statutorily authorized to regulate futures markets for energy commodities, which include natural gas futures contracts. Nonetheless, FERC has asserted that it has authority to investigate and further, to bring an imminent enforcement action (as soon as July 24, 2007), for alleged manipulation of settlement prices of natural gas futures by Plaintiff on the NYMEX, in connection with Plaintiff's involvement in Amaranth's trading of natural gas futures. FERC has informed Plaintiff by letter received on Friday, July 20, 2007, that it intends to file an enforcement action against Plaintiff by issuing an Order To Show Cause and Notice of Proposed Penalties ("OSC") no sooner than five days after the date of the letter (July 19, 2007), which is Tuesday, July 24, 2007.[1] FERC's assertion of jurisdiction to bring an enforcement action is an impermissible encroachment on the exclusive statutory jurisdiction of the CFTC, and is beyond the scope of FERC's statutory authority to regulate wholesale energy markets. Plaintiff seeks a temporary restraining order pending an injunction to prohibit FERC from bringing an enforcement action against Plaintiff and a declaratory judgment that FERC has exceeded its statutory authority.

## THE PARTIES

3.     Plaintiff Brian Hunter is an individual citizen and resident of the Province of Alberta, Canada. Until September 2006, he was actively employed by Amaranth Advisors (Calgary) ULC as co-head of the trading desk for commodity derivatives.

4.     Defendant FERC is a federal agency charged with regulating wholesale energy markets including the interstate transmission and sale of physical natural gas. FERC has headquarters at 888 First Street, N.E., Washington, D.C., 20426.

---

[1] The FERC's letter ambiguously indicated that five calendar days from July 19, 2007 is July 26, 2007, which is incorrect.

2

## JURISDICTION AND VENUE

5.     This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201, *et seq.*, for the purpose of determining a question of actual controversy between the parties.

6.     The Court has jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331 and 1337.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e).

## THE FACTS

### The CFTC has Exclusive Jurisdiction Over Natural Gas Futures Traded on NYMEX Under The Commodities Exchange Act

8.     The Commodity Exchange Act ("CEA") has conferred upon the CFTC regulatory authority over futures contracts markets.

9.     Under 7 U.S.C. § 2(a)(1)(A), the CFTC has "exclusive jurisdiction" with respect to "accounts, agreements…and *transactions involving contracts of sale of a commodity for future delivery.*" *Id.* (emphasis added).

10.     NYMEX is the world's largest commodity futures exchange and the floor of the NYMEX is regulated by the CFTC.

### Amaranth Traded Only Natural Gas Futures, Not Physical Natural Gas

11.     Beginning on June 1, 2005 and throughout the period under investigation by FERC, Mr. Hunter served as co-head of Amaranth's trading desk for commodity derivatives.

12.     In this capacity, Mr. Hunter engaged in transactions, through Amaranth, on the NYMEX using derivative financial instruments, including futures contracts.

13.     At no point did Amaranth execute transactions or assume a stake in the physical natural gas markets. Likewise, Amaranth had no involvement in transportation or transmission services relating to natural gas.

14.    Amaranth was not capable of accepting or providing physical delivery of natural gas. As a result, all of Amaranth's trades settled financially and none of its transactions were made in connection with the immediate delivery of physical natural gas.

15.    In other words, all of Plaintiff's trading on behalf of Amaranth related to "contracts of sale of a commodity for future delivery," rather than to the sale of natural gas.

### The CFTC is Conducting An Investigation
### Pursuant To its Authority under the CEA

16.    Upon information and belief, the CFTC is conducting an investigation into Amaranth's trading activities in the natural gas futures markets and such investigation by the CFTC is ongoing.

### FERC's Jurisdiction is Limited
### To Regulation of Wholesale Energy Markets

17.    Like all federal agencies, FERC jurisdiction is limited by statute. More specifically, FERC's jurisdiction is circumscribed in the Natural Gas Act, 15 U.S.C. §§ 717, *et seq.* ("NGA"), and the Federal Power Act, 16 U.S.C. §§ 791, *et seq.* ("FPA").

18.    The NGA confers jurisdiction upon FERC to regulate natural gas companies and the transport and sale of natural gas for ultimate distribution to the public. 15 U.S.C. §§ 717(a) and (b).

19.    The FPA confers jurisdiction upon FERC to regulate utilities and the sale and transmission of electricity. 16 U.S.C. §§ 812 and 813. The FPA therefore regulates wholesale electricity and not natural gas futures.

20.    Neither the NGA nor the FPA grant FERC jurisdiction over the alleged manipulation of settlement prices for natural gas *futures* on NYMEX, or for natural gas *futures* traded on any other designated futures exchange.

4

### The Energy Policy Act Did Not Expand
### FERC's Jurisdiction Under the NGA or FPA

21.    Prior to 2005, FERC's jurisdiction was limited to oversight and regulation, rather than enforcement authority, of the wholesale energy markets.

22.    In 2005, Congress provided FERC with enforcement authority over wholesale energy markets, including physical natural gas, by amending the NGA and the FPA through §§ 315 and 1283 of the Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594 (2005) (the "EPAct").

23.    Nothing in the EPAct grants FERC jurisdictional authority over natural gas futures, such as those traded on NYMEX. Rather, in keeping with the statutory limits on FERC's jurisdiction, the EPAct expressly notes "the *exclusive* jurisdiction of the [CFTC] under the [CEA]." 15 U.S.C. § 717t-2(c)(2) (emphasis added).

24.    FERC's new enforcement authority under the NGA and FPA did not extend FERC's jurisdiction to include regulation of markets for natural gas futures. Instead, FERC's enforcement authority is explicitly limited to those areas that were already within FERC's statutory jurisdiction.

25.    Specifically, the EPAct amended the NGA as follows:

> "PROHIBITION ON MARKET MANIPULATION
> "SEC. 4A. It shall be unlawful for any entity, directly or indirectly, to use or employ, **in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of [FERC]**, any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b))) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action."

5

15 U.S.C. § 717c-1 (emphasis added).

26.    The EPAct amended the FPA as follows:

"SEC. 222. PROHIBITION OF ENERGY MARKET MANIPULATION.

"(a) IN GENERAL.—It shall be unlawful for any entity (including an entity described in section 201(f)), directly or indirectly, to use or employ, **in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of [FERC]**, any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b))), in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers."

16 U.S.C. § 824v (emphasis added).

27.    On October 12, 2005, FERC and the CFTC entered into a Memorandum of Understanding, as directed by §§ 316 and 1281 of the EPAct.

28.    The Preamble to the Memorandum of Understanding states that it designed is to "ensure that information requests to markets within the respective jurisdiction of each agency are properly coordinated..." and recognizes the respective "exclusive" jurisdictions of FERC and the CFTC: namely that "the CFTC has exclusive jurisdiction with respect to accounts, agreements and transactions involving contracts of sale of a commodity for future delivery, including, but not limited to natural gas, electricity or any other energy product..." while FERC has "exclusive jurisdiction over, among other things, the transportation of natural gas in interstate commerce and certain sales in interstate commerce of natural gas for resale..."

29.    FERC itself has recognized in other ways that the EPAct did not enlarge FERC's jurisdiction beyond regulation of energy markets to include regulation of energy futures markets.

6

In FERC's promulgation of its final rule setting forth its regulation on "Prohibition of Energy Market Manipulation," 18 C.F.R. § 1c.1, issued in Order No. 670, 114 FERC 61,047 (Jan. 19, 2006) ("Order 670"), FERC stated that the purpose of the Final Rule is to "deter or punish fraud in *wholesale* energy markets." *Id.* at ¶ 5 (emphasis added).

30.    Order 670 states further: "[a]s an initial matter, this Final Rule does not, and is not intended to, expand the types of transactions subject to [FERC's] jurisdiction under the...NGA...," *id.* at ¶ 16, and that its "jurisdiction is limited to certain wholesale transactions that remain within the ambit of the NGA, [Natural Gas Policy Act of 1978], and FPA." *Id.* at ¶ 22.

31.    In Order 670, FERC conceded that "the most reasonable interpretation of the EPAct is that Congress did not expand the Commission's traditional NGA and FPA subject matter jurisdiction..." Had Congress intended to expand the transactions under the Commission's traditional jurisdiction via the EPAct, "it would have done so explicitly." *Id.* at ¶ 20.

32.    In other words, in the promulgation of its own rule under the EPAct, FERC itself has recognized that its jurisdiction is specifically limited to wholesale energy markets, which are distinct from the markets for energy futures.

## FERC's Improper Assertion of Jurisdiction

33.    Despite the statutory framework explicitly limiting FERC's jurisdiction to natural gas markets, FERC has impermissibly and lawlessly attempted to confer additional jurisdiction on itself to investigate and to bring an enforcement action concerning alleged manipulation of the settlement price of certain NYMEX natural gas futures contracts traded by Plaintiff in his capacity as a natural gas futures trader for Amaranth.

7

34.     It is a matter of public record that FERC has faced critical scrutiny from Congress over the past seven years regarding the agency's ability to regulate the physical energy markets effectively.  For example, a General Accounting Office report on the California energy crisis of 2000 and 2001 concluded—in the words of one press report—that FERC regulators "failed to do their jobs" and "are utterly unprepared to deal with the next crisis if it occurs."

35.     On or about April 5, 2007, a *Dow Jones* news article reported on FERC Chairman Joseph Kelliher's efforts to defend the agency, and in particular its enforcement capabilities, in the face of "intense congressional scrutiny" before his consideration for re-election in June 2007.

36.     As recently as June 2007, FERC's chief enforcement officer, Susan Court, speaking at a *Platt's* "Energy Podium" in Washington, D.C., defended the FERC's enforcement efforts as members of Congress and state officials have increasingly called on federal regulators to explain rising oil, natural gas and electricity prices.

37.     On May 16, 2007, FERC made a determination as to its jurisdiction over natural gas futures contracts by issuing a Non-Public Order of Investigation, Docket No. IN07-26-00 (the "Formal Order").

38.     On June 26, 2007, and on July 6, 2007, by and through his counsel, Mr. Hunter made submissions to FERC's Division of Investigations, pursuant to 18 C.F.R. § 1b.19, explaining that an action against Mr. Hunter is not warranted because the FERC is completely mistaken in its theories and, among other reasons, that any enforcement action by the FERC exceeds the FERC's statutory authority.

39.     Nevertheless, FERC has informed Plaintiff by letter dated July 19, 2007, that it intends to file an enforcement action against Plaintiff by issuing an OSC no sooner than July 24, 2007.

8

40.    FERC has informed Plaintiff in substance that its enforcement action will allege that Amaranth, through Plaintiff, engaged in a scheme to depress the settlement price of NYMEX natural gas futures contracts..

41.    FERC's enforcement action concerns allegations of trading in natural gas futures contracts on NYMEX, which are beyond FERC's statutory enforcement jurisdiction.

42.    FERC's imminent enforcement action is a lawless and impermissible encroachment on the exclusive statutory jurisdiction of the CFTC, and is beyond the scope of FERC's statutory authority, which authority is limited to regulation of wholesale energy markets.

**Irreparable Harm**

43.    Since his departure from Amaranth, Plantiff has formed and become the majority owner of a new company, Solengo Capital Advisors ULC ("Solengo"), a company registered under the laws of the Province of Alberta ("Alberta").

44.    Solengo is currently only a fledgling company that intends to provide professional investment advisory services to potential clients that are private investment funds.

45.    The private investment funds that will be advised by Solengo are making the necessary preparations to actively solicit investments that are crucial to their successful launch as commodity derivatives investment funds.

46.    The willingness of potential investors to commit capital to these funds is dependent upon Solengo and its principals continuing to maintain an unblemished regulatory record.

47.    Solengo's ability to serve as an authorized investment advisor, and the ability of the Solengo advised investment funds to attract capital from investors, is contingent upon their obtaining the necessary legal registration in several jurisdictions, including registration of

9

Solengo as an investment adviser in Alberta and registration of the Cayman Islands incorporated investment funds with the Monetary Authority in the Cayman Islands.

48.    Registration in Alberta and in the Cayman Islands is in turn contingent upon Mr. Hunter continuing to maintain his record of compliance with all applicable laws. The OSC will substantially derail Solengo's ability to obtain the necessary legal authorizations in Alberta and the ability of the Solengo-advised investment funds to register in the Cayman Islands. Without such registrations, Solengo cannot operate.

49.    Further, under the laws of the Cayman Islands, the investment funds advised by Solengo must maintain a board of independent, unaffiliated directors. The OSC would create a dramatic increase in the personal risk to such potential directors of serving on the boards of these funds, thereby creating a significant deterrence effect. The lack of qualified outside directors will make it impossible for these investment funds to operate.

50.    The Solengo-advised investment funds must also engage the services of a prime brokerage firm in order to implement their intention to trade in commodity derivatives. The OSC would create a dramatic increase in the risk such a firm would take on by agreeing to clear and execute the trades of the Solengo advised investment funds. Were the OSC permitted to go forward, no prime brokerage firm would agree to service the Solengo funds' trading.

51.    In order to conduct their business, the Solengo-advised investment funds must also retain the services of an offshore fund administrator and solicit other third party services, including accounting and other financial services. Such administrative and financial services vendors will be unwilling to contract with the Solengo-advised investment funds were the OSC permitted to move forward.

10

52.     Solengo's viability also depends on the successful recruiting and hiring of a select number of individuals, in great demand because of their unique set of skills.   Commodity derivatives trading is highly quantitative and requires an advanced mathematical background. Any delay in Solengo's ability to move forward in hiring represents an unquantifiable business loss because of the likelihood that individuals with the relevant educational background and industry experience will accept other employment opportunities and the unique team of such professionals who have been assembled may break up and be essentially irreplaceable.

53.     The harm to Solengo from the OSC and, by virtue of his equity stake, to Mr. Hunter, is unquantifiable at present.  If Solengo ceases to exist as a business, Mr. Hunter will not only be forced to forgo an unspecified amount in potential performance and management fees from the Solengo-advised investment funds, but will also lose his new business.

54.     Unlike Plaintiff, FERC will not be harmed by the issuance of an injunction to delay its planned issuance of an OSC, pending the resolution of these issues at a full proceeding before this Court. FERC's planned OSC relates only to past events..

## COUNT I
## DECLARATORY JUDGMENT

### FERC's Imminent Enforcement Action by OSC
### Is Beyond The Scope of Its Authority

55.     Plaintiff adopts and incorporates each of the foregoing allegations of this Complaint as if hereinafter set forth in full.

56.     The Energy Policy Act of 2005, §§ 315 and 1283, did not grant Defendant enforcement authority over entities exclusively involved in futures trading.

11

57.    Both the Natural Gas Act, 15 U.S.C. §§ 717, *et seq.*, and the Federal Power Act, 16 U.S.C. §§ 791, *et seq.*, restrict FERC's jurisdiction to the regulation of wholesale energy markets.

58.    Regulation of trading of natural gas futures contracts on NYMEX is reserved for the exclusive jurisdiction of the CFTC.

59.    By threatening and proceeding to an imminent enforcement action by against Plaintiff by OSC for alleged manipulation of natural gas futures on NYMEX, the FERC has grossly exceeded its statutory authority.

60.    The issue requires a purely legal determination by this Court of FERC's enforcement power under the Energy Policy Act.

61.    A declaratory judgment would clarify the legal relationship between FERC's assertion of jurisdiction, the Energy Policy Act, and the CEA.

62.    An injunction of FERC's unauthorized action would promote the public interest.

63.    Plaintiff has a direct and vital interest in having this issue resolved.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Issue a Declaratory Judgment as follows:

    A.    The Federal Energy Regulatory Commission's assertion of jurisdiction over trading of energy commodities for future delivery is in conflict with the provisions of the Energy Policy Act, and the Natural Gas Act, 15 U.S.C. §§ 717, *et seq.*

    B.    The Federal Energy Regulatory Commission's assertion of jurisdiction over trading of energy commodities for future delivery is in conflict with the Commodity Exchange Act, 7 U.S.C. § 2.

    C.    The Federal Energy Regulatory Commission is enjoined from proceeding with any enforcement action against Plaintiff.

D.     Granting such other and further relief as the Court deems just and equitable.

## COUNT II
## TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

**FERC's Imminent Enforcement Action Is Beyond The Scope of Its Authority**

64.     Plaintiff adopts and incorporates each of the foregoing allegations of this Complaint as if hereinafter set forth in full.

65.     The Energy Policy Act of 2005, §§ 315 and 1283, did not grant Defendant enforcement authority over entities exclusively involved in futures trading.

66.     Both the Natural Gas Act, 15 U.S.C. §§ 717, *et seq.*, and the Federal Power Act, 16 U.S.C. §§ 791, *et seq.*, restrict FERC's jurisdiction to the regulation of wholesale energy markets, which include physical natural gas.

67.     Plaintiff never traded physical natural gas.

68.     Exclusive jurisdiction over trading in natural gas futures markets on NYMEX is reserved to the CFTC.

69.     FERC has informed Plaintiff by letter dated July 19, 2007 and received on Friday, July 20, 2007 that it will bring an enforcement action against Plaintiff by issuing an OSC Tuesday, July 24, 2007 or Thursday, June 26, 2007.

70.     By pursuing an enforcement action against Plaintiff for alleged manipulation of natural gas futures contracts, the FERC has grossly exceeded its statutory authority.

71.     The unauthorized enforcement action brought by FERC will immediately and irreversibly damage both Plaintiff's personal reputation and the viability of Solengo, such that Solengo will cease to exist.

13

72.    There is no adequate legal remedy to redress the irreparable harm to be suffered by Plaintiff and Solengo in the event that FERC brings an unauthorized enforcement action against Plaintiff.

73.    By contrast, a temporary restraining order and preliminary injunction prohibiting the Commission from filing an unauthorized enforcement action against Mr. Hunter pending a proper resolution of these issues at a full proceeding before this Court would cause no harm to Defendant or to the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Issue a Temporary Restraining Order and a preliminary injunction to prevent the Federal Energy Regulatory Commission from improperly bringing an enforcement action against Plaintiff in excess of its statutory authority; and

2.      Grant such other and further relief as the Court deems just and equitable.

Dated:     July 23, 2007
             Washington, D.C.

Respectfully submitted,

KOBRE & KIM LLP

By: _____ /s/ _____

Michael S. Kim
Natalie Holme Elsberg
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
Telephone:    212.488.1200
Facsimile:     212.488.1220

Justin V. Shur (973855)
Kobre & Kim LLP
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
Telephone:    202.664.1900
Facsimile:     202.664.1920

*Attorneys for Plaintiff Brian Hunter*

15

EXHIBIT 27

```
 1              Donohoe

 2      Q    What is an execution trader?

 3      A    A trader that executes orders in

 4   natural gas for a book runner.

 5      Q    What do you mean a book runner?

 6      A    A portfolio manager.

 7      Q    In the case of Amaranth, who was the

 8   portfolio manager?

 9      A    Brian Hunter.

10      Q    That was true the entire time that

11   you were at Amaranth?

12      A    I believe so.

13      Q    Was Brian Hunter your supervisor at

14   Amaranth?

15      A    Yes.

16      Q    How much discretion did you have over

17   how you would execute trades?

18      A    A fair amount in that I could choose

19   the instruments, whether it's options, price,

20   spreads.

21      Q    So explain to me the interaction

22   between you and Brian Hunter for executing

23   trades; what would he say, and what would you do?

24      A    He would direct a macro strategy, and

25   I would implement that via trading, trading of
```

1          Donohoe

2     the instruments.

3          Q    Give me an example of a macro

4     strategy.

5          A    I would like a summer winter spread.

6     I could do that by spread, leg it, buy summer,

7     sell winter, use options.

8          Q    So what would be the instruction from

9     Brian Hunter to you concerning a summer winter

10    spread?

11         A    These orders would vary.  I mean

12    there was a lot of discussion, so I would

13    understand the volume he intended, where he

14    intended.  My discretion would be what months to

15    use, where the liquidity was, and I would execute

16    the trade.

17         Q    Can you give me an example of the

18    types of discussions that you would have with

19    Brian Hunter concerning the execution of trades

20    dealing with a summer winter spread?

21         A    Could you repeat that.

22         Q    Sure.

23              If Brian Hunter wanted to trade

24    something within the summer winter spread, what

25    would he say to you?

1           Donohoe

2       A   He could straight out tell me exactly

3   what he wanted traded, or he could say I would

4   like X amount of summer winter, or I would like

5   the position to look like this by the end of the

6   day or by the end of the week, and I would

7   execute those kinds of orders.

8       Q   When you say he would say to you he

9   wants the position to look like this, give me an

10  example of what "this" would be.

11      A   I would like to have 1,000 more

12  spreads in the book by the end of this week or

13  1,000 less.  I would execute that.

14      Q   With an instruction where he would

15  say just as you said there, I want 1,000 more

16  spreads in the book, what would you do at that

17  point?

18      A   Look for the best way to put that

19  spread on.

20      Q   Give me the various ways you could

21  put that spread on.

22      A   I could use options, outright

23  spreads, I could leg the spread, the two

24  components.

25      Q   In what market would you be doing any