UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
U.S. COMMODITY FUTURES TRADING : 07 Civ. 6682 (DC)
COMMISSION, :
: ECF Case
Plaintiff, :
: **Oral Argument Requested**
v. :
:
AMARANTH ADVISORS, L.L.C., AMARANTH :
ADVISORS (CALGARY) ULC AND BRIAN :
HUNTER, :
:
Defendants. :
:
---------------------------------------------------------------x

# DEFENDANT BRIAN HUNTER'S REPLY MEMORANDUM OF LAW
# IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT

 

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

*Counsel for Brian Hunter*

## **TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................................1

    I.     THE COMPLAINT FAILS TO STATE A CLAIM......................................................1

    II.    THE COMPLAINT FAILS TO SATISFY RULE 9(b)................................................4

         A.     Rule 9(b) Applies ..............................................................................................4

         B.     The Complaint Fails to Satisfy Rule 9(b)........................................................6

    III.   THE COURT LACKS JURISDICTION OVER HUNTER WITH RESPECT
         TO THIS CLAIM .........................................................................................................7

         A.     The CFTC Fails To Establish Specific Jurisdiction ......................................7

         B.     The CFTC Fails To Establish General Jurisdiction ......................................8

CONCLUSION..............................................................................................................................10

## **TABLE OF AUTHORITIES**

**Cases**

*Archibald v. Archibald*, 826 F. Supp. 26 (D. Me. 1993) .................................................................. 9

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................... 3, 5, 6, 7

*Burnham v. Superior Court of California*, 495 U.S. 604 (1990) ..................................................... 9

*C.F.T.C. v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005) ........................................................ 7

*C.F.T.C. v. Enron*, No. H-03-909, 2004 WL 594752 (S.D. Tex. March 10, 2004) ....................... 3, 4

*C.F.T.C. v. Risk Capital Trading*, 452 F. Supp. 2d 1229 (N.D. Ga. 2006) ...................................... 5

*C.F.T.C. v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ............................................................................... 5

*Corry v. CFM Majestic Inc.*, 16 F. Supp. 2d 660 (E.D. Va. 1998) .............................................. 9, 10

*Dietrich v. Bauer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999) .................................................................. 5

*Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y. 1995) ............................. 4

*Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................... 10

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553
  (S.D.N.Y. June 28, 2007) ............................................................................................................ 5, 6

*In re Henner*, 30 A.D. 1151 (Agric. Dec. 1971) .............................................................................. 4

*In re Hohenberg Bros.*, C.F.T.C. No. 75-4, 1977 WL 13562 (C.F.T.C. February 18,
  1977) .............................................................................................................................................. 2

*In re Indiana Farm Bureau*, C.F.T.C. No. 75-14, 1982 WL 30249 (C.F.T.C. December
  17, 1982) ........................................................................................................................................ 2

*In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005) ................................... 5

*Johnson v. Woodcock*, 444 F.3d 953 (8th Cir. 2006) ..................................................................... 9

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) .......................... 8

*Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993) ..................................................... 10

*Porter v. Berall, et al.*, 293 F.3d 1073 (8th Cir. 2002) ................................................................ 10

*Premium Plus Partners v. Davis*, 04 C 1851, 2005 WL 711591 (N.D. Ill. March 28,
  2005) .............................................................................................................................................. 5

*Psimenos v. E.F. Hutton & Co., Inc.,* 722 F.2d 1041 (2d Cir. 1983) ................................................ 5

*S.E.C. v. Masri*, No. 04 Civ. 1584 (RJH), 2007 WL 4126773 (S.D.N.Y. November 20,
  2007) .............................................................................................................................................. 3

*Span Const. & Engineering, Inc. v. Stephens*, No. CIV-F-06-0286 (AWI) (DLB), 2006
  WL 1883391 (E.D.Cal. July 7, 2006) ............................................................................................ 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*, --- U.S. ----, 127 S.Ct. 2499 (2007) ........................... 7

*United States v. Finnerty*, 474 F. Supp. 2d 530 (S.D.N.Y. 2007) .................................................... 4

**ARGUMENT**

I.    **THE COMPLAINT FAILS TO STATE A CLAIM**

The Complaint fails to allege—as it must—facts to establish that Brian Hunter ("Hunter") sought to create an *artificial* price.[1] As demonstrated in Hunter's Memorandum, under the law, such a price must be something other than the simple result of large volume trading, regardless of whether Hunter's subjective intent in making the trades was to affect the price.

The CFTC appears to have fundamentally misunderstood Hunter's Rule 12(b)(6) motion, instead devoting page-after-page to buttressing the straw man argument that the Complaint is adequately "detailed." Hunter's 12(b)(6) motion does not challenge whether the Complaint is sufficiently "detailed." Even with all the "details" in the Complaint, one critically-necessary allegation is missing—a factual allegation to support that Hunter sought to create an *artificial* price.

Other than repeatedly citing a single case from the Southern District of Texas (discussed below), the only relevant argument the CFTC makes is that "[t]here is nothing in CEA-related precedent that suggests the Complaint must allege facts showing that the resulting price would have been artificial had the defendant succeeded." (Opp. at 9-10.)[2] But—remarkably—the CFTC belies this assertion in its very next sentence, where the CFTC concedes that "[t]he accused must have acted purposefully to effect prices that *did not reflect forces of supply and demand*." (Opp. at 10 (emphasis added).)[3] As the CFTC has held elsewhere: "An '*artificial*' or '*distorted*' price is a price which *does not reflect the market or economic forces of supply and demand* operating upon the price of the particular contract under scrutiny. It is, in economic language, a non-equilibrium price." *In re Indiana Farm Bureau*, C.F.T.C. No. 75-14,

---

[1] *See* Defendant Brian Hunter's Memorandum of Law in Support of His Motion to Dismiss the Complaint (hereinafter, "Memorandum" or "Mem."), at 7-16.
[2] References to "Opp." or the "Opposition" are to the Memorandum of Law of Plaintiff Commodity Futures Trading Commission in Opposition to Defendants' Motions to Dismiss.
[3] *See also* Opp. at 7 ("To prove the intent element of manipulation, it must be shown that 'the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand…'").

1

1982 WL 30249, at *4 n.2 (C.F.T.C. December 17, 1982) (emphasis added).[4] Thus, the CFTC concedes the very point it attempts to disprove.

The CFTC confuses the matter further by continually reciting the elements of attempted manipulation as simply: "(1) an intent to affect the market price of a commodity; and (2) some overt act in furtherance of that intent" (Opp. at 5, 9.) This recitation, when standing alone, misleadingly suggests that the intent need only be to "affect" the price, not to create a price that would be *artificial, i.e.*, one that does not reflect the legitimate forces of supply and demand. But that proposition is just plain wrong. In *In re Hohenberg Bros.*, C.F.T.C. No. 75-4, 1977 WL 13562 (C.F.T.C. February 18, 1977), the case for which the CFTC cites those two elements, the CFTC gave a fuller explication of what it means to intend to affect price: a finding for manipulation requires "conduct with the intention of affecting the market price of a commodity *(as determined by the forces of supply and demand)* and as a result of such conduct or course of action *an artificial price was created*," and that "[a]n attempted manipulation, on the other hand, is simply a manipulation that has not succeeded—that is, the conduct engaged in has *failed to create an artificial price*." *Id.* at *7 (emphasis added).

Indeed, contrary to the Opposition's confusing back-and-forth on the issue, it is crystal clear that, to allege attempted manipulation, the CFTC must allege facts showing that the defendant acted with the intent to create an *artificial* price. In *Indiana Farm Bureau*, the CFTC flatly held: "[t]he intent requirement, *which is the same for a manipulation and an attempted manipulation*, is 'the performance of an act or conduct which was *intended to effect an artificial price*.'" *Indiana Farm Bureau*, 1982 WL 30249, at * 4 (emphasis added), citing *Hohenberg Bros.*, 1977 WL 13562, at *7.

The next question in the analysis, then, becomes what constitutes an "artificial" price. The CFTC never directly addresses this question. In his Memorandum, Hunter demonstrated that, under the law, an artificial price is one that inherently *deceives* the market by injecting inaccurate information into

---

[4] The CFTC's assertion that it need not allege facts supporting the notion that Hunter sought to create an artificial price is also belied by the fact that its Complaint and Opposition are rife with the conclusory allegation that Hunter sought to do just that. *See, e.g.*, Complaint ¶ 26 (alleging that "Defendants intended to create *artificial* natural gas futures prices") (emphasis added); Opp. at 6, 10.

2

the marketplace or creating a false impression of supply and demand and, moreover, that an artificial price is *not* merely the result of large volume trading, regardless of subjective intent. In support, Hunter cited a wealth of case law directly on point, including several decisions by the Second Circuit and by this very Court. (*See* Mem. at 8-14.) *The CFTC simply ignores this authority, making no attempt at all to address it in its response to Hunter's 12(b)(6) motion*.[5]

Instead, the CFTC attempts to leave the Court with the impression that "banging-the-close" is a commonly recognized form of manipulation. (Opp. at 1.) But that impression would be false. To begin with, a simple search in Westlaw reveals that in fact *there is not a single case* in which a federal court referred to so-called "banging-the-close" manipulation using such terms. Calling certain high-volume trading by a clever phrase that sounds improper does not change the law—which requires fraud or deception as a premise to market manipulation. Putting aside terminology, the CFTC fails to respond to the abundant precedent cited by Hunter and does not identify a single case from the Second Circuit holding, as the CFTC insists, that large volume selling with the intent to affect price is manipulation.[6]

The CFTC's entire Opposition cites only one case for this proposition—a case from the Southern District of Texas. *See C.F.T.C. v. Enron*, No. H-03-909, 2004 WL 594752 (S.D. Tex. March 10, 2004). But, despite the CFTC's assertion that the case is "nearly identical to the case at bar" (Opp. at 6), there is at least one critical difference. In *Enron*, the CFTC alleged that the defendant had colluded with another Enron trader to intentionally "bid up" the price, suggesting that the defendant was intentionally trading at something higher than prevailing market price in improper concert with another

---

[5] In its Rule 9(b) argument, the CFTC attempts to argue that the cases are inapplicable to the extent they deal with the securities laws. That contention is addressed in the Rule 9(b) section below. However, it is important to note that the CFTC never even tries to argue that a manipulation claim under the securities laws could be based only on legitimate open-market trading, as it is trying to do here with respect to futures trading.

[6] Although it is not cited by the CFTC, we note that after Defendants filed their motions to dismiss, Judge Holwell issued *S.E.C. v. Masri*, No. 04 Civ. 1584 (RJH), 2007 WL 4126773 (S.D.N.Y. November 20, 2007), a decision in which he declined "to adopt [the] *per se* rule that open-market activity cannot be considered manipulative based solely on manipulative intent…without additional deceptive or fraudulent conduct." *Id.* at *8. We respectfully submit, however, that this decision is wrong, as the court simply failed to address the Second Circuit's binding and contrary precedent of *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), a case that was decided four months earlier. Indeed, it appears that the *Masri* court may not have been aware of the binding *ATSI* decision because it erroneously stated that "the law of the Second Circuit on so-called open-market manipulation—where the alleged manipulator has made otherwise legitimate trades, yet with the subjective intent to affect the stock price thereby—is not yet fully settled," only discussed Second Circuit cases from 2002, and fails to address *ATSI Communications*. *Id.* at *6 (internal citation omitted). The *Masri* decision, therefore, should be disregarded.

market participant. *See Enron*, 2004 WL 594752, at *7.[7] There is no such allegation of trading at non-market prices here. Hunter is alleged simply to have traded in large volumes himself.[8]

The CFTC also attempts to skirt precedent cited by Hunter by arguing—in the separate portion of the brief relating to Rule 9(b) and not Rule 12(b)(6)—that "virtually all of the cases…relate to manipulation of trading a security under the securities laws, not a claim for commodity market price manipulation under the [Commodity Exchange Act ("CEA")]." (Opp. at 18.) Here the CFTC baldly asserts that "courts have developed a different test for determining a manipulation claim under the CEA than in the securities context." (Opp. at 18.) Not surprisingly, however, the CFTC never explicates what this supposedly "different test" actually is. The point for 12(b)(6) purposes is whether mere large volume trading is sufficient to create an artificial price. As Hunter demonstrated, courts routinely hold that it is not. Despite devoting several pages to how the CEA and securities laws are "different laws with different histories" (Opp. at 12), the CFTC offers no authority or logic to support the outlandish proposition that, whereas large volume selling standing alone is legal under the securities laws, it is illegal under the CEA.

The CFTC does not dispute that the price Hunter allegedly sought to effect would simply be the product of large volume selling. Under the law, such a price is not artificial. Therefore, the Complaint should be dismissed for failure to state a claim.

## II.   **THE COMPLAINT FAILS TO SATISFY RULE 9(b)**

### A.   **Rule 9(b) Applies**

In his Memorandum, Hunter demonstrated that Rule 9(b) applies because the CFTC has brought a claim for market manipulation, which, under Second Circuit precedent in the context of the closely analogous securities laws, constitutes a claim for fraud. (Mem. at 17 (citing *ATSI Communications*, 493

---

[7]   The fact that the *Enron* court sustained the complaint on the basis that the defendant sold at something *other* than prevailing market price is further demonstrated by the fact that the case it cites to support its holding is itself also one in which the respondent clearly sold at something other than prevailing market prices. *See In re Henner*, 30 A.D. 1151, 1174 (Agric. Dec. 1971) (finding that the respondent had purposely paid above-market prices for November shell egg futures).

[8]   In any case, given the Second Circuit's guidance in *ATSI Communications*, as well as this Court's well-reasoned decisions in *Gruntal & Co., Inc. v. San Diego Bancorp*, 901 F. Supp. 607 (S.D.N.Y. 1995) and *United States v. Finnerty*, 474 F. Supp. 2d 530 (S.D.N.Y. 2007), this Court should not follow *Enron*.

4

F.3d at 101).) Other than further repeated citations to the *Enron* case, as well as a passing citation to one other district court case from outside this Circuit[9] (both of which this Court should disregard for reasons stated herein), the CFTC's sole argument that Rule 9(b) does not apply is the mantra that the CEA and the securities laws are "different laws with different histories." (Opp. at 12.) But, again, other than citing wholly irrelevant differences between the two laws, the CFTC offers no authority or logic for its wishful thinking that, whereas Rule 9(b) applies to manipulation claims in the securities context, it does not in the CEA context.[10] The Court should reject that proposition. Indeed, as one court in this District stated in applying Rule 9(b) to a manipulation claim under the CEA, "[i]t makes little sense to apply caselaw articulating standards applicable to allegations of market manipulation only when the allegations concern claims under the securities laws." *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 344 n.5 (S.D.N.Y. 2005).[11]

The CFTC attempts to distinguish the application of Rule 9(b) to claims of manipulation under the CEA in *In re Natural Gas* and *In re Crude Oil* on the ground that those cases purportedly involved

---

[9] *Premium Plus Partners v. Davis*, 04 C 1851, 2005 WL 711591 (N.D. Ill. March 28, 2005), cited at Opp. at 14 n. 3.

[10] The CFTC baldly asserts, "courts have developed a different test for determining a manipulation claim under the CEA than in the securities context, one which does not necessarily require alleging fraud or misleading statements." (Opp. at 18.) Putting aside the fact that the CFTC cites no relevant authority for this proposition, it is unclear what the CFTC means here by "fraud." Even in the securities context, a plaintiff can bring a claim for manipulation of securities—through wash sales, for example—without alleging that the defendant actually made fraudulent or misleading statements. *See., e.g., Dietrich v. Bauer*, 76 F. Supp. 2d 312, 339-40 (S.D.N.Y. 1999) (observing that a "market manipulation claim can also be based on matched orders"). The point is that the defendants' conduct must result in a price that is artificial or distorted, such that the market is deceived.

[11] The CFTC's argument that the CEA contains provisions against fraudulent statements that are separate from its manipulation provision (Opp. at 18-19) is wholly irrelevant. The fact that the Securities Exchange Act covers in one provision what the CEA covers in several does not mean that manipulation under the CEA need not be deceptive and that it is not a species of fraud requiring the application of Rule 9(b). Further, the cases that the CFTC cites for the proposition that the CEA has separate anti-fraud provisions have no bearing here as they involved conduct that is easily distinguishable from the conduct at issue in this case. *See C.F.T.C. v. Risk Capital Trading*, 452 F. Supp. 2d 1229, 1245 (N.D. Ga. 2006) (finding that defendant's misleading statements to investors concerning the potential risk from these investments were "the hallmark of misleading sales practices under the [CEA]"; *C.F.T.C. v. Vartuli*, 228 F.3d 94, 106 (2d Cir. 2000) (noting that the defendant "presented the performance of hypothetical or simulated accounts in advertisements without including the required disclaimer"). The CFTC has failed to explain why the Court should consider these unrelated cases regarding misleading sales practices by commodity investment firms involving separate provisions of the CEA to be more relevant than cases from the securities context involving open market trading with the apparent intent of depressing prices, especially given precedent permitting the application of cases grounded in securities law to the commodities context. *See, e.g., Psimenos v. E.F. Hutton & Co., Inc.*, 722 F.2d 1041, 1044 (2d Cir. 1983) ("In construing the reaches of jurisdiction under the CEA, courts have analogized to similar problems under the securities laws which have been more extensively litigated.") (citations omitted); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) (finding applicable to the commodities context case law concerning Rule 9(b) originally developed in the securities context).

5

"inaccurate, misleading, and false trading information." (Opp. at 14 n.3.) However, this distinction is meaningless in light of the Second Circuit's recent holding in *ATSI Communications* that "a claim for market manipulation is a claim for fraud" and therefore Rule 9(b) applies. *ATSI Communications*, 493 F.3d at 101. Consistent with that holding, courts have applied Rule 9(b)'s "strong inference" requirement to manipulation claims, even where those claims involved mere trading, such as wash sales. (*See* Mem. at 17.) The CFTC makes no effort to somehow reconcile this fact with its contentions. Nor can it.

### B. The Complaint Fails to Satisfy Rule 9(b)

Hunter's Rule 9(b) argument is straightforward: the Complaint fails to satisfy Rule 9(b) because the allegations fail to give rise to a "strong inference" that Hunter acted with the requisite state of mind—which, as discussed above, constitutes the specific intent to create an artificial price. The CFTC again completely misses the point by addressing a *different* part of the Rule 9(b) requirements, devoting page after page toward the uncontested proposition that the Complaint provides "[1] what manipulative acts were performed, [2] which defendants performed them; [3] when the manipulative acts were performed; and [4] what effect the scheme had on the market for the securities at issue." (Opp. at 14.) But in addition to those requirements, Rule 9(b) also requires that the allegations give rise to a strong inference of intent.[12] Thus, the sole question presented by Hunter's Rule 9(b) motion is whether the allegations satisfy this "strong inference" requirement. For all the reasons cited in Hunter's Memorandum, they do not.

The CFTC simply fails to address those reasons. For example, in his Memorandum, Hunter showed how the very instant message conversations that the CFTC attached to the Complaint demonstrate that the CFTC's readings are implausible, at best. As Hunter explained in his Memorandum, under Supreme Court precedent, to meet the "strong inference" standard, the plaintiff must show that the inferences it seeks to draw are "at least as compelling as any opposing inference one

---

[12] *See, e.g.*, *In re Crude Oil*, 2007 WL 1946553, at *8 (in manipulation case under the CEA, holding that plaintiffs failed to satisfy Rule 9(b)'s strong inference standard); *see also* Mem. at 17.

could draw from the facts alleged." *ATSI Communications*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, --- U.S. ----, 127 S.Ct. 2499, 2510 (2007)).  The CFTC simply ignores that requirement and Hunter's arguments without addressing them.  Instead, the CFTC attempts to satisfy an inapplicable lower standard by stating that "the reasonable inferences from these allegations, *which must be drawn in Plaintiff's favor on a motion to dismiss*, are that Hunter intentionally chose to wait until the last 8 minutes of trading…"  (Opp. at 9 (emphasis added).)  But the lower reasonable inference standard applicable to a Rule 12(b)(6) motion to dismiss is simply not applicable to Rule 9(b), which requires strong inferences, *i.e.*, inferences that are more plausible than those drawn by Hunter.  *See Tellabs*, 127 S.Ct. at 2509.  Other than a passing comment that the explanations offered by defendants are "strained," (Opp. at 9) the CFTC makes no attempt to satisfy that standard.[13]

Hunter will not burden the Court by restating all the reasons—left unanswered by the CFTC—that the Complaint fails to give rise to a strong inference of manipulative intent.  However, the CFTC does not discuss any of the "strong inference" arguments raised by Hunter in his memorandum of law.  (*See generally* Mem. at 20-24.)  As a result, the CFTC has clearly failed to meet its burden.

### III. THE COURT LACKS JURISDICTION OVER HUNTER WITH RESPECT TO THIS CLAIM

#### A. The CFTC Fails To Establish Specific Jurisdiction

The CFTC does not dispute that its claim alleges no injury to U.S. markets or investors.  It also does not dispute that its claim does not arise out of any act that Hunter committed within the United States.  (*See* Opp. at 26.)  It does not even address Hunter's argument that there appears to be no case which held that a court has jurisdiction over a nonresident individual for merely *attempting* to cause an

---

[13] Likewise, the CFTC conflates the Rule 12(b)(6) and Rule 9(b) standards in its discussion of whether the CFTC must specifically allege a profit motive.  (*See* Opp at 10.)  The holding in *C.F.T.C. v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005), cited by the CFTC for the proposition that the CFTC need not "specifically allege a motive or expectation of financial benefit," (Opp. at 10), relates to whether a profit motive is an essential element of a claim.  But Hunter's point in his Memorandum was that, in order to satisfy the "motive and opportunity" prong of the Second Circuit's "strong inference" test of *Rule 9(b)*, the CFTC must demonstrate that Hunter would realize some concrete and personal benefit from the fraud.  The CFTC fails to address this point, but simply cites to ¶ 30 of its Complaint.  For reasons explained in the Memorandum, however, this allegation fails to allege any potential "concrete and personal" benefit that would flow to Hunter.  (*See* Mem. at 18-20.)

7

injury within the forum state, without committing any acts within the forum state and without actually causing any injurious effect within the forum state.

Rather, the CFTC merely alleges Hunter's role in the alleged violation. (*See id*.) But none of these allegations involved Hunter's physical presence in the United States, and none resulted in any injury to U.S. markets.[14] Under such circumstances, for reasons stated in Hunter's Memorandum, the assertion of specific jurisdiction is not appropriate.

B.   **The CFTC Fails To Establish General Jurisdiction**

As a fallback, the CFTC argues that the Court has "general jurisdiction" over Hunter. If this were so, due process would then allow *any* court in the United States to have jurisdiction over Brian Hunter with respect to *any* matter, even if the claim were unrelated to his contacts with the United States. In other words, according to the CFTC's logic, if a Texas plaintiff happened to be involved in a car accident with Hunter while vacationing in Calgary, Canada (where Hunter resides), she could force Hunter to answer suit in a Texas state court without offending due process. Under the contacts alleged, this cannot be so.

While the CFTC recites the "continuous and systematic" test and then alleges various contacts Hunter has had with the United States (*see* Opp. at 26-30), it fails to actually establish that these contacts were sufficiently "continuous and systematic" to satisfy due process.

Indeed, the CFTC cites no general jurisdiction case involving nonresident *individuals*, instead citing only cases dealing with nonresident *corporations*. This is a significant distinction, as neither the Supreme Court nor the Second Circuit has clearly established that general jurisdiction even applies to nonresident individuals. The Supreme Court has stated, "It may be that whatever special rule exists permitting 'continuous and systematic' contacts to support jurisdiction with respect to matters unrelated to activity in the form *applies only to corporations*, which have never fitted comfortably in a

---

[14]   The CFTC wrongly contends that the "effects test" does not apply because Hunter purportedly "had significant on-going contacts with the United States…" (Opp. at 30 n.9.) The effects test applies because, for purposes of specific jurisdiction, the CFTC's claim does not arise out of any acts that Hunter committed within the United States, such that the court must examine whether the cause of action arises out of some effect he created within the United States through acts done elsewhere. *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972).

8

jurisdictional regime based primarily upon de facto power over the defendant's person." *Burnham v. Superior Court of California*, 495 U.S. 604, 609, n.1 (1990) (plurality opinion) (internal citations omitted) (emphasis added).  Thus, while courts have considered whether an individual's contacts give rise to general jurisdiction, "General personal jurisdiction case law traditionally involves *corporate defendants* whose contacts with the state are business-related.  The Court has been unable to find any case where an *individual* defendant is subject to the court's general personal jurisdiction based on the type of forum contacts alleged in this case." *Archibald v. Archibald*, 826 F. Supp. 26, 29 n.3 (D. Me. 1993) (emphasis added) (finding no general jurisdiction despite fact that defendant maintained regular contact with plaintiff in forum state through regular phone calls, written correspondence and visits, and also frequently traveled to forum state for vacation).[15]  In any case, even if the "continuous and systematic" test for general jurisdiction applies to individuals, "[t]he threshold for satisfying the requirements for general jurisdiction is substantially greater than that for specific jurisdiction. Typically, courts assert general jurisdiction only over nonresidents who are essentially domiciled within the forum state."  *Corry v. CFM Majestic Inc.*, 16 F. Supp. 2d 660, 663 (E.D. Va. 1998) (internal citations omitted).

The CFTC has made no effort to show that the contacts it alleges meet the appropriate standard for individuals.  For example, the CFTC alleges that Hunter previously resided in the United States. (Opp. at 27.)  However, courts have held that prior residence in the forum alone is insufficient.[16] Similarly, the CFTC alleges that Hunter made frequent trips to the United States, that he met with various people in the United States, and that he made frequent calls to and communications with people

---

[15] *Span Const. & Engineering, Inc. v. Stephens*, No. CIV-F-06-0286 (AWI) (DLB), 2006 WL 1883391, at *5-6 (E.D.Cal. July 7, 2006) (stating "Most general jurisdiction cases involve *corporate defendants*; it is rarer for a plaintiff to allege the existence of general jurisdiction over a *non-resident individual*...In case after case, when an individual conducts business that requires their occasional presence in a state, courts have not found sufficient contact for general jurisdiction" and finding no general jurisdiction in California despite fact that defendant was employed by California corporation, trained in California, traveled to California for work every year, communicated daily with California colleagues, regularly received expense and salary checks from California, and participated in retirement plan which was administered in California) (emphasis added).

[16] *See, e.g.*, *Johnson v. Woodcock*, 444 F.3d 953 (8th Cir. 2006) (holding that Minnesota lacked general jurisdiction over a defendant even though defendant was a prior resident, as well as maintained a contractual relationship with a Minnesota publishing company and collaborated with a Minnesota resident).

9

located in the United States. (Opp. at 27-29.) However, again, courts have found such contacts to be insufficient to give rise to general jurisdiction.[17] In light of this, the CFTC has failed to meet its burden of establishing jurisdiction.

## CONCLUSION

The Court should dismiss the CFTC's Complaint against Hunter for lack of personal jurisdiction pursuant to Rule 12(b)(2), or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6) and for failure to plead intent under Rule 9(b).

Dated:  January 10, 2008
        New York, New York

                              Respectfully submitted,

                              KOBRE & KIM LLP

                                /s/ Michael S. Kim
                              Michael S. Kim (MK-0308)
                              Matthew I. Menchel (MM-0675)
                              Leif T. Simonson (LS-5915)
                              800 Third Avenue
                              New York, New York 10022
                              Tel: 212.488.1200
                              Fax: 212.488.1220

                              *Counsel for Brian Hunter*

---

[17] *See, e.g.*, *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984) (finding that CEO's travel to forum for contract negotiations, employees' travel to forum for training, receipt of funds drawn on forum bank accounts, and purchases from forum companies were not sufficient contacts to give rise to general jurisdiction); *Porter v. Berall, et al.*, 293 F.3d 1073, 1075 (8th Cir. 2002) (holding no general jurisdiction despite fact that there were "numerous phone calls and letters between defendants and forum," and that defendants appointed an agent to transact business in the forum, executed documents in the forum and solicited business in the forum) (citing additional cases); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993) (holding that a company's maintenance of a sales force and holding district meetings in the forum at least three times a year were not sufficient for general jurisdiction); *CFM Majestic Inc.*, 16 F. Supp. 2d at 663 (holding no general jurisdiction in Indiana over corporation despite its maintaining an agent in Indiana to promote and negotiate and its employees' travels to Indiana to negotiate terms, receive training, attend regular meetings, and inspect and purchase goods).