UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

U.S. COMMODITY FUTURES TRADING       :
COMMISSION,
                                     :
                Plaintiff,
                                     :
        - against -
                                     :
AMARANTH ADVISORS, L.L.C.,
AMARANTH ADVISORS (CALGARY) ULC,     :
and BRIAN HUNTER,
                                     :
                Defendants.
                                     :
- - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/21/2008

**OPINION**

07 Civ. 6682 (DC)

**APPEARANCES:**      (see last page)

**CHIN, District Judge**

The U.S. Commodity Futures Trading Commission (the
"CFTC") brings this action against defendants Amaranth Advisers,
L.L.C. ("Amaranth Advisors"), Amaranth Advisors (Calgary) ULC
("Amaranth Calgary"; together, "Amaranth"), and Brian Hunter under
the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 1 et seq.  The
CFTC alleges that defendants attempted to manipulate the price of
natural gas futures contracts by deliberately waiting to sell a
substantial number of those contracts in the final minutes before
the close of trading.  Amaranth also purportedly attempted to
"cover up" the alleged manipulative scheme by submitting false
statements to the New York Mercantile Exchange ("NYMEX").

Defendants move to dismiss the complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6).  They argue, among other
things, that the CFTC is seeking to "transform legitimate
speculative trading" into a violation of the CEA.  They also

contend that they did not conduct the trades in question with the intent to manipulate prices.  In addition, Hunter -- a Canadian citizen, residing in Canada, and working for a Canadian company when he made the trades at issue in this case -- moves to dismiss for lack of personal jurisdiction.

For the reasons that follow, defendants' motions to dismiss are denied.

**BACKGROUND**

**A.    The Facts**

As alleged in the complaint, the facts are as follows:

**1.    The Parties**

The CFTC is an independent federal regulatory agency charged with administering and enforcing the CEA.  (Compl. ¶ 9).

Amaranth Advisors was a hedge fund, incorporated in Delaware, with its principal place of business in Greenwich, Connecticut, until its collapse in September 2006.  (Id. ¶ 10). See U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C., 523 F. Supp. 2d 328 (S.D.N.Y. 2007).  It had owned 99 percent of Amaranth Calgary, a Nova Scotia company based in Calgary, Canada.  (Compl. ¶¶ 11, 12).

Hunter was in charge of the natural gas trading at Amaranth.  (Id. ¶¶ 20, 22).  In October 2005, he became the president of Amaranth Calgary and transferred from Greenwich to Calgary.  (Id. ¶¶ 14, 20).  While at Amaranth Calgary, Hunter continued to supervise natural gas traders working at the

Greenwich office.   (Id.).   Hunter was in Calgary when he executed the trades on NYMEX that are at issue in the instant case.   (See id. ¶¶ 8, 14, 20; see also Hunter Mem. at 3).

### 2.   **Commodity Futures Markets**

Defendants traded natural gas futures contracts, which are standardized agreements "to purchase or sell a commodity for delivery in the future" at a pre-determined price.   (Id. ¶ 16).   The buyer, who is obligated to accept delivery of the commodity, is called the "long" and is said to hold a "long position" on a futures contract.[1]   The party selling the commodity, and thus the party obligated to deliver the commodity on the delivery date, is the "short" and holds a "short position" on the futures contract.   Because all futures contracts are standardized except for the price, a party holding one position on a futures contract may cancel its obligation by acquiring an equal and opposite position in a corresponding contract.   Any difference between the price of the initial contract and the offsetting contract is the profit or loss on the contract.

Amaranth was not capable of delivering or accepting the delivery of physical natural gas, so it needed to have a "flat position" at the close of trading for a given contract (id. ¶ 19), meaning that it needed to offset any short or long position prior

---

[1]    The explanations of futures contracts and commodities markets come from In re Natural Gas Commodity Litigation, 337 F. Supp. 2d 498, 502 (S.D.N.Y. 2004).   For additional explanations, see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982), and In re Soybean Futures Litigation, 892 F. Supp. 1025 (N.D. Ill. 1995).

to the expiration of a contract or roll its position over to the following month (Amaranth Mem. at 4).

Futures contracts are bought and sold on futures or commodity exchanges, such as NYMEX.  (Compl. ¶ 18).  NYMEX trades futures contracts for, among other things, the delivery of natural gas at the Henry Hub in Louisiana for the present calendar month and for each of the next 72 consecutive months.  (Id. ¶ 17).  Contracts expire on the third to last business day of the month prior to which delivery must be made on open contracts (the "expiration day").  (Amaranth Mem. at 4).  For instance, for the March 2006 natural gas futures, the expiration day was February 24, 2006.  Any net contract positions left open at expiration must be settled through physical delivery.  (Id.).  Pursuant to NYMEX rules, the settlement price for natural gas futures is based on "the volume weighted average of trades executed from 2:00-2:30 p.m. ('closing range')" on expiration day.  (Compl. ¶ 25).

### 3.  **Swaps Markets**

Defendants also traded over-the-counter ("OTC")[2] natural gas swaps, which are different financial instruments from futures contracts and exchanged in commercial markets, such as the IntercontinentalExchange ("ICE").  (Id. ¶ 18).  In general, swaps

---

[2]    "Over the counter" refers to the "trading of commodities, contracts, or other instruments not listed on any exchange."  (CFTC Glossary, http://www.cftc.gov/educationcenter/ glossary (last visited May 13, 2008)).  "At one time completely unorganized, the over-the-counter market is now relatively organized with computerized quotation and transaction reporting services."  Black's Law Dictionary 1105 (6th ed. 1990).

refer to the "the exchange of one asset or liability for a similar asset or liability." (CFTC Glossary). Commodity swaps, more specifically, are swaps "in which the payout to at least one counterparty is based on the price of a commodity or the level of a commodity index." (Id.). ICE, for instance, uses the NYMEX settlement price of natural gas futures to calculate the settlement price of natural gas swaps. (Compl. ¶ 29).

On the days when defendants purportedly attempted to manipulate the prices of natural gas futures, they held large short positions on natural gas swaps. (Id. ¶¶ 30, 41, 47).

### 4. **The Alleged Manipulative Scheme**

The NYMEX trades in question were made on February 24 and April 26, 2006.

#### a. **The February 24, 2006 Trades**

On February 23, 2006, Hunter told an Amaranth natural gas trader, Matthew Donohoe, to "make sure we have lots of futures to sell MoC [market on close][3] tomorrow." (Id. ¶ 32). When trading commenced on February 24, the expiration day for the March 2006 natural gas futures, Amaranth had a short position in more than 1,700 contracts. (Id. ¶ 33). But by the start of the closing range, defendants had reversed their position to long in more than 3,000 contracts. (Id. ¶ 35).

---

[3]     A "market on close" order is an "order to buy or sell at the end of the trading session at a price within the closing range of prices." (CFTC Glossary).

At about 12:15 p.m. on February 24, Hunter sent an instant message to Amaranth trader Matthew Calhoun, stating that the March 2006 contracts needed "to get smashed[4] on settle then day is done." (Id. ¶ 36, Ex. A at AALLC_REG0684186). Less than half an hour before the closing range, Hunter disclosed his trading strategy to another trader, who expressed astonishment that Hunter had so many March 2006 contracts left to sell:

```
Hunter:    We have 4000 to sell MoC
Hunter:    shhhh
gloverb:   come on
Hunter:    y
gloverb:   unless you are huge bearish
gloverb:   position
gloverb:   why the f would y[ou] do that
Hunter:    all from options yest[e]rday
Hunter:    so we[']ll see what the floor has
Hunter:    bit of an exp[e]riment mainly
gloverb:   what the f
gloverb:   that is huge
```

(Id. ¶ 38). At about 2:11 p.m., Hunter sent another message to "gloverb," stating that he had "alot [sic] more to sell . . . waiting until 2:20." (Id. ¶ 39).

On February 24, defendants sold more than 3,000 March 2006 contracts during the closing range. (Id. ¶ 41).

### b. The April 26, 2006 Trades

From April 21 to April 26, defendants began acquiring May 2006 contracts so that by the closing range on April 26, the expiration day for the May 2006 contracts, they held a long position in more than 3,000 May 2006 contracts. (Id. ¶¶ 45, 46).

---

[4]    "Smashed" refers to prices that fall very quickly. (Compl. ¶ 37).

At the beginning of the closing range on April 26, Hunter sent Calhoun an instant message, stating that he was "'wa[i]ting to sell.'" (Id. ¶ 53). Also early in the closing range, Hunter told an Amaranth risk manager that he had "'yet to sell,'" despite the presence of many buyers. (Id. ¶ 52). He was mainly referring to the hedge fund Centaurus Advisors LLC ("Centaurus"). (Id. ¶ 48). Hunter believed that Centaurus was planning to purchase a large number of May 2006 natural gas futures in the closing range, which "would tend to exert upward price pressures." (Id. ¶¶ 48, 54). In several instant messages, Hunter expressed concern that Centaurus's purchases would affect the settlement price:

```
Hunter:    FYI Arnold [a trader at Centaurus]
           is getting scary short . . .
Chasman:   what u think arnold has?
Hunter:    we are rolling size into may
Hunter:    and I am worrie[d] that [Arnold] has
           taken the other side of everything
```

(Id. ¶¶ 49-50). Hunter knew that selling his May 2006 contracts would "mute the effect of the buyers." (Id. ¶ 54).

Halfway into the closing range, defendants placed two different orders to sell their May 2006 contracts, but with instructions to hold the execution of the orders until the last eight minutes of the closing range. (Id. ¶¶ 55-58). At 2:22 p.m., with only eight minutes left before the close of trading, defendants placed a third order to sell 2,000 May 2006 contracts, which comprised two-thirds of the long position Amaranth had going into the closing range. (Id. ¶ 59). The last order was "so large, and came so late in the closing range, that the broker was

-7-

not able to execute the entire order," and only 1,675 of the contracts were sold before the close of trading.  (Id. ¶¶ 60-61).

### c.    **Marking the Close**

Defendants' trading strategy of purchasing a substantial number of futures contracts leading up to the closing range on expiration day, followed by the sale of those contracts several minutes before the close of trading, is known as "marking the close."  See Sec. & Exch. Comm'n v. Masri, 523 F. Supp. 2d 361, 369-70 (S.D.N.Y. 2007).  This type of trading strategy, conducted "at or near the close of trading for the primary purpose of attempting to change the closing price," was specifically prohibited in a compliance manual issued by Amaranth Calgary on March 10, 2006.  (Compl. ¶ 42-43).

### d.    **Defendants' Motives**

Defendants had at least two motives for attempting to manipulate natural gas futures prices.  First, defendants were trying to "mute the effect" of Centaurus's large purchases of the May 2006 natural gas futures.  (Id. ¶¶ 48-54; see also CFTC Mem. at 10).  Second, and ultimately, defendants sought to profit from their large short positions on natural gas swaps, the prices of which depended on the closing price of natural gas futures. (Compl. ¶¶ 30, 41, 47).  On February 24, it had a short position in at least 12,000 swaps (id. ¶ 41), and on April 26, it had a short position in more than 19,000 swaps (id. ¶ 47).  A low settlement price of natural gas futures would have benefited these short positions.  (Id. ¶ 28).

-8-

4.   **The Cover Up**

In a letter dated August 2, 2006, the NYMEX Compliance Department informed Amaranth that it had commenced an investigation into Amaranth's April 26 trading activities.  (Id. ¶ 63, Ex. B).  The letter noted that Amaranth sold 99 percent of its contracts during the final four minutes of regular trading hours, and 75 percent of its contracts in the final minute.  (Id. Ex. B). NYMEX asked Amaranth to submit a written explanation "of the commercial need and justification for their trading."  (Id.).

Amaranth responded in a letter dated August 15, 2006. (Id. Ex. C).  This letter "contain[ed] a number of false and misleading statements, including the manner in which Amaranth described its positions and trading strategy."  (Id. ¶ 68). Specifically, Amaranth "deliberately" concealed that it had "given specific instructions to its floor brokers on April 26, 2006 as to when Amaranth's sales orders should be executed, claiming [instead] that it did not decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later."  (Id. ¶¶ 68, 80).

B.   **Procedural History**

After a year-long administrative investigation, the CFTC commenced this action on July 25, 2007, asserting two causes of action:  an attempted manipulation claim under sections 6(c), 6(d), and 9(a)(2) of the CEA, and a cover-up claim under section 9(a)(4) of the CEA.  7 U.S.C. §§ 9, 13b, 13(a)(2), 13(a)(4). Section 6c of the CEA authorizes the CFTC to seek civil monetary

-9-

penalties and injunctive relief "[w]henever it shall appear to the
[CFTC] that any registered entity or other person has engaged, is
engaging, or is about to engage in any act or practice
constituting a violation of any provision" of the CEA.  § 13a-1.

All defendants waived service of summons.  They now move
to dismiss the complaint for failure to state a claim.  <u>See</u> Fed.
R. Civ. P. 12(b)(6).  Hunter also moves to dismiss for lack of
personal jurisdiction.  <u>See</u> Fed. R. Civ. P. 12(b)(2).

<u>**DISCUSSION**</u>

First, I address whether this Court has personal
jurisdiction over Hunter.  Second, I address the attempted
manipulation claim.  Third, I address the cover-up claim against
Amaranth.

## A.   <u>Personal Jurisdiction Over Hunter</u>

### 1.   <u>Applicable Law</u>

For cases arising under federal law that involve a
defendant residing outside the forum state, the district court
applies the personal jurisdiction rules of the state in which it
sits unless the federal statute explicitly provides for nationwide
service of process.  <u>Pacific Elec. Wire & Cable Co. v. Set Top
Int'l, Inc.</u>, No. 03 Civ. 9623 (JFK), 2005 WL 578916, at *8
(S.D.N.Y. Mar. 11, 2005) (citing <u>PDK Labs, Inc. v. Friedlander</u>,
103 F.3d 1105, 1108 (2d Cir. 1997)).  For claims arising under the
CEA, New York's long-arm statute, N.Y. C.P.L.R. § 302(a), governs
the scope of personal jurisdiction.  <u>See Michelson v. Merrill</u>

Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1284
(S.D.N.Y. 1989) (holding New Mexico long-arm statute governs scope
of personal jurisdiction for claims arising under the CEA) (citing
Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 108
(1987)).

 The exercise of personal jurisdiction must also comport
with the Due Process Clause of the U.S. Constitution.  D.H. Blair
& Co., 462 F.3d 95, 104-05 (2d Cir. 2006).  Because the
"application of N.Y. C.P.L.R. § 302(a) meets due process
requirements," I address only the requirements under the long-arm
statute.  Id. at 105; see also United States v. Montreal Trust
Co., 358 F.2d 239, 242 (2d Cir. 1966) (exercise of personal
jurisdiction under New York's long-arm statute does not present
constitutional issues because the jurisdictional reach of N.Y.
C.P.L.R. § 302(a) over non-domiciliaries is narrower than what is
permitted under the Due Process Clause).

 Section 302(a)(1) permits a court to exercise personal
jurisdiction over an out-of-state party if he "transacts any
business within the state" and if the "cause of action aris[es]
from" the business contacts.  N.Y. C.P.L.R. § 302(a)(1); D.H.
Blair & Co., 462 F.3d at 104.  The transacting business element
requires a defendant to have "'purposely availed [himself] of the
privilege of conducting activities within New York and thereby
invoked the benefits and protections of its laws.'"  Bank Brussels
Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d
Cir. 1999) (quoting Parke-Bernet Galleries, Inc. v. Franklyn, 308

N.Y.S.2d 337, 341 (1970)) (alterations in original).  The "arising out of" element requires "a substantial nexus" between the business transaction and the claim.  <u>Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.</u>, 98 F.3d 25, 31 (2d Cir. 1996).

### 2.    **Application**

It is undisputed that the attempted manipulation claim arises out of the trades Hunter executed on NYMEX on February 24 and April 26, 2006.  The sole issue is whether Hunter purposefully availed himself of the privilege of conducting business in New York when he placed the trades from Canada.

A recent case decided in this district, <u>In re Natural Gas Commodity Litigation</u>, 337 F. Supp. 2d 498 (S.D.N.Y. 2004), is directly on point.  There, the court held that it had personal jurisdiction over an out-of-state defendant whose out-of-state acts were conducted "with the purpose of manipulating the market for natural gas futures on the <u>New York</u> Mercantile Exchange."  <u>Id.</u> at 517 (emphasis in original).  The defendant company had not actually traded natural gas futures on NYMEX, but its trading activities on a Texas-based internet system were sufficient to trigger personal jurisdiction because those activities were intended to affect NYMEX prices.

Hunter's contacts with New York is more direct than the contacts in <u>In re Natural Gas Commodity Litigation</u> because he personally placed orders through a NYMEX broker and directed Amaranth traders under his supervision to place orders to trade natural gas futures on NYMEX on February 24 and March 26.  <u>See</u>

Sec. & Exch. Comm'n v. Alexander, No. 00 Civ. 7290 (LTS), 2003 WL
21196852, at *2 (court had personal jurisdiction over Greek
citizen residing in Greece who carried out his trades on the New
York Stock Exchange from Greece by telephone through a Greek
brokerage firm).  Hunter was clearly transacting business within
the state, albeit by telephone from Canada, which is sufficient to
support personal jurisdiction under New York's long-arm statute.
See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (in
light of the "inescapable fact of modern commercial life that a
substantial amount of business is transacted solely by mail and
wire communications across state lines," jurisdiction "may not be
avoided merely because the defendant did not physically enter the
forum State" (emphasis in original)).  Accordingly, Hunter's
motion to dismiss for lack of personal jurisdiction is denied.

**B.    The Attempted Manipulation Claim**

        I first discuss the legal standards applicable to Rule
12(b)(6) motions to dismiss an attempted manipulation claim under
the CEA.  I then address whether the CFTC has sufficiently pled
the elements of an attempted manipulation claim.

    **1.    Pleading Standards**

        **a.    Which Pleading Standard Applies to an
                Attempted Manipulation Claim under the CEA?**

        The parties disagree as to whether an attempted
manipulation claim under the CEA is subject to Federal Rule of
Civil Procedure 8(a)'s liberal pleading standard or the heightened
pleading standard of Rule 9(b).  Rule 8(a) requires only "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  By contrast, Rule 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

District courts are divided on this issue.  <u>Compare Enron Corp.</u>, 2004 WL 594752, at *3 (claims under sections 6(c), 6(d), and 9(a)(2) of the CEA "need not be pled with the factual specificity required by Fed. R. Civ. P. 9(b)"), <u>and</u> <u>Premium Plus Partners, L.P. v. Davis</u>, No. 04 Civ. 1851 (MRF), 2005 WL 711592, at *15 (N.D. Ill. Mar. 28, 2005) (declining to apply heightened pleading to manipulation claim under CEA), <u>with</u> <u>In re Natural Gas Commodity Litig.</u>, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (applying Rule 9(b) to manipulation claim under the CEA).

Only two cases decided in this district have addressed the question of whether heightened pleading is required to assert a manipulation claim under the CEA.  <u>See</u> <u>In re Crude Oil Commodity Litig.</u>, 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. Jun. 28, 2007); <u>In re Natural Gas Commodity Litig.</u>, 358 F. Supp. 2d 336. To resolve the issue, both cases followed a "case-specific approach" by examining whether the alleged manipulative scheme sounded in fraud, thereby implicating the heightened pleading standards of Rule 9(b).  <u>In re Crude Oil Commodity Litig.</u>, 2007 WL 1946553, at *4-5; <u>In re Natural Gas Commodity Litig.</u>, 358 F. Supp. 2d at 343.  In other words, if a particular manipulation claim sounds in fraud, it must comply with Rule 9(b); if it does not

-14-

sound in fraud, it need not comply with Rule 9(b).  I agree with
this approach.  Accordingly, I turn to the allegations as pled in
the complaint to determine if they sound in fraud.

          The CFTC alleges that defendants intended to create
artificial prices of natural gas futures contracts by deliberately
waiting to sell a substantial number of futures contracts in the
closing range on expiration day.  This attempted manipulation
claim is not premised on allegations of fraud.  Defendants are not
alleged to have made any false statements or misrepresentations in
connection with the alleged attempted manipulation.

          In contrast, the two cases decided in this district
applied Rule 9(b) because the manipulation claims there involved
false statements or the concealment of information.  See In re
Natural Gas Commodity Litig., 358 F. Supp. 2d at 343 (finding that
Rule 9(b) applied to manipulation claim because alleged scheme was
"classically associated with fraud:  the dissemination of
'inaccurate, misleading, and false trading information,' and
participation in 'a variety of fraudulent trade reporting
strategies whose purpose was to . . . manipulate the spot prices
of natural gas.'" (quoting amended complaint) (emphasis in
original)); In re Crude Oil Commodity Litig., 2007 WL 1946553, at
*5 (applying Rule 9(b) to manipulation claim because complaint
alleged that defendants conspired "'to conceal the availability,
release and/or sale' of defendants' supplies of crude oil . . .
and also used proxies to sell their crude oil inventories 'so as
to not appear to the market as a seller of crude oil'" (quoting
amended complaint) (emphasis in original)).

-15-

Here, the CFTC's theory of attempted manipulation is not based on misleading statements or omissions, but rather on a particular trading strategy.  The manipulation is not based on false statements of fact intended to deceive a buyer or seller, but on the timing of trades intended to change the closing price. Because the attempted manipulation claim does not sound in fraud, it is not subject to the heightened pleading standards in Rule 9(b).  Instead, the liberal pleading standards under Rule 8(a) apply.

### b.  Pleading Standards under Rule 8(a)

On a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

In its recent decision in Bell Atlantic Corp., the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45-47 (1957), adopting in its place a "plausibility" requirement.  Bell Atl. Corp., 127 S. Ct. at 1969.  As interpreted by the Second Circuit, Bell Atlantic Corp. did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim <u>plausible</u>."
<u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007).  The question
is whether the pleading alleges "'enough facts to state a claim
for relief that is plausible on its face.'"  <u>Patane v. Clark</u>, 508
F.3d 106, 111-12 (2d Cir. 2007) (quoting <u>Bell Atl. Corp.</u>, 127 S.
Ct. at 1974).

### 2.  <u>Elements of Attempted Manipulation</u>

The CEA prohibits "[a]ny person [from] manipulat[ing] or
attempt[ing] to manipulate the price of any commodity in
interstate commerce, or for future delivery on or subject to the
rules of any registered entity."  7 U.S.C. § 13(a)(2).  To state a
claim for attempted manipulation, the CFTC must allege (1) an
intent to affect market prices and (2) an overt act in furtherance
thereof.  <u>U.S. Commodity Futures Trading Comm'n v. McGraw-Hill
Cos.</u>, 507 F. Supp. 2d 45, 51 (D.D.C. 2007) ("Attempted
manipulation is demonstrated by the intent to affect market prices
and some 'overt act' in furtherance thereof.") (internal citations
omitted); <u>U.S. Commodity Futures Trading Comm'n v. Johnson</u>, 408 F.
Supp. 2d 259, 267 (S.D. Tex. 2005); <u>see also</u> <u>In re Hohenberg Bros.
Co.</u>, 1977 WL 13562, at *7 (CFTC Feb. 18, 1977) ("An attempted
manipulation requires only an intent to affect the market price of
the commodity and some overt act in furtherance of that intent.").
I address the two elements in turn.

### a.  <u>Manipulative Intent</u>

The intent requirement for proving an attempted
manipulation and a completed manipulation is the same.  <u>Enron</u>

-17-

Corp., 2004 WL 594752, at *7.  To establish intent, "it must be
proven that the accused acted (or failed to act) with the purpose
or conscious object of causing or effecting a price or price trend
in the market that did not reflect the legitimate forces of supply
and demand."  Id. (quoting In re Indiana Farm Bureau Coop. Assoc.,
CFTC No. 75-14, 1982 WL 30249, at *6 (C.F.T.C. Dec. 17, 1982)).
Because "proof of intent will most often be circumstantial in
nature, manipulative intent must normally be shown inferentially
from the conduct of the accused."  Id. (quoting In re Indiana Farm
Bureau Coop. Assoc., 1982 WL 30249, at *6); see also In re
Hohenberg Bros. Co., 1977 WL 13562, at *7 (because "it is
impossible to discover an attempted manipulator's state of mind,"
intent may be inferred "by a person's actions and the totality of
the circumstances").

        Here, the complaint makes a number of factual
allegations from which one could reasonably infer an intent on the
part of defendants to affect the prices of natural gas futures
contracts.  Hunter's numerous instant message conversations could
plausibly be interpreted to reflect such an intent.  For example,
in an instant message sent on February 24, Hunter revealed that he
needed the March 2006 contracts to "get smashed."  In another
conversation, Hunter astounded a colleague when he disclosed that
he had not yet sold his March 2006 contracts and was trying an
experiment.  On April 26, Hunter told two colleagues that he was
waiting to sell his May 2006 contracts, knowing that selling near
the end of trading hours would attenuate the effect on the

settlement price of Centaurus's large purchases.  The CFTC contends that these instant messages, as well as several others, reveal an intent to manipulate prices.  Although defendants suggest an alternative interpretation of these instant messages that convey a more benign motive, at this juncture, on a motion to dismiss, all reasonable inferences must be construed in the CFTC's favor.  Bernheim v. Litt, 79 F.3d at 321.

In addition to the instant messages, the CFTC argues that defendants' concerns about their short swaps positions, which would have benefitted from low natural gas futures settlement prices, as well as Hunter's concern about the effects of Centaurus's trading activities provide additional circumstantial evidence of intent.  (Compl. ¶¶ 41, 47-49).  These alleged profit motives render the inference of intent even more plausible.

Defendants argue, however, that the CFTC's allegations to support an inference of intent are insufficient without alleging that defendants "sought to cause a price that would actually be 'artificial.'"  (Hunter Mem. at 8 (emphasis in original)).  A claim for attempted manipulation, however, does not require that the CFTC assert that an attempt to manipulate prices would, in fact, affect market prices.  Johnson, 408 F. Supp. 2d at 268 ("CFTC is not required to specifically assert . . . a likelihood that the defendants' alleged price manipulation would actually affect market prices."); In re Hohenberg Bros. Co., 1977 WL 13562, at *8 ("demonstrated capability of realizing manipulation" is not a necessary element of attempted manipulation claim).  This argument is thus rejected.

-19-

From the totality of the circumstances surrounding defendants' trading activities on February 24 and April 26, 2006, I conclude that the CFTC's claim that defendants intended their actions to lower the prices of natural gas futures is plausible.

### b. **Overt Acts**

The complaint alleges numerous overt acts committed by defendants in furtherance of their intent to manipulate the settlement prices of natural gas futures. Specifically, the CFTC alleges that shortly before the closing range on February 24, the expiration day for the March 2006 natural gas futures, defendants reversed their overall position from short to long in more than 3,000 futures contracts. Defendants then placed orders to sell those contracts during the closing range when prices would be affected by the large volume of trades. (Compl. ¶¶ 33, 35).

The CFTC alleges that defendants perpetrated the manipulative scheme again on April 21. Defendants allegedly instructed NYMEX brokers to sell a total of 1,044 natural gas futures contracts in the last eight minutes of trading. (Compl. ¶¶ 55-58). Eight minutes before the end of trading, Hunter allegedly placed another order with a NYMEX broker to sell 2,000 futures contracts. (Compl. ¶¶ 59-61). These allegations sufficiently meet the overt acts requirement of an attempted manipulation claim.

Defendants, however, contend that to state a claim for attempted manipulation, the CFTC may not simply allege any overt act, but must allege an unlawful, fraudulent act. Without an

-20-

allegation of fraud or deception, defendants argue, there is no manipulative conduct, but merely "legitimate speculative trading." (Amaranth Mem. at 5, 6). Quoting a recent Second Circuit decision, defendants assert that "short selling -- even in high volumes -- is not, by itself, manipulative." (Amaranth Mem. at 9, quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007)). At bottom, defendants raise the issue whether manipulative intent alone can support liability for otherwise legal, open-market transactions.

This question, however, has already been addressed in the context of federal securities laws. In Securities and Exchange Commission v. Masri, Judge Holwell expressly "decline[d] to adopt defendants' proposed per se rule that open-market activity cannot be considered manipulative based solely on manipulative intent, that is, without additional deceptive or manipulative conduct." 523 F. Supp. 2d at 371. Instead, he held that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation." Id. at 372.

The open-market transactions at issue in Masri involved a specific type of trading strategy known as "marking the close" -- the same trading activity at issue in this case. Marking the close refers to the execution of purchase or sale orders at or near the close of the market to affect the closing price of a security. Sec. & Exch. Comm'n v. Schiffer, No. 97 Civ. 5853 (RO),

1998 WL 226101, at *1 n.3 (S.D.N.Y. May 5, 1998).  Although
"transactions made at the close of the day are not prohibited,"
the timing of such transactions is not only "suspicious," but also
"more capable of artificially affecting the price of the
security."  Masri, 523 F. Supp. 2d at 370.  The Masri court thus
concluded that allegations of "end-of-day" transactions,
accompanied by evidence sufficiently indicative of manipulative
intent, stated a claim for market manipulation in violation of
section 10(b) of the Securities Exchange Act of 1934.  Id. at 372.

        Although Masri dealt with the interpretation of federal
securities laws, there is no doubt that marking the close or any
other trading practices, without an allegation of fraudulent
conduct, can also constitute manipulation in contravention of the
CEA, so long as they are pursued with a manipulative intent.
While the 1934 Act prohibits both fraud and manipulation in
section 10(b), the CEA has a separate anti-fraud section apart
from the anti-manipulation provision.  See Three Crown Ltd. v.
Caxton Corp., 817 F. Supp. 1033, 1043 n.19 (S.D.N.Y. 1993) (making
same observation).  When the statute distinguishes fraud and
manipulation by addressing them in different provisions, it would
be redundant to construe manipulation to require a fraud element.
Furthermore, that courts in this district use the "case-specific
approach" to determine whether heightened pleading standards apply
to an attempted manipulation claim suggests that not all
manipulative schemes in contravention of the CEA involve fraud.

        This conclusion is in accord with the decisions of other
courts that have considered what kinds of acts fall within the

ambit of the CEA.  The Fifth Circuit defined "manipulation" under the CEA to include "any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets."  Volkart Bros., Inc. v. Freeman, 311 F.2d 52, 58 (5th Cir. 1962).  A district court in Texas has held that "[b]uying or selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots is one form of manipulation, among others."  Enron Corp., 2004 WL 594752, at *5 (internal citations omitted). Indeed, even Amaranth Calgary in its compliance manual prohibited "'marking the close' at or near the close of trading for the primary purpose of attempting to change the closing price." (Compl. ¶ 43).

For the foregoing reasons, I reject defendants' argument that it is necessary to plead a fraudulent act to state an attempted manipulation claim under the CEA.  The complaint sufficiently alleges that defendants committed overt acts in furtherance of an intent to manipulate the settlement prices of the March 2006 and May 2006 natural gas futures.  Accordingly, the motions to dismiss the attempted manipulation claim are denied.

D.    **The Cover-Up Claim**

    1.    **Applicable Law**

        a.    **Section 9(a)(4)**

The CFTC alleges that Amaranth sought to "cover up" its alleged manipulative scheme by submitting a letter containing

false statements to NYMEX, which is specifically prohibited in
section 9(a)(4) of the CEA:

> It shall be a felony [for any] person
> willfully to falsify, conceal, or cover up by
> any trick, scheme, or artifice a material
> fact, make any false, fictitious, or
> fraudulent statements or representations, or
> make or use any false writing or document
> knowing the same to contain any false,
> fictitious, or fraudulent statement or entry
> to a registered entity, board of trade, or
> futures association designated or registered
> under [the CEA] acting in furtherance of its
> official duties under [the CEA].

7 U.S.C. § 13(a)(4).  The CFTC brings a civil claim under this
section pursuant to section 6c of the CEA, which authorizes the
CFTC to seek civil monetary penalties for "a violation of any
provision" of the CEA.  § 13a-1.

        No federal court has yet dealt with section 9(a)(4) of
the CEA, or addressed whether a "cover up" claim under this
section is subject to Rule 9(b).  The "use [of a] false writing or
document knowing the same to contain any false . . . statement
. . . to a registered entity, board of trade, or futures
association" is not fraud in the classic sense where a defendant
induces another to surrender something of value by making false
representations.  § 13(a)(4); see Black's Law Dictionary 660 (6th
ed. 1990).  But it is nonetheless fraud because false statements
issued to cover up illicit activities can prevent NYMEX from
carrying out its enforcement duties if it relies on those
statements.  Cf. United States v. Arcadipane, 41 F.3d 1, 4 (1st
Cir. 1994) (noting that 18 U.S.C. § 1001, which is nearly
identical to section 9(a)(4) of the CEA, "is intended to promote

-24-

the smooth functioning of government agencies and the expeditious processing of the government's business by ensuring that those who deal with the government furnish information on which the government confidently may rely").  Accordingly, because claims under section 9(a)(4) sound in fraud, they are subject to the heightened pleading requirements in Rule 9(b).

### b.   Pleading Requirements Under Rule 9(b)

The Second Circuit has read Rule 9(b) to require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal citations omitted).

### 2.   Application

The issue is whether the CFTC has satisfied the heightened pleading requirement under Rule 9(b).  It has.

First, the complaint alleges that the statement that Amaranth "did not decide to sell its March natural gas futures contracts outright until 2:17 p.m. or later" was fraudulent. (Compl. ¶ 68; see id. Ex. C).  Second, the complaint identifies the "speaker" as Amaranth.  (Id. ¶ 66).  Third, the complaint specifies that the statement was made in a letter dated August 15, 2006 and addressed to the NYMEX Compliance Department.  (Id.). Fourth, the CFTC alleges that this statement was fraudulent because Amaranth had decided to sell the contracts before 2:17 p.m., which is evidenced by two sell orders defendants placed at

-25-

"about the middle of the close . . . with instructions to hold execution of the order until the last eight minutes of the closing range." (Id. ¶¶ 55, 56, 62-66).  Although the statement in question is not fraud in the classic sense of duping investors or business partners, it is nonetheless fraudulent in the sense of section 9(a)(4), for it was intended to cover up Amaranth's alleged manipulative scheme from the NYMEX Compliance Department and thwart its investigation of Amaranth's trading activities.

These allegations sufficiently make out a claim under section 9(a)(4) of the CEA and provide fair notice to defendants of the "who, what, when, where and how of the alleged fraud" required under the heightened pleading standards.  United States ex rel. Woods v. Empire Blue Cross & Blue Shield, No. 99 Civ. 4968 (DC), 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002) (quoting United States ex rel. Thompson v. Columbia/HCA Health Care Corp., 125 F.3d 899, 903 (5th Cir. 1997)); Werner v. Satterlee, Stephens, Burke & Burke, 797 F. Supp. 1196, 1207 (S.D.N.Y. 1992) (one goal of Rule 9(b) is "providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense").

Amaranth, however, argues that the allegations in the complaint are "conclusory" and not substantiated by "documentary evidence [or] testimony."  (Amaranth Mem. at 24).  The CFTC, however, "need only allege, not prove, sufficient facts to survive a motion to dismiss."  Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999) (emphasis in original).  The CFTC has alleged facts, such as the two sell orders and Hunter's instant messages, to

support its claim under section 9(a)(4).  At this stage of the litigation, I accept, as I must, the CFTC's allegations and version of the facts.  Defendants' arguments that the CFTC's allegations are insufficient to prove that their statements to NYMEX were false are more properly made in a motion for summary judgment rather than a motion to dismiss.  See In re Natural Gas Commodity Litig., 337 F. Supp. 2d at 508 (defendants' arguments that plaintiff's allegations fail to establish claim under the CEA should be made in summary judgment motion, not in a motion to dismiss).  Accordingly, defendants' motions to dismiss the cover-up claim are denied.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are denied.  Counsel shall appear for a pretrial conference on June 13, 2008, at 10:00 a.m.

SO ORDERED.

Dated:    New York, New York
          May 21, 2008

DENNY CHIN
United States District Judge

-27-

**<u>APPEARANCES</u>**

TERRY ARBIT, ESQ.
General Counsel for the U.S. Commodity
    Futures Trading Commission
    By:  Stephen Jay Obie, Esq.
         David W. MacGregor, Esq.
         Manal Sultan, Esq.
         Elizabeth C. Brennan, Esq.
         David W. Oakland, Esq.
         Karin N. Roth, Esq.
         W. Derek Shakabpa, Esq.
140 Broadway
New York, New York  10005

WINSTON & STRAWN LLP
Attorneys for Defendants Amaranth Advisors, L.L.C.
    and Amaranth Advisors (Calgary) ULC
    By:  David E. Mollon, Esq.
         Steven M. Schwartz, Esq.
         Lauren B. Lepore, Esq.
200 Park Avenue
New York, New York  10166

KOBRE & KIM LLP
Attorneys for Defendant Brian Hunter
    By:  Michael S. Kim, Esq.
         Leif T. Simonson, Esq.
800 Third Avenue
New York, New York  10022