UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                        Plaintiff,

v.

BRIAN HUNTER,

                        Defendants.

07 Civ. 6682 (DC)

ECF CASE

**PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW**

U.S. COMMODITY FUTURES TRADING
      COMMISSION
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9700

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

PROCEDURAL BACKGROUND ........................................................................... 1

FACTS EXPECTED AT TRIAL ............................................................................. 3

    A.    The Nature of the Natural Gas Futures and Swaps Market ........................ 3

    B.    Hunter Directed Amaranth's Natural Gas Trading ..................................... 4

    C.    Hunter Attempted to Manipulate NG Futures Prices on
        February 24, 2006 ..................................................................................... 5

        1.  Hunter Directs the Reversal of Amaranth's Futures Position On the
            Morning of February 24 ......................................................... 5

        2.  Smashing the Close .................................................................. 6

    D.    Hunter Also Attempted to Manipulate NG Futures Prices on
        April 26, 2006 ........................................................................................... 8

        1.  As in February, Hunter Again Reversed Amaranth's NG Futures Position
            to be Able to Sell Over 3,000 Contracts in the Close on Expiry Day ...... 8

        2.  Hunter Waited to Unload Thousands of Contracts in the Last 8 Minutes
            of the Close on April 26, 2006 ............................................... 9

        3.  Hunter Supplied Information Contained in a False Letter to NYMEX.. 11

ARGUMENT ........................................................................................................ 12

    A.    Hunter Intended to Manipulate the Price of Natural Gas Futures ............ 12

        1.  Intent to Manipulate in February 2006 ................................... 14

        2.  Intent to Manipulate in April 2006 ......................................... 15

    B.    Hunter's Overt Acts in Furtherance of His Intent to Manipulate the
        Price of Natural Gas Futures Contracts ................................................... 16

        1.  Hunter's February 2006 Overt Acts in Furtherance of His Intent to
            Manipulate Natural Gas Futures Prices ................................... 17

        2.  Hunter's Overt Acts in April 2006 in Furtherance of His Intent to
            Manipulate Natural Gas Futures Prices ................................... 18

RELIEF REQUESTED .......................................................................................... 18

## TABLE OF AUTHORITIES

### CASES

*Cargill, Inc. v. Hardin*,
    452 F.2d 1154 (8th Cir. 1971) ...........................................................................................1

*CFTC v. Amaranth Advisors*, *L.L.C.*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)...........................................................2, 12, 13, 16

*CFTC v. Capital Blu Management Inc.*,
    2010 WL 4942720, at *1 (M.D. Fl. Nov. 29, 2010) ......................................................18

*CFTC v. Hunter*
    2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012)......................................................3, 13

*Tull v. United States*,
    481 U.S. 412, 425-26 (1987) ...........................................................................................18

*Volkart Bros., Inc. v. Freeman*,
    311 F.2d 52 (5th Cir. 1962) .......................................................................................12, 16

### AGENCY DECISIONS

*In re Henner*,
    30 A.D. 1151 (Agric. Dec. 1971).....................................................................................16

*In re Hohenberg Bros. Co.*,
    [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271,
    1977 WL 13562 (C.F.T.C. Feb. 18, 1977)................................................................12, 15

*In re Indiana Farm Bureau Coop. Assoc.*,
    [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796
    1982 WL 30249 (C.F.T.C. Dec. 17, 1982) .....................................................................12

*In re U.S. Securities & Futures Corp., et al.*,
    CFTC Dkt. No. 01-01, 2009 WL 3423842 (C.F.T.C. Oct. 7, 2009).................................16

### STATUTES AND REGULATIONS

7 U.S.C. § 1a(29) .......................................................................................................................3

7 U.S.C. § 9..................................................................................................................2, 12, 19

7 U.S.C. § 13................................................................................................................2, 12, 13, 19

7 U.S.C. § 13b..............................................................................................................2, 12, 19

## INTRODUCTION

> *"The methods and techniques of manipulation are limited only by the ingenuity of man."*
> Cargill, Inc. v. Hardin, *452 F.2d 1154, 1163 (8th Cir. 1971).*

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") charges that Defendant Brian Hunter attempted to manipulate the price of natural gas futures contracts traded on the New York Mercantile Exchange ("NYMEX") on February 24 and April 26, 2006, in violation of the Commodity Exchange Act.  Hunter, who earned over $100 million in salary and bonuses in 2005 as head natural gas trader for the hedge fund Amaranth Advisors, L.L.C., and whose trading led to Amaranth's demise in 2006 after losing over $6 billion[1], bragged in contemporaneous instant messages ("IMs") that his manipulation was an "experiment," and that he needed natural gas futures contracts "to get smashed."  After his large volume trading on February 24, he boasted that he was "flexing" his muscles.  In both February and April, Hunter reversed Amaranth's futures position from short to long shortly prior to the end of trading for the following month's contracts, building up large long positions for the purpose of selling them at the close in order to cause lower prices.  At the same time, he built up large positions in swap contracts that would benefit from these lower futures prices.  The evidence at trial will show that Hunter intended to affect the prices of natural gas futures contracts on the days in question and that he committed overt acts in furtherance of that intent.

## PROCEDURAL BACKGROUND

On July 25, 2007, the Commission filed a Complaint against Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) ULC (collectively "Amaranth") and Hunter alleging that in

---

[1] *See* Jenny Anderson, *Betting the House and Losing Big*, N.Y. Times (Sept. 23, 2006) (viewed at http://www.nytimes.com/2006/09/23/business/23hedge.html); Heather Timmons, *A Familiar Story, Youthful Bent Included*, N.Y. Times (Sept. 22, 2006) (viewed at http://www.nytimes.com/2006/09/22/business/22trader.html); *see generally* Barbara Dreyfuss, *Hedge Hogs: The Cowboy Traders Behind Wall Street's Largest Hedge Fund Disaster* (2013).

February and April 2006, Hunter, Amaranth's head natural gas trader, engaged in a scheme to manipulate the price of NYMEX natural gas futures contracts by selling large amounts of such contracts at the close of trading on the final trading day. The scheme involved Hunter and others at his direction placing large sell orders in the last half hour of trading on February 24, 2006, and in the last eight minutes of trading on April 26, 2006, with the intent to lower natural gas futures prices in order to benefit Amaranth's large short natural gas swaps position, the value of which was derived from the settlement prices of the NYMEX natural gas futures contracts on those days. The Complaint alleges that Hunter thereby attempted to manipulate the price of natural gas futures in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, as amended (the "Act" or "CEA"), 7 U.S.C. §§ 9, 13b and 13(a)(2).[2]

On November 8, 2007, Hunter and Amaranth filed motions to dismiss the complaint, including a challenge to personal jurisdiction over Hunter. On May 21, 2008, then-District Judge Denny Chin for this Court issued an Opinion and Order which denied the motions to dismiss in all respects. *See CFTC v. Amaranth Advisors*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008). On June 10, 2008, this Court denied defendants' motion to reconsider the decision denying their motions to dismiss.[3]

After Judge Chin was appointed to the Court of Appeals, District Judge Barbara Jones denied Hunter's motion for summary judgment[4] on January 31, 2012, holding that "Hunter's interpretation of the legal standard for manipulative intent is incorrect, and the Court dispensed

---

[2] Unless otherwise noted, all citations to the Act and Regulations herein refer to them as in effect at the relevant times in 2006.

[3] Defendant Hunter has advised Plaintiff's counsel that he does not intend to put on any evidence regarding the personal jurisdiction defense but seeks only to preserve the defense as asserted at the pleading stage solely for purposes of appellate review. This issue is further addressed by Plaintiff in a motion in limine being filed today.

[4] The Complaint also alleges that Amaranth tried to cover-up the attempted manipulation on April 26 by sending a false letter to NYMEX, in violation of Section 9(a)(4) of the CEA, 7 U.S.C. §§ 13(a)(4). Judge Denny Chin entered a Consent Order of permanent injunction, civil monetary penalty and other relief on August 12, 2009 (Docket #73), that resolved both the manipulation and false statement claims as against Amaranth.

with this issue when it decided Hunter's motion to dismiss. There has been no change in controlling law, and there are no other compelling reasons to revisit that decision." *CFTC v. Hunter*, 07 Civ. 6682 (BSJ), 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012).

The remaining count of the Complaint is Count 1 against Hunter, charging him with attempted manipulation of the price of NYMEX natural gas futures contracts on February 24 and April 26, 2006 in violation of Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2).

## FACTS EXPECTED AT TRIAL

The Commission expects that the evidence at trial in substance will establish the following facts.

### A.     The Nature of the Natural Gas Futures and Swaps Market

A futures contract is an agreement to purchase or sell a commodity for delivery in the future at a price that is determined at the initiation of the contract, that obligates each party to the contract to fulfill the contract at the specified price, that is used to assume or shift price risk, and that may be satisfied by delivery or offset.  Natural gas futures contracts ("NG contracts") are traded on the New York Mercantile Exchange ("NYMEX"), a board of trade and designated contract market under Section 5(b) of the Act and Commission Regulations 38.3(a)(1)(ii) and (iii), and thus a registered entity under Section 1a(29) of the Act.  CEA § 1a(29); 7 U.S.C. § 1a(29).  NG contracts are for the delivery of natural gas at the Henry Hub in Louisiana during the specific month identified in the contract.

Expiration day is the last day the futures contract for a particular month can be traded on the NYMEX.  At the relevant times, expiration day for NG contracts was the third to last business day of the month prior to which delivery must be made. Thus, February 24, 2006 was the expiration day for the March 2006 natural gas futures contract (the "March NG contract"),

and April 26, 2006 was the expiration day for the May 2006 natural gas futures contract (the

"May NG contract").  Once the futures market closes on expiration day, market participants that

have open positions in the contract must either make delivery of natural gas during the contract

month (if they are sellers and have an open short position) or take delivery (if they are buyers

with an open long position).  Many market participants, including Amaranth, do not have the

ability to make or take delivery of natural gas, and therefore must not have an open position at

the end of trading on expiration day, i.e., must have a flat position in the expiring contract.  On

expiration day in February and April 2006, in accordance with NYMEX Rule 6.52A, the

settlement price of the NYMEX natural gas futures contract was the weighted average price of

all open outcry trades executed from 2:00-2:30 p.m. (the "Closing Range"), which Hunter knew.

Generally, swaps are contracts that involve the exchange of one asset or liability for a

similar asset or liability.  Commodity swaps in particular are generally swaps in which the

payout to at least one counterparty is based on the price of a commodity or the level of a

commodity index.  Relevant to this trial are natural gas lookalike swaps, which are transacted on

NYMEX ClearPort, the Intercontinental Exchange ("ICE") and in the over-the-counter ("OTC")

market, and are valued based on the settlement price of the NYMEX NG futures contract.

### B.  Hunter Directed Amaranth's Natural Gas Trading

In 2006, Defendant Brian Hunter headed energy trading at Amaranth.  Matthew

Donohoe, a long-time friend of Hunter, worked at Amaranth and executed trades for Hunter at

Hunter's direction.  Hunter's compensation was directly tied to the value of the energy portfolio;

in April 2006 Hunter's energy portfolio was worth as much as $5 billion.  In fact, Hunter's

compensation for 2005 was over $100 million.

Hunter was responsible for Amaranth's energy portfolio, which contained NYMEX

natural gas futures and NYMEX lookalike swaps. Hunter was responsible for developing the

trading strategy for Amaranth in the natural gas market on February 24 and April 26, 2006 and for making decisions regarding the execution of those trades.  The natural gas futures trades for Amaranth that Donohoe placed on those days were done at Hunter's direction.[5]

As for the natural gas swap positions in Amaranth's energy portfolio, the holders of swaps positions do not make or take delivery of any product upon expiry.  Rather, the swap contracts expire and are financially settled; i.e., one party is paid by its counterparty based on the underlying futures contract.  The settlement price for these swaps is the settlement price of the corresponding NYMEX futures contract.

Because of the direct link in prices between futures and swaps, it is therefore possible to affect the profitability of swaps by attempting to manipulate the NYMEX futures settlement price. This possibility was well-recognized by Amaranth's traders. Indeed, Amaranth Advisors' (Calgary) Compliance Manual specifically prohibited employing manipulative trading strategies such as trading "for the purpose of artificially causing the price of a commodity to move up or down" or "'marking the close' at or near the close of trading for the primary purpose of attempting to change the closing price to protect or alter the value of an existing position . . .."

### C.      Hunter Attempted to Manipulate NG Futures Prices on February 24, 2006

On the morning of February 24, Hunter directed the purchase of over 4,700 March NG futures contracts, taking Amaranth from a short position of over 1,700 contracts to 3,111 long, all of which he then directed to be sold in the Closing Range that same day.

> 1.      Hunter Directs the Reversal of Amaranth's Futures
> Position On the Morning of February 24

At the end of the prior trading day, February 23, 2006, Amaranth was short more than 1,700 March NG futures contracts.  Notwithstanding that, Hunter instructed Donohoe, in an IM

---

[5] Plaintiff expects that the evidence will explain to the jury why Hunter is not being held responsible for the trading strategy at the end of March 2006; namely, that he was on a lengthy vacation in the Maldive Islands.

on February 23, "[to] make sure we have lots of futures to sell MoC [market on close] tomorrow." At 10:23 a.m. on February 24, Amaranth's operations department reminded Hunter that he had to have a flat position in the March NG contract by the end of trading that day.  But, as Hunter had instructed him, Donohoe did not just get flat, he instead reversed Amaranth's short position and continued to buy March NG futures contracts until about 12:32 p.m., by which time Amaranth was long over 3,000 March NG futures contracts.  When Donohoe informed Hunter that he had built up a long position of 3,111 contracts, Hunter responded "cool" and confirmed that it "should be enough."  Hunter then decided that no more futures would be traded at that point, and Hunter told Donohoe that he was "telling Vinnie [Rufa]," a phone clerk for the NYMEX floor broker ALX Energy, Inc. ("ALX").

After building up his position to 3,111 contracts long just after noon, Hunter did no further NYMEX trading until the Closing Range, between 2:00 and 2:30 p.m.  Hunter has acknowledged that 3,000 futures contracts is a large number of contracts for a floor broker to execute during the close.  During the day, Hunter also caused Amaranth to increase its short position in March natural gas look-alike swaps.  This swaps position would benefit from a lower settlement price in the March NG futures contract on February 24.

2.    <u>Smashing the Close</u>

While Hunter was building Amaranth's long futures position to sell off during the Closing Range, he stated to another Amaranth natural gas trader in an IM at 12:16 p.m. that they "just need H [the March NG contract] to get smashed on settle then day is done." To Hunter, "smashed" in the context of futures prices means if the prices fall very quickly.  At the point in time on February 24, 2006, Hunter wanted the March NG futures price to fall.

Shortly before the close, Hunter had an instant message conversation with a trader at another firm and informed him that Amaranth had a "huge" position to sell in the futures close as an "experiment" and that he should not tell anyone:

| | |
|---|---|
| Brian Hunter: | We have 4000 to sell MoC |
| Brian Hunter: | shhhh |
| [Other trader]: | come on |
| Brian Hunter: | y |
| [Other trader]: | unless you are huge bearish |
| [Other trader]: | position |
| [Other trader]: | why the f would yo do that |
| Brian Hunter: | all from options yesterday |
| Brian Hunter: | so we ll see what the floor has |
| Brian Hunter: | bit of an expiriment mainly |
| [Other trader]: | what the f |
| [Other trader]: | that is huge[6] |

Hunter was thus describing that he was going to be a big seller of futures in the Closing Range.

On February 24, Hunter placed an order with NYMEX floor broker ALX to sell all 3,111 March NG futures contracts in the Closing Range. Nearly 3,000 of Amaranth's contracts were sold during the Closing Range.[7] The floor broker who received Hunter's 3,111 contracts order recalled specifically that because this order was so large, it was difficult to fill in the 30-minute Closing Range. During the Closing Range, Hunter told Donohoe by IM that "today came together quite nicely." Afterward Hunter and Donohoe had the following IM exchange:

| | |
|---|---|
| Matthew Donohoe: | h [March contract] will setlle lower |
| Matthew Donohoe: | and h/j [March/April spread] wider |
| Matthew Donohoe: | nice |
| Brian Hunter: | I am flexing here |
| Matthew Donohoe: | looking preety bang on |
| Matthew Donohoe: | we already mimiced |
| Matthew Donohoe: | lol |

[6] The formatting of IMs is modified for readability purposes. Misspellings in the original IMs are reproduced without change or notation.

[7] After the close there is an opportunity for trading on the NYMEX floor in what is referred to as the post-close. Because ALX had been unable to sell the remainder of the position during the 30 minutes Closing Range, they finished the sale in the post-close session. Transactions in the post-close session are not factored into the settlement price.

|  |  |
|---|---|
| Matthew Donohoe: | rrrrrrrrrrrrrrrrrrr |
| Brian Hunter: | hahahahaha |

In using the phrase "I am flexing here," Hunter referred to having a good trading day.  Hunter's book on this day made profits of $45 million, and was up $163 million that week.

Prior to the expiry of the March NG contract on February 24, 2006, Hunter generally traded the expiring contract during the expiry only to clean up a small position in order to become flat.  Nevertheless, on February 24, 2006, Amaranth became the largest net seller of futures contracts during the Closing Range of the expiration day, selling more than five times as many contracts as the next largest net seller.

### D.  Hunter Also Attempted to Manipulate NG Futures Prices on April 26, 2006

On the days leading up to April 26, Hunter directed the reversal of Amaranth's short May NG futures position, taking Amaranth from a short position of over 2,976 contracts to a position of approximately 3,044 long, all of which he then directed to be sold in the last eight minutes of the Closing Range on April 26.

1. As in February, Hunter Again Reversed Amaranth's NG Futures Position to be Able to Sell Over 3,000 Contracts in the Close on Expiry Day

In the days preceding the expiry day, April 26, Hunter reversed Amaranth's short May NG futures position such that by the start of the day on April 26 he had accumulated a long position of 3,044 May NG futures contracts.  On April 26, Amaranth substantially increased its short May OTC swaps position.  The increase in the short swaps position included entering into a 10,000 futures equivalent contract spread transaction, effectively making Amaranth's May swaps position 10,000 futures equivalent contracts shorter.  Amaranth's large short May swaps position would have benefitted from a lower settlement price in the May NG futures contract on April 26.

      2.      Hunter Waited to Unload Thousands of Contracts in
              <u>the Last 8 Minutes of the Close on April 26, 2006</u>

Although Amaranth entered the expiry day on April 26 with a long position of 3,044 May

NG futures contracts, and it had to be flat by the end of the day, Hunter did not trade any futures

contracts prior to the start of the Closing Range at 2:00 p.m.  Indeed, in an IM at the start of the

Closing Range Hunter told Amaranth energy risk manager David Chasman that although there

are "definitely buyers . . . we have yet to sell."  Similarly, early in the Closing Range, Hunter

said in an IM with another Amaranth trader "we are waiting to sell."

Prior to the Closing Range, Hunter expressed in an IM his concern that another hedge

fund would be making purchases in the Closing Range in such substantial amounts that it would

exert an upward pressure on the price, or in his words "run[] it up on the close."  Hunter's "we

have yet to sell" statement meant he was observing what appeared to be an increase in price due

to the presence of more buyers than sellers at this time during the close; he expected that the

upward price pressure would be somewhat muted by Amaranth's selling once it began.

On April 26, Hunter waited until almost the end of the Closing Range to begin selling

over 3,000 NG futures contracts.  The sales were split among three NYMEX floor brokers: 2,000

contracts to ALX, 544 to Gotham Energy ("Gotham") and 500 to TFS Energy Futures ("TFS"),

as follows:

| **Broker** | **Order Size** | **Time of Order** | **Instructions on order ticket** |
|---|---|---|---|
| Gotham | 544 | 2:16  (14 minutes before close) | "Last 8 minutes" |
| TFS | 500 | 2:21  (9 minutes before close) | "Last 8 minutes" |
| ALX | 2,000 | 2:22  (8 minutes before close) | |

The evidence will show that at approximately 2:16 p.m., Donohoe called floor broker

Gotham.  Donohoe told the Gotham clerk to sell 544 May NG futures contracts in the "last eight

minutes."  The clerk repeated the order to Donohoe including the last eight minutes instruction

and filled out an order ticket, noting the last eight minute instruction.[8]  In general during 2006, an

order for over 200 contracts would be a substantial order, and an order for 500 or more contracts

would be "very big."

At or before 2:21 p.m., Donohoe placed an order with TFS to sell another 500 contracts

of the 3,044 contract position, again with the instruction to wait until the last eight minutes of the

Closing Range.  The TFS clerk's order ticket (time stamped at 2:21 p.m.) also notes the "last 8

minutes" instruction.

Finally, Amaranth placed one last order with broker ALX, to sell 2,000 May NG futures

contracts, or the balance of its 3,044 contract position.  The ALX order ticket is time-stamped at

2:22 pm – eight minutes before the close of trading.  The time stamp indicates when the order

was received.  During the Closing Range on April 26th, Amaranth sold more than twice as many

contracts as the next largest net seller.[9]

Hunter and Donohoe will claim that they could not recall any reason for giving an

instruction to hold the orders until the last eight minutes of the Closing Range.  Donohoe did not

know of any other time in his career at Amaranth that he gave a similar instruction to a broker.

In fact, Harpeet Arora, Hunter's former supervisor and former head of energy trading at

Amaranth, could not recall ever having seen any trader hold such a position as it is extremely

unusual for a trader to hold a long futures position until the final minutes of trading on that

contract's expiry day.  A trader's ability to exit an open position to avoid the obligation to make

or take delivery deteriorates toward the end of the NG futures closing period.  Even Hunter will

agree that toward the end of the settlement period, there is the risk that there will not be enough

---

[8] In a later recorded conversation between the Gotham clerk and another individual, the Gotham clerk said that he
hoped Donohoe wanted the price low because "we got it there."

[9] ALX was not able to sell all 2,000 contracts of its order in the eight minutes that were remaining in the close.
ALX only sold 1,675 of the contracts, leaving Hunter with an open position at the end of the Closing Range of 325
contracts.  At Amaranth's instructions, ALX sold those remaining contracts in the post-close session.

liquidity and that a significant volume of sales would move the price because trading in a shorter period of time is more likely to cause an effect on price.

> 3.      Hunter Supplied Information Contained in a False
> Letter to NYMEX

Statements contained in a letter from Amaranth to the NYMEX about the April 26 trading, for which Hunter provided information, were false.

On August 2, 2006 the NYMEX Compliance Department, investigating Amaranth's trading of NG futures contracts on April 26, wrote to Amaranth asking that Amaranth review its trading activity for April 26 and provide a written explanation of the commercial need and justification for its trading.  NYMEX's letter noted the extraordinary concentration of Amaranth's trading that occurred in the final minutes prior to the termination of trading in the contract, and that Amaranth sold 99% of its contracts in the final four minutes of the Closing Range and 75% of its contracts in the final minute of the Closing Range.  Hunter was a key part of the team of Amaranth employees involved in preparing Amaranth's response to the letter, and gave details of what happened that were included in the letter that Amaranth sent to NYMEX on August 15, 2006.

One of the false statements contained in Amaranth's letter is the false claim that Amaranth did not control the timing of the execution of its orders on the floor on April 26 (the letter falsely claimed "the timing of the execution of the trades in the trading pit was at the discretion of the floor brokers") despite having explicitly instructed two different floor brokers to wait until the last eight minutes to execute Amaranth's orders.

11

## ARGUMENT

The CEA prohibits "[a]ny person [from] manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." CEA § 9(a)(2), 7 U.S.C. § 13(a)(2); *Id.* § 6(c), (d), 7 U.S.C. § 9, 13b. Attempted manipulation requires "(1) an intent to affect market price; and (2) an overt act in furtherance thereof." *See Amaranth Advisors,* 554 F. Supp. 2d at 532 (S.D.N.Y. 2008) (Chin, J.). "Manipulation is any and every operation or transaction or practice calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) (internal quotation marks and citation omitted) (citing legislative history of the Act).[10]

### A.  Hunter Intended to Manipulate the Price of Natural Gas Futures

To establish intent to manipulate prices, it must be shown that a person "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *See In re Hohenberg Bros. Co.*, CFTC No. 75-4, 1977 WL 13562 at *7 (Feb. 18, 1977). This requisite intent can be inferred from objective facts, actions, statements, and the totality of the circumstances. *Id*; *see In re Indiana Farm Bureau Coop. Assoc.*, CFTC No. 75-14, 1982 WL 30249, at *7 (C.F.T.C. Dec. 17, 1982) (stating that "manipulative intent must normally be shown inferentially from the conduct of the accused"). A profit motive may also evidence intent, although profit motive is not a necessary element of an attempted manipulation. *See Hohenberg Bros. Co.*, at *8.

---

[10] A dominant or controlling position in the market is not an element of a claim of attempted manipulation. *Hohenberg Bros. Co.*, at *8. The ability to realize a manipulation is also not an element of an attempted manipulation. *Id.*

Hunter may seek to argue to the jury or request that it be instructed that they must find that the manipulative intent was his "sole" or "principal" intent. Such a standard has no basis in the Commodity Exchange Act and no case has ever held that such a degree of intent must be found under the Act to state a claim under Section 9(a)(2) of the Act. This Court repeatedly has rejected Hunter's versions of the intent requirement of the Act. *See Hunter*, 2012 WL 297838, at *2 (Jones, J.); *Amaranth Advisors*, 554 F. Supp.2d at 534 (Chin, J.) If one purpose is "to affect the price," the Act forbids trading like Hunter's. *Id.* at 532 (Chin, J.); *Hunter*, 2012 WL 297838, at * 1 (Jones, J.).[11]

For good reason too: a trader's overt acts in furtherance of a manipulative intent can have multiple purposes. For example, the very act of smashing the close in this case is the sale of the NG futures in the last minutes of trading on the expiry day of the contract. These sales had the prohibited intent to drive down the price, but of course the sales also were intended to ensure that Amaranth—a hedge fund incapable of making or taking physical delivery of the commodity – was flat in that contract when it expired. The mere existence of other business purposes for the actions Hunter took in attempting to smash the price during the close should not be the basis for misleading the jury on the appropriate legal standard.

Taking all those factors into consideration, the facts will establish that Hunter intended to affect the price of natural gas futures in a manner that did not reflect the legitimate forces of supply and demand. This intent is demonstrated through the overall totality of circumstances surrounding his trading in February and April 2006, including his actions, his statements and his motive to profit from Amaranth's short swap positions.

---

[11] *See generally* the Commission's Memorandum of Law in Support of Its Motion in Limine to Preclude Defendant Hunter from Rearguing Elements of Attempted Manipulation, also being filed today.

1.      Intent to Manipulate in February 2006

Throughout the accumulation and subsequent dumping of the March NG futures contract,

Hunter's own statements and actions demonstrate his intent to build Amaranth's long position

for the purpose of getting the March NG futures contract "smashed" on settlement, including the

following:

- On February 23, 2006, the day before expiry of the March NG futures contract, Hunter instructed Donohoe to "make sure we have lots of futures to sell MoC tomorrow" even though Amaranth was then short more than 1,700 March NG futures contracts.

- On the morning of February 24, 2006, the expiry day, at Hunter's direction Amaranth bought over 4,700 March NG futures contracts turning Amaranth's short position of over 1,700 futures contracts into a long position of over 3000 futures contracts.

- At Hunter's direction, Amaranth then held that position until the close, during which it sold off more than 3,000 contracts that he had accumulated just that morning.

- On this same day, Hunter told another Amaranth natural gas trader that "[*we*] *just need H [March contract] to get smashed on settle* then day is done" and confirmed that 3,111 futures ". . . *should be enough*" (emphasis added) for selling in the Closing Range.

- Shortly before the close, Hunter stated to a trader from another firm that Amaranth has a large position to sell during the close but indicated to the trader not to share that information.  When the trader inquired as to why Hunter would hold such a position, Hunter responded that he was conducting an experiment.

- Hunter was pleased by the trading and commented that the day "came together quite nicely."

- Just after the close Donohoe commented that the March price will settle lower. Hunter responded "I am flexing here," by which he was referring to having a good trading day.

Importantly, Hunter took these actions knowing that Amaranth could not accept delivery

of the natural gas and, as a result, had to close all futures positions by the end of expiry day.

14

Further evidencing intent, Hunter's motive in engaging in this "experiment" is clear: profit. Although proof of a profit motive is not a necessary element, *see Hohenberg Bros. Co.*, at *8, in this case, Hunter's portfolio would earn substantial profits on its over-the-counter positions tied to the February 24th closing price, and Hunter's compensation was directly tied to his group's profits.

2.     Intent to Manipulate in April 2006

Hunter's April 2006 conduct, similar to his conduct in February 2006, indicates once again that he intended to affect the expiring month NG futures contract price in a manner that did not reflect the legitimate forces of supply and demand. Hunter again built up Amaranth's position in the expiring NG futures contract, this time starting a few days prior to expiration day, and held a position of over 3,000 contracts on the expiration day so that he could dump the contracts during the last few minutes of the close. It is extremely unusual for a trader to hold a long futures position until the final minutes of expiry of trading in that contract month. Hunter's contemporaneous actions and statements evidence his intent to manipulate the price of natural gas futures contracts:

- At Hunter's direction, Amaranth bought over 6,000 May NG contracts in the days leading up to the April 26 expiration day, turning a 2,976 short position into a 3,044 long position, in order to have a large long May NG contract position on expiration day.

- Hunter waited until the last few minutes of the Closing Range to sell any of these contracts.

- Early in the close, when there appeared to be more buyers than sellers and the price started rising, Hunter stated "but we have yet to sell." Hunter meant by that he expected that the upward price pressure would be somewhat muted by Amaranth's selling once it began, evidencing his intent to delay selling in order to lower prices.

- Having waited until more than half way into the Closing Range to place the sale orders, Hunter then placed or directed the placing of the orders with multiple floor

15

brokers with the instruction to wait even longer, until the last eight minutes, to execute the trades, indicating an intent to have the most impact on the price.

- Hunter has given no explanation as to the reason behind the eight minute instruction.

Although Hunter may offer self-serving explanations for his trading, his after-the-fact explanations are without evidentiary support, conflict with the clear evidence of intent described above, and as a result, any such explanations are likely to be rejected by the jury.

Hunter acquired, then dumped, the May NG futures at the end of the close for a reason: an attempt to manipulate natural gas futures prices during the Closing Range in an effort to benefit his overall position. Hunter's intention to manipulate natural gas futures prices as set forth in contemporaneous IMs is indisputable and is evidenced by the false statements made shortly after the trading at issue incorporated in Amaranth's letter to NYMEX.

### B. Hunter's Overt Acts in Furtherance of His Intent to Manipulate the Price of Natural Gas Futures Contracts

An overt act in furtherance of the intent to manipulate prices includes, among other things, placing orders, selling contracts and executing transactions. *Amaranth Advisors,* 554 F. Supp. 2d at 533. An overt act can be any step taken to manipulate prices, including "any and every operation or transaction or practice," so long as the act is taken in furtherance of the requisite intent. *Volkart Bros.*, 311 F.2d at 58 (citing legislative history of the Act). Each and every act, whether it be the actual transactions buying and selling the futures in question or otherwise, undertaken in furtherance of the manipulative intent is a violation of the Act. *See In re Henner*, 30 A.D. 1151, 1198 (Agric. Dec. 1971) (holding that a violation of the Act occurs "*[w]henever* a buyer on an Exchange intentionally pays more than he has to for the purpose of causing the quoted price to be higher than it would otherwise have been…, *the resultant price is an artificial price* not determined by the free forces of supply and demand on the exchange")

16

(emphasis supplied); *see also In re U.S. Securities & Futures Corp., et al.*, CFTC Dkt. No. 01-01, 2009 WL 3423842, at *14 (C.F.T.C. Oct. 7, 2009) ("The complaint alleges that each transaction at issue constituted a separate violation, and there were 90,000 transactions. Thus, the approximately $2 million penalty assessed by the ALJ against USSFC results in a very low per violation amount yet is large enough to capture the gravity of the conduct and to serve as a deterrent.")

As head of Amaranth's energy trading, Hunter took and directed numerous overt acts in furtherance of his intent to manipulate prices in February and April 2006, including the purchase and sale of thousands of NYMEX futures contracts and OTC swaps, placing phone calls and sending IMs.

> 1. Hunter's February 2006 Overt Acts in Furtherance of His Intent to Manipulate Natural Gas Futures Prices

As described above, Hunter's overt acts in February 2006 include directing and executing the manipulation scheme and his actual implementation of the scheme through trading, including the following acts.

On February 23, 2006, Hunter's overt acts included instructing Donohoe to make sure Amaranth was long the March NG futures contract for the next day's close, and reversing Amaranth's position from being short the March NG futures contract at the beginning of the expiry day to being substantially long by the start of the Closing Range.  On February 24, 2006, Hunter completed a number of additional overt acts, including ensuring that Amaranth continued to buy March NG contracts until about 12:32 p.m., making Amaranth long 3,111 March NG contracts.  This reversal to a long position enabled Amaranth to be the largest seller by far during the Closing Range.

On February 24, 2006, Hunter also increased Amaranth's short position in March NG look-alike swaps.  Such position would benefit from a lower futures settlement price.  In the Closing Range on February 24, 2006, Hunter continued to take overt acts through his selling spree of approximately 3,000 contracts.

### 2. Hunter's Overt Acts in April 2006 in Furtherance of His Intent to Manipulate Natural Gas Futures Prices

Again, as more specifically described above, Hunter completed numerous overt acts on the days immediately prior to the expiry of the May NG futures contract to position Amaranth to sell approximately 3,000 contracts during the final minutes of the Closing Range.  Hunter also acquired large swap positions that would benefit from a lower settlement price and had orders placed to NYMEX floor brokers with the instruction to wait until the last eight minutes to execute in order to maximize the effect of his trades on the price of the May NG contract.

## RELIEF REQUESTED

A jury trial has been demanded.  In this enforcement action, it is the jury's duty to determine Hunter's liability; it will remain the Court's duty then to determine the amount of civil monetary penalty and the scope of injunctive relief.  *CFTC v. Capital Blu Management Inc.*, 2010 WL 4942720, at *1 (M.D. Fl. Nov. 29, 2010); *Tull v. United States*, 481 U.S. 412, 425-26 (1987) (holding that right to jury trial encompasses determination of liability in civil enforcement action and reserves to the Court the determination of the amount of penalty and the scope of equitable relief).

Upon the jury's finding that Hunter is liable, the Commission will seek the following relief from the Court: (a) a judgment finding Hunter liable for violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2); (b) a final order of permanent injunction against Hunter from directly or indirectly violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7

U.S.C. §§ 9, 13b, and 13(a)(2), by engaging in conduct including that described in the

Complaint; (c) an order imposing trading and registration bans; (d) an order directing Hunter to

pay civil monetary penalties for each and every violation of the Act; and (e) an order for other

equitable and ancillary relief.

Dated: September 19, 2013
      New York, New York

                                  Respectfully submitted,
                                  ATTORNEYS FOR PLAINTIFF
                                  U.S. COMMODITY FUTURES TRADING
                                  COMMISSION

                                  /s/ David W. MacGregor
                                  David W. MacGregor
                                  Chief Trial Attorney
                                  Manal Sultan
                                  Chief Trial Attorney
                                  Commodity Futures Trading Commission
                                  140 Broadway, 19th Floor
                                  New York, NY 10005
                                  (646) 746-9700
                                  (646) 746-9762 (direct dial)
                                  (646) 746-9940 (facsimile)
                                  dmacgregor@cftc.gov