UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                  Plaintiff,

v.

BRIAN HUNTER,

                  Defendant.

07 Civ. 6682 (RA)

ECF CASE

DECLARATION OF MICHAEL C. McLAUGHLIN
PURSUANT TO 28 U.S.C. § 1746

I, Michael C. McLaughlin, hereby declare as follows:

1.     I have personal knowledge of the facts stated herein, and if called as a witness, I could competently testify to those facts.

2.     I have been employed as a futures trading investigator at the Division of Enforcement of the Commodity Futures Trading Commission ("CFTC") for thirteen years. My office is at 140 Broadway, New York, NY 10005. My duties as an investigator include investigating commodity firms and individuals located throughout the United States, for the purpose of ensuring compliance with and enforcement of the Commodity Exchange Act. As part of my duties as an investigator, I have interviewed witnesses, prepared investigative reports of those interviews, analyzed trading data and banking data and prepared reports concerning certain aspects of my investigative findings to be used in court.

3.     I submit this declaration in support of Plaintiff's Motion *in Limine* to Allow Examination of Defendant Hunter Concerning Prior Credibility Findings in the U.S. Federal Energy Regulatory Commission Proceeding.

4.      Attached hereto as Exhibit 1 is a series of excerpts from the Initial Decision

issued by Presiding Administrative Law Judge Carmen A. Cintron on January 22, 2010 in the

proceeding held by U.S. Federal Energy Regulatory Commission (the "FERC") in the *Matter of*

*Brian Hunter*, Docket No. IN07-26-004 (the "FERC Initial Decision").  I downloaded the

excerpts provided as Exhibit 1 from the FERC website at

http://www.ferc.gov/enforcement/market-manipulation/hunter.pdf.

5.      According to the transcript of the FERC proceeding, Hunter testified for four

days, from August 18, 2009 through August 21, 2009.

6.      Attached hereto as Exhibit 2 are true and correct copies of two pages excerpted

from the transcript of the FERC proceeding.


I declare, under penalty of perjury, that the forgoing is true and accurate.


Michael C. McLaughlin


Executed on this 19th day of September 2013, in New York, NY

2

Exhibit 1

UNITED STATES OF AMERICA    130 FERC ¶ 63,004
FEDERAL ENERGY REGULATORY COMMISSION

Brian Hunter                                    Docket No. IN07-26-004

INITIAL DECISION

(Issued January 22, 2010)

*APPEARANCES*

*Michael Kim, Esq.*; *Matthew Menchel, Esq.*; *Andrew Lourie, Esq.*; *Daniel Rashbaum, Esq.*; *Leanne Bortner, Esq.*; and *Zaharah Markoe, Esq.*; on behalf of Brian Hunter.

*Todd Mullins, Esq.*; *Kenneth Behle, Esq.*; *Justin Shellaway, Esq.*; *Aaron Fate, Esq., Erik Baptist, Esq.*; *Laura Chipkin, Esq.*; *Jamie Jordan, Esq.*; *Lee Ann Watson, Esq.*; and *Blair Hopkin, Esq.*; on behalf of the Federal Energy Regulatory Commission Enforcement Staff.

**CARMEN A. CINTRON**, Presiding Administrative Law Judge

20100122-3065 FERC PDF (Unofficial) 01/22/2010

Docket No. IN07-26-004                                                                58

ALX's floor trader, appeared to have large quantities and was hitting bids consistently.[81] *Id.* at 1103-05, 1110-11.

160.    Several anomalies make Hunter's explanation of his trading during the March 2006 natural gas contract settlement period (to profit from repeated strong March 2006 buying) problematic.  First, Hunter sent a text on settlement day stating: "just need H (March 2006) to get smashed on settle."  Ex. S-45.  This would not likely hurt the 4,800 March 2006 futures Hunter acquired, since the spreads would largely insulate him from an absolute price decrease (see discussion *supra* P 159).  However, Hunter also held a substantial short March 2006 swap position – 9,657 short March 2006 ICE swaps and 4,348 short March 2006 Clearport swaps - that would clearly benefit from a price decrease.  Ex. S-1 at 97.  Hunter does not offer an explanation of the NYMEX-equivalent swaps.  Yet clearly his calculus would have included those swap positions, since his March 2006 strategy clearly impacts them.  That he would be silent on something that is so significant seems odd, especially since the Order to Show Cause focused on these elements.  Indeed, if Hunter felt there would be strong buying pressure during the settlement period, it is curious that he continued to hold such a large net short position into the settlement period.

161.    Second, Hunter's attempt to beat the close by selling ratably seems unlikely to succeed, especially since the instruction to sell ratably precludes information gathering or feedback.  That is, selling ratably yields roughly an unweighted-average of the prices observed over the close, and there is no statistical reason to expect this to consistently exceed the weighted-average price (the VWAP).  Third, the bets that he claimed he took to benefit from strong repeat March 2006 buying seem poorly designed to profit from such a recurrence.  The first bet-approximately 3,000 EFSs, the short March 2006 swaps/long March 2006 futures-is largely insulated from absolute price movements of the March 2006 natural gas contract.  The second bet – 1,800 March 2006 (long) - April 2006 (short) spreads – is a bet that the price of the March 2006 natural gas contract will increase relative to that of the April 2006 natural gas contract.  Only the smaller second bet seems consistent with his expectation that the event on the 23rd would repeat.

162.    However, both bets are also insulated from falling March 2006 prices, and so not inconsistent with Enforcement Staff's averments.  The value of the EFSs depends on how March 2006 futures sales performs relative to March 2006 swaps (both move together until close to the settlement period and, as discussed, the

---

[81] Bolling was a local, trading on his own account.  He described himself as a market maker, "if there are buyers looking for sellers, you sell.  If there are sellers looking for buyers, you buy."  Tr. at 1050.

weighted average sales price of the March 2006 futures is unlikely to exceed the
VWAP, though an order sold ratably throughout the settlement period should
come close to the VWAP). The value of the March 2006-April 2006 spread
position is protected (albeit not perfectly) because, if the price of the March 2006
contract falls (and what he owns decreases in value), the April 2006 price is also
likely to fall (thus increasing the value of his short April position). *See, e.g.*, Dr.
King's Figure II (Ex. S-11 at 27), demonstrating how highly correlated these
prices are.

163.    The bets that he claimed he took to benefit from a strong repeat March
2006 buying thus seem poorly designed to profit from such a recurrence. Hunter
continued to hold a large short swap position throughout the settlement period that
would be harmed by price increases due to strong buying pressure while the EFSs
and March 2006-April 2006 spread positions prevent him from benefitting
substantially from price increases (just as they protect Hunter from absolute price
decreases). Hence, the argument that he was going to benefit from repeated strong
March 2006 buying is not credible.

164.    Fourth, the distinction between paper and realized profits sheds light on
Hunter's explanation. He may argue that driving down the price of the March
2006 natural gas contracts would hurt his short summer-long winter spread. But,
as he often said, the whole curve tends to move together, and so if March 2006
natural gas contract fell, his summer gains would offset his winter losses. The
offsetting gains and losses, however, are not symmetric. The gain on driving
down the March 2006 natural gas contract is realized (since the swaps expire that
day), whereas the losses on the long winter positions would be on paper. After the
manipulation ends, the market would recover, and the paper losses would turn into
paper gains.[82] Hence, it appears that Amaranth gained after the manipulation.

165.    Hunter's explanation for the February expiry, that he wanted to beat the
close, contradicts his defense that he only focused on his overall book and was
never concerned with one-day price movements and trading in the front month
contract. Tr. at 595-97. Hunter claims he does not recall a lot of the events that

---

[82] This does not mean that the market goes up by the same amount as the
manipulation pushed the market down – rather that the change in the market price
the following business days would be whatever the market would have done
absent the manipulation plus the amount of the manipulation. For example, if
manipulation caused the market to close 5 cents lower on February 24, 2006, and
the market would have closed 2 cents lower the following business day, then the
market would close 3 cents higher that day- the 2 cents drop plus the 5 cent
recovery from manipulation. *See*, note 54, *supra*.

Docket No. IN07-26-004                                                                                         60

are at-issue in this case and his only recollection comes from reviewing documents. *Id.* at 897-900. This testimony is not credible. Hunter exhibited significant selective memory in this case, which is inconsistent with his intelligence, experience and knowledge. Hunter could not satisfactorily explain why a two-minute settlement period for options would be replicated the next day for a thirty-minute close for futures. *Id.* at 456-59. Further, Hunter could not explain why the behavior of participants the previous day (trading to "squeeze the spread") would be replicated the next day during the settlement period. *Id.* at 457-59. Hunter's suggestion that market participants on February 23 were left holding futures is not conclusive since there is no evidence indicating that these market participants would have to wait until the settlement period to flatten out of their futures positions, rather than doing so earlier in the day. The most salient point is that Amaranth traded similarly during the next settlement period (March 2006 for the April contract) but there is no evidence to indicate that there was a similar rally on the penultimate day to justify another experiment.

166. Moreover, contemporaneous instant messages show his real mindset and thus are deemed admissions against interest. Hunter expected the market to go down from selling pressure. An instant message dated February 24 on or about 11:00 a.m. indicates he expected "H [March] will go off soft." Ex. S-43; Tr. at 465-66. He saw "futures sellers everywhere." Ex. S-43; Tr. at 465-66. In another instant message on February 24 on or about 1:30 p.m., Hunter conveys the thought that John Arnold (of Centaurus) and Sempra will be sellers. too. Ex. S-47. Additionally, in another instant message the same day on or about 11 a.m., Donohue asked Hunter if Centaurus was positioning for a "punch down" or "protecting up" and Hunter replied "punch down." Hunter in the same message states "they want it down Friday." Ex. S-54; Tr. at 463-65. It is curious that, given Hunter thought the behavior of February 23 would repeat on February 24, he did not try to reduce or eliminate his short March swap position sooner rather than wait until they expired.

167. The record demonstrates other contradictions in Hunter's conduct and his explanations. Consequently, the only conclusion to be reached is that his explanations are *ex post facto* and solely intended to obfuscate the truth. For instance, Hunter claims that 3,000 futures would not have an impact on the market at the close because this is not a lot of volume. *Id.* at 746-47. However, his experiment required that he "have a large enough number of lots to be meaningful to the settlement average" (*Id.* at 724) and that the pit understand he had a lot of volume to sell, in order to have buyers come to him. *Id.* at 724, 730-31. He communicated to a trader of a competing company that he had a lot of volume to sell. *Id.* at 708-10. He was signaling others he had a lot of volume to sell.

20100122-3065 FERC PDF (Unofficial) 01/22/2010

Docket No. IN07-26-004                                                             61

168.   Hunter claims he could not have known on February 23 that a decline in
March settlement prices would benefit his book because he could not know what
would happen to other prices out the curve, for instance, the winter contracts. *Id.*
at 691, 694. However, the evidence demonstrates that Hunter could run stress
scenarios and make predictions of likely outcomes. Ex. RES-4-1 at 17-18. He
could make an informed judgment as to what would happen to the summer prices.

169.   Moreover, one could argue that if Hunter really expected buying pressure
on February 24, as happened on February 23, the way to beat the close would have
been to wait to see if the buying occurred and sell when prices were higher and not
sell ratably during the close. Hunter alleges that his strategy depended on his
offers getting lifted (buyers in the pit would come to him and higher offers would
be lifted as opposed to his broker having to hit bids in order to sell). However,
nothing in this record supports this. Hunter does not recall telling his broker to
have offers get lifted. Tr. at 469-70. There is also no evidence that he instructed
Donohoe to have offers lifted instead of hitting bids. *Id.* at 994. This is not what
happened. As stated above, what happened is that Amaranth's brokers were
hitting bids repeatedly and consistently and selling below the average prices of all
others in the market. *Id.* at 1103. There is no record evidence of Hunter checking
during the close to see if Amaranth was having offers lifted and there is no
evidence that after the close Hunter complained to his traders (ALX) or chastised
them for not complying with his instructions. *Id.* at 469-70. Finally, it is not
credible that an experiment was conducted and yet Hunter could not recall on the
witness stand whether it was a success or not. *Id.* at 470. Hunter's execution
trader did not remember anything about an experiment either. *Id.* at 994. Hunter
and Donohoe are not credible.[83] The record evidence does show that Hunter
intended to conduct an experiment to lower the price of the March futures, to
benefit his short positions on other exchanges.[84] His assertions to the contrary are
not credible.

---

[83] Donohoe was Hunter's friend and his execution trader at Amaranth. Tr.
at 330.

[84] Note that this pattern is consistent with findings in the Senate Report for
the September prompt futures. For the September prompt-month, Amaranth
stopped trading in NYMEX around 1:15 p.m. and shortly thereafter concluded its
trading on ICE. Staff Report, *Excessive Speculation in the Natural Gas Market*
(2007) *supra* note 37, at 107. Shortly after Amaranth exited the market the price
of the September contracts began to rise and the September/October spread began
to narrow. *Id.* Amaranth's selling helped keep the price of the September contract
down and the spread wide. *Id.*

Docket No. IN07-26-004                                                              62

### March Settlement (April Futures)

170.   Record evidence conclusively establishes Hunter was out of the country
during this settlement period.  Hunter was in the Maldives; his execution trader
Donohoe was in Greenwich.  Tr. at 334, 471.  It is also undisputed that trading in
this period exhibited similar patterns to the previous month.  Through Hunter's
book, Amaranth again traded a large quantity of prompt-month futures in the
thirty-minute settlement period while holding large short prompt-month NYMEX-
equivalent positions on other exchanges.[85]  Hunter and Donohoe claim that there
was nothing salient about this month which would help them remember what
happened.  Tr. at 471, 968.  However, this was the second time Amaranth had
traded such large positions in the final settlement period.  Therefore, their
testimony about their lack of recollection is not credible.  There were some
communications between Hunter and Donohoe, however Hunter argues this was
not related to trading but to Harry Arora's (another Amaranth head energy trader)
departure.  *Id.* at 473, 475-77; Exs. S-33, S-51.  It is noted that there was no
penultimate day rally as happened in the previous settlement in February.

171.   The record establishes Hunter was responsible for Amaranth's natural gas
book.  Tr. at 955.  Hunter understood his approximate overall positions.  *Id.* at
471-78.  Donohoe, Hunter's execution trader, did not have authority to determine
Amaranth's trading strategy.  *Id.* at 957.  Donohoe executed orders on behalf of
Hunter.  *Id.* at 911.  There is no record evidence that Donohoe traded against
Hunter's wishes in this month or was reprimanded or cautioned for trading outside
of his authority or against Hunter's wishes.  Based on the evidence in this record
and considering what transpired the previous and the following month (a pattern of
conduct) it is found that Hunter again lowered the price of the prompt-month
future to benefit his short position in NYMEX-equivalents in the other exchanges
in contravention of the Anti-Manipulation Rule.

172.   The evidence demonstrates that Amaranth's behavior in the March
settlement period was quite similar to that of the previous month – selling futures
ratably during the close at prices generally below contemporaneous trades while
holding a large short swap position that would benefit from falling prices.[86]  Such

---

[85] Hunter's NYMEX-equivalent swaps were many times the size of his futures
positions.  Ex. S-1 at 111.

[86] The 2006 short summer-long winter spread got much longer and the overall
portfolio got somewhat longer.  Hunter testified that he never wants his book to get out of
balance, but he allowed this to take place while he was on vacation.  This is a significant
deviation from the goal of maintaining a balanced spread, and so a significant anomaly
that was not explained by Hunter.

a strategy also does not require Hunter's presence, as it may be implemented with a simple instruction. Accordingly, it is found that Hunter is not credible. He has developed a story to defend his actions in this matter which is inconsistent with the record evidence. Further, it is additionally found that he intended to lower the price of the April futures to benefit his short NYMEX-equivalent positions in the other exchanges.

### April Settlement (May Futures)

173.   The trading for the April settlement (May Futures) was different from the previous two periods, as Amaranth's sale of prompt-month futures was concentrated in the last eight minutes of the settlement period rather than the entire thirty minutes and the transactions were executed through three brokers: ALX, Gotham, and TFS, rather than solely through ALX. The record shows there were specific instructions to sell in the "last eight minutes." Tr. at 971-74; Exs. S-1 at 117, S-246, S-162 at NX_USSEN_01548 and NX_USSEN_01584. In an instant message on April 26, 2006, at 2:06:58 PM EDT, Brian Hunter stated "we are waiting to sell." Ex. S-17. Donohoe did not remember why he gave the instruction to execute the trades in the last eight minutes. Tr. at 968-69, 978-79. This testimony is not credible. This witness exhibited significant lack of candor on the witness stand, which can be attributed to the fact that, as of the time of the hearing, he was still very good friends with Hunter, and they talk nearly everyday.[87] *Id.* at 964:13-18.

174.   It is found that this trading influenced the price of the May contract (prompt-month) and the price of the June 2006 contract (prompt-next month).[88] Amaranth had significant short May and June position which benefited from the lower prices.

175.   Hunter maintains that the April trading was done to reduce the book. According to Hunter's testimony, this allegedly would be done by selling long winter contracts and buying or otherwise liquidating short summer positions. Tr.

---

[87] Hunter and Donohoe are defendants in a pending civil lawsuit. *In re Amaranth Natural Gas Commodities Litigation*, No. 07-6377, 612 F. Supp. 2d 376 (S.D.N.Y. Apr. 27, 2009). Hunter is also a defendant in *CFTC v. Amaranth Advisors, L.L.C.*, No. 07 Civ. 6682 (S.D.N.Y.). Amaranth Advisors L.L.C. and Amaranth Advisors (Calgary) U.L.C. settled with the CFTC. *CFTC v. Amaranth Advisors, L.L.C.*, U.S. Dist. 101406 (S.D.N.Y. Aug. 12, 2009).

[88] This contract settles during the last two minutes of trading. The prices of the adjacent natural gas contracts or those contracts with close expiration dates are highly correlated. Ex. S-1 at 118-19.

Docket No. IN07-26-004                                                           65

| | |
|---|---|
| Q | Number 3, what you actually did, you sold futures in the close, right? |
| A | That day, I sold futures in the close. |
| Q | That was option 3 that you testified earlier when your lawyer was asking— |
| A | What I am going to say is that day, I sold futures in the close. |
| Q | Right. |
| A | That's it. That day, I sold futures in the close. I do not agree that 3 and selling futures in the close are necessarily the same thing. I just said I sold futures in the close. That is all I am going to say. |
| Q | What's the wrong with admitting selling futures in the close is with number 3? |
| A | I'm just saying I sold futures in the close. That's a true statement. |

(Tr. at 895:5-20.)

178.    Moreover, Hunter could have expired May swaps in direct proportion to the sold winter positions. *Id.* at 485-86. In the letter to NYMEX quoted above, Amaranth admitted that this approach would have been easy. Ex. S-170; Tr. at 486. Hunter admitted that this would not have required selling futures in the close. Tr. at 486. Hunter built up a number of futures to roll or sell during this settlement period to offset the selling of winter longs, Hunter could have done the same thing with May swaps. He could have rolled swaps into June. The record in this case is devoid of an explanation of why Hunter's executed trades were superior to this alternative.

179.    Amaranth could also have reduced its position by trading a spread. *Id.* at 485. According to Hunter, this had advantages and disadvantages. *Id.* at 787-89. One disadvantage Hunter mentioned was the fact that he did not want to signal the market about large Amaranth trades. *Id.* at 788. However, Hunter executed a large May/June trade (10,000 lots) with Centaurus on April 26th. This trade by its very nature had to send signals to the market. Thus, Hunter's testimony in this regard is not credible.

180.    There were other alternatives. Hunter could have bought summers and sold winters in separate transactions. *Id.* at 790-91. Hunter asserted that this was risky, because during the time that one "leg" has been lifted the other still needs to be lifted exposing the firm to price movements. *Id.* However, the evidence in this case establishes that Hunter subjected Amaranth to this risk by expiring off a

20100122-3065 FERC PDF (Unofficial) 01/22/2010

Docket No. IN07-26-004                                                        66

significant summer position (the May swaps) even though he had not sold a
corresponding winter position. Ex. S-233 at Amarnath_Reg07359.

181.   Indeed, Hunter's strategy seems needlessly complex compared with a direct
and simple strategy of selling whatever winter length he could and, very shortly
thereafter each sale, buying the same quantity of summer length (for example,
June, July, August, and September) to maintain spread balance. Tr. at 483-85.
That is, Hunter could have adjusted his summer positions in the out months
(beyond what he already had in May to expire). Moreover, this carried little
delivery risk since adjustment focuses on the out months. Tr. at 488. Also, if
Hunter was worried about signaling information to the market with his trades, he
could have used multiple brokers to execute his trades as he did with the May
futures he sold on settlement day. Furthermore, this would not lock Hunter into
having to unwind complex and costly-to-acquire positions if he failed to sell many
long winter lots. The method Hunter chose seems more complicated and costly
than he needed for what he wanted to do.

182.   The following is Hunter's testimony:

> Q      Another way to do this is just not have a May position at
>        all, have the positions in June that you would need to
>        adjust, depending on how many of those winter
>        contracts you could sell; right?
>
> A      You mean if I sold winter, then I could go try and buy a
>        corresponding amount of June?
>
> Q      Adjust the June positions and not have to worry about
>        the May position that's going to expire.
>
> A      By adjust, the only way to adjust it is to buy June; right?
>
> Q      Sure, if you say so. That's another way to do it; right?
>
> A      I think it's the only way to do it.
>
> Q      Okay.
>
> A      But yeah, that's an option.
>
> Q      And that wouldn't require you to sell futures in the
>        settlement period for the May contract, would it?
>
> A      If you're buying June, it wouldn't require you to do so,
>        no, but you could. You could do it that way.

(Tr. at 486-87.)

183.   Hunter claims that on April 26 they spent the day trying to sell winter
positions, which would determine the number of futures that would have to be sold
(and the number of swaps that would be expired) and that is why they waited until
the last eight minutes to sell futures. However, this part of the story is not

credible. The record supports the opposite. There are contemporaneous instant
messages on April 26 which show that Amaranth was unable to sell winter until at
or about 2:00 p.m.[91] Exs. RES-20-47, 20-48, 20-49; Tr. at 1030-34. In these
instant messages, Donohoe is discussing attempts to sell and sales of winter "five
minutes before the end of the close and 15 minutes before the end of the close, and
into the close."[92] RES-20-47, 20-48; Tr. at 1031-32. The evidence in this case
establishes that Donohoe was trying to sell winter seven minutes before the
settlement period expired, which was after Amaranth had placed its order to sell
futures in the last eight minutes of the settlement period. The inference drawn
from this evidence is that there was no relationship between selling winter in the
close and selling futures within the last eight minutes of the close.

184.    Hunter's explanation for the instruction to sell in the last eight minutes is
not credible. Since May was the expiry month, why wait for the last eight minutes
to start selling positions that needed to be closed? Further, if the positions needed
to be closed, the traders knew this and, therefore, did not need to be reminded.

185.    The record evidence also demonstrates that Hunter misrepresented his June
position on the witness stand. He stated he was quite long June explaining an
instant message with Glover in which he stated he was a touch worried about a
lower close. A lower settlement price, Hunter testified, would hurt his long June
position. As the evidence shows Hunter was short in May and in June. Tr. at 798.

---

[91] The instant messages made Hunter testify (he claims no independent
recollection) that after the settlement period started the price of the winter futures became
more appealing. Id. at 496. However, he would have no idea in the morning that that
would be the case, and so would have no reason to wait for such an appealing price.
Furthermore, the instant messages do not indicate that price was at issue. There is no
evidence of efforts to sell winter during the day or that the price of these contracts
changed during the day. These contracts, which are somewhat out on the curve, trade
every day in large volume. Tr. at 530. The trade data shows that there was a sale at 1:30
p.m. at $1.98. Exs. RES-20-45; S-1-5 at
AMARNTH_REG057018_Trades_2006_Jan_May_WithID.xls. Contracts sold during
the settlement period at mostly lower prices ($1.96 to $1.97, one sale was at $2.00), not at
better prices, as Hunter testified. Exs. RES-20-47, 20-48, 20-39, 20-40; S1-5 at
AMARANTH_REG057018_Trades_2006_Jan_May_WithID.xls.

[92] In another instant message, Hunter says that they were going to "sell Cal 7 and
8" and "H/J" spreads to protect their winter position. Ex. S-18; Tr. at 497-500. Donohoe
testified that selling H/J and Cal 8 was a proxy for selling winter. Tr. at 1027-28.
However, the transactions dealing with the H/J spread (H is March '07/winter and J is
April '07/summer) reduce the book independently of the selling of May futures. Tr. at
819, 820:8-15.

20100122-3065 FERC PDF (Unofficial) 01/22/2010

Docket No. IN07-26-004                                                              68

He moved a part of his short position from June to May, but that still left him short
in June. *Id.* Since Hunter was short both months, lower May and June prices
would benefit these positions. Hunter also stated a lower May price would hurt
him because he had a May/June spread based on a trade he entered into with
Centaurus. In this trade he rolled a 10,000 lot (bought June at the May settlement
price plus about 21 cents). Tr. at 492, 555-56. However, Hunter testified that any
spread involving May would disappear at the close of settlement, at 2:30 p.m. *Id.*
at 558, 810. Moreover, if May fell as much as June, the moves theoretically
would have no effect on the May/June roll. If May had fallen more than June, he
probably would have done better. *See, id.* at 559. Indeed, if prices had gone down
throughout the settlement period, Hunter would have done even better. During the
settlement period prices went up then down, and this was profitable for Hunter
(although not as profitable relative to not rolling May into June).

186.   Another related aspect of Hunter's explanation that is troublesome is that
he fails to explain, given the importance he attaches to balancing the book, why
the book exhibited so much variation in the extent to which it was imbalanced (the
amount by which it was net long or short). Hunter's attorney illustrated this point,
saying:

> "He never wants his book to get out of balance. Here
> was his thing: If he sold a lot of winter length, more
> winter length than he had summer shorts, his book
> would also be out of balance. That's what he never
> wants to happen." (*Id.* at 246.)

In Hunter's own words: "So the idea, when you try and reduce – because it
actually can get quite complex—is that you want to reduce in such a way that you
kind of keep your book in balance." *Id.* at 775:18-23-782. Hunter states that an
imbalanced book is undesirable when discussing options for the April settlement
day. *Id.* at 812. These statements are hard to reconcile with the increase in the
summer-winter spreads subsequent to the settlement periods at-issue in this case.
Regarding net length, Hunter testified that his book was not perfectly balanced and
that this would be sort of "somewhat a hedge against what we perceived spread
movements might be." *Id.* at 320. Again, observing variation in the balance of the
book subsequent to the expiration without explanation compels the conclusion that
his explanation for his trading for this settlement period is not credible.

187.   Enforcement Staff Demonstrative Exhibits 49 through 51 give an indication
as to what happened to Hunter's book. The book becomes increasingly
unbalanced over this time and tends to get increasingly long, though there is some
volatility. Hunter failed to explain why the book continued to grow in subsequent
months. Given the importance he placed on decreasing his book and that

Docket No. IN07-26-004                                                        69

decreasing the book is the foundation for his trading strategy for the last expiry, observing the book increase subsequent to the expiration without explanation cannot be reconciled with his story.  This is another aspect of Hunter's explanation that is not credible.

188.    Furthermore, considering the summer and winter elements separately, the book seems to be growing rather consistently.  This seems inconsistent with Hunter's explanation that he was pressured to trim the book.  Hence, Hunter's repeated claims that he never wants his book to get out of balance as he decreases his short summer-long winter spread position is inconsistent with how this spread evolved.  Given the importance that Hunter attaches to maintaining a balanced spread, such an apparent inconsistency requires an explanation which is not found in this record.  The inference to be drawn from this lack of explanation is that Hunter is not credible.  This undermines Hunter's explanation for his trading of the May 2006 natural gas contract.  Hunter's explanation is not credible, as there is little evidence of trimming here.



Docket No. IN07-26-004                                          71

189.   Additionally, in all of Hunter's explanations there is studiously an attempt
to obfuscate the issue of the positions on the other exchanges.  Hunter apparently
did not want to mention these positions.  There is no explicit explanation of how
these positions fit into the strategy of unwinding Hunter's book.  Given that the
manipulation allegation keys in on the ICE positions, it is inexplicable that
Hunter's explanation does not directly address his ICE positions.  The ICE
positions are, after all, in Hunter's Energy2 book and are clearly part of his
summer-winter spread strategy (as they are short summer positions).

190.   Further, in general, we have three months with heavy prompt-month selling
(relative to what Amaranth typically sold).  Ex. S-1 at 58.  The pattern across the
three months was quite similar, though the selling in the May 2006 contract was
concentrated near the end of the settlement period rather than throughout the
settlement period as for the March 2006 and April 2006 contracts.  Hunter offers
three explanations: the crushed spread for the February expiry, his vacation for the
March expiry, and trimming the book for the April expiry.  It seems curious that
three very different explanations gave rise to largely the same trading behavior.
For all of the complexity in Hunter's book reduction strategy, it is not inconsistent
with Enforcement Staff's manipulation accusation.  Hunter's short May and June
positions benefited from falling May and June prices.

191.   Based on the above, it is concluded that Hunter's arguments are not
credible.  The preponderance of the evidence demonstrates that Hunter intended to
and did manipulate the prices in the three at-issue months.  Accordingly, it is
found that Hunter exhibited the requisite scienter and violated the first two prongs
of Section 1c.1.  The following is the last prong of Section 1c.1.

### 3) In Connection with the Purchase of Jurisdictional Natural Gas

#### Party Contentions

*Enforcement Staff*

192.   Enforcement Staff explains that the question at issue in this proceeding is
whether Hunter's trading was "in connection with the purchase or sale of natural
gas . . . subject to the jurisdiction of the Commission."  Enforcement Staff RB at
37, citing 18 C.F.R. § 1c.1.  Hunter erroneously tried to heighten the standard by
claiming that Enforcement Staff must show a "direct and measurable impact" and
that Hunter's activity created an artificial price in the physical natural gas market.
Enforcement Staff RB at 37.

193.   According to Enforcement Staff, there are three factors to establish that the
NYMEX futures settlement price is connected to physical markets.  Enforcement
Staff IB at 64, RB at 37.  First, NYMEX natural gas futures contracts can become

20100122-3065 FERC PDF (Unofficial) 01/22/2010

to take the gas delivery obligation from Amaranth. Ex. S-1-5 at
Amarnath_Reg057016_trades_2005_withid.xls.

210.   Hunter was aware that NYMEX prices form the basis of physical
transactions as part of the price formula. Tr. at 451-53. In addition, Hunter knew
that "physical basis" transactions involve the delivery of physical gas in the form
of a basis transaction and involve the final NYMEX natural gas futures contract as
one leg of the transaction. *Id.* at 453-55; Ex. S-1 at 41-42. Moreover, Hunter was
aware of industry publications (IFERC and NGI) which use NYMEX as a portion
of the basis transactions. Tr. at 453-54. Accordingly, it is found that Hunter acted
recklessly with regard to the effect his trades would have on jurisdictional
transactions.[102] Enforcement Staff met its burden of proof in this regard. Hunter's
arguments are contrary to record evidence and not given any weight.

### Penalty Factors

211.   The Commission stated that it reserved the imposition of civil penalties and
would make a determination based on the record established in this proceeding.
Hearing Order, *supra* note 7, at P 14.

212.   The record evidence in this case demonstrates that Hunter violated the
Commission's Anti-Manipulation Rule.[103] Hunter's violations were serious,
willful and harmful. However, a consideration in Hunter's favor is that Hunter has
no known previous violation of the Commission's Rules. Hunter intended to
manipulate the price of natural gas futures contracts, which in turn affected the
price of jurisdictional transactions. He knew physical and financial markets prices
are interrelated. He recklessly disregarded the impact his manipulation would
have on jurisdictional transactions. Hunter knew his conduct was improper and
not in compliance with Amaranth compliance manuals and instructions. To wit,
the Amaranth compliance manual prohibited traders from "engaging in 'marking
the close' at or near the close of trading for the primary purpose of attempting to
change the closing price to protect or alter the value of an existing position."[104]

---

[102] Hunter argues that a future that goes to delivery is a fixed-price contract that is
not affected by the NYMEX settlement price. This argument is flawed. The economic
impact of the settlement price is either beneficial or detrimental to market participants
who entered or exit the market during the period of manipulation by virtue of the true up
of the settlement price *vis a vis* their margin accounts. In other words the settlement price
will have a financial impact on the participant. Moreover, a physical transaction agreeing
to pay a settlement price is hurt if that price is affected by manipulation.

[103] 18 C.F.R. § 1c.1.

[104] As President of Amaranth Advisors Calgary, U.L.C., Hunter was responsible

Docket No. IN07-26-004                                                           78

Ex. S-175. On the witness stand, Hunter testified that this type of conduct would
be inappropriate. Tr. at 449-50. Additionally, Hunter has not been forthright with
this tribunal. Hunter's explanations of his conduct are not credible and amount to
after-the-fact defenses of his actions. Hunter held executive level positions at
Amaranth. Accordingly, his conduct warrants close scrutiny due to his position.

213.    There is no question that market manipulation harms the market. As Dr.
Kaminski testified, manipulation that took place in this case diluted price
discovery and affected hedging. Price discovery and hedging depend on pricing
fundamentals and valid predictions about future values, and are impacted by
manipulation since the prices then are not connected to fundamentals. Ex. S-1 at
53-55. The manipulation also impacted producers of natural gas who sold around
this time frame using natural gas futures contract price as a price benchmark since
they were paid less than the market price for their gas. Tr. at 913-20; Ex. S-10 at
12-13.

214.    Enforcement Staff points out that Hunter was uncooperative during the
investigation, failing to appear at a deposition and refusing to give sworn
testimony. Finally, although Amaranth had a compliance manual in place, the
violation still occurred and Amaranth did not self report the violation.
Accordingly, it appears that Hunter does not deserve any credit for reduction of his
penalty.


**IV. CONCLUSION**

215.    In this case Enforcement Staff has met its burden of proof.[105] The evidence
shows that in February, March and April 2006, Hunter's trades were unique.
Hunter's explanations of his conduct are not credible. Therefore, it is concluded
that Hunter intended those trades solely for the benefit of Amaranth, he intended
to lower the settlement price in those three months in order to benefit the book's
positions in other markets. Consequently, it is found that Hunter's conduct was
fraudulent, with the requisite scienter and with reckless disregard to jurisdictional
transactions.[106] Accordingly, all three prongs of the Anti-Manipulation Rule have

---

of ensuring employee knowledge of and compliance with this manual.

[105] On January 11, 2010, Enforcement Staff filed a declaration in compliance with
the recently issued Policy Statement on Disclosure of Exculpatory Materials, 120 FERC ¶
61,248 (December 17, 2009) (Brady Policy Statement).

[106] Amaranth dominated trading in the U. S. financial market in 2006. It
frequently held 40 percent or more of the open interest in natural gas futures in a
particular contract month. Its massive trading "moved prices and increased price

Docket No. IN07-26-004                                                79

been met and it is concluded that Hunter violated Section 1c.1 of the
Commission's Rules.

216.    This order is subject to review by the Commission on exceptions or on its
own motion, as provided by the Commission's Rules of Practice and Procedure.


                                        Carmen A. Cintron
                            Presiding Administrative Law Judge

---

volatility."  Staff Report, *Excessive Speculation in the Natural Gas Market* (2007) *supra*
note 37, at 114, 119.  The conclusions in this decision supported by the record in this case
are consistent with the findings in the Senate Report.

Exhibit 2

182

1                        BEFORE THE

2          FEDERAL ENERGY REGULATORY COMMISSION

3

4

5     - - - - - - - - - -x

6     IN THE MATTER OF:  :  Docket Number

7     BRIAN HUNTER        :   IN07-26-004

8     - - - - - - - - - -x

9

10                         Hearing Room 6

11                         Federal Energy Regulatory

12                          Commission

13                         888 First Street, NE

14                         Washington, DC

15

16                         Tuesday, August 18, 2009

17

18       The above-entitled matter came on for hearing, pursuant

19    to notice, at 10:08 a.m.

20

21    BEFORE:

22          HONORABLE CARMEN CINTRON

23          ADMINISTRATIVE LAW JUDGE

24

25

```
1              PRESIDING JUDGE:  This is for King, Kaminski,

2     and Kaminski.  What objections are you reserving?

3              MR. MENCHEL:  We filed a motion to strike

4     certain portions --

5              PRESIDING JUDGE:  And I denied that this

6     morning.

7              MR. MENCHEL:  I understand.

8              PRESIDING JUDGE:  The exhibits are admitted into

9     evidence, and none of them have any identification as

10    protected documents.  All right.

11             (Exhibits S-1, S-10, and S-11 received.)

12             PRESIDING JUDGE:  Proceed, Mr. Mullins.

13             MR. MULLINS:  We call Mr. Hunter.

14             PRESIDING JUDGE:  Please proceed to the stand,

15    Mr. Hunter.

16    Whereupon,

17                     BRIAN J. HUNTER

18    was called as a witness and, having first been duly sworn,

19    was examined and testified as follows:

20             PRESIDING JUDGE:  Go ahead, Mr. Mullins.

21                  DIRECT EXAMINATION

22             BY MR. MULLINS:

23        Q    Please state your name for the record.

24        A    Brian Hunter.

25        Q    Mr. Hunter, it's true, is it not, that on
```

(FERC Hearing)  Hunter, Brian  (3)