UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | 07 Civ. 6682 (RA) |
| v. | ECF CASE |
| BRIAN HUNTER, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE CLOSURE OF AMARANTH**

U.S. COMMODITY FUTURES TRADING
    COMMISSION
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9762

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or the "Commission") submits this memorandum of law in opposition to Defendant Brian Hunter's Motion *in Limine* to Exclude Evidence of the Closure of Amaranth.  Docket No. 105 (appearing on Docket as Defendant's First Motion *in Limine*).

The Commission respectfully submits that Hunter's motion should be denied because evidence of Hunter's risky and massive trading bets leading up to the time of Amaranth's collapse is probative of his intent to engage in manipulative trading on the dates in question, and is thus admissible under Federal Rule of Evidence ("FRE") 404(b).

## BACKGROUND

The Commission's complaint alleges that Hunter, as agent and employee of Amaranth Advisors LLC and as President of Amaranth Advisors (Calgary) ULC (collectively, "Amaranth"), intentionally and unlawfully attempted to manipulate the price of natural gas futures contracts on the New York Mercantile Exchange ("NYMEX") in February and April 2006.  *See*, *e.g.*, Complaint ¶¶ 2, 23.  The evidence will show that Hunter engaged in a scheme to manipulate the price of NYMEX natural gas futures contracts by selling large amounts of such contracts near the close of trading on the final trading day, with the intent to lower natural gas futures prices in order to benefit the massive short position that Amaranth held in natural gas swaps.[1]  The Commission, in requesting relief from this Court, seeks, *inter alia*, an order of permanent injunction to enjoin such prohibited acts and practices and compel compliance with the Act, alleging that "there is a reasonable likelihood that [Hunter] will continue to engage in the acts and practices alleged in this Complaint or similar acts and practices" in the future. Complaint ¶¶ 5-6.

---

[1] The value of the natural gas swaps positions was derived from settlement prices of the NYMEX natural gas futures contracts on the days in question.

The story behind Amaranth's collapse, one of the largest in hedge fund history, has been widely publicized. As head natural gas trader at Amaranth, Hunter earned over $100 million in salary and bonuses in 2005. However, his risky and oversized trading bets ultimately led to Amaranth's demise in September 2006 after losing over $6 billion. As the Second Circuit recently observed in related class action litigation, the "Senate investigation . . . conclude[d] that Amaranth, in the months leading up to its demise, had taken positions in natural gas futures and swaps so massive that its trading directly affected domestic natural gas prices and price volatility." *In re Amaranth Natural Gas Comm. Litig.*, 730 F.3d 170, 172 (2d Cir. 2013) (citing *Staff Report of S. Permanent Subcomm. on Investigations, Comm. on Homeland Security and Governmental Affairs, 110th Cong., Excessive Speculation in the Natural Gas Market* 6 (2007) ("Senate Report")).

Seeking to keep the jury in the dark about the fact that his risky trading led to Amaranth's downfall, Hunter has filed a motion *in limine* to exclude evidence regarding the collapse of Amaranth in September 2006, arguing, essentially, that (i) evidence of Amaranth's collapse and resulting investor losses in September 2006 is not relevant, under FRE 401, to establish whether Hunter attempted to manipulate the market in February and April 2006; and (ii) even if such evidence was relevant, it should be excluded under FRE 403 because any probative value would be substantially outweighed by the likelihood that such evidence would confuse and mislead the jury.

Hunter's argument is meritless. The Commission does not intend to introduce evidence of Amaranth's closure to establish investor losses. Rather, evidence of Hunter's risky and massive trading bets in the time frame leading up to Amaranth's closure is admissible under FRE 404(b) because it is probative of Hunter's intent to engage in manipulative trading on the days in

2

question. Indeed, Hunter claims that he lacked the requisite intent to affect the price of natural gas futures contracts because he is a risk-averse trader. In particular, with respect to the April 2006 trading, Hunter contends that he had a legitimate business reason to enter the trades – *i.e.*, to reduce Amaranth's risk and exposure to natural gas positions – rather than to drive down futures prices.[2] However, Hunter continued to make risky and massive bets in natural gas futures and swaps in the time frame leading up to Amaranth's collapse after losing over $6 billion, which undermines Hunter's proffered excuse and is thus probative of his intent to engage in market manipulation. Also, as explained below, the fact that Amaranth's natural gas spread position ballooned in the months after April 2006 – indeed, Amaranth's positions grew so large that Amaranth ultimately had difficulty meeting margin calls when those positions incurred losses – also belies Hunter's *post hoc* explanation that his April trading "was the result of a business decision that was based on the need to reduce [Amaranth's] overall natural gas positions." *See* Amended Declaration of Brian Hunter ¶¶ 12-13, in Opposition to the Commission's Motion for Summary Judgment (Docket No. 87) (filed under seal).

Moreover, several of Hunter's proposed exhibits contain natural gas futures trading data up through September 2006 and beyond and thus introduction of such evidence at trial by Plaintiff will not prejudice Hunter.

Under these circumstances, evidence of subsequent acts leading up to Amaranth's collapse is properly admissible under Rule 404(b).

## ARGUMENT

Pursuant to FRE 404(b), evidence of "other acts" may not be offered "to prove the character of a person in order to show action in conformity therewith," but may be admissible for

---

[2] *See, e.g.,* Joint Proposed Jury Instructions, Defendant's Proposed Jury Instructions to Which Plaintiff Objects, Defendant's Twelfth Request to Charge at 43-44 (Docket No. 103).

other purposes, such as proving "knowledge or intent." *U.S. v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998) (internal quotations and citations omitted). The Second Circuit has interpreted FRE 404(b) as an "inclusionary rule" which permits the admission of "other acts" evidence "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (citations and internal quotation marks omitted).[3] Moreover, the Second Circuit has made clear that "'[s]ubsequent act' evidence may be admitted under Rule 404(b)" and "[t]he fact that the evidence involved a subsequent act rather than prior act is of no moment." *Germosen*, 139 F.3d at 128 (affirming trial court's admission of evidence relating to the default of defendant's travel agency subsequent to his arrest, finding the evidence was directly relevant to the charged conspiracy to engage in fraudulent scheme to sell airline tickets from travel agencies on the verge of bankruptcy in order to keep the proceeds of the sales without remitter to the air carrier's representatives).

In order to assess whether evidence of "other acts" is admissible under FRE 404(b), a court must apply a four-part test. The court must determine whether the evidence is "(1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial." *U.S. v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681 (1988)). "In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction." *Id.*

---

[3]   Rule 404(b) applies equally to civil and criminal cases. *See* Fed. R. Evid. 404(b). Adv. Comm. Notes (2006 Amendments) ("The admissibility standards of Rule 404(b) remain fully applicable to both civil and criminal cases.").

Here, evidence of subsequent acts – namely, Amaranth's collapse in September 2006 and the role of Hunter's risky trading leading to Amaranth's collapse – should be admitted as the evidence satisfies the criteria established by this four-part test.

### A. Evidence of Amaranth's Collapse Is offered For A Proper Purpose

Evidence of Hunter's risky trading leading up to and including Amaranth's collapse is being offered for the purpose of establishing his intent to attempt to affect the price of natural gas futures contracts in February and April 2006. As noted, Rule 404(b) squarely contemplates the admission of subsequent acts evidence to show intent. Fed. R. Evid. 404(b).

### B. Evidence of Amaranth's Collapse is Relevant to Prove Intent

Evidence of Hunter's subsequent risky trading is directly relevant to the issue of intent. Hunter maintains that he had legitimate business reasons to enter into the trades at issue and thus did not have the requisite intent to affect the price of natural gas futures contracts. Hunter has asserted that, generally, he traded spreads instead of outright futures (*i.e.,* individual futures contracts) because trading outrights involves too much risk. Hunter has also described his purported aversion to risk: "the nature of the Amaranth portfolio under [his] direction—a series of correlated spreads—precludes the notion that I would ever intentionally try to increase the value of the portfolio by attempting to depress the price of a particular expiring futures contract." Amended Declaration of Brian Hunter ¶ 3, filed in Opposition to the Commission's Motion for Summary Judgment (Docket No. 87) (filed under seal). Hunter continued that "[a]s a trader at a hedge fund, the only concern [he has] is how much money the *portfolio* makes or loses as a whole. Because my portfolio is based on spreads rather than on much riskier outright positions (which some traders do engage in), my portfolio does not make or lose a material amount of money based on the movement in price of one month (prompt month or otherwise)." *Id.*

5

Although Hunter purports to have traded spreads instead of outright futures contracts because of the increased risks associated with outright positions, Hunter's trading leading to the collapse of Amaranth after losing over $6 billion tells a much different story. Far from taking on less risk, Hunter continued to increase the size of Amaranth's natural gas positions after April 2006, making large and risky bets in the time frame leading up to Amaranth's collapse. Indeed, trading data suggests that Hunter generally continued to increase the size of his positions in natural gas futures and swaps after April 2006. *See In re Amaranth Nat. Gas Comm. Litig.*, 703 F.3d at 172 (discussing Senate Report); Senate Report at 77-78 ("In June and July 2006, Amaranth did not, however, pare down its spread positions; it enlarged them…By the end of July, for example, Amaranth had increased its long position for January 2007 to nearly 80,000 contracts…[,] an extraordinary large position in a single futures month.").[4]

For these reasons, the evidence of trading subsequent to April 2006 resulting in Amaranth's demise undermines Hunter's explanation and, thus makes it "directly relevant to [d]efendant's claimed lack of intent," *Germosen*, 139 F.3d at 128. As such, the facts in this case are significantly different from those cited by Defendant. *See* Def. Mem. of Law 3-4 (*citing Plew v. Ltd. Brands, Inc.*, 08 CIV. 3741 LTS MHD, 2012 WL 379933, *8 (S.D.N.Y. Feb. 6, 2012) (refusing to admit evidence in patent infringement lawsuit concerning defendants' decision not to seek indemnification from a third party after being sued by plaintiff; because the questions before the jury were whether plaintiff's patent was valid and whether defendants' product infringed on the patent, evidence concerning the indemnification agreement risked "inviting a mini-trial on an issue that is both legally inconsequential and potentially unfairly prejudicial");

---

[4]   According to the Senate Report, "[t]he amount of natural gas represented by a position size of 80,000 natural gas contracts for January 2007 is nearly equal to the entire amount of natural gas that was actually used by U.S. residential consumers nationwide during January 2007." Senate Report at 78.

*United States v. Morel*, 751 F. Supp. 2d 423, 431-32 (E.D.N.Y. 2010) (refusing to admit evidence in cocaine smuggling case concerning government's initial decision not to prosecute defendant; evidence "presents a substantial risk of confusing and misleading the jury" because the defendant's confession had been suppressed, which meant that the government would be unable to offer any explanation to the jury for its change in course); *United States v. Al Kassar*, 582 F. Supp. 2d 498 (S.D.N.Y. 2008) (refusing to admit classified material into evidence relating to defendants' past contact with government officials; the circumstances were not, on their face, analogous to charges at issue and "would require a trial within a trial before the jury could determine whether there was any meaningful analogy at all")).

Moreover, evidence of Hunter's subsequent trading is also directly relevant to the Commission's request to enjoin Hunter from engaging in manipulative trading in the future. As noted, the Commission has alleged that "there is a reasonable likelihood that [Hunter] will continue to engage in the acts and practices alleged in this Complaint or similar acts and practices," *see* Complaint ¶ 6, particularly because Hunter contends that his trading was justified by legitimate business reasons.

### C.     Evidence of Amaranth's Collapse is More Probative than Prejudicial

The probative value of the subsequent acts evidence substantially outweighs any potential for prejudice or confusion. There is a very low risk that Hunter will be prejudiced by the admission of evidence of trading leading up to Amaranth's collapse in September 2006. As noted, the Commission is not seeking to establish investor losses nor hold Hunter responsible for them. Rather, evidence of subsequent trading is highly probative of Hunter's intent and rebuts his contention that he was engaging in risk-reducing trades and that he was attempting to reduce the size of Amaranth's natural gas positions in April 2006.

Moreover, Hunter himself has submitted a number of proposed exhibits which cover the time frame leading up to Amaranth's collapse in September 2006, and thus he cannot complain about the admission of evidence subsequent to the April 2006 time frame.[5]  For example, Hunter's exhibits include "Hunter Position Reports Prepared by Donohoe From February 21, 2006 – August 14, 2006."  *See* Docket No. 103.  Hunter has also submitted "Exhibits 1-16 to Dr. Michael Quinn's Report dated March 27, 2009," which were prepared by Hunter's expert and include analyses of trading data ranging from July 2004 to January 2008.  *See* Docket No. 101.

### D.      Limiting Instructions, if Necessary, Can be Given to the Jury

Any potential prejudice or confusion arising out of the admission of evidence of Hunter's subsequent trading in the time frame leading up to Amaranth's collapse can be cured with a cautionary instruction to the jury.  For example, the Court could instruct the jury that evidence of Hunter's subsequent trading shall not be admissible to show that he engaged in market manipulation subsequent to April 2006, but rather solely to establish his intent to attempt to affect the price of natural gas futures contracts on the dates in question.

---

[5]     To the extent that the Commission is permitted to introduce evidence of Hunter's trading in the time frame leading up to Amaranth's collapse, the Commission does not object to Hunter's introduction of certain trading data solely because such evidence post-dates April 2006. However, the Commission otherwise preserves its objections to Hunter's exhibits.

**CONCLUSION**

For the reasons stated herein, the Plaintiff respectfully requests that the Court deny Hunter's motion *in limine* to exclude evidence of the closure of Amaranth and Hunter's trading that led to Amaranth's collapse.

Dated: November 15, 2013
New York, New York

>Respectfully submitted,
>ATTORNEYS FOR PLAINTIFF
>U.S. COMMODITY FUTURES TRADING
>COMMISSION
>
>
>/s/ David W. MacGregor
>David W. MacGregor
>Chief Trial Attorney
>Manal Sultan
>Deputy Director
>Commodity Futures Trading Commission
>140 Broadway, 19th Floor
>New York, NY 10005
>(646) 746-9700
>(646) 746-9762 (direct dial)
>(646) 746-9940 (facsimile)
>dmacgregor@cftc.gov