UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
:
U.S. COMMODITY FUTURES TRADING    :   07 Civ. 6682 (RA)
COMMISSION,                       :
:
Plaintiff,                        :
:
v.                                :
:
BRIAN HUNTER,                     :
:
Defendant.                        :
:
---------------------------------------------------------x

**DEFENDANT BRIAN HUNTER'S MEMORANDUM OF LAW IN RESPONSE TO THE CFTC'S PRETRIAL MEMORANDUM OF LAW**

KOBRE & KIM LLP

800 Third Avenue
New York, New York 10022
Tel +1 212 488 1200

*Counsel for Brian Hunter*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................2

    A.    The Evidence Establishes That Hunter Engaged in the At-Issue Trades for Business Reasons Having Nothing to Do with Lowering the Settlement Price ..............................2

        1.  The February 24, 2006 Trading ................................................................................2

        2.  The April 26, 2006 Trading ......................................................................................5

    B.    The CFTC Must Prove That the At-Issue Trades Would Not Have Occurred But For Hunter's Alleged Manipulative Intent on the Relevant Dates ..........................................9

    C.    Adopting the Standard Proposed by the CFTC Would Deprive Hunter of His Constitutional Right to Due Process ................................................................................11

## TABLE OF AUTHORITIES

<div align="right">**Page(s)**</div>

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 588 (1985)....................................10

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) ..........................................................................................................13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .........................................10

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)........................................................................12

*Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986).................................................13

*General Elec. Co. v. U.S. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ....................................................13

*In re Indiana Farm Bureau Coop. Assoc.*, CFTC No. 75–14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982) ........................................................................................................... 10-11

*Securities and Exchange Commission v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007)..... 9, 11-12

*United States v Mulheren*, 938 F.2d 364 (2d Cir. 1991)................................................................12

*United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998).................................................13

**Statutes**

Sherman Anti-Trust Act....................................................................................................................10

Commodity Exchange Act................................................................................................... *passim*

Defendant Brian Hunter, by and through his counsel Kobre & Kim LLP, respectfully submits this memorandum of law in response to Plaintiff the United States Commodity Futures Trading Commission's (the "CFTC") pretrial memorandum of law [DE 109] (the "CFTC Pretrial Mem.").

## PRELIMINARY STATEMENT

A review of the contemporaneous emails, IMs and trading records from 2006 proves that Amaranth's trading on the two days at issue was for lawful business purposes that had nothing to do with creating a lower settlement price—let alone an artificial one. In the face of this irrefutable evidence, the CFTC's response is to fall back to the untenable legal position that manipulative intent need not be the sole, principal or primary intent (CFTC Pretrial Mem. at 13) of a defendant accused of attempted price manipulation under the Commodity Exchange Act ("CEA"). The CFTC incorrectly asserts that a trader can be found to have violated the CEA if manipulation was just one of many reasons behind the at-issue trading, regardless of whether or not the trader's primary purpose was a legitimate, non-manipulative business purpose and regardless of whether or not there was a causal connection between the trades and the alleged manipulative purpose. The CFTC's position, however, is unsupported by either case law or common sense.

Evidence of a non-manipulative business reason for allegedly manipulative trading would refute allegations of intent to create an artificial price or a price that does not result from normal economic forces. This is so even if there is also evidence that an actor may at the same time have hoped and expected that his trading would cause a price movement beneficial to him and was even partially motivated by such result. The CFTC must therefore establish that "but for" the manipulative purpose, the allegedly unlawful trading would not have occurred at all. This is

so because if the evidence establishes that the same trades would have occurred regardless of any manipulative intent, then precisely the same price would have certainly resulted—a price that could not be considered artificial under any circumstances because it would be the result of normal, lawful, non-manipulative economic forces.

## ARGUMENT

**A. The Evidence Establishes That Hunter Engaged in the At-Issue Trades for Business Reasons Having Nothing to Do with Lowering the Settlement Price**

The CFTC has alleged that Hunter caused Amaranth to trade futures during the final settlement period of two months—February and April—in order to lower the settlement price to benefit a different position Amaranth held on another exchange. It is undisputed that Amaranth traded approximately 3000 prompt month futures in the close during the two at-issue settlement periods. The CFTC's evidence of intent to manipulate rests on the fact that Amaranth had expiring short swap positions that would rise in value from a reduction in the settlement price of futures contracts on the two expiry days in question. However, upon review of contemporaneous emails, instant messages ("IMs") and trading records, the evidence shows that the alleged trading on those two days was for specific business purposes that had nothing whatsoever to do with lowering the settlement price.

  1. The February 24, 2006 Trading

The impetus for Hunter's trading strategy on February 24, 2006 was a very unusual options settlement during the last two minutes of the close the previous day, which led him to devise a trading strategy having nothing to do with impacting price, but instead designed to see if in the aftermath of the unusual options settlement, Amaranth's brokers could obtain futures prices that on average exceeded the settlement price simply by trading the futures ratably throughout the settlement period.

Contemporaneous IMs corroborate Hunter's explanation for the trades. The correspondence shows that Hunter and the many people with whom he corresponded that day noticed a very unusual 2-minute options settlement on February 23, which caused the March/April spread to contract wildly. *See, e.g.,* DX 7, 8, 11 and 17. In fact, it was such an unusual and significant event in the market that NYMEX opened an investigation to determine the cause of the strange option settlement on February 23. *See* DX 6. At the end of the day on February 23, Hunter decided to try to sell futures ratably or "market on close" ("MOC") the next day into a period of aggressive futures buying that, based on Hunter's experience, he anticipated would occur on February 24 as a result of the highly unusual option price movements of the 23rd.[1]

Hunter's testimony is not the only evidence on this point. Contemporaneous IMs corroborate Hunter's explanations and show that it was indeed this unusual options settlement that was the impetus to sell futures ratably in the close. For example, in one IM sent shortly after the rare option settlement on the 23rd, Hunter told his execution trader to "make sure we have lots of futures to sell MoC tomorrow [on February 24]." *See* DX 14. Importantly, this direction came in the very same IM in which Hunter and the trader had been discussing this unusual options settlement which had drawn so much attention from so many participants in the market and from the exchange itself. *See id*.

The evidence demonstrates, as Hunter has explained in testimony, that he engaged in an "experiment" to take advantage of this expected aggressive futures buying in the close to see if he could sell the 3000 futures ratably over the 30-minute settlement period, yet still end up with an average selling price above the final settlement price, which is a weighted average of all

---

[1] Hunter has testified previously in detail precisely why the options settlement of the 23rd was likely to cause aggressive futures buying during the settlement period the next day, but such technical detail is not necessary for the purposes of this response.

3

trades during the 30 minutes.  Hunter believed that Amaranth might be able to "beat" the settlement by selling ratably over the entire 30 minutes because the futures buying pressure that he expected would lead to upward pricing pressure, which would in turn result in the broker selling the futures in the close at an average price that was several cents higher than the final NYMEX settlement price.  There was little if any financial risk to conducting this small experiment; and if Hunter was correct, it would potentially be valuable trading information for Amaranth to have for the future.

Indeed, in an IM sent approximately 30 minutes before Hunter sold the futures during that settlement period, another futures trader asked Hunter why he was selling futures contracts in the close.  Hunter responded that his purpose was to conduct an experiment *based on the "options [settlement] yestrday* [sic]," which directly corroborates his non-manipulative and perfectly lawful explanation as to why he ordered the trades   See DX 45.  When reading the two IMs set forth above together, it is evident that it was indeed the very unusual options settlement, not price manipulation, that was the impetus for the futures trading Hunter directed on February 24.  This real-time evidence shows Hunter's state of mind just before the relevant trading and his legitimate motivation for engaging in such trading.[2]

Additional evidence also severely undermines any inference of manipulative intent.  Hunter chose to use a "MoC" order, which gives Amaranth's outside, independent floor brokers discretion as to the timing of their sales, in order to get the best (*i.e.*, highest) price while selling

---

[2] The CFTC cites snippets of IMs out of context to bolster its claims with no testimony to support the meaning the CFTC ascribes to them.  For example, the CFTC claims that Hunter and Matthew Donohoe celebrated their successful manipulation in an IM stating, "I am flexing here" (*see* CFTC Pretrial Mem. at 14), when in fact all the testimonial evidence establishes that "flexing" refers to Hunter's ability to predict the 72 month price curve, a task he and other traders tried to do every single trading day. Similarly, the CFTC claims that an IM where Hunter passively states that he "need[s] H to get smashed on settle" (CFTC Pretrial Mem. at 14) indicates that Hunter was himself attempting to manipulate the March settlement price, whereas it says no such thing and no testimonial evidence supports the CFTC's interpretation.  The evidence establishes that the IM is in fact about the summer/winter spread (in trader parlance, "H" in that context is short hand for "summer") and Hunter's hope about the movement of the summer/winter spread.

4

ratably over the entire settlement period, rather than instructing brokers to sell contracts immediately at whatever price was obtainable at the time. Hunter's instruction to brokers to sell ratably (in "roughly equal amounts") during the thirty-minute settlement period is likewise inconsistent with any inference that he pressured brokers to unload large numbers of contracts early in the settlement period to signal to buyers to hold off bidding and drive the price down.

Indeed, the evidence will establish that one cannot even successfully move price in a desired direction by selling a finite amount of futures in the settlement period on an expiry day at prevailing market prices (the only conduct of which Hunter is accused), which in-and-of-itself is reason enough that Hunter, an experienced market participant, would not have attempted to do so.

2. The April 26, 2006 Trading

Contemporaneous correspondence regarding April 2006 proves that on April 26, 2006, Hunter also sold futures solely for a lawful, non-manipulative business purpose, and that he did so as part of a trading strategy he was instructed to undertake by his superiors at Amaranth.

Hunter sold futures during the settlement period on April 26, 2006. This was part of a risk reduction strategy whereby Hunter was instructed by his superiors at Amaranth to reduce the overall size of the natural gas book. Indisputable documentary evidence proves that at the end of April, Amaranth's Executive Committee (which did not include Hunter) made the decision to reduce risk in Amaranth's natural gas portfolio (also known as his "book") by substantially reducing positions in the summer/winter spread, in which Amaranth held large positions that were generally short summer and long winter. Amaranth wanted to take roughly $1 billion out of its natural gas portfolio and put it elsewhere in the fund, and to do so needed to reduce the size of the natural gas book, which is sometimes also referred to as "reducing risk." That this was


what Amaranth and Hunter were doing is clear and indisputable. For example, an email sent five days before the at-issue trade from the energy desk's risk manager demanded that Hunter and his execution trader ". . . give me the trades that you are going to do to reduce your position by 25%." *See* DX 71.

Contemporaneous emails and IMs also establish that Hunter preferred not to reduce these positions because it is difficult to do in such large amounts and because he believed that Amaranth would do better financially by sticking with the current position. However, because he was ordered to reduce the position, he complied, and trading futures in the closing period at the end of April was simply a part of that portfolio reduction effort.

As Hunter and several others have testified, reducing a $4 billion book by 25% based on spreads is extraordinarily complex and fraught with risk itself, should the marketplace become aware of the effort by a large market participant and try to exploit it. It was therefore critical to reduce the portfolio in a way that would not expose the book to even more risk. Thus, various reduction strategies were considered and one was chosen: Hunter would reduce Amaranth's natural gas positions by proportionately reducing both legs of the summer/winter spread. There were three basic ways of reducing the spread in a balanced manner: (1) sell the spread directly to one counterparty; (2) sell the legs of the spread separately; or (3) expire one leg of the spread (e.g., the summer leg) through swaps that expire on the expiry day and sell the other leg (e.g., the winter leg) while holding futures to sell or roll in the close depending on how much winter you were able to sell.

Amaranth ultimately chose the third option for a number of business reasons, including that it prevented the market from learning that Amaranth was attempting to sell off a large position of its summer/winter spread (which could result in devastating losses to Amaranth).

IMs and trade data from NYMEX conclusively show that Amaranth engaged in this book reduction strategy on April 26.

The evidence shows that stock-piling 3000 May futures allowed Hunter the flexibility to execute that particular strategy but also protect against the possibility of not being able to sell as much winter length as he expected, which was a key part of the strategy.  In such case, he would have to sell the futures in the close, rather than roll them to the next month.  As part of the strategy, Hunter would only know whether he needed to roll or sell these futures towards the end of the settlement period.  Because Amaranth was not able to sell as much winter length as Hunter would have liked, he caused Amaranth to sell (rather than roll) the May futures in the last eight minutes of the settlement period.  The IMs and exchange data prove that Amaranth was indeed selling as much winter length as it could during the day, right up to the last eight minutes of the settlement period, but eventually ran out of time to sell as much as it needed to.

In any event, it is important to note that waiting until the final eight minutes of the settlement period to sell futures contracts—which the CFTC alleges to be proof of manipulative intent—actually *reduces the likelihood of a lower settlement price*.  This is so because the settlement price is based on the volume weighted-average of all trades during that 30-minute period and by waiting until the last eight minutes, 22 minutes of trading has already occurred that cannot be affected by the trades that follow in the last eight.  The CFTC mistakenly alleges that waiting until the last eight minutes of the settlement was done in order to depress the settlement price as much as possible.  This is simply an incorrect understanding of the way settlement prices are calculated.

The CFTC's case is premised on the mistaken notion that Hunter purportedly dumped these 3000 futures in the closing period on April 26 not as part of a trading strategy, but rather in

7

order to cause a lower settlement price for the expiring May futures contract so as to benefit Amaranth's short May swap positions (which themselves settled at the end of day futures settlement price). However, the real-time evidence proves beyond question that not only was Hunter ordered to reduce the book, but also that prior to selling futures in the close, Hunter *did not want a lower close*. For example, Hunter wrote to another trader just 37 minutes before the settlement period that he was "worried about a lower close." *See* DX 81. Similarly, just a few days after that close, the evidence shows that Hunter was upset about having had to expire the May swaps, the very instrument the CFTC accuses Hunter of scheming to expire at a manipulated profit. When his risk manager commented that Hunter's book had lost $40-$50 million, Hunter responded, "FYI if we hadn't expired anything off [meaning the May swaps the CFTC accuses Hunter of scheming to expire off] we'd have made a mountain of money." *See* DX 89.[3] The contemporaneous and unimpeachable evidence is directly contrary to the CFTC's theory of the case and there is no evidence whatsoever—outside the undisputed fact that Hunter sold futures that day—that the futures were sold on April 26 as part of some scheme to make a bigger profit on expiring May swaps.

In short, the contemporaneous correspondence shows beyond dispute that:

1. On April 26, Hunter caused Amaranth to trade futures in the last eight minutes of the settlement period as part of a risk reduction strategy that he was ordered by his superiors to execute on that day in order to reduce the size of Amaranth's natural gas portfolio—a non-manipulative business reason;

2. Hunter tried to avoid Amaranth selling futures in the settlement period that day; Hunter hoped to roll the futures forward into June, rather than sell them outright in the settlement;

---

[3] Although the CFTC has never charged Hunter with a false statement claim, it asserts that Hunter "supplied information contained in a false letter to NYMEX." *See* CFTC Pretrial Mem. at 11. In any event, the statement in the letter regarding the "discretion of the floor brokers" is not false and moreover, there is no evidence that Hunter provided this particular statement in the letter.

8

3. Hunter did not want a lower settlement price on April 26, the very thing he is accused of trying to bring about in order to benefit his short swap position;

4. Hunter did not want to expire off the May swaps on April 26, the very thing the CFTC accuses him of scheming to do; and

5. Hunter complained, even days later, that being forced to expire off the May swaps on April 26 lost his book $40-$50 million dollars.

All these facts—along with the other facts set forth above—establish that Hunter could not have intended to manipulate the settlement price of the May natural gas futures contracts on April 26, 2006.

### B. The CFTC Must Prove That the At-Issue Trades Would Not Have Occurred But For Hunter's Alleged Manipulative Intent on the Relevant Dates

The CFTC maintains that manipulative intent need not be the principal or primary intent of a party in order to support a finding that the party engaged in attempted manipulation in violation of the CEA. *See* CFTC Pretrial Mem. at 13. To the contrary, because manipulation in violation of the CEA requires proof of an intent to create an artificial market price, where there is more than one purpose for a trade, the CFTC must establish that "but for" an alleged manipulative purpose on the trader's part, the at-issue trades would not have occurred. *Securities and Exchange Commission v. Masri*, 523 F.Supp.2d 361, 372 (S.D.N.Y. 2007) ("The Court holds that in order to impose liability for an open market transaction, the SEC must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction").

Although *Masri* was not a commodities case brought under the CEA, the same principle applies with equal force here. This is because, by definition, the settlement price of a futures contract cannot be deemed "artificial," *i.e.* the product of forces other than normal economic forces, where there were multiple reasons for the transaction and there is insufficient evidence that the transaction would not have occurred but for the allegedly manipulative purpose. The

9

CFTC simply cannot be said to have proven that the accused intended to create an artificial price through market transactions if the CFTC has failed to establish that the exact same transactions would not have been entered into for a non-manipulative business purpose.

Accordingly, to the extent that Hunter presents credible evidence showing that he engaged in the at-issue trades for a lawful business purpose and that, even if a manipulative motive can be attributed to him, those trades would have occurred anyway, the CFTC cannot meet its burden to establish a claim of attempted manipulation under the CEA.

Requiring the CFTC to show that the offending market activity would not have occurred but for the manipulative purpose is also consistent with the law in other contexts regarding attempts to engage in unlawful market conduct, where there is a similar concern about chilling legitimate market conduct. For example, the U.S. Supreme Court has held that under the anti-monopolization prohibition in Section 2 of the Sherman Anti-Trust Act, a plaintiff must produce evidence showing that the overwhelming, or perhaps sole, purpose of the defendant's conduct was to reduce competition in cases where a dominant firm's conduct may involve a mixture of potentially pro-consumer and competition-restriction actions.[4]

Likewise, even the CFTC has itself previously expressed concern about adopting a standard of manipulation that would chill legitimate business conduct. *See In re Indiana Farm Bureau Coop. Assoc.*, CFTC No. 75–14, 1982 WL 30249, at *6 (C.F.T.C. Dec. 17, 1982) (noting that in this context, the manipulative intent standard is designed to "separate[ ] otherwise lawful business conduct from unlawful manipulative activity," inasmuch as "a clear line between lawful

---

[4] *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (when refusing to grant summary judgment on Section 2 claims, acknowledging that "[l]iability turns, then, on whether 'valid business reasons' can explain Kodak's actions" and that Kodak had several business reasons that could explain its actions) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)); *Aspen Skiing Co.*, 472 U.S. at 610 (where jury had concluded that Aspen Skiing's decision to discontinue a joint marketing arrangement with its weaker competitor (Aspen Highlands) was motivated solely by its desire to "discourage its customers from doing business with its smaller rival," rejecting Aspen Skiing's appeal because the company failed to present credible evidence that its actions were motivated by any pro-consumer or efficiency concerns).

and unlawful activity is required in order to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation"). Consequently, competent evidence of a non-manipulative business reason for allegedly manipulative trading would refute allegations of an attempt to create a price that would not have resulted from normal economic forces unless the CFTC can establish that "but for" the manipulative purpose, the trades would not have been made. This is so even if there is also evidence that an actor may at the same time have wished to cause and benefit from a price movement through such conduct.

    **C. Adopting the Standard Proposed by the CFTC Would Deprive Hunter of His Constitutional Right to Due Process**

Hunter's constitutional right to due process of law would be violated if the CFTC were relieved of the burden of having to establish that the trades at issue would not have occurred "but for" the alleged manipulative intent of Hunter. That is, if this Court were to adopt the CFTC's position as the current state of the law, it would violate Hunter's right to receive adequate notice that he could be subject to punishment under the CEA for trading primarily for lawful, non-manipulative purposes. The CFTC is unable to point to anything in the CEA or in any regulation, rule or agency pronouncement during the relevant time that supports the CFTC's position or would have put a reasonable trader on notice that this was the CFTC's interpretation of the CEA.

In fact, even in the context of a manipulation claim under the securities laws, it was only *after* Hunter's alleged unlawful conduct here that any case discussed the standard to be applied where "mixed" or multiple motives are alleged to be involved. And, that case actually supports Hunter's position that a "but for" test must be applied. *See Masri*, 523 F.Supp.2d. In *Masri*, the court echoed a number of the concerns discussed above about permitting liability for attempted or actual market manipulation based on wrongful motives where a price resulted from a

transaction that was engaged in for another economic reason and cautioned against adopting a standard that would chill legitimate market activity. In particular, the court held the following:

> The Court holds that in order to impose liability for an open market transaction, the SEC must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction. The Court reaches this conclusion based on three considerations. First, in [*United States v.*] *Mulheren*, the Second Circuit accepted, with "misgivings," the government's theory that an open-market transaction could violate Section 10(b) where it was done with the "sole intent" to affect the price of securities, and not for any "investment purpose." 938 F.2d [364] . . . [,] 368 [(2d Cir. 1991)]. Because the Second Circuit accepted the government's theory only with "misgivings," then *a fortiorari*, it would find problematic a theory under which an investor could be found liable for market manipulation when only one of the investor's purposes was to alter the price. Second, if a transaction would have been conducted for investment purposes or other economic reasons, and regardless of the manipulative purpose, then it can no longer be said that it is "artificially" affecting the price of the security or injecting inaccurate information into the market, which is the principal concern about manipulative conduct. *See Ernst & Ernst* [*v. Hochfelder*], 425 U.S. [185] . . . [,] 198 [(1976)] . . . (manipulative "conduct [is] designed to deceive or defraud investors by controlling or artificially affecting the price of securities.").

*Id.* at 372-73 (emphasis in original).

While the CFTC contends that this Court has rejected Hunter's versions of the intent requirement of the CEA and has held that trading is prohibited merely "[i]f one purpose is to affect the price" (CFTC Pretrial Mem. at 13), the cases upon which the CFTC relies in no way suggest that conduct undertaken primarily for another business purpose can nevertheless be punishable under the CEA as long as the CFTC can point to *any* allegedly manipulative motive(s) or purposes at the time of the relevant conduct. In particular, none of the following cases purport, as the CFTC claims, to hold that trading is manipulative if "one purpose" is to affect the price. CFTC Mem. at 13. Rather, these cases merely recognize the uncontested principle that the actual purpose behind a given trading activity may be susceptible to conflicting interpretations or inferences. *See U.S. Commodity Futures Trading Comm'n v. Hunter*, No. 07

Civ. 6682 (BSJ) (FM), 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012); *Amaranth Advisors, L.L.C.,* 554 F.Supp.2d at 532-33.

Moreover, the cases the CFTC cites were all decided years *after* Hunter engaged in the at-issue trades and as such, they have no bearing on the issue of whether Hunter had fair notice that this would be the standard that would be applied to his conduct at the time that he acted. Courts have repeatedly recognized that, regardless of whether, in a non-penal context, the Commission's interpretation might be permissible, "a regulation cannot be construed to mean what an agency intended but did not adequately express" so as to cut off a party's rights in an enforcement proceeding, inasmuch as "statutes and regulations which allow monetary penalties against those who violate them . . . must give an [accused] . . . fair warning of the conduct [they] . . . prohibit[ ] or require[ ]." *Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154, 156-57 (D.C. Cir. 1986) (quotations and citations omitted). The question is whether "[i]f, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *General Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (citation omitted). *See also United States v. Chrysler Corp.*, 158 F.3d 1350, 1356 (D.C. Cir. 1998) (notice of interpretation was inadequate where the regulation was silent on the question, the Federal Register Notice was too general and the agency had previously taken conflicting positions).

Accordingly, if the Court were to actually adopt the standard proposed by the CFTC, it is respectfully submitted that the Court would then have to dismiss the Complaint due to a deprivation of due process because it is apparent that a reasonable person in Hunter's position during the relevant period in 2006 would not have ascertained that his alleged NYMEX futures

trading activity could expose him to liability and penalties under the CEA for attempted manipulation where his primary purpose for the trading was a non-manipulative business purpose.[5]

Dated:  November 15, 2013
       New York, New York

                                    Respectfully submitted,

                                    KOBRE & KIM LLP

                                  s/ Andrew C. Lourie

                                  Michael S. Kim
                                  Michael.Kim@kobrekim.com
                                  Matthew I. Menchel
                                  Matthew.Menchel@kobrekim.com
                                  Zaharah R. Markoe
                                  Zaharah.Markoe@kobrekim.com
                                  Pamela Sawhney
                                  Pamela.Sawhhey@kobrekim.com
                                  800 Third Avenue
                                  New York, New York 10022
                                  Telephone: +1 212 488 1200
                                  Facsimile: +1 212 488 1220

                                  Andrew C. Lourie
                                  Andrew.Lourie@kobrekim.com
                                  Leanne A. Bortner
                                  Leanne.Bortner@kobrekim.com
                                  1919 M Street, NW
                                  Washington, DC 20036
                                  Telephone: +1 202 664 1900
                                  Facsimile: +1 202 664 1920

                                  *Counsel for Brian Hunter*

---

[5] Hunter maintains and preserves for appeal his position that his rights to due process were violated when the CFTC brought the instant enforcement action based solely on open market trading at prevailing market prices, regardless of what his intent was, because there was nothing to put him on notice in 2006 that such conduct could be considered unlawful under the CEA.

14